**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
EASTERN DIVISION**

| | |
|---|---|
| THE RELIGIOUS SISTERS OF MERCY; SACRED HEART MERCY HEALTH CARE CENTER (Jackson, MN); SACRED HEART MERCY HEALTH CARE CENTER (Alma, MI); SMP HEALTH SYSTEM; UNIVERSITY OF MARY; <br><br> - and - <br><br> STATE OF NORTH DAKOTA, <br><br> *Plaintiffs*, <br><br> v. <br><br> SYLVIA BURWELL, Secretary of the United States Department of Health and Human Services; and UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, <br><br> *Defendants*. | Civ. Action No. _____ <br><br> **COMPLAINT** |

## INTRODUCTION AND NATURE OF THE ACTION

This lawsuit challenges a new Regulation ("Regulation" or "Rule") issued by the Department of Health and Human Services ("HHS") that seeks to override the medical judgment of healthcare professionals across the country. On pain of significant financial liability, the Regulation forces doctors to perform controversial and sometimes harmful medical procedures ostensibly designed to permanently change an individual's sex—including the sex of children. Under the new Regulation, a doctor must perform these procedures even when they are contrary to the doctor's medical judgment and could result in significant, long-term medical harm. Thus, the Regulation represents a radical invasion of the federal bureaucracy into a doctor's medical judgment.

HHS attempts to impose these dramatic new requirements by redefining a single word incorporated in the Affordable Care Act: "sex." For decades, across multiple federal statutes, Congress has consistently used the term "sex" to refer to an individual's status as male or female, as determined by a person's biological sex at birth. But in the Regulation, HHS redefines "sex" to include "an individual's internal sense of gender, which may be male, female, neither, or a combination of male and female, and which may be different from an individual's sex assigned at birth." 45 C.F.R. § 92.4. Thus, with a single stroke of the pen, HHS has created a massive new liability for thousands of healthcare professionals unless they cast aside their medical judgment and perform controversial and even harmful medical transition procedures. And HHS has done this despite the fact that Congress has repeatedly rejected similar

attempts to redefine "sex" through legislation, and federal courts have repeatedly rejected attempts to accomplish the same goal through litigation.

The Regulation not only forces healthcare professionals to violate their medical judgment, it also forces them to violate their deeply held religious beliefs. Plaintiffs include the Religious Sisters of Mercy, an order of Catholic religious sisters who devote themselves to works of mercy primarily in the fields of education and health care, and who serve in healthcare centers, including the two Plaintiff Sacred Heart Mercy Health Care Center clinics owned and operated by the Sisters of Mercy; SMP Health System, a Catholic Health System sponsored by the Sisters of Mary of the Presentation that fulfills the healing ministry of Jesus by operating hospitals, clinics, and nursing homes in rural North Dakota; and the University of Mary, a Catholic university that infuses Benedictine values throughout its educational experience, including its premier nursing program. These religious organizations are deeply committed to the dignity of every human person, and their doctors and nurses are trained to care for everyone with joy and compassion. They eagerly provide comprehensive care to society's most vulnerable populations, but their religious beliefs will not allow them to perform or pay for medical transition procedures that can be deeply harmful to patients. Tragically, the Regulation would force them to violate those religious beliefs and perform harmful medical transition procedures or else suffer massive financial liability. The regulation also requires that they pay for these same medical transition procedures in their health plans on pain of massive financial liability.

The Regulation also undermines the longstanding sovereign power of States such as North Dakota to regulate healthcare, ensure appropriate standards of medical judgment, and protect its citizens' constitutional and civil rights. Under this Rule, States are now required to force all healthcare professionals at state-run facilities to participate in medical transition procedures (including hormone therapy, plastic surgery, hysterectomies, and gender reassignment surgery), and to cover those procedures in the States' health insurance plans, even if a doctor believes such procedures are harmful to the patient. The Rule exposes the States to litigation by its employees and patients, despite the fact that neither Congress nor the States expressed any intent to waive the States' sovereign immunity in this area. And the Rule threatens to strip the States of billions of dollars in federal healthcare funding, jeopardizing the availability of healthcare for the nation's most vulnerable citizens.

Ultimately, this case boils down to a very simple question of statutory interpretation: Can HHS redefine the term "sex" to thwart decades of settled judicial and Congressional precedent and impose massive new obligations on healthcare professionals and sovereign States? The answer is "no," and the new Regulation must be set aside as a violation of the Administrative Procedure Act and multiple other federal laws and constitutional provisions.

## I. PARTIES

1.     Plaintiff Religious Sisters of Mercy ("Sisters of Mercy") is a Catholic order of religious sisters devoted to works of mercy, including offering healthcare to the underserved. Located in Alma, Michigan, the Sisters of Mercy is a nonprofit

corporation incorporated in 1973. The Sisters of Mercy are an international institute of pontifical right—that is, officially approved by the Vatican—which traces its roots back to Venerable Catherine McAuley in Dublin, Ireland in 1831.

2.     Each Sister of Mercy has chosen to follow Jesus Christ by taking a lifetime vow to serve the poor and sick by offering care for the whole person, and working to heal those who are suffering from physical, psychological, intellectual, and spiritual woundedness. The Sisters of Mercy offer a variety of apostolic services. One aspect of their mission is fulfilled through "comprehensive health care" services, which the Sisters of Mercy understand as "the complete care of the total human person" which "seeks to bring about that profound and extensive healing which is a continuation of the work of redemption."  Consistent with this mission, some of the Sisters of Mercy serve in healthcare facilities, such as hospitals, throughout the country. These Sisters include licensed doctors, including a surgeon, and other healthcare professionals. In accordance with their vows, the Sisters of Mercy offer healthcare services in accordance with the Ethical and Religious Directives of the United States Conference of Catholic Bishops.

3.     The Sisters of Mercy own and operate two clinics, Plaintiff Sacred Heart Mercy Health Care Center in Alma, Michigan, and Plaintiff Sacred Heart Mercy Health Care Center in Jackson, Minnesota. Both are nonprofits incorporated in their respective states. The Sisters of Mercy also run their clinics in accordance with the Ethical and Religious Directives of the United States Conference of Catholic Bishops.

Some of the Sisters of Mercy serve as licensed doctors, nurses, or other healthcare professionals who perform medical services in these clinics.

4.      Plaintiff Sisters of Mary of the Presentation Health System ("SMP Health System") is a non-profit Catholic health system headquartered in Fargo, North Dakota. It was founded and is operated by the Sisters of Mary of the Presentation. The Sisters believe that Catholic health care services and programs are ecclesial in nature, mandated by the Church to carry on the healing ministry of Jesus.

5.      As part of that healing ministry, SMP Health System provides a variety of health care services throughout North Dakota, including hospitals, clinics, long-term care facilities, and senior housing.

6.      SMP Health System's mission statement is as follows: "SMP Health System, inspired by the Sisters of Mary of the Presentation, provides leadership to its Catholic health care ministries as they work to fulfill the healing mission of Jesus." In accordance with that mission, the Sisters of Mary run the health care ministries in accordance with the Ethical and Religious Directives of the United States Conference of Catholic Bishops.

7.      Plaintiff University of Mary is a Roman Catholic Benedictine University with its primary campus in Bismarck, North Dakota. The University of Mary also has campuses throughout North Dakota and in several other states, Arequipa, Peru, and Rome, Italy. The University offers more than 60 degree programs, including nursing, theology, pastoral ministry, and Catholic studies.

8.      The University strives to infuse all of its programs with Christian, Catholic, Benedictine values to prepare its students to be ethical leaders in their careers and their communities. The University welcomes students of all faiths and backgrounds, and, as is fundamental to its mission, upholds Catholic teaching in all of its programs and services. The University provides health benefits to its employees through a self-funded health plan. The University offers a nursing program and many allied health programs, including physical therapy, occupational therapy, speech and language pathology, radiologic technology, respiratory therapy, exercise science, athletic training, and social work.

9.      The State of North Dakota oversees and controls several agencies and a healthcare facility that receive federal funding administered by HHS. For example, North Dakota State Hospital, located in Jamestown, is a state-run hospital that accepts HHS-administered funding and provides psychiatric and chemical dependency treatment to North Dakotans who require in-patient or specialized residential care. Its clinical disciplines include psychiatry, psychology, nursing, social work, addiction counseling, chaplaincy, education, occupational therapy, therapeutic recreation, and vocational rehabilitation. North Dakota also employs many healthcare employees through its constituent agencies, and provides health benefits to those employees and their families.

10.     Defendants are appointed officials of the United States government and United States governmental agencies responsible for the issuance and implementation of the challenged Regulation.

11. Defendant Sylvia Burwell is the Secretary of the United States Department of Health and Human Services. She is sued in her official capacity only.

12. Defendant the United States Department of Health and Human Services is the agency that promulgated and now enforces the challenged Regulation.

## II. JURISDICTION AND VENUE

13. The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1361.

14. Venue lies in this district pursuant to 28 U.S.C. § 1391.

## III. FACTUAL BACKGROUND

### A. The Affordable Care Act and Related Federal Statutes.

15. In March 2010, Congress passed, and President Obama signed into law, the Patient Protection and Affordable Care Act, Pub. L. 111-148 (March 23, 2010), and the Health Care and Education Reconciliation Act, Pub. L. 111-152 (March 30, 2010), collectively known as the "Affordable Care Act" or "ACA."

16. Section 1557 of the ACA states that no individual can be denied certain federally-funded health benefits because of the individual's race, color, national origin, sex, age, or disability. 42 U.S.C. § 18116. Section 1557 does not add a new non-discrimination provision to the United States Code, but merely incorporates by reference pre-existing provisions under Title VI, Title IX, the Americans with Disabilities Act, and the Rehabilitation Act. Section 1557 does not independently define terms such as "sex." Section 1557's sole basis for prohibiting sex discrimination is based on its reference to Title IX, 20 U.S.C. § 1681 *et seq.*

17.     Title IX does not apply to covered entities "controlled by a religious organization if the application of this subsection would not be consistent with the religious tenets of such organization." 20 U.S.C. § 1681(a)(3).

18.     Title IX also states that it cannot be "construed to require or prohibit any person, or public or private entity, to provide or pay for any benefit or service, including the use of facilities, related to an abortion." 20 U.S.C. § 1688.

19.     At the time that the ACA was enacted in 2010, no federal courts and no federal agencies had interpreted "sex" in Title IX to include gender identity.

20.     At the time that the ACA was enacted, and to this day, Congress has repeatedly rejected attempts to expand the term "sex" in Title IX. Lawmakers have also rejected multiple attempts to amend the Civil Rights Act to add the new categories of "sexual orientation" and "gender identity." The first such attempt was in 1974, and there have been dozens of such attempts since then. They have repeatedly failed.

21.     The ACA states that "nothing in this title (or any amendment made by this title), shall be construed to require a qualified health plan to provide [abortion] coverage . . . as part of its essential health benefits for any plan year." 42 U.S.C. § 18023(b)(1)(A)(i). 42 U.S.C. § 18023(b)(1)(A)(i).

22.     Federally-funded programs may not require an "individual to perform or assist in the performance of any sterilization procedure or abortion if his performance or assistance in the performance of such procedure or abortion would be contrary to his religious beliefs or moral convictions." 42 U.S.C. § 300a-7(b)(1).

Congress has also mandated that "[n]o individual shall be required to perform or assist in the performance of any part of a health service program or research activity funded in whole or in part under a program administered by the Secretary of Health and Human Services if his performance or assistance in the performance of such part of such program or activity would be contrary to his religious beliefs or moral convictions." *Id.* § 300a-7(d).

      **B.    The Regulation.**

23.    On September 8, 2015, HHS proposed a new rule to "interpret" Section 1557 of the Affordable Care Act (ACA), to extend Title IX's definition of "sex" to include "gender identity," "sex stereotypes," and "termination of pregnancy," among other things. 45 C.F.R. § 92.4.

24.    The Rule was published as final on May 18, 2016, and it expanded the definition of "gender identity" even further from the proposed definition to mean an individual's "internal sense of gender, which may be male, female, neither, or a combination of male and female." *Id.* HHS stated in the Rule that "gender identity spectrum includes an array of possible gender identities beyond male and female," and individuals with "non-binary gender identities are protected under the rule." Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31376, 31392, 31384 (May 18, 2016). HHS cited as authority the "Dear Colleague" letter issued

jointly by the Department of Education (ED) and Department of Justice (DOJ) just five days earlier.[1]

25.    The Rule also defines "sex" to include discrimination based upon "termination of pregnancy" in covered programs. HHS declined to add an explicit carve-out for abortion and abortion-related services parallel to the carve-out included in Title IX; it merely noted the existence of conscience protections in federal law and ACA limitations on requirement for abortion coverage in certain contexts. *Id.* at 31388.

26.    This new Regulation applies to any entities or individuals that operate, offer, or contract for health programs and activities that receive any Federal financial assistance from HHS.[2] In light of this sweeping application, HHS has estimated the Rule will "likely cover[] almost all licensed physicians because they accept Federal financial assistance," including payments from Medicare and Medicaid.[3] Other observers have estimated that the Rule will apply "to over 133,000 (virtually all) hospitals, nursing homes, home health agencies, and similar provider facilities, about 445,000 clinical laboratories, 1,200 community health centers, 171 health-related

---

[1] U.S. Dep't of Justice & U.S. Dep't of Educ., Dear Colleague Letter on Transgender Students, May 13, 2016, http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201605-title-ix-transgender.pdf.

[2] 45 C.F.R. § 92.4.

[3] Nondiscrimination in Health Programs and Activities, 80 Fed. Reg. 54172, 54195 (proposed Sept. 8, 2015); 81 Fed. Reg. at 31445.

schools, state Medicaid and CHIP programs, state public health agencies, federally facilitated and state-based marketplaces, at least 180 health insurers that market policies through the FFM and state-based marketplaces, and up to 900,000 physicians."[4]

27.   The new Rule requires covered entities to provide health programs or activities in accordance with HHS's expansive and unwarranted definition of "sex." This includes a number of new requirements.

### 1.   Healthcare professionals must perform or refer for medical transition procedures.

28.   The Rule requires covered employers, and their healthcare providers and professionals, to perform (or refer for) medical transition procedures (such as hysterectomies, mastectomies, hormone treatments, plastic surgery, etc.), if a physician or healthcare provider offers analogous services in other contexts. For example, in the preamble, HHS stated, "A provider specializing in gynecological services that previously declined to provide a medically necessary hysterectomy for a transgender man would have to revise its policy to provide the procedure for transgender individuals in the same manner it provides the procedure for other individuals."[5] HHS explained that a hysterectomy in this medical transition context

---

[4] Timothy Jost, *Implementing Health Reform: HHS Proposes Rule Implementing Anti-Discrimination ACA Provisions (Contraceptive Coverage Litigation Update)*, Health Affairs Blog (Sept. 4, 2015), http://healthaffairs.org/blog/2015/09/04/ implementing-health-reform-hhs-proposes-rule-implementing-anti-discrimination-aca-provisions/.

[5] 81 Fed. Reg. at 31455.

would be "medically necessary to treat gender dysphoria,"[6] thereby declaring medical necessity, benefit, and prudence as a matter of federal law, and without regard to the opinions, judgment, and conscientious considerations of the many medical professionals that hold views to the contrary.

29.   There is widespread, well-documented debate about the medical risks and ethics associated with various medical transition procedures, even within the transgender community itself. In fact, HHS's own medical experts recently wrote, "Based on a thorough review of the clinical evidence available at this time, there is not enough evidence to determine whether gender reassignment surgery improves health outcomes for Medicare beneficiaries with gender dysphoria."[7] The evidence showed that "[t]here were conflicting (inconsistent) study results—of the best designed studies, some reported benefits *while others reported harms*."[8] Yet the new Rule attempts to preempt the serious medical and moral debate about gender transition procedures by concluding in the context of physicians offering "health services" that a "categorization of all transition-related treatment . . . as experimental, is outdated and not based on current standards of care."[9] The Regulation also improperly preempts the prerogative of States not only to regulate

---

[6] *Id.* at 31429.

[7] Centers for Medicare & Medicaid Services, Proposed Decision Memo for Gender Dysphoria and Gender Reassignment Surgery (June 2, 2016).

[8] *Id.* (emphasis added).

[9] 81 Fed. Reg. at 31435; *see also id.* at 31429.

the healing professions, but also to maintain standards of care that rely upon the medical judgment of health professionals as to what is in the best interests of their patients.

30.    Furthermore, a number of commenters requested that HHS make clear that health services need only be covered if they are deemed to be "medically necessary" or "medically appropriate" in the professional opinion of those charged with the care of the patient at issue. But HHS refused to make this clarification, stating that some procedures "related to gender transition" may be required even if they were not "strictly identified as medically necessary or appropriate."[10] Thus, under the Regulation, if a doctor would perform a mastectomy as part of a medically-necessary treatment for breast cancer, it would be illegal for the same doctor to decline to perform a mastectomy for a medical transition, even if the doctor believed that removing healthy breast tissue was contrary to the patient's medical interest.

31.    Because Plaintiff SMP Health System provides hysterectomies to some patients, such as those diagnosed with uterine cancer, the Regulations would simultaneously force it to provide a hysterectomy (and remove an otherwise healthy uterus) for a medical transition, notwithstanding the serious potential harm to the patient. Elective hysterectomies increase a number of health risks for the patient. Moreover, such a procedure also renders an individual permanently sterile. Nevertheless, the Regulations would require Plaintiffs to perform that procedure

---

[10] *Id.* at 31435.

even when they believed it was not in the best interests of the patient. Such a standard turns the venerable medical oath to "do no harm" on its head.

32.     And while Plaintiffs such as the two Sacred Heart Mercy Health Care Center clinics provide hormone treatments to patients for medical reasons in some contexts, these health professionals have serious medical and religious concerns with offering hormone treatment for a medical transition.

### 2.     Healthcare facilities and professionals must alter their speech and medical advice.

33.     As discussed above, HHS has concluded, in the context of physicians offering "health services," that a "categorization of all transition-related treatment . . . as experimental, is outdated and not based on current standards of care."[11] In so doing, HHS has seriously curbed a physician's ability to offer a contrary view, even if such a view is based on the physician's professional training and best medical judgment. This Regulation would thus force healthcare providers to alter speech and medical advice to comply with the Rule.

34.     Under the Rule, HHS would compel the speech of healthcare professionals in several ways. For example, the Rule mandates revisions to healthcare professionals' written policies, requiring express affirmance that transition-related procedures will be provided,[12] even if such revisions do not reflect the medical judgment, values, or beliefs of the individuals or organizations. Second,

---

[11] *Id.*

[12] *Id.* at 31455.

it requires physicians to use gender-transition affirming language in all situations regardless of circumstance, and provides as just one example the requirement that medical providers use "a transgender individual's preferred name and pronoun."[13] HHS also relies upon a transgender medical guidance document stating that "Mental health professionals should not impose a binary view of gender."[14] Thus, to avoid facing liability for being discriminatory under the proposed rule, healthcare professionals are compelled to speak by revising their policy to endorse transition-related services, to express language that is affirming of gender transition, and to express and explore a view of gender that is not binary. Further, by treating as discriminatory a medical view of "transition-related treatment . . . as experimental,"[15] HHS is coercing medical professionals like Plaintiffs to speak about these procedures the way the government wants them to, even though they disagree, and even though they believe they are disserving their patients by concealing the information the government wants concealed.

### 3. Certain employers and insurance providers must offer employee benefits covering medical transition procedures.

35.    The Regulation prohibits certain employers, health programs, or insurance plans from exercising judgment as to what they cover. HHS stated, "[A]n

---

[13] *Id.* at 31406.

[14] *Id.* at 31435 n.263 (citing World Professional Association for Transgender Health (WPATH), Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People at 16 (7th ed. 2012)).

[15] 81 Fed. Reg. at 31435.

explicit, categorical (or automatic) exclusion or limitation of coverage for all health services related to gender transition is unlawful on its face."[16]

36.     For example, if a doctor concludes that a hysterectomy "is medically necessary to treat gender dysphoria," the patient's employer or insurance plan would be required to cover the procedure on the same basis that it would cover it for other conditions (like cancer).[17] HHS also stated that the "range of transition-related services, which includes treatment for gender dysphoria, is not limited to surgical treatments and may include, but is not limited to, services such as hormone therapy and psychotherapy, which may occur over the lifetime of the individual."[18] As such, coverage is required under the new Rule notwithstanding the rights of employers that only offer employee health benefits consistent with the religious beliefs and values of their organization.

37.     This conflict with religious or otherwise conscientious employers extends beyond treatment surrounding gender dysphoria, because some required procedures (such as elective hysterectomies) result in sterilization, and the new Rule also extends to "termination of pregnancy." 45 C.F.R. § 92.4. Although HHS states that laws protecting religious objections to abortion (or "termination of pregnancy") will apply, HHS recently approved California forcing all insurers to include abortion coverage, even for objecting religious institutions. And HHS could have included, but

[16] *Id.* at 31429.

[17] *Id.*

[18] *Id.* at 31435-36.

explicitly chose to exclude, a clear regulatory carve-out for services related to abortion that parallels the carve-out in Title IX.

38.     This health benefit requirement of the new Rule applies to any of the following types of employers who receive HHS funding: 1) any entity principally involved in providing or administering health services (including hospitals, nursing homes, counseling centers, physicians' offices, etc.), 2) any type of employer who receives HHS funding for the primary purpose of funding an "employee health benefit program," or 3) any entity such as a university with a health training or research program that receives HHS funding or Federal financial assistance—including student Pell grants—for that "health program or activity."[19]

39.     Thus, employers who have always offered employee health benefits that reflect their religious or conscientious beliefs, and excluded medical transition procedures from employee benefits, will now be considered discriminatory under the Regulation.

> **4.     Sex-specific healthcare facilities or programs, including shower facilities or hospital wards, must be opened to individuals based on gender identity.**

40.     With regard to facilities, the new Rule states that even for sex-specific facilities such as "shower facilities" offered by healthcare providers, individuals may not be excluded "based on their gender identity."[20]

---

[19] *Id.* at 31472, 45 C.F.R. § 92.208; *see also* 81 Fed. Reg. at 31437.

[20] 81 Fed. Reg. at 31409.

41.    When Title IX—the foundation for the new Rule—was enacted, Congress was significantly concerned about protecting and preserving the privacy rights of individuals in intimate areas. *See* 20 U.S.C. § 1686, 117 Cong. Rec. 30407 (1971), 117 Cong. Rec. 39260 (1971), 117 Cong. Rec. 39263 (1971), and 118 Cong. Rec. 5807 (1972). And the predecessor agency of HHS, the Department of Health, Education, and Welfare (HEW), promulgated regulations guaranteeing the privacy of individuals in intimate areas. *See* 34 C.F.R. § 106.32(b); 34 C.F.R. § 106.33 ("A recipient may provide separate toilet, locker room, and shower facilities on the basis of sex . . ."). Yet, HHS wholly disregarded any "legal right to privacy" that could be violated "simply by permitting another person access to a sex-specific program or facility which corresponds to their gender identity."[21]

42.    With regard to other health programs, HHS stated that sex-specific health programs or activities are allowable only where the covered entity can demonstrate an exceedingly persuasive justification, *i.e.*, that the sex-specific program is substantially related to the achievement of an important health-related or scientific objective. HHS stated that it "will expect a covered entity to supply objective evidence, and empirical data if available, to justify the need to restrict participation in the program to only one sex," and in "no case will [HHS] accept a justification that relies on overly broad generalizations about the sexes."[22]

---

[21] *Id.* at 31389, 31409.

[22] *Id.* at 31409.

### 5. Covered entities must provide assurances of compliance and post notices of compliance.

43.    Through HHS-690 Form, which now references Section 1557, a covered entity seeking federal financial assistance must now certify, in relevant part, that "no person in the United States shall, on the ground of race, color, national origin, sex, age, or disability be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any health program or activity for which the Applicant receives Federal financial assistance from the Department."[23]

44.    The Rule requires covered entities to post notices regarding compliance with the Rule in conspicuous locations by October 16, 2016 (90 days from the effective date). HHS provided a sample notice in Appendix A to the new Rule, which states in relevant part that the covered entity "does not exclude people or treat them differently because of race, color, national origin, age, disability, or sex."[24]

### 6. Enforcement Mechanisms and Remedial Measures.

45.    Covered entities are required to record and submit compliance reports to HHS's Office of Civil Rights ("OCR") upon request.[25]

---

[23] HHS, Assurance of Compliance, https://www.hhs.gov/sites/default/files/hhs-690.pdf.

[24] 81 Fed. Reg. at 31472, 45 C.F.R. § 92, App. A, https://www.federalregister.gov/articles/ 2016/05/18/2016-11458/nondiscrimination-in-health-programs-and-activities#h-139.

[25] 81 Fed. Reg. at 31439, 31472, 45 C.F.R. § 92.301.

46.     Covered entities that are found to violate the Regulation may lose their federal funding, be barred from doing business with the government, or risk false claims liability.[26]

47.     Covered entities are subject to enforcement proceedings by the Department of Justice.[27]

48.     Covered entities are also subject to individual lawsuits from patients who believe the covered entity has violated the new Rule.[28]

### 7.    No Religious Exemption.

49.     Section 1557 does not independently prohibit discrimination on the basis of sex. Instead, Congress specifically invoked Title IX, 20 U.S.C. § 1681 *et seq.*, which includes both a ban on sex discrimination and a generous carve-out for religious organizations. In this Regulation interpreting Section 1557, however, HHS has "interpreted" Congress's reference to Title IX to include the ban, but not the religious exemption.

50.     Although HHS was asked to include a religious exemption in the Regulation due to the obvious implications for religious healthcare providers, HHS declined to do so, stating instead that religious objectors could assert claims under

---

[26] 81 Fed. Reg. at 31472, 45 C.F.R. § 92.301 ("The enforcement mechanisms available for and provided under Title VI of the Civil Rights Act of 1964 . . . shall apply for purposes of Section 1557.")

[27] 81 Fed. Reg. at 31440.

[28] *Id.* at 31472, 45 C.F.R. § 92.301.

existing statutory protections for religious freedom.[29] HHS also failed to provide any mechanism by which a religious entity could determine if it was entitled to any existing religious protections under the law.  HHS's refusal to protect the conscience rights (or even medical judgment) of physicians is striking when compared to federal policy in other areas. For example, a recent TRICARE guidance memo states in the context of medical gender dysphoria treatment, "In no circumstance will a provider be required to deliver care that he or she feels unprepared to provide either by lack of clinical skill or due to ethical, moral, or religious beliefs."[30]

## C.     The Effect on the Sisters of Mercy

51.     The Sisters of Mercy founded their order in 1973 for the purpose of carrying out their faith in Jesus Christ by serving others. The Sisters of Mercy have a variety of apostolate services that they offer. One aspect of their mission is fulfilled through "comprehensive health care" services, which the Sisters of Mercy understand as "the complete care of the total human person" which "seeks to bring about that profound and extensive healing which is a continuation of the work of redemption." Consistent with this mission, some of the Sisters of Mercy serve in a variety of different healthcare facilities, such as hospitals, throughout the country. These Sisters include licensed doctors, including at least one surgeon, and other healthcare professionals. In accordance with their vows, the Sisters of Mercy offer healthcare

---

[29] 81 Fed. Reg. at 31376.

[30] Memorandum from Karen S. Guice, Acting Assistant Sec'y of Defense to Assistant Sec'y of the Army, et al., Subject: Guidance for Treatment of Gender Dysphoria for Active and Reserve Component Service Members (July 29, 2016).

services in accordance with the Ethical and Religious Directives of the United States Conference of Catholic Bishops.

52.     The Sisters of Mercy hold religious beliefs about the nature and purposes of human sexuality, including that sexual identity is an objective fact rooted in nature as male or female persons. Like the Catholic Church they serve, the Sisters of Mercy believe that every man and woman is created in the image and likeness of God, and that they reflect God's image in unique—and uniquely dignified—ways.

53.     Further, in their professional medical judgment, the Sisters of Mercy who work in health care believe that optimal patient care—including in patient education, diagnosis, and treatment—requires taking account of the biological differences between men and women.

54.     In the Sisters' best medical judgment, providing or assisting with gender transition services is not in keeping with the best interests of their patients, and in fact is experimental and could be harmful for patients.

55.     Providing services that are contrary to their understanding of God's plan for human sexuality would also substantially burden the religious exercise of the Sisters of Mercy.

56.     For decades, the religious beliefs of the Sisters of Mercy have been respected by health institutions where they work. But the new Rule now makes it illegal for employers to accommodate the religious beliefs of their employees.

57.     Thus, this new Rule will impact the Sisters of Mercy by requiring the Sisters of Mercy to offer medical services that violate their best medical judgment

and religious beliefs when they serve in healthcare organizations that are covered entities under the Rule. For example, Sisters of Mercy who offer endocrinology services or mental health counseling for other medical reasons will now be required to provide these medical services as part of a gender transition, which would violate both their best medical judgment and their religious beliefs.

58.     The Rule also chills the Sisters' ability to discuss their medical opinions with their patients and offer medical advice freely. And the rule would pressure the Sisters of Mercy to reject a binary view of gender, which is contrary to their medical judgment and religious beliefs.

59.     The Rule therefore threatens the ability of the Sisters of Mercy to carry out their religious mission of providing comprehensive health care services in the healthcare facilities in which they work.

**D.      The Effect on Sacred Heart Mercy Health Care Centers**

60.     The Sisters of Mercy also own and operate two health clinics in the United States: Plaintiff Sacred Heart Mercy Health Care Center in Alma, Michigan; and Plaintiff Sacred Heart Mercy Health Care Center in Jackson, Minnesota. Some of the Sisters of Mercy serve as licensed doctors, nurses, or other healthcare professionals in these clinics. Both clinics provide resources to accommodate the spiritual needs of employees, patients, and their families. For example, the clinic in Alma, Michigan, offers Mass in its chapel, followed by the exposition of the Blessed Sacrament so that employees, patients, and local residents can worship. Both clinics are run by Sisters of Mercy themselves.

61.     The mission of the Sacred Heart Mercy Health Care Center in Michigan is to "embrace the extensive expressions of human woundedness in order to extend the healing of the redemption of Jesus Christ." Sacred Heart Mercy Health Care Center, *Mission*, http://www.sacredheartmercy.org/mission/ (last visited Nov. 7, 2016). The vision of the Center is to "provide outstanding Catholic health care by embracing the misery of mankind as a point of convergence with the Mercy of God through undertaking the works of mercy in a comprehensive manner." *See id.*

62.     In accordance with this vision and mission, the Sacred Heart clinics are operated in accordance with *The Ethical and Religious Directives for Catholic Healthcare Services*, as promulgated by the United States Conference of Catholic Bishops and interpreted by the local Bishop.

63.     The Sacred Heart clinics strive to provide top-quality care to their patients. They serve and respect individuals of all faiths, and seek to ensure that patients and their families can exercise their own faith traditions in order to assist them in the healing and recovery process, and to make critical decisions about matters such as end-of-life care and clinical ethics. This new Rule will impact the Sacred Heart clinics by 1) requiring the Sacred Heart clinics to offer medical services that violate their best medical judgment and religious beliefs, and 2) requiring the Sacred Heart clinics to provide insurance coverage for services that violate their religious beliefs.

25

### 1.  Compulsory Medical Services

64.    The Sacred Heart clinics provide all of their standard medical services to every individual who needs and qualifies for their care, including to individuals who identify as transgender. Thus, for instance, if a transgender individual comes in with high blood pressure or a diabetes diagnosis, the Sacred Heart clinics would provide the same full spectrum of compassionate care for that individual as they provide for every other patient. And, just as they do for every other patient, the Sacred Heart clinics would appropriately tailor that care to the biologically sex-specific health needs of the patient.

65.    The Sacred Heart clinics and the Sisters who own and operate them hold religious beliefs about the nature and purposes of human sexuality, including that sexual identity is an objective fact rooted in nature as male or female persons. Like the Catholic Church they serve, they believe that every man and woman is created in the image and likeness of God and that they reflect God's image in unique—and uniquely dignified—ways.

66.    Further, in their professional medical judgment, the Sacred Heart clinicians believe that optimal patient care—including patient education, diagnosis, and treatment—requires taking account of the biological differences between men and women.

67.    In the best medical judgment of the Sacred Heart clinics and the Sisters who own and operate them, providing or assisting with gender transition services is

not in keeping with the best interests of their patients, and in fact is experimental and could be harmful for patients.

68.    Providing services that are contrary to their understanding of God's plan for human sexuality would also substantially burden the religious exercise of the Sacred Heart clinics and the Sisters who own and operate them.

69.    Accordingly, after careful review of the issue, the Sacred Heart clinics and the Sisters who own and operate them made the decision not to provide, perform, or otherwise facilitate medical transitions. To provide or otherwise facilitate those services would also violate the religious beliefs of the Sacred Heart clinics and the Sisters who own and operate them.

70.    The Sacred Heart clinics offer endocrinology hormone services and mental health counseling for anxiety and depression, including for pediatric patients. The new Rule would force the Sacred Heart clinics to offer their services as a part of a medical transition, which would violate both their best medical judgment and their religious beliefs.

71.    The Rule also chills the ability of the clinics and the Sisters at the clinics to discuss their medical opinions with their patients and offer medical advice freely. And the rule would pressure the Sacred Heart clinics and the Sisters who own and operate them to reject a binary view of gender, which is contrary to their medical judgment and religious beliefs.

## 2. Compulsory Insurance Coverage

72.     The Sacred Heart clinics offer health benefits to eligible employees who work for the clinics.

73.     It would violate the religious beliefs of the Sacred Heart clinics and the Sisters who own and operate them if they were forced to offer a health plan that included benefits for abortions, sterilizations, or any drugs or procedures related to gender transition. Yet after January 1, 2017, the Rule will require them to offer an insurance plan that includes these health benefits.

74.     The Sacred Heart clinics and the Sisters who own and operate them sincerely believe that providing insurance coverage for gender transition, sterilization, and abortion would constitute impermissible material cooperation with evil. The Sacred Heart clinics must now choose between (a) following their faith and their best medical judgment, or (b) following the Regulation. If they follow their faith and medical judgment, the Sacred Heart clinics will be subject to financial penalties and lawsuits. Most significantly, a significant portion of the patients served by the Sacred Heart clinics are poor, disabled, and elderly Medicare and Medicaid patients. If the Sacred Heart clinics refuse to both deny their faith and lower their standard of care, they risk losing that funding and suffering a crippling blow to their capacity to carry out their religious mission to serve the poor, disabled, and elderly.

## E.     The Effect on SMP Health System

75.     The Sisters of Mary of the Presentation were founded in France in 1828 for the purpose of teaching children and serving the sick, disabled, and elderly. In

28

1903, fleeing religious persecution in France, the Sisters arrived in the United States and began a school in Wild Rice, North Dakota and a hospital in Spring Valley, Illinois. The Sisters of Mary of the Presentation now have a Provincial home in Valley City, North Dakota, and operate three critical access hospitals in North Dakota, in addition to the original hospital in Spring Valley. The Sisters also operate five nursing homes to serve the elderly in North Dakota. Together, these ministries constitute SMP Health System.

76.     SMP Health System shares the religious beliefs of its sponsor, the Sisters of Mary of the Presentation. The mission of SMP Health System is to "provide[] leadership to its Catholic health care ministries as they work to fulfill the healing mission of Jesus." SMP Health System's vision statement explains that "Our concern is for all people, but the poor and elderly have a special claim on us. From our limited resources we provide services characterized by excellence, compassion, and personalized concern. Because we care, we focus on the needs of the whole person, physical, spiritual, psychological, and social." *See* SMP Health System, *Mission, Values, Vision and Philosophy*, http://smphs.org/mission-values-vision-philosophy.html (last visited Nov. 7, 2016).

77.     In accordance with this vision and mission, the Sisters of Mary operate their clinics in a manner that abides by *The Ethical and Religious Directives for Catholic Healthcare Services*, as promulgated by the United States Conference of Catholic Bishops and interpreted by the local Bishop. The Sisters of Mary strive to

"provide quality patient care in an environment that contributes to the healing of the whole person."

78.     This new Rule will impact SMP Health System by 1) requiring SMP Health System to offer medical services that violate its best medical judgment and religious beliefs, and 2) requiring SMP Health System to provide insurance coverage for services that violate its religious beliefs.

### 1. Compulsory Medical Services

79.     SMP Health System provides all of its standard medical services to every individual who needs and qualifies for its care, including to individuals who identify as transgender. Thus, for instance, if a transgender individual comes in with high blood pressure or a diabetes diagnosis, SMP Health System would provide the same full spectrum of compassionate care for that individual as they provide for every other patient. And, just as they do for every other patient, SMP Health System would appropriately tailor that care to the biologically sex-specific health needs of the patient.

80.     SMP Health System holds religious beliefs that sexual identity is an objective fact rooted in nature as male or female persons. Like the Catholic Church it serves, SMP Health System believes that every man and woman is created in the image and likeness of God and that they reflect God's image in unique—and uniquely dignified—ways.

81.     In SMP Health System's best medical judgment, providing or assisting with gender transition services is not in keeping with the best interests of its patients.

82.     Providing such services would also substantially burden the religious exercise of SMP Health System.

83.     Accordingly, after careful review of the issue, SMP Health System made the decision not to provide, perform, or otherwise facilitate medical transitions. To provide or otherwise facilitate those services would also violate SMP Health System's religious beliefs.

84.     The SMP Health System physicians and facilities offer services such as hysterectomies, mastectomies, endocrinology services, and psychiatric support. SMP Health System physicians also offer endocrinology services to pediatric patients in certain contexts. The new Rule would force SMP Health System to offer these services as a part of a medical transition, which would violate both their best medical judgment and their religious beliefs.

85.     This Rule also chills the speech of SMP Health System physicians who wish to discuss their medical opinions with their patients and offer medical advice freely.

86.     Some of the procedures required under the Rule, including elective hysterectomies, can result in the sterilization of the patient. Since SMP Health System does not believe hysterectomies for the purpose of gender transition are medically necessary, being forced to provide such procedures would violate SMP Health System's best medical judgment and religious beliefs.

87.     The Rule also prohibits discrimination on the basis of "termination of pregnancy." In certain contexts, SMP Health System performs surgical procedures

for women who have miscarried a baby, such as dilation and curettage (D&C) procedures. However, SMP Health System would be unwilling to offer the same service if the goal of the procedure was to terminate a pregnancy. The Rule forces SMP Health System to provide abortion-related procedures in violation of its best medical judgment and religious beliefs.

## 2.  Required Insurance Coverage

88.     SMP Health System offers health benefits to its full time employees.

89.     SMP Health System offers its employees a self-insured plan in Illinois, administered by a third-party administrator, and a fully insured plan in North Dakota.

90.     In accordance with SMP Health System's religious beliefs, the employee benefits plans specifically exclude coverage for:

- Gender transition surgeries and treatment leading to and/or related to such surgeries;

- Sterilizations;

- Abortions.

91.     SMP Health System sincerely believes that providing insurance coverage for gender transition, sterilization, and abortion would constitute impermissible material cooperation with evil.

92.     SMP Health System must now choose between (a) following its faith and its best medical judgment, or (b) following the Regulation. If it follows its faith and medical judgment, SMP Health System will be subject to financial penalties and lawsuits. Most significantly, SMP Health System annually provides a substantial

amount of services to poor, disabled, and elderly Medicare and Medicaid patients. If SMP Health System refuses to both deny its faith and lower its standard of care, it risks losing that funding and suffering a crippling blow to its capacity to carry out its religious mission to serve the poor, disabled, and elderly.

### F.    The Effect on University of Mary

93.    The University of Mary has a long tradition of carrying out the mission of Jesus Christ through education. In 1878, a brave group of Benedictine Sisters arrived in Dakota Territory to bring ministries of healing and learning, founding schools and hospitals to serve the community.

94.    In 1959, the Benedictine Sisters of the Annunciation founded Mary College, offering degrees in education and nursing.  The college expanded and added additional programs. In the 1980s, it added its first graduate program, in nursing, and became the University of Mary.

95.    The University strives to infuse all of its programs with Christian, Catholic, Benedictine values to prepare its students to be ethical leaders in their careers and their communities. The University welcomes students of all faiths and backgrounds and, as is fundamental to its mission, upholds Catholic teaching in all of its programs and services.

96.    For example, the University's freshman and sophomore students are required to live on campus. The University residence life program has been designed to be a co-curricular student learning program. The program is structured to help students learn by participating in a residence life community where the programming

and policies are designed to encourage students to practice Christian virtues and the University's Benedictine values.

97.     The University has a long history of offering medical education inspired by its Catholic faith. For example, the University is one of only a few in the United States to offer a master's degree in bioethics, designed to help professionals make morally sound decisions about responsible use of biomedical advances. The program is offered in partnership with the National Catholic Bioethics Center.

98.     As it has since its founding, the University offers a nursing program. It provides several nursing degrees at the undergraduate, graduate and doctoral level. The University's nursing program on June 17, 2016 received a three-year grant for over $1 million from the Department of Health and Human Services. That grant is intended to aid in training nurses to improve rural healthcare in North Dakota.

99.     The University also has a student health clinic that operates in accordance with the Ethical and Religious Directives of the United States Conference of Catholic Bishops.

100.    As a result of the receipt of funds administered by HHS, the University is subject to the new Rule promulgated by the Department.

101.    The University has over 360 employees. Approximately 347 of these employees are eligible for health insurance benefits from the University.

102.    The University operates a self-funded health plan which provides coverage for its employees through a third-party administrator. The same plan

provides coverage for all employees, whether in the nursing program or outside the nursing program.

103.   In keeping with the University's Catholic beliefs, that plan excludes coverage for:

- "Treatment leading to or in connection with sex change or transformation surgery and related complications";

- Sterilization;

- Abortion.

104.   The University sincerely believes that providing insurance coverage for gender transitions, sterilization, or abortion would constitute impermissible material cooperation with evil.

105.   The University must now choose between (a) following its faith, or (b) following the Regulation. If it follows its faith, the University will be subject to financial penalties and lawsuits, including loss of its funding to train nurses in rural North Dakota, an important part of its religious mission to serve the religious, academic, and cultural needs of its students and the people of its region.

106.   The Regulation also makes it more expensive for the University to do business with its third-party administrator. The Regulation subjects the third-party administrator to potential liability for administering the University's religious health plan, and thus the University will likely be required to indemnify its third-party administrator from this liability. This constitutes an additional substantial burden on its religious exercise.

### G.      The New Rule's Impact on North Dakota.

107.    The new Regulation runs headlong into established standards of medical care, usurps North Dakota's legitimate authority over its medical facilities, and makes it impossible for North Dakota to comply with conflicting federal law, among other harms.

#### 1.      Standard of Care.

108.    "[T]he State has a significant role to play in regulating the medical profession," *Gonzales v. Carhart*, 550 U.S. 124, 157 (2007), as well as "an interest in protecting the integrity and ethics of the medical profession." *Washington v. Glucksberg*, 521 U.S. 702, 731 (1997). This includes "maintaining high standards of professional conduct" in the practice of medicine. *Barsky v. Bd. of Regents of Univ.*, 347 U.S. 442, 451 (1954).

109.    North Dakota, for example, actively protects the physician-patient relationship and the ability of doctors to exercise independent medical judgment in service of their patients.

110.    Every person should be treated with dignity and respect, especially when in need of medical attention. The standard of care established in North Dakota, and around the country, enables patients to obtain quality healthcare as determined by medical professionals, and not those outside the doctor-patient relationship. The Regulation, however, usurps this standard of care. It discards independent medical judgment and a physician's duty to his or her patient's permanent well-being and replaces them with rigid commands.

111.   The Regulation will force physicians who accept Medicare and Medicaid payments and who operate, offer, or contract for health programs and activities that receive Federal financial assistance to subject their patients to procedures that permanently alter or remove well-functioning organs, even though the physicians' independent medical judgment advises against such a course of action. And beyond compelling physicians to act against their medical judgment, the Regulation requires them to express opinions contrary to what they deem to be in the patient's best interest or to avoid even describing medical transition procedures as risky or experimental. Patients deserve better—and are treated more humanely—under State law.

### 2.   Control over Facilities.

112.   Every State provides healthcare services directly to citizens through various mechanisms of government. North Dakota, for example, provides health services through the North Dakota Department of Human Services, which, among other things, operates the North Dakota State Hospital, a state-run hospital that accepts HHS-administered funds.

113.   These covered entities, which exist across the country, will now be covered under the Regulation with respect to "all of the operations" of such entities. Thus, these entities will have to offer all manner of (and referrals for) medical transition procedures and treatments. As a result, North Dakota will be forced to allocate personnel, resources, and facility spaces to offer and accommodate the myriad medical transition procedures now required to be performed under the new

Rule. Healthcare facilities will also be required to open up sex-separated showers, locker rooms, or other facilities based on individual preference. This is true even in controlled medical locations where patient access to intimate facilities is often under the control of healthcare professionals that are supposed to act in the best interests of the patient. Thus, the requirements of the new Rule amount to a substantial interference in the control that North Dakota and other States legitimately exercise over their healthcare facilities.

### 3.    Conflicting Federal Law.

114.    Title VII of the Civil Rights Act of 1964 ("Title VII") prohibits employment discrimination based on religion. 42 U.S.C. § 2000e-2. To comply with Title VII, employers must reasonably accommodate an employee's religious belief, observance, or practice unless such accommodation imposes an undue hardship on the employer's business. *Id.* at § 2000e-1; *EEOC v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028, 2032 (2015) (providing that Title VII requires reasonable religious accommodations).

115.    But the Regulation in many circumstances makes such accommodation illegal, placing employers between a legal Scylla and Charybdis. On the one hand, employers are required under Title VII to reasonably accommodate their employees' religious and conscientious objections. On the other hand, the Regulation requires medical employers to provide (or refer for) medical transition procedures even when doing so would violate the religious or conscientious objections or concerns of its employees. HHS refused to affirm the principles of religious accommodation in its

new Rule even when asked to do so. Thus, it forces employers like North Dakota to choose between violating the Regulation or violating Title VII.

### 4.    Additional Harms.

116.    The Regulation is costly and burdensome on North Dakota for a variety of additional reasons, to wit:

117.    North Dakota operates as an employer that offers covered health benefits to its employees and their families through its constituent agencies. The new Rule will require North Dakota to provide insurance coverage for medical transition procedures.

118.    The new Rule also purports to require North Dakota to provide abortion coverage through its employee health benefits. HHS states that a State's Medicaid program constitutes a covered "health program or activity" under the Rule. Thus, "the State will be governed by Section 1557 in the provision of employee health benefits for its Medicaid employees." 81 Fed. Reg. at 31437.

119.    The exclusions North Dakota currently possesses in its employee insurance policies related to pregnancy termination and medical transition procedures will now be illegal under the new Rule. As a result, North Dakota will be required to change its insurance coverage.

120.    In order to receive federal healthcare funding, North Dakota must submit assurances, notices of compliance, and other information, demonstrating that their health programs and activities satisfy the requirements imposed by the Regulation. 81 Fed. Reg. at 31392, 31442.

121. The costs of personnel training will be significant, even by HHS's very modest estimates. HHS estimates that 7,637,306 state workers will need to receive training under the new Rule, and that the cost of this training in the first two years of implementation alone will be $17.8 million.

122. The penalties for noncompliance are so severe as to make the Regulation coercive. North Dakota, as an example, faces the loss of significant financial support in healthcare funding to serve its most vulnerable citizens.

123. Finally, the new Rule could subject North Dakota to private lawsuits for damages and attorney's fees, even though North Dakota did not and could not have known or consented to this waiver of its sovereign immunity.

## IV. CLAIMS

### COUNT I

#### Violation of the Administrative Procedure Act
#### Agency Action Not in Accordance with Law

124. The Plaintiffs incorporate by reference all preceding paragraphs.

125. Defendants are "agencies" under the APA, 5 U.S.C. § 551(1), and the new Regulation complained of herein is a "rule" under the APA, *id.* § 551(4), and constitutes "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Id.* § 704.

126. The APA prohibits agency actions that are "not in accordance with law." *Id.* § 706(2)(A). Under the APA, "an agency may not interpret a regulation so as to violate a statute." *Univ. of Iowa Hosps. & Clinics v. Shalala*, 180 F.3d 943, 951 (8th Cir. 1999). In such cases, courts review questions of law de novo. *Iowa League of Cities*

*v. EPA*, 711 F.3d 844, 872 (8th Cir. 2013). The Regulation is not in accordance with law for a number of independent reasons.

127.   HHS has explained that the Regulation will require physicians to perform medical transition procedures regardless of whether those procedures are "medically necessary" or even "medically appropriate." It is not in accordance with law, within the meaning of 5 U.S.C. § 706(2)(A), for the federal government to require medical professionals to perform procedures that may not be necessary or appropriate, and may in fact be harmful to the patients. This violates constitutional and statutory rights of medical professionals, including substantive due process rights and freedom of speech protections, as well as the sovereign prerogatives of the States, which play a significant role in overseeing the promulgation and administration of appropriate standards of care within the healthcare community. Courts scrutinize particularly closely agency action that raises constitutional concerns.

128.   The Regulation also states that a physician's view of medical transition procedures as "experimental" is "outdated and not based on current standards of care." 81 Fed. Reg. at 31435; *see also id.* at 31429.  It is not in accordance with law, within the meaning of 5 U.S.C. § 706(2)(A), for the federal government to dictate appropriate medical views on the necessity and experimental nature of medical transition procedures, and to dictate what constitutes best standards of care in an area of science and medicine that is being hotly debated in the medical community.

This violates constitutional and statutory rights of medical professionals, including substantive due process rights and freedom of speech protections.

129.   The Regulation is not in accordance with Section 1557 of the Affordable Care Act (42 U.S.C. § 18116) or Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* Section 1557 does not, on its own terms, prohibit discrimination on the basis of "sex." Instead, it prohibits discrimination "on the ground prohibited under . . . title IX of the Education Amendments of 1972." 42 U.S.C. § 18116(a). Title IX, in turn, prohibits discrimination "on the basis of sex . . . except that . . . this section shall not apply to an educational institution which is controlled by a religious organization if the application of this subsection would not be consistent with the religious tenets of such organization." 20 U.S.C. § 1681(a)-(a)(3).

130.   Neither Section 1557 nor Title IX uses the term "sex" to include "gender identity." Thus, HHS's attempt to expand the definition is not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A).

131.   HHS's failure to include in the Regulation a religious exemption that parallels the religious exemption in Title IX is also not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A).

132.   HHS's failure to include an exclusion for sterilization and sterilization-related services is not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A) because it is inconsistent with the Church Amendments, 42 U.S.C. § 300a-7(b), which protect the right of healthcare entities who receive federal funding to refuse to participate in or assist with sterilizations.

133.    HHS's failure to include an exclusion for abortion and abortion-related services is not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A) because it is inconsistent with the plain language of Title IX, which prohibits requiring coverage, payment, or the use of facilities for abortion.

134.    HHS's failure to include an exclusion for abortion and abortion-related services is not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A) because it is inconsistent with the Church Amendments, 42 U.S.C. §300a-7(b), which protect the right of healthcare entities who receive federal funding to refuse to participate in or assist with abortions.

135.    HHS's failure to include an exclusion for abortion and abortion-related services is not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A) because it is inconsistent with Section 245 of the Public Health Service Act, 42 U.S.C. § 238(n), which prohibits the federal government and any state or local government receiving federal financial assistance from discriminating against any healthcare entity on the basis that the entity refuses to perform abortions, provide referrals for abortions, or to make arrangements for such abortions.

136.    HHS's failure to include an exclusion for abortion and abortion-related services is not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A) because it is inconsistent with the Weldon Amendment, which has been readopted or incorporated by reference in every HHS appropriations act since 2005,[31] and provides

---

[31] *See* Consolidated Appropriations Act, 2016, H.R. 2029, 114th Cong. § 507(d) (2015).

that no funds may be made available under HHS appropriations act to a government entity that discriminates against an institution or individual physician or healthcare professional on the basis that the entity or individual "does not provide, pay for, provide coverage of, or refer for abortions."

137.   HHS's failure to include an exclusion for abortion and abortion-related services is not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A) because it is inconsistent with Section 1303(b)(4) of the ACA, 42 U.S.C. § 18023(b)(4), which states that "[n]o qualified health plan offered through an Exchange may discriminate against any individual health care provider or health care facility because of its unwillingness to provide, pay for, provide coverage of, or refer for abortions."

138.   The Regulation is not in accordance with Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e *et seq.*). Title VII prohibits employers from discriminating against employees on the basis of religion. 42 U.S.C. § 2000e-2. This means that employers, including Plaintiffs, have a duty to reasonably accommodate their employees' religious practices unless doing so would cause undue hardship to the employer. Plaintiffs employ individuals who have religious or conscientious objections to performing medical transition procedures. It should not be an undue hardship on Plaintiffs to accommodate these employees' religious beliefs, but the new Regulation will in many cases make it illegal for Plaintiffs who receive HHS funds to accommodate their employees in accordance with Title VII. Thus, the Regulation is not in accordance with Title VII.

139.   The Regulation states that a physician's view of medical transition procedures as "experimental" is "outdated and not based on current standards of care." 81 Fed. Reg. at 31435; *see also id.* at 31429. It is not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A) for the federal government to dictate appropriate medical views on the necessity and experimental nature of medical transition procedures, and to dictate what constitutes best standards of care and what services physicians must offer in an area of science and medicine that is being hotly debated in the medical community. This violates constitutional and statutory rights of medical professionals, including a medical professional's freedom of speech to offer candid professional advice about the experimental nature and dangerous health outcomes associated with medical transition procedures, and freedom not to be compelled to speak in favor of or make referrals for such procedures.

140.   The Regulation also forces physicians to provide medical services related to gender transition. This is not in accordance with substantive due process rights protecting a medical professional's right to not perform a procedure he or she believes to be experimental, ethically questionable, and potentially harmful.

141.   The Regulation is not in accordance with the First Amendment because the Regulation is overbroad and not narrowly tailored to a compelling governmental interest.

142.   The Regulation is not in accordance with the First Amendment and Fifth Amendment because it is void for vagueness.

45

143.   The Regulation is not in accordance with the First Amendment because it violates Plaintiffs' rights not to be subjected to a system of unbridled discretion when engaging in speech or religious exercise.

144.   The Regulation is not in accordance with the Tenth Amendment, which prohibits the federal government from co-opting a state's control over budgetary processes and legislative agendas.

145.   The Regulation is contrary to the First Amendment because it imposes an unconstitutional condition on Plaintiffs' receipt of federal funding. *See Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 133 S. Ct. 2321, 2331 (2013).

146.   The Regulation is contrary to the First Amendment because violates Plaintiffs' freedom of association protections.

147.   The Regulation is contrary to law because it violates the Religious Freedom Restoration Act.

148.   The Regulation is contrary to law because it violates the Free Exercise clause of the First Amendment.

149.   The Regulation is contrary to law because it violates the Fifth Amendment Due Process and Equal Protection clauses.

150.   The Regulation is contrary to the protections of the Spending Clause.

151.   The Regulation is an unlawful abrogation of sovereign immunity under the Eleventh Amendment.

152.   The Regulation is contrary to the protections of the Tenth Amendment.

153.    Plaintiffs have no adequate or available administrative remedy, or, in the alternative, any effort to obtain an administrative remedy would be futile.

154.    Plaintiffs have no adequate remedy at law.

155.    Absent injunctive and declaratory relief against the Regulation, the Plaintiffs have been and will continue to be harmed.

## COUNT II

### Violation of the Administrative Procedure Act
### Agency Action In Excess of Statutory Authority and Limitations

156.    The Plaintiffs incorporate by reference all preceding paragraphs.

157.    Defendants are "agencies" under the APA, 5 U.S.C. § 551(1), and the new Regulation complained of herein is a "rule" under the APA, *id.* § 551(4), and constitutes "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Id.* § 704.

158.    The APA prohibits agency actions that are "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C). The Regulation is in excess of statutory jurisdiction, authority, and limitations for a number of reasons.

159.    For the reasons described above, there is no statutory authority or jurisdiction for HHS to require medical professionals and facilities to perform procedures (or refer for the same) that may not be necessary or appropriate, and may in fact be harmful to the patients.

160.    For the reasons described above, there is no statutory authority or jurisdiction for HHS to dictate appropriate medical views on the necessity and experimental nature of medical transition procedures, or to dictate what constitutes

best standards of care in an area of science and medicine that is being hotly debated in the medical community.

161.   For the reasons described above, HHS's decision to interpret Section 1557's reference to "sex" discrimination to include "gender identity" is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C).

162.   For the reasons described above, HHS's failure to include a religious exemption in the Regulation that parallels the religious exemption in Title IX is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C).

163.   For the reasons discussed above, HHS's failure to include an exclusion for sterilization and sterilization-related services is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C) because it is inconsistent with the Church Amendments, 42 U.S.C. § 300a-7(b).

164.   For the reasons discussed above, HHS's failure to include an exclusion for abortion and abortion-related services is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C) because it is inconsistent with the plain language of Title IX, which prohibits requiring coverage, payment, or the use of facilities for abortion.

165.   For the reasons discussed above, HHS's failure to include an exclusion for abortion and abortion-related services is in excess of statutory jurisdiction,

authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C) because it is inconsistent with the Church Amendments, 42 U.S.C. § 300a-7(b).

166.   For the reasons discussed above, HHS's failure to include an exclusion for abortion and abortion-related services is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C) because it is inconsistent with Section 245 of the Public Health Service Act, 42 U.S.C. § 238(n).

167.   For the reasons discussed above, HHS's failure to include an exclusion for abortion and abortion-related services is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C) because it is inconsistent with the Weldon Amendment, which has been readopted or incorporated by reference in every HHS appropriations act since 2005.[32]

168.   For the reasons discussed above, HHS's failure to include an exclusion for abortion and abortion-related services is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C) because it is inconsistent with Section 1303(b)(4) of the ACA, 42 U.S.C. § 18023.

169.   For the reasons described above, HHS's decision to require Plaintiffs to act in violation of Title VII by not accommodating their employees' religious and conscientious objections to participating in (or referring for) medical transition treatment or procedures is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C).

---

[32] *See* Consolidated Appropriations Act, 2016, H.R. 2029, 114th Cong. § 507(d) (2015).

170.    For the reasons discussed above, the Regulation is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C) as it violates Plaintiffs' freedom of speech.

171.    For the reasons discussed above, the Regulation is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C) as it violates Plaintiffs' substantive due process rights.

172.    For the reasons discussed above, the Regulation is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C) as it violates the First Amendment because it is overbroad and not narrowly tailored to a compelling governmental interest.

173.    For the reasons discussed above, the Regulation is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C) as it violates the First Amendment because it is overbroad and not narrowly tailored to a compelling governmental interest.

174.    For the reasons discussed above, the Regulation is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C) because it is void under the First and Fifth Amendment for vagueness.

175.    For the reasons discussed above, the Regulation is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C) because it violates Plaintiffs' rights not to be subjected to a system of unbridled discretion when engaging in speech or when engaging in religious exercise, as secured to them by the First Amendment of the United States Constitution.

176.    For the reasons discussed above, the Regulation is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C) because it co-opts states' control over budgetary processes and legislative agendas contrary to Article I and the Tenth Amendment.

177.    For the reasons discussed above, the Regulation is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C) because it imposes an unconstitutional condition on Plaintiffs' receipt of federal funding contrary to the First Amendment.

178.    For the reasons discussed above, the Regulation is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C) because it violates Plaintiffs' First Amendment freedom of association.

179.    For the reasons discussed above, the Regulation is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C) because it violates the Religious Freedom Restoration Act.

180.    For the reasons discussed above, the Regulation is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C) because it violates the Free Exercise clause of the First Amendment.

181.    For the reasons discussed above, the Regulation is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C) because it violates the Fifth Amendment Due Process and Equal Protection clauses.

182.   For the reasons discussed above, the Regulation is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C) because it is contrary to the protections of the Spending Clause.

183.   For the reasons discussed above, the Regulation is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C) because it is an unlawful abrogation of sovereign immunity.

184.   For the reasons discussed above, the Regulation is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C) because it is contrary to the protections of the Tenth Amendment.

185.   Plaintiffs have no adequate or available administrative remedy, or, in the alternative, any effort to obtain an administrative remedy would be futile.

186.   Plaintiffs have no adequate remedy at law.

187.   Absent injunctive and declaratory relief against the Regulation, the Plaintiffs have been and will continue to be harmed.

## COUNT III

### Violation of the Administrative Procedure Act
### Agency Action that is Arbitrary, Capricious and an Abuse of Discretion

188.   The Plaintiffs incorporate by reference all preceding paragraphs.

189.   Defendants are "agencies" under the APA, 5 U.S.C. § 551(1), and the new Regulation complained of herein is a "rule" under the APA, *id.* § 551(4), and constitutes "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Id.* § 704.

190.    The APA prohibits agency actions that are "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A). The Regulation is arbitrary and capricious agency action for a number of reasons.

191.    HHS has explained that the Regulation will require physicians to perform medical transition procedures regardless of whether those procedures are "medically necessary" or even "medically appropriate." It is arbitrary and capricious for the federal government to require medical professionals to perform (or refer for) procedures that the physician believes may not be necessary or appropriate, and that may even be harmful to the patient.

192.    For the reasons discussed above, it is arbitrary and capricious for HHS to dictate appropriate medical views on the necessity and experimental nature of medical transition procedures, and to dictate what constitutes best standards of care.

193.    For the reasons discussed above, HHS's inclusion of "gender identity" in its interpretation of "sex" is an arbitrary and capricious interpretation of Section 1557 of the Affordable Care Act (42 U.S.C. § 18116) and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*

194.    For the reasons discussed above, HHS's failure to include a religious exemption in the Regulation that parallels the religious exemption in Title IX is arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A).

195.    For the reasons discussed above, HHS's failure to include an exclusion for sterilization and sterilization-related services is arbitrary and capricious within

the meaning of 5 U.S.C. § 706(2)(A) because it is inconsistent with the Church Amendments, 42 U.S.C. § 300a-7(b).

196.   For the reasons discussed above, HHS's failure to include an exclusion for abortion and abortion-related services is arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A).

197.   For the reasons described above, HHS's decision to require Plaintiffs to act in violation of Title VII by not accommodating their employees' religious objections to participating in medical transition procedures is arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A).

198.   For the reasons discussed above, the Regulation is arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A) as it violates Plaintiffs' freedom of speech.

199.   For the reasons discussed above, the Regulation is arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A) as it violates Plaintiffs' substantive due process rights.

200.   For the reasons discussed above, the Regulation is arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A) as it violates the First Amendment because it is overbroad and not narrowly tailored to a compelling governmental interest.

201.   For the reasons discussed above, the Regulation is arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A) because it is void under the First and Fifth Amendment for vagueness.

202.    For the reasons discussed above, the Regulation is arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A) because it violates Plaintiffs' rights not to be subjected to a system of unbridled discretion when engaging in speech or when engaging in religious exercise, as secured to them by the First Amendment of the United States Constitution.

203.    For the reasons discussed above, the Regulation is arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A) because it co-opts States' control over budgetary processes and legislative agendas contrary to the Tenth Amendment.

204.    For the reasons discussed above, the Regulation is arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A) because it imposes an unconstitutional condition on Plaintiffs' receipt of federal funding contrary to the First Amendment.

205.    The Regulation is arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A) because it violates Plaintiffs' First Amendment freedom of association.

206.    For the reasons discussed above, the Regulation is arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A) because it violates the Religious Freedom Restoration Act.

207.    For the reasons discussed above, the Regulation is arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A) because it violates the Free Exercise Clause of the First Amendment.

208.   For the reasons discussed above, the Regulation is arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A) because it violates the Fifth Amendment Due Process and Equal Protection clauses.

209.   For the reasons discussed above, the Regulation is arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A) because it is contrary to the protections of the Spending Clause.

210.   For the reasons discussed above, the Regulation is arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A) because it is an unlawful abrogation of sovereign immunity.

211.   For the reasons discussed above, the Regulation is arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A) because it is contrary to the protections of the Tenth Amendment.

212.   Plaintiffs have no adequate or available administrative remedy, or, in the alternative, any effort to obtain an administrative remedy would be futile.

213.   Plaintiffs have no adequate remedy at law.

214.   Absent injunctive and declaratory relief against the Regulation, the Plaintiffs have been and will continue to be harmed.

## COUNT IV

**Violation of the First Amendment of the United States Constitution
Freedom of Speech
Compelled Speech and Compelled Silence**

215.   The Plaintiffs incorporate by reference all preceding paragraphs.

216.   The Plaintiffs plan to continue using their best medical and ethical judgment in treating and advising patients. Performing (or referring for) medical transition procedures is contrary to their best medical and/or ethical judgment.

217.   The Regulation states, in the context of physicians offering "health services" that a "categorization of all transition-related treatment . . . as experimental, is outdated and not based on current standards of care." 81 Fed. Reg. at 31435; *see also id.* at 31429.

218.   The Regulation would prohibit the Plaintiffs from expressing their professional opinions that medical transition procedures are not the best standard of care or are experimental.

219.   The Regulation would also require Plaintiffs to amend their written policies to expressly endorse gender transition procedures, even if such revisions do not reflect the medical judgment, values, or beliefs of Plaintiffs. *Id.* at 31455. The regulation would also require Plaintiffs to use gender-transition affirming language in all situations, regardless of circumstance. *Id.* at 31406.

220.   Performing (or referring for) medical transition procedures is also contrary to the religious and conscientious beliefs of the Plaintiffs, and their beliefs prohibit them from conducting, participating in, or referring for such procedures.

221.   The Regulation would compel the Plaintiffs to conduct, participate in, refer for, or otherwise facilitate medical transition procedures.

222.    The Regulation would prohibit the Plaintiffs from expressing their religious views that medical transition procedures are not the best standard of care or are experimental.

223.    The Regulation would compel the Plaintiffs to speak in ways that they would not otherwise speak.

224.    The Regulation thus violates the Plaintiffs right to be free from compelled speech as secured to them by the First Amendment of the United States Constitution.

225.    The Regulation's compelled speech requirement is not justified by a compelling governmental interest.

226.    Even if HHS has a compelling government interest, the Regulation is not narrowly tailored to achieve that interest.

227.    Absent injunctive and declaratory relief against the Regulation, the Plaintiffs have been and will continue to be harmed.

## COUNT V

**Violation of the First Amendment of the United States Constitution
Freedom of Speech and Free Exercise Clause
Viewpoint Discrimination**

228.    The Plaintiffs incorporate by reference all preceding paragraphs.

229.    The Plaintiffs' sincere religious and conscientious beliefs prohibit them from facilitating or participating in medical transition procedures.

230.    The Plaintiffs' medical judgment is that, in general, it is harmful to encourage a patient to undergo medical transition procedures.

231.   The Regulation states, in the context of physicians offering "health services" that a "categorization of all transition-related treatment, for example as experimental, is outdated and not based on current standards of care." 81 Fed. Reg. at 31435; *see also id.* at 31429.

232.   The Regulation would prohibit the Plaintiffs from expressing their religious or conscientious viewpoint that medical transition procedures are not the best standard of care.

233.   The Regulation withholds funding based on an intent to restrict Plaintiffs' speech.

234.   The Regulation's viewpoint discrimination is not justified by a compelling governmental interest.

235.   Even if HHS has a compelling government interest, the Regulation is not narrowly tailored to achieve that interest.

236.   Defendants' actions thus violate the Plaintiffs rights as secured to them by the First Amendment of the United States Constitution.

237.   Absent injunctive and declaratory relief against the Regulation, the Plaintiffs have been and will continue to be harmed.

## COUNT VI

**Violation of the First and Fifth Amendments of the United States Constitution
Freedom of Speech and Due Process
Overbreadth**

238.   Plaintiffs incorporate by reference all preceding paragraphs.

239.   The Regulation regulates protected speech.

240. The Regulation states, in the context of physicians offering "health services" that a "categorization of all transition-related treatment . . . as experimental, is outdated and not based on current standards of care." 81 Fed. Reg. at 31435; *see also id.* at 31429.

241. This exposes the Plaintiffs to penalties for expressing their medical and moral views of medical transition procedures. It also prohibits Plaintiffs from using their medical judgment to determine the appropriate standard of care for interactions with their patients.

242. Plaintiffs believe that the Regulation restricts their speech regarding the best standard of care for patients.

243. The Regulation states: "The determination of whether a certain practice is discriminatory typically requires a nuanced analysis that is fact-dependent." *Id.* at 31377.

244. The Regulation chills the Plaintiffs' speech.

245. The Regulation's overbreadth is not justified by a compelling governmental interest.

246. Even if HHS has a compelling government interest, the Regulation is not narrowly tailored to achieve that interest.

247. Defendants have therefore violated the Plaintiffs' rights secured to them by the Free Speech Clause of the First Amendment and the Due Process Clause of the Fifth Amendment by prohibiting speech that would otherwise be protected.

248.    Absent injunctive and declaratory relief against the Regulation, the Plaintiffs have been and will continue to be harmed.

## COUNT VII

**Violation of the First and Fifth Amendments of the United States Constitution
Freedom of Speech and Due Process
Void for Vagueness**

249.    The Plaintiffs incorporate by reference all preceding paragraphs.

250.    The Regulation requires that a covered entity apply "neutral, nondiscriminatory criteria that it uses for other conditions when the coverage determination is related to gender transition" and "decline[s] to limit application of the rule by specifying that coverage for the health services addressed in § 92.207(b)(3)-(5) must be provided only when the services are medically necessary or medically appropriate." 81 Fed. Reg. at 31435.

251.    Without allowing Plaintiffs to use their judgment about what is medically necessary or appropriate, the Regulation is ambiguous in the types of services Plaintiffs are required to provide and perform.

252.    Requiring the Plaintiffs apply "neutral, nondiscriminatory criteria that it uses for other conditions" is a subjective standard without a limiting construction. *Id.*

253.    The Regulation states, in the context of physicians offering "health services" that a "categorization of all transition-related treatment, for example as experimental, is outdated and not based on current standards of care." *Id.*; *see also id.* at 31429.

254.    The Regulation does not provide a limiting construction for what the current standard of care is, nor does it provide guidance as to how physicians can rely on their best medical judgment when it conflicts with the Regulation.

255.    The Regulation is not justified by a compelling governmental interest.

256.    Even if HHS has a compelling government interest, the Regulation is not narrowly tailored to achieve that interest.

257.    Because Plaintiffs are unable to determine what kind of procedures and services they will be required to provide and perform, Defendants have violated the Plaintiffs' rights secured to them by the Free Speech Clause of the First Amendment and the Due Process Clause of the Fifth Amendment.

258.    Absent injunctive and declaratory relief against the Regulation, the Plaintiffs have been and will continue to be harmed.

## **COUNT VIII**

**Violation of the First Amendment of the United States Constitution
Free Exercise Clause and Freedom of Speech
Unbridled Discretion**

259.    The Plaintiffs incorporate by reference all preceding paragraphs.

260.    The Regulation "applies to every health program or activity, any part of which receives Federal financial assistance provided or made available by the Department; every health program or activity administered by the Department; and every health program or activity administered by a Title I entity." 45 C.F.R. 92.2(a).

261.   The Regulation also states: "The determination of whether a certain practice is discriminatory typically requires a nuanced analysis that is fact-dependent." 81 Fed. Reg. at 31377.

262.   The Regulation also says: "Insofar as the application of any requirement under this part would violate applicable Federal statutory protections for religious freedom and conscience, such application shall not be required." 45 C.F.R. 92.2(b)(2).

263.   Because the Defendants have sole discretion over financial assistance provided or made available, and because Defendants have sole discretion over the application of the Regulation and any religious freedom protection that applies, the Regulation vests unbridled discretion over which organizations will have their First Amendment interests accommodated.

264.   In Title IX of the Education Amendments of 1972, Congress precluded discrimination on the basis of "sex" in federally funded education programs, "except that . . . this section shall not apply to an educational institution which is controlled by a religious organization if the application of this subsection would not be consistent with the religious tenets of such organization." 20 U.S.C. § 1681(a)-(a)(3). Defendants have exercised unbridled discretion by declining to apply the clear religious freedom protections of Title IX.

265.   In Title IX of the Education Amendments of 1972, Congress banned sex discrimination in federally funded education programs, except that it made clear that "Nothing in this chapter shall be construed to require or prohibit any person, or public or private entity, to provide or pay for any benefit or service, including the use of

63

facilities, related to an abortion. Nothing in this section shall be construed to permit a penalty to be imposed on any person or individual because such person or individual is seeking or has received any benefit or service related to a legal abortion." 20 U.S.C. § 1688. Defendants have exercised unbridled discretion by declining to apply the clear abortion protections of Title IX.

266.   Defendants' actions therefore violate the Plaintiffs' rights not to be subjected to a system of unbridled discretion when engaging in speech or when engaging in religious exercise, as secured to them by the First Amendment of the United States Constitution.

267.   Absent injunctive and declaratory relief against the Regulation, Plaintiffs have been and will continue to be harmed.

## COUNT IX

### Violation of the First Amendment to the United States Constitution
### Free Speech Clause
### Unconstitutional Conditions

268.   The Plaintiffs incorporate by reference all preceding paragraphs.

269.   The Regulation imposes an unconstitutional condition on Plaintiffs' receipt of federal funding. *See Agency for Int'l Dev.*, 133 S. Ct. at 2331.

270.   The Regulation applies to any healthcare provider who accepts federal funding from any source for any program.

271.   The Regulation requires the Plaintiffs to adopt policies regarding standards of care for patients that violate Plaintiffs' religious and conscientious

beliefs, as well as their medical judgment, and also interfere with the Plaintiffs' practice of medicine.

272.    Defendants' actions therefore impose an unconstitutional condition on Plaintiffs' receipt of federal funding and violate Plaintiffs' rights as secured to them by the First and Fourteenth Amendments of the United States Constitution.

273.    Absent injunctive and declaratory relief against the Regulation, Plaintiffs have been and will continue to be harmed.

## COUNT X

**Violation of the First Amendment
Freedom of Speech
Expressive Association**

274.    The Plaintiffs incorporate by reference all preceding paragraphs.

275.    The Plaintiffs believe and teach that participating in actions, procedures, and services with the goal of transitioning from one sex to another violate their religious beliefs.

276.    The Plaintiffs believe and teach that participating in actions, procedures, and services that result in elective sterilizations violate their religious beliefs.

277.    The Plaintiffs believe and teach that participating in actions, procedures, and services related to abortion violate their religious beliefs.

278.    The Transgender Mandate would compel the Plaintiffs to participate in procedures, services, and activities that contradict the Plaintiffs' religious beliefs and message.

279. The Transgender Mandate would compel the Plaintiffs to offer insurance coverage for procedures, services, and activities that violate Plaintiffs' religious beliefs and message.

280. Defendants' actions thus violate Plaintiffs' rights of expressive association as secured to them by the First Amendment of the United States Constitution.

281. Absent injunctive and declaratory relief against the Transgender Mandate, the Plaintiffs have been and will continue to be harmed.

282. The Regulation exposes the Plaintiffs to civil suits that would hold them liable for practicing and expressing their sincerely held religious beliefs.

283. The Regulation furthers no compelling governmental interest.

284. The Regulation is not the least restrictive means of furthering Defendants' stated interests.

## COUNT XI

### Violation of the Religious Freedom Restoration Act
### Compelled Medical Services

285. The Plaintiffs incorporate by reference all preceding paragraphs.

286. The Religious Plaintiffs' sincerely held religious beliefs prohibit them from deliberately offering services and performing (or referring for) operations or other procedures required by the Regulation. The Plaintiffs' compliance with these beliefs is a religious exercise.

287.   The Plaintiffs' sincerely held religious beliefs prohibit them facilitating medical transition procedures. The Plaintiffs' compliance with these beliefs is a religious exercise.

288.   The Plaintiffs' sincerely held religious beliefs prohibit them facilitating sterilization procedures. The Plaintiffs' compliance with these beliefs is a religious exercise.

289.   The Plaintiffs' sincerely held religious beliefs prohibit them facilitating abortion-related services. The Plaintiffs' compliance with these beliefs is a religious exercise.

290.   The Regulation creates government-imposed coercive pressure on the Plaintiffs to change or violate their religious beliefs.

291.   The Regulation chills the Plaintiffs' religious exercise.

292.   The Regulation exposes the Plaintiffs to the loss of substantial government funding as a result of their religious exercise.

293.   The Regulation exposes the Plaintiffs to substantial penalties under the False Claims Act, 31 U.S.C. § 3729 *et seq.*

294.   The Regulation exposes the Plaintiffs to criminal penalties under 18 U.S.C. § 1035.

295.   The Regulation exposes the Plaintiffs to civil suits that would hold them liable for practicing their sincerely held religious beliefs.

296.   The Regulation thus imposes a substantial burden on the Plaintiffs' religious exercise.

297.   The Regulation furthers no compelling governmental interest.

298.   The Regulation is not the least restrictive means of furthering Defendants' stated interests.

299.   The Regulation violates the Plaintiffs rights secured to them by the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.*

## COUNT XII

### Violation of the Religious Freedom Restoration Act
### Compelled Insurance Coverage

300.   The Plaintiffs incorporate by reference all preceding paragraphs.

301.   For the same reasons discussed above, Plaintiffs' sincerely held religious beliefs prohibit them from deliberately offering health insurance that would cover gender transition procedures, sterilization procedures, or abortion-related procedures.

302.   Plaintiffs specifically exclude coverage of any services related to gender transition procedures, sterilization procedures, or abortion-related procedures in their insurance plans.

303.   The Plaintiffs' compliance with these beliefs by maintaining these exclusions is a religious exercise.

304.   Under the Regulation, insurance exclusions related to gender transition are facially invalid.

305.   Under the Regulation, insurance exclusions related to sterilization are facially invalid.

306.    Under the Regulation, insurance exclusions related to abortion services are facially invalid.

307.    The Regulation exposes the Plaintiffs to the loss of substantial government funding as a result of their religious exercise.

308.    The Regulation also makes it much more expensive for the Plaintiffs to do business with a third party administrator for a health benefits plan. The Regulation subjects third party administrators to potential liability for administering religious health plans like Plaintiffs', and thus Plaintiffs will be forced to indemnify any third party administrator from this liability. This constitutes an additional substantial burden on its religious exercise.

309.    The Regulation exposes the Plaintiffs to substantial penalties under the False Claims Act, 31 U.S.C. § 3729 *et seq*.

310.    The Regulation exposes the Plaintiffs to criminal penalties under 18 U.S.C. § 1035.

311.    The Regulation exposes the Plaintiffs to civil suits that would hold them liable for practicing their sincerely held religious beliefs.

312.    The Regulation thus imposes a substantial burden on the Plaintiffs' religious exercise.

313.    The Regulation furthers no compelling governmental interest.

314.    The Regulation is not the least restrictive means of furthering Defendants' stated interests.

315.   The Regulation violates the Plaintiffs rights secured to them by the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.*

## COUNT XIII

### Violation of the First Amendment to the United States Constitution Free Exercise Clause

316.   The Plaintiffs incorporate by reference all preceding paragraphs.

317.   Plaintiffs object to providing, facilitating, or otherwise participating in medical transition procedures.

318.   The Regulation imposes substantial burdens on the Plaintiffs by forcing them to choose between federal funding and their livelihood as healthcare providers and their exercise of religion.

319.   The Regulation seeks to suppress the religious practice of individuals and organizations such as the Plaintiffs, while allowing exemptions for similar conduct based on secular and non-religious reasons. Thus, the Regulation is neither neutral nor generally applicable.

320.   The Regulation is not justified by a compelling governmental interest.

321.   Even if HHS has a compelling government interest, the Regulation is not narrowly tailored to achieve that interest.

322.   Defendants' actions thus violate the Plaintiffs' rights secured to them by the Free Exercise Clause of the First Amendment of the United States Constitution.

323.   Absent injunctive and declaratory relief against the Regulation, Plaintiffs have been and will continue to be harmed.

## COUNT XIV

**Violation of the Fifth Amendment to the United States Constitution
Due Process Clause
Substantive Due Process**

324.   Plaintiffs incorporate by reference all preceding paragraphs.

325.   The United States has a deeply rooted tradition of honoring physicians' rights to provide medical treatment in accordance with their moral and religious beliefs.

326.   Plaintiffs possess a fundamental right of liberty of conscience.

327.   Plaintiffs possess a fundamental right not to be coerced to provide medical procedures and services in violation of their conscience.

328.   The Regulation coerces Plaintiffs to provide medical procedures and services in violation of their conscience.

329.   Defendants' conduct cannot be justified by a compelling governmental interest.

330.   The Regulation is not justified by a compelling governmental interest.

331.   Even if HHS has a compelling government interest, the Regulation is not narrowly tailored to achieve that interest.

332.   Defendants' actions therefore violate Plaintiffs' rights to substantive due process.

333.   Absent injunctive and declaratory relief against the Regulation, the Plaintiffs have been and will continue to be harmed.

**COUNT XV**

**Violation of the Fifth Amendment to the United States Constitution
Due Process and Equal Protection**

334.    The Plaintiffs incorporate by reference all preceding paragraphs.

335.    The Due Process Clause of the Fifth Amendment mandates the equal treatment of all religious faiths and institutions without discrimination or preference.

336.    The Regulation discriminates on the basis of religious views or religious status by refusing to recognize religious exemptions that exist in the law.

337.    The Regulation discriminates on the basis of religious views or religious status by refusing to recognize valid medical views of religious healthcare professionals on medical transition procedures.

338.    The Defendants' actions thus violate the Plaintiffs' rights secured to them by the Fifth Amendment of the United States Constitution.

339.    Absent injunctive and declaratory relief against the Regulation, the Plaintiffs have been and will continue to be harmed.

**COUNT XVI**

**Violation of the Clear Notice Standards
Under the Spending Clause of Article I of the United States Constitution**

340.    The Plaintiffs incorporate by reference all preceding paragraphs.

341.    When Congress exercises its Spending Clause power against the States, the United States Supreme Court has held that principles of federalism require conditions on Congressional funds given to States must enable a state official to "clearly understand," from the language of the law itself, what conditions the State

is agreeing to when accepting the federal funds. *Arlington Cent. Sch. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). "The legitimacy of Congress's exercise of the spending power 'thus rests on whether the [entity] voluntarily and knowingly accepts the terms of the 'contract.'" *NFIB v. Sebelius*, 132 S. Ct. 2566, 2602 (2012) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). Defendants' *ex-post* Regulation is not in accord with the understanding that existed when the States chose to begin accepting Medicare and Medicaid as payment for medical services provided. *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985) (providing that a state's obligation under cooperative federalism program "generally should be determined by reference to the law in effect when the grants were made").

342.   The text employed by Congress does not support understanding the term "sex" in the manner put forth by Defendants. While Congress has expressed its intent to cover "gender identity," as a protected class, in *other* pieces of legislation, *see, e.g.*, 18 U.S.C. § 249(a)(2)(A); 42 U.S.C. § 13925(b)(13)(A), it has not done so in Title IX. In *other* legislation, Congress included "gender identity" along with "sex," thus evidencing its intent for "sex" in Title IX to retain its original and only meaning—one's immutable, biological sex as acknowledged at or before birth.

343.   The Regulation was passed under the authority Congress delegated to HHS in Section 1557 of the Affordable Care Act. Section 1557 does not add a new non-discrimination provision to the federal code, but merely incorporates by reference pre-existing provisions under Title VI, Title IX, the Americans with Disabilities Act,

and the Rehabilitation Act. Section 1557 does not independently define terms such as "sex."

344.   At the time that the ACA was passed in 2010, no federal courts or agencies had interpreted "sex" in Title IX to include gender identity.

345.   Title IX also provides that "Nothing in this chapter shall be construed to require . . . any person, or public or private entity, to provide or pay for any benefit or service, including the use of facilities, related to an abortion." 20 U.S.C. § 1688.

346.   Thus, no State could fathom, much less "clearly understand," that the ACA would impose on it the conditions created by HHS's new Regulation—namely, a new "gender identity" requirement, as well as a provision to require coverage, funding, or facilities for abortion. Accordingly, the new Regulation violates the Spending Clause.

347.   Moreover, Defendants are "agencies" under the APA, 5 U.S.C. § 551(1), and the new Regulation complained of herein is a "rule" under the APA, *id.* § 551(4), and constitutes "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Id.* § 704. The APA requires the Court to hold unlawful and set aside any agency action that is "contrary to constitutional right, power, privilege, or immunity" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.* § 706(2)(B)–(C). Thus, the Spending Clause violations articulated herein provide the Court with an additional basis to set aside the new Rule under the APA.

348.    The Defendants' actions thus violate the APA and the Spending Clause of the United States Constitution.

349.    Absent injunctive and declaratory relief against the Regulation, the State Plaintiffs have been and will continue to be harmed.

## COUNT XVII

### Violation of the Eleventh Amendment to the United States Constitution Unlawful Abrogation of Sovereign Immunity

350.    Plaintiffs incorporate by reference all preceding paragraphs.

351.    The federal government may not abrogate a state's sovereign immunity unless it makes that intention to abrogate unmistakably clear in the language of the statute and acts pursuant to a valid exercise of its power under § 5 of the Fourteenth Amendment. *See, e.g.*, *Nevada Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 726, 728 n.2 (2003).

352.    The abrogation referenced herein was not unmistakably clear in the language of the relevant statutes, and Defendants did not act pursuant to a valid exercise of federal power under § 5 of the Fourteenth Amendment.

353.    In enacting Section 1557 of the ACA, Congress did not make findings regarding "gender identity," but merely incorporated existing law under Title IX, which does not extend to "gender identity." Congress has in fact declined to pass specific "gender identity" legislation on numerous occasions.

354.    The Regulation abrogates the sovereign immunity of the States by subjecting them to lawsuits from their employees. It does so without clear

authorization from Congress, and its expansion of the definition of "sex" to include "gender identity" is not supported by Congressional findings.

355.   The Regulation abrogates the sovereign immunity of the States by subjecting them to lawsuits from non-employees, including spouses and dependents of its employees, students at health-related schools run by the States, and patients at state-run hospitals and medical facilities. It does so without clear authorization from Congress, and its expansion of the definition of "sex" to include "gender identity" is not supported by Congressional findings.

356.   Moreover, Defendants are "agencies" under the APA, 5 U.S.C. § 551(1), and the new Regulation complained of herein is a "rule" under the APA, *id.* § 551(4), and constitutes "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Id.* § 704. The APA requires the Court to hold unlawful and set aside any agency action that is "contrary to constitutional right, power, privilege, or immunity" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.* § 706(2)(B)-(C). Thus, the improper abrogation of the States' sovereign immunity articulated herein provides the Court with an additional basis to set aside the new Rule under the APA.

357.   The Defendants' actions thus violate the APA and the Eleventh Amendment to the United States Constitution.

358.   Absent injunctive and declaratory relief against the Regulation, the State Plaintiffs have been and will continue to be harmed.

## COUNT XVIII

**Violation of the Spending Clause of Article I of the United States Constitution
The Regulation is Unlawful and Unconstitutionally Coercive**

359.   Plaintiffs incorporate by reference all preceding paragraphs.

360.   The federal government cannot use its Spending Clause powers to coerce the States, even when proper notice procedures are followed.

361.   The Supreme Court struck down a similar attempt under the ACA because "such conditions take the form of threats to terminate other significant independent grants," and are therefore "properly viewed as a means of pressuring the States to accept policy changes." *NFIB*, 132 S. Ct. at 2604.

362.   The Regulation threatens other independent grants, such as general Medicare and Medicaid funds, as well as other health-related grants.

363.   By placing in jeopardy a substantial percentage of the State's budget if it refuses to comply with the Regulation, Defendants have left the State no real choice but to acquiesce in such policy. *See NFIB*, 132 S. Ct. at 2605 ("The threatened loss of over 10 percent of a State's overall budget, in contrast, is economic dragooning that leaves the States with no real option but to acquiesce . . .").

364.   Such compulsion is excessive under the Spending Clause, even in the presence of clear notice. "Congress may use its spending power to create incentives for [entities] to act in accordance with federal policies. But when 'pressure turns into compulsion,' the legislation runs contrary to our system of federalism." *NFIB*, 132 S. Ct. at 2602 (quoting *Charles C. Steward Mach. Co. v. Davis*, 301 U.S. 548, 590 (1937))

(internal citation omitted). "That is true whether Congress directly commands a State to regulate or indirectly coerces a State to adopt a federal regulatory system as its own." *Id.*

365.   The compulsion is also improper because the Regulation changes the conditions for the receipt of federal funds *after* the States had already accepted Congress's original conditions. But "[t]he legitimacy of Congress's exercise of the spending power 'thus rests on whether the [entity] voluntarily and knowingly accepts the terms of the 'contract.''" *Id.* (quoting *Pennhurst*, 451 U.S. at 17).

366.   Moreover, Defendants are "agencies" under the APA, 5 U.S.C. § 551(1), and the new Regulation complained of herein is a "rule" under the APA, *id.* § 551(4), and constitutes "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Id.* § 704. The APA requires the Court to hold unlawful and set aside any agency action that is "contrary to constitutional right, power, privilege, or immunity" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.* § 706(2)(B)-(C). Thus, the Spending Clause violations articulated herein provide the Court with an additional basis to set aside the new Rule under the APA.

367.   The Defendants' actions thus violate the APA and the Spending Clause of the United States Constitution.

368.   Absent injunctive and declaratory relief against the Regulation, the Plaintiffs have been and will continue to be harmed.

## COUNT XIX

**Violation of Article I and the Tenth Amendment
of the United States Constitution
The Regulation Unlawfully Commandeers the States**

369.    Plaintiffs incorporate by reference all preceding paragraphs.

370.    The Tenth Amendment restrains the power of Congress by reserving powers for the states that are not delegated to Congress in Article I.

371.    With the Regulation, Defendants have "commandeer[ed] a State's legislative or administrative apparatus for federal purposes." *NFIB*, 132 S. Ct. at 2602.

372.    Such commandeering exceeds powers delegated to Congress under Article I and invades the powers reserved to the States in the Tenth Amendment.

373.    The Defendants' actions thus violate Article I and the Tenth Amendment of the United States Constitution.

374.    Absent injunctive and declaratory relief against the Regulation, the Plaintiffs have been and will continue to be harmed.

## COUNT XX

**Violation of the Tenth Amendment to the United States Constitution
Unconstitutional Exercise of Federal Power**

375.    Plaintiffs incorporate by reference all preceding paragraphs.

376.    State Plaintiff cannot afford the exorbitant and unfunded costs of the Regulation, but has no choice other than to participate.

377.    By effectively co-opting the State's control over its budgetary processes and legislative agendas through compelling it to assume costs it cannot afford, the new Rule invades its sovereign sphere.

378.    The new Rule violates the Tenth Amendment of the Constitution of the United States, and runs afoul of the Constitution's principle of federalism, by commandeering the State and its employees as agents of the federal government's regulatory scheme at the State's own cost.

379.    The Defendants' actions thus violate the Tenth Amendment to the United States Constitution.

380.    Absent injunctive and declaratory relief against the Regulation, the Plaintiffs have been and will continue to be harmed.

## V. PRAYER FOR RELIEF

Wherefore, Plaintiffs pray the Court:

a.    Declare that the challenged Regulation is invalid under the Administrative Procedure Act;

b.    Declare that the challenged Regulation is invalid under the Religious Freedom Restoration Act;

c.    Declare that the challenged Regulation is invalid under the First Amendment to the United States Constitution;

d.    Declare that the challenged Regulation is invalid under the Fifth Amendment of the United States Constitution;

e.     Declare that the challenged Regulation is invalid under the Fourteenth Amendment of the United States Constitution;

f.     Declare that the challenged Regulation is invalid under the Spending Clause of Article I of the United States Constitution;

g.     Declare that the challenged Regulation is invalid under the Tenth Amendment to the United States Constitution;

h.     Declare that the challenged Regulation is invalid under the Eleventh Amendment to the United States Constitution;

i.     Issue a permanent injunction enjoining Defendants from enforcing the challenged Regulations against Plaintiffs, those acting in concert with Plaintiffs, and all States;

j.     Award actual damages;

k.     Award nominal damages;

l.     Award Plaintiffs the costs of this action and reasonable attorney's fees; and

m.     Award such other and further relief as it deems equitable and just.

## VI. JURY DEMAND

Plaintiffs hereby request a trial by jury on all issues so triable.

81

Respectfully submitted this the 7th day of November, 2016.

| | |
|---|---|
| /s/ Luke W. Goodrich | /s/ Wayne Stenehjem |
| Luke W. Goodrich | Wayne Stenehjem |
| Stephanie H. Barclay | Attorney General of North Dakota |
| The Becket Fund for Religious Liberty | 600 E. Boulevard Avenue |
| 1200 New Hampshire Ave. NW | Bismarck, ND  58505-0040 |
| Suite 700 | Telephone:  (701) 328-2210 |
| Washington, DC 20036 | Facsimile:  (701) 328-2226 |
| Telephone:  (202) 349-7216 | |
| Facsimile:  (202) 955-0090 | Douglas A. Bahr |
| lgoodrich@becketfund.org | Solicitor General |
| | N.D. Office of Attorney General |
| *Counsel for Plaintiffs Religious Sisters of Mercy, Sacred Hearth Mercy Health Care Center (Jackson, MN); Sacred Heart Mercy Health Care Center (Alma, MI); SMP Health System, and University of Mary* | 500 N. 9th Street |
| | Bismarck, ND 58501 |
| | Telephone:  (701) 328-3640 |
| | Facsimile:  (701) 328-4300 |
| | |
| | *Counsel for Plaintiff North Dakota* |