**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
EASTERN DIVISION**

THE RELIGIOUS SISTERS OF MERCY;
SACRED HEART MERCY HEALTH CARE
CENTER (Jackson, MN); SACRED HEART
MERCY HEALTH CARE CENTER (Alma,
MI); SMP HEALTH SYSTEM; UNIVER-
SITY OF MARY;

- and -

STATE OF NORTH DAKOTA,

     *Plaintiffs,*

    v.

SYLVIA BURWELL, Secretary
of the United States Department of
Health and Human Services; and UNITED
STATES DEPARTMENT OF HEALTH
AND HUMAN SERVICES,

     *Defendants.*

No. 3:16-cv-00386-RRE-ARS

**Plaintiffs' Memorandum in
Support of Their Motion for
Preliminary Injunction**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION ............................................................................................... 1

STATEMENT OF FACTS ................................................................................... 2

   A.  Title IX .................................................................................................. 2

   B.  Attempts to Add Protection for "Gender Identity" ............................. 3

   C.  The Affordable Care Act ..................................................................... 3

   D.  Executive Branch Changes .................................................................. 3

   E.  The Rule ............................................................................................... 5

   F.  Plaintiffs and the Effect of the New Rule ........................................... 7

ARGUMENT ..................................................................................................... 11

   I.  The Rule violates the Administrative Procedure Act ........................ 12

      A.  HHS's interpretation of "sex" to include "gender
          identity" is contrary to law ............................................................ 12

      B.  HHS's failure to include religious or abortion-
          related exemptions is contrary to law, arbitrary
          and capricious, and in excess of statutory authority ..................... 18

          1.  The Rule is contrary to law, arbitrary and
              capricious, and exceeds statutory authority
              because it fails to include Title IX's exemption
              for religious entities ............................................................ 18

          2.  The Rule is contrary to law, arbitrary and
              capricious, and exceeds statutory authority
              because it ignores Title IX's abortion exemption ................. 19

      C.  HHS's failure to allow employers to accommodate
          employees' religious beliefs is contrary to Title VII ................... 20

   II.  The Rule violates the Religious Freedom Restoration Act ............... 21

i

A. The Rule substantially burdens Plaintiffs' religious exercise by imposing massive financial penalties ......................................22

B. The Rule cannot satisfy strict scrutiny...........................................................23

    1. The Rule furthers no compelling interest............................................23

    2. Defendants have numerous less restrictive means of furthering their interests........................................................27

III. The Rule violates the Spending Clause ................................................29

IV. The Rule violates the Free Speech Clause.............................................31

V. The Rule is unconstitutionally vague.....................................................34

A. The Rule fails to give fair notice of what conduct is subject to liability and gives HHS ample room for arbitrary enforcement..................................................................35

B. The Rule's vague, overbroad, and content-based restrictions result in a serious chilling effect on protected expressive activity.........................................................37

VI. A preliminary injunction is required......................................................38

CONCLUSION.............................................................................................41

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*281 Care Comm. v. Arneson*,
  766 F.3d 774 (8th Cir. 2014) .........................................................................26, 40

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
  133 S. Ct. 2321 (2013) .......................................................................................33

*Arlington Central School District Board of Education v. Murphy*,
  548 U.S. 291 (2006) ...........................................................................................29

*Baggett v. Bullitt*,
  377 U.S. 360 (1964) ...........................................................................................38

*Burwell v. Hobby Lobby Stores, Inc.*,
  134 S. Ct. 2751 (2014) .............................................................................. *passim*

*Cannon v. Univ. of Chicago*,
  441 U.S. 677 (1979) .......................................................................................2, 15

*Chalenor v. Univ. of N.D.*,
  291 F.3d 1042 (8th Cir. 2002) ........................................................................2, 16

*Christian Legal Soc'y v. Walker*,
  453 F.3d 853 (7th Cir. 2006) .............................................................................40

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
  508 U.S. 520 (1993) ...........................................................................................23

*Conant v. Walters*,
  309 F.3d 629 (9th Cir. 2002) .............................................................................32

*Cramp v. Bd. of Pub. Instruction of Orange Cty., Fla.*,
  368 U.S. 278 (1961) ...........................................................................................37

*Dept. of Health & Human Servs. v. CNS Int'l Ministries*,
  No. 15-775, 2016 WL 2842448 (U.S. May 16, 2016) ........................................11

*EEOC v. Abercrombie & Fitch Stores, Inc.*,
  135 S. Ct. 2028 (2015) .......................................................................................20

*Elrod v. Burns*,
  427 U.S. 347 (1976) ...........................................................................................38

*Etsitty v. Utah Transit Auth.*,
  502 F.3d 1215 (10th Cir. 2007) ............................................................13, 17

*F.C.C. v. Fox Television Stations, Inc.*,
  132 S. Ct. 2307 (2012) ..............................................................34, 35, 37

*Gonzales v. O Centro Espirita Beneficente*
  *Uniao do Vegetal*,
  546 U.S. 418 (2006) ...................................................................21, 33

*Grayned v. City of Rockford*,
  408 U.S. 104 (1972) ...................................................................34, 37

*Gross v. Weber*,
  186 F.3d 1089 (8th Cir. 1999) ..............................................................29

*Hamilton v. Schriro*,
  74 F.3d 1545 (8th Cir. 1996) ...............................................................23

*Harris v. McRae*,
  448 U.S. 297 (1980) ..........................................................................26

*Hawkins v. Cmty. Bank of Raymore*,
  761 F.3d 937 (8th Cir. 2014) ..........................................................11-12

*Hobby Lobby Stores, Inc. v. Sebelius*,
  723 F.3d 1114 (10th Cir. 2013) ............................................................38

*Holder v. Humanitarian Law Project*,
  561 U.S. 1 (2010) ............................................................................34

*I.R.S., Fresno Serv. Ctr. v. FLRA*,
  706 F.2d 1019 (9th Cir. 1983) ..............................................................21

*Iowa Right to Life Comm., Inc. v. Williams*,
  187 F.3d 963 (8th Cir. 1999) ...............................................................38

*Johnston v. Univ. of Pittsburgh of Com. Sys. of Higher Educ.*,
  97 F. Supp. 3d 657 (W.D. Pa. 2015) .......................................................14

*Kansas v. United States*,
  249 F.3d 1213 (10th Cir. 2001) ............................................................39

*Knox v. Serv. Emps. Int'l Union*,
  132 S. Ct. 2277 (2012) .....................................................................30

*Korte v. Sebelius*,
735 F.3d 654 (7th Cir. 2013) ..................................................................39

*N. Haven Bd. of Ed. v. Bell*,
456 U.S. 512 (1982)..................................................................................15

*New Motor Vehicle Bd. of California v. Orrin W. Fox Co.*,
434 U.S. 1345 (1977)................................................................................39

*NFIB v. Sebelius*,
132 S. Ct. 2566 (2012)..............................................................................30

*Oglala Sioux Tribe of Indians v. Andrus*,
603 F.2d 707 (8th Cir. 1979) ...................................................................21

*Opulent Life Church v. City of Holly Spring, Miss.*,
697 F.3d 279 (5th Cir. 2012) ...................................................................39

*Pennhurst State Sch. & Hosp. v. Halderman*,
451 U.S. 1 (1981)................................................................................ 28-29

*Premachandra v. Mitts*,
753 F.2d 635 (8th Cir. 1985) ...................................................................29

*R.A.V. v. St. Paul*,
505 U.S. 377 (1992)..................................................................................33

*Rosenberger v. Rector*,
515 U.S. 819 (1995)..................................................................................33

*Sharpe Holdings, Inc. v. U.S. Dep't of Health & Human Servs.*,
801 F.3d 927 (8th Cir. 2015) ............................................................ *passim*

*Smith v. Goguen*,
415 U.S. 566 (1974)............................................................................37, 38

*Sommers v. Budget Mktg., Inc.*,
667 F.2d 748 (8th Cir. 1982) ...............................................12, 13, 15, 16

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011)..................................................................................32

*South Dakota v. Dole*,
483 U.S. 203 (1987)..................................................................................28

*Sweet v. Mulberry Lutheran Home*,
No. IP02-0320-C-H/K, 2003 WL 21525058 (S.D. Ind. June 17, 2003)..................................14

*Texas v. E.P.A.*,
   829 F.3d 405 (5th Cir. 2016) .............................................................39

*Texas v. United States*,
   809 F.3d 134 (5th Cir. 2015) .............................................................40

*Texas v. United States*,
   No. 7:16-CV-00054-O, 2016 WL 4426495 (N.D. Tex. Aug. 21, 2016) ...........................14, 30

*Ulane v. E. Airlines, Inc.*,
   742 F.2d 1081 (7th Cir. 1984) .......................................................13, 17

*United States v. Smith*,
   756 F.3d 1070 (8th Cir. 2014) .............................................................13

*United States v. Williams*,
   553 U.S. 285 (2008) .................................................................34, 35

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
   455 U.S. 489 (1982) ......................................................................37

*Walters v. Metro. Educ. Enters., Inc.*,
   519 U.S. 202 (1997) ......................................................................17

*Wolfe v. Fayetteville, Arkansas Sch. Dist.*,
   648 F.3d 860 (8th Cir. 2011) .............................................................12

**Statutes**

5 U.S.C. § 706.................................................................................11

18 U.S.C. § 249..............................................................................3, 16

20 U.S.C. § 1681.......................................................................*passim*

20 U.S.C. § 1688..............................................................................2, 19

42 U.S.C. § 1395.............................................................................25

42 U.S.C. § 2000bb-1 ...................................................................21, 23

42 U.S.C. § 2000e...........................................................................20

42 U.S.C. § 2000e-2........................................................................20

42 U.S.C. § 13925..........................................................................3, 16

42 U.S.C. § 18023..........................................................................26

42 U.S.C. § 18116 ...................................................................................................2, 3, 18, 20

**Regulations**

44 Fed. Reg. 71413 (Dec. 11, 1979) .....................................................................................3, 15

77 Fed. Reg. 5662 (Feb. 3, 2012) ..................................................................................................4

81 Fed. Reg. 31376 (May 18, 2016) .......................................................................................*passim*

34 C.F.R. pt. 106 ............................................................................................................................3

45 C.F.R. § 92.4 .......................................................................................................................*passim*

45 C.F.R. § 92.101 .................................................................................................2, 6, 12, 18

45 C.F.R. § 92.207 ........................................................................................................................7

45 C.F.R. § 92.301 .................................................................................................7, 22, 39

Exec. Order No. 13,672, 79 Fed. Reg. 42971 (July 21, 2014)........................................................5

**Legislative Materials**

118 Cong. Rec. 5808 (1972) .....................................................................................................15

H.R. 166, 94th Cong. (1975) ...................................................................................................16

H.R. 1652, 113th Cong. (2013)............................................................................................3, 16

H.R. 2015, 110th Cong. (2007) ............................................................................................3, 16

H.R. 2074, 96th Cong. (1979) ................................................................................................16

H.R. 2981, 111th Cong. (2009)............................................................................................3, 16

H.R. 3185, 114th Cong. (2015).............................................................................................3, 16

H.R. 4636, 103rd Cong. (1994) .............................................................................................16

H.R. 14752, 93rd Cong. (1974) .............................................................................................16

Health Care and Education Reconciliation Act,
    Pub. L. 111-152 (March 30, 2010) ....................................................................................3

Patient Protection and Affordable Care Act,
    Pub. L. 111-148 (March 23, 2010) ....................................................................................3

S. 1858, 114th Cong. (2015) .................................................................................3, 16

S. 2081, 96th Cong. (1979) ........................................................................................16

S. 439, 114th Cong. (2015) ...................................................................................3, 16

S. 811, 112th Cong. (2011) ...................................................................................3, 16

Social Security Amendments of 1965,
      Pub. L. No. 89–97, 79 Stat. 286 ........................................................................29

**Other Authorities**

American Heritage Dictionary (1976) ....................................................................2, 14

Catherine E. Lhamon, Assistant Sec'y for Civil Rights,
      U.S. Dep't of Educ., Office for Civil Rights,
      *Questions and Answers on Title IX and Sexual Violence* (2014) ...............................4

Compl., *Prescott v. Rady Children's Hosp. - San Diego*,
      No. 16-2408 (S.D. Cal. Sept. 26, 2016) .............................................................31

David Haig, *The Inexorable Rise of Gender and the Decline of Sex:*
      *Social Change in Academic Titles*, *1945–2001*,
      Archives of Sexual Behav., Apr. 2004 ..............................................................14

Dear Colleague Letter on Harassment and Bullying from
      Russlynn Ali, Assistant Sec'y for Civil Rights, U.S. Dep't
      of Educ., Office for Civil Rights (Oct. 26, 2010) ................................................4

Def.'s Post-Trial Br., *Schroer v. Billington*,
      577 F. Supp. 2d 293 (D.D.C. 2008) (No. 05-01090) ......................................4, 17

Institute of Medicine of the National Academies, The Health of
      Lesbian, Gay, Bisexual and Transgender People:
      Building a Foundation for Better Understanding (2011) ......................................25

Joanne Meyerowitz, *A History of "Gender,"*
      113 Am. Hist. Rev. 1346 (2008) ......................................................................14

Lena H. Sun & Lenny Bernstein, *U.S. Moves to Protect Women, Transgender*
      *People in Health Care*, Washington Post, Sep. 3, 2015 ......................................17

Letter from Jocelyn Samuels, Dir., Office for Civil Rights,
      Dep't of Health & Human Servs., to Catherine W. Short, et al.
      (June 21, 2016)..............................................................................................20

Mem. from the Attorney General on Treatment of Transgender
    Employment Discrimination Claims Under Title VII of the
    Civil Rights Act of 1964 (Dec. 15, 2014) ..................................................5

New Oxford American Dictionary (3d ed. 2010) ...........................................14

Oxford English Dictionary (1961) .................................................................14

Patricia A. Shiu, Director, U.S. Dep't of Labor, Office of Fed.
    Contract Compliance Programs, Directive 2014-02, Gender
    Identity and Sex Discrimination (2014).....................................................5

Press Release, Shantae Goodloe, U.S. Dep't of Hous. and Urban Dev.,
    HUD No. 10-139, *HUD Issues Guidance on LGBT Housing
    Discrimination Complaints* (July 1, 2010),................................................4

Sacred Heart Mercy Health Care Center, *Mission*,
    http://www.sacredheartmercy.org/mission/ ...............................................8

SMP Health System, *Philosophy*,
    http://www.smphs.org/mission-values-vision-philosophy.html .................8

*Trans Health Clinics*, Trans-Health.com,
    http://www.trans-health.com/clinics/ ......................................................28

U.S. Dep't of Justice and U.S. Dep't of Educ., Dear Colleague Letter
    on Transgender Students, May 13, 2016 ...................................................5

Webster's Third New Int'l Dictionary (1971) ...............................................14

ix

## INTRODUCTION

In 45 days, Plaintiffs will run afoul of a new Rule issued by the Department of Health and Human Services that seeks to override the medical judgment of healthcare professionals across the country. On pain of massive liability, the Rule forces doctors and hospitals to perform controversial and potentially harmful medical procedures that purport to permanently alter an individual's sex—even when doing so would violate a doctor's religious beliefs and medical judgment, and even when the government's own programs exclude the procedures as potentially harmful.

The purported authority for this dramatic new mandate is the administrative redefinition of a single word in Title IX: "sex." For decades, Congress has consistently used "sex" to refer to an individual's status as male or female, as determined by biological sex at birth. But in the new Rule, HHS redefines "sex" to include an individual's "gender identity," which it defines as "an individual's internal sense of gender, which may be male, female, neither, or a combination of male and female, and which may be different from an individual's sex assigned at birth." 45 C.F.R. § 92.4. HHS then claims that it is "discrimination" on the basis of "sex" to decline to perform gender transition procedures. Thus, with a single stroke of the pen, HHS has created massive new liability for thousands of doctors unless they cast aside their convictions and perform procedures that can be deeply harmful to their patients. It has also threatened to deprive the nation's most vulnerable citizens of healthcare by stripping states and hospitals of Medicare and Medicaid funds.

The Rule ought to be short-lived, because it cannot withstand even the slightest judicial scrutiny. HHS's attempt to redefine "sex" violates the Administrative Procedure Act. Its attempt to force doctors to violate their religious beliefs violates the Religious Freedom Restoration Act. Its attempt to manipulate the States violates the Spending Clause. And its attempt to control doctors' speech violates the Free Speech Clause. Accordingly, it must be enjoined.

## STATEMENT OF FACTS

The Rule at issue here prohibits discrimination on the basis of "sex" in certain health activities. 45 C.F.R. § 92.101(a)(1). It defines "sex" to include, among other things, "gender identity." *Id.* § 92.4. The purported authority for the Rule is Section 1557 of the Affordable Care Act ("ACA"), which prohibits discrimination in various health activities "on the ground prohibited under . . . title IX of the Education Amendments of 1972." 42 U.S.C. § 18116(a). Title IX, in turn, prohibits discrimination in education on the basis of "sex." 20 U.S.C. § 1681(a). Because the purported authority for the Rule ultimately comes from Title IX, we begin there.

### A. Title IX

Congress enacted Title IX in 1972, prohibiting discrimination in certain education programs on the basis of "sex." 20 U.S.C. § 1681(a). The statute expressly exempts religious organizations and precludes interpreting "sex" to mean abortion. 20 U.S.C. § 1681(a)(3); 20 U.S.C. § 1688.

At that time, the term "sex" was commonly understood to refer to the physiological differences between men and women, particularly with respect to reproductive functions. *See, e.g.*, American Heritage Dictionary 1187 (1976) ("The property or quality by which organisms are classified according to their reproductive functions."). That understanding is reflected throughout the statute, which requires equal treatment with respect to two different "sexes"—male and female. *See, e.g.*, 20 U.S.C. § 1681(a)(8) (requiring comparable activities between students of "one sex" and "the other sex"). The law has long been interpreted to prohibit federally funded education programs from treating men better than women, or vice versa. *See, e.g.*, *Cannon v. Univ. of Chicago*, 441 U.S. 677, 680 (1979); *Chalenor v. Univ. of N.D.*, 291 F.3d 1042, 1044 (8th Cir. 2002).

### B. Attempts to Add Protection for "Gender Identity"

Since Title IX was enacted, Congress has considered a variety of proposals to add new statutory protections based on "gender identity." These include many attempts to amend both Title VII

2

and Title IX. *E.g.*, H.R. 2015, 110th Cong. (2007); H.R. 2981, 111th Cong. (2009); S. 811, 112th Cong. (2011); H.R. 1652, 113th Cong. (2013); S. 439, 114th Cong. (2015). And they include attempts currently pending in Congress to do precisely what the new Rule purports to do—prohibit discrimination in federally funded programs on the basis of "gender identity." H.R. 3185, 114th Cong. (2015); S. 1858, 114th Cong. (2015). To date, almost all of these proposals have failed. But two have succeeded. First, in 2010, Congress enacted hate crimes legislation providing enhanced penalties for crimes motivated by "gender identity." 18 U.S.C. § 249(a)(2). Second, in 2013, Congress reauthorized the Violence Against Women Act, prohibiting discrimination in certain funding programs on the basis of "sex" and—separately—"gender identity." 42 U.S.C. § 13925(b)(13)(A).

### C. The Affordable Care Act

Against this backdrop, in March 2010, Congress enacted the Patient Protection and Affordable Care Act, Pub. L. 111-148 (March 23, 2010), and the Health Care and Education Reconciliation Act, Pub. L. 111-152 (March 30, 2010), collectively known as the "Affordable Care Act" or "ACA." As noted above, the key provision at issue in this case, Section 1557, does not use the term "sex" but instead prohibits discrimination "on the ground prohibited under . . . title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.)." 42 U.S.C. § 18116(a). Nothing in nearly 1,000 pages of text of the ACA mentions "gender identity."

### D. Executive Branch Changes

For several decades, across a variety of statutes, federal agencies consistently interpreted "sex" to refer to physiological differences between males and females. *See, e.g.*, A Policy Interpretation: Title IX & Intercollegiate Athletics, 44 Fed. Reg. 71413 (Dec. 11, 1979) (listing "male and female" 28 times, "men and women" 24 times, and "men's and women's" 21 times); Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 34 C.F.R. pt. 106 (addressing expenditures for male and female teams). As late as 2008, the U.S.

Department of Justice was still arguing that "the term 'sex' . . . prohibits discrimination based on the biological state of a male or female," and that "a claim based on gender identity or transsexuality fails as outside the scope of [the term 'sex']." Def.'s Post-Trial Br. at 4, *Schroer v. Billington*, 577 F. Supp. 2d 293 (D.D.C. 2008) (No. 05-01090). No agency, to our knowledge, interpreted "sex" to include "gender identity" before 2010.

But in 2010, several months *after* enactment of the ACA, federal agencies issued a rash of letters, memos, executive orders, and regulations interpreting prohibitions on "sex" discrimination to include protections for "gender identity":

- In July 2010, the Department of Housing and Urban Development (HUD) "announced a new policy . . . treat[ing] gender identity discrimination . . . as gender discrimination under the Fair Housing Act."[1]

- In October 2010, the Office for Civil Rights (OCR) for the Department of Education (DOE) issued a "Dear Colleague" letter asserting that, "[w]hen students are subjected to harassment on the basis of their LGBT status, they may also . . . be subjected to forms of sex discrimination prohibited under Title IX."[2]

- In February 2012, HUD issued a regulation forbidding discrimination on the basis of "gender identity" in HUD-assisted or insured housing.[3]

- In April 2014, OCR issued a document stating that "Title IX's sex discrimination prohibition extends to claims of discrimination based on gender identity . . ."[4]

---

[1] Press Release, Shantae Goodloe, U.S. Dep't of Hous. and Urban Dev., HUD No. 10-139, *HUD Issues Guidance on LGBT Housing Discrimination Complaints* (July 1, 2010), http://portal.hud.gov/hudportal/HUD?src=/press/press_releases_media_advisories/2010/HUDNo.10-139.

[2] Dear Colleague Letter on Harassment and Bullying from Russlynn Ali, Assistant Sec'y for Civil Rights, U.S. Dep't of Educ., Office for Civil Rights (Oct. 26, 2010), http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.pdf.

[3] Equal Access to Housing in HUD Programs Regardless of Sexual Orientation or Gender Identity, 77 Fed. Reg. 5662 (Feb. 3, 2012), https://www.regulations.gov/contentStreamer?documentId=HUD-2011-0014-0312&disposition=attachment&contentType=pdf.

[4] Catherine E. Lhamon, Assistant Sec'y for Civil Rights, U.S. Dep't of Educ., Office for Civil Rights, *Questions and Answers on Title IX and Sexual Violence* (2014), http://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf.

4

- In July 2014, the President amended a 50-year-old executive order by adding "gender identity" to a list of prohibited bases of discrimination in federal contracting.[5]

- In August 2014, the Department of Labor issued a Directive that "discrimination based on gender identity or transgender status . . . is discrimination based on sex."[6]

- In December 2014, the Department of Justice (DOJ) issued a memo concluding that Title VII's reference to "sex" "encompasses discrimination based on gender identity, including transgender status."[7]

- In May 2016, DOJ and DOE issued a "Dear Colleague Letter" stating that Title IX's prohibition on "sex discrimination . . . encompasses discrimination based on a student's gender identity."[8]

None of these agency actions involved a statute that used the term "gender identity."

**E. The Rule**

On May 18, 2016, after notice and comment, HHS issued the Rule at issue here—six years after Congress passed the ACA. The Rule applies to any "entity that operates a health program or activity, any part of which receives Federal financial assistance." 45 C.F.R. § 92.4 (definition of "Covered entity"). "Federal financial assistance" is defined broadly to include "any grant, loan, credit, subsidy, contract . . . or any other arrangement" by which the federal government makes available its property or funds. *Id.* Thus, by HHS's own estimate, the Rule applies to almost every health care provider in the country—including over 133,000 health care facilities (such as hospitals and health clinics) and "almost all licensed physicians"—because they all accept some form of

---

[5] Exec. Order No. 13,672, 79 Fed. Reg. 42971 (July 21, 2014), https://www.gpo.gov/fdsys/pkg/FR-2014-07-23/pdf/2014-17522.pdf.

[6] Patricia A. Shiu, Director, U.S. Dep't of Labor, Office of Fed. Contract Compliance Programs, Directive 2014-02, Gender Identity and Sex Discrimination (2014), www.dol.gov/ofccp/regs/compliance/directives/dir2014_02.html.

[7] Mem. from the Attorney General on Treatment of Transgender Employment Discrimination Claims Under Title VII of the Civil Rights Act of 1964 (Dec. 15, 2014) at 2, https://www.justice.gov/sites/default/files/opa/press-releases/attachments/2014/12/18/title_vii_memo.pdf.

[8] U.S. Dep't of Justice and U.S. Dep't of Educ., Dear Colleague Letter on Transgender Students, May 13, 2016, http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201605-title-ix-transgender.pdf.

federal funding, such as Medicare or Medicaid. Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31376, 31445-46 (May 18, 2016).

The new Rule prohibits discrimination "on the basis of . . . sex," defines "sex" to include "gender identity," and defines "gender identity" as an individual's "internal sense of gender, which may be male, female, neither, or a combination of male and female." 45 C.F.R. § 92.101(a)(1), § 92.4. The Rule also defines "sex" to include discrimination based upon "termination of pregnancy." 45 C.F.R. § 92.4.

**Medical Procedures.** The Rule requires covered entities to perform medical transition procedures or else be liable for "discrimination." The Rule explains: "A provider specializing in gynecological services that previously declined to provide a medically necessary hysterectomy for a transgender man would have to revise its policy to provide the procedure for transgender individuals in the same manner it provides the procedure for other individuals." 81 Fed. Reg. at 31455. In other words, if a gynecologist performs a hysterectomy for a woman with uterine cancer, she must do the same for a woman who wants to remove a healthy uterus to transition to living as a man. Thus, declining to remove a healthy organ is "discrimination." HHS explains that this reasoning applies across the full "range of transition-related services." *Id.* at 31435. This "is not limited to surgical treatments and may include, but is not limited to, services such as hormone therapy and psychotherapy, which may occur over the lifetime of the individual." *Id.* at 31435-36.

In addition, because the new Rule prohibits discrimination on the basis of "termination of pregnancy," it pressures healthcare providers who perform procedures such as a dilation and curettage for a miscarriage to perform the same procedure for an abortion.

**Insurance Coverage**. The Rule also requires covered entities to pay for medical transition

procedures in their health insurance plans. The Rule states: "A covered entity shall not, in providing or administering health-related insurance . . . [h]ave or implement a categorical coverage exclusion or limitation for all health services related to gender transition." 45 C.F.R. § 92.207(b)(4). According to HHS, this means that a plan excluding "coverage for all health services related to gender transition is unlawful on its face." 81 Fed. Reg. at 31429. In addition, if a doctor concludes that a hysterectomy "is medically necessary to treat gender dysphoria," the patient's employer would be required to cover that procedure on the same basis that it would cover a hysterectomy for other conditions (like cancer). *Id.* at 31429. Also, because the new Rule prohibits discrimination on the basis of "termination of pregnancy," it pressures employers who cover procedures such as a dilation and curettage for a miscarriage to cover the same procedure for an abortion.

**Enforcement**. If a covered entity violates the Rule, it is subject to the same penalties that accompany a violation of Title IX. 45 C.F.R. § 92.301. These include the loss of federal funding (Medicare and Medicaid alone can total many millions of dollars), debarment from doing business with the government, and false claims liability. 81 Fed. Reg. at 31472; 45 C.F.R. § 92.301. Penalties also include enforcement proceedings brought by the Department of Justice, 81 Fed. Reg. at 31440, and private lawsuits for damages and attorneys' fees. *Id.* at 31471; 45 C.F.R. § 92.301.

### F.  Plaintiffs and the Effect of the New Rule

The Plaintiffs are five private Catholic organizations and one State that will be adversely affected by the new Rule. Plaintiff **Religious Sisters of Mercy** is a Catholic order of religious sisters devoted to works of mercy, including offering healthcare to the underserved. Ex. A, ¶ 2 (Sister Mary Judith O'Brien Decl.). Each sister has chosen to follow Jesus Christ by taking a lifetime vow to serve the poor and sick by caring for the whole person—including physical, psychological, intellectual, and spiritual woundedness. *Id.* at ¶ 4. As part of their mission, they seek "to bring about that profound and extensive healing which is a continuation of the work of redemption." Sacred

Heart Mercy Health Care Center, *Mission*, http://www.sacredheartmercy.org/mission/ (last visited Nov. 16, 2016). Consistent with this mission, some of the sisters serve as licensed healthcare professionals in healthcare facilities throughout the country. Ex. A, ¶ 5-6 (Sister O'Brien Decl.).

The Religious Sisters of Mercy also own and operate two clinics that are Plaintiffs, both named **Sacred Heart Mercy Health Care Center**—one in Alma, Michigan, and one in Jackson, Minnesota. *Id.* at ¶ 6. Both are incorporated as religious nonprofits. *Id.* The clinics further the sisters' mission to care for the elderly and the poor by serving Medicare and Medicaid patients and by providing low-cost or free care to the uninsured. *Id.* at ¶ 8. Some of the sisters work in these clinics as doctors, nurses, or other healthcare professionals. *Id.* at ¶ 6. The clinics share the religious beliefs of the Religious Sisters of Mercy and are run in accordance with *The Ethical and Religious Directives of the United States Conference of Catholic Bishops*. *Id.*

Plaintiff **SMP Health System** is a non-profit Catholic health system headquartered in Fargo, North Dakota, and founded and sponsored by the Sisters of Mary of the Presentation. Ex. B, ¶ 3 (Sister Suzanne Stahl Decl.). The sisters believe that Catholic health care services and programs are ecclesial in nature, mandated by the Church to carry on the healing ministry of Jesus. SMP Health System, *Philosophy*, http://www.smphs.org/mission-values-vision-philosophy.html (last visited Nov. 16, 2016). As part of that healing ministry, SMP Health System provides a variety of health care services throughout North Dakota, including critical access hospitals, clinics, long-term care facilities, and senior housing. Ex. B, ¶ 3 (Sister Stahl Decl.). It has a special emphasis on providing services to the poor and elderly, including many Medicare and Medicaid patients. *Id.* at ¶ 4. SMP Health System shares the beliefs of the sisters and operates in accordance with *The Ethical and Religious Directives for Catholic Healthcare Services*. *Id.* at ¶ 5.

8

Plaintiff **University of Mary** is a Roman Catholic, Benedictine University with its main campus in Bismarck, North Dakota. The University infuses all of its programs with Christian, Catholic, Benedictine values to prepare its students to be ethical leaders in their communities. Ex. C, ¶ 6 (Monsignor James Patrick Shea Decl.). The University welcomes students of all faiths and backgrounds, and, as is fundamental to its mission, upholds Catholic teaching in all of its programs. *Id.* The University is subject to the Rule because it offers a nursing program that receives funding administered by HHS. *Id.* at ¶ 9. It also has a student health clinic. *Id.* at ¶ 11.

Like the Catholic Church they serve, these Plaintiffs believe that every man and woman is created in the image of God and reflects God's image in unique—and uniquely dignified—ways. Ex. A, ¶ 9 (Sister O'Brien Decl.); Ex B, ¶ 6 (Sister Stahl Decl.); Ex. C, ¶ 10 (Msgr. Shea Decl.). To the extent they provide medical services, Plaintiffs serve everyone in need, including transgender individuals. Ex. D, ¶ 6 (Sister Edith Mary Hart Decl.); Ex. E ¶ 4 (Dr. Richard Twanow Decl.). But they also believe that gender transition procedures are not in the best interests of their patients. Providing those procedures would violate their religious beliefs and medical judgment. Ex. D, ¶¶ 9-11 (Sister Hart Decl.); Ex. B, ¶ 8 (Sister Stahl Decl.); Ex. E, ¶ 5 (Dr. Twanow Decl.). They also have similar religious and medical objections to providing abortions or sterilizations. Ex. B, ¶¶ 9-10 (Sister Stahl Decl.); Ex. E, ¶¶ 8-9 (Dr. Twanow Decl.).

The Rule affects these Plaintiffs in two ways. First, the Rule requires Plaintiffs to offer medical services that violate their religious beliefs and medical judgment. Currently, Plaintiffs provide a variety of health services that are routinely requested as part of a gender transition. For example, the Sacred Heart Mercy Health Care Clinics provide endocrinology services and mental health counseling for anxiety and depression. Ex. D, ¶¶ 10-11 (Sister Hart Decl.). SMP Health System provides hysterectomies, mastectomies, endocrinology services, and psychiatric support. Ex. B,

¶ 8 (Sister Stahl Decl.). They willingly provide these services to everyone in need. Ex. D, ¶ 6
(Sister Hart Decl.). Ex. E, ¶ 4 (Dr. Twanow Decl.). But they cannot, in light of their religious
beliefs and medical judgment, provide these services in furtherance of a gender transition. Ex. D,
¶¶ 9-11 (Sister Hart Decl.); Ex. B, ¶ 8 (Sister Stahl Decl.); Ex. E, ¶ 5 (Dr. Twanow Decl.). Under
the new Rule, they are required "to revise [their] policy to provide the procedure for transgender
individuals in the same manner [they] provide[] the procedure for other individuals," or else they
are liable for "discrimination" based on "gender identity." 81 Fed. Reg. at 31455. If they do not
comply, they are subject to the loss of federal funding, federal enforcement proceedings, and pri-
vate lawsuits for damages and attorneys' fees, which will cripple their religious mission to serve
the poor.

Plaintiffs face a similar dilemma regarding abortion. Currently, Plaintiffs offer procedures for
women who have miscarried a baby, such as dilation and curettage (D&C), that can also be used
to perform an abortion. Ex. B, ¶ 10 (Sister Stahl Decl.). But they cannot offer these services in
furtherance of an abortion. *Id*. Thus, under the Rule, they face the prospect of liability for "dis-
crimination" based on "termination of pregnancy." 45 C.F.R. § 92.4.

Second, the Rule requires Plaintiffs to provide insurance coverage for certain procedures in
violation of their beliefs. As part of their religious beliefs, Plaintiffs provide health benefits to all
of their eligible employees. Ex. A, ¶ 13 (Sister O'Brien Decl.); Ex. B, ¶ 11 (Sister Stahl Decl.);
Ex. C, ¶ 12 (Msgr. Shea Decl.). But Plaintiffs cannot, in good conscience, include coverage in their
insurance for abortions, sterilizations, or any drugs or procedures related to gender transition. Ex.
A, ¶ 13 (Sister O'Brien Decl.); Ex. B, ¶ 11 (Sister Stahl Decl.); Ex. C, ¶ 14 (Msgr. Shea Decl.).
Yet as of January 1, 2017, the Rule makes it "unlawful on its face" to adopt a "categorical" exclu-
sion of "all health services related to gender transition." 81 Fed. Reg. 31429. If they continue to

10

follow their conscience and medical judgment, these Plaintiffs face significant financial penalties.

Plaintiff **State of North Dakota** oversees and controls several agencies and a healthcare facility that receive federal funding administered by HHS. North Dakota also employs many healthcare professionals and provides health benefits to those employees and their families. The new Rule requires North Dakota to provide gender transition procedures, even when its doctors believe such procedures are harmful. If North Dakota's doctors have a religious objection to performing those procedures, the Rule makes it illegal for the State to accommodate those doctors' religious beliefs, even though Title VII would otherwise require it to do so. The Rule also compels North Dakota to provide insurance coverage for medical transition procedures and abortion procedures, as well as training, at significant financial cost. If North Dakota does not comply, it faces significant financial penalties, including loss of federal funding and private lawsuits for damages and attorneys' fees.

## ARGUMENT

When determining whether to issue a preliminary injunction, the Court considers (1) the movant's likelihood of success on the merits, (2) the threat of irreparable harm to the movant, (3) the balance of harms between the parties, and (4) the public interest. *Sharpe Holdings, Inc. v. U.S. Dep't of Health & Human Servs.*, 801 F.3d 927, 936–37 (8th Cir. 2015), *vacated on other grounds, Dept. of Health & Human Servs. v. CNS Int'l Ministries*, No. 15-775, 2016 WL 2842448 (U.S. May 16, 2016). Because "the probability-of-success factor is the most significant," *id.*, we begin there.

## I.  The Rule violates the Administrative Procedure Act.

Under the Administrative Procedure Act ("APA"), courts must "hold unlawful and set aside" agency actions that are "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (2)(C). APA claims proceed under "the two-step framework established by *Chevron*." *Hawkins v. Cmty. Bank of Raymore*, 761

F.3d 937, 940 (8th Cir. 2014). First, courts use the "traditional tools of statutory construction" to interpret the statute. *Id.* If "the intent of Congress is clear as to the precise question at issue . . . that is the end of the matter." *Id.* at 940. Second, and only if "the statute is silent or ambiguous," the court considers whether the agency's interpretation "defines a term in a reasonable way in light of the Legislature's design." *Id.* at 940-41 (internal quotation omitted). Here, the Rule conflicts with the unambiguous text of the statute, so it must be set aside at the first step.

**A.  HHS's interpretation of "sex" to include "gender identity" is contrary to law.**

The new Rule prohibits discrimination "on the basis of sex" in certain health activities, and defines "on the basis of sex" to include, among other things, "gender identity." 45 C.F.R. § 92.101(a)(1), § 92.4. The purported authority for this Rule is Section 1557 of the ACA, which forbids federally funded health programs from discriminating "on the ground prohibited under" four other federal statutes: Title VI, 42 U.S.C. § 2000d ("race, color, or national origin"); Title IX, 20 U.S.C. § 1681 ("sex"); The Age Discrimination Act, 42 U.S.C. § 6101 ("age"); and the Rehabilitation Act, 29 U.S.C. § 794 ("disability").

Section 1557 does not itself use the term "sex"; instead, it simply incorporates the prohibition contained in Title IX. Title IX's key operative provision states:

> No person in the United States shall, on the basis of sex, . . . be subjected to discrimination under any education program or activity receiving Federal financial assistance, except that . . . this section shall not apply to an educational institution which is controlled by a religious organization if the application of this subsection would not be consistent with the religious tenets of such organization.

20 U.S.C. § 1681(a)-(a)(3). Thus, a key question is whether "sex" in Title IX refers to physiological differences between males and females, or whether the term also means "gender identity."

The Eighth Circuit has already answered this question in the analogous context of Title VII—which also prohibits discrimination on the basis of "sex"—and which the Eighth Circuit has held must be "treated interchangeably" with Title IX. *Wolfe v. Fayetteville, Arkansas Sch. Dist.*, 648

F.3d 860, 866 (8th Cir. 2011). Specifically, in *Sommers v. Budget Mktg., Inc.*, 667 F.2d 748 (8th Cir. 1982), the plaintiff alleged that her employment was terminated because of her gender identity—she was "transsexual"—and that this constituted discrimination on the basis of "sex" under Title VII. She argued that "the court should not be bound by the plain meaning of the term 'sex' under Title VII as connoting either male or female gender, but should instead expand the coverage of the Act to protect individuals such as herself who are psychologically female, albeit biologically male." *Id.* at 749. The Eighth Circuit unanimously rejected her argument. Examining the text, purpose, and history of the Act, the Court held that "the word 'sex' in Title VII is to be given its traditional definition" (referring to "biological fact as the basis for determining sex") "rather than an expansive interpretation." *Id.* at 749-50. "Because Congress has not shown an intention to protect transsexuals, we hold that discrimination based on one's transsexualism does not fall within the protective purview of the Act." *Id.* at 750. *Sommers* thus fully resolves this case.

*Sommers* is also plainly correct. To determine the meaning of "sex," the Court must examine the statute's "text, structure, history, and purpose." *United States v. Smith*, 756 F.3d 1070, 1075 (8th Cir. 2014), *cert. denied*, 135 S. Ct. 948 (2015). Here, as many courts have already held, the text, structure, history, and purpose of Title IX are clear: The word "sex" does not mean "gender identity." *Sommers*, 667 F.2d at 750.[9]

---

[9] *See also*, *e.g.*:

- *Etsitty v. Utah Transit Auth.*, 502 F.3d 1215, 1221 (10th Cir. 2007) ("This court agrees with . . . the vast majority of federal courts to have addressed this issue and concludes discrimination against a transsexual based on the person's status as a transsexual is not discrimination because of sex . . . .");

- *Ulane v. E. Airlines, Inc.*, 742 F.2d 1081, 1085 (7th Cir. 1984) ("The phrase in Title VII prohibiting discrimination based on sex, in its plain meaning, implies that it is unlawful to discriminate against women because they are women and against men because they are men. The words of Title VII do not outlaw discrimination against a person who has a sexual identity disorder.");

13

*Text.* Because Title IX does not define "sex," this Court must give the term its "ordinary, contemporary, common meaning." *Smith*, 756 F.3d at 1073. When Title IX passed, virtually every dictionary definition of "sex" referred to physiological distinctions between females and males, particularly with respect to reproduction. *See, e.g.*, American Heritage Dictionary 1187 (1976); Webster's Third New Int'l Dictionary 2081 (1971); 9 Oxford English Dictionary 578 (1961).

The term "gender identity," by contrast, was rarely used. Until the 1950s, "gender" was used primarily by linguists to refer to grammatical classification. Joanne Meyerowitz, *A History of "Gender,"* 113 Am. Hist. Rev. 1346, 1353 (2008). But in the mid-1950s, psychologist John Money appropriated the term "gender" to refer to culturally determined roles for men and women, distinct from "biological sex." *Id.* at 1354. Other social scientists adopted this new usage, and in 1963, Robert Stoller, a psychoanalyst, coined the term "gender identity." David Haig, *The Inexorable Rise of Gender and the Decline of Sex: Social Change in Academic Titles*, *1945–2001*, Archives of Sexual Behav., Apr. 2004, at 93. He argued that "sex was biological but gender was social." *Id.* That usage was further popularized by feminist authors in the 1970s. Meyerowitz, *A History of "Gender,"* at 1353. Thus, to the extent "gender" or "gender identity" were used at the time of Title IX's passage, they were used in *contrast* to "sex": "gender" was socially constructed, "sex" was biological. That use remains common today. *See, e.g.*, New Oxford American Dictionary 721-22,

---

- *Texas v. United States*, No. 7:16-CV-00054-O, 2016 WL 4426495, at *14 (N.D. Tex. Aug. 21, 2016) ("[T]he plain meaning of the term sex" in Title IX regulations "meant the biological and anatomical differences between male and female students as determined at their birth.");

- *Johnston v. Univ. of Pittsburgh of Com. Sys. of Higher Educ.*, 97 F. Supp. 3d 657, 674 (W.D. Pa. 2015), appeal dismissed (Mar. 30, 2016) ("Title IX does not prohibit discrimination on the basis of transgender itself because transgender is not a protected characteristic under the statute.");

- *Sweet v. Mulberry Lutheran Home*, No. IP02-0320-C-H/K, 2003 WL 21525058, at *2 (S.D. Ind. June 17, 2003) (Hamilton, J.) ("[D]iscrimination on the basis of sex means discrimination on the basis of the plaintiff's biological sex, not sexual orientation or sexual identity, including an intention to change sex.").

1600 (3d ed. 2010) ("gender" is defined in social and cultural terms and "sex" in biological terms).

*Purpose.* This understanding of the term "sex" also fits Title IX's purpose. Title IX was enacted based on Congressional hearings concerning pervasive discrimination against women in education. 44 Fed. Reg. at 71423; *N. Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 523 n.13 (1982). Its chief sponsor said it was "an important first step in the effort to provide for the women of America something that is rightfully theirs—an equal chance to attend the schools of their choice . . . ." 118 Cong. Rec. 5808 (1972). Thus, the purpose of Title IX—like the purpose of banning sex discrimination in Title VII—was to "provid[e] equal opportunities for women." *Sommers*, 667 F.2d at 750. There is no hint of any congressional purpose regarding "gender identity."

*Structure.* This understanding of the term "sex" is also reflected throughout the statute, which requires equal treatment with respect to two different "sexes"—male and female. For example, the main operative section of Title IX states that if certain activities are provided for students of "one sex," comparable activities must be provided for students of "the other sex." 20 U.S.C. § 1681(a)(8). It also provides that schools may transition from admitting students of "only one sex" to admitting students of "both sexes." *Id.* § 1681(a)(2). If, as HHS claims, the term "sex" includes an individual's "internal sense of gender, which may be male, female, neither, or a combination of male and female," 45 C.F.R. § 92.4, it makes no sense to refer to students of either "one sex" or "the other sex," 20 U.S.C. § 1681(a)(8).

*History.* This understanding of "sex" is also consistent with Title IX's history. "Gender identity" appears nowhere in Title IX's legislative history. Rather, "[t]he legislative history of Title IX clearly shows that it was enacted because of discrimination that currently was being practiced against women in educational institutions." 44 Fed. Reg. at 71423. That is also how courts have interpreted Title IX for decades. *See, e.g.*, *N. Haven Bd. of Ed.*, 456 U.S. at 517-20; *Cannon*, 441

U.S. at 680; *Chalenor*, 291 F.3d at 1044.

More importantly, when Title IX was enacted, and ever since, Congress has treated "sex" and "gender identity" (along with "sexual orientation") as distinct. In the 1970s, Congress rejected several proposals to amend the Civil Rights Act to add "sexual orientation."[10] Similarly, in 1994, Congress rejected the Employment Non-Discrimination Act ("ENDA"), which sought to prohibit employment discrimination on the basis of "sexual orientation."[11] In 2007, 2009, and 2011, Congress rejected a broader version of ENDA, which, for the first time, sought to add protections for "gender identity."[12] In 2013 and 2015, Congress rejected proposals to amend Title IX to add protections for "gender identity."[13] And Congress has so far rejected a proposal to do precisely what the new Rule purports to do—prohibit discrimination in federally funded programs on the basis of "gender identity."[14] None of these proposals makes any sense if Title IX and Title VII *already* prohibit such discrimination. *Sommers*, 667 F.2d at 750 ("Because Congress has not shown an intention to protect transsexuals, we hold that discrimination based on one's transsexualism does not fall within the protective purview of the Act.").

But not every proposal to protect "gender identity" failed. In 2010, Congress provided enhanced penalties for crimes motivated by "gender identity." 18 U.S.C. § 249(a)(2). And in 2013, Congress prohibited discrimination in certain funding programs on the basis of both "sex" and "gender identity"—showing that Congress understands "sex" and "gender identity" to be distinct.

The same is true of federal agencies. For the first 38 years after Title IX's enactment, federal

---

[10] H.R. 14752, 93rd Cong. (1974); H.R. 166, 94th Cong. (1975); H.R. 2074, 96th Cong. (1979); S. 2081, 96th Cong. (1979).

[11] H.R. 4636, 103rd Cong. (1994).

[12] H.R. 2015, 110th Cong. (2007); H.R. 2981, 111th Cong. (2009); S. 811, 112th Cong. (2011).

[13] H.R. 1652, 113th Cong. (2013); S. 439, 114th Cong. (2015).

[14] H.R. 3185, 114th Cong. (2015); S. 1858, 114th Cong. (2015).

agencies issued numerous regulations, memos, and guidance documents interpreting Title IX. Those pronouncements uniformly reflected a definition of "sex" based on physiology. *See, e.g.*, *supra* Statement of Facts, Part A. None mentioned "gender identity." The Department of Justice also steadfastly maintained that "the term 'sex' . . . prohibits discrimination based on the biological state of a male or female," and that "a claim based on gender identity or transsexuality fails as outside the scope of [the term 'sex']." Def.'s Post-Trial Br. at 4, *Schroer v. Billington*, 577 F. Supp. 2d 293 (D.D.C. 2008) (No. 05-01090). This uniform interpretation of "sex" by multiple federal agencies across several decades is further evidence of the term's "ordinary, contemporary, common meaning." *Walters v. Metro. Educ. Enters., Inc.*, 519 U.S. 202, 207 (1997) (citation omitted).

It was not until 2010 that federal agencies began issuing a rash of new pronouncements arguing that the term "sex" includes "gender identity." *See supra* Statement of Facts, Part D. Not surprisingly, these pronouncements, including the Rule at issue here, were hailed as "groundbreaking."[15] But they were "groundbreaking" precisely because they redefined "sex." And "groundbreaking" changes in the law are supposed to be made by the democratically-elected Congress, not unelected agencies. *See Etsitty*, 502 F.3d at 1222 ("If transsexuals are to receive legal protection apart from their status as male or female, however, such protection must come from Congress and not the courts."); *Ulane*, 742 F.2d at 1086 ("If Congress believes that transsexuals should enjoy the protection of Title VII, it may so provide.").

In short, the term "sex" is not ambiguous. It refers to the biological differences between males and females. HHS's attempt to make it mean something different violates the APA.

---

[15] *See, e.g.*, Lena H. Sun & Lenny Bernstein, *U.S. Moves to Protect Women, Transgender People in Health Care*, Washington Post, Sep. 3, 2015 (The new Rule "for the first time includes bans on gender identity discrimination as a form of sexual discrimination, language that advocacy groups have pushed for and immediately hailed as groundbreaking.").

**B. HHS's failure to include religious or abortion-related exemptions is contrary to law, arbitrary and capricious, and in excess of statutory authority.**

HHS's Rule is also "contrary to law" and "in excess of statutory authority" because it contravenes the controlling statutes. Title IX, as incorporated by Section 1557, includes two exemptions relevant here: one for religious organizations, and one for abortion. Yet despite the fact that Section 1557 incorporated these exemptions, HHS refused to incorporate them in its Rule. This refusal is contrary to law and in excess of statutory jurisdiction and authority under the APA.

**1. The Rule is contrary to law, arbitrary and capricious, and exceeds statutory authority because it fails to include Title IX's exemption for religious entities.**

Section 1557 prohibits discrimination "on the ground prohibited under . . . title IX of the Education Amendments of 1972." 42 U.S.C. § 18116(a). Title IX's prohibition on sex discrimination includes a broad exemption stating that Title IX "shall not apply to an educational institution which is controlled by a religious organization if the application of this subsection would not be consistent with the religious tenets of such organization." 20 U.S.C. § 1681(a)(3). Thus when Congress incorporated "title IX of the Education Amendments of 1972" in Section 1557, it also included Title IX's religious exemption. Yet despite many requests to include this exemption, HHS refused.

Notably, for other prohibited areas of discrimination—including race, color, national origin, age and disability—HHS complied with Congress's incorporation of existing exceptions. *See* 45 C.F.R. § 92.101 ("The exceptions applicable to Title VI apply to discrimination on the basis of race, color, or national origin under this part. The exceptions applicable to Section 504 apply to discrimination on the basis of disability under this part. The exceptions applicable to the Age Act apply to discrimination on the basis of age under this part."); *see also* 81 Fed. Reg. at 31378. But when it came to Title IX's religious exemption, HHS parted ways with Congress. HHS stated that "certain protections already exist in Federal law with respect to religious beliefs," and that HHS would rather make its own "determinations on a case-by-case basis, based on a thorough analysis

and relying on the extensive case law interpreting [other legal] standards." *Id.* at 31379-80.

HHS also refused to apply Title IX's religious exemption because it is "limited in scope to educational institutions." *Id.* at 31380. But of course it is. *All of Title IX*—including its ban on sex discrimination—is limited to "educational institution[s]." 20 U.S.C. § 1681. When Congress brought the ban on sex discrimination into the healthcare context, it also brought the religious exemption. Both provisions are in the same section of the same statute, and both are expressly incorporated by Section 1557. HHS's refusal to incorporate both is in excess of statutory authority.

### 2. The Rule is contrary to law, arbitrary and capricious, and exceeds statutory authority because it ignores Title IX's abortion exemption.

The new Rule is equally dismissive of congressional intent on the issue of abortion. Title IX makes crystal clear that the ban on "sex" discrimination cannot be used as a means of requiring services or insurance coverage relating to abortion: "Nothing in this chapter shall be construed to require or prohibit any person, or public or private entity, to provide or pay for any benefit or service, including the use of facilities, related to an abortion." 20 U.S.C. § 1688.

In its Proposed Rule, however, HHS did precisely what Congress forbade: it expanded the definition of sex discrimination to include discrimination on the basis of a "termination of pregnancy." Understandably, several commenters expressed concern that this language might be read to require the provision of, or coverage or referral for, abortion. Again, however, HHS refused to abide by the limitations Congress included in Title IX. Instead, it simply noted the existence of *other* exemptions and conscience protections in federal law. 81 Fed. Reg. at 31380, 31388. HHS's references to these statutory protections is cold comfort, given that HHS has interpreted some of

these protections very narrowly.[16] More importantly, HHS's refusal to follow the plain text of Title IX exceeds its statutory authority. Congress incorporated "title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.)," 42 U.S.C. § 18116(a)—which includes the abortion exemption—and it is not for the agency to cherry-pick which parts it will follow.

## C. HHS's failure to allow employers to accommodate employees' religious beliefs is contrary to Title VII.

HHS's Rule is also contrary to Title VII, because it makes it illegal for employers to accommodate the religious beliefs of their employees. North Dakota, for example, employs many healthcare workers, some of whom have religious objections to participating in medical transition procedures. Similarly, a number of the Religious Sisters of Mercy work for nonreligious healthcare employers. *See* Ex. A, ¶ 5 (Sister O'Brien Decl.); Ex. D, ¶ 3 (Sister Hart Decl.). Under Title VII, these employers are obligated to provide reasonable accommodations for their employees' religious beliefs, as long as doing so does not impose an undue hardship on the employer. 42 U.S.C. §§ 2000e-2, 2000e(j); *EEOC v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028, 2032 (2015).

But the new Rule now makes these accommodations illegal. For example, the Rule says that if a doctor "works as an attending physician at a hospital," then not just the doctor but also "[t]he hospital may be responsible for discrimination by the doctor's practice that occurs at the hospital." 81 Fed. Reg. at 31384 & n.40. The Rule also states that the hospital "will be held accountable for discrimination [by a doctor] under Section 1557" where "a doctor is an employee of a hospital." *Id.* at 31384. Employers thus face an impossible choice: They must either force their doctors and

---

[16] *See, e.g.*, Letter from Jocelyn Samuels, Dir., Office for Civil Rights, Dep't of Health & Human Servs., to Catherine W. Short, et al. (June 21, 2016), https://adflegal.blob.core.windows.net/web-content-dev/docs/default-source/documents/resources/media-resources/cdmhc-investigation-closure-letter.pdf?sfvrsn=2 (allowing California to require insurers to cover abortions over religious objections).

nurses to participate in gender transition procedures in violation of Title VII, or they must violate the new Rule. Because the new Rule conflicts with Title VII, it must be set aside under the APA.[17]

## II. The Rule violates the Religious Freedom Restoration Act.

The new Rule also violates the Religious Freedom Restoration Act ("RFRA"). RFRA is a federal civil rights law that provides "very broad protection for religious liberty." *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2760 (2014). It provides that "Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person . . . is the least restrictive means of furthering [a] compelling governmental interest." 42 U.S.C. § 2000bb-1(b)-(b)(2).

RFRA claims proceed in two steps. First, the Court must determine whether the government has imposed a "substantial burden" on the plaintiffs' religious exercise. *Hobby Lobby*, 134 S. Ct. at 2775. Second, if a substantial burden exists, the government must satisfy strict scrutiny—that is, it must "'demonstrate[] that application of the burden to the person' represents the least restrictive means of advancing a compelling interest." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 423 (2006) (citation omitted). Here, the Rule substantially burdens Plaintiffs' religious exercise by requiring them, on pain of massive financial liability, to perform and pay for controversial medical procedures in violation of their religious beliefs. And the Rule does not even come close to satisfying strict scrutiny.

### A. The Rule substantially burdens Plaintiffs' religious exercise by imposing massive financial penalties.

Consistent with their religious beliefs, Plaintiffs are committed to caring for transgender individuals with compassion and respect. These Plaintiffs cannot, in accordance with their religious

---

[17] *See, e.g.*, *I.R.S., Fresno Serv. Ctr. v. FLRA*, 706 F.2d 1019, 1025 (9th Cir. 1983) (setting aside agency action that was inconsistent with Title VII); *Oglala Sioux Tribe of Indians v. Andrus*, 603 F.2d 707, 717 (8th Cir. 1979) (invalidating a regulation under one statute because it conflicted with another statute).

beliefs and medical judgment, participate in medical transition procedures. Ex. D, ¶¶ 9-11 (Sister Hart Decl.); Ex. B, ¶ 8 (Sister Stahl Decl.); Ex. E, ¶ 5 (Dr. Twanow Decl.). Nor can they participate in elective abortion or sterilization. Ex. B, ¶¶ 9-10 (Sister Stahl Decl.). Nor can they provide health benefits coverage for such procedures, or for sterilization or abortion, without violating their religious beliefs. Ex. A, ¶ 13 (Sister O'Brien Decl.); Ex. B, ¶ 11 (Sister Stahl Decl.); Ex. C, ¶ 14 (Msgr. Shea Decl.). But if Plaintiffs continue their religious exercise, they face massive financial penalties, including loss of Medicare, Medicaid, and other federal funds, 45 C.F.R. § 92.301; debarment from federal contracting; enforcement proceedings brought by the Department of Justice; liability under the False Claims Act, including treble damages, 81 Fed. Reg. at 31440; and private lawsuits brought by patients or employees for damages and attorneys' fees, *id. id.* at 31472.

Financial penalties imposed on a religious practice are the quintessential example of a substantial burden. In *Hobby Lobby*, for example, the Court said that "[b]ecause the [Rule] forces [plaintiffs] to pay an enormous sum of money . . . if they insist on providing insurance coverage in accordance with their religious beliefs, the [Rule] clearly imposes a substantial burden on those beliefs." *Hobby Lobby*, 134 S. Ct. at 2779. Similarly, in *Sharpe Holdings*, the Eight Circuit held that "[w]hen the government imposes a direct monetary penalty to coerce conduct that violates religious belief, '[t]here has never been a question' that the government 'imposes a substantial burden on the exercise of religion.'" 801 F.3d at 938 (citation omitted). This is an *a fortiori* case. The Rule imposes the same sort of enormous financial penalties, only this time, Plaintiffs are not only being forced to "provid[e] insurance coverage," they are also being forced to perform the procedures that violate their religion. *Hobby Lobby*, 134 S. Ct. at 2779.

### B.  The Rule cannot satisfy strict scrutiny.

Because the Rule imposes a substantial burden on Plaintiffs' religious exercise, the only re-

maining question is whether the Rule satisfies strict scrutiny. Strict scrutiny under RFRA is "exceptionally demanding." *Sharpe Holdings*, 801 F.3d at 943 (quoting *Hobby Lobby*). Under that test, the government must demonstrate that the Rule furthers an interest "of the highest order." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993). And it "bear[s] the burden of demonstrating that the regulation is the least restrictive means of achieving a compelling interest." *Hamilton v. Schriro*, 74 F.3d 1545, 1552 (8th Cir. 1996) (citing 42 U.S.C. § 2000bb-1(b)). It cannot do so here.

### 1.  The Rule furthers no compelling interest.

The government claims it has "a compelling interest in ensuring that individuals have nondiscriminatory access to health care and health coverage." 81 Fed. Reg. at 31380. But under RFRA, such "'[b]roadly formulated,' or 'sweeping' governmental interests are inadequate." *Sharpe Holdings*, 801 F.3d at 943 (citations omitted). Rather, RFRA requires courts "to 'scrutiniz[e] the asserted harm of granting specific exemptions to particular religious claimants'—in other words, to look to the marginal interest in enforcing the [Rule] in [this case]." *Hobby Lobby*, 134 S. Ct. at 2779. The government has not done so here.

HHS asserts an interest in removing obstacles to access to healthcare for transgender individuals. 81 Fed. Reg. 31460. As discussed above, there is no indication that Congress shared this interest when it enacted Section 1557. *See supra* Part I.A & B. But in any case, the relevant question here is not whether Plaintiffs should offer healthcare services to transgender individuals. Plaintiffs are already willing to do so—for anything from cancer to the common cold. The question is whether the government has justified its "marginal interest" in forcing Plaintiffs to offer medical services and coverage for procedures that violate their best medical judgment and religious beliefs.

HHS cannot have a compelling interest in forcing private doctors to go against their own medical judgment and perform procedures that HHS's own experts admit are potentially harmful. As

HHS's medical experts wrote earlier this year: "Based on a thorough review of the clinical evidence available at this time, there is not *enough evidence to determine whether gender reassignment surgery improves health outcomes* for Medicare beneficiaries with gender dysphoria."[18] Instead, "There were conflicting (inconsistent) study results—of the best designed studies, some reported benefits while *others reported harms*." *Id.* (emphasis added). For that reason, Medicare and Medicaid do not require coverage for gender reassignment surgery, but allow states and local administrators to make coverage determinations on a case-by-case basis.[19] Many states forbid coverage entirely—with the full consent of HHS. This creates a bizarre situation—doctors are required under the Rule to perform and provide coverage for medical transition procedures because they accept Medicare and Medicaid, but Medicare and Medicaid often do not cover those procedures themselves because they are potentially harmful.

There are also sound medical reasons for not covering these procedures, particularly for children.[20] As guidance documents that HHS relied upon explain: "Gender dysphoria during childhood does not inevitably continue into adulthood. Rather, in follow-up studies of prepubertal children

---

[18]Ex. F (Centers for Medicare & Medicaid Services, *Proposed Decision Memo for Gender Dysphoria and Gender Reassignment Surgery* (June 2, 2016) https://www.cms.gov/medicare-coverage-database/details/nca-proposed-decision-memo.aspx?NCAId=282 (emphasis added) ("CMS Proposed Decision Memo")).

[19]Ex. G (Centers for Medicare & Medicaid Services, *Decision Memo for Gender Dysphoria and Gender Reassignment Surgery* (Aug. 30, 2016), https://www.cms.gov/medicare-coverage-database/details/nca-decision-memo.aspx?NCAId=282).

[20] Jesse Singal, What's Missing From the Conversation About Transgender Kids, NYMag.com: Science of Us, July 25, 2015, http://nymag.com/scienceofus/2016/07/whats-missing-from-the-conversation-about-transgender-kids.html ("[T]here is strong evidence that even many children with rather severe gender dysphoria will, in the long run, shed it and come to feel comfortable with the bodies they were born with.").

(mainly boys) who were referred to clinics for assessment of gender dysphoria, the dysphoria persisted into adulthood for only 6-23% of children."[21] The same report noted that "Newer studies, also including girls, showed a 12-27% persistence rate of gender dysphoria . . . ." *Id.* Given that gender dysphoria will resolve in the overwhelming majority of children, the government cannot hope to prove that it has a compelling interest in requiring Plaintiffs to provide cross-sex hormones and other medical transition procedures for children.

Whether for children or adults, medical transition procedures also carry significant risks. The Institute of Medicine noted that transgender individuals "may be at increased risk for breast, ovarian, uterine, or prostate cancer as a result of hormone therapy."[22] The WPATH report notes that hormone therapy is associated with increased risk of cardiovascular disease, Type 2 diabetes, gallstones, venous thromboembolic disease, and hypertension. Ex. H at 40 (WPATH Report). This is a matter for careful consideration by doctors, not across-the-board rules, issued in a for-thee-but-not-for-me fashion, by political appointees in Washington. *Cf.* 42 U.S.C. § 1395 ("Nothing in this subchapter shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided.").

With regard to abortions, Congress has long provided exemptions for medical professionals who cannot participate in abortion. The Rule itself notes that "the proposed rule would not displace

---

[21] Ex. H at 11 (World Prof'l Ass'n for Transgender Health, Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People, (7th ed. 2012), http://www.wpath.org/site_page.cfm?pk_association_webpage_menu=1351&pk_association_webpage=3926 (footnote omitted) (WPATH Report) (cited in 81 Fed. Reg. at 31435 n.263)).

[22] Institute of Medicine of the National Academies, The Health of Lesbian, Gay, Bisexual and Transgender People: Building a Foundation for Better Understanding, 264 (2011), http://www.becketfund.org/wp-content/uploads/2016/08/The-Health-of-LGBT-People_Book.pdf.

the protections afforded by provider conscience laws," or "provisions in the ACA related to abortion services." 81 Fed. Reg. at 31378, 31379. Therefore, the government has no compelling interest in forcing Plaintiffs to participate.

The government's attempt to compel insurance coverage for medical transitions and abortion fails for similar reasons. As many courts have recognized, "A law cannot be regarded as protecting an interest of the highest order . . . when it leaves appreciable damage to that supposedly vital interest unprohibited." *281 Care Comm. v. Arneson*, 766 F.3d 774, 785 (8th Cir. 2014), *cert. denied*, 135 S. Ct. 1550 (2015). Here, the government has exempted every employer in the country that does not receive certain federally administered funds. It has also exempted *its own insurance programs* from the Rule. As described above, Medicare and Medicaid are exempt. So is TRICARE, the military's insurance program, which excludes coverage for "surgical treatment for gender dysphoria," as well as cross-sex hormones and pubertal suppression for children under 16. TRICARE Policy Manual 6010.57-M, Chapter 7, Section 1.2 at 4.1, 3.2.3.1, 3.2.2.3 (updated: Sept. 6, 2016). And TRICARE protects the religious beliefs of physicians who object to performing gender transition procedures.[23] In short, the government seeks to impose on Plaintiffs a rule that has massive exemptions for others, including the government itself.

With regard to pregnancy termination, courts have long held that the right to an abortion does not include the right to an abortion at another's expense. *See Harris v. McRae*, 448 U.S. 297 (1980) (upholding the Hyde Amendment, which restricts government funding for abortions). Congress ensured that insurers would not be required to cover abortions under the ACA. *See* 42

---

[23] Ex. I at 2-3 (Mem. from Karen S. Guice, Acting Assistant Sec'y of Def. to Assistant Sec'y of the Army, et al., Subject: Guidance for Treatment of Gender Dysphoria for Active and Reserve Component Service Members (July 29, 2016), http://www.defense.gov/Portals/1/features/2016/0616_policy/Guidance_for_Treatment_of_Gender_Dysphoria_Memo_FINAL_SIGNED.pdf (TRICARE Memo) ("In no circumstance will a provider be required to deliver care that he or she feels unprepared to provide either by lack of clinical skill or due to ethical, moral, or religious beliefs.").

U.S.C. § 18023. The agency cannot now claim a compelling interest in doing the opposite.

**2.   Defendants have numerous less restrictive means of furthering their interests.**

Even assuming the Rule furthered a compelling governmental interest—and it does not—the Rule also fails strict scrutiny because there are numerous less restrictive alternatives. Under RFRA, the government must "come forward with evidence that [its Rule is] the only feasible means to [accomplish its goal] and that no alternative means would suffice to achieve its compelling interest." *Sharpe Holdings*, 801 F.3d at 943. But numerous alternatives are available here.

If the government wishes to increase access to gender transition services and insurance coverage for those services, "[t]he most straightforward way of doing this would be for the Government to assume the cost of providing the [procedures] at issue to any [individuals] who are unable to obtain them under their health-insurance policies due to their employers' religious objections." *Hobby Lobby*, 134 S. Ct. at 2780. For example, "the government could provide subsidies, reimbursements, tax credits, or tax deductions to employees" or "the government could pay for the distribution of [services] at community health centers, public clinics, and hospitals with income-based support." *Sharpe Holdings*, 801 F.3d at 945. Here, as in *Hobby Lobby* and *Sharpe Holdings*, "the government has not shown that these alternatives are infeasible." *Id.*

The government could also set up an alternative system for provision of benefits. Indeed, the government has already essentially done so: It requires insurance plans on its own exchanges to offer this coverage. 81 Fed. Reg. 31428. The government need not coerce religious charities when it has created its own marketplaces to offer this type of care to those who wish to obtain it. The government also offers credits to those who need help affording health care on the exchanges; those same credits could be made available to individuals who do not have this coverage through their employers. The government could also set up an alternative coverage mechanism, as it has done with the preventive services mandate. *See Hobby Lobby*, 134 S. Ct. at 2781-82. As in *Sharpe*

*Holdings*, "we cannot say on this limited record that the government has eliminated the use of [these alternatives] as a viable option." 801 F.3d at 945.

The government also has many alternatives available besides coercing the participation of medical professionals. Many doctors and hospitals provide medical transition services; in fact, many hospitals have established centers of excellence for transgender procedures. *See, e.g.*, *Trans Health Clinics*, Trans-Health.com, http://www.trans-health.com/clinics/ (last updated Aug. 4, 2016) (listing "health clinics that specialize in trans health care"). If the government wants to increase access to gender transition services—and get better care for people who want them—the government could partner with willing professionals to increase access. It could train health care navigators to assist individuals in finding such services, just as it does with assisting individuals to find plans on the exchanges. Such options would not only increase access to health care for transgender individuals, they would focus upon doctors with special expertise in transgender issues, rather than conscripting unwilling doctors who may not have the necessary expertise.

### III. The Rule violates the Spending Clause.

The Rule also violates the Spending Clause by imposing unauthorized and coercive conditions on the States. Congress is permitted to use its power under the Spending Clause to induce States to voluntarily accept federal conditions in exchange for the receipt of federal funds. But such conditions must be both (a) unambiguous and (b) non-coercive. *South Dakota v. Dole*, 483 U.S. 203, 207-08, 211 (1987). The Rule fails both tests.

First, the alleged condition on spending was hardly "unambiguous." Congress never conditioned the States' acceptance of Medicare and Medicaid funding on agreement with the agency's new definition of "sex." Congressional attempts to use the spending power to induce States to accept federal conditions "is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions." *Pennhurst State Sch. & Hosp. v. Halderman*,

451 U.S. 1, 17 (1981). For this reason, "[t]he legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'" *Id.* Of course States cannot voluntarily and knowingly accept conditions they do not know about. "Accordingly, if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Id.*

Many courts have struck down or refused to impose ambiguous conditions on federal funds. For example, in *Gross v. Weber*, the Eighth Circuit refused to impose retroactive Title IX liability on a school district on the grounds that "[t]itle IX provides no notice that educational institutions will be subject to liability for prior events. It would be unfair to impose a greater duty than that which the educational institutions agreed to assume." *Gross v. Weber*, 186 F.3d 1089, 1092 (8th Cir. 1999). Likewise, in *Pennhurst*, the Supreme Court found that Congress had failed to unambiguously require participating States to satisfy the statute's "bill of rights" provisions in a program for the developmentally disabled. As the Court explained, "where Congress has intended the States to fund certain entitlements as a condition of receiving federal funds, it has proved capable of saying so explicitly." *Id.* at 17–18. Since the "bill of rights" provisions were not imposed unambiguously, the Court concluded that the States could not be forced to comply. *See also Arlington Central School District Board of Education v. Murphy*, 548 U.S. 291, 297 (2006) (federal statute "does not even hint" at the condition imposed on state officials).

Here, there is no plausible argument that Congress unambiguously told the States that their receipt of Medicare and Medicaid funds was conditioned on embracing the agency's newly-minted definition of "sex." To understand the terms North Dakota accepted, "the focus must be on the law when [the relevant statute] was enacted." *Premachandra v. Mitts*, 753 F.2d 635, 638 (8th Cir. 1985) (en banc). Both Medicaid and Medicare were adopted in 1965. Social Security Amendments

of 1965, Pub. L. No. 89–97, 79 Stat. 286. But there is nothing in either statute to suggest that states accepting government funds to care for the poor and elderly through these programs were "unambiguously" informed—or informed *at all*—that their participation in helping those in need also included an agreement to abide by the government's interpretation of the word "sex" fifty years into the future. Indeed, as explained above, the agency's interpretation of "sex" is not even consistent with Title IX. Rather, "the common understanding" of the term "sex" "when Title IX was enacted" referred to "the biological differences between male and female." *Texas v. United States*, 2016 WL 4426495 at *15.

The Rule also violates the Spending Clause because it is unconstitutionally coercive. "Congress may use its spending power to create incentives for States to act in accordance with federal policies. But when "'pressure turns to compulsion,' the legislation runs contrary to our system of federalism." *NFIB*, 132 S. Ct. at 2602 (citation omitted). In *NFIB*, the Supreme Court considered the line that separates appropriate spending conditions from the proverbial "gun to the head." *Id.* at 2602-04. It held that a threat to eliminate all federal Medicaid funding, which constituted "10 percent of a State's overall budget," was unconstitutionally coercive. *Id.* at 2604-05. Here, North Dakota faces even more coercion than was rejected by seven justices in *NFIB*, because it stands to lose not only all of its Medicare funding, but all other HHS funding, and to face private lawsuits for damages and attorneys' fees. Thus, this is an *a fortiori* case.

## IV.  The Rule violates the Free Speech Clause.

The Rule also violates the Free Speech Clause by prohibiting doctors from expressing some points of view and compelling them to express others. Under the First Amendment, "[t]he government may not prohibit the dissemination of ideas that it disfavors, nor compel the endorsement of ideas that it approves." *Knox v. Serv. Emps. Int'l Union*, 132 S. Ct. 2277, 2288 (2012) (citations omitted). Here, the new Rule does both.

30

First, the Rule deems a particular medical viewpoint to be discriminatory—namely, the viewpoint that transition-related treatment is "experimental." 81 Fed. Reg. at 31435; *see also id*. at 31429. HHS rejects this viewpoint as "outdated and not based on current standards of care" and approvingly cites another HHS document stating that "sex reassignment surgery *can no longer be considered* an experimental treatment." *Id*. at 31435 & n.263 (citing Ex. J at 22-24 (U.S. Dep't of Health & Human Servs., Departmental Appeals Bd., Appellate Division NCD 140.3, Docket No. A-13-87, Decision No. 2576 (May 30, 2014), http://www.hhs.gov/sites/default/files/static/dab/decisions/board-decisions/2014/dab2576.pdf)). Thus, if a covered entity advises a patient that a medical transition procedure is "experimental"—as Plaintiffs do—it is subject to liability for "discrimination."

Second, the Rule mandates revisions to healthcare professionals' written policies, requiring express affirmance that transition-related procedures will be provided. 81 Fed. Reg. at 31455. If a covered entity does not revise its written policies—even when doing so would contradict its religious beliefs and medical judgment—it again faces liability. Third, the Rule requires physicians to use gender-transition affirming language, including "a transgender individual's preferred name and pronoun." *See, e.g.*, 81 Fed. Reg. at 31406. Failure to do so again results in liability. *See, e.g.*, Compl., *Prescott v. Rady Children's Hosp. - San Diego*, No. 16-2408 (S.D. Cal. Sept. 26, 2016) (suing a hospital under the new Rule for failing to use a patient's preferred pronoun). In short, to avoid liability under the new Rule, healthcare professionals must avoid expressing the viewpoint that medical transition procedures are "experimental"; they must revise their written policies to endorse transition-related services; and they must use language that affirms gender transition.

Under the Free Speech Clause, however, the government cannot prohibit health providers from speaking about their own medical judgment simply because the government dislikes the content

of that speech. For example, in *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011), the Supreme Court struck down a state regulation prohibiting pharmacies from selling information about prescribing practices to drug manufacturers for marketing purposes. *Id.* at 567. The Court noted that the state had "imposed a restriction on access to information in private hands," and the "law impose[d] a burden based on the content of speech and the identity of the speaker." *Id.* at 567-68. Even under the more relaxed scrutiny applied to "commercial speech," the Court held the state's interests in medical privacy, improved public health, and reduced healthcare costs did not "withstand[] scrutiny." *Id.* at 571-72.

Even more relevant here, in *Conant v. Walters*, 309 F.3d 629, 637 (9th Cir. 2002), the Ninth Circuit struck down a government policy that sought "to punish physicians on the basis of the content of doctor-patient communications." Specifically, the government sought to punish a "physician's professional 'recommendation' of the use of medical marijuana." *Id.* at 632. The court held that this policy "strike[s] at core First Amendment interests of doctors and patients," because an "integral component of the practice of medicine is the communication between a doctor and a patient. Physicians must be able to speak frankly and openly to patients." *Id.* at 636.

The government's regulation of speech is even more troubling than in *Sorrell* or *Conant*. First, unlike the speech in *Sorrell*, which included records sold for a profit to marketers, Plaintiffs are speaking based on their best medical and religious judgment, and they are forgoing profit rather than seeking it. *Cf. Conant*, 309 F.3d at 639-640 (Kozinski, J., concurring). Second, more than just prohibiting Plaintiffs' dissemination of certain information to certain parties, HHS's Rule deems a particular medical viewpoint to be discriminatory—namely, the viewpoint that transition-related treatment is "experimental." 81 Fed. Reg. at 31435; *see also id.* at 31429. HHS rejects this viewpoint as "outdated and not based on current standards of care," and approvingly cites another HHS

32

document stating that "sex reassignment surgery *can no longer be considered* an experimental treatment." *Id.* at 31435 & n.263 (citing Ex. J at 23 (HHS Appeals Board Decision)). It also compels providers to revise their written policies to endorse medical transition procedures and to use language that is affirming of gender transition. Thus, HHS treats the expression of certain medical and religious viewpoints about gender transition procedures as illegal discrimination.

Plaintiffs hold those viewpoints. *See* Ex. A, ¶ 9 (Sister O'Brien Decl.); Ex. D, ¶ 11 (Sister Hart Decl.); Ex. E, ¶ 5 (Dr. Twanow Decl.). Plaintiffs are unwilling to revise their written policies to affirm and offer gender transition procedures, as required by the Rule. Ex. A, ¶ 11 (Sister O'Brien Decl.); Ex. B, ¶ 8 (Sister Stahl Decl.). *See, Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 133 S. Ct. 2321, 2330-31 (2013) (rejecting requirement that federal grant recipients adopt policy opposing prostitution). And Plaintiffs, such as the Religious Sisters of Mercy, are unwilling to use gender-transition affirming language, such as "a transgender individual's preferred name and pronoun," because doing so would violate their religious beliefs and medical judgment. Ex. D, ¶ 12 (Sister Hart Decl.). For their viewpoints, Plaintiffs are subject to enforcement proceedings, loss of federal funding, and private lawsuits under the Rule. "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Rosenberger v. Rector*, 515 U.S. 819, 829 (1995). Such content-based restrictions on speech are "presumptively invalid." *R.A.V. v. St. Paul*, 505 U.S. 377, 382 (1992).[24]

## V.  The Rule is unconstitutionally vague

The Rule also violates the Due Process Clause and First Amendment because it is hopelessly vague. "A fundamental principle in our legal system is that laws which regulate persons or entities

---

[24] For the same reasons the Rule fails strict scrutiny under RFRA, it also fails strict scrutiny under the Speech Clause. *See O Centro*, 546 U.S. at 429-30 (regardless of whether strict scrutiny is triggered by the Free Speech Clause or RFRA, "the consequences are the same").

must give fair notice of conduct that is forbidden or required." *F.C.C. v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012). A law is impermissibly vague where it allows the government to rely on "untethered" and "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 20-21 (2010). A law cannot be "so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). And when protected expression is being potentially swept into the reach of a law, "rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *Fox*, 132 S. Ct. at 2317.

The Rule fails these constitutional requirements. Under the sweeping new definition of "sex," health care providers are left to guess at the type of action (or inaction) that might result in crippling liability. Further, in the face of HHS's vague prohibitions on certain types of expression, healthcare professionals face serious pressure to self-censor in order to avoid liability.

### A. The Rule fails to give fair notice of what conduct is subject to liability and gives HHS ample room for arbitrary enforcement.

"Even when speech is not at issue, the void for vagueness doctrine" requires that "regulated parties should know what is required of them so they may act accordingly." *Fox*, 132 S. Ct. at 2317 (citing *Grayned v. City of Rockford*, 408 U.S. 104, 108-109 (1972)). "[P]recision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *Id.*

Here, HHS specifically rejected commenters' repeated requests for "further information on the application of the rule to specific circumstances." 81 Fed. Reg. at 31377. Instead, HHS stated, "we neither address every scenario that might arise in the application of these standards nor state that certain practices as a matter of law are 'always' or 'never' permissible. The determination of whether a certain practice is discriminatory typically requires a nuanced analysis that is fact-dependent." *Id.* HHS in fact boasted that it "value[s] the flexibility inherent in the contextualized

approach we have chosen to assess compliance." *Id.* at 31419. But HHS has left itself so much flexibility that there is nothing to prevent it from "act[ing] in an arbitrary or discriminatory way" when it enforces the Rule. *Fox*, 132 S. Ct. at 2317.

For example, regarding prohibitions on discriminatory insurance coverage, the Rule "require[s] that a covered entity apply the same neutral, nondiscriminatory criteria that it uses for other conditions when the coverage determination is related to gender transition." 81 Fed. Reg. at 31435. Yet HHS provides no clear guidance on what qualifies as "neutral, nondiscriminatory criteria." For instance, HHS pays lip service to the idea that it "will not second-guess a covered entity's neutral nondiscriminatory application of evidence-based criteria used to make medical necessity or coverage determinations." *Id.* at 31436-37. But HHS also "decline[s] to limit application of the rule by specifying that coverage for the health services . . . must be provided *only* when the services are *medically necessary or medically appropriate*." 81 Fed. Reg. at 31435 (emphasis added). In other words, HHS reserves the right to impose liability even when a covered entity determines that a procedure is *not* "medically necessary or medically appropriate." *Id.*

By removing the most obvious types of "neutral" criteria on which covered entities have historically relied—limiting coverage to procedures that are medically necessary, medically appropriate, and that are not merely cosmetic or experimental—HHS has left covered entities with no clear criteria to choose from. And because covered entities lack "fair notice of what is prohibited" under the Rule, Plaintiffs are pressured to provide coverage for any transition-related procedure an employee's provider recommends. *See Williams*, 553 U.S. at 304.

The Rule also bans discriminatory "benefit design" for an insurance plan—without explaining what a "benefit design" even is. Not surprisingly, HHS received many "requests for guidance and clarification regarding potentially discriminatory benefit designs and suggestions for scenarios that

constitute per se discrimination." 81 Fed. Reg. at 31433. But HHS refused:

> [W]e decline to define 'benefit design' in the final rule because to do so would be overly prescriptive. We also decline to codify examples of discriminatory benefit designs because determining whether a particular benefit design results in discrimination will be a fact-specific inquiry that OCR will conduct through its enforcement of Section 1557. For the same reason, we avoid characterizing specific benefit design practices as per se discriminatory in the final rule.

*Id.* at 31433-34. This is a pathetic lack of guidance. Plaintiffs and other covered entities are designing complex insurance plans that affect thousands of employees. But under this Rule, they can do nothing but guess at what HHS will decide constitutes a discriminatory benefit design. And they must make those guesses on pain of massive financial liability.

Professionals providing healthcare services face the same dearth of guidance. HHS states that "providers of health services may no longer deny or limit services based on an individual's sex, without a legitimate nondiscriminatory reason." 81 Fed. Reg. at 31455. But HHS offers no guidance on what will qualify as "a legitimate nondiscriminatory reason." For many years, doctors have deemed medical transition procedures experimental or harmful based on the current status of the medical literature. But now HHS says that a "categorization of all transition-related treatment . . . as experimental, is outdated and not based on current standards of care." 81 Fed. Reg. at 31435.

At the same time, HHS offers no guidance on what the applicable standards of care actually are. Indeed, HHS "decline[d] to include a definition of 'health services related to gender transition'" but instead "intends to interpret these services broadly and recognizes that health services related to gender transition may change as standards of medical care continue to evolve." *Id*. Nor did HHS provide guidance on whether physicians can rely on their best medical judgment when it conflicts with this Rule. This stands in sharp contrast with the regulations governing the military's TRICARE plan, which provides a clear safe harbor, stating: "In no circumstance will a provider be required to deliver care that he or she feels unprepared to provide either by lack of clinical skill

or due to ethical, moral, or religious beliefs." *See* Ex. I at 2-3 (TRICARE Memo).

In short, the new Rule places healthcare professionals, including Plaintiffs, in the unprecedented position of being forced to perform or cover procedures that violate their medical judgment or else face crippling liability—with the agency deliberately choosing to withhold clear guidance about how to walk the tightrope between the two. The result is an unconstitutionally vague rule that "trap[s] the innocent by not providing fair warning." *Grayned*, 408 U.S. at 108.

### B. The Rule's vague, overbroad, and content-based restrictions result in a serious chilling effect on protected expressive activity.

The vagueness here is all the more troubling because it chills constitutionally protected activity: "The vice of unconstitutional vagueness is further aggravated where, as here, the [rule] in question operates to inhibit the exercise of individual freedoms affirmatively protected by the Constitution." *Cramp v. Bd. of Pub. Instruction of Orange Cty., Fla.*, 368 U.S. 278, 287 (1961). A law that "threatens to inhibit the exercise of constitutionally protected rights," such as "the right of free speech," is subject to "a more stringent vagueness test." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982). Indeed, "[w]hen speech is involved, rigorous adherence to" the requirements to give fair notice and provide precise guidance regarding enforcement "is necessary to ensure that ambiguity does not chill protected speech." *Fox*, 132 S. Ct. at 2317.

HHS may argue that it does not plan to enforce the Rule to punish protected speech. But there is no question that the Rule's "literal scope, unaided by a narrowing . . . court interpretation, is capable of reaching expression sheltered by the First Amendment." *Smith v. Goguen*, 415 U.S. 566, 573 (1974). The Rule says that medical views opposed to medical transition procedures are "outdated" and discriminatory, and it compels transition-affirming speech such as revised policies and preferred pronouns. 81 Fed. Reg. at 31435, 31429. In such circumstances, those who wish to avoid liability can do so "only by restricting their conduct to that which is unquestionably safe."

37

*Baggett v. Bullitt*, 377 U.S. 360, 372 (1964); *see, e.g.*, Ex. A, ¶ 11 (Sister O'Brien Decl.). Thus, the Rule falls short of the "greater degree of specificity" required when it "abut[s] upon sensitive areas of basic First Amendment freedoms." *Goguen*, 415 U.S. at 573; *Baggett*, 377 U.S. at 372.

## VI. A preliminary injunction is required.

The Court should enter a preliminary injunction against the Rule before January 1, 2017—which is when Plaintiffs will be forced to make significant, expensive changes to their insurance plans. When issuing a preliminary injunction, the Court considers (1) the movant's likelihood of success on the merits, (2) the threat of irreparable harm to the movant, (3) the balance of harms between the parties, and (4) the public interest. *Sharpe Holdings*, 801 F.3d at 936–37.

**Likelihood of Success on the Merits.** As shown above, Plaintiffs are highly likely to succeed on the merits of all their claims. This is the most significant preliminary injunction factor, *id.*, and in cases like this one, where First Amendment rights are at stake, "the analysis begins and ends with the likelihood of success on the merits," *Korte v. Sebelius*, 735 F.3d 654, 666 (7th Cir. 2013); *see also Hobby Lobby*, 723 F.3d 1114, 1146 (10th Cir. 2013) ("[O]ur case law analogizes RFRA to a constitutional right."), *aff'd sub nom. Burwell v. Hobby Lobby*, 134 S. Ct. 2751 (2014).

**Irreparable Harm.** It is settled law that a potential violation of Plaintiffs' rights under the First Amendment and RFRA threatens irreparable harm. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Iowa Right to Life Comm., Inc. v. Williams*, 187 F.3d 963, 970 (8th Cir. 1999) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Here, coercing Plaintiffs to provide harmful medical procedures or objectionable insurance coverage in direct violation of their faith is the epitome of irreparable injury. Once they have been forced to violate their conscience, future remedies cannot undo the past.

The same principle applies to the harm to Plaintiffs from the government's violations of the Administrative Procedure Act, Due Process Clause, and Spending Clause. Absent an injunction,

they must either violate their faith and suffer the substantial costs of complying with an invalid Rule, *see* 81 Fed. Reg. 31455-57 (estimating costs), or violate the Rule and face large financial penalties, 45 C.F.R. § 92.301. Those harms cannot be compensated by damages; they can only be prevented. *Cf. Texas v. E.P.A.*, 829 F.3d 405, 434 (5th Cir. 2016) (finding irreparable harm because "[n]o mechanism here exists for [plaintiffs] to recover the compliance costs they will incur if the Final Rule is invalidated on the merits.").

The Rule also threatens irreparable harm to North Dakota by upending its current laws and policies governing its health care facilities and by invalidating religious accommodations for state employees. *See supra* Statement of Facts, Part F. A State suffers irreparable harm when its laws or policies are enjoined. *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977). Here, the Rule strips North Dakota of its right to enforce its own laws in its healthcare programs and workplaces, requires State healthcare facilities to offer transition and abortion procedures, and requires the State to train employees about obligations under the Rule. North Dakota did not agree to these requirements when it chose to participate in Medicare and Medicaid decades ago. This amounts to irreparable harm to its sovereign interest. *See Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001) (erroneous tribal gaming commission decision amounts to irreparable injury to state's sovereign interest).

**Balance of Harms.** Since Plaintiffs are likely to succeed, Defendants must "present powerful evidence of harms to [their] interests" to prevent Plaintiffs from meeting the balancing requirement. *Opulent Life Church v. City of Holly Spring, Miss.*, 697 F.3d 279, 297 (5th Cir. 2012). Here, the harms faced by Plaintiffs are severe, and the harms to Defendants are minimal. HHS has acknowledged that its goals need not be achieved immediately or uniformly, a fact made plain by its decision to wait *six years* after enactment of the ACA to promulgate the Rule—and to exempt

its own insurance programs from its effect. HHS claimed that the Rule "would not displace the protections afforded by provider conscience laws, the Religious Freedom Restoration Act (RFRA), provisions in the ACA related to abortion services, or regulations issued under the ACA related to preventive health services." 81 Fed. Reg. at 31378-79. Those are the very protections invoked here. "[W]here the regulation [is underinclusive and] fails to address significant influences that impact the purported interest, it usually flushes out the fact that the interest does not rise to the level of being 'compelling' … enough to justify abridging core constitutional rights…" 2*81 Care Comm.*, 766 F.3d at 785 (second alteration in original). The same is true for unlawful government action which places heavy burdens on the sovereign interests of states. *See Texas v. United States*, 809 F.3d 134, 187 (5th Cir. 2015), *as revised* (Nov. 25, 2015), *aff'd by divided court* 136 S. Ct. 2271 (2016), *reh'g denied,* 2016 WL 5640497 (Mem.) (Oct. 3, 2016).

**Public Interest.** "This factor overlaps considerably with the previous one, and most of the same analysis applies." *Texas*, 809 F.3d at 187. "[I]njunctions protecting First Amendment freedoms are always in the public interest." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006). Moreover, stripping Plaintiffs of Medicare and Medicaid funding hurts the vulnerable people that depend on Plaintiffs' health services—both the poor and elderly, and those in rural areas that depend on Plaintiffs' critical access to hospitals. Given the gravity of the changes proposed in the Rule, the medical debate on the propriety of these procedures, the widespread impact on private and public entities, the harm to citizens who rely upon Plaintiffs for medical treatment, and the intrusion into sovereignty, the public interest favors an injunction.

## CONCLUSION

The motion should be granted.

Respectfully submitted this the 17th day of November, 2016.

| | |
|---|---|
| /s/ Luke W. Goodrich | /s/ Wayne Stenehjem |
| Luke W. Goodrich | Wayne Stenehjem |
| Stephanie H. Barclay | Attorney General of North Dakota |
| The Becket Fund for Religious Liberty | 600 E. Boulevard Avenue |
| 1200 New Hampshire Ave. NW | Bismarck, ND  58505-0040 |
| Suite 700 | Telephone: (701) 328-2210 |
| Washington, DC 20036 | Facsimile: (701) 328-2226 |
| Telephone: (202) 349-7216 | |
| Facsimile: (202) 955-0090 | Douglas A. Bahr |
| lgoodrich@becketfund.org | Solicitor General |
| | N.D. Office of Attorney General |
| | 500 N. 9th Street |
| *Counsel for Plaintiffs Religious Sisters of* | Bismarck, ND 58501 |
| *Mercy, Sacred Hearth Mercy Health Care* | Telephone: (701) 328-3640 |
| *Center (Jackson, MN); Sacred Heart Mercy* | Facsimile: (701) 328-4300 |
| *Health Care Center (Alma, MI); SMP* | |
| *Health System, and University of Mary* | *Counsel for Plaintiff North Dakota* |

41

**CERTIFICATE OF SERVICE**

I hereby certify that on November 17, 2016 the foregoing memorandum was served on

Defendants via email in accordance with Defendants' consent to receive service via email.

/s/ Luke W. Goodrich
Luke W. Goodrich