# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA
### EASTERN DIVISION

THE RELIGIOUS SISTERS OF MERCY, *et al.*,

      *Plaintiffs*,

   v.

SYLVIA BURWELL, Secretary of the United States Department of Health and Human Services, *et al.*,

      *Defendants*.

No. 3:16-cv-00386-RRE-ARS

**BRIEF OF PROPOSED *AMICI CURIAE* AMERICAN CIVIL LIBERTIES UNION, ACLU OF NORTH DAKOTA, ACLU OF SOUTH DAKOTA, ACLU OF MICHIGAN, AND ACLU OF MINNESOTA**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...........................................................................................iii

INTERESTS OF *AMICI* CURIAE ................................................................................1

INTRODUCTION .........................................................................................................1

FACTUAL AND PROCEDURAL BACKGROUND....................................................3

ARGUMENT .................................................................................................................9

I.     Plaintiffs' Claimed Right to Discriminate Against Transgender People and Women Seeking Reproductive Care Is in Direct Conflict with Constitutional and Statutory Protections.........................................................................................................9

     A.    Private Plaintiffs' Requested Religious Accommodation Would Violate the Establishment Clause. ................................................................................9

     B.    North Dakota's Claimed Right to Discriminate Violates the Equal Protection Clause.........................................................................................................11

     C.    Plaintiffs' Claimed Right To Refuse to Provide Emergency Abortions Contradicts the Emergency Medical Treatment and Active Labor Act. .......................13

II.    The Final Rule Is Valid Under the Administrative Procedure Act.....................15

     A.    The Final Rule's Interpretation of Section 1557 Is Reasonable and Consistent with the Statutory Text.................................................................................16

          1.    Discrimination "on the basis of sex" includes discrimination based on gender identity, and, at a minimum, does not unambiguously exclude it........17

          2.    An injunction against enforcement of the rule on its face is inappropriate. .....20

     B.    The Final Rule's Omission of Title IX's Religious Exemption and Abortion Language Is Reasonable and Consistent with the Statutory Text.............................22

     C.    The Final Rule Does Not Conflict with Title VII. ....................................23

III.   The Final Rule Does Not Violate Plaintiffs' Rights Under the Religious Freedom Restoration Act. ..........................................................................................................25

IV.   The Final Rule Does Not Violate the Spending Clause.....................................31

V.    Plaintiffs Have Not Identified a Conflict Between the Final Rule and the First Amendment...........................................................................................................33

VI.   The Final Rule Is Not Unconstitutionally Vague. ................................................................34

VII.   Plaintiffs Have Not Demonstrated Irreparable Harm. ........................................................37

VIII.   The Balance of Equities and the Public Interest Oppose Granting the Injunction. ............38

CONCLUSION..........................................................................................................................41

# TABLE OF AUTHORITIES

## Cases

*281 Care Comm. v. Arneson*, 766 F.3d 774 (8th Cir. 2014)........................................................ 26

*Adkins v. City of New York*, 143 F. Supp. 3d 134 (S.D.N.Y. 2015) ............................................. 12

*Adkins v. Kaspar*, 393 F.3d 559 (5th Cir. 2004) ........................................................................ 25

*Arlington Center School District Board of Education v. Murphy*, 548 U.S. 291 (2006) ............. 31

*Babbitt v. Sweet Home Chapter of Communities for a Greater Oregon*, 515 U.S. 687 (1995) ... 20

*Barber v. Bryant*, --- F. Supp. 3d ----, No. 3:16-CV-417-CWR-LRA, 2016 WL 3562647
    (S.D. Miss. June 30, 2016)................................................................................................... 10

*Barnes v. Gorman*, 536 U.S. 181 (2002) .................................................................................... 31

*Bennet v. Kentucky Department of Education*, 470 U.S. 656 (1985) ............................................ 31

*Benning v. Georgia*, 391 F.3d 1299 (11th Cir. 2004) .................................................................. 31

*Board of Education of the Highland Local School District v. U.S. Department of Education*,
    --- F. Supp. 3d ----, No. 2:16-CV-524, 2016 WL 5372349 (S.D. Ohio Sept. 26, 2016) ........ 12

*Bob Jones University v. United States*, 461 U.S. 574 (1983) ................................................. 26, 30

*Borzych v. Frank*, 439 F.3d 388 (7th Cir. 2006)......................................................................... 25

*Bruff v. North Mississippi Health Services,, Inc.*, 244 F.3d 495 (5th Cir. 2001)......................... 25

*Burton v. Wilmington Parking Authority*, 365 U.S. 715 (1961) .................................................. 30

*Burwell v. Hobby Lobby Stores, Inc.,* 134 S. Ct. 2783 (2015)............................................... 29, 30

*Campaign for Southern Equality v. Bryant*, 64 F. Supp. 3d 906 (S.D. Miss. 2014).................... 11

*Chevron U.S.A. Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984) ...................... 2

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) ...................................... 16

*City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989) ......................................................... 26

*Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432 (1985) ................................................. 11

*Connally v. General Construction Company,* 269 U.S. 385 (1984)............................................. 35

*Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327 (1987) .......................................................................................... 9

*Crawford v. Davis*, 109 F.3d 1281 (8th Cir. 1997) .......................................................... 33

*Cruz v. Zucker*, No. 14-CV-4456 (JSR), 2016 WL 3660763 (S.D.N.Y. July 5, 2016) ................. 6

*Cutter v. Wilkinson*, 544 U.S. 709 (2005) ....................................................................... 9

*Daniel v. Paul*, 395 U.S. 298 (1969) .............................................................................. 30

*Davis ex relative LaShonda D. v. Monroe County Board of Education.*, 526 U.S. 629 (1999) ... 31

*Dawson v. H&H Elec., Inc.,*
    No. 4:14CV00583 SWW, 2015 WL 5437101 (E.D. Ark. Sept. 15, 2015) ................ 12, 18, 20

*Doe v. University of Illinois*, 138 F.3d 653 (7th Cir. 1998) ................................................ 33

*Doyle v. Secretary of Health and Human Services*, 848 F.2d 296 (1st Cir. 1988) ...................... 35

*Estate of Thornton v. Caldor*, 472 U.S. 703 (1985) ........................................................... 9

*Etsitty v. Utah Transit Authority*, 502 F.3d 1215 (10th Cir. 2007) .................................... 21

*Eure v. Sage Corp.*, 61 F. Supp. 3d 651 (W.D. Tex. 2014) ............................................... 20

*Fabian v. Hospital of Central Connecticut,* 172 F. Supp. 3d 509 (D. Conn. 2016) .................... 18

*Finkle v. Howard County, Maryland*, 12 F. Supp. 3d 780 (D. Md. 2014) ............................. 18

*Franks v. Kentucky School for the Deaf*, 142 F.3d 360 (6th Cir. 1998) ................................ 33

*Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1998) .............................. 31

*General Electric Co. v. Gilbert*, 429 U.S. 125 (1976) ....................................................... 12

*Glenn v. Brumby*, 663 F.3d 1312 (11th Cir. 2011) ............................................... 12, 18, 20

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006) ........... 25, 27

*Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417 (11th Cir. 1984) .............................. 38

*Hunter v. United Parcel Serv., Inc.*, 697 F.3d 697(8th Cir. 2012) ..................................... 12

*In re Union Pacific Railroad Employment Practices Litigation*, 479 F.3d 936 (8th Cir. 2007) .. 19

*International Union, United Automobile, Aerospace & Agricultural Implement Workers of
    America, UAW v. Johnson Controls, Incorporated*, 499 U.S. 187 (1991) ........................... 12

iv

*Johnston v. University of Pittsburgh of the Commonwealth System of Higher Education,*
    97 F. Supp. 3d 657 (W.D. Pa. 2015)...........................................................21

*Kansas v. United States,* 249 F.3d 1213 (10th Cir. 2001) ..........................................38

*Knight v. Connecticut Department of Public Health,* 275 F.3d 156 (2d Cir. 2001) ....................24

*McClung v. Paul,* 788 F.3d 822 (8th Cir. 2015) ...........................................16

*McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973) ...........................................36

*Mead v. Holder,* 766 F. Supp. 2d 16 (D.D.C. 2011)...........................................26

*Means v. United States of America Conference of Catholic Bishops,*
    No. 15-1779 (6th Cir. Jan.15, 2016) ...........................................14

*Meritor Savings Bank v. Vinson,* 477 U.S. 57 (1986)...........................................34

*Mexichem Specialty Resins, Inc. v. Environmental Protection Agency,*
    787 F.3d 544 (D.C. Cir. 2015) ...........................................37

*Mississippi University for Women v. Hogan,* 458 U.S. 718 (1982)...........................................11

*Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.,*
    463 U.S. 29 (1983)...........................................16

*National Federation of Independent Business v. Sebelius,* 132 S. Ct. 2566 (2012) ....................32

*New Motor Vehicle Board of California v. Orrin W. Fox Co.,* 434 U.S. 1345 (1977)................38

*Norsworthy v. Beard,* 87 F. Supp. 3d 1104 (N.D. Cal. 2015)...........................................12

*Novus Franchising, Inc. v. Dawson,* 725 F.3d 885 (8th Cir.2013)...........................................37

*Pace v. Bogalusa City School Board,* 403 F.3d 272 (5th Cir. 2005)...........................................32

*Pennhurst State School & Hospital v. Halderman,* 451 U.S. 1 (1981)...........................................31

*Price Waterhouse v. Hopkins,* 490 U.S. 228 (1989)...........................................12, 18, 20, 21

*R.A.V. v. City of St. Paul, Minnesota,* 505 U.S. 377 (1992) ...........................................34

*Radtke v. Miscellaneous Drivers & Helpers Union Local No. 638 Health, Welfare, Eye &
    Dental Fund,* 867 F. Supp. 2d 1023 (D. Minn. 2012)...........................................18

*Roberts v. Clark County School District,*
    No. 215CV00388-JAD-PAL, 2016 WL 5843046, at *9 (D. Nev. Oct. 4, 2016) ..................18

*Roberts v. United States Jaycees,* 468 U.S. 609 (1984)...........................................26, 30, 35

*Robinson v. Dignity Health*, Case No. 3:16-cv-03035, ECF No. 1 (June 6, 2016) ..................... 39

*Rock of Ages Corporation v. Secretary of Labor*, 170 F.3d 148 (2d Cir. 1999).......................... 36

*Rumble v. Fairview Health Services,*
    No. 14-CV-2037 SRN/FLN, 2015 WL 1197415, at *2 (D. Minn. Mar. 16, 2015) ............... 18

*Rumble v. Fairview Health Servs.*,
    No. 14-CV-2037 SRN/FLN, 2015 WL 1197415 (D. Minn. Mar. 16, 2015)....... 12, 18, 19, 21

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47  (2006) .......................... 34

*School of the Ozarks, Inc. v. U.S. Department of Health & Human Servsices,*
    86 F. Supp. 3d 1066 (W.D. Mo. 2015) ..................................................................... 27

*Schroer v. Billington*, 424 F. Supp. 2d 203 (D.D.C. 2006).................................................... 13, 18

*Schwenk v. Hartford*, 204 F.3d 1187, 1201 (9th Cir. 2000) ...................................................... 18

*Silver Sage Partners, Limited. v. City of Desert Hot Springs*, 251 F.3d 814 (9th Cir. 2001)....... 38

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) ....................................................................... 19

*Smith v. City of Salem*, 378 F.3d 566 (6th Cir. 2004) ...................................................... 12, 18, 21

*Sommers v. Budget Marketing, Inc.*, 667 F.2d 748 (8th Cir. 1982)............................................ 17

*Swanner v. Anchorage Equal Rights Commissionn*, 874 P.2d 274 (Alaska 1994)...................... 30

*Texas Monthly, Inc. v. Bullock*, 489 U.S. 1 (1989) ...................................................................... 9

*Turic v. Holland Hospitality, Inc.*, 85 F.3d 1211 (6th Cir. 1996).................................................. 13

*United States v. Burke*, 504 U.S. 229 (1992) ............................................................................. 30

*United States v. Central Carolina Bank & Trust Co.*, 431 F.2d 972 (4th Cir. 1970) ................... 38

*United States v. Hayes International Corp.*, 415 F.2d 1038 (5th Cir. 1969)................................. 38

*United States v. Mead Corp.*, 533 U.S. 218 (2001) ................................................................... 15

*United States v. National Lead Co.*, 438 F.2d 935 (8th Cir. 1971)............................................. 38

*United States v. Virginia*, 518 U.S. 515 (1996) .................................................................... 11, 13

*Watkins Inc. v. Lewis*, 346 F.3d 841 (8th Cir. 2003) ................................................................. 37

*Wilson v. United States West Communications*, 58 F.3d 1337 (8th Cir. 1995) ........................... 24

*Winter v. Natural Resource Defense Council, Inc.*, 555 U.S. 7 (2008) ........................................ 38

*Wisconsin Gas Co. v. FERC*, 758 F.2d 669 (D.C. Cir. 1985)........................................ 37

**Statutes**

10 U.S.C. § 1079 ........................................................................................................ 28

20 U.S.C. § 1681 ........................................................................................................ 16

20 U.S.C. § 1682 ........................................................................................................ 32

20 U.S.C. § 1688 ........................................................................................................ 23

29 U.S.C. § 794a ........................................................................................................ 32

42 U.S.C § 300a-7 ................................................................................................. 15, 29

42 U.S.C. § 1395dd ................................................................................................. 13, 14

42 U.S.C. § 1395w-102 ................................................................................................. 36

42 U.S.C. § 18023 ........................................................................................................ 29

42 U.S.C. § 18116 ......................................................................................... 4, 16, 22, 32

42 U.S.C. § 2000bb–1 ................................................................................................. 25

42 U.S.C. § 2000d-1 ................................................................................................... 32

42 U.S.C. § 2000e ....................................................................................................... 24

42 U.S.C. § 238n .................................................................................................. 15, 29

42 U.S.C. § 6104 ........................................................................................................ 32

5 U.S.C. § 706 ............................................................................................................ 15

**Regulations**

34 C.F.R. § 106.21 ...................................................................................................... 23

45 C.F.R. § 156.125 .................................................................................................... 36

45 C.F.R. § 92.1 ......................................................................................................... 39

45 C.F.R. § 92.207 ...................................................................................................... 5

45 C.F.R. § 92.4 ..................................................................................................... 4, 16

45 C.F.R. 92.2 ......................................................................................... 27

81 Fed Reg. 31,376 ........................................................................... *passim*

81 Fed. Reg. 61,068 .......................................................................... *passim*

**Other Authorities**

151 Cong. Rec. H176-02 (daily ed. Jan. 25, 2005) (statement of Rep. Weldon) ........................ 15

American College of Obstetricians and Gynecologists, *Practice Bulletin No. 160, Premature Rupture of Membranes*, 127 Obstetrics & Gynecology (2016) ............................................. 14

American Heritage Dictionary of the English Language, 730 (5th ed. 2011) .............................. 17

American Heritage Dictionary, 548 (3rd ed. 1973) ..................................................... 17

Debra B. Stulberg et al., *Referrals for Services Prohibited in Catholic Health Care Facilities*, 48 Perspectives on Sexual & Reproductive Health 111 (2016)................................ 7

Department of Health & Human Services, NCD 140.3, Transsexual Surgery (Docket No. A-13-87), Decision (May 30, 2014).............................................................. 6

Lambda Legal Defense & Education Fund, *Professional Organization Statements Supporting Transgender People in Health Care* (2016) ................................ 6

Mem. from Karen S. Guice, Acting Assistant Sec'y of Def. to Assistant Sec'y of the Army, et al., Subject: Guidance for Treatment of Gender Dysphoria for Active and Reserve Component Service Members (July 29, 2016) ....................... 28

Oxford English Dictionary Online (2016) ................................................................. 17

Robert K. Creasy et al., Creasy and Resnik's Maternal-Fetal Medicine: Principles and Practice  (Saunders, 7th ed. 2013) ...................................................... 14

Steven G. Gabbe et al., Obstetrics: Normal and Problem Pregnancies 822 (Saunders, 6th ed. 2012) ................................................................................................ 14

U.S. Conference of Catholic Bishops, *Ethical and Religious Directives for Catholic Health Care Services* (5th ed. 2009)................................................ 7

Webster's Seventh New Collegiate Dictionary (7th ed. 1970) ..................................... 17

## INTEREST OF PROPOSED *AMICI CURIAE*

Proposed *Amici Curiae* American Civil Liberties Union, ACLU of North Dakota, ACLU of South Dakota, ACLU of Michigan, and ACLU of Minnesota submit this brief in opposition Plaintiffs' Motion for Preliminary Injunction. The American Civil Liberties Union is a nationwide nonpartisan organization of more than 500,000 members dedicated to protecting the fundamental liberties and basic civil rights guaranteed by the United States Constitution. The ACLU of North Dakota and the ACLU of South Dakota are, respectively, the North Dakota and South Dakota chapters of the American Civil Liberties Union. The ACLU of Michigan and the ACLU of Minnesota are, respectively, the Michigan and Minnesota affiliates of the American Civil Liberties Union. *Amici* are referred to collectively as the "ACLU." The ACLU advocates on behalf of transgender people, people seeking reproductive healthcare, and religious freedom, including by fighting to prevent discrimination in healthcare and to eliminate religious restrictions on access to care. If the Court issues Plaintiffs' requested injunction against the Final Rule, thousands of transgender people and women seeking reproductive care—including ACLU members—will lose critical protections against discrimination in healthcare.

## INTRODUCTION

As part of the Affordable Care Act, Congress passed a landmark anti-discrimination provision ("Section 1557") that prohibits discrimination on the basis of sex in healthcare programs receiving federal funds. After a detailed notice-and-comment process, the U.S. Department of Health & Human Services ("HHS") issued a final rule (the "Final Rule") pursuant to Section 1557 explicitly prohibiting covered entities from discriminating against patients and employees because they are transgender or because they seek reproductive care. Through this

lawsuit, Plaintiffs now seek to eliminate those protections root and branch. *Amici* respectfully request that the Court deny Plaintiffs' motions for preliminary injunction, for several reasons.

First, the Court should deny the requested injunction because the broad sweep of Plaintiffs' arguments stands in direct conflict with several constitutional and statutory protections. Plaintiffs' request for a religious accommodation affording them a blanket right to engage in federally funded healthcare discrimination would violate the Establishment Clause. Discrimination against transgender people and women at public hospitals and in public healthcare plans violates the Equal Protection Clause. And Plaintiffs' claimed right to deny stabilizing abortions to patients experiencing emergency medical conditions contradicts the Emergency Medical Treatment and Active Labor Act ("EMTALA").

Second, Plaintiffs are not likely to succeed on the merits of their claims. Defendants reasonably interpreted discrimination "on the basis of sex" to encompass discrimination based on gender identity and termination of pregnancy, and that reasonable interpretation is entitled to deference under *Chevron, U.S.A. Inc. v. NRDC*, 467 U.S. 837, 842–45 (1984). At a minimum, even if the Court accepts Plaintiffs' assertion that discrimination based on gender identity is not *always* discrimination "on the basis of sex," it is well-established that discrimination based on gender identity is *sometimes* discrimination based on sex. Moreover, the conflicts Plaintiffs identify between the Final Rule and Title IX and Title VII are based on their own misreadings of the statutory texts.

Plaintiffs' other claims are also unlikely to succeed. Plaintiffs' Religious Freedom Restoration Act ("RFRA") claims are meritless, both because Plaintiffs have not articulated the burden on their religious exercise with sufficient specificity, and because the Final Rule is the least restrictive means for furthering the government's compelling interest in preventing taxpayer

funded discrimination. The Final Rule does not violate the Spending Clause because the statutory text provides sufficient notice that federal healthcare funds are conditioned on compliance with anti-discrimination requirements, because the clear-statement doctrine does not apply to claims for injunctive relief or prospective withholding of funds, and because the relevant anti-discrimination conditions are not unduly coercive. Moreover, the Final Rule is independently justified by Congress's powers under Section 5 of the Fourteenth Amendment. Plaintiffs' free speech claim is based on imagined conflicts and egregious distortions of the Final Rule. And, like other anti-discrimination laws, the Final Rule is sufficiently definite to survive scrutiny under the void-for-vagueness doctrine.

Finally, Plaintiffs have failed to establish the remaining preliminary injunction factors. Plaintiffs have not put forth sufficient evidence to demonstrate that compliance with the Final Rule would impose irreparable harm, particularly in light of their significant delay in seeking preliminary relief. The public interest also militates heavily against a preliminary injunction—especially one that enjoins the Final Rule, in its entirety, nationwide. If the Final Rule is enjoined, thousands of transgender people and women seeking reproductive care throughout the country will lose critical protections against discrimination in healthcare services, coverage, and facilities. As a result, these people will be put at risk of being denied healthcare because of who they are. For that reason alone, the Court should refuse to grant a preliminary injunction.

## FACTUAL AND PROCEDURAL BACKGROUND

### Section 1557 and the Final Rule

On March 23, 2010, Congress enacted the Patient Protection and Affordable Care Act, Pub. L. 111-148, also known as the Affordable Care Act. Section 1557 of the Affordable Care Act prohibits discrimination in federally financed healthcare programs and activities on the basis

of race, sex, color, national origin, age, or disability. 42 U.S.C. § 18116. On May 18, 2016, HHS published the Final Rule, "Nondiscrimination in Health Programs and Activities," implementing Section 1557. 81 Fed. Reg. 31,376. The Final Rule states that Section 1557's prohibition against sex discrimination includes "discrimination on the basis of pregnancy, false pregnancy, termination of pregnancy, or recovery therefrom, childbirth or related medical conditions, sex stereotyping, and gender identity." *Id.* at 31,467; 45 C.F.R. § 92.4.

The Final Rule further provides that, under Section 1557's sex discrimination prohibition, entities receiving federal funding "may no longer deny or limit services based on an individual's sex, without a legitimate nondiscriminatory reason." 81 Fed. Reg. at 31,455. This prohibition is not limited to the provision of care related to gender transition. It also applies to the denial of routine medical care for conditions unrelated to gender dysphoria. *Id.* at 31,460. The Final Rule states that "individuals may not be excluded from health programs and activities for which they are otherwise eligible based on their gender identity." *Id.* at 31,409.

For services related to gender transition, the Final Rule does not require a covered entity to "add to or change the types of services offered in the practice." *Id*. at 31,455. If, however, a covered entity provides medically necessary hysterectomies for other conditions, it must provide the same service when medically necessary to treat gender dysphoria. *Id.* Similarly, if a covered entity performs cosmetic surgery such as breast implants for non-transgender women, it must offer the same cosmetic surgery to transgender women as well. *Id.* The Final Rule applies only to covered entities; it does not require individual doctors at covered entities to perform any particular procedure. *Id.* at 31,384

With respect to insurance providers or healthcare entities' employee benefits plans, the Final Rule prohibits covered entities from categorically refusing to provide insurance coverage

for care related to gender dysphoria without regard to medical necessity. 45 C.F.R. §
92.207(b)(4). The Final Rule does not prohibit providers from determining whether "a particular
health service is medically necessary or otherwise meets applicable coverage requirements in any
individual case." *Id*. § 92.207(d). Rather, it prohibits insurance companies from broadly
prohibiting coverage for all healthcare related to gender dysphoria without analyzing medical
necessity. The Final Rule "specifies that a categorical coverage exclusion or limitation for all
health care services related to gender transition is discriminatory on its face." 81 Fed. Reg. at
31,456.

### Sex Discrimination in Healthcare

Section 1557 and the Final Rule address the very real problem of discrimination in
healthcare, particularly discrimination against transgender people and women seeking
reproductive care. As documented by HHS, transgender people have experienced and continue to
experience multiple forms of discrimination in access to healthcare services, insurance coverage,
and facilities. According to evidence in the administrative record, transgender individuals
experience significant discrimination from entities providing healthcare even when seeking
routine medical care for treatments unrelated to gender dysphoria. "For transgender individuals,
a major barrier to receiving care is a concern over being refused medical treatment based on bias
against them. In a 2010 report, 26.7% of transgender respondents reported that they were refused
needed health care. A 2011 survey revealed that 25% of transgender individuals reported being
subject to harassment in medical settings." 81 Fed. Reg. at 31,460.

Moreover, some entities providing insurance or healthcare discriminate against
transgender patients by refusing to cover medically necessary treatments for gender dysphoria in
accordance with accepted standards of care. Gender dysphoria is a serious medical condition
codified in the Diagnostic and Statistical Manual of Mental Disorders (DSM-V) and

5

International Classification of Diseases (ICD-10). The criteria for diagnosing gender dysphoria are set forth in the DSM-V (302.85). The widely accepted standards of care for treating gender dysphoria are published by the World Professional Association for Transgender Health ("WPATH"). The WPATH Standards of Care have been recognized as the authoritative standards of care by the leading medical organizations and federal courts. *See, e.g.*, *Cruz v. Zucker*, No. 14-CV-4456 (JSR), 2016 WL 3660763, at *4 n.4 (S.D.N.Y. July 5, 2016); Lambda Legal Def. & Educ. Fund, Professional Organization Statements Supporting Transgender People in Health Care (2016).[1] According to every major medical organization and the overwhelming consensus among medical experts, treatments for gender dysphoria, including surgical procedures, are effective, safe, and medically necessary when clinically indicated to alleviate gender dysphoria. *Id.*[2]

In the past, public and private insurance companies excluded coverage for transition-related care based on the erroneous assumption that such treatments were cosmetic or experimental. Today, however, the medical consensus recognizes that such discriminatory exclusions of transition-related healthcare have no basis in medical science. Dep't of Health & Human Servs., NCD 140.3, Transsexual Surgery, Docket No. A-13-87, 18 (2014).[3] Under these exclusions, the same types of surgeries, hormones, and preventive screenings that are used to provide medically necessary care to non-transgender individuals, are excluded from insurance

---

[1] http://www.lambdalegal.org/sites/default/files/publications/downloads/ll_trans_professional_statements.rtf_.pdf.

[2] Plaintiffs dispute that surgery for gender dysphoria can ever be medically necessary. But that is a question that must be resolved with the benefit of expert testimony after full discovery and an evidentiary hearing. Plaintiffs cannot obtain a preliminary injunction based on unsupported factual contentions, especially when those assertions are contrary to the prevailing medical consensus.

[3] http://www.hhs.gov/sites/default/files/static/dab/decisions/board-decisions/2014/dab2576.pdf.

coverage when used as medically necessary treatment for gender dysphoria. *See* 81 Fed. Reg. at 31,460. As a result of this discrimination in healthcare, transgender people are more likely to lack health insurance and suffer significant health disparities, such as high rates of untreated mental health needs, suicide attempts, violence, and HIV. *Id.*

Patients seeking access to reproductive care also encounter significant sex discrimination in the healthcare system. For instance, hundreds of Catholic hospitals and hospital systems around the country—nearly all of which receive Medicare and Medicaid funds—prohibit a range of reproductive health services, including sterilization and abortion, even when a person's health or life is at risk. U.S. Conference of Catholic Bishops, Ethical and Religious Directives for Catholic Health Care Services, Directives 45 and 53 (5th ed. 2009).[4] In many instances, these hospitals refuse even to provide information about emergency medical conditions or provide patients with referrals to other healthcare providers. *See id.*, Directive 28; *see also* Debra B. Stulberg et al., *Referrals for Services Prohibited in Catholic Health Care Facilities*, 48 Perspectives on Sexual & Reproductive Health (2016).[5] In this case, Plaintiffs seek to refuse abortion services in all circumstances, even when the patient's life is in jeopardy, and might even seek to refuse to provide emergency stabilizing care to patients who are experiencing rare complications from an abortion that has already been performed. *See* Compl. ¶ 87.

**The Lawsuit**

On November 7, 2016, Plaintiffs brought this lawsuit against Secretary Burwell and the U.S. Department of Health and Human Services ("Defendants") challenging the Final Rule on a number of constitutional and statutory grounds. ECF No. 1. Plaintiffs include the State of North

---

[4] http://www.usccb.org/issues-and-action/human-life-and-dignity/health-care/upload/Ethical-Religious-Directives-Catholic-Health-Care-Services-fifth-edition-2009.pdf.

[5] https://reujq2sar5z38mfxc343rf51-wpengine.netdna-ssl.com/wp-content/uploads/2016/08/Stulberg_et_al-2016-Perspectives_on_Sexual_and_Reproductive_Health.pdf.

Dakota and a number of religiously affiliated healthcare providers: the Religious Sisters of Mercy and their two Sacred Heart Mercy Health Care Centers in Alma, Michigan, and Jackson Minnesota; SMP Health System, a Catholic health system headquartered in Fargo, North Dakota; and the University of Mary, a Catholic university with its main campus in Bismarck, North Dakota (collectively, "Private Plaintiffs"). Plaintiffs filed the instant motion for preliminary injunction on November 17, 2016.

Plaintiffs seek a preliminary injunction invalidating the Final Rule in its entirety and have not asked the Court to determine whether individual provisions of the Final Rule are valid or whether the Final Rule is invalid as applied to discrete policies and practices. As a result, they have provided scant evidence to demonstrate how the Rule would actually affect their operations. For example, Plaintiffs have not identified how many of their individual employees religiously object to providing transition-related care or reproductive care that may be required under the Final Rule, nor have they identified the types of healthcare to which these employees object. And North Dakota has not identified what insurance coverage it provides its employees or what forms of transition-related healthcare it currently provides. The thin factual record makes it difficult to properly assess Plaintiffs' claims. Without being able to assess a particular policy or practice, the Court cannot determine whether the Final Rule prohibits the relevant conduct or whether the conduct may legally be prohibited.

**ARGUMENT**

I.    **Plaintiffs' Claimed Right to Discriminate Against Transgender People and Women Seeking Reproductive Care Is in Direct Conflict with Constitutional and Statutory Protections.**

    A.    **Private Plaintiffs' Requested Religious Accommodation Would Violate the Establishment Clause.**

If Plaintiffs are granted the relief they seek, they would in effect be granted a religious exemption that crosses the line from permissible religious accommodation to unconstitutional fostering of religion. As the Supreme Court cautioned in *Cutter v. Wilkinson*, 544 U.S. 709 (2005), the Establishment Clause requires courts analyzing religious exemption requests to "take adequate account of the burdens a requested accommodation may impose on nonbeneficiaries." *Id.* at 720. Otherwise, "[a]t some point, accommodation may devolve into 'an unlawful fostering of religion.'" *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 334–35 (1987). In *Estate of Thornton v. Caldor*, for instance, the Court held that the Establishment Clause prohibited a Connecticut law that "arm[ed] Sabbath observers with an absolute and unqualified right not to work on whatever day they designate[d] as their Sabbath," because the statute took "no account of the convenience or interests of the employer or those of other employees who do not observe the Sabbath." 472 U.S. 703, 709 (1985). Because the statute forced non-religious employees to "take a back seat to the Sabbath observer," *id.* at 710 n.9, the Court concluded that it had "a primary effect that impermissibly advances a particular religious practice," *id.* at 710. *See also Texas Monthly, Inc. v. Bullock*, 489 U.S. 1, 18 n.8 (1989).

Applying these precedents, a federal district court recently issued a preliminary injunction against a Mississippi statute providing that the state may not take any action against anyone who acts on the basis of the belief that: "(a) Marriage is or should be recognized as the union of one man and one woman; (b) Sexual relations are properly reserved to such a marriage;

9

(c) Male (man) or female (woman) refer to an individual's biological sex as objectively determined by anatomy and genetics at the time of birth." *Barber v. Bryant*, --- F. Supp. 3d ----, Case No. 3:16-CV-417-CWR-LRA, 2016 WL 3562647, at *6 (S.D. Miss. June 30, 2016) (citation and internal quotation marks omitted), *stay pending appeal denied*, 833 F.3d. 510 (5th Cir. 2016), *appeal pending*. The *Barber* court reasoned that the Mississippi statute impermissibly accorded persons with the protected religious beliefs the "absolute right to refuse service to LGBT citizens without regard for the impact on their employer, coworkers, or those being denied service." *Id.* at *31. The court concluded that the statute "cannot withstand the *Caldor* line of cases" because it "results in LGBT citizens being personally and immediately confronted with a denial of service." *Id.* at *32.

Plaintiffs' requested religious exemption goes even further. They seek a blanket right to refuse healthcare coverage and services to transgender people and women seeking reproductive care, without any regard for the serious—indeed, potentially "life threatening"—consequences for the people denied medically necessary healthcare. 81 Fed. Reg. at 31,380. Transgender people who are discriminatorily denied healthcare coverage and services related to gender dysphoria are likely to experience serious negative health consequences, high rates of untreated mental health needs, suicide attempts, violence, and HIV. *Id.* at 31,460. Similarly, discriminating against patients who seek access to reproductive care creates the risk that these patients will be denied potentially lifesaving services and information during medical emergencies. *See infra* Section I.C. Whatever the outer limits of permissible accommodation, these harms are beyond the pale. The Establishment Clause does not countenance religious exemptions that "come[] at the expense of other citizens," *Barber*, 2016 WL 3562647, at *31, particularly when the potential consequences are so dire.

**B.      North Dakota's Claimed Right to Discriminate Violates the Equal Protection Clause.**

Plaintiffs request an injunction against the Final Rule in its entirety. But instead of articulating how they intend to treat their transgender employees and patients, Plaintiffs assert that any restrictions on their ability to discriminate based on gender identity are invalid on their face. Accepting Plaintiffs' argument that the Final Rule is facially invalid would authorize discrimination that is prohibited not only by Section 1557, but also by the Fourteenth Amendment's Equal Protection Clause.

A state's use of sex and gender based classifications is subject to intermediate scrutiny under the Equal Protections Clause. *United States v. Virginia*, 518 U.S. 515, 554–55 (1996). This standard requires the state to demonstrate that its "gender classification . . . is substantially related to a sufficiently important government interest." *Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 441 (1985). The state's justification must be "genuine"— in other words, it cannot be "hypothesized or invented *post hoc* in response to litigation." *Virginia*, 518 U.S. at 533. "State actors controlling gates of opportunity . . . may not exclude qualified individuals based on 'fixed notions concerning the roles and abilities of males and females.'" *Id*. at 541 (quoting *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 725 (1982)).

Transgender status qualifies as a quasi-suspect classification meriting heightened scrutiny under the Equal Protection Clause. Courts consider several factors in determining whether a group qualifies as a suspect or quasi-suspect class, including *inter alia* whether the group has suffered a history of discrimination, whether the characteristic at issue bears on a person's ability to contribute to society, whether the classification applies to a discernible group, and whether the group is politically marginalized. *Campaign for S. Equal. v. Bryant*, 64 F. Supp. 3d 906, 929–30 (S.D. Miss. 2014) (collecting cases). Applying these criteria, a number of courts have recognized

that transgender status qualifies as a quasi-suspect class. *See, e.g., Bd. of Ed. of the Highland Local Sch. Dist. v. U.S. Dep't of Ed.*, --- F. Supp. 3d ----, Case No. 2:16-CV-524, 2016 WL 5372349, at *16 (S.D. Ohio Sept. 26, 2016); *Adkins v. City of New York*, 143 F. Supp. 3d 134, 139 (S.D.N.Y. 2015); *Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1119 (N.D. Cal. 2015). This Court should reach the same conclusion.

Discrimination on the basis of gender identity also qualifies as sex discrimination under the Equal Protection Clause. *See Glenn v. Brumby*, 663 F.3d 1312 (11th Cir. 2011); *Smith v. City of Salem*, 378 F.3d 566 (6th Cir. 2004). As the Supreme Court made clear in *Price Waterhouse v. Hopkins*, discrimination on the basis of gender stereotype is sex-based discrimination. 490 U.S. 228, 250–51 (1989).[6] "A person is defined as transgender precisely because of the perception that his or her behavior transgresses gender stereotypes. . . . There is thus a congruence between discriminating against transgender . . . individuals and discrimination on the basis of gender-based behavioral norms." *Glenn*, 663 F.3d at 1316. A number of courts, including the Eighth Circuit, have applied the same reasoning in the Title VII context. *See Hunter v. United Parcel Serv., Inc.*, 697 F.3d 697, 702 (8th Cir. 2012) ("Gender stereotyping can violate Title VII when it influences employment decisions."); *Dawson v. H&H Elec., Inc.,* No. 4:14CV00583 SWW, 2015 WL 5437101, at *3 (E.D. Ark. Sept. 15, 2015) (holding that under *Price Waterhouse*, discrimination based on "sex" includes discrimination "because of [a person's] gender transition and [their] failure to conform to gender stereotypes"). *Rumble v. Fairview Health Servs.*, No. 14-CV-2037 SRN/FLN, 2015 WL 1197415, at *2 (D. Minn. Mar. 16, 2015) ("Because the term

---

[6] Although *Price Waterhouse* was a Title VII case, the Supreme Court regularly analogizes between Title VII and the Equal Protection Clause in determining what constitutes discrimination "because of" a protected characteristic. *See, e.g., Gen. Elec. Co. v. Gilbert*, 429 U.S. 125, 133 (1976), *superseded by statute on other grounds as recognized in Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991).

'transgender' describes people whose gender expression differs from their assigned sex at birth, discrimination based on an individual's transgender status constitutes discrimination based on gender stereotyping.").[7]

North Dakota advances no important governmental interest capable of satisfying intermediate scrutiny. To the extent it is concerned about individual state employees' religious objections to providing treatment to transgender people or women seeking reproductive care, those concerns may be addressed through reasonable accommodations under Title VII. *See infra* Section II.C. Insofar as North Dakota claims that ceasing discrimination against transgender people and women seeking reproductive care would require personnel training and other expenses, *see* Compl. ¶ 121, those expenses are constitutionally required. *See Virginia*, 518 U.S. at 540, 546.

### C. Plaintiffs' Claimed Right To Refuse to Provide Emergency Abortions Contradicts the Emergency Medical Treatment and Active Labor Act.

To the extent that Plaintiffs seek an injunction against the Final Rule to avoid providing stabilizing abortions to patients experiencing pregnancy-related emergencies, they are requesting the right to violate EMTALA. EMTALA requires hospital emergency departments that accept Medicare funds to stabilize all patients who are experiencing an emergency medical condition, regardless of their condition and regardless of the treatment needed to stabilize the patient. 42 U.S.C. § 1395dd.[8]

---

[7] An injunction against the Final Rule's provision barring discrimination based on sex would also violate the Equal Protection Clause in the context of women seeking reproductive care. For example, an employer engages in sex discrimination when it fires a woman out of animus for her decision to obtain an abortion. *See Turic v. Holland Hosp., Inc.*, 85 F.3d 1211, 1214 (6th Cir. 1996) (holding that an employer violated Title VII's prohibition against sex discrimination when it fired an employee for considering having an abortion).

[8] EMTALA defines an emergency medical condition as "a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of

13

There are a number of conditions that arise during, or that are exacerbated by, pregnancy that necessitate an abortion to stabilize the patient. *See generally* Br. of Amici Curiae Obstetricians-Gynecologists in Supp. of Pl-App and Reversal, *Means v. U.S. Conference of Catholic Bishops*, No. 15-1779 (6th Cir. Jan.15, 2016). For example, when a pregnant woman's water breaks before the fetus is viable, the patient may be at risk for developing life-threatening complications, including chorioamnionitis. *See, e.g.*, American College of Obstetricians and Gynecologists Practice Bulletin No. 160, Premature Rupture of Membranes, 127 Obstetrics & Gynecology e39 (2016). The only treatment to end the infection, and protect the patient's health and life, is immediate delivery of the fetus, i.e., an abortion. *Id.* A woman may also develop a hypertensive disorder called preeclampsia, the leading cause of illness and death of pregnant women worldwide. *See, e.g.*, Steven G. Gabbe et al., Obstetrics: Normal and Problem Pregnancies 822 (Saunders, 6th ed. 2012). In cases where the fetus is not viable, an immediate abortion might be needed to stabilize the patient. *See, e.g.,* Robert K. Creasy et al., Creasy and Resnik's Maternal-Fetal Medicine: Principles and Practice 770-71 (Saunders, 7th ed. 2013).

In the context of Plaintiffs' preliminary injunction motion, any claimed right to deny all abortion care, and thus emergency abortions to patients experiencing emergency medical conditions, is nothing less than a declaration of intent to violate EMTALA.[9] Plaintiffs provide no justification for such a right. The federal refusal laws—i.e., the Church, Coats, and Weldon Amendments—provide no exception for hospitals in the context of emergency abortions under

---

immediate medical attention could reasonably be expected to result in—(i) placing the health of the individual . . . in serious jeopardy, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily organ or part." *Id.* § 1395dd(e)(1)(A).

[9] Although Plaintiffs baldly assert that their hospital emergency rooms comply with EMTALA, they repeatedly make clear that they do not provide abortion under any circumstances. *See, e.g.,* Declaration of Sister Suzanne Stahl ¶ 20, ECF No. 6–2; Declaration of Dr. Richard Twanow, M.D. ¶ 9, ECF No. 6-5.

EMTALA. *See* 42 U.S.C. § 300a-7; 42 U.S.C. § 238n; Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, Div. H., tit. V § 507(d) (Dec. 18, 2015). The Church Amendment, 42 U.S.C. § 300a-7, prohibits courts from ruling that a hospital is obligated to provide abortions because it receives one of three specific federal funding streams; EMTALA is not predicated on receipt of those funds, but is rather predicated on receipt of Medicare funds. The Coats Amendment does not apply to hospitals. 42 U.S.C. § 238n(c). And Representative Weldon, the sponsor of the Weldon Amendment, explicitly stated that the Weldon Amendment was not intended to reach emergency abortions. *See* 151 Cong. Rec. H176-02 (Jan. 25, 2005).

## II.     The Final Rule Is Valid Under the Administrative Procedure Act.

Plaintiffs argue that the Final Rule violates the APA. Pls. Mem. in Supp. of Their Motion for Preliminary Injunction ("Pls. PI Br.") at 11–21, ECF No. 6. The Final Rule is valid under the APA unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §§ 706(2)(A), (C). The Court must defer to an agency's reasonable interpretation of a statute it administers, particularly where, as here, the agency's interpretation is the result of notice-and-comment rulemaking. *United States v. Mead Corp.*, 533 U.S. 218, 226–28 (2001); *Chevron*, 467 U.S. at 842–45. In reviewing Defendants' interpretation of Section 1557, the Court must first decide "whether Congress has directly spoken to the precise question at issue." *Id.* at 842. Where "Congress has explicitly left a gap," the agency's interpretation is "given controlling weight unless . . . arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 843–44.

An agency's interpretation of a statute will be considered arbitrary and capricious only if it has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs

counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *McClung v. Paul*, 788 F.3d 822, 828 (8th Cir. 2015) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). This standard "is a narrow one," under which the Court may not "substitute its judgment for that of the agency." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).

The Final Rule implements Section 1557, which prohibits discrimination on the grounds prohibited under Title VI, Title IX, the Age Discrimination Act, and the Rehabilitation Act. 42 U.S.C. § 18116. Title IX prohibits discrimination "on the basis of sex." 20 U.S.C. § 1681. The Final Rule construes "on the basis of sex," as incorporated into Section 1557, to include "discrimination on the basis of pregnancy, false pregnancy, termination of pregnancy, or recovery therefrom, childbirth or related medical conditions, sex stereotyping, and gender identity." 45 C.F.R. § 92.4.

Plaintiffs raise three distinct APA challenges to the Final Rule. They argue that: (1) the Final Rule's interpretation of "on the basis of sex" to include discrimination based on gender identity is contrary to Title IX and Section 1557; (2) the Final Rule should have incorporated Title IX's religious exemption and language regarding abortion; and (3) the Final Rule prohibits employers from accommodating their employees' religious beliefs, as required under Title VII. These challenges are all meritless.

### A. The Final Rule's Interpretation of Section 1557 Is Reasonable and Consistent with the Statutory Text.

Defendants acted well within their discretion in concluding that discrimination "on the basis of sex" includes discrimination based on gender identity. First, as numerous courts have concluded, discrimination "on the basis of sex" encompasses discrimination based on gender

identity, or at least does not unambiguously exclude it. Second, even if Plaintiffs could show that discrimination against transgender people is not *always* discrimination on the basis of sex, it certainly may sometimes qualify as discrimination based on sex stereotypes, making wholesale injunctive relief inappropriate.

> 1.   *Discrimination "on the basis of sex" includes discrimination based on gender identity, and, at a minimum, does not unambiguously exclude it.*

Plaintiffs argue that the Final Rule's interpretation of the statutory prohibition against discrimination "on the basis of sex" to include discrimination based on gender identity is contrary to law. Pls. PI. Br. at 12–17. But the plain meaning of the term "sex," standing alone, is broad enough to encompass the psychological and behavioral aspects of sex that Plaintiffs refer to as "gender." *See* "sex, n., 4a," OED Online, Oxford University Press (2016) (defining sex as "a social or cultural phenomenon, and its manifestations"); Am. Heritage Dictionary 548, 1187 (1973) (defining sex to include "the physiological, functional, and psychological differences that distinguish the male and the female."); Webster's Seventh New Collegiate Dictionary 347, 795 (1970) (defining sex to include "behavioral peculiarities" that "distinguish males and females."); *see also* American Heritage Dictionary of the English Language 730 (5th Ed, 2011) ("[S]ome people maintain that the word gender should be used only to refer to sociocultural roles," but "[t]he distinction can be problematic . . . and it may seem contrived to insist that sex is incorrect in this instance.").

Invoking the Eighth Circuit's decision in *Sommers v. Budget Mktg., Inc.*, 667 F.2d 748, 750 (8th Cir. 1982), Plaintiffs argue that federal statutory prohibitions against sex discrimination do not apply to transgender people. Pls. PI Br. at 13. But "the narrow view of the term 'sex' in Title VII in . . . *Sommers* has been eviscerated" by the Supreme Court's decision in *Price Waterhouse. Radtke v. Miscellaneous Drivers & Helpers Union Local No. 638 Health, Welfare,*

*Eye & Dental Fund*, 867 F. Supp. 2d 1023, 1032 (D. Minn. 2012) (quoting *Smith*, 378 F.3d at

573) (some internal quotation marks omitted). In *Price Waterhouse*, the Supreme Court held that

an employer discriminated against a female employee on the basis of sex when it advised her to

"walk more femininely, talk more femininely, dress more femininely, wear make-up, have her

hair styled, and wear jewelry." 490 U.S. at 235, 250–51. *Price Waterhouse* thus demonstrated

"that Title VII barred not just discrimination based on the fact that [the employee] was a woman,

but also discrimination based on the fact that she failed 'to act like a woman.'" *Schwenk v.*

*Hartford*, 204 F.3d 1187, 1201 (9th Cir. 2000).

Applying *Price Waterhouse*, appellate and district courts across the country have held

that discrimination based on transgender status is discrimination on the basis of sex. Because

transgender individuals are, by definition, individuals whose gender identity does not conform to

their sex assigned at birth, there is inherently "a congruence between discriminating against

transgender and transsexual individuals and discrimination on the basis of gender-based

behavioral norms." *Glenn*, 663 F.3d at 1316. Thus, "any discrimination against transsexuals (as

transsexuals)—individuals who, by definition, do not conform to gender stereotypes—is . . .

discrimination on the basis of sex as interpreted by *Price Waterhouse*." *Finkle v. Howard Cty.,*

*Md.*, 12 F. Supp. 3d 780, 788 (D. Md. 2014); *accord Schwenk*, 204 F.3d at 1202; *Smith*, 378 F.3d

at 574–75; *Roberts v. Clark Cnty. Sch. Dist.,* No. 215CV00388-JAD-PAL, 2016 WL 5843046, at

*9 (D. Nev. Oct. 4, 2016); *Fabian v. Hosp. of Cent. Conn.*, 172 F. Supp. 3d 509, 527 (D. Conn.

2016); *Dawson*, 2015 WL 5437101, at *3; *Rumble*, 2015 WL 1197415, at *2 ; *Schroer v.*

*Billington*, 577 F. Supp. 2d 293, 305 (D.D.C. 2008).

*Rumble v. Fairview Health Services* is directly on point. There, an 18-year-old

transgender plaintiff filed a Section 1557 sex discrimination, alleging that he had been subjected

to prolonged and extreme abuse at a Minnesota hospital, over a six-day period, after requesting medical treatment for his debilitating pain and fever. 2015 WL 1197415, at *2–*6. At that time, HHS had not yet issued the Final Rule, but the Director of HHS's Office for Civil Rights ("OCR") had issued an opinion letter stating that Section 1557 "extends to claims of discrimination based on gender identity or failure to conform to stereotypical notions of masculinity or femininity." *Id.* at *10. Although the Eighth Circuit has held that "[a]n agency's interpretation that is found in an opinion letter . . . 'lack[s] the force of law' and is not entitled to deference under *Chevron*," *In re Union Pac. R.R. Emp't Practices Litig.*, 479 F.3d 936, 943 (8th Cir. 2007), the *Rumble* court nonetheless concluded that OCR's interpretation of Section 1557 was entitled to *Skidmore* deference "based on 'the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade.'" 2015 WL 1197415, at *10 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). It accordingly held that Section 1557 prohibits discrimination based on gender identity. *Id.*

This case is even more clear-cut. Unlike the opinion letter at issue in *Rumble*, the Final Rule is entitled to full *Chevron* deference because it is the product of notice-and-comment rulemaking. *Mead*, 533 U.S. at 229–31. Under such circumstances, "a reviewing court has no business rejecting an agency's exercise of its generally conferred authority to resolve a particular statutory ambiguity simply because the agency's chosen resolution seems unwise, but is obliged to accept the agency's position if Congress has not previously spoken to the point at issue and the agency's interpretation is reasonable." *Id.* at 229 (citations omitted). Applying the appropriate level of deference, there can be no doubt that Defendants reasonably construed Section 1557 to prohibit discrimination based on gender identity.

19

2.    *An injunction against enforcement of the rule on its face is inappropriate.*

Plaintiffs' motions seek to enjoin the Final Rule as a whole on APA grounds. In other words, Plaintiffs argue that the Final Rule can never be applied to prevent discrimination against transgender people. But even if discrimination based on a transgender person's gender identity or transgender status did not *always* constitute discrimination on the basis of sex, there is no dispute that discrimination against transgender individuals *sometimes* constitutes sex discrimination under *Price Waterhouse*. For that reason alone, Plaintiffs' facial challenge must fail. *See Babbitt v. Sweet Home Chapter of Communities for a Greater Oregon*, 515 U.S. 687, 699 (1995).

Even if this Court were persuaded by Plaintiffs that discrimination against transgender people is not *always* prohibited as sex discrimination, there is no doubt that discrimination against transgender people is at least sometimes sex discrimination. "In some cases, the plaintiffs bringing successful sex stereotyping claims are transgender people, arguing that the discrimination that they have suffered is because their coworkers perceived their behavior or appearance as not 'masculine or feminine enough.'" *Eure v. Sage Corp.*, 61 F. Supp. 3d 651, 661 (W.D. Tex. 2014). "Although the *Ulane*, *Sommers*, *Holloway* line of case law was, at one time, a complete bar for transgender plaintiffs to seek recovery on any basis, 'federal courts have recognized with near-total uniformity' that complete bar was eliminated when the Supreme Court upheld gender stereotyping as a valid approach to show discrimination because of sex." *Id.* at 661 n.6 (quoting *Glenn*, 663 F.3d at 1318 n. 5).

In *Dawson v. H&H Electric Co.*, for instance, an Arkansas federal district court held that a transgender plaintiff had "provided ample evidence from which a reasonable juror could find that she was terminated because of her sex" where she prevented evidence that:

> When she told [her supervisor] about her transgender status, he stated: "You're one of the best people I have. hate I'd to lose you." [Plaintiff] also offers evidence that [her

> supervisor] instructed her not to "rock the boat" and that he repeatedly forbade her to use her legal name, talk about her transgender status, or wear feminine clothes at work. [Plaintiff's] evidence further shows that soon after she disobeyed [her supervisor's] orders and began wearing makeup and feminine attire at work, [her supervisor] terminated her employment and told her that she was too much of a distraction.

2015 WL 5437101, at *4.

Even the post-*Price Waterhouse* cases cited by Plaintiffs acknowledge that discrimination against a transgender individual can sometimes constitute discrimination on the basis of sex. In *Johnston v. University of Pittsburgh of the Commonwealth System of Higher Education*, for instance, the court held that a transgender plaintiff had not adequately alleged a claim for sex discrimination under *Price Waterhouse* because:

> The University permitted him, without harassment or discrimination, to dress like a man, act like a man, change his name to reflect his male gender, and enroll in classes designated for males. Plaintiff's sole contention of discrimination is that UPJ forbade him from using University bathrooms and locker rooms consistent with his male gender identity rather than his female birth sex.

97 F. Supp. 3d 657, 681 (W.D. Pa. 2015), *appeal dismissed* (3d Cir. 15-2022) (Mar. 30, 2016); *see also Etsitty v. Utah Transit Auth.*, 502 F.3d 1215, 1222 n.2 (10th Cir. 2007) ("Sex stereotyping based on a person's gender non-conforming behavior is impermissible discrimination, irrespective of the cause of that behavior; a label, such as 'transsexual,' is not fatal to a sex discrimination claim where the victim has suffered discrimination because of his or her gender nonconformity." (some internal quotation marks omitted) (quoting *Smith*, 378 F.3d at 575)).

As the facts in *Rumble* demonstrate, transgender people experience significant amounts of discrimination in healthcare, including discrimination in receiving routine or emergency healthcare services unrelated to gender dysphoria. *See* 2015 WL 1197415, at *2–6, *18; *see also* 81 Fed. Reg. at 31,460 ("For transgender individuals, a major barrier to receiving care is a

concern over being refused medical treatment based on bias against them. In a 2010 report, 26.7% of transgender respondents reported that they were refused needed health care. A 2011 survey revealed that 25% of transgender individuals reported being subject to harassment in medical settings."). Thus, even if the Court concludes that discrimination against transgender people is not "discrimination because of sex" *per se*, Plaintiffs' challenge still fails because discrimination against transgender people undoubtedly constitutes sex discrimination in at least some circumstances.

### B.   The Final Rule's Omission of Title IX's Religious Exemption and Abortion Language Is Reasonable and Consistent with the Statutory Text.

Plaintiffs contend that the Final Rule is contrary to Section 1557 because it does not include Title IX's religious exemption and abortion language. Pls. PI Br. at 18–20. Plaintiffs' premise is mistaken—Section 1557 was never meant to incorporate every aspect of Title IX. Rather, the plain language of Section 1557 references Title IX, Title VI, and the other underlying civil rights statutes only with respect to identifying: 1) who is protected under Section 1557; and 2) the attendant enforcement mechanisms. The statute states in relevant part: "[A]n individual shall not, *on the ground prohibited under title VI of the Civil Rights Act of 1964, title IX of the Education Amendments of 1972, the Age Discrimination Act of 1975, or section 504 of the Rehabilitation Act of 1973*, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance . . . . *The enforcement mechanisms provided for and available under such title VI, title IX, section 504, or such Age Discrimination Act shall apply* for purposes of violations of this subsection." 42 U.S.C. § 18116(a) (emphases added). Had Congress intended Section 1557 to incorporate Title IX wholesale, it would have said so explicitly.

Defendants had good reason for declining to import Title IX's blanket religious exemption for educational institutions into the healthcare context. As the Final Rule states:

> [S]tudents or parents selecting religious educational institutions typically do so as a matter of choice; a student can attend public school (if K-12) or choose a different college. In the healthcare context, by contrast, individuals may have limited or no choice of providers, particularly in rural areas or where hospitals have merged with or are run by religious institutions. Moreover, the choice of providers may be even further circumscribed in emergency circumstances.

81 Fed. Reg. at 31,380. Additionally, "a blanket religious exemption could result in a denial or delay in the provision of health care to individuals and in discouraging individuals from seeking necessary care, with serious and, in some cases, life threatening results." *Id.*

Plaintiffs are also flatly wrong to argue that Title IX "forbade" Defendants from defining sex discrimination to include discrimination based on the termination of pregnancy. To the contrary, the Final Rule's prohibition on discriminating against a person because she has terminated a pregnancy tracks Title IX's statutory language, which says that "[n]othing in this section shall be construed to permit a penalty to be imposed on any person or individual because such a person or individual is seeking or has received any benefit or service related to a legal abortion." 20 U.S.C. § 1688. Similarly, Title IX's implementing regulations prohibit discrimination based on "termination of pregnancy." *See, e.g.*, 34 C.F.R. § 106.21(b). It is therefore audacious to claim, as Plaintiffs do, that the Rule is in conflict with Title IX, given that Title IX's own regulation contains precisely the same language prohibiting discrimination based on "termination of pregnancy."

## C.     The Final Rule Does Not Conflict with Title VII.

Plaintiffs also argue that the Final Rule is contrary to Title VII "because it makes it illegal for employers to accommodate the religious beliefs of their employees." Pls. PI Br. at 20. But the Final Rule imposes obligations only on entities receiving federal financial assistance, not their

employees. 81 Fed. Reg. at 31,384. Nothing in the Final Rule would prevent an entity receiving federal financial assistance—the only persons subject to the rule—from accommodating an objecting employee, so long as the entity ensures that healthcare services continue to be provided on a nondiscriminatory basis.[10]

Moreover, whereas the Final Rule does not *prohibit* healthcare entities from accommodating their employees' religious beliefs, Title VII does not *require* employers to accommodate employees' religious beliefs when doing so would result in an undue hardship. 42 U.S.C. § 2000e(j); *see also Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977) (defining "undue hardship" to mean more than a de minimis cost). Applying the undue hardship analysis, the Eighth Circuit held that Title VII did not require an employer to accommodate an employee whose religious beliefs compelled her to wear an anti-abortion pin, noting that although the employee's "religious beliefs did not create scheduling conflicts or violate dress code or safety rules," the proposed accommodation "would require [the employer] to allow [the employee] to impose her beliefs as she chooses." *Wilson v. U.S. W. Commc'ns*, 58 F.3d 1337, 1341 (8th Cir. 1995); *accord Knight v. Conn. Dep't of Pub. Health*, 275 F.3d 156, 168 (2d Cir. 2001) (holding that the plaintiffs' proposed accommodation was not reasonable because "[p]ermitting appellants to evangelize while providing services to clients would jeopardize the state's ability to provide services in a religion-neutral matter"). Along similar lines, the Fifth Circuit held that Title VII did not require a healthcare provider to accommodate a counselor who refused to perform her job duties because she had a religiously motivated objection to serving

_____

[10] Plaintiffs fail to mention whether they have received any requests for religious accommodation regarding transition-related care or reproductive care, even though the Final Rule has been in effect with respect to healthcare services since July 18.

gay people. *See Bruff v. N. Miss. Health Servs., Inc.*, 244 F.3d 495, 500–01 (5th Cir. 2001).

There is thus no conflict between Title VII and the Final Rule.

## III.    The Final Rule Does Not Violate Plaintiffs' Rights Under the Religious Freedom Restoration Act.

Private Plaintiffs also argue that the Final Rule violates their rights under RFRA. RFRA provides that the "Government shall not substantially burden a person's exercise of religion," unless it "demonstrates that application of the burden to the person" is "in furtherance of a compelling government interest," and is "the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb–1(a), (b).

As the statutory language makes clear, RFRA requires "case-by-case consideration of religious exemptions to generally applicable rules." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 436 (2006); *see also Adkins v. Kaspar*, 393 F.3d 559, 571 (5th Cir. 2004) (holding that the substantial burden analysis "requires a case-by-case, fact-specific inquiry to determine whether the government action or regulation in question imposes a substantial burden on an adherent's religious exercise"). Thus, RFRA does not "require[] (or permit[]) courts to nullify whole regulations just because they have a potential for improper application to a particular faith or belief." *Borzych v. Frank*, 439 F.3d 388, 391 (7th Cir. 2006).

Here, Plaintiffs have not shown with specificity how the Final Rule substantially burdens their religious exercise. For example, Plaintiffs do not explain which specific medical procedures they object to performing and under what circumstances, nor do they identify the specific forms of healthcare coverage that they object to providing. *See* Pls. PI Br. at 7–11. These factual lacunae are important because the RFRA analysis is highly fact-specific and relief is necessarily individualized. *See Borzych*, 439 F.3d at 391 (analyzing RLUIPA); *Adkins*, 393 F.3d at 571.

Without more evidence, it is simply impossible to determine what the substantial burden is on Plaintiffs' religious exercise and what forms of individualized relief might be available.

Even assuming, *arguendo*, that Plaintiffs could demonstrate a sufficiently specific substantial burden on their religious exercise, their RFRA claim would still fall because the Final Rule is the least restrictive means for furthering the government's compelling interests in preventing taxpayer-funded discrimination in healthcare. The government has a well-established compelling interest in eradicating all forms of invidious discrimination, including discrimination based on sex. *See, e.g.*, *Roberts v. U.S. Jaycees*, 468 U.S. 609, 628 (1984). But the government also has an independent—and at least equally compelling—interest in making sure that federal funds are not used to subsidize discrimination. *See e.g.*, *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 492 (1989) (plurality opinion). Thus, for example, the Supreme Court held in *Bob Jones University v. United States* that the denial of tax benefits to universities that engage in religiously motivated racial discrimination did not violate the Free Exercise Clause, because the government had a compelling interest in denying such benefits to discriminatory institutions. 461 U.S. 574, 591 (1983). Moreover, the government has a compelling interest in ensuring that people are able to access healthcare on a nondiscriminatory basis, *see* 81 Fed. Reg. at 31,380; *see also Mead v. Holder*, 766 F. Supp. 2d 16, 43 (D.D.C. 2011) (noting the government's compelling interest in "safeguarding the public health").

Invoking the Eighth Circuit's decision in *281 Care Comm. v. Arneson*, 766 F.3d 774 (8th Cir. 2014)—which involved a First Amendment free speech challenge to a law criminalizing false statements about a proposed ballot initiative—Plaintiffs argue that the government's interest in preventing taxpayer funded discrimination cannot be regarded as compelling because other government policies allow "appreciable damage to that supposedly vital interest."  Pls. PI

Br. at 26 (internal quotation marks omitted). To be sure, the government may not rely on a categorical interest in uniform statutory enforcement to oppose a RFRA claim where the statute at issue itself includes exemptions for similar religious conduct. *See O Centro*, 546 U.S. at 430–31. But the mere existence of exemptions in analogous contexts somewhere in the vast expanse of federal law does not, by itself, negate the government's compelling interest in enforcing a particular statute for purposes of RFRA. *See, e.g.*, *Sch. of the Ozarks, Inc. v. U.S. Dep't of Health & Human Servs.*, 86 F. Supp. 3d 1066, 1075–76 (W.D. Mo. 2015).

In any event, the so-called exemptions identified by Plaintiffs are inapposite. First, they argue that Medicare and Medicaid do not require coverage for gender confirmation surgery, but rather "allow state and local administrators to make coverage determinations on a case-by-case basis." Pls. PI Br. at 24 (citing Centers for Medicare & Medicaid Services, *Decision Memo for Gender Dysphoria and Gender Reassignment Surgery* (Aug. 30, 2016)). But the decision by the Centers for Medicare and Medicaid Services to allow individualized coverage determinations in no way conflicts with the Final Rule, which prohibits covered entities from *categorically* excluding all treatments for gender dysphoria from insurance coverage without engaging in individualized analysis. *See, e.g.*, 81 Fed. Reg. at 31,435 ("[W]e do not affirmatively require covered entities to cover any particular treatment, as long as the basis for exclusion is evidence-based and nondiscriminatory."). And, indeed, Medicare and Medicaid are themselves subject to the Final Rule. *See* 45 C.F.R. 92.2.

Second, Plaintiffs argue that TRICARE, the military's insurance program, does not cover surgical treatment for gender dysphoria. Pls. PI Br. at 26 (citing TRICARE Policy Manual 6010.57-M, Chapter 7, Sections 1.2 and 4.1 (updated Sept. 6, 2016)). But recent changes to TRICARE support, rather than undermine, the government's compelling interests. In a final rule

27

issued on September 2, 2016, the Department of Defense concluded that "[i]t is no longer justifiable to categorically exclude and not cover currently accepted medically and psychologically necessary treatments for gender dysphoria (such as psychotherapy, pharmacotherapy, and hormone replacement therapy) that are not otherwise excluded by statute." 81 Fed. Reg. 61,6008, 61,071 (Sept. 2, 2016); *see also id.* (noting "overwhelming support for these proposed changes"). While it is true that TRICARE does not provide coverage for surgical treatment related to gender dysphoria, this is based on a statutory prohibition against any surgical treatment that is not "focused on restoring function of the body part upon which surgery is performed." *Id.* at 61,074 (discussing 10 U.S.C. § 1079(a)(11)).

Plaintiffs also argue that the Military Health Service "protects the religious beliefs of physicians who object to performing gender transition procedures." Pls. PI Br. at 26 (citing Mem. from Karen S. Guice, Acting Assistant Sec'y of Def. to Assistant Sec'y of the Army, et al., Subject: Guidance for Treatment of Gender Dysphoria for Active and Reserve Component Service Members 2–3 (July 29, 2016) ("Guice Memo")). The cited memorandum provides that a Military Health Service provider will not "be required to deliver care that he or she feels unprepared to provide either by lack of clinical skill or due to ethical, moral, or religious beliefs." Guice Memo ¶ 6. The Memo goes on to state that "referral to an appropriate provider or level of care is required under such circumstances," and "reinforc[es] at all times the transgender Service member's right to receive all medical care with dignity and respect." *Id.* Similarly, the Final Rule does not require individual healthcare providers to provide transition-related care, so long as the healthcare entity receiving federal funds ensures that care is provided on a nondiscriminatory basis.

Finally, Plaintiffs argue that the government does not have a compelling interest in requiring them to provide healthcare services or coverage for abortion. Pls. PI Br. at 25–27. But, as Plaintiffs themselves acknowledge, the Final Rule does "not displace the protections afforded by provider conscience laws" or the "provisions in the ACA related to abortion services." 81 Fed. Reg. at 31,378; *see also* 42 U.S.C. § 300a-7; 42 U.S.C. § 238n; Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, Div. H., tit. V § 507(d) (Dec. 18, 2015). It is thus unclear what, exactly, Plaintiffs believe the Final Rule requires them to do in violation of their religious beliefs.[11]

The Final Rule is also the least restrictive means of advancing these compelling government interests. Plaintiffs suggest that the government itself may provide the healthcare services and coverage to which they object, or that it may partner with willing healthcare entities to ensure that these services are provided. *See* Pls. PI Br. at 27–28. But it is not a less restrictive alternative for the government to create an entirely new government program to directly provide healthcare services and coverage that existing, federally funded healthcare entities refuse to provide. *See Hobby Lobby*, 134 S. Ct. at 2786 (Kennedy, J., concurring) ("[I]t is the Court's understanding that an accommodation may be made to the employers without imposition of a whole new program or burden on the Government."). And, even if the government could directly provide the services and coverage to which Plaintiffs object, it might not be able to provide them to people living in rural areas or who rush to an area hospital while experiencing emergency medical conditions. 81 Fed. Reg. at 31,380.

---

[11] As noted above, EMTALA requires covered healthcare entities to provide appropriate stabilizing care, including abortion, to people experiencing emergency medical conditions. *Supra* Section I.C. Neither the federal religious refusals laws nor the ACA has displaced that requirement. *Id.*; *see also* 42 U.S.C. § 18023(d) (stating that nothing in the ACA "shall be construed to relieve any health care provider from providing emergency services as required by State or Federal law, including [EMTALA].").

Moreover, none of Plaintiffs' proposed alternatives addresses the core issue—namely, the government's compelling interest in making sure that federal funds, to which all taxpayers contribute, are not used to subsidize discrimination. Plaintiffs' logic would suggest that federally-funded universities should receive RFRA exemptions from Title VI because the government could itself provide education to the victims of religiously-motivated discrimination. To the contrary, as the Supreme Court made clear in *Bob Jones University*, there are no less restrictive means for furthering the government's interest in not funding discrimination than to simply not fund it. 461 U.S. at 604; *cf. Hobby Lobby Stores, Inc.*, 134 S. Ct. at 2783 (stating that prohibitions on racial discrimination in employment "are precisely tailored to achieve [the] critical goal" of eliminating such discrimination). Even if government funds could be segregated from an organization's discriminatory activities, the very fact of government funding would impermissibly lend the government's "power, property, and prestige" to a discriminatory organization. *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 725 (1961).

Every single instance of discrimination "causes grave harm to its victims." *United States v. Burke*, 504 U.S. 229, 238 (1992); *see also Daniel v. Paul*, 395 U.S. 298, 307–08 (1969) (describing "the daily affront and humiliation involved in discriminatory denials of access to facilities ostensibly open to the general public" (internal quotation marks omitted)). Such discrimination also denies society the benefit of their "participation in political, economic, and cultural life." *Roberts*, 468 U.S. at 625. Because of the harms associated with each instance of invidious discrimination, there is simply no "numerical cutoff below which the harm is insignificant." *Swanner v. Anchorage Equal Rights Comm'n*, 874 P.2d 274, 282 (Alaska 1994). That is especially true in the healthcare context, where a discriminatory denial of coverage or

services may discourage, or even prevent, individuals from seeking medically necessary care. *See* 81 Fed. Reg. at 31,380.

## IV.    The Final Rule Does Not Violate the Spending Clause.

Plaintiffs argue that the Final Rule violates the Spending Clause's clear-statement doctrine because Section 1557 does not state explicitly that it prohibits discrimination against transgender people and women seeking reproductive care.  Pls. PI Br. at 28 (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1 (1981)). To the contrary, the Spending Clause requires Congress to "express clearly its intent to impose conditions on the grant of federal funds so that the States can knowingly decide whether or not to accept those funds"; it does not require Congress to "specifically identif[y] and proscribe[] in advance" every improper action. *Bennet v. Ky. Dep't of Educ.*, 470 U.S. 656, 665–66 (1985). Instead, notice is provided "by the statutory provisions, regulations, and other guidelines provided by [the government] at t[he] time" the funds are received. *Id.* at 670. Thus, "[t]he Supreme Court has explained that so long as a spending condition has a clear and actionable prohibition of discrimination, it does not matter that the manner of that discrimination can vary widely." *Benning v. Georgia*, 391 F.3d 1299, 1306 (11th Cir. 2004); *see also Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 183 (2005) (stating that Title IX's provisions have been "broadly" interpreted "to encompass diverse forms of intentional sex discrimination").[12]

---

[12] Even if statutory notice here were inadequate, *Pennhurst*'s clear-notice rule does not affect "the scope of the behavior" proscribed by Spending Clause legislation, but only the availability of "money damages." *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 639 (1999); *accord Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006); *Barnes v. Gorman*, 536 U.S. 181, 186 (2002); *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 287 (1998); *see generally Pennhurst*, 451 U.S. at 28–29. Thus, Plaintiffs' clear-statement argument does not implicate the availability of prospective relief.

Plaintiffs also argue that the Final Rule is unconstitutionally coercive. Pls. PI Br. at 30. Congress has broad discretion to direct states to spend federal funds consistent with its view of the general welfare; however, where funding conditions "take the form of threats to terminate other significant *independen*t grants, the conditions are properly viewed as a means of pressuring the States to accept policy changes," and must be reviewed for excessive coercion. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2604 (2012) (emphasis added) (concluding that Congress could not coerce the states into adopting the Affordable Care Act's independent Medicaid expansion policy by threatening the loss of independent core Medicaid funds). Here, Section 1557 incorporates the enforcement mechanisms for Title VI, Title IX, the Rehabilitation Act, and the Age Discrimination Act. 42 U.S.C. § 18116(a). These statutes all condition vast sums of federal money on compliance with anti-discrimination laws. They also include "pinpoint provisions" authorizing federal agencies to deny funds only with respect to the particular statutory program or activity under which the discrimination occurred. *See* 42 U.S.C. § 2000d-1 (Title VI); 20 U.S.C. § 1682 (Title IX); 29 U.S.C. § 794a(a)(2) (Rehabilitation Act); 42 U.S.C. § 6104(a)(1) (Age Discrimination Act). Because these statutes restrict relief to the particular program or activity in which the discrimination occurred, they do not pose any coercion problems. *Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 287 (5th Cir. 2005).

Even if the Final Rule did violate the Spending Clause, it would nonetheless be independently justified as an exercise of Congress's authority under Section 5 of the Fourteenth Amendment—which grants Congress broad powers to enforce the Equal Protection Clause. The question whether Congress acted pursuant to its Section 5 authority does not depend on a specific reference in the statutory text itself or even in the legislative history. Rather, the question is whether Congress, "as an objective matter," had the constitutional authority to act pursuant to

its power to enforce the Equal Protection Clause. *Crawford v. Davis*, 109 F.3d 1281, 1283 (8th Cir. 1997). Applying these principles, the Eighth Circuit concluded that the constitutional roots of Title IX lie in Section 5 of the Fourteenth Amendment as well as the Spending Clause. *Id.*; *see also, e.g.*, *Doe v. Univ. of Ill.*, 138 F.3d 653 (7th Cir. 1998); *Franks v. Ky. Sch. for the Deaf*, 142 F.3d 360 (6th Cir. 1998). The same rationale applies to Section 1557, which incorporates Title IX's prohibition against sex discrimination in government-funded programs.

## V.     Plaintiffs Have Not Identified a Conflict Between the Final Rule and the First Amendment.

Plaintiffs argue that the Final Rule facially "violates the Free Speech Clause by prohibiting doctors from expressing some points of view and compelling them to express others." Pls. PI Br at 30. Plaintiffs' arguments, however, are based on egregious distortions of the Final Rule's text.

First, Plaintiffs take issue with a statement in the Final Rule's preamble explaining that categorically excluding all coverage for transition-related care as "experimental" is "outdated and not based on current standards of care." 81 Fed. Reg. at 31,429 (cited in Pls. PI Br. at 31). This statement merely explains the Final Rule's rationale for prohibiting insurance companies from categorically excluding coverage for transition-related care. In other words, this portion of the Final Rule regulates what a covered entity must do—provide an insurance policy that does not categorically exclude coverage. It does not require covered entities to voice support for such procedures or to refrain from criticizing such procedures.

Second, Plaintiffs assert that the Final Rule requires them to speak by publishing written policies expressing affirmation of transition-related procedures. Pls. PI Br. at 31. The Rule does nothing of the kind. The Rule's reference to "written policies" occurs in a section estimating potential costs that regulated entities might incur to ensure that they bring their practices into

compliance with Section 1557. *See* 81 Fed. Reg. at 31,455–46. The Final Rule does not require covered healthcare entities to publish such policies or mandate any particular message.

Finally, Plaintiffs object to a statement in the Final Rule's preamble describing potential types of harassment that could potentially constitute sex discrimination. 81 Fed. Reg. at 31,406 (cited in Pls. PI Br. at 31). But the Final Rule does not actually contain any provisions expressly addressing harassment. The statements to which Plaintiffs refer were made in the context of explaining why Defendants chose *not* to include an explicit anti-harassment provision in the Final Rule. As the Final Rule's preamble squarely states:

> OCR recognizes that various forms of harassment can impede an individual's ability to participate in or benefit from a health program or activity and can thus constitute unlawful discrimination under Section 1557 and this part. . . . Because it has been long-established that harassment is a form of prohibited discrimination under each of the laws cited in Section 1557 and this part, OCR does not believe a separate harassment provision is necessary and therefore declines to revise the proposed rule to include one.

*See* 81 Fed. Reg. at 31,405–06. Plaintiffs' concern that they may be sued for harassment at some point in the future is wholly speculative, but even if Plaintiffs' alleged an immediate and particularized injury in fact, the alleged injury is not traceable to the Final Rule and would not be redressed by an injunction prohibiting the Rule's enforcement.[13]

## VI.    The Final Rule Is Not Unconstitutionally Vague.

---

[13] To be sure, Section 1557's prohibition against sex discrimination also prohibits sex-based harassment, as the Final Rule acknowledges. *Id.*; *see also, e.g.*, *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67 (1986). But Section 1557 would prohibit such harassment even if the Final Rule were enjoined. Moreover, it is well-established that the First Amendment does not protect sex-based harassment. *See R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 389 (1992) ("[S]ince words can in some circumstances violate laws directed not against speech but against conduct . . . a particular content-based subcategory of a proscribable class of speech can be swept up incidentally within the reach of a statute directed at conduct rather than speech. Thus, for example, sexually derogatory 'fighting words,' among other words, may produce a violation of Title VII's prohibition against sexual discrimination in employment practices."); *see also Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 62 (2006).

Plaintiffs also challenge the Final Rule on vagueness grounds. Pls. PI Br. at 33–38. "The void-for-vagueness doctrine reflects the principle that 'a statute [or regulation] which either forbids or requires the doing of an act in terms so vague that [persons] of common intelligence must necessarily guess at its meaning and differ as to its application, violates the due process of law.'" *Roberts*, 468 U.S. at 629 (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1984)). In *Roberts*, the Supreme Court had "little trouble concluding that these concerns are not seriously implicated" by laws prohibiting discrimination at places of public accommodation. *Id.* That is true, despite the fact that, as the preamble for the Final Rule recognizes, "[t]he determination of whether a certain practice is discriminatory typically requires a nuanced analysis that is fact-dependent." 81 Fed. Reg. at 31,377. Courts have also rejected vagueness challenges to Medicare regulations because "[t]he definition of adequate medical care cannot be boiled down to a precise mathematical formula." *Doyle v. Sec'y of Health & Human Servs.*, 848 F.2d 296, 301 (1st Cir. 1988). Thus, both Section 1557 and the Final Rule easily survive vagueness review.

To the extent Plaintiffs challenge specific statements in the Final Rule, those challenges are based on distortions of the Rule's text. For example, the Final Rule states that covered entities cannot exclude transition-related care from their coverage "by categorizing all transition-related treatment as cosmetic or experimental," because "such across-the board categorization is now recognized as outdated and not based on current standards of care." 81 Fed. Reg. at 31,429. Plaintiffs argue that, "[b]y removing the most obvious types of 'neutral' criteria on which covered entities have historically relied—limiting coverage to procedures that are medically necessary, medically appropriate, and that are not merely cosmetic or experimental—HHS has left covered entities with no meaningful 'neutral, nondiscriminatory' criteria to choose from."

Pls. PI Br. at 35. But the Final Rule does not prohibit federally funded healthcare entities from denying coverage for particular transition-related procedures as experimental, cosmetic, or not medically necessary. Rather, it merely prohibits those entities from systematically denying transition-related care "by categorizing all transition-related treatment as cosmetic or experimental." 81 Fed. Reg. at 31,429.

Plaintiffs also complain that HHS declined to limit the Final Rule's application "by specifying that coverage for health services . . . must be provided *only* when the services are *medically necessary or medically appropriate*." Pls. PI Br. at 35 (omission and emphases in original) (quoting 81 Fed Reg. at 31,435). But the Final Rule does not require covered entities to provide procedures that are not "strictly identified as medically necessary or appropriate." 81 Fed. Reg. at 31,435. Rather, the Rule states that "if a covered entity covers certain types of elective procedures that are beyond those strictly identified as medically necessary or appropriate, it must apply the same standards to its coverage of comparable procedures related to gender transition." *Id.* There is nothing vague about this standard.

Finally, although Plaintiffs also challenge a number of terms contained in the Final Rule—such as "benefit design," "legitimate, non-discriminatory reason," and "health services related to gender transition," Pls. PI Br. at 35–36—those terms are concepts with which people in the healthcare industry are readily familiar. *See Rock of Ages Corp. v. Sec'y of Labor*, 170 F.3d 148, 156 (2d Cir. 1999) (holding that due process is satisfied "as long as a reasonably prudent person, familiar with the conditions the regulations are meant to address and the objectives the regulations are meant to achieve, has fair warning of what the regulations require"). Some of these terms are also commonly used in federal law. *See, e.g.*, 42 U.S.C. § 1395w-102 ("benefit design"); 45 C.F.R. § 156.125 ("benefit design"); *McDonnell Douglas Corp. v. Green*, 411 U.S.

792, 802 (1973) ("legitimate, nondiscriminatory reason"). Plaintiffs may dispute whether and how the terms should be applied, but they cannot argue that the concepts referenced are utterly devoid of meaning. Section 1557 and the Final Rule thus provide more than sufficient notice of the discriminatory conduct they prohibit.

## VII.   Plaintiffs Have Not Demonstrated Irreparable Harm.

"In order to demonstrate irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 895 (8th Cir.2013) (internal quotation marks omitted). "Failure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction." *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003). Here, Plaintiffs have not clearly demonstrated irreparable harm.

First, Private Plaintiffs argue that they will suffer irreparable injury to their religious exercise and free speech if the Final Rule is not immediately enjoined. Pls. PI Br. at 38. But as discussed above, Plaintiffs have not demonstrated that the Final Rule violates either of these rights.[14]

Second, Plaintiffs argue that the threatened costs of compliance (or noncompliance) with the Final Rule provides an independent basis for finding irreparable harm. *Id.* at 39. Such "[f]inancial injury is only irreparable where no 'adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation.'" *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (quoting *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). Plaintiffs have not explained why such damages would be

---

[14] Plaintiffs argue that "[t]he same principle applies to the harm to Plaintiffs from the government's violations of the Administrative Procedure Act, Due Process Clause, and Spending Clause." *Id.* Plaintiffs cite no authority to support this proposition. In any event, they have also failed to establish a likelihood of success on the merits for these claims.

insufficient to cover the costs of compliance, nor have they put forth a shred of evidence to estimate the overall magnitude of their compliance costs.

Third, North Dakota argues that the Final Rule imposes irreparable by interfering with the state's sovereign interests. Pls. PI Br. at 39. The cases Plaintiffs cite to support this argument involved either an injunction against a state law, *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345 (1977) (Rehnquist, Circuit Justice) (granting stay of district court order enjoining California Automobile Franchise Act), or an agency decision limiting a state's sovereignty over land within its borders, *Kansas v. United States*, 249 F.3d 1213 (10th Cir. 2001) (granting preliminary injunction against agency decision that tract of land in Kansas qualified as "Indian lands" over which the state had limited sovereignty). Here, North Dakota has not identified a concrete conflict between the Final Rule and its laws, nor has it alleged that the Final Rule limits its sovereignty over land within its border.

## VIII.   The Balance of Equities and the Public Interest Oppose Granting the Injunction.

A plaintiff seeking a preliminary injunction must also establish "that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008). Here, the balance tilts sharply against the grant of an injunction. As numerous courts, including the Fifth Circuit, have recognized, the violation of federal civil rights laws imposes irreparable harm as a matter of law. *See United States v. Nat'l Lead Co.*, 438 F.2d 935, 937–38 (8th Cir. 1971); *see also, e.g.*, *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 827 (9th Cir. 2001); *Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417, 1423 (11th Cir. 1984); *United States v. Cent. Carolina Bank & Trust Co.*, 431 F.2d 972, 975 (4th Cir.

38

1970); *United States v. Hayes Int'l Corp.*, 415 F.2d 1038, 1045 (5th Cir. 1969). But that is precisely what will happen if the Final Rule is erroneously enjoined.[15]

The grant of an injunction against the Final Rule's enforcement would impose irreparable harm on thousands of transgender people and women seeking reproductive care. A preliminary injunction would deprive these vulnerable populations of critical safeguards against discrimination in access to healthcare services, coverage, and facilities. These harms are not hypothetical. As the Final Rule found, "[M]any women and transgender individuals continue to experience discrimination in the healthcare context, which can lead to denials of adequate health care and increases in existing health disparities in underserved communities." 81 Fed. Reg. at 31,460. As noted above, *supra* at 18–19, Jakob Rumble was subject to six days of abuse at a Minnesota hospital, after seeking treatment for a fever and excruciating pain, because of his transgender status. *Rumble*, 2015 WL 1197415, at *2. Joe Robinson, an operating room nurse at a hospital in Arizona, had to pay thousands of dollars out of pocket for his doctor-prescribed treatment because his employer refuses to provide any coverage for transition-related care. Complaint, *Robinson v. Dignity Health*, Case No. 3:16-cv-03035, ECF No. 1. And OCR has already collected numerous complaints of discrimination against transgender people in healthcare. *See* OCR Enforcement Under Section 1557 of the Affordable Care Act – Sex

---

[15] To the extent Plaintiffs claim a need for relief before January 1, 2017, it is worth noting that this supposed emergency is entirely of their own construction. The Final Rule was issued on May 18, 2016. Most of the Rule's provisions—including provisions prohibiting discrimination in access to healthcare services and facilities, as well as healthcare plan benefit implementation— went into effect on July 18, 2016. 45 C.F.R. § 92.1. Plaintiffs filed this lawsuit on November 7 and moved for a preliminary injunction on November 17—half a year after the Rule was issued and four months after it had already gone into effect—leaving precious little time for appropriate consideration of their numerous claims. *See* ECF Nos. 1, 5.

Discrimination Cases.[16] More than a quarter of transgender survey respondents report that they were denied healthcare or subjected to harassment while seeking it. *See* 81 Fed. Reg. at 31,460. As a result transgender people suffer significant health disparities. *Id.*

Patients seeking reproductive care are also in danger. As discussed above, *supra* at 7, Catholic hospitals and healthcare systems around the country prohibit a range of reproductive health services and information, including services and information related sterilization and abortion, even when a person's health or life is at risk. For example, when Jessica Mann became pregnant with her third child, her doctor recommended that she undergo a tubal ligation at the time of delivery because of a pre-existing brain tumor that could become life-threating when strained by pregnancy; however, her hospital flatly refused to allow her doctor to perform the procedure because it conflicted with the Ethical & Religious Directives for Catholic Health Care Services. Administrative Complaint, *Mann v. Ascension Health* (HHS Office for Civil Rights Oct. 25, 2016).[17] Similarly, Melanie Jones was turned away by her doctor, who was part of a Catholic healthcare network, when seeking treatment for bleeding and cramping after her intrauterine device (IUD) became dislodged; her doctor said that she was not allowed to remove the IUD because of religious restrictions. Administrative Complaint, *Jones v. Mercy Hosp. & Med. Ctr.* (HHS Office for Civil Rights June 30, 2016).

Any injunction against the Final Rule threatens significantly worse health outcomes for transgender people and women seeking reproductive care. Plaintiffs cannot justify these results

---

[16] http://www.hhs.gov/civil-rights/for-individuals/section-1557/ocr-enforcement-section-1557-aca-sex-discrimination/index.html.

[17] https://www.aclu.org/legal-document/ocr-complaint-behalf-jessica-mann?redirect=legal-document/complaint-behalf-jessica-mann-and-aclu.

any more than they can justify the use of taxpayer funds for discriminatory ends. Their requests

for preliminary relief should be denied.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion for Preliminary

Injunction.

Respectfully submitted this 7th day of December, 2016.

/s/ *Courtney A. Bowie*
Courtney A. Bowie
American Civil Liberties Union
  of South Dakota
P.O. Box 1170
Sioux Falls, SD 57101
(201) 284-9500
cbowie@aclu.org

Jennifer Cook, ND Bar. No. 06531
American Civil Liberties Union
  of North Dakota
P.O. Box 1190
Fargo, ND 58107
(701) 478-9924
jcook@aclu.org

Brian Hauss*
Joshua Block*
Brigitte Amiri*
James D. Esseks*
Louise Melling*
American Civil Liberties
  Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
bhauss@aclu.org

Daniel Mach*
American Civil Liberties Union
  Foundation
915 15th Street, N.W.
Washington, D.C. 20005
(202) 548-6604
dmach@aclu.org

Michael J. Steinberg**
American Civil Liberties Union Fund
  of Michigan
2966 Woodward Ave.
Detroit, MI 48201
(313) 578-6800
msteinberg@aclumich.org

Teresa J. Nelson*
American Civil Liberties Union
  of Minnesota
2300 Myrtle Ave., Suite 180
St. Paul, MN  55114
(651) 645-4097 x.1220
tnelson@aclu-mn.org

Counsel for Proposed *Amici Curiae*

*Applications for admission forthcoming.
**Application for admission *pro hac vice* forthcoming.

41