# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA
## EASTERN DIVISION

| | |
|---|---|
| THE RELIGIOUS SISTERS OF MERCY, *et al.*, | No. 3:16-cv-00386-RRE-ARS |
| *Plaintiffs,* | |
| v. | **Plaintiffs' Reply in Support of Their Motion for Preliminary Injunction** |
| SYLVIA BURWELL, *et al.*, | |
| *Defendants.* | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ....................................................................................................................... 1

    I.    The Rule imposes immediate, irreparable harm ............................................. 1

    II.    HHS's jurisdictional arguments are meritless ................................................ 8

          A.    Plaintiffs' claims are ripe and Plaintiffs have standing ........................ 8

          B.    A pre-enforcement challenge is not prohibited ................................... 11

    III.    The Rule violates the Administrative Procedure Act .................................... 13

          A.    HHS's interpretation of "sex" is contrary to law ............................... 13

          B.    HHS's failure to include Title IX's exemptions
               is contrary to law ................................................................................ 16

          C.    HHS's Rule is contrary to Title VII ................................................... 17

    IV.    The Rule violates RFRA ............................................................................... 17

    V.    The Rule violates the Spending Clause ......................................................... 19

    VI.    The Rule violates the Free Speech Clause ..................................................... 20

    VII.    The Rule is unconstitutionally vague ............................................................ 23

    VIII.    *Amici*'s arguments are meritless .................................................................. 24

    IX.    The balance of harms and public interest favor Plaintiffs ............................ 25

    CONCLUSION .................................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**                                                                        **Page(s)**

*281 Care Comm. v. Arneson*,
  638 F.3d 621 (8th Cir. 2011) ...................................................................................11

*281 Care Comm. v. Arneson*,
  766 F.3d 774 (8th Cir. 2014) ...................................................................................22

*Abbott Labs. v. Gardner*,
  387 U.S. 136 (1967)..................................................................................10, 11, 12

*Advanta USA, Inc. v. Chao*,
  350 F.3d 726 (8th Cir. 2003) ...................................................................................10

*Agency for Int'l Dev. v.
  Alliance for Open Soc'y Int'l, Inc.*,
  133 S. Ct. 2321 (2013)..............................................................................................21

*Am. Civil Liberties Union v. Trinity Health Corp.*,
  No. 15-12611, 2016 WL 1407844 (E.D. Mich. Apr. 11, 2016) ...............................25

*Ashcroft v. ACLU*,
  542 U.S. 656 (2004)....................................................................................................6

*Baggett v. Bullitt*,
  377 U.S. 360 (1964)..................................................................................................24

*Barrera v. Wheeler*,
  441 F.2d 795 (8th Cir. 1971) ...................................................................................12

*Byers v. Intuit, Inc.*,
  564 F. Supp. 2d 385 (E.D. Pa. 2008), ........................................................................7

*Cannon v. Univ. of Chi.*,
  441 U.S. 677 (1979)..................................................................................................13

*Cenzon-DeCarlo v. Mount Sinai Hosp.*,
  626 F.3d 695 (2d Cir. 2010)........................................................................................4

*Chemical Waste Management, Inc. v. E.P.A.*,
  869 F.2d 1526 (D.C. Cir. 1989) ...............................................................................10

*Child Evangelism Fellowship of Minn. v.
  Minneapolis Special Sch. Dist. No. 1*,
  690 F.3d 996 (8th Cir. 2012) .....................................................................................2

*City of Lakewood v. Plain Dealer Publ'g Co.*,
   486 U.S. 750 (1988).................................................................24

*Crawford v. Davis*,
   109 F.3d 1281 (8th Cir. 1997) ................................................13

*Cutter v. Wilkinson*,
   544 U.S. 709 (2005).................................................................24

*Delta Air Lines, Inc. v. Exp.-Imp. Bank of U.S.*,
   85 F. Supp. 3d 250 (D.D.C. 2015) .......................................9, 11

*Doe v. Garrett*,
   903 F.2d 1455 (11th Cir. 1990) ..............................................13

*Douglas v. Kimberly-Clark Corp.*,
   No. 91-2599, 1991 WL 236882 (E.D. Pa. Oct. 31, 1991) .......7

*Etsitty v. Utah Transit Auth.*,
   502 F.3d 1215 (10th Cir. 2007) ..............................................14

*Farm Credit Servs. of Am. v. Opp*,
   No. 12-382, 2013 WL 434724 (D. Neb. Feb. 4, 2013).............2

*FCC v. Fox Television Stations, Inc.*,
   132 S. Ct. 2307 (2012)............................................................23

*Freed v. Consol. Rail Corp.*,
   201 F.3d 188 (3d Cir. 2000)....................................................13

*Gates v. U.S. Postal Serv.*,
   622 F. Supp. 563 (E.D. Mo. 1985).........................................13

*Gen. Conference Corp. of Seventh-Day Adventists v. McGill*,
   617 F.3d 402 (6th Cir. 2010) ....................................................7

*Geneva Coll. v. Sebelius*,
   929 F. Supp. 2d 402 (W.D. Pa. 2013)......................................5

*Gonzales v. O Centro Espirita Beneficente*
   *Uniao do Vegetal*,
   546 U.S. 418 (2006)................................................................18

*Hobby Lobby Stores, Inc. v. Sebelius*,
   723 F.3d 1114 (10th Cir. 2013) ...................................7, 18, 24

*Horne v. Firemen's Ret. Sys. of St. Louis*,
   69 F.3d 233 (8th Cir. 1995) ......................................................8

iii

*Hunter v. United Parcel Serv., Inc.*,
    697 F.3d 697 (8th Cir. 2012) ............................................................................13, 14, 15

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
    515 U.S. 557 (1995)............................................................................................21

*Iowa League of Cities v. E.P.A.*,
    711 F.3d 844 (8th Cir. 2013) .........................................................................7, 9

*Jensen v. Schweiker*,
    709 F.2d 1227 (8th Cir. 1983) .........................................................................12

*Johnson v. State of Mo.*,
    142 F.3d 1087 (8th Cir. 1998) .........................................................................10

*Johnston v. Univ. of Pittsburgh of Com. Sys. of Higher Educ.*,
    97 F. Supp. 3d 657 (W.D. Pa. 2015)..............................................................13, 14

*Kolender v. Lawson*,
    461 U.S. 352 (1983)...........................................................................................24

*Lockhart v. United States*,
    136 S. Ct. 958 (2016).........................................................................................15

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)...................................................................................10, 11

*McCutcheon v. FEC*,
    134 S. Ct. 1434 (2014).......................................................................................19

*Means v. U.S. Conference of Catholic Bishops*,
    No. 15-353, 2015 WL 3970046 (W.D. Mich. June 30, 2015)................................25

*Miener v. State of Mo.*,
    673 F.2d 969 (8th Cir. 1982) ...........................................................................13

*Minn. Citizens Concerned for Life v. Fed. Election Comm'n*,
    113 F.3d 129 (8th Cir. 1997) ...........................................................................12

*Mowlana v. Lynch*,
    803 F.3d 923 (8th Cir. 2015) ...........................................................................15

*Nat'l Socialist Party of Am. v. Vill. of Skokie*,
    432 U.S. 43 (1977)............................................................................................21

*Nat. Res. Def. Council v. EPA*,
    559 F.3d 561 (D.C. Cir. 2009) .........................................................................10

*Nat'l Parks Conservation Ass'n v. E.P.A.*,
  759 F.3d 969 (8th Cir. 2014) .................................................................11

*Neb. Pub. Power Dist. v. MidAmerican Energy Co.*,
  234 F.3d 1032 (8th Cir. 2000) .............................................................2, 9

*NFIB v. Sebelius*,
  132 S. Ct. 2566 (2012).........................................................................20

*Ohio Forestry Ass'n, Inc. v. Sierra Club*,
  523 U.S. 726 (1998).............................................................................8

*Parrish v. Dayton*,
  761 F.3d 873 (8th Cir. 2014) ...............................................................9

*Price Waterhouse v. Hopkins*,
  490 U.S. 228 (1989)........................................................................13, 14

*Pub. Water Supply Dist. No. 8 of Clay*
  *Cty., Mo. v. City of Kearney, Mo.*,
  401 F.3d 930 (8th Cir. 2005) ...............................................................8

*Quick v. Donaldson Co., Inc.*,
  90 F.3d 1372 (8th Cir. 1996) ...............................................................14

*Radtke v. Misc. Drivers & Helpers Union Local No. 638*,
  867 F. Supp. 2d 1023 (D. Minn. 2012)...................................................14

*Rumble v. Fairview Health Servs.*,
  No. 14-2037, 2015 WL 1197415, (D. Minn. Mar. 16, 2015) .................................14

*Real Alts., Inc. v. Burwell*,
  150 F. Supp. 3d 419 (M.D. Pa. 2015) ...................................................4

*Roark & Hardee LP v. City of Austin*,
  522 F.3d 533 (5th Cir. 2008) ...............................................................23

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*,
  547 U.S. 47 (2006)..............................................................................21

*Sharpe Holdings, Inc. v. U.S. Dep't of Health & Human Servs.*,
  801 F.3d 927 (8th Cir. 2015) ...............................................2, 7, 18, 19

*Smith v. Goguen*,
  415 U.S. 566 (1974).............................................................................22

*Snyder v. Phelps*,
  562 U.S. 443 (2011)..............................................................................21

v

*Sommers v. Budget Mktg., Inc.*,
  667 F.2d 748 (8th Cir. 1982) ............................................................13

*South Dakota v. Dole*,
  483 U.S. 203 (1987).......................................................................19

*Thunder Basin Coal Co. v. Reich*,
  510 U.S. 200 (1994).......................................................................12

*Tomic v. Catholic Diocese of Peoria*,
  442 F.3d 1036 (7th Cir. 2006) ...........................................................7

*United Parcel Serv., Inc. v. Mitchell*,
  451 U.S. 56 (1981).........................................................................18

*United States v. Baker*,
  98 F.3d 330 (8th Cir. 1996) ..............................................................17

*United States v. Stanko*,
  491 F.3d 408 (8th Cir. 2007) ............................................................15

*United States v. Stevens*,
  559 U.S. 460 (2010)........................................................................6

*Van Wyhe v. Reisch*,
  581 F.3d 639 (8th Cir. 2009) ............................................................19

*Williamson v. A.G. Edwards & Sons, Inc.*,
  876 F.2d 69 (8th Cir. 1989) ..............................................................14

*Window Sys., Inc. v. Manchester Mem'l Hosp.*,
  424 F. Supp. 331 (D. Conn. 1976)........................................................7

**Statutes**

20 U.S.C. § 1681 ...........................................................................17

42 U.S.C. § 2000bb-1 ......................................................................18

42 U.S.C. § 18116 .....................................................................12, 13

Minn. Stat. § 363A.03 ......................................................................15

**Regulations**

45 C.F.R. § 92.4 ............................................................................14

45 C.F.R. § 92.101 .........................................................................16

81 Fed. Reg. 31376 (May 18, 2016) ............................................. *passim*

## INTRODUCTION

This case would vanish if HHS would do one simple thing: Agree that Plaintiffs are in full compliance with the Rule. HHS repeatedly proclaims that the Rule is not meant to override an "applicable" religious defense or a doctor's "nondiscriminatory" medical judgment. HHS 7, 9-10. But it carefully avoids saying that Plaintiffs' religious defenses are actually "applicable" here or that their medical judgments are "nondiscriminatory." Instead, HHS would have Plaintiffs play a regulatory game of Russian roulette, where only HHS knows how many chambers of the gun are loaded. Plaintiffs can pull the trigger and hope the Rule won't apply. But if it does, Plaintiffs will suffer massive consequences. HHS lacks any statutory basis for making Plaintiffs play this game. Accordingly, a preliminary injunction is required.

## ARGUMENT

## I.     The Rule imposes immediate, irreparable harm.

The irreparable harm in this case is readily apparent. Based on their religious beliefs and medical judgment, Plaintiffs have categorical policies against performing procedures or providing insurance coverage for gender transitions. Pls.' Mem. in Supp. of Mot. for Prelim. Inj. 8-12 (Mem.). Under the Rule, however, Plaintiffs "have to revise [their] policy to provide the procedure[s] for transgender individuals in the same manner [they] provide[] the procedure[s] for other individuals." Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31376, 31455 (May 18, 2016). Plaintiffs have already received requests for the type of transition services required by the Rule and have declined based on medical judgment and religious beliefs, putting them squarely in conflict with the Rule. *See*, *e.g.*, Ex. A, ¶¶ 3-4 (Sister O'Brien Decl.).

Similarly, HHS concedes that, as of January 1, any insurance policy that categorically excludes gender transition services will be "unlawful on its face." 81 Fed. Reg. 31429; *cf*. Def.'s Opp'n to

1

Pls.' Mot. for Prelim. Inj. 10-11 (HHS) (Rule "prohibit[s]" categorical exclusions). Although HHS claims that Plaintiffs have not "clearly alleged" that their insurance plans exclude "all services for gender transition," HHS 17-18 & n.8, that is wishful thinking. Plaintiffs' insurance plans do just that. *See, e.g.*, Ex. A, ¶ 6 (Sister O'Brien Decl.); Ex. B, ¶¶ 4, 6 (Bakke Decl.). In fact, since Plaintiffs' last filing, one of Plaintiffs' third-party administrators informed it that, if it wants to continue categorically excluding gender transition services, it must indemnify the third-party administrator for the liability resulting from the new Rule. Ex. B, ¶ 6. And another insurance company that has previously excluded gender transition services from one of Plaintiffs' insurance plans just recently communicated that, in the absence of an injunction protecting Plaintiffs, the company may remove this exclusion from the plan on January 1 because of the new Rule. Ex. B, ¶ 8.

Thus, Plaintiffs face a stark choice: They must either maintain their current policies and face massive liability under the new Rule, or alter their policies in violation of their conscience. This is the quintessential type of irreparable harm that merits an injunction. *See, e.g.*, *Sharpe Holdings, Inc. v. U.S. Dep't of Health & Human Servs.*, 801 F.3d 927, 945 (8th Cir. 2015) (affirming injunction where plaintiffs "will be forced to violate their sincerely held religious beliefs by complying with [an insurance mandate]" or "incur severe monetary penalties for refusing to comply"); *Neb. Pub. Power Dist. v. MidAmerican Energy Co.*, 234 F.3d 1032, 1038-39 (8th Cir. 2000) ("The insecurity caused by" "contending interpretations" of legal obligations "works a definite, tangible and significant future harm, and indeed even works a present harm on [plaintiffs'] ability to plan and to conduct business operations."); *Farm Credit Servs. of Am. v. Opp*, No. 12-382, 2013 WL 434724, at *5 (D. Neb. Feb. 4, 2013) (injunction would prevent irreparable harm in advance of deadline to change insurance plans); *Child Evangelism Fellowship of Minn. v. Minneapolis Special Sch. Dist. No. 1*, 690 F.3d 996, 1000 (8th Cir. 2012) ("[L]oss of First Amendment freedoms, for

even minimal periods of time, unquestionably constitutes irreparable injury.").

In response, HHS claims that there is no irreparable harm because Plaintiffs *might* be able to avoid liability in a future enforcement proceeding under the Rule. HHS 19-22. But this argument fails for several reasons. First, HHS never says that Plaintiffs are in compliance with the Rule. Before filing this motion, Plaintiffs asked if HHS would simply agree in writing that practices engaged in by parties like Plaintiffs do not violate the Rule. Ex. C, ¶¶ 3, 6 (Goodrich Decl.). But HHS refused. *Id.* at ¶¶ 4, 6. Instead it offers only coy generalities. It repeatedly says, for example, that the Rule "does not require any covered entity to perform, or to provide insurance coverage for, any particular medical services"; rather, it requires avoiding "unlawful discrimination." HHS 1; *see also* HHS 8-12, 16-17, 21, 31. But this is simply an oblique way of saying that if Plaintiffs' refusal to perform or cover gender transition procedures is deemed discriminatory, then they must perform and cover them. And the Rule indicates that it will treat Plaintiffs' policies on coverage and medical services as discriminatory. *See* Mem. 9-11.

Similarly, HHS repeatedly quotes from the Rule's Preamble, saying that some "[s]cientific or medical reasons can justify distinctions based on" sex. HHS 1, 7, 16. But the Rule does not purport to protect *all* good faith medical judgments. It protects only judgments that HHS deems to be based on the "best available science" and expert consensus. 81 Fed. Reg. at 31405. It says that "sex-specific" health classifications are "unlawful unless the covered entity can show an *exceedingly persuasive justification* for it." *Id.* at 31409 (emphasis added). And it says that it will respect medical judgment only if HHS deems it to be "nondiscriminatory" and "legitimate," HHS 1, 8, 9, 10, 18, 21, after "carefully scrutiniz[ing]" it for any hint of "pretext." 81 Fed. Reg. at 31429. Thus, the self-serving statements in HHS's legal brief are cold comfort—particularly when HHS carefully avoids saying that *Plaintiffs'* medical judgments, as detailed in their written policies and opening

brief, are "nondiscriminatory" and "legitimate." Indeed, the Rule implies just the opposite, stating that a judgment that all gender transition procedures are "experimental"—which is what Plaintiffs maintain—is contrary to "current standards of care." *Id.* at 31429, 31435.

On the question of religious conscience, HHS offers the truism that its Rule cannot trump federal conscience statutes when those statutes are "applicable." HHS 7-8, 10. But it studiously avoids saying whether those statutes are "applicable" to Plaintiffs' conduct here. For example, HHS does not deny that on January 1, 2017, a health plan that categorically excludes coverage for gender transition procedures will be "unlawful on its face." 81 Fed. Reg. at 31429; *see* HHS 10-11 (such plans are "preclud[ed]"). But HHS refuses to say whether Plaintiffs' plans are protected under RFRA. HHS also suggests that it will take a dim view of such objections, arguing that its Rule furthers a "compelling interest" under RFRA, 81 Fed. Reg. at 31380, and admitting that it "decided against including a blanket religious exemption in the final rule," *id.* at 31376, precisely so that it could enforce the Rule against religious objectors. HHS 32-33; 81 Fed. Reg. at 31380.

HHS's assurances based on the Church Amendment are equally hollow. HHS itself has recently stated that the Church Amendment is limited to "three specified federal funding streams." Dkt. No. 50 at 9 n.4, *Franciscan Alliance, Inc. v. Burwell*, No. 16-108 (N.D. Tex. Nov. 23, 2016). Plaintiffs provide many health services outside the scope of those three funding streams, and the Rule applies to them in "all of [their] operations." 81 Fed. Reg. at 31430. Further, several courts, often at the behest of HHS, have held that the Church Amendment is enforceable only by HHS, not private parties.[1] And HHS has repeatedly argued that the Church Amendment protects only

---

[1] *See, e.g.*, *Cenzon-DeCarlo v. Mount Sinai Hosp.*, 626 F.3d 695, 699 (2d Cir. 2010) (finding no private right of action under Church Amendment); *Real Alts., Inc. v. Burwell*, 150 F. Supp. 3d 419, 446 (M.D. Pa. 2015) (Plaintiff who does not show a "connection between [his or her] actions" and "grant funding for 'voluntary family planning projects' . . . lack[s] standing to advance [his or her] claim that the mandate

"individuals" and therefore does not protect entities like Plaintiffs *at all*.[2] Indeed, HHS's own website describes the Church and Weldon Amendments as limited only to "recipients of *certain* federal funds*," with respect to "*certain* health care providers" who refuse to participate in "*certain* health care services."[3] It is little wonder, then, that HHS never actually says that the Church Amendment protects Plaintiffs here.

HHS also argues that any injury is "speculative," because Plaintiffs "have not identified any enforcement action against them." HHS 18-19. But with respect to insurance, there can be no enforcement action yet because the challenged provisions of the Rule do not take effect until January 1, 2017. Further, in just six months since HHS issued the new Rule, activist groups have already filed four complaints against entities like the Plaintiffs—and that is *before* the insurance provisions have even taken effect.[4] Two Catholic hospitals are already facing enforcement proceedings, one of which was sued by the ACLU over an insurance exclusion just like Plaintiffs'.[5] And the ACLU has an active campaign to identify clients who were treated at "Catholic-sponsored hospital[s]" so

---

violates the Church Amendment.") (quoting *Geneva Coll. v. Sebelius*, 929 F. Supp. 2d 402, 449-50 (W.D. Pa. 2013)), *appeal docketed,* No. 16-1275 (3rd Cir. Feb. 10, 2016).

[2] *See, e.g.*, Dkt. No. 27 at 33, *Real Alts., et al. v. Burwell*, No. 15-105 (M.D. Pa. May 28, 2015), 2015 WL 12700984 (arguing that an entity could not receive protection under the Church Amendment because it is not an "individual"); *accord* Dkt. No. 31 at 44, *Ave Maria Sch. of Law v. Sebelius*, No. 13-795 (M.D. Fla. Mar. 7, 2014), 2014 WL 1420311 ("Nor is plaintiff an 'individual' under that provision. Plaintiff is therefore not within the Church Amendment's zone of interests either.").

[3] Ex. C-1 (OCR, *Laws and Regulations Enforced by OCR*, Laws Regulations Guidance, http://www.hhs.gov/civil-rights/for-providers/laws-regulations-guidance/laws/index.html (last visited Dec. 14, 2016)) (emphasis added).

[4] Admin. Compl., *ACLU v. Ascension Health*, U.S. Dept. of Health & Human Servs., Office for Civil Rights (Oct. 25, 2016); Compl. & Jury Demand, *Dovel v. Pub. Library of Cincinnati & Hamilton Cty.*, No. 16-955 (S.D. Ohio Sept. 26, 2016); Compl., *Prescott v. Rady Children's Hosp. - San Diego*, No. 16-2408 (S.D. Cal. Sept. 26, 2016); Compl., *Robinson v. Dignity Health*, No. 16-3035 (N.D. Cal. June 6, 2016).

[5] *See* Compl., *Robinson*, No. 16-3035; Compl., *Prescott*, No. 16-2408.

5

that it can file lawsuits against them for following their "religiously based Directives."[6] Beyond

that, HHS itself has already initiated multiple enforcement actions under the new Rule, and it is

now investigating a plaintiff in a similar case. *See* Dkt No. 57, *Franciscan Alliance*, No. 16-108

(N.D. Tex. Oct. 21, 2016). HHS's claim that enforcement against Plaintiffs is "speculative" (HHS

18), *while it is currently investigating identically situated plaintiffs*, is absurd.

Ultimately, HHS has adopted a Rule that, by its plain text, makes Plaintiffs' conduct illegal. It

cannot evade judicial review by claiming that Plaintiffs might successfully raise an affirmative

defense. In *Ashcroft v. ACLU*, for example, the government opposed an injunction on the ground

that "[n]o prosecutions ha[d] yet been undertaken under the law," and anyone prosecuted could

assert "an affirmative defense" under the First Amendment. 542 U.S. 656, 670-71 (2004). The

Supreme Court rejected that argument, noting that when "only an affirmative defense is available,

speakers may self-censor rather than risk the perils of trial"—which is an irreparable harm. *Id.*

Similarly, in *United States v. Stevens*, the government argued that a law banning depictions of

animal cruelty should be upheld because the law included a broad "exceptions clause" for consti-

tutionally protected speech, and because the government promised to apply it in a way that re-

spected speech. 559 U.S. 460, 479-81 (2010). But the Supreme Court flatly rejected that argument,

stating that "[w]e w[ill] not uphold an unconstitutional statute merely because the Government

promise[s] to use it responsibly." *Id.* at 480. Instead, "[t]he Government's assurance that it will

apply [the law] far more restrictively than its language provides is pertinent only as an implicit

acknowledgment of the potential constitutional problems with a more natural reading." *Id.* So too

here: HHS tries to assure the Court that it will apply the Rule in a way that respects religious

---

[6] Ex. C-2 (ACLU, *Do You Believe a Catholic Hospital Provided You or a Loved One Inadequate Repro-
ductive Health Care?*, https://action.aclu.org/secure/do-you-believe-catholic-hospital-provided-you-or-
loved-one-inadequate-reproductive-health-car (last visited Dec. 14, 2016)).

conscience and medical judgment precisely because the plain language of the Rule is indefensible.

HHS also claims that Plaintiffs face no harm because, if they are sued by private parties, they can "raise as a defense . . . [the] arguments that they attempt to present here." HHS 12 n.6. But that is misleading. As HHS well knows, several circuits have held that RFRA cannot be applied in lawsuits between private parties.[7] Other courts have also held that APA claims cannot be asserted between private parties.[8] Thus, when Plaintiffs are sued by a private party, they may well be foreclosed from raising the APA or RFRA as a defense.

Finally, the prospect of possibly obtaining relief in the future does not change the fact that Plaintiffs must decide *now* whether to take actions that expose them to massive liability. They must decide now whether to keep their policy of declining to perform gender transition procedures—despite the fact that the Rule requires them "to revise [their] policy to provide the procedure[s] for transgender individuals." 81 Fed. Reg. at 31455. And they must decide now whether to keep the categorical exclusions of gender transition procedures in their health plans—despite the fact that those plans become "unlawful on [their] face" in 18 days. 81 Fed. Reg. at 31429. The government cannot force Plaintiffs to "immediately alter their behavior or play an expensive game of Russian roulette" with the healthcare ministries to which they have devoted their lives. *Iowa League of Cities v. E.P.A.*, 711 F.3d 844, 868 (8th Cir. 2013). As many courts have held, that constitutes irreparable harm. *Sharpe*, 801 F.3d at 945; *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1146 (10th Cir. 2013), *aff'd*, 134 S. Ct. 2751 (2014).

---

[7] *See, e.g.*, *Tomic v. Catholic Diocese of Peoria*, 442 F.3d 1036, 1042 (7th Cir. 2006) ("RFRA is applicable only to suits to which the government is a party."); *Gen. Conference Corp. of Seventh-Day Adventists v. McGill*, 617 F.3d 402, 411-12 (6th Cir. 2010) (same).

[8] *See, e.g.*, *Byers v. Intuit, Inc.*, 564 F. Supp. 2d 385, 413 (E.D. Pa. 2008), *aff'd*, 600 F.3d 286 (3d Cir. 2010) ("[T]he APA is not applicable to suits between private parties.") (quoting *Window Sys., Inc. v. Manchester Mem'l Hosp.*, 424 F. Supp. 331, 336 (D. Conn. 1976)); *Douglas v. Kimberly-Clark Corp.*, No. 91-2599, 1991 WL 236882, at *2 (E.D. Pa. Oct. 31, 1991) (government must be a party for APA claim).

## II. HHS's jurisdictional arguments are meritless.

For similar reasons, HHS's attacks on this Court's jurisdiction also fail.

### A. Plaintiffs' claims are ripe and Plaintiffs have standing.

First, HHS argues that "Plaintiffs' claims are not ripe" because the Court must "wait for the Rule to be applied to Plaintiffs to see what its effects will be." HHS 19, 22 (alterations omitted). But this argument flies in the face of the "essential distinction between a declaratory judgment action and an action seeking other relief": namely that "no actual wrong need have been committed or loss have occurred in order to sustain the action." *Horne v. Firemen's Ret. Sys. of St. Loui*s, 69 F.3d 233, 236 (8th Cir. 1995) (citation omitted); *accord Pub. Water Supply Dist. No. 8 of Clay Cty., Mo. v. City of Kearney, Mo.*, 401 F.3d 930, 932 (8th Cir. 2005) ("A declaratory judgment action can be sustained if no injury has yet occurred."). Indeed, courts routinely decide pre-enforcement challenges to agency rules when the question presented is purely legal. This is especially true when, as here, the rule pressures a regulated entity "to modify its behavior in order to avoid future adverse consequences." *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 734 (1998).

Plaintiffs easily meet this standard. It is undisputed that they conscientiously object to providing or covering gender transition procedures. Mem. 7-11, 32-33. There is nothing "contingent" about the existing conflict between the Rule and Plaintiffs' policies. HHS 20; 81 Fed. Reg. at 31455 (provider of hysterectomies "would have to revise its policy" to provide them for transgender individuals); *id.* at 31429 (categorical exclusion of coverage for gender transitions "is unlawful on its face under paragraph (b)(4)"). The only questions are purely legal: whether the Rule is valid and whether Plaintiffs' medical and religious objections absolve them from complying. Plaintiffs face substantial pressure "to modify [their] behavior in order to avoid future adverse consequences." *Ohio Forestry Ass'n*, 523 U.S. at 734. Accordingly, their claim is ripe.

This case is thus similar to *Iowa League of Cities*, where the Eighth Circuit held that a challenge to an agency guidance document was ripe for review because it involved "primarily legal questions" and plaintiffs needed to "immediately alter their behavior or play an expensive game of Russian roulette" based on potential liability under the new agency rules. 711 F.3d at 867-68; *accord MidAmerican Energy*, 234 F.3d at 1038, 1039 (case ripe where question is "purely legal," facts necessary to resolve case were established, and "[d]elayed judicial resolution would only increase the parties' uncertainty" and result in "financial risk" or modification of behavior). We are aware of no case—and HHS has cited none—where a court dismissed a claim as unripe simply because the Plaintiff might later prevail on an as-yet-unresolved *legal* defense. Instead, HHS only cites a handful of cases where the plaintiff based its claim on a chain of unpredictable future *factual* events, such as a challenge regarding an unscheduled election that "may not occur at all." *Parrish v. Dayton*, 761 F.3d 873, 876 (8th Cir. 2014).

Next, HHS claims that "further factual development [is] necessary because it [is] near impossible . . . to evaluate [this case] in a factual vacuum." HHS 22 (citing *Delta Air Lines, Inc. v. Exp.-Imp. Bank of U.S.*, 85 F. Supp. 3d 250, 270 (D.D.C. 2015)). But HHS fails to identify even one specific fact that needs to be developed to determine the purely legal issues in this case. That is because all of the relevant facts are undisputed: Plaintiffs have clearly explained the nature of their policies, their religious beliefs, and their medical judgments. *See* Mem. 7-11.

HHS also argues that the Court is not permitted to consider the "examples and guidance provided in the Rule's preamble." HHS 20 n.9. But the only case HHS cites for this proposition involved agency statements that were "conditional," "equivocal," "nonbinding," "hypothetical," and "non-specific," and therefore did not even constitute "final agency action." *See* HHS 20 n.9 (citing

9

*Nat. Res. Def. Council v. EPA*, 559 F.3d 561, 565 (D.C. Cir. 2009)). Here, by contrast, HHS included specific, unequivocal requirements in the preamble, stating, for example, that covered entities "have to revise [specific] polic[ies]" and that other policies are "unlawful on [their] face." 81 Fed. Reg. at 31455, 31429. Thus, this case is even stronger than *Chemical Waste Management, Inc. v. E.P.A.*, where the D.C. Circuit held that an agency's "interpretive principles" were ripe for review, even though they "consisted only of brief references which were 'buried' within lengthy preambles." 869 F.2d 1526, 1530, 1534 (D.C. Cir. 1989). Indeed, the Eighth Circuit has determined—over an agency's objections—that language in a Preamble was controlling when it "specifically addressed the exact issue at the heart of this [dispute]," just as HHS's preamble language does here. *Advanta USA, Inc. v. Chao*, 350 F.3d 726, 730 (8th Cir. 2003).

Ultimately, the case is ripe for a simple reason: The Rule directly regulates Plaintiffs' day-to-day operations right now, and they face significant consequences for violating it. This case is no different from *Abbott Laboratories v. Gardner*, 387 U.S. 136, 151 (1967), where the government argued that a pre-enforcement challenge to a rule was not ripe because the government had not yet taken any enforcement action. The Supreme Court rejected this argument, noting that the rule would have "a direct effect on the day-to-day business" of plaintiffs by forcing them to either "comply with the . . . requirement and incur the costs of changing over their [practices] or . . . follow their present course and risk prosecution." *Id.* at 152. The rule thus "put[ ] petitioners in a dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate." *Id.* Plaintiffs face precisely the same dilemma.

For many of the same reasons this case is ripe, Plaintiffs also have standing. *See Johnson v. State of Mo.*, 142 F.3d 1087, 1090 n.4 (8th Cir. 1998) (doctrines of standing and ripeness are "closely related"). As the Supreme Court has explained: "When the suit is one challenging the

legality of government action," and "the plaintiff is himself an object of the action," then "there is ordinarily little question" that the plaintiff has standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561-62 (1992). That is the case here. Defendants rely primarily on a single district court case where the court found it was "near impossible . . . to evaluate whether the [plaintiff's] actions were consistent with the [new guidelines]" because it would need to perform a complicated, fact-specific analysis to assess liability. *Delta Air Lines*, 85 F. Supp. 3d at 250. But here, Plaintiffs are engaging in conduct plainly prohibited by the Rule, so there is no complicated question of liability; the only question is whether the Rule can validly be applied to Plaintiffs. Absent an injunction, then, the only question is the "the timing and extent" of Plaintiffs' injury, and this concrete "[r]isk of direct financial harm" is more than enough to "establish[] injury in fact." *Nat'l Parks Conservation Ass'n v. E.P.A.*, 759 F.3d 969, 975 (8th Cir. 2014); *see also 281 Care Comm. v. Arneson*, 638 F.3d 621, 630-31 (8th Cir. 2011) (allowing pre-enforcement action due to the "sensitive nature of constitutionally protected expression").

### B.  A pre-enforcement challenge is not prohibited.

HHS also argues that Plaintiffs' claims are not justiciable because Section 1557 implicitly "prohibit[s] pre-enforcement review." HHS 22. But with respect to pre-enforcement challenges, the Supreme Court has said that when a legal issue is "fit for judicial resolution," and a regulation "requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance, access to the courts under the Administrative Procedure Act and the Declaratory Judgment Act *must be permitted*, absent a statutory bar or some other unusual circumstance." *Abbott Labs.*, 387 U.S. at 153 (emphasis added). This presumption of judicial review can be rebutted "only upon a showing of 'clear and convincing evidence' of a contrary legislative intent." *Id.* at 141. Citing this principle, the Eighth Circuit has noted that "[f]itness for

11

judicial decision means, most often, that the issue is legal rather than factual" and "[s]ufficient hardship is usually found if the regulation imposes costly, self-executing compliance burdens or if it chills protected First Amendment activity." *Minn. Citizens Concerned for Life v. Fed. Election Comm'n*, 113 F.3d 129, 132 (8th Cir. 1997). HHS has failed to rebut a presumption of judicial review here.

HHS relies primarily on the fact that it must conduct agency proceedings before withdrawing federal funds. HHS 24-25. But Plaintiffs are not merely challenging the withdrawal of funds; they are challenging the way the Rule constrains their conduct and exposes them to private lawsuits, public enforcement, and False Claims Act liability. Mem. 21-22. Unlike the cases HHS cites (at 23), where plaintiffs tried to skirt an administrative process they could already use, *cf. Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207 (1994), no administrative process allows Plaintiffs to pursue their current claims. Unsurprisingly, the Eighth Circuit has affirmed this common-sense principle that "[e]xhaustion of administrative remedies is not a prerequisite to adjudication of a claim in the courts, where there are no prescribed agency procedures or remedies to exhaust." *Barrera v. Wheeler*, 441 F.2d 795, 799-800 (8th Cir. 1971); *see also Jensen v. Schweiker*, 709 F.2d 1227, 1229 (8th Cir. 1983) (declining to require exhaustion of constitutional challenge).

Next, HHS claims that Congress must have intended to preclude pre-enforcement review because it incorporated the "enforcement mechanisms provided for and available under [Title VI]." HHS 23-24 (quoting 42 U.S.C. § 18116(a)). But the Supreme Court has rejected this argument before, stating that "[t]he mere fact that some acts are made reviewable should not suffice to support an implication of exclusion as to others. The right to review is too important to be excluded on such slender and indeterminate evidence of legislative intent." *Abbott Labs.*, 387 U.S. at 141. Accordingly, numerous courts have held that Title VI does *not* require exhaustion of administrative

remedies before judicial review in all contexts,[9] including when the enforcement mechanisms of Title VI have been incorporated into other statutes.[10]

More importantly, Plaintiffs are not challenging the Rule's incorporation of "race" under Title VI; they are challenging its interpretation of "sex" under Title IX. For that, Section 1557 incorporates "[t]he enforcement mechanisms provided . . . [under] *[T]itle IX*." 42 U.S.C. § 18116(a) (emphasis added). Remarkably, HHS fails to cite the Eighth Circuit's clear holding that Title IX does not "contain[] a 'sufficiently comprehensive' remedial scheme" to preclude judicial review. *Crawford v. Davis*, 109 F.3d 1281, 1284 (8th Cir. 1997). Indeed, Title IX's procedure "to terminate federal support to institutions that violate Title IX" is "a far cry from the 'unusually elaborate enforcement provisions' of the statutes at issue" in cases where exhaustion was required. *Id.* (citing *Cannon v. Univ. of Chi.*, 441 U.S. 677, 709 (1979). Thus, Plaintiffs are entitled to judicial review.

## III. The Rule violates the Administrative Procedure Act.

Once HHS's jurisdictional arguments are swept aside, HHS has little to say on the merits.

### A. HHS's interpretation of "sex" is contrary to law.

HHS admits that the Eighth Circuit rejected its expansive interpretation of "sex" in *Sommers v. Budget Mktg., Inc.*, 667 F.2d 748 (8th Cir. 1982). But it argues that *Sommers* "has been abrogated" by *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), and "is inconsistent with" *Hunter v. United Parcel Serv., Inc.*, 697 F.3d 697 (8th Cir. 2012). HHS 26-28. Both assertions are baseless.

---

[9] *See, e.g.*, *Gates v. U.S. Postal Serv.*, 622 F. Supp. 563, 564 (E.D. Mo. 1985) ("[T]he Eighth Circuit has not required plaintiffs to exhaust Title VI [administrative] remedies . . ."), *aff'd without opinion*, 808 F.2d 839 (8th Cir. 1986); *Freed v. Consol. Rail Corp.*, 201 F.3d 188, 191 (3d Cir. 2000) ("Title VI . . . does not require that plaintiffs exhaust the administrative process before bringing suit.").

[10] *See, e.g.*, *Miener v. State of Mo.*, 673 F.2d 969, 978 (8th Cir. 1982) (Section 504 suits, which adopt the enforcement procedures of Title VI, "may be maintained in advance of the exhaustion of administrative remedies."); *Doe v. Garrett*, 903 F.2d 1455, 1460 (11th Cir. 1990) ("Title VI—and by extension section 794—does not incorporate Title VII's requirement of exhaustion of administrative remedies.").

In *Price Waterhouse*, the Court simply held that "sex" discrimination includes "disparate treatment of men and women resulting from sex stereotypes." 490 U.S. at 250-51. As many courts have recognized, sex stereotyping claims and gender identity claims are different; the former involves "behaviors, mannerisms, and appearances" associated with biological sex, while the latter involve transgender "status." *Johnston v. Univ. of Pittsburgh of Com. Sys. of Higher Educ.*, 97 F. Supp. 3d 657, 680-81 (W.D. Pa. 2015) (collecting cases). Indeed, HHS's own Rule recognizes this distinction by defining "sex" discrimination to include *both* "sex stereotyping, and gender identity." 45 C.F.R. § 92.4. If they were the same thing, prohibiting both would be superfluous. Thus, *Sommers* is not "inconsistent with" *Price Waterhouse*. HHS 28.

Indeed, many courts have expressly rejected the argument that *Price Waterhouse* requires "a more expansive interpretation of sex," holding instead that discrimination "based on the person's status as a transsexual is not discrimination because of sex." *Etsitty v. Utah Transit Auth.*, 502 F.3d 1215, 1222 (10th Cir. 2007); *see also* Mem. 13 n.9 (collecting cases). The two district courts that have concluded otherwise are simply mistaken. *Radtke v. Misc. Drivers & Helpers Union Local No. 638*, 867 F. Supp. 2d 1023, 1032 (D. Minn. 2012); *Rumble v. Fairview Health Servs.*, No. 14-2037, 2015 WL 1197415, at *2 (D. Minn. Mar. 16, 2015). In fact, since *Price Waterhouse*, the Eighth Circuit has reaffirmed that "sex" has been interpreted to mean "either 'man' or 'woman,'" and bars discrimination "against women because they are women and against men because they are men." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1377 (8th Cir. 1996). And just one month after *Price Waterhouse* was decided, the Eighth Circuit reaffirmed the traditional interpretation of "sex," expressly relying on *Sommers*. *See Williamson v. A.G. Edwards & Sons, Inc.*, 876 F.2d 69, 70 (8th Cir. 1989) (per curiam). Thus, *Sommers* remains good law.

Nor is *Sommers* "inconsistent with" *Hunter*. HHS 28. *Hunter* involved a claim not only under

14

Title VII, but under a Minnesota statute explicitly protecting "sexual orientation," which was defined to include an "identity not traditionally associated with one's biological maleness or femaleness." 697 F.3d at 702 (quoting Minn. Stat. § 363A.03, subd. 44). Thus, *Hunter* addressed a gender identity claim in the context of *state law*—which, unlike Title VII, provided separate protections for "sex" and gender identity. *Id.* at 703. Unsurprisingly, *Hunter* never mentions *Sommers*, much less suggests that it has been overruled. Accordingly, *Sommers* remains binding on this Court.

Even assuming the meaning of "sex" were an open question—and it is not—*Sommers* is plainly correct. HHS concedes that "the statutory text should be the Court's starting point." HHS 26. But it offers no serious textual argument at all. First, it concedes that the common meaning of "sex" when Title IX was enacted referred to the differences between males and females; it says only that this common meaning is not "particularly relevant." HHS 28. But that is directly contrary to Eighth Circuit precedent, which requires the Court to give undefined words their "ordinary meanings when the statute was enacted." *Mowlana v. Lynch*, 803 F.3d 923, 925 (8th Cir. 2015).

Second, HHS does not dispute that Congress has enacted *other* statutes protecting both "sex" and "gender identity" separately, but has refused to do the same in Title IX. Mem. 16. It says only that "there is no evidence" that "the inclusion of 'gender identity' in [these statutes]" means that sex and gender identity are different. HHS 29. But of course there is: It's called the canon against superfluity, and it requires courts to "avoid an interpretation of a statute that renders some [part] altogether redundant [or] . . . superfluous." *United States v. Stanko*, 491 F.3d 408, 413 (8th Cir. 2007) (internal quotation marks and citations omitted). That canon has special force in circumstances like this, where Congress has added a *new* protection for "gender identity" to other statutes that *already* protected "sex," thus clearly highlighting the difference between these two terms. *See Lockhart v. United States*, 136 S. Ct. 958, 965-66 (2016) (applying canon against superfluity).

Third, HHS does not dispute that the structure of Title IX contemplates only two sexes, male and female. Mem. 15. And it does not dispute that federal agencies uniformly interpreted "sex" to refer to male or female for almost 40 years. Mem. 16-17. All of this confirms that the common meaning of "sex" refers to the differences between male and female.

Lacking any textual argument, HHS claims that "sex" should be interpreted in light of the "purpose" of Section 1557. HHS 28. But Section 1557 does not use the term "sex." Instead, it incorporates the statutory prohibition of Title IX. Thus, the relevant "purpose" for determining the meaning of "sex" is the purpose of Title IX. And HHS does not dispute that Title IX's purpose was "to ensure equal opportunities in education for women" (HHS 28)—further confirming the ordinary meaning of "sex." Finally, HHS claims that its interpretation of "sex" is entitled to *Chevron* deference because it is "reasonable." HHS 29-32. But the word "sex" is not ambiguous, so HHS receives no deference.

### B.  HHS's failure to include Title IX's exemptions is contrary to law.

The Rule is also contrary to law because it refuses to incorporate Title IX's religious and abortion exemptions—even though it incorporates *other* exemptions from Title VI, the Age Act, and the Rehabilitation Act. Mem. 18-19; 45 C.F.R. § 92.101(c). HHS says this shouldn't matter, because its Rule acknowledges the "Weldon, Church, and Coats amendments, and RFRA." HHS 32. But HHS lacks authority to displace those statutes even if it wanted to. And, as noted above, those statutes do not necessarily offer the same protection as Title IX's blanket exemptions—which HHS itself implicitly admits by openly rejecting Title IX's exemption. 81 Fed. Reg. at 31376. Next, HHS says that, "[w]hile *Title IX* contains a religious exemption, . . . *Section 1557* does not." HHS 32. But Section 1557 does not contain a ban on sex discrimination either. Instead, Section 1557 *incorporates* Title IX—and Title IX includes a religious exemption in the very same sentence that

it bans sex discrimination. 20 U.S.C. § 1681(a)(3). HHS has no rational basis—and no legislative warrant—for incorporating one part of the sentence but not the other.

Lastly, HHS says that a religious exemption is more appropriate in the education context than in the healthcare context, because people "typically" have more "choice" in schools than in hospitals. HHS 32. But not always: Many people have very limited educational choices. More importantly, that is a policy decision for Congress to make. If Congress wanted to ban sex discrimination without incorporating a religious exemption, it easily could have done so. Instead, it adopted a statute that bans sex discrimination and exempts religious organizations in the same breath.

### C.  HHS's Rule is contrary to Title VII.

Finally, HHS's Rule is contrary to Title VII because it restricts the ability of employers to accommodate religious employees. Mem. 20-21. HHS denies this, claiming that employers can accommodate employees by "excusing an objecting provider and allowing a non-objecting provider to perform a particular service." HHS 16-17. But what if there is no "non-objecting provider" available to perform the service? This is common among sole-practitioner clinics and smaller hospitals with a limited number of specialists. Prior to the new Rule, employers could accommodate their employees under Title VII by referring patients elsewhere. But now the employer "will be held accountable for discrimination." 81 Fed. Reg. at 31384. That is contrary to Title VII.

### IV. The Rule violates RFRA.

HHS ducks on even addressing Plaintiffs' RFRA arguments. Mem. 21-27. HHS does not dispute the existence of a substantial burden, nor does it offer any evidence or argument that the Rule is the least restrictive means of advancing a compelling governmental interest. By failing to brief the issue, HHS has waived it. *United States v. Baker*, 98 F.3d 330, 337 (8th Cir. 1996). Nor can

the Court consider *amici's* arguments in place of the government's. Courts do not consider arguments raised by *amici* if they were not raised by a party. *United Parcel Serv., Inc. v. Mitchell*, 451 U.S. 56, 60, n.2 (1981). And RFRA expressly places the burden of proof on the "Government" to make its own case—something it has entirely failed to do here. 42 U.S.C. § 2000bb-1(b) ("Government may substantially burden a person's exercise of religion only if *it* demonstrates" that strict scrutiny is satisfied) (emphasis added); *see also Hobby Lobby*, 134 S. Ct. at 2776 (refusing to consider RFRA arguments raised by *amici* because HHS "has never made this argument").

Nevertheless, a brief review of *amici's* arguments demonstrates why they are meritless. *Amici* claim (at 25) that Plaintiffs have not identified what "medical procedures" or "healthcare coverage" they object to. But Plaintiffs have explained precisely what procedures and coverage they object to and why. *See, e.g.*, Mem. 9-10. Plaintiffs have also presented specific evidence that the Rule burdens their religious practices by requiring them to change their policies with regard to medical services right now, and to change their insurance policies on January 1. *Id.*; *see also supra* Part I. This is more than enough detail for a RFRA claim. And notably, neither *amici* nor HHS dispute that the Rule imposes a substantial burden on Plaintiffs' religious exercise. Nor could they in light of *Hobby Lobby* or *Sharpe*, both of which held that a rule requiring insurance coverage of contraceptives was a substantial burden. 134 S. Ct. at 2779; 801 F.3d at 938.

As for strict scrutiny, HHS's silence belies any argument that it has a compelling interest in forcing Plaintiffs to provide the services at issue here. *Amici* try to expand the analysis to suggest that the real interest is to stop government-funded discrimination. *Amici* 26. But that is precisely the kind of "broadly formulated interest[]" that cannot satisfy strict scrutiny under RFRA. *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006); *Sharpe*, 801 F.3d at 943 (same). In any case, even at that impermissible level of generality, *amici's* arguments

18

fail. The government still allows gaping holes in coverage of transgender services elsewhere in the law. Mem. 23-27. Indeed, under *amici's* theory, the whole of Title IX—which of course includes both the broad religious entity exception and the protection against forced participation in abortions—is a massive act of government-funded discrimination that undermines *amici*'s claimed compelling interest. Moreover, there is nothing to stop the government from using other means, such as "subsidies, reimbursements, tax credits, or tax deductions to employees," to further its interests; that is what strict scrutiny requires. *Sharpe*, 801 F.3d at 945; *McCutcheon v. FEC*, 134 S. Ct. 1434, 1458 (2014) ("multiple alternatives available" to government to avoid harming First Amendment rights, including new government programs). Finally, *amici* present no evidence suggesting that Plaintiffs' proposed alternatives would be unworkable. *Sharpe*, 801 F.3d at 945. Given the controlling caselaw, the availability of less restrictive alternatives, and HHS's failure to advance a RFRA argument at all, Plaintiffs' RFRA claim is highly likely to succeed.

## V.  The Rule violates the Spending Clause.

The Rule also violates the Spending Clause by imposing new conditions on North Dakota that were not unambiguously included in the text of the relevant statute and therefore not clearly agreed to by North Dakota. HHS does not dispute that "conditions on the state's receipt of federal funds must be set out unambiguously." *Van Wyhe v. Reisch*, 581 F.3d 639, 650 (8th Cir. 2009) (citing *South Dakota v. Dole*, 483 U.S. 203, 207-11 (1987)). Instead, it argues that Congress need not spell out "every conceivable state action that would be improper." HHS 34. But that is a straw man. The key question is whether "the state's participation is the result of a knowing and informed choice." *Van Wyhe*, 581 F.3d at 650 (quoting *Dole*). Thus, in *Van Wyhe*, the Court found that Congress had clearly conditioned receipt of funds on application of the strict scrutiny standard to religious claims, but that subjecting states to suits for "appropriate relief" did not unambiguously abrogate sovereign immunity. *Id.* at 650, 653. Here, given that no court or agency interpreted Title

IX to include gender identity for almost 40 years, the claim that referencing that standard in the Affordable Care Act somehow "unambiguously" gave states a "knowing and informed choice" about covering sex change operations is absurd.

And HHS knows it. Indeed, the basic premise of HHS's argument under the APA is that it is "entitled to deference" under *Chevron* because "sex" *is* ambiguous. HHS 29-32. But "sex" is not Schrödinger's cat; it cannot be both ambiguous and unambiguous at the same time.

Nor can HHS remedy the absence of an unambiguous condition in Medicaid and Medicare by pointing to Section 1557's passage in 2010. HHS 35. Section 1557 does not condition receipt of federal funding (unambiguously or otherwise) on willingness to provide and pay for gender transition procedures. Instead, it simply incorporates an existing statute that, even in 2010, no part of the federal government had ever suggested should cover gender identity. Mem. 4.

Finally, HHS tries to avoid the obvious coercion inherent in the Rule by claiming that it is not trying to "leverage[] an old and large program to force states to participate in a new one." HHS 35. Yet that is precisely what the Rule does—North Dakota faces the loss of crucially important funding to care for the poor and elderly unless it cooperates with the Rule. In his controlling opinion for seven Justices in *NFIB v. Sebelius*, 132 S. Ct. 2566, 2576 (2012), Chief Justice Roberts held that a threat to eliminate all federal Medicaid funding, which constituted "10 percent of a State's overall budget," was "economic dragooning" and thus unconstitutionally coercive. *Id.* at 2604-05. Here, North Dakota faces even more coercion, because it stands to lose not only all of its Medicare funding, but all other HHS funding, and to face private lawsuits for damages and attorneys' fees.

## VI. The Rule violates the Free Speech Clause.

On the issue of free speech, HHS does not dispute that the Rule requires Plaintiffs to revise

their written policies to affirm the provision of medical transition procedures. HHS 36-37. Nor does HHS dispute that the Rule will require physicians to use transgender affirming language. HHS 37. HHS also continues to cite sources suggesting that Plaintiffs' medical viewpoints are impermissible. HHS 31 & n.14; *see also Amici* 6 (relying on same sources to argue Plaintiffs' views "have no basis in medical science"). HHS simply argues that because it purports to "prohibit[ ] discrimination," it is regulating "conduct," not speech. HHS 37. But the Supreme Court has repeatedly rejected the argument that government can regulate speech simply by labeling it "discriminatory conduct." *See, e.g.*, *Nat'l Socialist Party of Am. v. Vill. of Skokie*, 432 U.S. 43 (1977) (unanimously protecting the speech rights of Nazi group); *Snyder v. Phelps*, 562 U.S. 443, 448 (2011) (protecting harassing and discriminatory speech of funeral protesters); *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557 (1995) (unanimously protecting group's exclusion of LGBT messages despite conflicting anti-discrimination laws). Here, Plaintiffs' desire to ensure their speech reflects their medical judgments and religious beliefs is a much simpler case.

In fact, this case is quite like *Agency for International Development v. Alliance for Open Society International, Inc.*, in which HHS required recipients of anti-trafficking grants to amend their policies to express opposition to legalized prostitution. 133 S. Ct. 2321, 2331 (2013). Although HHS claimed that it was merely regulating conduct, the Supreme Court disagreed, concluding that HHS was unconstitutionally trying to "compel[ ] a grant recipient to adopt a particular belief as a condition of funding." *Id.* at 2330. The same is true here.[11]

HHS tries to gloss over the fact that the Rule deems one particular viewpoint to be "outdated

---

[11] This case also stands in sharp contrast to *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, where the Court observed that the viewpoint-neutral regulation at issue did "not dictate the content of the speech at all," but merely required schools to send scheduling notices for the military similar to those it was already sending for other on-campus recruiters. 547 U.S. 47, 62 (2006).

and not based on current standards of care"—the viewpoint that "transition-related treatment . . . [i]s experimental." 81 Fed. Reg. at 31435. HHS argues that this statement simply deals with insurance coverage, not medical advice. HHS 36-37. But this statement follows comments regarding access to both "coverage *and* care" and is supported by a citation to WPATH "standards of care" for physicians providing medical services. 81 Fed. Reg. at 31434 & n.263 (emphasis added). It is also unclear why HHS's view of the science in the insurance realm would be any different than in the medical services realm. Indeed, elsewhere in its brief, HHS itself quotes from insurance-related parts of the preamble to argue that it will respect some medical judgments in the medical services realm. HHS 9 (quoting 81 Fed. Reg. at 31436-37).

Finally, HHS tries to assure the Court that the Rule is valid because HHS will not use the Rule to punish protected speech. HHS 36-37. But the Eighth Circuit has rejected that argument before. In *281 Care Committee v. Arneson*, the government argued that a pre-enforcement challenge to a law was improper since there was no "credible threat" of enforcement sufficient to chill speech, and the plaintiffs' speech was arguably protected under the statute. 766 F.3d 774, 780 (8th Cir. 2014), *cert. denied*, 135 S. Ct. 1550 (2015). But the court determined that "[r]easonable chill exists" where a plaintiff's desired activity "could fall within the prohibition" of a law that "sweeps broadly" based on its plain meaning. *Id.* at 781-82. This harm existed even if future attempts to regulate the speech were unlikely to succeed, because "any person" could file a complaint, and complaints could "be used [] tactically" to try to punish unpopular speech. *Id*. Here, there is no question that the Rule's "literal scope, unaided by a narrowing . . . court interpretation, is capable of reaching expression sheltered by the First Amendment" and capable of chilling expression of medical professionals who fear their medical or religious views will be labeled as discriminatory. *Smith v. Goguen*, 415 U.S. 566, 573 (1974). The Rule thus violates Plaintiffs' free speech rights.

**VII.  The Rule is unconstitutionally vague.**

The Rule also violates the Due Process Clause and the First Amendment because it is uncon-stitutionally vague. Indeed, HHS's main defense to this case is to claim that nobody can know whether Plaintiffs are violating the Rule until after an enforcement proceeding is complete. HHS 21-22. If that is not a failure to "give fair notice of conduct that is forbidden or required," it is hard to imagine what would be. *FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012).

Citing *Roark & Hardee LP v. City of Austin*, HHS claims that facial vagueness challenges are "often difficult." 522 F.3d 533, 547 (5th Cir. 2008). But the court said this specifically in the context of a law that "does not threaten to inhibit any constitutionally protected conduct." *Id.* By contrast, *Roark* recognized that "[m]any times void-for-vagueness challenges are successfully made when laws have the capacity 'to chill constitutionally protected conduct, especially conduct protected by the First Amendment,'" and that in that context "a more stringent vagueness test should apply." *Id.* at 546, 552. Here, there is no question that the Rule has the capacity to chill Plaintiffs' free exercise and speech rights. *See* Mem. 30-33, 37-38. And unlike the clear standards in *Roark* that provided the parties with a "clear 'how to' guide for avoiding a violation under the" law, 522 F.3d at 553, HHS has done the opposite. In fact, HHS's response brief only underscores just how standardless the Rule is, and just how unbridled HHS's discretion to enforce it would be.

For example, HHS argues that Plaintiffs are wrong to have relied on the Rule's preamble for guidance, yet HHS itself relies on the preamble when it suits HHS's litigation position. *Compare* HHS 20 n.9 ("Plaintiffs' focus on examples and guidance provided in the Rule's preamble is par-ticularly misplaced."), *with id.* 16 (relying on a statement found *only* in the Preamble to assert that HHS will protect "[s]cientific or medical reasons" for "distinctions based on sex"). HHS states that it will protect medical judgment and physician speech, but only if such medical judgments are

not "discriminatory"—without saying whether the medical judgments at issue here count as discriminatory. HHS 37 & n.16. HHS also pays lip service to the existence of RFRA, 81 Fed. Reg. at 31379, but offers no guidance on whether it protects Plaintiffs, and even goes so far as to avoid addressing the merits of Plaintiffs' RFRA claim entirely. HHS's silence on this topic is telling, given that the Rule acknowledges that some RFRA claims will fail. 81 Fed. Reg. at 31380.

In the end, the Rule attempts to "vest[ ] virtually complete discretion in the hands of" HHS to determine which religious exercise, medical judgments, and speech are discriminatory, and which are not. *Kolender v. Lawson*, 461 U.S. 352, 358 (1983). The subjective nature of the Rule and lack of clear standards pressure Plaintiffs to "'steer far wider of the unlawful zone' . . . than if the boundaries of the forbidden areas were clearly marked." *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964); *see also City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 770 (1988). But that is precisely what the doctrines of vagueness and unbridled discretion prohibit.

### VIII. *Amici*'s arguments are meritless.

*Amici* claim that enjoining the new Rule would violate the Establishment Clause, Equal Protection Clause, and EMTALA. *Amici* 9-15. These arguments are baseless. Plaintiffs have provided healthcare in compliance with their beliefs for decades, and no court has ever found this to be unlawful. Enjoining the new Rule would preserve the status quo that has governed for decades.

Not surprisingly, *amici* fail to cite a single case holding that an application of RFRA violated the Establishment Clause. In fact, *amici*'s Establishment Clause argument has been made and rejected repeatedly, including just two years ago in *Hobby Lobby. Compare Hobby Lobby*, 134 S. Ct. at 2805, 2802 n.25 (Ginsburg, J., dissenting) (suggesting that the majority's application of RFRA violated the Establishment Clause), *with id.* at 2781 n.37 (rejecting this argument); *see also Cutter v. Wilkinson*, 544 U.S. 709 (2005) (unanimously holding that RFRA's companion statute

does not violate Establishment Clause). Similarly, *amici* fail to cite a single case holding that a government violated the Equal Protection Clause by declining to perform or cover gender transition procedures—even though states and the federal government have been doing this for decades. And *amici* fail to cite a single case holding that a religious hospital violated EMTALA by declining to perform an abortion—even though religious hospitals have been doing this for decades. To the contrary, *amici*'s arguments on this point have repeatedly failed. *See, e.g.*, *Am. Civil Liberties Union v. Trinity Health Corp.*, No. 15-12611, 2016 WL 1407844, at *4 (E.D. Mich. Apr. 11, 2016) (rejecting ACLU's EMTALA argument); *Means v. U.S. Conference of Catholic Bishops*, No. 15-353, 2015 WL 3970046, at *12 (W.D. Mich. June 30, 2015) (same). They fail here, too.

## IX. The balance of harms and public interest favor Plaintiffs.

HHS's arguments on the other preliminary injunction factors are also meritless. As explained above, Plaintiffs face serious harm right now. Being forced to choose between violating the law and violating their conscience is a much greater harm than being temporarily enjoined from enforcing a regulation. HHS 39. HHS cites the public interest in enforcing "civil rights statutes," *id.*—but the Rule is not a statute. RFRA actually is a civil rights statute, and Plaintiffs' constitutional rights to free speech, due process, and the free exercise of religion are no less important.

HHS complains that an injunction would be improper because Plaintiffs "delay[ed] in seeking relief." HHS 40. But Plaintiffs filed suit just 16 weeks after the Rule took effect. HHS, by contrast, did not promulgate the Rule until *six years* after enactment of the ACA. Plaintiffs have moved quickly to protect their rights, and the public interest weighs heavily in favor of maintaining the status quo while this Court considers the serious legal problems created by the new Rule.

### CONCLUSION

The motion should be granted.

Respectfully submitted this 14th day of December, 2016.

| /s/ Luke W. Goodrich | /s/ Wayne Stenehjem |
|---|---|
| Luke W. Goodrich | Wayne Stenehjem |
| Stephanie H. Barclay | Attorney General of North Dakota |
| The Becket Fund for Religious Liberty | 600 E. Boulevard Avenue |
| 1200 New Hampshire Ave. NW | Bismarck, ND  58505-0040 |
| Suite 700 | Telephone: (701) 328-2210 |
| Washington, DC 20036 | Facsimile: (701) 328-2226 |
| Telephone: (202) 349-7216 | |
| Facsimile: (202) 955-0090 | |
| lgoodrich@becketfund.org | Matthew Sagsveen |
| | Solicitor General |
| | N.D. Office of Attorney General |
| | 500 N. 9th Street |
| *Counsel for Plaintiffs Religious Sisters of* | Bismarck, ND 58501 |
| *Mercy, Sacred Hearth Mercy Health Care* | Telephone: (701) 328-3640 |
| *Center (Jackson, MN); Sacred Heart Mercy* | Facsimile: (701) 328-4300 |
| *Health Care Center (Alma, MI); SMP* | |
| *Health System, and University of Mary* | |
| | *Counsel for Plaintiff North Dakota* |

26

**CERTIFICATE OF SERVICE**

I hereby certify that on December 14, 2016, the foregoing brief was served on all parties via ECF.

                          /s/ Luke W. Goodrich
                          Luke W. Goodrich