## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| THE RELIGIOUS SISTERS OF MERCY, *et al.*, | |
| *Plaintiffs,* | No. 3:16-cv-386 |
| v. | **AMENDED COMPLAINT** |
| ALEX M. AZAR II, Secretary of the United States Department of Health and Human Service, *et al.*, | |
| *Defendants.* | |
| CATHOLIC BENEFITS ASSOCIATION, *et al.* | |
| *Plaintiffs,* | |
| v. | No. 3:16-cv-432 |
| ALEX M AZAR II, Secretary of the United States Department of Health and Human Service, *et al.*, | |
| *Defendants.* | |

1

## INTRODUCTION AND NATURE OF THE ACTION

1.     Section 1557 of the Affordable Care Act (ACA) prohibits any federally funded health program from engaging in sex discrimination. This means federally funded health programs are prohibited from engaging in any practices that would treat men better than women, or vice versa.

2.     The Department of Health and Human Services (HHS), however, interprets Section 1557 more broadly. It interprets "sex" discrimination to include discrimination based on "gender identity" or "termination of pregnancy." And based on this interpretation, HHS says doctors and hospitals must perform and pay for controversial gender transition procedures and abortions on pain of massive financial penalties—even when doing so would violate their religious beliefs and medical judgment.

3.     Plaintiffs are four private Catholic organizations and one State that are adversely affected by HHS's interpretation of Section 1557. They seek a ruling that HHS's interpretation of Section 1557 is unlawful, as well as an injunction prohibiting HHS from interpreting and enforcing Section 1557 in a way that would force them to perform or pay for gender-transition procedures and abortions in violation of their religious beliefs and medical judgment.

## I. PARTIES

4.     Plaintiff Religious Sisters of Mercy ("Sisters of Mercy") is a Catholic order of religious sisters devoted to works of mercy, including offering healthcare to the underserved. Located in Alma, Michigan, the Sisters of Mercy is a nonprofit corporation incorporated in 1973. The Sisters of Mercy are an international institute of pontifical right—that is, officially approved by the Vatican—which traces its roots back to Venerable Catherine McAuley in Dublin, Ireland in 1831.

5.     Each Sister of Mercy has chosen to follow Jesus Christ by taking a lifetime vow to serve the poor and sick by offering care for the whole person, and working

to heal those who are suffering from physical, psychological, intellectual, and spiritual woundedness. The Sisters of Mercy offer a variety of apostolic services. One aspect of their mission is fulfilled through "comprehensive health care" services, which the Sisters of Mercy understand as "the complete care of the total human person" which "seeks to bring about that profound and extensive healing which is a continuation of the work of redemption." Consistent with this mission, some of the Sisters of Mercy serve in healthcare facilities, such as hospitals, throughout the country. These Sisters include licensed doctors, including a surgeon, and other healthcare professionals. In accordance with their vows, the Sisters of Mercy offer healthcare services in accordance with the Ethical and Religious Directives of the United States Conference of Catholic Bishops.

6.      The Sisters of Mercy own and operate a clinic, Plaintiff Sacred Heart Mercy Health Care Center in Alma, Michigan. The clinic is a nonprofit incorporated in Michigan. The Sisters of Mercy also run their clinic in accordance with the Ethical and Religious Directives of the United States Conference of Catholic Bishops. Some of the Sisters of Mercy serve as licensed doctors, nurses, or other healthcare professionals who perform medical services in this clinic.

7.      Plaintiff Sisters of Mary of the Presentation Health System ("SMP Health System") is a non-profit Catholic health system headquartered in Valley City, North Dakota. It was founded and is operated by the Sisters of Mary of the Presentation. The Sisters believe that Catholic health care services and programs are ecclesial in nature, mandated by the Church to carry on the healing ministry of Jesus.

8.      As part of that healing ministry, SMP Health System provides a variety of health care services throughout North Dakota, including hospitals, clinics, long-term care facilities, and senior housing.

9.      SMP Health System's mission statement is as follows: "SMP Health System, inspired by the Sisters of Mary of the Presentation, provides leadership to its

Catholic health care ministries as they work to fulfill the healing mission of Jesus." In accordance with that mission, the Sisters of Mary run the health care ministries in accordance with the Ethical and Religious Directives of the United States Conference of Catholic Bishops.

10.     Plaintiff University of Mary is a Roman Catholic Benedictine University with its primary campus in Bismarck, North Dakota. The University of Mary also has campuses throughout North Dakota and in several other states, Arequipa, Peru, and Rome, Italy. The University offers more than 60 degree programs, including nursing, theology, pastoral ministry, and Catholic studies.

11.     The University strives to infuse all of its programs with Christian, Catholic, Benedictine values to prepare its students to be ethical leaders in their careers and their communities. The University welcomes students of all faiths and backgrounds, and, as is fundamental to its mission, upholds Catholic teaching in all of its programs and services. The University provides health benefits to its employees through a self-funded health plan. The University offers a nursing program and many allied health programs, including physical therapy, occupational therapy, speech and language pathology, radiologic technology, respiratory therapy, exercise science, athletic training, and social work.

12.     The State of North Dakota oversees and controls several agencies and a healthcare facility that receive federal funding administered by HHS. For example, North Dakota State Hospital, located in Jamestown, is a state-run hospital that accepts HHS-administered funding and provides psychiatric and chemical dependency treatment to North Dakotans who require in-patient or specialized residential care. Its clinical disciplines include psychiatry, psychology, nursing, social work, addiction counseling, chaplaincy, education, occupational therapy, therapeutic recreation, and vocational rehabilitation. North Dakota also employs many healthcare employees

through its constituent agencies, and provides health benefits to those employees and their families.

13.     Defendants are appointed officials of the United States government and United States governmental agencies responsible for the implementation of Section 1557 and the issuance of regulations under it.

14.     Defendant Alex M. Azar II is the Secretary of the United States Department of Health and Human Services. He is sued in his official capacity only.

15.     Defendant the United States Department of Health and Human Services is the agency that enforces Section 1557 and that promulgated the challenged interpretation.

## II. JURISDICTION AND VENUE

16.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1361.

17.     Venue lies in this district pursuant to 28 U.S.C. § 1391.

## III. FACTUAL BACKGROUND

### A. The Affordable Care Act and Related Federal Statutes.

18.     In March 2010, Congress passed, and President Obama signed into law, the Patient Protection and Affordable Care Act, Pub. L. 111-148 (March 23, 2010), and the Health Care and Education Reconciliation Act, Pub. L. 111-152 (March 30, 2010), collectively known as the "Affordable Care Act" or "ACA."

19.     Section 1557 of the ACA states that no individual can be denied certain federally funded health benefits because of the individual's race, color, national origin, sex, age, or disability. 42 U.S.C. § 18116. Section 1557 does not add a new non-discrimination provision to the United States Code, but merely incorporates by reference pre-existing provisions under Title VI, Title IX, the Americans with Disabilities Act, and the Rehabilitation Act. Section 1557 does not independently define terms

such as "sex." Section 1557's sole basis for prohibiting sex discrimination is based on its reference to Title IX, 20 U.S.C. § 1681 *et seq*.

20.     Title IX does not apply to covered entities "controlled by a religious organization if the application of this subsection would not be consistent with the religious tenets of such organization." 20 U.S.C. § 1681(a)(3).

21.     Title IX also states that it cannot be "construed to require or prohibit any person, or public or private entity, to provide or pay for any benefit or service, including the use of facilities, related to an abortion." 20 U.S.C. § 1688. This provision is sometimes called the Danforth Amendment or the abortion neutrality exemption.

22.     At the time that the ACA was enacted in 2010, no federal courts and no federal agencies had interpreted "sex" in Title IX to include gender identity.

23.     At the time that the ACA was enacted, and to this day, Congress has repeatedly rejected attempts to expand the term "sex" in Title IX. Lawmakers have also rejected multiple attempts to amend the Civil Rights Act to add the new categories of "sexual orientation" and "gender identity." The first such attempt was in 1974, and there have been dozens of such attempts since then. They have repeatedly failed.

24.     The ACA states that "nothing in this title (or any amendment made by this title), shall be construed to require a qualified health plan to provide [abortion] coverage ... as part of its essential health benefits for any plan year." 42 U.S.C. § 18023(b)(1)(A)(i).

25.     Federally-funded programs may not require an "individual to perform or assist in the performance of any sterilization procedure or abortion if his performance or assistance in the performance of such procedure or abortion would be contrary to his religious beliefs or moral convictions." 42 U.S.C. § 300a-7(b)(1). Congress has also mandated that "[n]o individual shall be required to perform or assist in the performance of any part of a health service program or research activity funded in

whole or in part under a program administered by the Secretary of Health and Human Services if his performance or assistance in the performance of such part of such program or activity would be contrary to his religious beliefs or moral convictions." *Id.* § 300a-7(d).

## B. The 2016 Rule

26.     On September 8, 2015, HHS proposed a new rule to "interpret" Section 1557 of the Affordable Care Act (ACA), to extend Title IX's definition of "sex" to include "gender identity," "sex stereotyping," and "termination of pregnancy," among other things. Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31,376, 31,467 (May 18, 2016) (the "2016 Rule").

27.     The 2016 Rule was published as final on May 18, 2016, and it expanded the definition of "gender identity" even further from the proposed definition to mean an individual's "internal sense of gender, which may be male, female, neither, or a combination of male and female." *Id.* HHS stated that the "gender identity spectrum includes an array of possible gender identities beyond male and female," and individuals with "non-binary gender identities are protected under the rule." 81 Fed. Reg. at 31,392, 31,384. HHS cited as authority a "Dear Colleague" letter issued jointly by the Department of Education (ED) and Department of Justice (DOJ) just five days earlier.[1]

28.     HHS also defined "sex" to include discrimination based upon "termination of pregnancy" in covered programs. HHS declined to add an explicit carve-out for abortion and abortion-related services parallel to the carve-out included in Title IX; it merely noted the existence of conscience protections in federal law and ACA limitations on requirement for abortion coverage in certain contexts. *Id.* at 31,388.

---

[1] U.S. Dep't of Justice & U.S. Dep't of Educ., Dear Colleague Letter on Transgender Students, May 13, 2016, https://perma.cc/B7WQ-942F.

29.    HHS's new interpretation of Section 1557 applied to any entities or individuals that operate, offer, or contract for health programs and activities that receive any Federal financial assistance from HHS.[2] In light of this sweeping application, HHS estimated the 2016 Rule would "likely cover[] almost all licensed physicians because they accept Federal financial assistance," including payments from Medicare and Medicaid.[3] Other observers have estimated that the 2016 Rule applies "to over 133,000 (virtually all) hospitals, nursing homes, home health agencies, and similar provider facilities, about 445,000 clinical laboratories, 1,200 community health centers, 171 health-related schools, state Medicaid and CHIP programs, state public health agencies, federally facilitated and state-based marketplaces, at least 180 health insurers that market policies through the FFM and state-based marketplaces, and up to 900,000 physicians."[4]

30.    Under Section 1557, then, covered entities would now be required to provide health programs or activities in accordance with HHS's expansive and unwarranted definition of "sex." This includes a number of new requirements.

### 1.  Healthcare professionals must perform or refer for medical transition procedures.

31.    HHS's interpretation of Section 1557 requires covered employers, and their healthcare providers and professionals, to perform (or refer for) medical transition procedures (such as hysterectomies, mastectomies, hormone treatments, plastic surgery, etc.), if a physician or healthcare provider offers analogous services in other contexts. For example, explaining the impact of interpreting "sex" discrimination to

---

[2] 45 C.F.R. § 92.4.

[3] Nondiscrimination in Health Programs and Activities, 80 Fed. Reg. 54,172, 54,195 (proposed Sept. 8, 2015); 81 Fed. Reg. at 31,445.

[4] Timothy Jost, *Implementing Health Reform: HHS Proposes Rule Implementing Anti-Discrimination ACA Provisions (Contraceptive Coverage Litigation Update)*, Health Affairs Blog (Sept. 4, 2015), https://perma.cc/QKR5-A8T8.

include "gender identity," HHS stated: "A provider specializing in gynecological services that previously declined to provide a medically necessary hysterectomy for a transgender man would have to revise its policy to provide the procedure for transgender individuals in the same manner it provides the procedure for other individuals."[5] HHS explained that a hysterectomy in this medical transition context would be "medically necessary to treat gender dysphoria,"[6] thereby declaring medical necessity, benefit, and prudence as a matter of federal law, and without regard to the opinions, judgment, and conscientious considerations of the many medical professionals that hold views to the contrary.

32.     There is widespread, well-documented debate about the medical risks and ethics associated with various medical transition procedures, even within the transgender community itself. In fact, HHS's own medical experts wrote, "Based on a thorough review of the clinical evidence available at this time, there is not enough evidence to determine whether gender reassignment surgery improves health outcomes for Medicare beneficiaries with gender dysphoria."[7] The evidence shows that "[t]here were conflicting (inconsistent) study results—of the best designed studies, some reported benefits *while others reported harms*."[8] Yet HHS's interpretation of Section 1557 attempts to preempt the serious medical and moral debate about gender transition procedures by concluding in the context of physicians offering "health services" that a "categorization of all transition-related treatment ... as experimental, is outdated and not based on current standards of care."[9] HHS has also improperly at-

---

[5] 81 Fed. Reg. at 31,455.

[6] *Id.* at 31,429.

[7] Centers for Medicare & Medicaid Services, Proposed Decision Memo for Gender Dysphoria and Gender Reassignment Surgery (June 2, 2016).

[8] *Id.* (emphasis added).

[9] 81 Fed. Reg. at 31,435; *see also id.* at 31,429.

tempted to preempt the prerogative of States not only to regulate the healing professions, but also to maintain standards of care that rely upon the medical judgment of health professionals as to what is in the best interests of their patients.

33.     Furthermore, a number of commenters requested that HHS make clear that health services need only be covered if they are deemed to be "medically necessary" or "medically appropriate" in the professional opinion of those charged with the care of the patient at issue. But HHS refused to make this clarification, stating that some procedures "related to gender transition" may be required even if they were not "strictly identified as medically necessary or appropriate."[10] Thus, under HHS's interpretation of Section 1557, if a doctor would perform a mastectomy as part of a medically-necessary treatment for breast cancer, it would be illegal for the same doctor to decline to perform a mastectomy for a medical transition, even if the doctor believed that removing healthy breast tissue was contrary to the patient's medical interest.

34.     Because Plaintiff SMP Health System provides hysterectomies to some patients, such as those diagnosed with uterine cancer, HHS's interpretation of Section 1557 would simultaneously force it to provide a hysterectomy (and remove an otherwise healthy uterus) for a medical transition, notwithstanding the serious potential harm to the patient. Elective hysterectomies increase a number of health risks for the patient. Moreover, such a procedure also renders an individual permanently sterile. Nevertheless, the 2016 Rule requires Plaintiffs to perform that procedure even when they believe it is not in the best interests of the patient. Such a standard turns the venerable medical oath to "do no harm" on its head.

---

[10] *Id.* at 31,435.

35.    And while Plaintiffs, such as the Sacred Heart Mercy Health Care Center clinic, provide hormone treatments to patients for medical reasons in some contexts, these health professionals have serious medical and religious concerns with offering hormone treatment for a medical transition.

### 2. Healthcare facilities and professionals must alter their speech and medical advice.

36.    As discussed above, HHS concluded, in the context of physicians offering "health services," that a "categorization of all transition-related treatment ... as experimental, is outdated and not based on current standards of care."[11] In so doing, HHS has seriously curbed a physician's ability to offer a contrary view, even if such a view is based on the physician's professional training and best medical judgment. HHS's interpretation of Section 1557 thus forces healthcare providers to alter speech and medical advice to comply with the Rule.

37.    HHS's interpretation of Section 1557 compels the speech of healthcare professionals in several ways. For example, the 2016 Rule mandates revisions to healthcare professionals' written policies, requiring express affirmation that transition-related procedures will be provided,[12] even if such revisions do not reflect the medical judgment, values, or beliefs of the individuals or organizations. Second, it requires physicians to use gender-transition affirming language in all situations regardless of circumstance, and provides as just one example the requirement that medical providers use "a transgender individual's preferred name and pronoun."[13] HHS also relies upon a transgender medical guidance document stating that "Mental

---

[11] *Id*. at 31,435

[12] *Id*. at 31,455.

[13] *Id*. at 31,406.

health professionals should not impose a binary view of gender."[14] Thus, to avoid facing liability for being discriminatory according to HHS, healthcare professionals are compelled to speak by revising their policy to endorse transition-related services, to express language that is affirming of gender transition, and to express and explore a view of gender that is not binary. Further, by treating as discriminatory a medical view of "transition-related treatment ... as experimental,"[15] the 2016 Rule coerces medical professionals like Plaintiffs to speak about these procedures the way the government wants them to, even though they disagree, and even though they believe they are disserving their patients by concealing the information the government wants concealed.

### 3. Certain employers and insurance providers must offer employee benefits covering medical transition procedures.

38.     HHS's interpretation of Section 1557 also prohibits certain employers, health programs, or insurance plans from exercising judgment as to what they cover. HHS stated, "[A]n explicit, categorical (or automatic) exclusion or limitation of coverage for all health services related to gender transition is unlawful on its face."[16]

39.     For example, if a doctor concludes that a hysterectomy "is medically necessary to treat gender dysphoria," the patient's employer or insurance plan would be required to cover the procedure on the same basis that it would cover it for other conditions (like cancer).[17] HHS also stated that the "range of transition-related services, which includes treatment for gender dysphoria, is not limited to surgical treatments and may include, but is not limited to, services such as hormone therapy and

---

[14] ECF No. 6-8 at 16 (cited at 81 Fed. Reg. at 31,435 n.263).

[15] 81 Fed. Reg. at 31,435.

[16] *Id.* at 31,429.

[17] *Id.*

psychotherapy, which may occur over the lifetime of the individual."[18] As such, coverage is required notwithstanding the rights of employers that only offer employee health benefits consistent with the religious beliefs and values of their organization.

40.   This conflict with religious or otherwise conscientious employers extends beyond treatment surrounding gender dysphoria, because some required procedures (such as elective hysterectomies) result in sterilization, and the 2016 Rule also extends to "termination of pregnancy." 45 C.F.R. § 92.4. Although HHS stated that laws protecting religious objections to abortion (or "termination of pregnancy") will apply, HHS has previously approved California forcing all insurers to include abortion coverage, even for objecting religious institutions. And HHS could have included, but explicitly chose to exclude, a clear regulatory carve-out for services related to abortion that parallels the carve-out in Title IX.

41.   This health benefit requirement of the 2016 Rule applies to any of the following types of employers who receive HHS funding: 1) any entity principally involved in providing or administering health services (including hospitals, nursing homes, counseling centers, physicians' offices, etc.), 2) any type of employer who received HHS funding for the primary purpose of funding an "employee health benefit program," or 3) any entity such as a university with a health training or research program that received HHS funding or Federal financial assistance—including student Pell grants—for that "health program or activity."[19]

42.   Thus, employers who have always offered employee health benefits that reflect their religious or conscientious beliefs, and excluded medical transition procedures from employee benefits, are considered discriminatory under the 2016 Rule.

---

[18] *Id.* at 31,435-36.

[19] *Id.* at 31,472, 45 C.F.R. § 92.208; *see also* 81 Fed. Reg. at 31,437.

### 4. Sex-specific healthcare facilities or programs, including shower facilities or hospital wards, must be opened to individuals based on gender identity.

43.   With regard to facilities, HHS stated that the prohibition on "gender identity" and "sex stereotyping" discrimination means that even for sex-specific facilities such as "shower facilities" offered by healthcare providers, individuals may not be excluded "based on their gender identity."[20]

44.   When Title IX—the foundation for the 2016 Rule—was enacted, Congress was significantly concerned about protecting and preserving the privacy rights of individuals in intimate areas. *See* 20 U.S.C. § 1686, 117 Cong. Rec. 30407 (1971), 117 Cong. Rec. 39260 (1971), 117 Cong. Rec. 39263 (1971), and 118 Cong. Rec. 5807 (1972). And the predecessor agency of HHS, the Department of Health, Education, and Welfare (HEW), promulgated regulations guaranteeing the privacy of individuals in intimate areas. *See* 34 C.F.R. § 106.32(b); 34 C.F.R. § 106.33 ("A recipient may provide separate toilet, locker room, and shower facilities on the basis of sex ..."). Yet, in promulgating the 2016 Rule, HHS wholly disregarded any "legal right to privacy" that could be violated "simply by permitting another person access to a sex-specific program or facility which corresponds to their gender identity."[21]

45.   With regard to other health programs, HHS stated that sex-specific health programs or activities are allowable only where the covered entity can demonstrate an exceedingly persuasive justification, *i.e.*, that the sex-specific program is substantially related to the achievement of an important health-related or scientific objective. HHS stated that it "will expect a covered entity to supply objective evidence,

---

[20] 81 Fed. Reg. at 31,409.

[21] *Id.* at 31,389, 31,409.

and empirical data if available, to justify the need to restrict participation in the program to only one sex," and in "no case will [HHS] accept a justification that relies on overly broad generalizations about the sexes."[22]

### 5. Enforcement Mechanisms and Remedial Measures.

46.   The 2016 Rule requires covered entities to record and submit compliance reports to HHS's Office of Civil Rights ("OCR") upon request.[23]

47.   Covered entities that are found to violate the 2016 Rule could lose their federal funding, be barred from doing business with the government, or risk false claims liability.[24]

48.   Covered entities are subject to enforcement proceedings by the Department of Justice.[25]

49.   Covered entities are also subject to individual lawsuits from patients who believed the covered entity violated the 2016 Rule.[26]

### 6. No Religious Exemption

50.   Section 1557 does not independently prohibit discrimination on the basis of sex. Instead, Congress specifically invoked Title IX, 20 U.S.C. § 1681 *et seq.*, which includes both a ban on sex discrimination and a broad exemption for religious organizations. In interpreting Section 1557 in the 2016 Rule, however, HHS "interpreted" Congress's reference to Title IX to include the ban, but not the religious exemption.

51.   Although HHS was asked to include a religious exemption in the 2016 Rule due to the obvious implications for religious healthcare providers, HHS declined

---

[22] *Id.* at 31,409.

[23] 81 Fed. Reg. at 31,439, 31,472, 45 C.F.R. § 92.301.

[24] 81 Fed. Reg. at 31,472, 45 C.F.R. § 92.301 ("The enforcement mechanisms available for and provided under Title VI of the Civil Rights Act of 1964 ... shall apply for purposes of Section 1557.")

[25] 81 Fed. Reg. at 31,440.

[26] *Id.* at 31,472, 45 C.F.R. § 92.301.

to do so, stating instead that religious objectors could assert claims under existing statutory protections for religious freedom.[27] HHS also failed to provide any mechanism by which a religious entity could determine if it was entitled to any existing religious protections under the law. HHS's refusal to protect the conscience rights (or even medical judgment) of physicians is striking when compared to federal policy in other areas. For example, a recent TRICARE guidance memo states in the context of medical gender dysphoria treatment, "In no circumstance will a provider be required to deliver care that he or she feels unprepared to provide either by lack of clinical skill or due to ethical, moral, or religious beliefs."[28]

### C. *Franciscan Alliance v. Burwell*

52.    On August 23, 2016, States, religious hospitals, and religious healthcare professionals challenged the 2016 Rule in the Northern District of Texas. *Franciscan All., Inc. v. Burwell*, No. 16-cv-108, ECF No. 1 (N.D. Tex. filed Aug. 23, 2016).

53.    On December 31, 2016, the district court in *Franciscan Alliance* preliminarily enjoined HHS from enforcing the 2016 Rule's prohibition against discrimination on the basis of "gender identity" and "termination of pregnancy." *Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660, 670 (N.D. Tex. 2016).

54.    The court concluded that HHS's "implement[ation] of Section 1557" had likely violated RFRA by "plac[ing] substantial pressure on [Appellants] to perform and cover transition and abortion procedures" without its action being narrowly tailored to a compelling government interest. *Id.* at 691-93.

55.    The court also agreed that the 2016 Rule exceeded HHS's statutory authority by defining "sex" discrimination under Section 1557 to include discrimination

---

[27] 81 Fed. Reg. at 31,376.

[28] ECF No. 6-9 at 2-3.

on the basis of "gender identity" and by not incorporating Title IX's religion and abortion exemptions. *Id.* at 687-91.

56.    In 2017, the *Franciscan Alliance* court granted HHS's motion for a stay of the litigation allowing HHS to reconsider the challenged aspects of the 2016 Rule. *Franciscan Alliance*, No. 16-cv-108, ECF No. 105 (N.D. Tex. filed July 10, 2017).

57.    In December 2018—after over a year of inaction from HHS—the *Franciscan Alliance* court reopened the litigation, *id.*, ECF No. 126 (N.D. Tex. filed Dec. 17, 2018), and the plaintiffs sought summary judgment, *e.g., id.*, ECF No. 136 (N.D. Tex. filed Feb. 4, 2019). Pursuant to their RFRA claim, the plaintiffs sought an injunction stating that HHS should be "permanently enjoined" from "[c]onstruing Section 1557 to require Private Plaintiffs to provide medical services or insurance coverage related to 'gender identity' or 'termination of pregnancy' in violation of their religious beliefs." *Id.*, ECF No. 135-1 (N.D. Tex. filed Feb. 4, 2019). And plaintiffs additionally sought a vacatur of the unlawful portions of the 2016 Rule, which corresponded with their APA claim. *Id.*

58.    In May 2019, while the summary-judgment motions were pending, HHS issued a Notice of Proposed Rulemaking proposing to amend the 2016 Rule. *Id.*, ECF No. 159 (N.D. Tex. filed May 31, 2019).

59.    Citing the *Franciscan Alliance* court's preliminary-injunction decision, the proposed rule stated that the 2016 Rule's definition of "sex" "exceeded [HHS's] authority under Section 1557." *Id.* at 15. The proposed rule sought to address this issue by repealing the 2016 Rule's definition of "sex" in its entirety, which would allegedly "allow the Federal courts, in particular, the U.S. Supreme Court ... to resolve any dispute about the proper legal interpretation of" "sex" in Section 1557. *Id.* at 112-13. As the proposed rule noted, the Supreme Court had recently granted certiorari to decide whether "sex" discrimination under Title VII included discrimination on the

basis of "sexual orientation" and "gender identity," in three cases that would be decided together as *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020). *Id.* at 40-41.

60.    On October 15, 2019, the *Franciscan Alliance* court granted summary judgment for the plaintiffs. *Franciscan All., Inc. v. Azar*, 414 F. Supp. 3d 928 (N.D. Tex. 2019). The court found "no reason to depart from its" preliminary-injunction analysis on the merits, concluding that the 2016 Rule violated both RFRA and the APA. *Id.* at 942.

61.    The court concluded, however, that the proper remedy was vacatur of "the unlawful portions of" the 2016 Rule, "not a permanent injunction." *Id.* at 944-45; *see Franciscan Alliance*, No. 16-cv-108, ECF No. 182 (N.D. Tex. Nov. 21, 2019) (clarifying that the 2016 Rule was vacated "insofar as [it] defines '*On the basis of sex*' to include gender identity and termination of pregnancy").

62.    HHS did not appeal the court's ruling on the merits; the plaintiffs, however, appealed the denial of injunctive relief to the Fifth Circuit, where their appeal is now pending. *Franciscan All., Inc. v. Azar*, No. 20-10093 (5th Cir. filed Jan. 24, 2020).

**D. The 2020 Rule**

63.    On June 12, 2020, HHS issued a new Section 1557 rule, finalizing the rule proposed in 2019. *See* Nondiscrimination in Health and Health Education Programs or Activities, 85 Fed. Reg. 37,160 (June 19, 2020) (the "2020 Rule").

64.    The 2020 Rule made a number of changes to the 2016 Rule. HHS noted that the 2020 Rule was promulgated in part in response to the *Franciscan Alliance* court's orders.  *See, e.g.*, *id.* at 37,164-65; *id.* at 37,168. Two changes are most relevant here.

**1.  "Sex" Discrimination**

18

65.     First, the 2020 Rule repealed the 2016 Rule's definition of "sex" discrimination, which included, among other things, discrimination based on "gender identity," "sex stereotyping," and "termination of pregnancy." *Id.* at 37,167. HHS concluded that "the 2016 Rule's extension of sex-discrimination protections to encompass gender identity was contrary to the text of Title IX." *Id.* at 37,168.

66.     HHS, however, declined to replace the 2016 Rule's definition of "sex" with a new definition, reasoning instead that the Supreme Court's then-forthcoming decision in *Bostock* would "likely have ramifications for the definition of 'on the basis of sex' under Title IX." *Id.* at 37,168; *id.* ("[T]his rule … does not define sex[.]"); *id.* at 37,178 ("This final rule repeals the 2016 Rule's definition of 'on the basis of sex,' but declines to replace it with a new regulatory definition."). HHS clarified that simply repealing the 2016 Rule's prior definition would then permit "application of the [*Bostock*] Court's construction." *Id.* at 37,168.

## 2.  Abortion and Religious Organizations

67.     Additionally, under the 2020 Rule, HHS noted that it would "interpret Section 1557's prohibition on sex-based discrimination consistent with Title IX and its implementing regulations." *Id.* at 37,192. To this end, the 2020 Rule implemented two provisions related to abortion and religious organizations.

68.     First, HHS explained that the Section 1557 regulations are implemented consistent with the abortion neutrality exemption in Title IX, which states that nothing in Title IX "shall be construed to require or prohibit any person, or public or private entity, to provide or pay for any benefit or service, including the use of facilities, related to an abortion." 20 U.S.C. § 1688; 85 Fed. Reg. at 37,192. HHS noted that its decision to incorporate Title IX's abortion neutrality exemption into the 2020 Rule was also justified by the *Franciscan Alliance* court's decision "vacat[ing] the 'termination of pregnancy' language in the 2016 Rule because it failed to incorporate the abortion-neutrality language from" Title IX. *Id.* at 37,193.

19

69.     Second, while the 2016 Rule declined to incorporate Title IX's religious exemption, HHS reevaluated the issue and recognized that "Section 1557's prohibition on sex-based discrimination" must be interpreted in a manner "consistent with Title IX and its implementing regulations." *Id.* at 37,192. Title IX itself states that "this section shall not apply to an educational institution which is controlled by a religious organization if the application of this subsection would not be consistent with the religious tenets of such organization." 20 U.S.C. § 1681(a)(3); 20 U.S.C. § 1687(4) (Title IX covers defined "program[s] or activit[ies]" but "does not include any operation of an entity which is controlled by a religious organization if the application of section 1681 of this title to such operation would not be consistent with the religious tenets of such organization").

70.     HHS, however, did not believe the Title IX religious exemption applied to all religious institutions. And HHS explained that the 2020 Rule did not itself include "a religious exemption, whether narrow or broad." 85 Fed. Reg. at 37,205. Instead, the 2020 Rule simply applied Title IX's existing religious exemption to "[a]ny educational operation of an entity ... control[led] by a religious organization." *Id.* at 37,207. This exemption would therefore only apply to an "educational operation of an entity controlled by a religious organization engaged in the provision of health care ... if application of [Section 1557 and the 2020 Rule] would be inconsistent with the organization's religious tenets." *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Human Servs.*, No. 20-cv-1630, 2020 WL 5232076, at *27 (D.D.C. Sept. 2, 2020).

71.     As a result, the 2020 Rule's Title IX religious exemption does not apply to all religious organizations covered by the Rule, including Plaintiffs. Instead, it applies only to an "educational operation of an entity controlled by a religious organization engaged in the provision of health care." *Id.*

### 3.  *Bostock* and Challenges to the 2020 Rule

72.    On June 15, 2020, the Supreme Court decided *Bostock v. Clayton County*. 140 S. Ct. 1731.

73.    The Court held that when "an employer ... fires someone simply for being homosexual or transgender," the employer has "discriminated against that individual 'because of such individual's sex'" within the meaning of Title VII. *Id.* at 1753.

74.    The Court cautioned, however, that its opinion did not "prejudge" the proper interpretation of "other federal or state laws that prohibit sex discrimination," *id.*, including Section 1557 and Title IX, *see id.* at 1779-82 & n.57 (Alito, J., dissenting).

75.    The *Bostock* Court also explained it was "deeply concerned with preserving the promise of the free exercise of religion," and that religious employers might not be liable under Title VII "in cases like ours" if complying would require them "to violate their religious convictions." *Id.* at 1753-54 (majority opinion).

76.    In particular, the Court invoked RFRA as a key protection for religious objectors, describing it as a "super statute" that "might supersede ... in appropriate cases" an otherwise-applicable ban on gender-identity discrimination. *Id.* at 1754.

77.    Likewise addressing religious-freedom concerns, Justice Alito's dissent noted that "because some employers and healthcare providers"—like Plaintiffs here— "have strong religious objections to sex reassignment procedures," extending *Bostock* so as to "require[]them to pay for or to perform" those procedures would "have a severe impact on their ability to honor their deeply held religious beliefs." *Id.* at 1782 (Alito, J., dissenting).

78.    Following *Bostock*, plaintiffs in multiple jurisdictions sued HHS, challenging the 2020 Rule in light of *Bostock* and seeking restoration of the 2016 Rule, in whole or in part. *See Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Human Servs.*, No. 20-cv-01630 (D.D.C. filed June 22, 2020); *Walker v. Azar*, No. 20-cv-02834 (E.D.N.Y. filed June 26, 2020); *Boston All. of Gay, Lesbian, Bisexual & Transgender*

21

*Youth v. U.S. Dep't of Health & Human Servs.*, No. 20-cv-11297 (D. Mass. filed July 9, 2020); *Washington v. U.S. Dep't of Health & Human Servs.*, No. 20-cv-01105 (W.D. Wash. filed July 16, 2020); *New York v. U.S. Dep't of Health & Human Servs.*, No. 20-cv-05583 (S.D.N.Y. filed July 20, 2020).

79.    In each of these cases, the plaintiffs challenged some or all of the 2020 Rule's repeal of the 2016 Rule's definition of "sex" discrimination, asserting that *Bostock* had rendered that repeal unlawful and that Section 1557 must be construed to prohibit "gender identity" discrimination.

80.    Plaintiffs in these cases also challenged the 2020 Rule's incorporation of Title IX's religious exemption, asserting that religious organizations, too, must be subject to this expansive understanding of Section 1557's "sex" discrimination prohibition.

81.    In one of the cases, the State of Washington sued to enjoin three portions of the 2020 Rule: (1) HHS's decision to repeal the 2016 Rule's definition of "sex" discrimination, particularly as it related to "gender identity" discrimination; (2) the 2020 Rule's incorporation of the Title IX religious exemption; and (3) the 2020 Rule's narrower definition of "covered entities." *Washington v. U.S. Dep't of Health & Human Servs.*, No. C20-1105-JLR, 2020 WL 5095467, at *5 (W.D. Wash. Aug. 28, 2020).

82.    The district court, however, concluded that Washington lacked Article III standing to challenge the 2020 Rule. *Id.* The court concluded that in light of *Bostock*, it is possible that "Title IX and Section 1557 ... incorporate protection for gender identity and sexual orientation discrimination" such that "the 2020 Rule does, in fact, extend protection against discrimination to LGBTQ individuals via the Rule's incorporation of Title IX by reference." *Id.* at *8. As a result, Washington State did not demonstrate that it had Article III standing to bring suit. *Id.*

83.    In the remaining two cases, however, the district courts entered "overlapping injunctions," *Whitman-Walker*, 2020 WL 5232076, at *41 (internal quotation

marks omitted), preventing the 2020 Rule "from becoming operative" and reinstating portions of the 2016 Rule, *Walker v. Azar*, No. 20-cv-02834, 2020 WL 4749859, at *1 (E.D.N.Y. Aug. 17, 2020).

84.     One of these courts acknowledged that it "has no power to revive a rule vacated by another district court," namely the *Franciscan Alliance* court. *Walker*, 2020 WL 4749859, at *7. Nevertheless, the court "predict[ed] that either the district court or some higher authority w[ould] revisit the vacatur," and then specifically held that portions of the 2016 Rule vacated by the *Franciscan Alliance* district court— including "the definitions of 'on the basis of sex,' 'gender identity,' and 'sex stereotyping'"—"remain in effect." *Id.* at *7, *10.

85.     Indeed, in a later order, the district court doubled down, clarifying that its "existing stay/preliminary injunction of the repeal of the 2016 Rules' definition of 'on the basis of sex,' 'gender identity,' and 'sex stereotyping' ... remains in effect." *Walker v. Azar*, No. 20-cv-02834, 2020 WL 6363970, *4 (E.D.N.Y. Oct. 29, 2020) (also enjoining repeal of the former 45 C.F.R. § 92.206).

86.     The other district court held that a portion of the 2016 Rule purportedly not vacated by the *Franciscan Alliance* court—namely, defining "sex" to include "sex stereotyping"—independently prohibits "[d]iscrimination based on transgender status—*i.e.*, gender identity." *Whitman-Walker*, 2020 WL 5232076, at *23, *45.

87.     In other words, after enjoining the 2020 Rule, the district court concluded that "Plaintiffs [are] left with the 2016 Rule's prohibition on discrimination based on sex stereotyping," which, according to the *Whitman-Walker* court, would include prohibiting gender identity discrimination. *Id.* at *14.

88.     The *Whitman-Walker* court also enjoined the 2020 Rule's incorporation of the religious exemption from Title IX, even though the *Franciscan Alliance* court held that the 2016 Rule was arbitrary and capricious for *not* including Title IX's religious exemption. *Id.* at *27-29.

23

89.     In light of these lawsuits challenging the 2020 Rule, there now exists a "credible threat of prosecution" pursuant to Section 1557. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014).

90.     Specifically, plaintiffs have challenged HHS's decision to repeal the 2016 Rule's definitions for sex discrimination, which included defining sex discrimination as discrimination based on "termination of pregnancy" and "gender identity."

91.     Plaintiffs have also challenged the 2020 Rule's inclusion of an abortion neutrality exemption and a Title IX exemption, as well as the 2020 Rule's decision to narrow the definition of "covered entities" to not include health insurance providers.

92.     Indeed, four of these cases are live and moving forward, and in some of them, the plaintiffs have successfully enjoined important aspects of the 2020 Rule.

93.     For example, under the decisions of the *Whitman-Walker* and *Walker* courts, the vacated 2016 Rule "remains in effect" such that Plaintiffs can be held liable for "gender identity" discrimination by taking into account biological differences between men and women and by refusing to provide or assist with gender transition services on account of their sincerely held religious beliefs.

94.     The *Whitman-Walker* court went even further, enjoining the 2020 Rule's Title IX religious exemption, even though the *Franciscan Alliance* court held that the 2016 Rule was arbitrary and capricious for *not* including Title IX's religious exemption. *Whitman-Walker*, 2020 WL 5232076, at*27-29.

95.     Furthermore, even under the *Washington* court's decision holding that Washington lacked Article III standing to challenge the 2020 Rule, Plaintiffs can be held liable for "gender identity" discrimination. According to the court, in light of *Bostock*, it is possible that "Title IX and Section 1557 ... incorporate protection for gender identity and sexual orientation discrimination" such that "the 2020 Rule does, in fact, extend protection against discrimination to LGBTQ individuals via the Rule's incorporation of Title IX by reference." *Washington*, 2020 WL 5095467, at *8.

24

96.    In light of these developments, Plaintiffs have standing to challenge Section 1557's prohibition on gender identity discrimination because Plaintiffs have "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and ... a credible threat of prosecution thereunder." *Jones v. Jegley*, 947 F.3d 1100, 1103 (8th Cir. 2020) (quoting *SBAL*, 73 U.S. at 159).

97.    That is, Plaintiffs have Article III standing because "there is a substantial risk that the harm will occur." *City of Kennett, Missouri v. Envtl. Prot. Agency*, 887 F.3d 424, 431 (8th Cir. 2018) (quotation marks omitted); *see also Attias v. Carefirst, Inc.*, 865 F.3d 620, 627 (D.C. Cir. 2017) ("[W]e have frequently upheld claims of standing based on allegations of a 'substantial risk' of future injury.").

### E. The Effect on the Sisters of Mercy

98.    The Sisters of Mercy founded their order in 1973 for the purpose of carrying out their faith in Jesus Christ by serving others. The Sisters of Mercy have a variety of apostolate services that they offer. One aspect of their mission is fulfilled through "comprehensive health care" services, which the Sisters of Mercy understand as "the complete care of the total human person" which "seeks to bring about that profound and extensive healing which is a continuation of the work of redemption." Consistent with this mission, some of the Sisters of Mercy serve in a variety of different healthcare facilities, such as hospitals, throughout the country. These Sisters include licensed doctors, including at least one surgeon, and other healthcare professionals. In accordance with their vows, the Sisters of Mercy offer healthcare services in accordance with the Ethical and Religious Directives of the United States Conference of Catholic Bishops.

99.    The Sisters of Mercy hold religious beliefs about the nature and purposes of human sexuality, including that sexual identity is an objective fact rooted in nature as male or female persons. Like the Catholic Church they serve, the Sisters of

Mercy believe that every man and woman is created in the image and likeness of God, and that they reflect God's image in unique—and uniquely dignified—ways.

100.    Further, in their professional medical judgment, the Sisters of Mercy who work in health care believe that optimal patient care—including in patient education, diagnosis, and treatment—requires taking account of the biological differences between men and women.

101.    In the Sisters' best medical judgment, providing or assisting with gender transition services is not in keeping with the best interests of their patients, and in fact is experimental and could be harmful for patients.

102.    Providing services that are contrary to their understanding of God's plan for human sexuality would also substantially burden the religious exercise of the Sisters of Mercy.

103.    For decades, the religious beliefs of the Sisters of Mercy have been respected by health institutions where they work. But HHS's novel interpretations of Section 1557 now make it illegal for employers to accommodate the religious beliefs of their employees.

104.    Thus, Section 1557, as newly interpreted, will impact the Sisters of Mercy by requiring the Sisters of Mercy to offer medical services that violate their best medical judgment and religious beliefs when they serve in healthcare organizations that are covered entities. For example, Sisters of Mercy who offer endocrinology services or mental health counseling for other medical reasons will now be required to provide these medical services as part of a gender transition, which would violate both their best medical judgment and their religious beliefs.

105.    Section 1557 also chills the Sisters' ability to discuss their medical opinions with their patients and offer medical advice freely. And Section 1557 would pressure the Sisters of Mercy to reject a binary view of gender, which is contrary to their medical judgment and religious beliefs.

26

106.    Section 1557, as newly interpreted, therefore threatens the ability of the Sisters of Mercy to carry out their religious mission of providing comprehensive health care services in the healthcare facilities in which they work.

**F. The Effect on Sacred Heart Mercy Health Care Center**

107.    The Sisters of Mercy also own and operate a health clinic: Plaintiff Sacred Heart Mercy Health Care Center in Alma, Michigan. Some of the Sisters of Mercy serve as licensed doctors, nurses, or other healthcare professionals in this clinic. The clinic provides resources to accommodate the spiritual needs of employees, patients, and their families. For example, the clinic offers Mass in its chapel, followed by the exposition of the Blessed Sacrament so that employees, patients, and local residents can worship. The clinic is run by Sisters of Mercy themselves.

108.    The mission of the Sacred Heart Mercy Health Care Center in Michigan is to "embrace the extensive expressions of human woundedness in order to extend the healing of the redemption of Jesus Christ." Sacred Heart Mercy Health Care Center, *Mission*, https://perma.cc/XZE8-BM8U. The vision of the Center is to "provide outstanding Catholic health care by embracing the misery of mankind as a point of convergence with the Mercy of God through undertaking the works of mercy in a comprehensive manner." *See id.*

109.    In accordance with this vision and mission, the clinic is operated in accordance with *The Ethical and Religious Directives for Catholic Healthcare Services*, as promulgated by the United States Conference of Catholic Bishops and interpreted by the local Bishop.

110.    The Sacred Heart clinic strives to provide top-quality care to its patients. It serves and respects individuals of all faiths, and seeks to ensure that patients and their families can exercise their own faith traditions in order to assist them in the healing and recovery process, and to make critical decisions about matters such as end-of-life care and clinical ethics. HHS's new interpretations of Section 1557 will

27

impact the Sacred Heart clinic by 1) requiring the Sacred Heart clinic to offer medical services that violate its best medical judgment and religious beliefs, and 2) requiring the Sacred Heart clinic to provide insurance coverage for services that violate its religious beliefs.

### 1. Compulsory Medical Services

111.   The Sacred Heart clinic provides all of its standard medical services to every individual who needs and qualifies for its care, including to individuals who identify as transgender. Thus, for instance, if a transgender individual comes in with high blood pressure or a diabetes diagnosis, the Sacred Heart clinic would provide the same full spectrum of compassionate care for that individual as it provides for every other patient. And, just as it does for every other patient, the Sacred Heart clinic would appropriately tailor that care to the biologically sex-specific health needs of the patient.

112.   The Sacred Heart clinic and the Sisters who own and operate it hold religious beliefs about the nature and purposes of human sexuality, including that sexual identity is an objective fact rooted in nature as male or female persons. Like the Catholic Church they serve, they believe that every man and woman is created in the image and likeness of God and that they reflect God's image in unique—and uniquely dignified—ways.

113.   Further, in their professional medical judgment, the Sacred Heart clinicians believe that optimal patient care—including patient education, diagnosis, and treatment—requires taking account of the biological differences between men and women.

114.   In the best medical judgment of the Sacred Heart clinic and the Sisters who own and operate it, providing or assisting with gender transition services is not in keeping with the best interests of their patients, and in fact is experimental and could be harmful for patients.

115.   Providing services that are contrary to their understanding of God's plan for human sexuality would also substantially burden the religious exercise of the Sacred Heart clinic and the Sisters who own and operate them.

116.   Accordingly, after careful review of the issue, the Sacred Heart clinic and the Sisters who own and operate it made the decision not to provide, perform, or otherwise facilitate medical transitions. To provide or otherwise facilitate those services would also violate the religious beliefs of the Sacred Heart clinic and the Sisters who own and operate it.

117.   The Sacred Heart clinic offers endocrinology hormone services and mental health counseling for anxiety and depression, including for pediatric patients. HHS's novel interpretations of Section 1557 would force the Sacred Heart clinic to offer its services as a part of a medical transition, which would violate both its best medical judgment and its religious beliefs.

118.   As newly interpreted, Section 1557 also chills the ability of the clinic and the Sisters at the clinic to discuss their medical opinions with their patients and offer medical advice freely. And Section 1557 would pressure the Sacred Heart clinic and the Sisters who own and operate it to reject a binary view of gender, which is contrary to their medical judgment and religious beliefs.

### 2. Compulsory Insurance Coverage

119.   The Sacred Heart clinic offers health benefits to eligible employees who work for the clinic.

120.   It would violate the religious beliefs of the Sacred Heart clinic and the Sisters who own and operate it if they were forced to offer a health plan that included benefits for abortions, sterilizations, or any drugs or procedures related to gender transition. Yet HHS's novel interpretations of Section 1557 will require them to offer an insurance plan that includes these health benefits.

121.     The Sacred Heart clinic and the Sisters who own and operate it sincerely believe that providing insurance coverage for gender transition, sterilization, and abortion would constitute impermissible material cooperation with evil. The Sacred Heart clinic must now choose between (a) following its faith and its best medical judgment, or (b) following Section 1557 as interpreted in the 2016 and 2020 Rules. If it follows its faith and medical judgment, the Sacred Heart clinic will be subject to financial penalties and lawsuits. Most significantly, a significant portion of the patients served by the Sacred Heart clinic are poor, disabled, and elderly Medicare and Medicaid patients. If the Sacred Heart clinic refuses to both deny its faith and lower its standard of care, it risks losing that funding and suffering a crippling blow to its capacity to carry out its religious mission to serve the poor, disabled, and elderly.

## G. The Effect on SMP Health System

122.     The Sisters of Mary of the Presentation were founded in France in 1828 for the purpose of teaching children and serving the sick, disabled, and elderly. In 1903, fleeing religious persecution in France, the Sisters arrived in the United States and began a school in Wild Rice, North Dakota and a hospital in Spring Valley, Illinois. The Sisters of Mary of the Presentation now have a Provincial home in Valley City, North Dakota, and operate three critical access hospitals in North Dakota, in addition to the original hospital in Spring Valley. The Sisters also operate five nursing homes to serve the elderly in North Dakota. Together, these ministries constitute SMP Health System.

123.     SMP Health System shares the religious beliefs of its sponsor, the Sisters of Mary of the Presentation. The mission of SMP Health System is to "provide[] leadership to its Catholic health care ministries as they work to fulfill the healing mission of Jesus." SMP Health System's vision statement explains that "Our concern is for all people, but the poor and elderly have a special claim on us. From our limited

resources we provide services characterized by excellence, compassion, and personalized concern. Because we care, we focus on the needs of the whole person, which includes their physical, spiritual, psychological, and social well-bring." *See* SMP Health System, *Mission, Values, Vision and Philosophy*, https://perma.cc/WT9T-WL3Y.

124.    In accordance with this vision and mission, the Sisters of Mary operate their clinics in a manner that abides by *The Ethical and Religious Directives for Catholic Healthcare Services*, as promulgated by the United States Conference of Catholic Bishops and interpreted by the local Bishop. The Sisters of Mary strive to "provide quality patient care in an environment that contributes to the healing of the whole person."

125.    HHS's new interpretations of Section 1557 will impact SMP Health System by 1) requiring SMP Health System to offer medical services that violate its best medical judgment and religious beliefs, and 2) requiring SMP Health System to provide insurance coverage for services that violate its religious beliefs.

### 1. Compulsory Medical Services

126.    SMP Health System provides all of its standard medical services to every individual who needs and qualifies for its care, including to individuals who identify as transgender. Thus, for instance, if a transgender individual comes in with high blood pressure or a diabetes diagnosis, SMP Health System would provide the same full spectrum of compassionate care for that individual as they provide for every other patient. And, just as they do for every other patient, SMP Health System would appropriately tailor that care to the biologically sex-specific health needs of the patient.

127.    SMP Health System holds religious beliefs that sexual identity is an objective fact rooted in nature as male or female persons. Like the Catholic Church it serves, SMP Health System believes that every man and woman is created in the

image and likeness of God and that they reflect God's image in unique—and uniquely dignified—ways.

128.   In SMP Health System's best medical judgment, providing or assisting with gender transition services is not in keeping with the best interests of its patients.

129.   Providing such services would also substantially burden the religious exercise of SMP Health System.

130.   Accordingly, after careful review of the issue, SMP Health System made the decision not to provide, perform, or otherwise facilitate medical transitions. To provide or otherwise facilitate those services would also violate SMP Health System's religious beliefs.

131.   The SMP Health System physicians and facilities offer services such as hysterectomies, mastectomies, endocrinology services, and psychiatric support. SMP Health System physicians also offer endocrinology services to pediatric patients in certain contexts. The new interpretations of Section 1557 would force SMP Health System physicians to offer these services as a part of a medical transition, which would violate both their best medical judgment and their religious beliefs.

132.   Section 1557 also chills the speech of SMP Health System physicians who wish to discuss their medical opinions with their patients and offer medical advice freely.

133.   Some of the procedures required under Section 1557 and the relevant 2016 and 2020 Rules, including elective hysterectomies, can result in the sterilization of the patient. Since SMP Health System does not believe hysterectomies for the purpose of gender transition are medically necessary, being forced to provide such procedures would violate SMP Health System's best medical judgment and religious beliefs.

134.   The 2016 Rule also prohibits discrimination on the basis of "termination of pregnancy." In certain contexts, SMP Health System performs surgical procedures

for women who have miscarried a baby, such as dilation and curettage (D&C) procedures. However, SMP Health System would be unwilling to offer the same service if the goal of the procedure was to terminate a pregnancy. The Rule forces SMP Health System to provide abortion-related procedures in violation of its best medical judgment and religious beliefs.

## 2. Compulsory Insurance Coverage

135.   SMP Health System offers health benefits to its full-time employees.

136.   SMP Health System offers its employees a self-insured plan in Illinois, administered by a third-party administrator, and a fully insured plan in North Dakota.

137.   In accordance with SMP Health System's religious beliefs, the employee benefits plans specifically exclude coverage for gender transition surgeries and treatment leading to and/or related to such surgeries; sterilizations; and abortions.

138.   SMP Health System sincerely believes that providing insurance coverage for gender transition, sterilization, and abortion would constitute impermissible material cooperation with evil.

139.   SMP Health System must now choose between (a) following its faith and its best medical judgment, or (b) following HHS's novel interpretations of Section 1557. If it follows its faith and medical judgment, SMP Health System will be subject to financial penalties and lawsuits. Most significantly, SMP Health System annually provides a substantial amount of services to poor, disabled, and elderly Medicare and Medicaid patients. If SMP Health System refuses to both deny its faith and lower its standard of care, it risks losing that funding and suffering a crippling blow to its capacity to carry out its religious mission to serve the poor, disabled, and elderly.

## H. The Effect on University of Mary

140.    The University of Mary has a long tradition of carrying out the mission of Jesus Christ through education. In 1878, a brave group of Benedictine Sisters arrived in Dakota Territory to bring ministries of healing and learning, founding schools and hospitals to serve the community.

141.    In 1959, the Benedictine Sisters of the Annunciation founded Mary College, offering degrees in education and nursing.  The college expanded and added additional programs. In the 1980s, it added its first graduate program, in nursing, and became the University of Mary.

142.    The University strives to infuse all of its programs with Christian, Catholic, Benedictine values to prepare its students to be ethical leaders in their careers and their communities. The University welcomes students of all faiths and backgrounds and, as is fundamental to its mission, upholds Catholic teaching in all of its programs and services.

143.    The University has a long history of offering medical education inspired by its Catholic faith. For example, the University is one of only a few in the United States to offer a master's degree in bioethics, designed to help professionals make morally sound decisions about responsible use of biomedical advances. The program is offered in partnership with the National Catholic Bioethics Center.

144.    As it has since its founding, the University offers a nursing program. It provides several nursing degrees at the undergraduate, graduate and doctoral level. In June 2016, the University's nursing program on June 17, 2016 received a three-year grant for over $1 million from the Department of Health and Human Services. That grant is intended to aid in training nurses to improve rural healthcare in North Dakota.  The University expects to continue partnering with the Department of Health and Human Services in the future.

145. The University also has a student health clinic that operates in accordance with the Ethical and Religious Directives of the United States Conference of Catholic Bishops.

146. As a result of the receipt of funds administered by HHS, the University is subject to the new interpretation of Section 1557.

147. The University has 396 employees who are eligible for health insurance benefits from the University.

148. The University operates a self-funded health plan which provides coverage for its employees through a third-party administrator. The same plan provides coverage for all employees, whether in the nursing program or outside the nursing program.

149. In keeping with the University's Catholic beliefs, that plan excludes coverage for: "Treatment leading to or in connection with sex change or transformation surgery and related complications"; sterilization; and abortion.

150. The University sincerely believes that providing insurance coverage for gender transitions, sterilization, or abortion would constitute impermissible material cooperation with evil.

151. The University must now choose between (a) following its faith, or (b) following HHS's novel interpretations of Section 1557. If it follows its faith, the University will be subject to financial penalties and lawsuits, including loss of HHS funding, jeopardizing its religious mission to serve the religious, academic, and cultural needs of its students and the people of its region.

152. The new interpretations of Section 1557 also make it more expensive for the University to do business with its third-party administrator. The Regulation subjects the third-party administrator to potential liability for administering the Univer-

sity's religious health plan, and thus the University will likely be required to indemnify its third-party administrator from this liability. This constitutes an additional substantial burden on its religious exercise.

## I. The Effect on North Dakota

153.    HHS's new interpretation of Section 1557 runs headlong into established standards of medical care, usurps North Dakota's legitimate authority over its medical facilities, and makes it impossible for North Dakota to comply with conflicting federal law, among other harms.

### 1. Standard of Care

154.    "[T]he State has a significant role to play in regulating the medical profession," *Gonzales v. Carhart*, 550 U.S. 124, 157 (2007), as well as "an interest in protecting the integrity and ethics of the medical profession." *Washington v. Glucksberg*, 521 U.S. 702, 731 (1997). This includes "maintaining high standards of professional conduct" in the practice of medicine. *Barsky v. Bd. of Regents of Univ.*, 347 U.S. 442, 451 (1954).

155.    North Dakota, for example, actively protects the physician-patient relationship and the ability of doctors to exercise independent medical judgment in service of their patients.

156.    Every person should be treated with dignity and respect, especially when in need of medical attention. The standard of care established in North Dakota, and around the country, enables patients to obtain quality healthcare as determined by medical professionals, and not those outside the doctor-patient relationship. The new interpretations of Section 1557, however, usurp this standard of care. It discards independent medical judgment and a physician's duty to his or her patient's permanent well-being and replaces them with rigid commands.

157.   As newly interpreted, Section 1557 will force physicians who accept Medicare and Medicaid payments and who operate, offer, or contract for health programs and activities that receive Federal financial assistance to subject their patients to procedures that permanently alter or remove well-functioning organs, even though the physicians' independent medical judgment advises against such a course of action. And beyond compelling physicians to act against their medical judgment, Section 1557 requires them to express opinions contrary to what they deem to be in the patient's best interest or to avoid even describing medical transition procedures as risky or experimental. Patients deserve better—and are treated more humanely—under State law.

## 2. Control over Facilities

158.   States routinely provide healthcare services directly to citizens through various mechanisms of government. North Dakota, for example, provides health services through the North Dakota Department of Human Services, which, among other things, operates the North Dakota State Hospital, a state-run hospital that accepts HHS-administered funds.

159.   These covered entities, which exist across the country, will now be covered under HHS's new interpretations of Section 1557 with respect to "all of the operations" of such entities. Thus, these entities will have to offer all manner of (and referrals for) medical transition procedures and treatments. As a result, North Dakota will be forced to allocate personnel, resources, and facility spaces to offer and accommodate the myriad medical transition procedures now required to be performed under Section 1557. Healthcare facilities will also be required to open up sex-separated showers, locker rooms, or other facilities based on individual preference. This is true even in controlled medical locations where patient access to intimate facilities is often under the control of healthcare professionals that are supposed to act in the best interests of the patient. Thus, the new requirements of Section 1557 amount to

a substantial interference in the control that North Dakota and other States legitimately exercise over their healthcare facilities.

### 3. Conflicting Federal Law

160.   Title VII of the Civil Rights Act of 1964 ("Title VII") prohibits employment discrimination based on religion. 42 U.S.C. § 2000e-2. To comply with Title VII, employers must reasonably accommodate an employee's religious belief, observance, or practice unless such accommodation imposes an undue hardship on the employer's business. *Id.* at § 2000e-1; *EEOC v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028, 2032 (2015) (providing that Title VII requires reasonable religious accommodations).

161.   But HHS's new interpretations of Section 1557 in many circumstances make such accommodation illegal, placing employers between a legal Scylla and Charybdis. On the one hand, employers are required under Title VII to reasonably accommodate their employees' religious and conscientious objections. On the other hand, the Regulation requires medical employers to provide (or refer for) medical transition procedures even when doing so would violate the religious or conscientious objections or concerns of its employees. Thus, it forces employers like North Dakota to choose between violating the Regulation or violating Title VII.

### 4. Additional Harms

162.   The Regulation is costly and burdensome on North Dakota for a variety of additional reasons, to wit:

163.   North Dakota operates as an employer that offers covered health benefits to its employees and their families through its constituent agencies. HHS's interpretation of Section 1557 will require North Dakota to provide insurance coverage for medical transition procedures.

164.   As interpreted by HHS, Section 1557 also purports to require North Dakota to provide abortion coverage through its employee health benefits. HHS states that a State's Medicaid program constitutes a covered "health program or activity"

under the 2016 Rule. Thus, "the State will be governed by Section 1557 in the provision of employee health benefits for its Medicaid employees." 81 Fed. Reg. at 31,437.

165.    The exclusions North Dakota currently possesses in its employee insurance policies related to pregnancy termination and medical transition procedures will now be illegal under the Section 1557. As a result, North Dakota will be required to change its insurance coverage.

166.    The costs of personnel training will be significant, even by HHS's very modest estimates. HHS estimates that 7,637,306 state workers will need to receive training under the 2016 Rule, and that the cost of this training in the first two years of implementation alone will be $17.8 million.

167.    The penalties for noncompliance are so severe as to make HHS's new regulations coercive. North Dakota, as an example, faces the loss of significant financial support in healthcare funding to serve its most vulnerable citizens.

168.    Finally, Section 1557 could subject North Dakota to private lawsuits for damages and attorney's fees, even though North Dakota did not and could not have known or consented to this waiver of its sovereign immunity.

## J. Procedural History

169.    Plaintiffs filed this lawsuit on November 7, 2016. ECF No. 1.

170.    Plaintiffs alleged that Defendants' interpretation of the ACA would require them to perform and provide insurance coverage for gender transitions and abortions in contravention of their religious beliefs and medical judgment, and that Defendants' actions therefore violated the Religious Freedom Restoration Act (RFRA), the First, Fifth, Tenth, and Eleventh Amendments, the Spending Clause, and the Administrative Procedure Act (APA).

171.    Plaintiffs Catholic Benefits Association, Diocese of Fargo, Catholic Charities North Dakota, and Catholic Medical Association (CBA Plaintiffs) filed their lawsuit on December 28, 2016. *Catholic Benefits Assoc. et al. v. Burwell et al.*, No. 16-

cv-432, ECF No. 1 (D.N.D. filed Dec. 28, 2016). Catholic Benefits Association Plaintiffs also alleged that Defendant EEOC's interpretation and enforcement of Title VII was illegal for similar reasons.

172.   On December 30, 2016, this Court issued an order staying enforcement of the 2016 Rule against Plaintiffs. ECF No. 23.

173.   On January 23, 2017, this Court consolidated Plaintiffs' lawsuit and the lawsuit brought by the Catholic Benefits Association Plaintiffs. ECF No. 37.

174.   On January 23, 2017, the Court also amended its December 30 order "to make clear that it temporarily stays enforcement, as to the named Plaintiffs, of Section 1557's prohibitions against discrimination on the bases of gender identity and termination of pregnancy." ECF No. 36.

175.   The Court noted that the *Franciscan Alliance* court had issued a nationwide preliminary injunction prohibiting HHS from enforcing the 2016 Rule, *id.* at 1, and that the Court found "the order issued in *Franciscan Alliance* to be thorough and well-reasoned." *Id.* at 2.

176.   On May 26, 2017, Defendants filed a motion for voluntary remand and stay. ECF No. 45. Defendants requested "the opportunity to reconsider the regulation at issue ... based in part on the Administration's desire to assess the reasonableness, necessity, and efficacy" of the 2016 Rule and "to address certain issues identified by [the *Franciscan Alliance*] federal district court in granting a preliminary injunction against those aspects of the regulation." *Id.* at 1.

177.   The parties then submitted briefs concerning the propriety of a stay or remand. ECF Nos. 46, 50, 51, 52, 53.

178.   On August 24, 2017, the Court granted Defendants' motion for a stay and denied the motion for remand. ECF No. 56. The Court held that "a stay is warranted AND appropriate so that the agency can revisit Section 1557 of the Affordable Care Act." *Id.* at 2. The Court also held that the consolidated cases would "be stayed

40

in all respects until further Order of the Court in order to allow HHS to reconsider the controversial rules and regulations at issue." *Id.*

179.   Following the Supreme Court's decision in *Bostock* and the district court decisions enjoining the 2020 Rule and purporting to revive the vacated 2016 Rule, Plaintiffs concluded that they faced the imminent threat that Section 1557 would be enforced against them to require them to violate their sincerely held religious beliefs.

180.   On November 6, 2020, Plaintiffs filed an unopposed motion to lift the stay and to set a briefing schedule for filing amended complaints and responses to the amended complaints. ECF No. 92.

181.   On November 9, 2020, the Court granted the parties' motion. ECF No. 93.

## IV. CLAIMS

### COUNT I
### Violation of the Religious Freedom Restoration Act
### Compelled Medical Services

182.   Plaintiffs incorporate by reference all preceding paragraphs.

183.   RFRA provides "very broad protection for religious liberty." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693 (2014). It does so by "operat[ing] as a kind of super statute, displacing the normal operation of other federal laws." *Bostock*, 140 S. Ct. at 1754.

184.   Under RFRA, "Government shall not substantially burden a person's exercise of religion" unless "it demonstrates that application of the burden to the person" "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(a)-(b).

185.   If the government's application of a law burdens a person's exercise of religion, and the government cannot satisfy the compelling interest/least restrictive

means test, the person "is entitled to an exemption." *Hobby Lobby*, 573 U.S. at 694-95.

186.   The Religious Plaintiffs' sincerely held religious beliefs prohibit them from deliberately offering services and performing (or referring for) medical transition procedures, sterilization procedures, and abortion-related services. Plaintiffs' compliance with these beliefs is a religious exercise.

187.   HHS's interpretation of Section 1557 to require covered entities to perform these services substantially burdens Plaintiffs' religious exercise by placing government-imposed coercive pressure on Plaintiffs to change or violate their beliefs.

188.   Specifically, if Plaintiffs continue to provide medical care in compliance with their religious beliefs, HHS's interpretation of Section 1557 exposes them to, among other harms:

   (a)   the loss of substantial government funding;

   (b)   substantial penalties under the False Claims Act, 31 U.S.C. § 3729 *et seq.*;

   (c)   criminal penalties under 18 U.S.C. § 1035; and

   (d)   civil suits that would hold Plaintiffs liable for practicing their beliefs.

189.   HHS's interpretation of Section 1557 thus imposes a substantial burden on Plaintiffs' religious exercise.

190.   HHS's interpretation of Section 1557 furthers no compelling governmental interest. Gender-transition procedures are intensely controversial in the medical community, with many sharing Plaintiffs' belief that those procedures are often harmful. As HHS now recognizes, "there is no medical consensus to support one or another form of treatment for gender dysphoria," much less a compelling reason to require objecting healthcare providers to provide such treatments. 85 Fed. Reg. at 37,198.

42

191.   Nor is HHS's interpretation of Section 1557 the least restrictive means of furthering Defendants' interests. If the government wishes to expand access to transition and abortion procedures, it has numerous means at its disposal other than compelling objecting providers to perform the procedures, including itself "assist[ing] transgender individuals in finding and paying for transition procedures available from the growing number of healthcare providers who offer and specialize in those services." *Franciscan All.*, 227 F. Supp. 3d at 693.

192.   HHS's interpretation of Section 1557 thus violates Plaintiffs' rights secured to them by RFRA.

## COUNT II
### Violation of the Religious Freedom Restoration Act
### Compelled Insurance Coverage

193.   Plaintiffs incorporate by reference all preceding paragraphs.

194.   For the same reasons discussed above, Plaintiffs' sincerely held religious beliefs prohibit them from deliberately offering health insurance that would cover gender transition procedures, sterilization procedures, or abortion-related procedures.

195.   Plaintiffs specifically exclude coverage of any services related to gender transition procedures, sterilization procedures, or abortion-related procedures in their insurance plans.

196.   Plaintiffs' compliance with these beliefs by maintaining these exclusions is a religious exercise.

197.   HHS's interpretation of Section 1557 to require covered entities to provide insurance coverage for these procedures substantially burdens Plaintiffs' religious exercise by placing government-imposed coercive pressure on Plaintiffs to change or violate their beliefs.

198.   Specifically, HHS's interpretation of Section 1557 exposes the Plaintiffs to the loss of substantial government funding as a result of their religious exercise.

199.   HHS's interpretation of Section 1557 also makes it much more expensive for the Plaintiffs to do business with a third party administrator for a health benefits plan. HHS's interpretation of Section 1557 subjects third party administrators to potential liability for administering religious health plans like Plaintiffs', and thus Plaintiffs will be forced to indemnify any third party administrator from this liability. This constitutes an additional substantial burden on Plaintiffs' religious exercise.

200.   HHS's interpretation of Section 1557 also exposes Plaintiffs to, among other harms:

(a) substantial penalties under the False Claims Act, 31 U.S.C. § 3729 *et seq.*;

(b)  criminal penalties under 18 U.S.C. § 1035;

(c) civil suits that would hold Plaintiffs liable for practicing their beliefs.

201.   HHS's interpretation of Section 1557 thus imposes a substantial burden on Plaintiffs' religious exercise.

202.   HHS's interpretation of Section 1557 furthers no compelling governmental interest. Gender-transition procedures are intensely controversial in the medical community, with many sharing Plaintiffs' belief that those procedures are often harmful. As HHS now recognizes, "there is no medical consensus to support one or another form of treatment for gender dysphoria," much less a compelling reason to require objecting entities to provide insurance coverage for such treatments. 85 Fed. Reg. at 37,198.

203.   Nor is HHS's interpretation of Section 1557 the least restrictive means of furthering Defendants' interests. "If the government wishes to expand access to transition and abortion procedures, '[t]he most straightforward way of doing this

would be for the government to assume the cost of providing the [procedures] at issue to any [individuals] who are unable to obtain them under their health-insurance policies due to their employers' religious objections." *Franciscan All.*, 227 F. Supp. 3d at 693.

204.   HHS's interpretation of Section 1557 thus violates Plaintiffs' rights secured to them by RFRA.

### COUNT III
### Violation of the Administrative Procedure Act
### Agency Action Not in Accordance with Law

205.   The Plaintiffs incorporate by reference all preceding paragraphs.

206.   Defendants are "agencies" under the APA, 5 U.S.C. § 551(1), and the Section 1557 Regulations (the 2016 Rule and 2020 Rule) complained of herein are "rules" under the APA, *id.* § 551(4), and constitute "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Id.* § 704.

207.   The APA prohibits agency actions that are "not in accordance with law." *Id.* § 706(2)(A). Under the APA, "an agency may not interpret a regulation so as to violate a statute." *Univ. of Iowa Hosps. & Clinics v. Shalala*, 180 F.3d 943, 951 (8th Cir. 1999). In such cases, courts review questions of law de novo. *Iowa League of Cities v. EPA*, 711 F.3d 844, 872 (8th Cir. 2013). The Section 1557 Regulations are not in accordance with law for a number of independent reasons.

208.   Section 1557 Regulations' definition of "sex" discrimination to include discrimination on the basis of "gender identity" and "sex stereotyping" requires physicians to perform medical transition procedures regardless of their best medical judgment and religious beliefs. It is not in accordance with law, within the meaning of 5 U.S.C. § 706(2)(A), for the federal government to require medical professionals to perform procedures that may not be necessary or appropriate, and may in fact be

harmful to the patients. This violates constitutional and statutory rights of medical professionals, including substantive due process rights and freedom of speech protections, as well as the sovereign prerogatives of the States, which play a significant role in overseeing the promulgation and administration of appropriate standards of care within the healthcare community. Courts scrutinize particularly closely agency action that raises constitutional concerns.

209.    The 2016 and 2020 Rules are not in accordance with Section 1557 of the Affordable Care Act (42 U.S.C. § 18116) or Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq*. Section 1557 does not, on its own terms, prohibit discrimination on the basis of "sex." Instead, it prohibits discrimination "on the ground prohibited under ... title IX of the Education Amendments of 1972." 42 U.S.C. § 18116(a). Title IX, in turn, prohibits discrimination "on the basis of sex ... except that ... this section shall not apply to an educational institution which is controlled by a religious organization if the application of this subsection would not be consistent with the religious tenets of such organization." 20 U.S.C. § 1681(a)-(a)(3).

210.    Neither Section 1557 nor Title IX uses the term "sex" to include "gender identity" or "sex stereotyping." Thus, HHS's attempt to expand the definition is not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A). This is true of both the 2016 Rule as well as the 2020 Rule because the 2020 Rule would permit "application of the [*Bostock*] Court's construction" of "sex" discrimination. 85 Fed. Reg. at 37,168.

211.    The Section 1557 Regulations are also not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A) to the extent they do not incorporate Title IX's religious exemption.

212.    The 2016 Rule and the 2020 Rule are not in accordance with Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e *et seq*.). Title VII prohibits employers from discriminating against employees on the basis of religion. 42 U.S.C. § 2000e-2.

This means that employers, including Plaintiffs, have a duty to reasonably accommodate their employees' religious practices unless doing so would cause undue hardship to the employer. Plaintiffs employ individuals who have religious or conscientious objections to performing medical transition procedures. It should not be an undue hardship on Plaintiffs to accommodate these employees' religious beliefs, but the 2016 Rule and the 2020 Rule will in many cases make it illegal for Plaintiffs who receive HHS funds to accommodate their employees in accordance with Title VII. Thus, the 2016 Rule and the 2020 Rule are not in accordance with Title VII.

213.   The 2016 Rule and the 2020 Rule also force physicians to provide medical services related to gender transition. This is not in accordance with substantive due process rights protecting a medical professional's right to not perform a procedure he or she believes to be experimental, ethically questionable, and potentially harmful.

214.   The 2016 Rule and the 2020 Rule are not in accordance with the First Amendment because the Rules are overbroad, vague, and not narrowly tailored to a compelling governmental interest.

215.   The 2016 Rule and the 2020 Rule are not in accordance with the Tenth Amendment, which prohibits the federal government from co-opting a state's control over budgetary processes and legislative agendas.

216.   The 2016 Rule and the 2020 Rule are contrary to the First Amendment because they impose an unconstitutional condition on Plaintiffs' receipt of federal funding. *See Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 133 S. Ct. 2321, 2331 (2013).

217.   The 2016 Rule and the 2020 Rule are contrary to law because they violate the Religious Freedom Restoration Act.

218.   The 2016 Rule and the 2020 Rule are contrary to law because they violate the Free Exercise Clause of the First Amendment.

47

219.   The 2016 Rule and the 2020 Rule are contrary to law because they violate the Fifth Amendment Due Process and Equal Protection clauses.

220.   The 2016 Rule and the 2020 Rule are contrary to the protections of the Spending Clause.

221.   The 2016 Rule and the 2020 Rule unlawfully abrogate sovereign immunity under the Eleventh Amendment.

222.   The 2016 Rule and the 2020 Rule are contrary to the protections of the Tenth Amendment.

223.   Plaintiffs have no adequate or available administrative remedy, or, in the alternative, any effort to obtain an administrative remedy would be futile.

224.   Plaintiffs have no adequate remedy at law.

225.   Absent injunctive and declaratory relief against the 2016 Rule, the 2020 Rule, and Section 1557, the Plaintiffs have been and will continue to be harmed.

## <u>COUNT IV</u>
## Violation of the Administrative Procedure Act
## Agency Action In Excess of Statutory Authority and Limitations

226.   The Plaintiffs incorporate by reference all preceding paragraphs.

227.   Defendants are "agencies" under the APA, 5 U.S.C. § 551(1), and the Section 1557 Regulations complained of herein are "rules" under the APA, *id.* § 551(4), and constitute "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Id.* § 704.

228.   The APA prohibits agency actions that are "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C). The Section 1557 Regulations are in excess of statutory jurisdiction, authority, and limitations for a number of reasons.

229.   For the reasons described above, there is no statutory authority or jurisdiction for HHS to require medical professionals and facilities to perform procedures

48

(or refer for the same) that may not be necessary or appropriate, and may in fact be harmful to the patients.

230. For the reasons described above, there is no statutory authority or jurisdiction for HHS to dictate appropriate medical views on the necessity and experimental nature of medical transition procedures, or to dictate what constitutes best standards of care in an area of science and medicine that is being hotly debated in the medical community.

231. For the reasons described above, HHS's decision to interpret Section 1557's reference to "sex" discrimination to include "gender identity" and "sex stereotyping" is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C).

232. For the reasons described above, HHS's failure to incorporate Title IX's religious exemption in the 2016 Rule and the 2020 Rule is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C).

233. For the reasons described above, HHS's decision to require Plaintiffs to act in violation of Title VII by not accommodating their employees' religious and conscientious objections to participating in (or referring for) medical transition treatment or procedures is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C).

234. For the reasons discussed above, the 2016 Rule and the 2020 Rule are in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C) as they violate Plaintiffs' freedom of speech.

235. For the reasons discussed above, the 2016 Rule and the 2020 Rule are in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C) as they violate Plaintiffs' substantive due process rights.

236. For the reasons discussed above, the 2016 Rule and the 2020 Rule are in excess of statutory jurisdiction, authority, and limitations within the meaning of 5

U.S.C. § 706(2)(C) as they violate the First Amendment because they are overbroad, vague, and not narrowly tailored to a compelling governmental interest.

237.   For the reasons discussed above, the 2016 Rule and the 2020 Rule are in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C) because they co-opt states' control over budgetary processes and legislative agendas contrary to Article I and the Tenth Amendment.

238.   For the reasons discussed above, the 2016 Rule and the 2020 Rule are in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C) because they impose an unconstitutional condition on Plaintiffs' receipt of federal funding contrary to the First Amendment.

239.   For the reasons discussed above, the 2016 Rule and the 2020 Rule are in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C) because they violate the Religious Freedom Restoration Act.

240.   For the reasons discussed above, the 2016 Rule and the 2020 Rule are in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C) because they violate the Free Exercise clause of the First Amendment.

241.   For the reasons discussed above, the 2016 Rule and the 2020 Rule are in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C) because they violate the Fifth Amendment Due Process and Equal Protection clauses.

242.   For the reasons discussed above, the 2016 Rule and the 2020 Rule are in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C) because they are contrary to the protections of the Spending Clause.

243.    For the reasons discussed above, the 2016 Rule and the 2020 Rule are in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C) because they unlawfully abrogate sovereign immunity.

244.    For the reasons discussed above, the 2016 Rule and the 2020 Rule are in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C) because they are contrary to the protections of the Tenth Amendment.

245.    Plaintiffs have no adequate or available administrative remedy, or, in the alternative, any effort to obtain an administrative remedy would be futile.

246.    Plaintiffs have no adequate remedy at law.

247.    Absent injunctive and declaratory relief against the 2016 Rule, the 2020 Rule, and Section 1557, the Plaintiffs have been and will continue to be harmed.

<u>**COUNT V**</u>
**Violation of the Administrative Procedure Act**
**Agency Action that is Arbitrary, Capricious and an Abuse of Discretion**

248.    The Plaintiffs incorporate by reference all preceding paragraphs.

249.    Defendants are "agencies" under the APA, 5 U.S.C. § 551(1), and the Section 1557 Regulations complained of herein are "rules" under the APA, *id.* § 551(4), and constitute "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Id.* § 704.

250.    The APA prohibits agency actions that are "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A). The Section 1557 Regulations are arbitrary and capricious agency actions for a number of reasons.

251.    The Section 1557 Regulations' definition of "sex" discrimination to include discrimination on the basis of "gender identity" and "sex stereotyping" requires physicians to perform medical transition procedures regardless of their best medical

judgment and religious beliefs. It is arbitrary and capricious for the federal government to require medical professionals to perform (or refer for) procedures that the physician believes may not be necessary or appropriate, and that may even be harmful to the patient.

252.   For the reasons discussed above, it is arbitrary and capricious for HHS to dictate appropriate medical views on the necessity and experimental nature of medical transition procedures, and to dictate what constitutes best standards of care.

253.   For the reasons discussed above, HHS's inclusion of "gender identity" and "sex stereotyping" in its interpretation of "sex" is an arbitrary and capricious interpretation of Section 1557 of the Affordable Care Act (42 U.S.C. § 18116) and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*

254.   For the reasons discussed above, HHS's failure to include Title IX's religious exemption in the Section 1557 Regulations is arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A).

255.   For the reasons described above, HHS's decision to require Plaintiffs to act in violation of Title VII by not accommodating their employees' religious objections to participating in medical transition procedures is arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A).

256.   For the reasons discussed above, the 2016 Rule and the 2020 Rule are arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A) as they violate Plaintiffs' freedom of speech.

257.   For the reasons discussed above, the 2016 Rule and the 2020 Rule are arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A) as they violate Plaintiffs' substantive due process rights.

258.   For the reasons discussed above, the 2016 Rule and the 2020 Rule are arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A) as they violate

the First Amendment because they are overbroad, vague, and not narrowly tailored to a compelling governmental interest.

259.     For the reasons discussed above, the 2016 Rule and the 2020 Rule are arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A) because they co-opt States' control over budgetary processes and legislative agendas contrary to the Tenth Amendment.

260.     For the reasons discussed above, the 2016 Rule and the 2020 Rule are arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A) because they impose an unconstitutional condition on Plaintiffs' receipt of federal funding contrary to the First Amendment.

261.     For the reasons discussed above, the 2016 Rule and the 2020 Rule are arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A) because they violate the Religious Freedom Restoration Act.

262.     For the reasons discussed above, the 2016 Rule and the 2020 Rule are arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A) because they violate the Free Exercise Clause of the First Amendment.

263.     For the reasons discussed above, the 2016 Rule and the 2020 Rule are arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A) because they violate the Fifth Amendment Due Process and Equal Protection clauses.

264.     For the reasons discussed above, the 2016 Rule and the 2020 Rule are arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A) because they are contrary to the protections of the Spending Clause.

265.     For the reasons discussed above, the 2016 Rule and the 2020 Rule are arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A) because they unlawfully abrogate sovereign immunity.

266.   For the reasons discussed above, the 2016 Rule and the 2020 Rule are arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A) because they are contrary to the protections of the Tenth Amendment.

267.   Plaintiffs have no adequate or available administrative remedy, or, in the alternative, any effort to obtain an administrative remedy would be futile.

268.   Plaintiffs have no adequate remedy at law.

269.   Absent injunctive and declaratory relief against the 2016 Rule, the 2020 Rule, and Section 1557, the Plaintiffs have been and will continue to be harmed.

<u>**COUNT VI**</u>
**Violation of the First Amendment of the United States Constitution**
**Freedom of Speech**
**Compelled Speech and Compelled Silence**

270.   Plaintiffs incorporate by reference all preceding paragraphs.

271.   Plaintiffs plan to continue using their best medical and ethical judgment in treating and advising patients. Performing (or referring for) medical transition procedures is contrary to their best medical and/or ethical judgment.

272.   The 2016 Rule states, in the context of physicians offering "health services" that a "categorization of all transition-related treatment ... as experimental, is outdated and not based on current standards of care." 81 Fed. Reg. at 31,435; *see also id.* at 31,429.

273.   Because two courts have enjoined relevant portions of the 2020 Rule and held that the 2016 Rule remains in effect as to "gender identity" and "sex stereotyping" discrimination, Plaintiffs face a substantial risk of enforcement under the 2016 Rule. Additionally, Plaintiffs also face a substantial risk of enforcement because one other court has held that the 2020 Rule itself prohibits "gender identity" discrimination similar to the 2016 Rule.

274.    HHS's interpretation of Section 1557 would prohibit the Plaintiffs from expressing their professional opinions that medical transition procedures are not the best standard of care or are experimental.

275.    HHS's interpretation of Section 1557 would also require Plaintiffs to amend their written policies to expressly endorse gender transition procedures, even if such revisions do not reflect the medical judgment, values, or beliefs of Plaintiffs. *Id.* at 31,455. HHS's interpretation of Section 1557 would also require Plaintiffs to use gender-transition affirming language in all situations, regardless of circumstance. *Id.* at 31,406.

276.    Performing (or referring for) medical transition procedures is also contrary to the religious and conscientious beliefs of the Plaintiffs, and their beliefs prohibit them from conducting, participating in, or referring for such procedures.

277.    HHS's interpretation of Section 1557 would compel the Plaintiffs to conduct, participate in, refer for, or otherwise facilitate medical transition procedures.

278.    HHS's interpretation of Section 1557 would prohibit the Plaintiffs from expressing their religious views that medical transition procedures are not the best standard of care or are experimental.

279.    HHS's interpretation of Section 1557 would compel the Plaintiffs to speak in ways that they would not otherwise speak.

280.    HHS's interpretation of Section 1557 thus violates the Plaintiffs right to be free from compelled speech as secured to them by the First Amendment of the United States Constitution.

281.    HHS's interpretation of Section 1557 would compel speech and is not justified by a compelling governmental interest.

282.    Even if HHS has a compelling government interest, HHS's interpretation of Section 1557 is not narrowly tailored to achieve that interest.

283.   Absent injunctive and declaratory relief against HHS's interpretation of Section 1557 and Section 1557, the Plaintiffs have been and will continue to be harmed.

## COUNT VII
### Violation of the First Amendment of the United States Constitution
### Freedom of Speech and Free Exercise Clause
### Viewpoint Discrimination

284.   Plaintiffs incorporate by reference all preceding paragraphs.

285.   Plaintiffs' sincere religious and conscientious beliefs prohibit them from facilitating or participating in medical transition procedures.

286.   Plaintiffs' medical judgment is that, in general, it is harmful to encourage a patient to undergo medical transition procedures.

287.   The 2016 Rule states, in the context of physicians offering "health services" that a "categorization of all transition-related treatment, for example as experimental, is outdated and not based on current standards of care." 81 Fed. Reg. at 31,435; *see also id.* at 31,429.

288.   Because two courts have enjoined relevant portions of the 2020 Rule and held that the 2016 Rule remains in effect as to "gender identity" and "sex stereotyping" discrimination, Plaintiffs face a substantial risk of enforcement under the 2016 Rule. Additionally, Plaintiffs also face a substantial risk of enforcement because one other court has held that the 2020 Rule itself prohibits "gender identity" discrimination similar to the 2016 Rule.

289.   HHS's interpretation of Section 1557 would prohibit the Plaintiffs from expressing their religious or conscientious viewpoint that medical transition procedures are not the best standard of care.

290.   HHS's interpretation of Section 1557 withholds funding based on an intent to restrict Plaintiffs' speech.

291.    HHS's interpretation of Section 1557 would discriminate based on viewpoint and is not justified by a compelling governmental interest.

292.    Even if HHS has a compelling government interest, HHS's interpretation of Section 1557 is not narrowly tailored to achieve that interest.

293.    Defendants' actions thus violate the Plaintiffs' rights as secured to them by the First Amendment of the United States Constitution.

294.    Absent injunctive and declaratory relief against HHS's interpretation of Section 1557 and Section 1557, the Plaintiffs have been and will continue to be harmed.

## COUNT VIII
### Violation of the First and Fifth Amendments of the U.S. Constitution
### Freedom of Speech and Due Process
### Overbreadth and Vagueness

295.    Plaintiffs incorporate by reference all preceding paragraphs.

296.    HHS's interpretation of Section 1557 regulates protected speech.

297.    The 2016 Rule states, in the context of physicians offering "health services" that a "categorization of all transition-related treatment ... as experimental, is outdated and not based on current standards of care." 81 Fed. Reg. at 31,435; *see also id.* at 31,429.

298.    Because two courts have enjoined relevant portions of the 2020 Rule and held that the 2016 Rule remains in effect as to "gender identity" and "sex stereotyping" discrimination, Plaintiffs face a substantial risk of enforcement under the 2016 Rule. Additionally, Plaintiffs also face a substantial risk of enforcement because one other court has held that the 2020 Rule itself prohibits "gender identity" discrimination similar to the 2016 Rule.

299.    This exposes the Plaintiffs to penalties for expressing their medical and moral views of medical transition procedures. It also prohibits Plaintiffs from using

their medical judgment to determine the appropriate standard of care for interactions with their patients.

300.    Plaintiffs believe that HHS's interpretation of Section 1557 restricts their speech regarding the best standard of care for patients.

301.    The 2016 Rule states: "The determination of whether a certain practice is discriminatory typically requires a nuanced analysis that is fact-dependent." *Id*. at 31,377.

302.    The 2016 Rule also requires that a covered entity apply "neutral, non-discriminatory criteria that it uses for other conditions when the coverage determination is related to gender transition" and "decline[s] to limit application of the rule by specifying that coverage for the health services addressed in § 92.207(b)(3)-(5) must be provided only when the services are medically necessary or medically appropriate." 81 Fed. Reg. at 31,435.

303.    Without allowing Plaintiffs to use their judgment about what is medically necessary or appropriate, the Regulation is ambiguous in the types of services Plaintiffs are required to provide and perform.

304.    Requiring the Plaintiffs apply "neutral, nondiscriminatory criteria that it uses for other conditions" is a subjective standard without a limiting construction. *Id.*

305.    The Regulation states, in the context of physicians offering "health services" that a "categorization of all transition-related treatment, for example as experimental, is outdated and not based on current standards of care." *Id.*; *see also id.* at 31,429.

306.    The Regulation does not provide a limiting construction for what the current standard of care is, nor does it provide guidance as to how physicians can rely on their best medical judgment when it conflicts with the Regulation.

307.   HHS's vague and overbroad interpretation of Section 1557 chills the Plaintiffs' speech.

308.   HHS's vague and overbroad interpretation of Section 1557 is not justified by a compelling governmental interest.

309.   Even if HHS has a compelling government interest, HHS's interpretation of Section 1557 is not narrowly tailored to achieve that interest.

310.   Defendants have therefore violated the Plaintiffs' rights secured to them by the Free Speech Clause of the First Amendment and the Due Process Clause of the Fifth Amendment by prohibiting speech that would otherwise be protected.

311.   Because Plaintiffs are unable to determine what kind of procedures and services they will be required to provide and perform, Defendants have violated the Plaintiffs' rights secured to them by the Free Speech Clause of the First Amendment and the Due Process Clause of the Fifth Amendment.

312.   Absent injunctive and declaratory relief against HHS's interpretation of Section 1557 and Section 1557, the Plaintiffs have been and will continue to be harmed.

## <u>COUNT IX</u>
### Violation of the First Amendment to the United States Constitution
### Free Speech Clause
### Unconstitutional Conditions

313.   Plaintiffs incorporate by reference all preceding paragraphs.

314.   HHS's interpretation of Section 1557 imposes an unconstitutional condition on Plaintiffs' receipt of federal funding. *See Agency for Int'l Dev.*, 133 S. Ct. at 2331.

315.   HHS's interpretation of Section 1557 applies to "[a]ny health program or activity, any part of which is receiving Federal financial assistance (including credits, subsidies, or contracts of insurance) provided by [HHS]." 85 Fed. Reg. at 37,244.

316.   HHS's interpretation of Section 1557 requires Plaintiffs to adopt policies regarding standards of care for patients that violate Plaintiffs' religious and conscientious beliefs, as well as their medical judgment, and also interfere with the Plaintiffs' practice of medicine.

317.   Defendants' actions therefore impose an unconstitutional condition on Plaintiffs' receipt of federal funding and violate Plaintiffs' rights as secured to them by the First and Fourteenth Amendments of the United States Constitution.

318.   Absent injunctive and declaratory relief against HHS's interpretation of Section 1557 and Section 1557, Plaintiffs have been and will continue to be harmed.

## COUNT X
### Violation of the First Amendment to the United States Constitution
### Free Exercise Clause

319.   Plaintiffs incorporate by reference all preceding paragraphs.

320.   Plaintiffs object to providing, facilitating, or otherwise participating in medical transition procedures and abortions.

321.   HHS's interpretation of Section 1557 imposes substantial burdens on Plaintiffs by forcing them to choose between federal funding and their livelihood as healthcare providers and their exercise of religion.

322.   HHS's interpretation of Section 1557 seeks to suppress the religious practice of individuals and organizations such as Plaintiffs, while allowing exemptions for similar conduct based on secular and non-religious reasons. Thus, HHS's interpretation of Section 1557 is neither neutral nor generally applicable.

323.   HHS's interpretation of Section 1557 interferes with a long-recognized, historically private religious practice contrary to the text, history, and tradition of the First Amendment's Religion Clauses.

324.   HHS's interpretation of Section 1557 is not justified by a compelling governmental interest.

60

325.   Even if HHS has a compelling government interest, HHS's interpretation of Section 1557 is not narrowly tailored to achieve that interest.

326.   Defendants' actions thus violate the Plaintiffs' rights secured to them by the Free Exercise Clause of the First Amendment of the United States Constitution.

327.   Absent injunctive and declaratory relief against HHS's interpretation of Section 1557 and Section 1557, Plaintiffs have been and will continue to be harmed.

## COUNT XI
### Violation of the Fifth Amendment to the United States Constitution
### Due Process Clause
### Substantive Due Process

328.   Plaintiffs incorporate by reference all preceding paragraphs.

329.   The United States has a deeply rooted tradition of honoring physicians' rights to provide medical treatment in accordance with their moral and religious beliefs.

330.   Plaintiffs possess a fundamental right of liberty of conscience.

331.   Plaintiffs possess a fundamental right not to be coerced to provide medical procedures and services in violation of their conscience.

332.   HHS's interpretation of Section 1557 coerces Plaintiffs to provide medical procedures and services in violation of their conscience.

333.   Defendants' conduct cannot be justified by a compelling governmental interest.

334.   HHS's interpretation of Section 1557 is not justified by a compelling governmental interest.

335.   Even if HHS has a compelling government interest, HHS's interpretation of Section 1557 is not narrowly tailored to achieve that interest.

336.   Defendants' actions therefore violate Plaintiffs' rights to substantive due process.

337.    Absent injunctive and declaratory relief against HHS's interpretation of Section 1557 and Section 1557, Plaintiffs have been and will continue to be harmed.

## COUNT XII
### Violation of the Fifth Amendment to the United States Constitution
### Due Process and Equal Protection

338.    Plaintiffs incorporate by reference all preceding paragraphs.

339.    The Due Process Clause of the Fifth Amendment mandates the equal treatment of all religious faiths and institutions without discrimination or preference.

340.    HHS's interpretation of Section 1557 discriminates on the basis of religious views or religious status by refusing to recognize religious exemptions that exist in the law.

341.    HHS's interpretation of Section 1557 discriminates on the basis of religious views or religious status by refusing to recognize valid medical views of religious healthcare professionals on medical transition procedures.

342.    Defendants' actions thus violate Plaintiffs' rights secured to them by the Fifth Amendment of the United States Constitution.

343.    Absent injunctive and declaratory relief against HHS's interpretation of Section 1557 and Section 1557, Plaintiffs have been and will continue to be harmed.

## COUNT XIII
### Violation of Article I of the United States Constitution
### Lack of Clear Notice under the Spending Clause

344.    Plaintiffs incorporate by reference all preceding paragraphs.

345.    When Congress exercises its Spending Clause power against the States, the United States Supreme Court has held that principles of federalism require conditions on Congressional funds given to States to enable a state official to "clearly understand," from the language of the law itself, what conditions the State is agreeing to when accepting the federal funds. *Arlington Cent. Sch. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). "The legitimacy of Congress's exercise of the spending power

'thus rests on whether the [entity] voluntarily and knowingly accepts the terms of the 'contract.'" *NFIB v. Sebelius*, 567 U.S. 519, 577 (2012) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). Defendants' *ex-post* interpretation of Section 1557 is not in accord with the understanding that existed when the States chose to begin accepting Medicare and Medicaid as payment for medical services provided. *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985) (providing that a state's obligation under cooperative federalism program "generally should be determined by reference to the law in effect when the grants were made").

346.   The text employed by Congress does not support understanding the term "sex" in the manner put forth by Defendants. While Congress has expressed its intent to cover "gender identity," as a protected class, in *other* pieces of legislation, *see, e.g.*, 18 U.S.C. § 249(a)(2)(A); 42 U.S.C. § 13925(b)(13)(A), it has not done so in Title IX. In *other* legislation, Congress included "gender identity" along with "sex," thus evidencing its intent for "sex" in Title IX to retain its original and only meaning—one's immutable, biological sex as acknowledged at or before birth.

347.   The Section 1557 Regulations were passed under the authority Congress delegated to HHS in Section 1557 of the Affordable Care Act. Section 1557 does not add a new non-discrimination provision to the federal code, but merely incorporates by reference pre-existing provisions under Title VI, Title IX, the Americans with Disabilities Act, and the Rehabilitation Act. Section 1557 does not independently define terms such as "sex."

348.   At the time that the ACA was passed in 2010, no federal courts or agencies had interpreted "sex" in Title IX to include gender identity.

349.   Title IX also provides that "Nothing in this chapter shall be construed to require ... any person, or public or private entity, to provide or pay for any benefit or service, including the use of facilities, related to an abortion." 20 U.S.C. § 1688.

350. Thus, no State could fathom, much less "clearly understand," that the ACA would impose on it the conditions created by HHS's interpretation of Section 1557—namely, a new "gender identity" requirement, as well as a provision to require coverage, funding, or facilities for abortion. Accordingly, HHS's interpretation of Section 1557 violates the Spending Clause.

351. Moreover, Defendants are "agencies" under the APA, 5 U.S.C. § 551(1), and HHS's interpretation of Section 1557 complained of herein is a "rule" under the APA, *id.* § 551(4), and constitutes "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Id.* § 704. The APA requires the Court to hold unlawful and set aside any agency action that is "contrary to constitutional right, power, privilege, or immunity" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.* § 706(2)(B)–(C). Thus, the Spending Clause violations articulated herein provide the Court with an additional basis to set aside the new Rule under the APA.

352. The Defendants' actions thus violate the APA and the Spending Clause of the United States Constitution.

353. Absent injunctive and declaratory relief against HHS's interpretation of Section 1557 and Section 1557, the State Plaintiffs have been and will continue to be harmed.

## **COUNT XIV**
**Violation of the Eleventh Amendment to the United States Constitution**
**Unlawful Abrogation of Sovereign Immunity**

354. Plaintiffs incorporate by reference all preceding paragraphs.

355. The federal government may not abrogate a state's sovereign immunity unless it makes that intention to abrogate unmistakably clear in the language of the statute and acts pursuant to a valid exercise of its power under § 5 of the Fourteenth

Amendment. *See, e.g.*, *Nevada Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 726, 728 n.2 (2003).

356.   The abrogation referenced herein was not unmistakably clear in the language of the relevant statutes, and Defendants did not act pursuant to a valid exercise of federal power under § 5 of the Fourteenth Amendment.

357.   In enacting Section 1557 of the ACA, Congress did not make findings regarding "gender identity," but merely incorporated existing law under Title IX, which does not extend to "gender identity." Congress has in fact declined to pass specific "gender identity" legislation on numerous occasions.

358.   HHS's interpretation of Section 1557 abrogates the sovereign immunity of the States by subjecting them to lawsuits from their employees. It does so without clear authorization from Congress, and its expansion of the definition of "sex" to include "gender identity" is not supported by Congressional findings.

359.   HHS's interpretation of Section 1557 abrogates the sovereign immunity of the States by subjecting them to lawsuits from non-employees, including spouses and dependents of its employees, students at health-related schools run by the States, and patients at state-run hospitals and medical facilities. It does so without clear authorization from Congress, and its expansion of the definition of "sex" to include "gender identity" is not supported by Congressional findings.

360.   Moreover, Defendants are "agencies" under the APA, 5 U.S.C. § 551(1), and HHS's interpretation of Section 1557 complained of herein is a "rule" under the APA, *id.* § 551(4), and constitutes "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Id.* § 704. The APA requires the Court to hold unlawful and set aside any agency action that is "contrary to constitutional right, power, privilege, or immunity" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.* § 706(2)(B)-(C). Thus, the improper abrogation of the States' sovereign immunity

articulated herein provides the Court with an additional basis to set aside the new Rule under the APA.

361.   The Defendants' actions thus violate the APA and the Eleventh Amendment to the United States Constitution.

362.   Absent injunctive and declaratory relief against HHS's interpretation of Section 1557 and Section 1557, the State Plaintiffs have been and will continue to be harmed.

## COUNT XV
### Violation of the Spending Clause of Article I of the U.S. Constitution
### The Regulation is Unlawful and Unconstitutionally Coercive

363.   Plaintiffs incorporate by reference all preceding paragraphs.

364.   The federal government cannot use its Spending Clause powers to coerce the States, even when proper notice procedures are followed.

365.   The Supreme Court struck down a similar attempt under the ACA because "such conditions take the form of threats to terminate other significant independent grants," and are therefore "properly viewed as a means of pressuring the States to accept policy changes." *NFIB*, 567 U.S. at 580.

366.   HHS's interpretation of Section 1557 threatens other independent grants, such as general Medicare and Medicaid funds, as well as other health-related grants.

367.   By placing in jeopardy a substantial percentage of the State's budget if it refuses to comply with HHS's interpretation of Section 1557, Defendants have left the State no real choice but to acquiesce in such policy. *See id.* at 582 ("The threatened loss of over 10 percent of a State's overall budget, in contrast, is economic dragooning that leaves the States with no real option but to acquiesce ...").

368.   Such compulsion is excessive under the Spending Clause, even in the presence of clear notice. "Congress may use its spending power to create incentives

for [entities] to act in accordance with federal policies. But when 'pressure turns into compulsion,' the legislation runs contrary to our system of federalism." *Id.* at 577-78 (quoting *Charles C. Steward Mach. Co. v. Davis*, 301 U.S. 548, 590 (1937)) (internal citation omitted). "That is true whether Congress directly commands a State to regulate or indirectly coerces a State to adopt a federal regulatory system as its own." *Id.* at 578.

369.   The compulsion is also improper because HHS's interpretation of Section 1557 changes the conditions for the receipt of federal funds *after* the States had already accepted Congress's original conditions. But "[t]he legitimacy of Congress's exercise of the spending power 'thus rests on whether the [entity] voluntarily and knowingly accepts the terms of the 'contract.''" *Id.* at 577 (quoting *Pennhurst*, 451 U.S. at 17).

370.   Moreover, Defendants are "agencies" under the APA, 5 U.S.C. § 551(1), and HHS's interpretation of Section 1557 complained of herein is a "rule" under the APA, *id.* § 551(4), and constitutes "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Id.* § 704. The APA requires the Court to hold unlawful and set aside any agency action that is "contrary to constitutional right, power, privilege, or immunity" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.* § 706(2)(B)-(C). Thus, the Spending Clause violations articulated herein provide the Court with an additional basis to set aside the new Rule under the APA.

371.   The Defendants' actions thus violate the APA and the Spending Clause of the United States Constitution.

372.   Absent injunctive and declaratory relief against HHS's interpretation of Section 1557 and Section 1557, the Plaintiffs have been and will continue to be harmed.

## COUNT XVI
### Violation of Article I and the Tenth Amendment of the U.S. Constitution
### The Regulation Unlawfully Commandeers the States

373.   Plaintiffs incorporate by reference all preceding paragraphs.

374.   The Tenth Amendment restrains the power of Congress by reserving powers for the states that are not delegated to Congress in Article I.

375.   With HHS's interpretation of Section 1557, Defendants have "commandeer[ed] a State's legislative or administrative apparatus for federal purposes." *NFIB*, 567 U.S. at 577.

376.   Such commandeering exceeds powers delegated to Congress under Article I and invades the powers reserved to the States in the Tenth Amendment.

377.   Defendants' actions thus violate Article I and the Tenth Amendment of the United States Constitution.

378.   Absent injunctive and declaratory relief against HHS's interpretation of Section 1557 and Section 1557, the Plaintiffs have been and will continue to be harmed.

## COUNT XVII
### Violation of the Tenth Amendment to the United States Constitution
### Unconstitutional Exercise of Federal Power

379.   Plaintiffs incorporate by reference all preceding paragraphs.

380.   State Plaintiff cannot afford the exorbitant and unfunded costs of HHS's interpretation of Section 1557, but has no choice other than to participate.

381.   By effectively co-opting the State's control over its budgetary processes and legislative agendas through compelling it to assume costs it cannot afford, HHS's interpretation of Section 1557 invades its sovereign sphere.

382.   HHS's interpretation of Section 1557 violates the Tenth Amendment of the Constitution of the United States, and runs afoul of the Constitution's principle

of federalism, by commandeering the State and its employees as agents of the federal government's regulatory scheme at the State's own cost.

383.    The Defendants' actions thus violate the Tenth Amendment to the United States Constitution.

384.    Absent injunctive and declaratory relief against HHS's interpretation of Section 1557 and Section 1557, the Plaintiffs have been and will continue to be harmed.

## V. PRAYER FOR RELIEF

Wherefore, Plaintiffs pray the Court:

a.  Declare that interpreting or applying Section 1557 to require provision and coverage of gender-transition procedures and abortions is invalid under:

  i.   the Administrative Procedure Act;

  ii.  the Religious Freedom Restoration Act;

  iii. the First Amendment to the United States Constitution;

  iv.  the Fifth Amendment of the United States Constitution;

  v.   the Fourteenth Amendment of the United States Constitution;

  vi.  the Spending Clause of Article I of the United States Constitution;

  vii. the Tenth Amendment to the United States Constitution;

  viii. the Eleventh Amendment to the United States Constitution;

b.  Issue a permanent injunction enjoining Defendants from interpreting or applying Section 1557 against Plaintiffs or those acting in concert with Plaintiffs in a manner that would require them to perform or insure gender-transition procedures or abortions;

c.  Award actual damages;

d.  Award nominal damages;

e.  Award Plaintiffs the costs of this action and reasonable attorney's fees; and

f.  Award such other and further relief as it deems equitable and just.

## VI. JURY DEMAND

Plaintiffs hereby request a trial by jury on all issues so triable.

Respectfully submitted this 23rd day of November, 2020.

| | |
|---|---|
| /s/ Luke W. Goodrich | /s/ Wayne Stenehjem |
| Luke W. Goodrich | Wayne Stenehjem |
| Mark L. Rienzi | Attorney General of North Dakota |
| The Becket Fund for Religious Liberty | 600 E. Boulevard Avenue |
| 1200 New Hampshire Ave. NW | Bismarck, ND  58505-0040 |
| Suite 700 | Telephone: (701) 328-2210 |
| Washington, DC 20036 | Facsimile: (701) 328-2226 |
| Telephone: (202) 349-7216 | |
| Facsimile: (202) 955-0090 | Matthew Sagsveen |
| lgoodrich@becketfund.org | Solicitor General |
| | N.D. Office of Attorney General |
| | 500 N. 9th Street |
| *Counsel for Plaintiffs Religious Sisters* | Bismarck, ND 58501 |
| *of Mercy; Sacred Heart Mercy Health* | Telephone: (701) 328-3640 |
| *Care Center (Alma, MI); SMP Health* | Facsimile: (701) 328-4300 |
| *System, and University of Mary* | |
| | *Counsel for Plaintiff North Dakota* |

## CERTIFICATE OF SERVICE

I hereby certify that on November 23, 2020, the foregoing was served on all parties via ECF.

 /s/ Luke W. Goodrich
Luke W. Goodrich