## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| THE RELIGIOUS SISTERS OF MERCY, *et al.*,<br><br>     *Plaintiffs,*<br><br>  v.<br><br>ALEX M. AZAR, Secretary of the United States Department of Health and Human Service, *et al.*,<br><br>     *Defendants.* | No. 3:16-cv-386<br><br>**Plaintiffs' Memorandum in Support of Their Motion for Partial Summary Judgment, or in the Alternative, Preliminary Injunction**<br><br>**Oral Argument Requested** |
| CATHOLIC BENEFITS ASSOCIATION, *et al.*<br><br>     *Plaintiffs,*<br><br>  v.<br><br>ALEX M AZAR, Secretary of the United States Department of Health and Human Service, *et al.*,<br><br>     *Defendants.* | No. 3:16-cv-432 |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................... iv

INTRODUCTION ............................................................................. 1

STATEMENT OF FACTS ................................................................ 2

    A. Plaintiffs ................................................................................ 2

    B. The Affordable Care Act and Section 1557 ...................... 4

    C. The 2016 Rule ...................................................................... 5

    D. Lawsuits Challenging the 2016 Rule ............................... 8

    E. The 2020 Rule .................................................................. 10

    F. *Bostock* and Recent Lawsuits Challenging the 2020 Rule ............................ 12

ARGUMENT ................................................................................ 15

I. As interpreted by HHS, Section 1557 violates RFRA. ......................... 16

    A. HHS's interpretation of Section 1557 substantially burdens
       Plaintiffs' religious exercise. ...................................... 16

    B. HHS's interpretation of Section 1557 fails strict scrutiny. ............................ 19

       1. HHS's interpretation furthers no compelling interest. ......................... 19

       2. HHS has many less restrictive means of furthering its in-
          terests. ................................................................ 23

II. HHS's interpretation of "sex" to include "gender identity" is con-
    trary to Title IX and Section 1557. ...................................... 25

    A. The text and history of Title IX and Section 1557 show that
       they do not prohibit "gender identity" discrimination................... 25

    B. "Gender identity" discrimination is not forbidden "sex stere-
       otyping".................................................................... 28

    C. *Bostock* does not justify HHS's interpretation.................... 30

III. HHS's failure to incorporate Title IX's religious exemption is
    contrary to Title IX and Section 1557............................... 32

IV. As interpreted by HHS, Section 1557 violates the Spending
    Clause. ...................................................................... 34

V. Injunctive relief is required. ...................................................... 37

CONCLUSION ............................................................................................................ 40

CERTIFICATE OF SERVICE ................................................................................... 42

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*281 Care Comm. v. Arneson,*
    766 F.3d 774 (8th Cir. 2014) ............................................................... 22

*Adams v. Sch. Bd. of St. Johns Cty.,*
    968 F.3d 1286 (11th Cir. 2020) ........................................................... 30

*Archdiocese of St. Louis v. Burwell,*
    28 F. Supp. 3d 944 (E.D. Mo. 2014) .............................................. 38, 40

*Bank One, Utah v. Guttau,*
    190 F.3d 844 (8th Cir. 1999) ...................................................... 15, 37, 40

*Barnhart v. Walton,*
    535 U.S. 212 (2002) .............................................................................. 30

*Bostock v. Clayton County,*
    140 S. Ct. 1731 (2020) ...................................................................*passim*

*Bowen v. Mich. Acad. of Family Phys.,*
    476 U.S. 667 (1986) .............................................................................. 34

*Burwell v. Hobby Lobby Stores, Inc.,*
    573 U.S. 682 (2014) ........................................................................*passim*

*Cannon v. Univ. of Chicago,*
    441 U.S. 677 (1979) ................................................................................ 5

*Carson v. Simon,*
    978 F.3d 1051 (8th Cir. 2020) ............................................................. 40

*Catholic Benefits Assoc. v. Burwell,*
    No. 16-cv-432, ECF 1 (D.N.D. filed Dec. 28, 2016).............................. 8

*Chalenor v. Univ. of N.D.,*
    291 F.3d 1042 (8th Cir. 2002) ............................................................... 5

*Christian Emps. All. v. Azar,*
    No. 3:16-cv-309, 2019 WL 2130142 (D.N.D. May 15, 2019)........... 37, 40

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
    508 U.S. 520 (1993) ....................................................................... 19, 21

*Corley v. United States,*
    556 U.S. 303 (2009) ..................................................................... 27

*EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.,*
    884 F.3d 560 (6th Cir. 2018) ..................................................... 29

*Elrod v. Burns,*
    427 U.S. 347 (1976) ..................................................................... 38

*Etsitty v. Utah Transit Auth.,*
    502 F.3d 1215 (10th Cir. 2007) ................................................. 31

*Franciscan All., Inc. v. Azar,*
    414 F. Supp. 3d 928 (N.D. Tex. 2019)...........................................*passim*

*Franciscan All., Inc. v. Azar,*
    No. 20-10093 (5th Cir. filed Jan. 24, 2020) .......................... 10

*Franciscan All., Inc. v. Burwell,*
    227 F. Supp. 3d 660 (N.D. Tex. 2016)...........................................*passim*

*Gibson v. Collier,*
    920 F.3d 212 (5th Cir. 2019) ............................................... 8, 19

*Gonzales v. O Centro Espirita Beneficente Uniao*
    *do Vegetal,* 546 U.S. 418 (2006) ............................... 16, 22, 38

*Gross v. FBL Fin. Servs., Inc.,*
    557 U.S. 167 (2009) ..................................................................... 31

*Gross v. Weber,*
    186 F.3d 1089 (8th Cir. 1999) ................................................. 36

*Hamilton v. Schriro,*
    74 F.3d 1545 (8th Cir. 1996) ................................................... 19

*Hawkins v. Cmty. Bank of Raymore,*
    761 F.3d 937 (8th Cir. 2014) ............................................. 25, 27

*Hobby Lobby Stores, Inc. v. Sebelius,*
    723 F.3d 1114 (10th Cir. 2013) ............................................... 38

*Holloway v. Arthur Anderson & Co.,*
    566 F.2d 659 (9th Cir. 1977) ................................................... 31

*Holt v. Hobbs,*
    574 U.S. 352 (2015*)* ................................................................... 24

*Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*,
   559 U.S. 573 (2010) ............................................................... 31

*Johnston v. Univ. of Pittsburgh*,
   97 F. Supp. 3d 657 (W.D. Pa. 2015) ..................................... 31

*Kansas v. United States*,
   249 F.3d 1213 (10th Cir. 2001) ............................................ 38

*Kisor v. Wilkie*,
   139 S. Ct. 2400 (2019) .......................................................... 25

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
   140 S. Ct. 2367 (2020) .......................................................... 22

*Mahler v. First Dakota Title Ltd. P'ship*,
   931 F.3d 799 (8th Cir. 2019) ................................................ 15

*Maryland v. King*,
   567 U.S. 1301 (2012) (Roberts, C.J., in chambers) .............. 38

*N. Haven Bd. of Ed. v. Bell*,
   456 U.S. 512 (1982) .............................................................. 27

*New York v. U.S. Dep't of Health & Human Servs.*,
   No. 20-cv-05583 (S.D.N.Y. filed July 20, 2020) .................. 13

*NFIB v. Sebelius*,
   567 U.S. 519 (2012) ........................................................ 36, 38

*North Dakota v. EPA*,
   730 F.3d 750 (8th Cir. 2013) ................................................ 25

*Opulent Life Church v. City of Holly Springs*,
   697 F.3d 279 (5th Cir. 2012) ................................................ 40

*Pennhurst State Sch. & Hosp. v. Halderman*,
   451 U.S. 1 (1981) .................................................................. 35

*Premachandra v. Mitts*,
   753 F.2d 635 (8th Cir. 1985) ................................................ 36

*Prescott v. Rady Children's Hosp.-San Diego*,
   265 F. Supp. 3d 1090 (S.D. Cal. 2017) ................................. 39

*Price Waterhouse v. Hopkins*,
   490 U.S. 228 (1989) .................................................. 28, 29, 30

*Sharpe Holdings, Inc. v. U.S. Dep't of Health & Human Servs.*,
    801 F.3d 927 (8th Cir. 2015) ...........................................................*passim*

*Smith v. Rasmussen*,
    249 F.3d 755 (8th Cir. 2001) ................................................. 8, 19, 21, 36

*Solis v. Summit Contractors, Inc.*,
    558 F.3d 815 (8th Cir. 2009) ................................................................ 29

*Sommers v. Budget Mktg., Inc.*,
    667 F.2d 748 (8th Cir. 1982) ................................................................ 31

*South Dakota v. Dole*,
    483 U.S. 203 (1987) .............................................................................. 35

*Telescope Media Grp. v. Lucero*,
    936 F.3d 740 (8th Cir. 2019) ................................................................ 38

*Thomas v. Review Bd.*,
    450 U.S. 707 (1981) .............................................................................. 17

*Thompson Truck & Trailer, Inc. v. United States*,
    901 F.3d 951 (8th Cir. 2018) ................................................................ 26

*Tovar v. Essentia Health*,
    342 F. Supp. 3d 947 (D. Minn. 2018) .................................................... 39

*Ulane v. E. Airlines, Inc.*,
    742 F.2d 1081 (7th Cir. 1984) .............................................................. 31

*Union Pac. R.R. Co. v. Surface Transp. Bd.*,
    863 F.3d 816 (8th Cir. 2017) ................................................................ 27

*United States v. Goad*,
    788 F.3d 873 (8th Cir. 2015) ................................................................ 26

*United States v. Nature*,
    898 F.3d 1022 (9th Cir. 2018) .............................................................. 34

*United States v. Virginia*,
    518 U.S. 515 (1996) .............................................................................. 27

*Velasquez v. Barr*,
    No. 19-1148, 2020 WL 6290677 (8th Cir. Oct. 27, 2020) ...................... 26

*Walker v. Azar*,
    No. 20-cv-02834, 2020 WL 4749859 (E.D.N.Y. Aug. 17, 2020)................ 14, 28, 39

*Walker v. Azar*,
    No. 20-cv-02834, 2020 WL 6363970 (E.D.N.Y. Oct. 29, 2020) ............................ 14

*Washington v. U.S. Dep't of Health & Human Servs.*,
    No. 20-cv-01105 (W.D. Wash. filed July 16, 2020) ................................................ 13

*Washington v. U.S. Dep't of Health & Human Servs.*,
    No. C20-1105-JLR, 2020 WL 5095467 (W.D. Wash. Aug. 28, 2020) ......... 13-14, 39

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Human Servs.*,
    No. 20-cv-01630, 2020 WL 5232076 (D.D.C. Sept. 2, 2020) ............... 14, 15, 28, 40

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ................................................................................................ 38, 39

**Statutes**

5 U.S.C. § 706 ....................................................................................................... 25, 32

20 U.S.C. § 1681 ...................................................................................................*passim*

20 U.S.C. § 1687 ............................................................................................................ 12

20 U.S.C. § 1688 ..................................................................................................... 5, 11

29 U.S.C. § 794 .............................................................................................................. 25

42 U.S.C § 2000bb-1 ............................................................................................... 16, 19

42 U.S.C. § 2000d ......................................................................................................... 25

42 U.S.C. § 18116 ..................................................................................................*passim*

Health Care and Education Reconciliation Act of 2010,
    Pub. L. No. 111-152, 124 Stat. 1029 (2010) ............................................................. 4

Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124
    Stat. 119 (2010) ......................................................................................................... 4

Social Security Amendments of 1965, Pub. L. No. 89–97,
    79 Stat. 286 (1965) ................................................................................................... 36

**Regulations**

34 C.F.R. § 106.33 ................................................................................................... 27, 30

38 C.F.R. § 17.38 .......................................................................................................... 23

45 C.F.R. § 92.6 .......................................................................... 32, 33

45 C.F.R. § 92.206 ........................................................................... 14

44 Fed. Reg. 71,413 (Dec. 11, 1979) ........................................... 27

81 Fed. Reg. 31,376 (May 18, 2016) ...................................... *passim*

85 Fed. Reg. 37,160 (June 19, 2020) ..................................... *passim*

**Other Authorities**

118 Cong. Rec. 5808 (1972) ......................................................... 27

Correction to Bränström and Pachankis, Am. J. Psychiatry (Aug. 1,
    2020)............................................................................................ 21

Richard Bränström & John E. Pachankis, *Reduction in Mental Health
    Treatment Utilization Among Transgender Individuals After
    Gender-Affirming Surgeries: A Total Population Study*, Am. J.
    Psychiatry 177:8 (Aug. 2020) .................................................. 20

Raffaele Bugiardini et al., *Prior Beta-Blocker Therapy for Hypertension
    and Sex-Based Differences in Heart Failure Among Patients With
    Incident Coronary Heart Disease*, Am. Heart Ass'n J. (July 13, 2020) ............... 28

Janine Austin Clayton, *Applying the New SABV (Sex as a Biological
    Variable) Policy to Research and Clinical Care*, 187 Physiology &
    Behavior 2 (2018) .................................................................... 28

Edward S. Huang et al., *Long Term Use of Aspirin and the Risk of
    Gastrointestinal Bleeding*, U.S. Nat'l Library of Medicine (May
    2012)............................................................................................ 28

Fed. R. Civ. P. 56 ......................................................................... 15

*Sex,* 9 Oxford English Dictionary 578 (1961)............................ 26

*Sex,* American Heritage Dictionary (1976) ........................... 5, 26

*Sex,* Webster's Third New Int'l Dictionary (1971)..................... 26

Daphna Stroumsa et al., *The Power and Limits of Classification—A 32-
    Year-Old Man with Abdominal Pain*, New England J. Med. (May
    16, 2019)..................................................................................... 28

## INTRODUCTION

Section 1557 of the Affordable Care Act (ACA) prohibits any federally funded health program from engaging in sex discrimination. This means federally funded health programs are prohibited from engaging in practices that would treat men better than women, or vice versa.

The Department of Health and Human Services (HHS), however, interprets Section 1557 more broadly. It interprets "sex" discrimination to include discrimination based on "gender identity" or "termination of pregnancy." And based on this interpretation, HHS says doctors and hospitals must perform and pay for controversial gender transition procedures and abortions on pain of massive financial penalties—even when doing so would violate their religious beliefs and medical judgment.

HHS's sweeping interpretation of Section 1557 is unlawful for several reasons. First, it violates the Religious Freedom Restoration Act by forcing the Plaintiffs—including several Catholic healthcare providers—to violate their religious beliefs, without serving any compelling governmental interest. Second, it violates the Administrative Procedure Act by misinterpreting Section 1557 and failing to incorporate a statutorily mandated religious exemption. Third, it violates the Spending Clause by imposing unauthorized and coercive conditions on Plaintiff North Dakota.

Another federal court has already ruled that HHS's interpretation of Section 1557 is unlawful. *Franciscan All., Inc. v. Azar*, 414 F. Supp. 3d 928 (N.D. Tex. 2019). HHS initially agreed with that decision, and it attempted to walk back its interpretation of Section 1557 by promulgating a new Rule in 2020. However, that Rule has now been preliminarily enjoined by two federal courts, which have reinstated HHS's unlawful interpretation of Section 1557. And in the wake of the Supreme Court's recent decision in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), HHS itself has taken the position that Section 1557 forces doctors and hospitals like Plaintiffs to perform

1

and pay for potentially harmful gender transition procedures in violation of their religious beliefs and medical judgment. Indeed, the next Administration has already stated its intent to extend Section 1557 to "the LGBTQ+ community" and "reverse" "religious exemptions" for "medical providers."

Accordingly, Plaintiffs seek relief from this Court. Specifically, they request declaratory relief and a permanent injunction prohibiting HHS from interpreting and enforcing Section 1557 in a way that would force Plaintiffs to perform or pay for gender transition procedures and abortions. At a minimum, they request a preliminary injunction no later than January 20, 2021—which is the date on which a new Administration can begin imposing financial penalties.

## STATEMENT OF FACTS

### A. Plaintiffs

Plaintiffs are four private Catholic organizations and one State that are adversely affected by Defendants' ("HHS") interpretation of Section 1557. Plaintiff **Religious Sisters of Mercy** is a Catholic order of religious sisters devoted to works of mercy, including offering healthcare to the underserved. Ex.A ¶2. Each sister has chosen to follow Jesus Christ by taking a lifetime vow to serve the poor and sick by caring for the whole person—including physical, psychological, intellectual, and spiritual woundedness. *Id.* ¶4. As part of their mission, they seek "to bring about that profound and extensive healing which is a continuation of the work of redemption." Ex.A ¶4; *see, e.g.*, Ex.F-1. Consistent with this mission, some of the sisters serve as licensed healthcare professionals in healthcare facilities throughout the country. Ex.A ¶5-6.

The Religious Sisters of Mercy own and operate a clinic that is also a Plaintiff—**Sacred Heart Mercy Health Care Center** in Alma, Michigan. *Id.* ¶6. Sacred Heart is incorporated as a religious nonprofit. *Id.* The clinic furthers the sisters' mission to care for the elderly and the poor by serving Medicare and Medicaid patients and by providing low-cost or free care to the uninsured. *Id.* ¶8. Some of the sisters work in

the clinic as doctors, nurses, or other healthcare professionals. *Id.* ¶6. Sacred Heart shares the Religious Sisters of Mercy's beliefs and is run in accordance with the U.S. Conference of Catholic Bishops' Ethical and Religious Directives for Catholic Health Care Services. *Id.*

Plaintiff **SMP Health System** is a nonprofit Catholic health system headquartered in Valley City, North Dakota, and founded and sponsored by the Sisters of Mary of the Presentation. Ex.B ¶3. The sisters believe that Catholic healthcare services and programs are ecclesial in nature, mandated by the Church to carry on the healing ministry of Jesus. Ex.F-2. As part of that healing ministry, SMP Health provides a variety of healthcare services throughout North Dakota, including critical-access hospitals, clinics, long-term care facilities, and senior housing. Ex.B ¶3. It has a special emphasis on providing services to the poor and elderly, including many Medicare and Medicaid patients. Ex.B ¶4. SMP Health shares the beliefs of the sisters and also operates in accordance with the Ethical and Religious Directives for Catholic Health Care Services. Ex.B ¶5.

Plaintiff **University of Mary** is a Roman Catholic, Benedictine University with its main campus in Bismarck, North Dakota. The University infuses all its programs with Christian, Catholic, Benedictine values to prepare its students to be ethical leaders in their communities. Ex.C ¶6. The University welcomes students of all faiths and backgrounds, and, as is fundamental to its mission, upholds Catholic teaching in all its programs. *Id.* The University is subject to HHS's interpretations of Section 1557 because it offers a nursing program that receives funding administered by HHS. Ex.C ¶8. It also has a student health clinic. Ex.C ¶10.

Like the Catholic Church they serve, these Plaintiffs believe that every man and woman is created in the image of God and reflects God's image in unique—and uniquely dignified—ways. Ex.A ¶9; Ex.B ¶6; Ex.C ¶9. To the extent they provide

medical services, Plaintiffs serve everyone in need, including transgender individuals. Ex.A ¶7; Ex.E ¶4. They also believe that gender-transition procedures can be deeply harmful to their patients; thus, providing those procedures would violate their religious beliefs and medical judgment. Ex.D ¶¶9-11; Ex.B ¶8; Ex.E ¶5. They also have similar religious and medical objections to providing abortions or sterilizations. Ex.B ¶¶9-10; Ex.E ¶¶8-9.

Plaintiff **State of North Dakota** oversees and controls several agencies and a healthcare facility that receive federal funding administered by HHS. Ex.G ¶4. North Dakota also employs many healthcare professionals and provides health benefits to those employees and their families. HHS's construction of Section 1557 will require North Dakota to provide gender-transition procedures, even when its doctors believe such procedures are harmful. *Id*. ¶7. If North Dakota's doctors have a religious objection to performing those procedures, HHS's interpretation of Section 1557 would make it illegal for the State to accommodate those doctors' religious beliefs, even though Title VII would otherwise require it to do so. HHS's regulations will also require North Dakota to provide insurance coverage for transition procedures and abortions, as well as training, at significant financial cost. If North Dakota does not comply, it faces significant financial penalties, including loss of federal funding and private lawsuits for damages and attorneys' fees. *Id.*

### B. The Affordable Care Act and Section 1557

In March 2010, Congress enacted the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010), and the Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029, collectively known as the "Affordable Care Act" or "ACA." The key provision at issue in this case is Section 1557 of the ACA, which forbids "discrimination" in healthcare

Specifically, Section 1557 prohibits "discrimination under[] any health program or activity, any part of which is receiving Federal financial assistance." 42 U.S.C.

§ 18116(a). But Section 1557 itself does not specify the grounds on which discrimination is prohibited. Instead, it incorporates the "ground[s] prohibited" under four other federal antidiscrimination statutes—(1) "title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d *et seq.*)" (*i.e.*, "race, color, or national origin"); (2) "title IX of the Education Amendments of 1972 (20 U.S.C. 1681 *et seq.*)" (*i.e.*, "sex"); (3) "the Age Discrimination Act of 1975 (42 U.S.C. 6101 *et seq.*)" (*i.e.*, "age"); and (4) "section 794 of Title 29" (*i.e.*, "disability"). Section 1557's sole basis for prohibiting sex discrimination, then, is its reference to Title IX.

Congress enacted Title IX in 1972, prohibiting discrimination in certain education programs on the basis of "sex." 20 U.S.C. § 1681(a). Title IX expressly exempts religious organizations from complying with the statute and precludes interpreting "sex" to mean abortion. 20 U.S.C. § 1681(a)(3); 20 U.S.C. § 1688.

At the time of Title IX's enactment, the term "sex" was commonly understood to refer to the physiological differences between men and women, particularly with respect to reproductive functions. *See, e.g.*, American Heritage Dictionary 1187 (1976) ("The property or quality by which organisms are classified according to their reproductive functions."). That understanding is reflected throughout the statute, which requires equal treatment with respect to two different "sexes"—male and female. 20 U.S.C. § 1681(a)(2); *see also id.* § 1681(a)(8) (requiring comparable activities between students of "one sex" and "the other sex"). The law has long been interpreted to prohibit federally funded education programs from treating men better than women, or vice versa. *See, e.g.*, *Cannon v. Univ. of Chicago*, 441 U.S. 677, 680 (1979); *Chalenor v. Univ. of N.D.*, 291 F.3d 1042, 1044 (8th Cir. 2002).

### C. The 2016 Rule

On May 18, 2016, after notice and comment, HHS issued a rule interpreting Section 1557. Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31,376 (May 18, 2016) (the "2016 Rule"). The 2016 Rule applies to any "entity that operates

a health program or activity, any part of which receives Federal financial assistance."
81 Fed. Reg. at 31,466 (definition of "Covered entity"). "Federal financial assistance"
is defined broadly to include "any grant, loan, credit, subsidy, contract … or any other
arrangement" by which the federal government makes available its property or funds.
*Id.* at 31,467. Thus, by HHS's own estimate, the 2016 Rule applies to almost every
healthcare provider in the country—including over 133,000 health care facilities
(such as hospitals and health clinics) and "almost all licensed physicians"—because
they all accept some form of federal funding, such as Medicare or Medicaid. *Id.* at
31,445-46.

The 2016 Rule prohibits discrimination "on the basis of … sex," defines "sex" to
include "gender identity," and defines "gender identity" as an individual's "internal
sense of gender, which may be male, female, neither, or a combination of male and
female." *Id.* at 31,467. The 2016 Rule also defines "sex" to include discrimination
based upon "termination of pregnancy." *Id.*

**Medical Procedures.** The 2016 Rule interprets Section 1557 to require covered
entities to perform medical transition procedures (such as hysterectomies, mastecto-
mies, hormone treatments, plastic surgery, and other treatments designed to alter a
patient's body in response to gender dysphoria) or else be liable for "discrimination."
As HHS explained: "A provider specializing in gynecological services that previously
declined to provide a medically necessary hysterectomy for a transgender man would
have to revise its policy to provide the procedure for transgender individuals in the
same manner it provides the procedure for other individuals." 81 Fed. Reg. at 31,455.
In other words, if a gynecologist performs a hysterectomy for a woman with uterine
cancer, she must do the same for a woman who wants to remove a healthy uterus to
transition to living as a man. Thus, according to HHS, declining to remove a healthy
organ is "discrimination." HHS explains that this reasoning applies across the full
"range of transition-related services." *Id.* at 31,435. This "is not limited to surgical

6

treatments and may include, but is not limited to, services such as hormone therapy and psychotherapy, which may occur over the lifetime of the individual." *Id.* at 31,435-36.

In addition, because the 2016 Rule interprets Section 1557 to prohibit discrimination on the basis of "termination of pregnancy," it pressures healthcare providers who perform procedures such as a dilation and curettage for a miscarriage to perform the same procedure for an abortion.

**Insurance Coverage**. The 2016 Rule also interprets Section 1557 to require covered entities to pay for medical transition procedures in their health-insurance plans. The 2016 Rule states: "A covered entity shall not, in providing or administering health-related insurance … [h]ave or implement a categorical coverage exclusion or limitation for all health services related to gender transition." *Id.* at 31,471-72. According to HHS, this means that a plan excluding "coverage for all health services related to gender transition is unlawful on its face." *Id.* at 31,429. In addition, if a doctor concludes that a hysterectomy "is medically necessary to treat gender dysphoria," the patient's employer would be required to cover that procedure on the same basis that it would cover a hysterectomy for other conditions (like cancer). *Id.* Also, because the 2016 Rule prohibits discrimination on the basis of "termination of pregnancy," it pressures employers who cover procedures such as a dilation and curettage for a miscarriage to cover the same procedure for an abortion.

**Enforcement**. If a covered entity violates Section 1557, it is subject to the same penalties that accompany a violation of Title IX. 42 U.S.C. § 18116(a). These include the loss of federal funding (Medicare and Medicaid alone can total many millions of dollars), debarment from doing business with the government, and false-claims liability. 81 Fed. Reg. at 31,472. Penalties also include enforcement proceedings brought by the Department of Justice, *id.* at 31,440, and private lawsuits for damages and attorneys' fees. *Id.* at 31,472.

7

HHS adopted this novel interpretation of Section 1557 despite "significant disagreement within the medical community" as to the "necessity and efficacy" of gender-transition procedures in the first place. *Gibson v. Collier*, 920 F.3d 212, 216, 224 (5th Cir. 2019); *Smith v. Rasmussen*, 249 F.3d 755, 760-61 (8th Cir. 2001) (recognizing "the lack of consensus in the medical community" regarding "sex reassignment surgery"). And HHS did this despite the fact that HHS's own medical experts recommended against mandating coverage of gender-reassignment surgery in Medicare—concluding after "a thorough review of the clinical evidence" that "there is not enough evidence to determine whether gender reassignment surgery improves health outcomes for Medicare beneficiaries with gender dysphoria," and some studies "reported harms." ECF No. 6-6; *see* ECF No. 6-7.

Despite this medical disagreement, and to say nothing of obvious implications for religious healthcare providers, HHS nonetheless declined to include a religious exemption or provide any mechanism by which a religious entity could determine if it was entitled to any existing religious protections under the law. 81 Fed. Reg. at 31,376. The 2016 Rule also failed to include an abortion exemption.

**D. Lawsuits Challenging the 2016 Rule**

After the 2016 Rule was finalized, multiple plaintiffs brought lawsuits challenging it. In August 2016, a coalition of States, religious hospitals, and religious healthcare professionals sued in the Northern District of Texas. *Franciscan All., Inc. v. Burwell*, No. 16-cv-108, ECF No. 1 (N.D. Tex. filed Aug. 23, 2016). On November 6, 2016, Plaintiffs filed this lawsuit challenging the 2016 Rule, ECF No. 1, and on December 28, 2016, another suit was filed in this District, *Catholic Benefits Assoc. v. Burwell*, No. 16-cv-432, ECF No. 1 (D.N.D. filed Dec. 28, 2016). These two District of North Dakota suits were eventually consolidated before this Court. ECF No. 37.

*Franciscan* proceeded first, and on December 31, 2016, the district court prelimi-

8

narily enjoined HHS from enforcing the 2016 Rule's prohibition against discrimination on the basis of "gender identity" and "termination of pregnancy." *Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660, 670 (N.D. Tex. 2016). The court concluded that HHS's "implement[ation] of Section 1557" had likely violated RFRA by "plac[ing] substantial pressure on [plaintiffs] to perform and cover transition and abortion procedures" without its action being narrowly tailored to a compelling government interest. *Id.* at 672, 691-93. The court also agreed that the 2016 Rule exceeded HHS's statutory authority by defining "sex" discrimination under Section 1557 to include discrimination on the basis of "gender identity" and by not incorporating Title IX's religious and abortion exemptions. *Id.* at 687-91.

Meanwhile, this Court issued orders staying enforcement of the 2016 Rule against Plaintiffs. ECF Nos. 23, 36. This Court noted that the *Franciscan* court had issued a nationwide preliminary injunction prohibiting HHS from enforcing the 2016 Rule and specifically found "the order issued in *Franciscan Alliance* to be thorough and well-reasoned." ECF No. 36 at 2.

Following these decisions, HHS filed motions for voluntary remand and to stay in these consolidated cases and in *Franciscan*. It requested "the opportunity to reconsider the regulation at issue … based in part on the Administration's desire to assess the reasonableness, necessity, and efficacy" of the 2016 Rule and "to address certain issues identified by [the *Franciscan*] court in granting a preliminary injunction against those aspects of the regulation." ECF No. 45 at 1. Both this Court and the *Franciscan* court granted HHS's motions to stay.

In December 2018, however, following 17 months of inaction, the *Franciscan* court lifted the stay of litigation. In May 2019, after the plaintiffs there had filed motions for summary judgment, HHS issued a Notice of Proposed Rulemaking proposing to amend the 2016 Rule. *Franciscan,* No. 16-cv-108, ECF No. 159 (N.D. Tex. May 31, 2019). The proposed rule noted that Section 1557 should "not be applied in a manner

9

that conflicts with or supersedes … statutes protecting conscience and religious free-
dom" and acknowledged the *Franciscan* court's conclusion that the prior rule violated
RFRA. *Id.* at 10-11, 75. Additionally, upon "further consideration of this issue," HHS
stated that "enforcement of Section 1557 … must be constrained by the statutory
contours of Title IX, which include explicit abortion and religious exemptions." *Id.* at
76. Finally, the proposed rule noted that the 2016 Rule's definition of "sex" "exceeded
[HHS's] authority under Section 1557." *Id.* at 15. The proposed rule sought to address
this issue by repealing the 2016 Rule's definition of "sex" in its entirety, which would
allegedly "allow the Federal courts, in particular, the U.S. Supreme Court to resolve
any dispute about the proper legal interpretation of" "sex" in Section 1557. *Id.* at 112-
13. As the proposed rule noted, the Supreme Court had recently granted certiorari to
decide whether "sex" discrimination under Title VII included discrimination on the
basis of "sexual orientation" and "gender identity," in three cases that would be de-
cided together as *Bostock*. *Id.* at 40-41.

On October 15, 2019, the *Franciscan* court granted summary judgment for the
plaintiffs. 414 F. Supp. 3d 928. The court found "no reason to depart from its" prelim-
inary-injunction analysis on the merits, holding that the 2016 Rule violated both
RFRA and the APA. *Id.* at 942. The court concluded, however, that the proper remedy
was vacatur of "the unlawful portions of" the 2016 Rule, "not a permanent injunction."
*Id.* at 944-45; *see Franciscan*, No. 16-cv-108, ECF No. 182 (N.D. Tex. Nov. 21, 2019)
(clarifying that the 2016 Rule was vacated "insofar as [it] defines '*On the basis of sex*'
to include gender identity and termination of pregnancy"). HHS did not appeal the
court's ruling on the merits; the plaintiffs, however, appealed the denial of injunctive
relief to the Fifth Circuit, where briefing on the appropriate form of relief is currently
underway. *Franciscan All., Inc. v. Azar*, No. 20-10093 (5th Cir. filed Jan. 24, 2020).

**E. The 2020 Rule**

On June 12, 2020, HHS issued a new rule interpreting Section 1557, finalizing the

rule proposed in 2019. *See* Nondiscrimination in Health and Health Education Programs or Activities, 85 Fed. Reg. 37,160 (June 19, 2020) (the "2020 Rule"). HHS noted that the 2020 Rule was promulgated in part in response to the *Franciscan* court's orders and to address deficiencies identified in the 2016 Rule.

Most importantly, the 2020 Rule repealed the 2016 Rule's definition of "sex" discrimination, which included, among other things, discrimination based on "termination of pregnancy" and "gender identity," as well as "sex stereotyping." *Id*. at 37,167. HHS concluded that "the 2016 Rule's extension of sex-discrimination protections to encompass gender identity was contrary to the text of Title IX." *Id*. at 37,168.

HHS, however, declined to replace the 2016 Rule's definition of "sex" with a new definition, reasoning instead that the Supreme Court's then-forthcoming decision in *Bostock* would "likely have ramifications for the definition of 'on the basis of sex' under Title IX." *Id.*; *see also id.* ("[T]his rule … does not define sex[.]"); *id.* at 37,178 ("This final rule repeals the 2016 Rule's definition of 'on the basis of sex,' but declines to replace it with a new regulatory definition."). HHS clarified that simply repealing the 2016 Rule's prior definition would then permit "application of the [*Bostock*] Court's construction." *Id.* at 37,168.

The 2020 Rule also included provisions addressing abortion and religious organizations. First, on abortion, HHS explained that the Section 1557 regulations are to be implemented consistent with the abortion neutrality exemption in Title IX, which states that nothing in Title IX "shall be construed to require or prohibit any person, or public or private entity, to provide or pay for any benefit or service, including the use of facilities, related to an abortion." 20 U.S.C. § 1688; 85 Fed. Reg. at 37,192. HHS noted that its decision to incorporate Title IX's abortion-neutrality exemption into the 2020 Rule was also justified by the *Franciscan* court's decision "vacat[ing] the 'termination of pregnancy' language in the 2016 Rule because it failed to incorporate the abortion-neutrality language from" Title IX. *Id*. at 37,193.

11

Second, on religious organizations, HHS recognized that its Section 1557 regulations must be "consistent with Title IX and its implementing regulations," *id.* at 37,192, and that Title IX itself states that "this section shall not apply to an educational institution which is controlled by a religious organization if the application of this subsection would not be consistent with the religious tenets of such organization." 20 U.S.C. § 1681(a)(3); 20 U.S.C. § 1687(4) (Title IX covers defined "program[s] or activit[ies]" but "does not include any operation of an entity which is controlled by a religious organization if the application of section 1681 of this title to such operation would not be consistent with the religious tenets of such organization"). Nonetheless, HHS declined to include in the text of the 2020 Rule "a religious exemption, whether narrow or broad," 85 Fed. Reg. at 37,205, and instead purported to incorporate by reference Title IX's religious exemption for "[a]ny *educational operation* of an entity … control[led] by a religious organization." *Id.* at 37,207 (emphasis added). On HHS's view, then, this exemption would not protect the Religious Sisters of Mercy, Sacred Heart Mercy Health Care Center, or SMP Health.

Finally, as relevant here, the 2020 Rule "eliminat[ed] the [2016 Rule's] language specifying a right to sue," but took no position "on the issue of whether Section 1557 provides a private right of action." *Id.* at 37,203. Rather, HHS claimed that "the issue of whether a person has a right to sue in Federal court under Section 1557 is one determined by the courts themselves and not by [HHS's] regulations." *Id.* at 37,236. "To the extent that Section 1557 permits private rights of action, plaintiffs can assert claims under Section 1557 itself rather than under [HHS's] Section 1557 regulation." *Id.* at 37,203. Thus, the 2020 Rule does not bar a plaintiff from bringing a private action to enforce Section 1557.

## F. *Bostock* and Recent Lawsuits Challenging the 2020 Rule

On June 15, 2020, three days after HHS issued the new 2020 Rule, the Supreme

Court decided *Bostock*. 140 S. Ct. 1731. The Court held that when "an employer … fires someone simply for being homosexual or transgender," the employer has "discriminated against that individual 'because of such individual's sex'" within the meaning of Title VII. *Id.* at 1753. The Court cautioned, however, that its opinion did not "prejudge" the proper interpretation of "other federal or state laws that prohibit sex discrimination," *id.*, including Section 1557 and Title IX, *see id.* at 1779-82 & n.57 (Alito, J., dissenting). And the *Bostock* Court explained it was "deeply concerned with preserving the promise of the free exercise of religion," stating that religious employers might not be liable under Title VII "in cases like ours" if complying would require them "to violate their religious convictions." *Id.* at 1753-54.

Following the Supreme Court's ruling, plaintiffs in at least five different lawsuits sued HHS, challenging the 2020 Rule based on *Bostock* and seeking restoration of the 2016 Rule, in whole or in part. *See Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Human Servs.*, No. 20-cv-01630 (D.D.C. filed June 22, 2020); *Walker v. Azar*, No. 20-cv-02834 (E.D.N.Y. filed June 26, 2020); *Boston All. of Gay, Lesbian, Bisexual & Transgender Youth v. U.S. Dep't of Health & Human Servs.*, No. 20-cv-11297 (D. Mass. filed July 9, 2020); *Washington v. U.S. Dep't of Health & Human Servs.*, No. 20-cv-01105 (W.D. Wash. filed July 16, 2020); *New York v. U.S. Dep't of Health & Human Servs.*, No. 20-cv-05583 (S.D.N.Y. filed July 20, 2020).

In two lawsuits, plaintiffs alleged that "sex" discrimination included discrimination based on "termination of pregnancy" and "gender identity" and that HHS's incorporation of exemptions was contrary to Section 1557. *Boston All.*, No. 20-cv-11297, ECF No. 1 ¶¶228-56, 271-83 (D. Mass. July 9, 2020); *New York*, No. 20-cv-05583, ECF No. 1 ¶86(a)-(f) (S.D.N.Y. July 20, 2020).

In another case, brought by the State of Washington, the court dismissed for lack of standing. *Washington v. U.S. Dep't of Health & Human Servs.*, No. C20-1105-JLR,

13

2020 WL 5095467, at *8 (W.D. Wash. Aug. 28, 2020). The court concluded that Washington lacked Article III standing because, in light of *Bostock*, it was possible that "Title IX and Section 1557 … incorporate protection for gender identity and sexual orientation discrimination" such that "the 2020 Rule does, in fact, extend protection against discrimination to LGBTQ individuals via the Rule's incorporation of Title IX by reference." *Id.*

In the remaining two cases, the district courts entered "overlapping injunctions," *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Human Servs.*, No. 20-cv-01630, 2020 WL 5232076, at *41 (D.D.C. Sept. 2, 2020) (quotation marks omitted), preventing the 2020 Rule "from becoming operative" and reinstating portions of the 2016 Rule, *Walker v. Azar*, No. 20-cv-02834, 2020 WL 4749859, at *1 (E.D.N.Y. Aug. 17, 2020).

One of these courts acknowledged that it had "no power to revive a rule vacated by another district court," referring to *Franciscan. Id.* at *7. Nevertheless, the court "predict[ed] that either the district court or some higher authority w[ould] revisit the vacatur," and then specifically held that portions of the 2016 Rule vacated by the *Franciscan* court—including "the definitions of 'on the basis of sex,' 'gender identity,' and 'sex stereotyping'"—"remain in effect." *Id.* at *7, *10; *see also Walker v. Azar*, No. 20-cv-02834, 2020 WL 6363970, *4 (E.D.N.Y. Oct. 29, 2020) (also enjoining repeal of the former 45 C.F.R. § 92.206).

The other district court indicated that a portion of the 2016 Rule purportedly not vacated by the *Franciscan* court—namely, the provision defining "sex" to include "sex stereotyping"—independently prohibits "[d]iscrimination based on transgender status—*i.e.*, gender identity." *Whitman-Walker*, 2020 WL 5232076, at *23, *45. The court therefore enjoined the 2020 Rule's repeal of this portion of the 2016 Rule in light of *Bostock*, "le[aving] … the 2016 Rule's prohibition on discrimination based on sex stereotyping"—which, again, the court had just said would also prohibit gender-identity

14

discrimination—in effect. *Id.* at *14.

Finally, the *Whitman-Walker* court also enjoined the 2020 Rule's incorporation of the religious exemption from Title IX, even though the *Franciscan* court held that the 2016 Rule was arbitrary and capricious for *not* including Title IX's religious exemption. *Id.* at *27-29.

Recognizing that these new developments expose them to liability, Plaintiffs moved to lift the stay in these consolidated cases, which the Court granted. ECF No. 93. Plaintiffs now move for partial summary judgment (on Counts I-V, XIII, and XV of their amended complaint (ECF No. 95) and to permanently enjoin HHS from interpreting and enforcing Section 1557 to require them to provide or cover gender transition procedures and abortions. At a minimum, given that the incoming administration has pledged to enforce Section 1557 on behalf of "the LGBTQ+ community" and to "reverse" "religious exemptions" for "medical providers" (Ex.F-10.), Plaintiffs request a preliminary injunction no later than January 20, 2021—the date on which the new Administration can begin punishing them under Section 1557.

## ARGUMENT

Plaintiffs are entitled to summary judgment on their RFRA, APA, and Spending Clause claims. And because Plaintiffs satisfy all four factors necessary for injunctive relief, this Court should also grant a permanent injunction.

"Summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Mahler v. First Dakota Title Ltd. P'ship*, 931 F.3d 799, 804 (8th Cir. 2019) (citing Fed. R. Civ. P. 56(a)).

"The standard for granting a permanent injunction is essentially the same as for a preliminary injunction, except that to obtain a permanent injunction the movant must attain success on the merits." *Bank One, Utah v. Guttau*, 190 F.3d 844, 847 (8th Cir. 1999). Thus, in addition to (1) actual success on the merits, courts also consider (2) the threat of irreparable harm to the movant, (3) the balance of harms between

the parties, and (4) the public interest. *Sharpe Holdings, Inc. v. U.S. Dep't of Health & Human Servs.*, 801 F.3d 927, 936-37 (8th Cir. 2015), *vacated on other grounds, Dept. of Health & Human Servs. v. CNS Int'l Ministries*, No. 15-775, 2016 WL 2842448 (U.S. May 16, 2016).

## I.  As interpreted by HHS, Section 1557 violates RFRA.

Section 1557—as interpreted by HHS and other courts to prohibit discrimination based on "gender identity" and "termination of pregnancy"—violates RFRA. RFRA provides "very broad protection for religious liberty." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 683 (2014). Under RFRA, "Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person … is the least restrictive means of furthering [a] compelling governmental interest." 42 U.S.C. § 2000bb-1(b)-(b)(2).

RFRA claims proceed in two steps. First, the Court must determine whether the government has imposed a "substantial burden" on the plaintiffs' religious exercise. Second, if so, the government must satisfy strict scrutiny—*i.e.*, it must "'demonstrate[] that application of the burden to the person' represents the least restrictive means of advancing a compelling interest." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 423 (2006) (quoting 42 U.S.C. § 2000bb-1(b)). Here, as interpreted by HHS, Section 1557 substantially burdens Plaintiffs' religious exercise by requiring Plaintiffs, on pain of massive financial liability, to perform and pay for controversial medical procedures in violation of their religious beliefs. And as applied to Plaintiffs, Section 1557 does not even come close to satisfying strict scrutiny.

### A.  HHS's interpretation of Section 1557 substantially burdens Plaintiffs' religious exercise.

The government substantially burdens religious exercise "when it 'conditions receipt of an important benefit upon conduct proscribed by a religious faith'" or "impos[es] … significant monetary penalties" on "adhere[nce] to [one's religious] beliefs."

16

*Sharpe Holdings*, 801 F.3d at 937 (quoting *Thomas v. Review Bd.*, 450 U.S. 707, 717-18 (1981)). That's just what HHS has done here. Because of their religious beliefs, Plaintiffs cannot perform or pay for gender transitions or abortions. Yet under Section 1557 as interpreted by HHS, if they decline to do so, they will forfeit "important benefit[s]"—millions of dollars in federal funding—and be subject to significant "penal[ties]"—*e.g.*, enforcement proceedings and treble damages. *Id.*

Plaintiffs' beliefs have never been in dispute. Plaintiffs are Catholic organizations that provide healthcare and health insurance consistent with their faith. Ex.A ¶¶3-5, 9-12, 15-18; Ex.B ¶¶3-11; Ex.C ¶¶4, 6, 9-13. Consistent with their beliefs, Plaintiffs care for transgender individuals with compassion and respect. Ex.A ¶7; Ex.B ¶7; Ex.D ¶5. And Plaintiffs believe medical transition procedures are not just contrary to God's plan for human sexuality but also experimental, potentially harmful, and thus not in their patients' best interests. Ex.A ¶¶11-12; Ex.B ¶8; Ex.D ¶¶9-13. They therefore cannot, in accordance with their religious beliefs and medical judgment, participate in transition procedures, although they provide health services that are routinely requested as part of a gender transition. Ex.D ¶¶9-11; Ex.B ¶8; Ex.E ¶5.

Plaintiffs similarly cannot participate in elective abortion or sterilization. Ex.B ¶¶9-10. Plaintiffs offer procedures for women who have miscarried a baby, such as dilation and curettage, that can also be used to perform an abortion. Ex.B ¶10. But because of their religious beliefs regarding the sanctity of human life, they cannot offer these services in furtherance of an abortion.

Nor can they provide health benefits coverage for any of these procedures without violating their religious beliefs. Ex.A ¶15; Ex.B ¶11; Ex.C ¶14. Plaintiffs believe that just as they cannot perform these procedures themselves, they cannot insure them either; to do so would be to harm their employees and violate their beliefs. Ex.A ¶¶15-18; Ex.B ¶11; Ex.C ¶14.

HHS's action substantially burdens Plaintiffs' religious exercise by "pressur[ing]"

17

them to abandon it on pain of "significant monetary penalties." *Sharpe Holdings*, 801 F.3d at 937. According to HHS's interpretation of Section 1557, it is illegal "sex" discrimination for Plaintiffs to decline to perform or insure gender transitions and abortions, at least if they would (as Plaintiffs do) perform or insure the same medical procedures for other purposes. 81 Fed. Reg. at 31,435-36; *see id.* at 31,429. If Plaintiffs adhere to their beliefs nonetheless, they face the loss of Medicare, Medicaid, and other federal funds, 81 Fed. Reg. at 31,472; debarment from federal contracting; enforcement proceedings brought by the Department of Justice; liability under the False Claims Act, including treble damages, *id.* at 31,440; and private lawsuits brought by patients or employees for damages and attorneys' fees, *id.* at 31,472.

Penalties like these are the quintessential substantial burden. In *Hobby Lobby*, for example, the Court said that because the Affordable Care Act provision there "force[d] [plaintiffs] to pay an enormous sum of money … if they insist on providing insurance coverage in accordance with their religious beliefs, [it] clearly impose[d] a substantial burden on those beliefs." 573 U.S. at 726. Similarly, in *Sharpe Holdings*, the Eighth Circuit held that when "the government imposes a direct monetary penalty to coerce conduct that violates religious belief"—there, as here and in *Hobby Lobby*, facilitating religiously objectionable health insurance—"there has never been a question" that that is a substantial burden. 801 F.3d at 938 (cleaned up).

This is an *a fortiori* case. HHS's interpretation of Section 1557 imposes the same sort of enormous financial penalties on religious exercise as in *Hobby Lobby* and *Sharpe Holdings*. Yet here, Plaintiffs are not only forced to "provid[e] insurance coverage," they are also forced to perform the procedures themselves. *Hobby Lobby*, 573 U.S. at 726. As the court held in *Franciscan*: "The [Section 1557] Rule places substantial pressure on Plaintiffs to perform and cover transition and abortion procedures … Accordingly, the Rule imposes a substantial burden." 227 F. Supp. 3d at 692.

18

**B. HHS's interpretation of Section 1557 fails strict scrutiny.**

Because Section 1557 as applied here imposes a substantial burden on Plaintiffs' religious exercise, the only question is whether HHS satisfies strict scrutiny. If not, Plaintiffs are "entitled to an exemption." *Hobby Lobby*, 573 U.S. at 694-95.

Strict scrutiny is "'exceptionally demanding.'" *Sharpe Holdings*, 801 F.3d at 943 (quoting *Hobby Lobby*, 573 U.S. at 728). HHS first must demonstrate that applying its interpretation of Section 1557 to Plaintiffs furthers an interest "of the highest order." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993). Then it "bear[s] the burden of demonstrating that" its actions are "the least restrictive means of achieving" that interest." *Hamilton v. Schriro*, 74 F.3d 1545, 1552 (8th Cir. 1996) (citing 42 U.S.C. § 2000bb-1(b)). HHS can carry neither burden here.

**1. HHS's interpretation furthers no compelling interest.**

First, HHS can't show a compelling interest in forcing Plaintiffs to perform and insure gender transitions and abortions. Indeed, HHS has conceded as much, stating that in light of the lack of "medical consensus" as to proper gender-dysphoria treatment, it "sees no compelling interest in forcing the provision, or coverage, of these medically controversial services by covered entities." 85 Fed. Reg. at 37,188.

HHS's concession is correct. This Circuit has already recognized "the lack of consensus in the medical community" regarding procedures like "sex reassignment surgery." *Smith*, 249 F.3d at 760-61. And "sex reassignment surgery remains one of the most hotly debated topics within the medical community today." *Gibson v. Collier*, 920 F.3d 212, 216, 224 (5th Cir. 2019). HHS can't have a compelling interest in mandating as a matter of antidiscrimination law that every doctor in the country take one side in this debate.

In fact, HHS itself has expressed doubt about the efficacy and necessity of transition procedures. Even before promulgating the 2016 Rule, HHS's own experts recognized: "Based on a thorough review of the clinical evidence available," "there is not

*enough evidence to determine whether gender reassignment surgery improves health outcomes* for [patients] with gender dysphoria." ECF No. 6-6 (emphasis added). Instead, "[t]here were conflicting (inconsistent) study results—of the best designed studies, some reported benefits while *others reported harms*." *Id.* (emphasis added).

The harms are especially pronounced for children. As guidance documents HHS relied on in the 2016 Rule explain: "Gender dysphoria during childhood does not inevitably continue into adulthood"; rather, the desistence rate appears to be as high as 94%.[1] HHS cannot have a compelling interest in requiring Plaintiffs to provide children with cross-sex hormones and other irreversible transition procedures if gender dysphoria for the overwhelming majority of them will resolve on its own.

For adults, too, the risks are significant. The Institute of Medicine has noted that hormone therapy may result in "increased risk" of "breast, ovarian, uterine, or prostate cancer." Ex.F-4 at 264. WPATH likewise has explained that hormone therapy is associated with increased risk of cardiovascular disease, Type 2 diabetes, gallstones, venous thromboembolic disease, and hypertension. ECF No. 6-8 at 40. Risks like these are exactly why Plaintiffs view gender-transition procedures as "experimental" and potentially "harmful for patients." Ex.A ¶11; Ex.D ¶9.

Controversy over the efficacy of gender-transition procedures has only grown since publication of the 2016 Rule. In October 2019, for example, researchers from the Yale School of Public Health published in the American Journal of Psychiatry the "first total population study" analyzing the long-term effects of "gender-affirming hormone and surgical interventions" on mental health.[2] Although the study's authors initially claimed to find a benefit from surgery—a finding touted in the media—the journal

---

[1] ECF No. 6-8 at 11 (cited in 81 Fed. Reg. at 31,435 n.263)).

[2] Richard Bränström & John E. Pachankis, *Reduction in Mental Health Treatment Utilization Among Transgender Individuals After Gender-Affirming Surgeries: A Total Population Study*, Am. J. Psychiatry 177:8, 727 (Aug. 2020).

later issued a correction, noting flaws in its "statistical methodology" and acknowledging that the data "demonstrated no advantage of surgery in relation to subsequent mood or anxiety disorder-related health care."[3] This correction aligned with the study's original finding that hormonal treatments, too, offered no advantage.[4]

Likewise, the UK's National Health Service recently shifted its guidance on puberty blockers for children, going from stating that their consequences are "fully reversible" to acknowledging "[l]ittle is known about the long-term side effects." Ex.F-6; Ex.F-7. And the Department of Defense in 2018 found there is "considerable scientific uncertainty and overall lack of high quality scientific evidence demonstrating the extent to which transition-related treatments, such as cross-sex hormone therapy and sex reassignment surgery[,] … remedy the multifaceted mental health problems associated with gender dysphoria." Ex.F-8.

Given "the lack of consensus in the medical community," *Smith*, 249 F.3d at 760-61, and the well documented harms from gender transition procedures, HHS has no interest, much less an "interest[] of the highest order" (*Lukumi*, 508 U.S. at 546 (cleaned up)), in punishing as "discriminators" those who, like Plaintiffs, believe based on their medical judgment that such procedures can be harmful.

Nor do any of the other interests HHS originally offered (though has now abandoned) qualify as compelling under RFRA. First, HHS claimed in 2016 that it had "a compelling interest in ensuring that individuals have nondiscriminatory access to health care and health coverage." 81 Fed. Reg. at 31,380. But under RFRA, such "[b]roadly formulated, or sweeping governmental interests are inadequate." *Sharpe Holdings*, 801 F.3d at 943 (cleaned up). Rather, RFRA requires courts "to 'scrutiniz[e]

---

[3] Correction to Bränström and Pachankis, Am. J. Psychiatry (Aug. 1, 2020), https://perma.cc/6J2K-G69H (emphasis added); *see also* Ex.F-5.

[4] Bränström & Pachankis, *supra* n.2, at 731 ("Time since initiating gender-affirming hormone treatment was not associated with … mental health treatment outcomes.").

the asserted harm of granting specific exemptions to particular religious claimants'—in other words, to look to the marginal interest in enforcing" Section 1557 in this case. *Hobby Lobby*, 573 U.S. at 726-27 (quoting *O Centro*, 546 U.S. at 431)). Applying this test, HHS can't show that it has a compelling interest in ensuring access to gender transition procedures by requiring *Plaintiffs* to provide them, particularly when the "growing number of healthcare providers who … specialize in those services" can provide them instead. *Franciscan*, 227 F. Supp. 3d at 693.

Second, HHS previously asserted an interest in removing obstacles to access to healthcare for transgender individuals. 81 Fed. Reg. at 31,460. But the relevant question isn't whether Plaintiffs should offer healthcare services to transgender individuals. Plaintiffs already do—for everything from cancer to the common cold. Rather, the question is whether HHS has a compelling interest in forcing private doctors to violate their medical judgment and perform procedures that HHS's own experts admit are potentially harmful. As already explained, it does not.

As for abortions, Congress has long provided exemptions for medical professionals who cannot participate in abortion. *Franciscan*, 227 F. Supp. 3d at 682-83. Therefore, HHS has no compelling interest in forcing Plaintiffs to do so. *See Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2392 (2020) (Alito, J., concurring) ("We can answer the compelling interest question simply by asking whether *Congress* has treated the [alleged interest] as … compelling[.]").

Nor does HHS have a compelling interest in forcing Plaintiffs to *insure* these procedures. "A law cannot be regarded as protecting an interest of the highest order … when it leaves appreciable damage to that supposedly vital interest unprohibited." *281 Care Comm. v. Arneson*, 766 F.3d 774, 785 (8th Cir. 2014) (cleaned up). Here, however, the government has exempted every employer in the country that does not receive certain federally administered funds. It has also exempted *its own health-*

22

*insurance programs* from covering gender-transition procedures. For example, TRI-CARE, the military's insurance program, excludes coverage for "surgical treatment for gender dysphoria," as well as cross-sex hormones for children under 16. Ex.F-9 at 4.1, 3.2.2. It also protects the religious beliefs of physicians who object to performing gender-transition procedures.[5] And the Veterans Health Administration's benefits package specifically excludes "gender alterations." 38 C.F.R. § 17.38(c)(4).

As the *Franciscan* court explained, the government cannot have a "compelling" interest in a policy that it is not even "willing to pursue itself." 227 F. Supp. 3d at 693-94. In short, HHS's interpretation of Section 1557 seeks to impose on Plaintiffs a rule that has massive exemptions for others, including the government itself. That is fatal to any purported compelling interest.

### 2. HHS has many less restrictive means of furthering its interests.

Even assuming Section 1557 as interpreted here furthered a compelling interest, HHS has ways of pursuing that interest without forcing religious objectors like Plaintiffs to violate their religious beliefs—so its actions still violate RFRA.

Under RFRA, HHS must produce evidence that compelling religious providers like Plaintiffs to perform and insure gender transition procedures and abortions is "the only feasible means to" accomplish its goal, such that "no alternative means would suffice." *Sharpe Holdings*, 801 F.3d at 943. But HHS has numerous alternatives here.

First, "[i]f the government wishes to expand access" to these procedures financially, "'[t]he most straightforward' way "would be for the government to assume the cost of providing the[m] to any … unable to obtain them under their health-insurance policies due to their employers' religious objections.'" *Franciscan*, 227 F. Supp. 3d at 693 (quoting *Hobby Lobby*, 573 U.S. at 728). "[T]he government could provide subsidies, reimbursements, tax credits, or tax deductions to employees." *Sharpe Holdings*,

---

[5] ECF No. 6-9 at 2-3("In no circumstance will a provider be required to deliver care that he or she feels unprepared to provide either by lack of clinical skill or due to ethical, moral, or religious beliefs.").

801 F.3d at 945. Or it "could pay for the distribution of [services] at community health centers, public clinics, and hospitals with income-based support." *Id.*

The government could also create an alternative system for provision of benefits. For example, it could (by act of Congress or statutorily-authorized regulation) require non-objecting insurance providers to offer plans with gender-transition coverage on an exchange. Or HHS could negotiate with providers to ensure that some or all plans on federally-facilitated exchanges offer coverage for these procedures. The government already offers credits to those who need help affording healthcare on the exchanges; those could be made available to individuals whose employer's plan doesn't cover these procedures. Or the government could set up an alternative coverage mechanism, as it has with the contraceptive mandate. *See Hobby Lobby*, 573 U.S. at 730-31. Before burdening Plaintiffs' exercise, HHS must "eliminate[]" these "as a viable option," *Sharpe Holdings*, 801 F.3d at 945—which it cannot do.

Second, there are also ways HHS could expand access to the procedures as a medical matter besides coercing objecting doctors to perform them. As the *Franciscan* court explained, "[t]he government could … assist transgender individuals in finding … the growing number of healthcare providers who offer and specialize in those services." 227 F. Supp. 3d at 693; *cf.* Ex.F-3 (listing "health clinics that specialize in trans health care"). Or it could train healthcare navigators to assist individuals in finding such services, just as it does with assisting individuals to find plans on ACA exchanges. These options wouldn't just increase access to transition procedures; they would also result in *better care* than conscripting unwilling doctors who often lack the necessary expertise. And if "less restrictive means" like these are available, HHS "must use" them. *Holt v. Hobbs*, 574 U.S. 352, 364-65 (2015*).

HHS's interpretation of Section 1557 burdens Plaintiffs' religious exercise and, as applied to Plaintiffs, doesn't satisfy strict scrutiny. Plaintiffs prevail under RFRA.

24

## II. HHS's interpretation of "sex" to include "gender identity" is contrary to Title IX and Section 1557.

RFRA aside, HHS's interpretation of Section 1557 to bar "gender identity" discrimination is also unlawful under the APA. As explained, the *Franciscan* court already vacated the 2016 Rule insofar as it defined "sex" discrimination to include "gender identity" and "termination of pregnancy" discrimination. In light of *Bostock*, however, two federal district courts have held that "gender identity" provisions of the 2016 Rule "remain in effect," and a third has suggested that the same result follows from the combination of the 2020 Rule and *Bostock* itself. *Supra* pp. 13-15.

Now as before, however, HHS's interpretation of Section 1557 to bar "gender identity" discrimination violates the APA. Agency regulations are unlawful if they conflict with the relevant statute. 5 U.S.C. § 706(2)(A), (2)(C). If the statute is "silent or ambiguous," courts defer to "reasonable" agency interpretations. *Hawkins v. Cmty. Bank of Raymore*, 761 F.3d 937, 940-41 (8th Cir. 2014) (cleaned up; citing *Chevron*). But if, "employing traditional tools of statutory construction," "Congress' intent is clear, that is the end of the matter"; a contrary rule must be set aside. *North Dakota v. EPA*, 730 F.3d 750, 763 (8th Cir. 2013) (quotation marks omitted); *see Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019) (deference applies only when the "legal toolkit is empty").

Here, Section 1557's prohibition on "sex" discrimination unambiguously means biological sex, not "gender identity"—and *Bostock* isn't to the contrary.

### A. The text and history of Title IX and Section 1557 show that they do not prohibit "gender identity" discrimination.

Section 1557 forbids federally funded health programs from discriminating on "the grounds prohibited under" four other federal statutes: Title VI, 42 U.S.C. § 2000d ("race, color, or national origin"); Title IX, 20 U.S.C. § 1681 ("sex"); the Age Discrimination Act, 42 U.S.C. § 6101 ("age"); and the Rehabilitation Act, 29 U.S.C. § 794 ("disability"). Section 1557 does not itself use the term "sex"; instead, it simply incorporates the prohibition contained in Title IX.

25

Title IX's operative provision states that "[n]o person in the United States shall, on the basis of sex, … be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]" 20 U.S.C. § 1681(a). Thus, the key question is whether "sex" in Title IX refers to physiological differences between males and females, or whether the term also means "gender identity."

 The answer is the former. "[T]he meaning of sex in Title IX unambiguously refers to "the biological and anatomical differences between male[s] and female[s] … as determined at their birth." *Franciscan*, 227 F. Supp. 3d at 687; ECF No. 36 at 2.

First, "begin[ning]," "as always, with the statute's text," *United States v. Goad*, 788 F.3d 873, 875 (8th Cir. 2015), the word "sex" means biological sex, not "gender identity." Because Title IX doesn't define "sex," this Court must give the term its "ordinary, contemporary, common meaning." *Id.* (internal quotation marks omitted). And when Title IX passed, virtually every dictionary definition of "sex" referred to physiological distinctions between females and males, particularly with respect to reproduction. *See, e.g.*, American Heritage Dictionary 1187 (1976); Webster's Third New Int'l Dictionary 2081 (1971); 9 Oxford English Dictionary 578 (1961); *see also Thompson Truck & Trailer, Inc. v. United States*, 901 F.3d 951, 953 (8th Cir. 2018) ("Ordinarily, a word's usage accords with its dictionary definition." (cleaned up)).

The term "gender identity," by contrast, was hardly used at all. ECF No. 6 at 14-15 (collecting sources). And the handful of academics who *did* use it at the time of Title IX's passage *contrasted* it to "sex": "gender" referred to socially constructed roles; "sex" referred to biology. *Id.* The single word "sex" in Title IX can't encompass both.

This ordinary meaning of "sex" is reinforced by the "language and design of the statute as a whole." *Velasquez v. Barr*, No. 19-1148, 2020 WL 6290677, at *4 n.3 (8th Cir. Oct. 27, 2020). Other provisions of Title IX also use the word "sex"—and they plainly reflect the understanding of "sex" as referring to the physiological distinction between males and females. For example, Title IX states that if certain activities are

provided for students of "one sex," comparable activities must be provided for students of "the other sex." 20 U.S.C. § 1681(a)(8). And it provides that schools may transition from admitting students of "only one sex" to admitting students of "both sexes." *Id.* § 1681(a)(2); *see also* 34 C.F.R. § 106.33 (longstanding Title IX regulation permitting separate facilities for "students of one sex" and "the other sex").

These provisions are irreconcilable with a reading of "sex" to mean "gender identity," which rejects the concept of two "sexes." As HHS explained, the "gender identity spectrum includes an array of possible gender identities beyond male and female," 81 Fed. Reg. 31,392, including "neither" or a "combination" thereof, *id.* at 31,467. Thus, interpreting "sex" in Title IX to mean gender identity would render much of the statute "nonsensical and superfluous." *Corley v. United States*, 556 U.S. 303, 314 (2009); *see Union Pac. R.R. Co. v. Surface Transp. Bd.*, 863 F.3d 816, 826 (8th Cir. 2017) ("[A] term is presumed to have the same meaning throughout the same statute.")

This textual evidence "also comports with the purposes and policies underlying" Title IX and Section 1557. *Hawkins*, 761 F.3d at 942. Congress enacted Title IX after hearings on pervasive discrimination in education against women. 44 Fed. Reg. 71,413, 71,423 (Dec. 11, 1979); *N. Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 523 n.13 (1982). Its sponsor said the purpose was to give "women of America … an equal chance to attend the schools of their choice." 118 Cong. Rec. 5808 (1972). There is no hint of any congressional purpose regarding "gender identity."

Likewise, the 2010 Congress's evident purpose in incorporating Title IX into Section 1557 was to prohibit "sex" discrimination in healthcare. And in the healthcare context, it makes no sense to coerce physicians to disregard biology and instead treat patients "consistent with their gender identity." *Cf.* 81 Fed. Reg. 31,471. "Physical differences between men and women … are enduring," and "[t]he two sexes are not fungible." *United States v. Virginia*, 518 U.S. 515, 533 (1996) (internal quotation marks omitted). And these differences are relevant to almost every aspect of

27

healthcare.[6] Men and women exhibit different heart-attack symptoms,[7] perceive pain differently,[8] and respond differently to everything from aspirin (higher risk of gastro-intestinal bleeding for women)[9] to beta-blockers ("may be an acute precipitant of heart failure in … women, but not men").[10] Ignoring these differences in favor of "gender identity"—like all bad medicine—can have tragic consequences.[11]

For all these reasons, Title IX's use of the term "sex," as incorporated into Section 1557, is not ambiguous. It refers to the biological differences between males and females—not to an "internal sense" of gender. *Cf.* 81 Fed. Reg. at 31,467.

## B. "Gender identity" discrimination is not forbidden "sex stereotyping."

The *Walker* and *Whitman-Walker* courts have suggested that, independent of the ordinary meaning of "sex," "gender identity" discrimination may be forbidden under Section 1557 as a form of "sex stereotyping." *Walker*, 2020 WL 4749859, at *7, *9; *Whitman-Walker*, 2020 WL 5232076, at *23. These courts are incorrect; to the contrary, to the extent the 2016 Rule's separate prohibition on "sex stereotyping" purports to independently bar "gender identity" discrimination, it violates the APA, too.

The "sex stereotyping" theory derives from the Supreme Court's decision in *Price*

---

[6] Janine Austin Clayton, *Applying the New SABV (Sex as a Biological Variable) Policy to Research and Clinical Care*, 187 Physiology & Behavior 2 (2018), https://perma.cc/JTJ9-PJ6E?type=image ("it has become increasingly clear that male/female differences extend well beyond reproductive and hormonal issues"; "[s]ex affects: cell physiology, metabolism, and many other biological functions; symptoms and manifestations of disease; and responses to treatment" and "has profound influences in neuroscience").

[7] 85 Fed. Reg. at 37,185.

[8] Clayton, *supra* n. 6, at 2.

[9] Edward S. Huang et al., *Long Term Use of Aspirin and the Risk of Gastrointestinal Bleeding*, U.S. Nat'l Library of Medicine (May 2012), https://perma.cc/VHX2-JBKY.

[10] Raffaele Bugiardini et al., *Prior Beta-Blocker Therapy for Hypertension and Sex-Based Differences in Heart Failure Among Patients with Incident Coronary Heart Disease*, Am. Heart Ass'n J. (July 13, 2020), https://perma.cc/4TJP-8Q8J.

[11] *E.g.*, Daphna Stroumsa et al., *The Power and Limits of Classification—A 32-Year-Old Man with Abdominal Pain*, New England J. Med. (May 16, 2019), https://perma.cc/Q73M-CPE5%20 (patient identifying as male treated for abdominal pain in accordance with gender identity, resulting in undiagnosed pregnancy, miscarriage, and stillbirth).

*Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989). There, a four-Justice plurality stated that Title VII prohibits "disparate treatment of men and women resulting from sex stereotypes." *Id.* at 251. Seizing on this language, some courts have reasoned that discrimination based on "gender identity" is "necessarily" a form of "sex stereotyping" (because transgender individuals don't conform to gender norms), and therefore discrimination based on "gender identity" is a form of "sex" discrimination. *E.g.*, *EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 576-77 (6th Cir. 2018); *but see Bostock*, 140 S. Ct. at 1738-43 (affirming *Harris* on other grounds).

But this syllogism falters at every step. First, it overreads *Price Waterhouse*. *Price Waterhouse* didn't hold that "sex stereotyping" as such is forbidden by Title VII. It held that sex stereotyping is forbidden *when it results in* "disparate treatment of men and women." 490 U.S. at 251. In *Price Waterhouse*, for instance, the "sex stereotype" was the employer's "belief" that women "must not be" "aggressive" in the workplace—a belief that "place[d] women in an … impermissible catch 22: out of a job if they behave aggressively and out of a job if they do not." 490 U.S. at 251.

A doctor's objection to performing a gender transition doesn't result in disparate treatment of men and women, and it isn't a sex stereotype. Indeed, it isn't sex-specific at all. The objection extends to involvement in transitions by both men and women—may be "gender identity" discrimination according to HHS's illegal 2016 Rule, but isn't "sex stereotyping" within the meaning of *Price Waterhouse*.

Second, the "sex stereotyping" argument is inconsistent with HHS's own regulations. The 2016 Rule prohibited both "gender identity" discrimination and—separately—"sex stereotyping." 81 Fed. Reg. at 31,467. It prohibited both because HHS correctly understood that "gender identity" discrimination *isn't* inherently a form of "sex stereotyping." *Cf. Solis v. Summit Contractors, Inc.*, 558 F.3d 815, 823 (8th Cir. 2009) ("We also should avoid a regulatory construction that would render another part of the same regulation superfluous." (cleaned up)).

29

Third, understanding "gender identity" discrimination as a subset of "sex stereo-typing" produces absurd results. On that logic, it is "sex stereotyping" to say that only women (not men) may identify as women, and only men (not women) may identify as men. But if that is forbidden sex stereotyping, so are many other common practices— such as saying that only women (not men) may use women's bathrooms and changing rooms. That result would violate not only "common sense," *Adams v. Sch. Bd. of St. Johns Cty.*, 968 F.3d 1286, 1318 (11th Cir. 2020) (Pryor, C.J., dissenting), but also the decades-old agency understanding that Title IX specifically *permits* entities to "pro-vide separate" (but "comparable") bathrooms and changing rooms "on the basis of sex." 34 C.F.R. § 106.33 (1980); *see also Barnhart v. Walton*, 535 U.S. 212, 219-20 (2002) ("longstanding" agency interpretations receive "particular deference"). Thus, HHS's strained theory of "sex stereotyping" likewise violates the APA.

## C. *Bostock* does not justify HHS's interpretation.

*Bostock* isn't to the contrary. In *Bostock*, the Court held that when "an em-ployer … fires someone simply for being homosexual or transgender," the employer has "discriminated against that individual 'because of such individual's sex'" within the meaning of Title VII. 140 S. Ct. at 1753. But *Bostock* explicitly did "not prejudge" laws other than Title VII. *Id*. And even if *Bostock*'s reasoning extended to the statutes at issue here, it wouldn't justify HHS's conclusion that declining to perform gender transitions—for males and females alike—is "sex" discrimination.

First, *Bostock* dealt only with Title VII—not Title IX or Section 1557. And the Supreme Court has said courts "must be careful not to apply rules applicable under one statute to a different statute without careful and critical examination." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 174 (2009) (quotation marks omitted) (declining to apply Title VII decision to identical language in the ADEA).

Here, Section 1557 and Title IX are "materially different" from Title VII, such that they don't forbid gender-identity discrimination even if Title VII does. *See id*. at 173.

30

For one thing, multiple provisions of Title IX refer to "one sex," "the other sex," or "both sexes." 20 U.S.C. § 1681(a)(2), (8). This language would be nonsensical if "sex" included the full "spectrum" of "non-binary" gender identities, 81 Fed. Reg. at 31,392—and it has no textual analogue in Title VII. Moreover, while *Bostock* noted that an individual's "transgender status is not relevant to employment decisions," 140 S. Ct. at 1741, the same simply isn't true in the healthcare context covered by Section 1557. In this context, the stubbornly real physiological differences between males and females mean that treating a patient consistent with gender identity (rather than biological sex) can risk the patient's life. *Supra* pp. 27-28.

Second, at the time of Title VII's passage, no court had considered whether "sex" discrimination included discrimination on the basis of "gender identity." But by the time Congress enacted Section 1557, decades of uniform Circuit caselaw under Title VII had rejected precisely that argument.[12] "When judicial interpretations have settled the meaning of an existing statutory provision," incorporating it "in a new statute" generally indicates "the intent to incorporate its … judicial interpretations as well." *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 589-90 (2010). This pre-Section 1557 consensus thus indicates—consistent with Title IX's text and the healthcare context—that in enacting Section 1557, Congress forbade healthcare discrimination based on biological sex, not "gender identity." And that's true regardless whether *Bostock* rejected the consensus as to Title VII. *See* 140 S. Ct. at 1750 ("[W]e must be sensitive to the possibility a statutory term that means one thing today … might have meant something else at the time of its adoption.").

Third, even if *Bostock*'s reasoning were extended to Title IX and Section 1557,

---

[12] *See Etsitty v. Utah Transit Auth.*, 502 F.3d 1215, 1221 (10th Cir. 2007) ("discrimination against a transsexual based on the person's status as a transsexual is not discrimination because of sex"); *Ulane v. E. Airlines, Inc.*, 742 F.2d 1081, 1085 (7th Cir. 1984) (same); *Sommers v. Budget Mktg., Inc.*, 667 F.2d 748, 750 (8th Cir. 1982) (same); *Holloway v. Arthur Anderson & Co.*, 566 F.2d 659, 661 (9th Cir. 1977) (same); *see also, e.g., Johnston v. Univ. of Pittsburgh*, 97 F. Supp. 3d 657, 674 (W.D. Pa. 2015) (consensus of "nearly every federal court that has considered the question").

HHS's interpretation of "sex" discrimination as requiring doctors to perform gender transitions would *still* be contrary to law. *Bostock* held that an employer's firing an employee "simply for being … transgender" is "sex" discrimination because the firing is based on "actions or attributes it would tolerate in an individual of another sex." *Id.* at 1737, 1740. In other words, sex is a but-for cause of such a firing, because "changing the employee's sex would have yielded a different choice." *Id.* at 1741.

But this reasoning doesn't apply to refusals to perform gender-transition procedures. If a doctor declines to perform (for example) a hysterectomy on a woman to facilitate her transition to living as a man, the doctor isn't discriminating based on "sex" within the meaning of *Bostock*. For "changing the [patient]'s sex" wouldn't "yield a different choice," as the Plaintiff wouldn't perform a hysterectomy on a man, either. So even under *Bostock*, HHS's interpretation of Section 1557 violates the APA.

## III. HHS's failure to incorporate Title IX's religious exemption is contrary to Title IX and Section 1557.

Separately, HHS's interpretation of Section 1557 is also "not in accordance with law" and "in excess of statutory jurisdiction" because it fails to include in full the religious exemption mandated by the controlling statutes. 5 U.S.C. § 706(2)(A), (2)(C). Title IX exempts religious institutions from its ban on "sex" discrimination. Section 1557, in turn, incorporates both the ban and the exemption. Yet in the 2016 Rule, HHS refused to incorporate any religious exemption at all. 81 Fed. Reg. at 31,380. Then, in the 2020 Rule, HHS acknowledged the exemption's applicability, but interpreted it more narrowly than Congress mandated. 45 C.F.R. § 92.6(b); 85 Fed. Reg. at 37,207. HHS's actions thus violate the APA.

Section 1557 bars discrimination "on the ground prohibited under … title IX of the Education Amendments of 1972." 42 U.S.C. § 18116(a). Title IX prohibits "sex" discrimination in "education," but then—in the same sentence—exempts educational institutions that are religious:

32

> this section shall not apply to an educational institution which is con-
> trolled by a religious organization if the application of this subsection
> would not be consistent with the religious tenets of such organization.

20 U.S.C. § 1681(a)(3). Thus, when Congress incorporated "title IX of the Education Amendments of 1972" into Section 1557, it also incorporated Title IX's religious exemption. Yet despite many requests to include this exemption in the 2016 Rule, HHS refused. *See* 81 Fed. Reg. at 31,379-80.

HHS's refusal was unlawful. Had Congress wanted to ban sex discrimination without incorporating a religious exemption, it could have easily done so. Instead, it banned sex discrimination by incorporating "20 U.S.C. 1681 *et seq.*," 42 U.S.C. § 18116(a)—which "can only mean Congress intended to incorporate the entire statutory structure, including the … religious exemption[]." *Franciscan*, 227 F. Supp. 3d at 690. Permitting HHS to omit an exemption for religious institutions would "nullif[y] Congress's specific direction to prohibit only the ground proscribed by Title IX," *id.* at 690-91—violating the APA.

HHS purported to address this failing in the 2020 Rule, but its efforts (which in any event have been enjoined) violate the APA, too, and for similar reasons. In the 2020 Rule, HHS acknowledged that the *Franciscan* court vacated the 2016 Rule in part because of its "failure to incorporate … the Title IX religious exemption," and thus purported to "explicitly incorporate" the exemption this time around. 85 Fed. Reg. at 37,162; *see* 45 C.F.R. § 92.6(b). But HHS stated that although Section 1557 had transposed Title IX's ban on "sex" discrimination in education to the healthcare context, the incorporated religious exemption nonetheless would be limited to "[a]ny educational operation of an entity … control[led] by a religious organization," 85 Fed. Reg. at 37,207, rather than protecting religious healthcare providers generally.

That exemption is narrower than the one Congress mandated. Title IX's religious exemption matches the scope of its prohibition: Title IX prohibits "sex" discrimination "under any education program or activity receiving Federal financial assistance," 20

U.S.C. § 1681(a), but then exempts otherwise-covered recipients—"educational institutions"—that meet the relevant religious requirements (*i.e.*, are "controlled by a religious organization" and have "religious tenets" inconsistent with Title IX's prohibition, *id.* § 1681(a)(3)). Thus, when Congress incorporated Title IX into Section 1557, it incorporated a religious exemption that matches *Section 1557's* scope. That is, Congress applied Title IX's prohibition on "sex" discrimination to "any *health* program or activity … receiving Federal financial assistance," 42 U.S.C. § 18116(a) (emphasis added), but exempted otherwise-covered recipients—now, healthcare providers—if they meet Title IX's religious requirements (again, "controlled by a religious organization" and "religious tenets" inconsistent with the prohibition).

Put differently, Section 1557 incorporates Title IX "*mutatis mutandis*"—just as Title IX put strings on education funding, but exempted religious educational institutions, so Section 1557 puts strings on healthcare funding, but exempts religious healthcare institutions. *See Bowen v. Mich. Acad. of Family Phys.*, 476 U.S. 667, 680 (1986); *United States v. Nature*, 898 F.3d 1022, 1024 (9th Cir. 2018). Indeed, there's no other sensible way to read Section 1557. If the incorporated religious exemption retains its education hook, then the incorporated prohibition would as well—triggering the strange result that Section 1557 would prohibit "sex" discrimination only in health *education*. Likewise, HHS has articulated no rationale—and there is none—for why Congress would require religious healthcare providers generally to violate their religious tenets while exempting only those that happen to also be educators.

HHS's halfway incorporation of the Title IX exemption in the 2020 Rule thus violates the APA. *See Franciscan*, 227 F. Supp. 3d at 690-91.

## IV. As interpreted by HHS, Section 1557 violates the Spending Clause.

Under HHS's interpretation of Section 1557, that statute also violates the Spending Clause by imposing unauthorized and coercive conditions on the States. Congress is permitted to use its Spending Clause power to induce States to voluntarily accept

34

federal conditions in exchange for federal funds. But such conditions must be both (a) unambiguous and (b) non-coercive. *South Dakota v. Dole*, 483 U.S. 203, 207-08, 211 (1987). As applied here, Section 1557 fails both tests.

First, the condition on healthcare funding HHS has attached to Section 1557—that recipients must perform and insure gender transitions and abortions—was hardly "unambiguous[]." "The legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'" *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). Of course, States cannot voluntarily and knowingly accept conditions they do not know about. "Accordingly, if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Id.*

Many courts have struck down or refused to impose ambiguous conditions on federal funds. For example, in *Gross v. Weber*, the Eighth Circuit refused to impose retroactive Title IX liability on a school district on the grounds that "[t]itle IX provides no notice that educational institutions will be subject to liability for prior events. It would be unfair to impose a greater duty than that which the educational institutions agreed to assume." 186 F.3d 1089, 1092 (8th Cir. 1999). Likewise, in *Pennhurst*, the Supreme Court found that Congress had not unambiguously required participating States to satisfy the statute's "bill of rights" provisions in a program for the developmentally disabled, and thus that the States could not be forced to comply. As the Court explained, "where Congress has intended the States to fund certain entitlements as a condition of receiving federal funds, it has proved capable of saying so explicitly." *Pennhurst,* 451 U.S. at 17-18, 20.

Here, there is no plausible argument that Congress unambiguously told the States that their receipt of Medicare and Medicaid funds was conditioned on embracing HHS's expansive definition of "sex." To understand the terms North Dakota accepted,

"the focus must be on the law when [the relevant statute] was enacted." *Premachandra v. Mitts*, 753 F.2d 635, 638 (8th Cir. 1985) (en banc). Both Medicaid and Medicare were adopted in 1965. Social Security Amendments of 1965, Pub. L. No. 89–97, 79 Stat. 286 (1965). But there is nothing in either statute to suggest that States accepting federal funds to care for the poor and elderly through these programs were "unambiguously" informed—or informed *at all*—that their participation in helping those in need also included an agreement to interpret "sex" to require performing and covering gender-transition procedures.

And indeed, the Eighth Circuit in *Smith v. Rasmussen* already held they were not, in a decision that should be dispositive here. 249 F.3d at 760-61. In *Smith*, the plaintiff argued that an Iowa regulation categorically prohibiting sex-reassignment surgeries for Medicaid recipients violated the Medicaid Act. The Eighth Circuit rejected this argument and ruled for the State, concluding that given "the disagreement regarding the efficacy of sex reassignment surgery," "the State's prohibition on funding of sex reassignment surgery is both reasonable and consistent with the Medicaid Act." *Id.* at 761. In other words, it is settled law in this Circuit that the States did not agree to fund sex-reassignment surgeries by accepting Medicaid funds (indeed, as of the time *Smith* was decided, at least 36 States *didn't*, *id.* It necessarily follows that any reading of Section 1557 imposing such a condition violates the Spending Clause.

Section 1557 also violates the Spending Clause as applied here because it is unconstitutionally coercive. "Congress may use its spending power to create incentives for States to act in accordance with federal policies. But when pressure turns into compulsion, the legislation runs contrary to our system of federalism." *NFIB v. Sebelius*, 567 U.S. 519, 577-78 (2012) (quotation marks omitted). In *NFIB*, the Court held that a threat to eliminate all federal Medicaid funding, which constituted "10 percent of a State's overall budget," was unconstitutionally coercive. *Id.* at 582. Here, North Dakota faces even more coercion than was rejected in *NFIB*, because it stands to lose

36

not only all its Medicare funding, but all other HHS funding, and to face private law-
suits for damages and attorneys' fees. Thus, this is an *a fortiori* case.

## V. Injunctive relief is required.

As shown, Plaintiffs have satisfied the most important injunctive-relief factor: suc-
cess on the merits. And as demonstrated below, they also satisfy the remaining three:
threat of irreparable harm, balance of harms, and the public interest. *Sharpe Hold-
ings*, 801 F.3d at 936-37. The Court should therefore permanently enjoin HHS from
interpreting and enforcing Section 1557 to require Plaintiffs to perform or insure gen-
der-transition procedures and abortions.

The Court may grant a permanent (rather than preliminary) injunction when
"nothing remains … to resolve regarding the underlying facts" and the parties "disa-
gree only on questions of law." *Guttau*, 190 F.3d at 847. And a permanent injunction
is especially necessary here, where after four years of litigation and a whole new rule-
making, Plaintiffs still face crippling liability for abiding by their beliefs and medical
judgment. *See Christian Emps. All. v. Azar*, No. 3:16-cv-309, 2019 WL 2130142, at *6
(D.N.D. May 15, 2019) (similar permanent relief against contraceptive mandate).

At a minimum, should the Court not be in a position to grant permanent relief at
this stage, the Court should issue a preliminary injunction before January 20, 2021.
Since 2017, HHS under the current Administration has been content to abide by the
Court's December 2016 stay of enforcement, although that stay originally was set to
last only until "a determination on … recusal" and a hearing on Plaintiffs' initial pre-
liminary-injunction motion (which never occurred). ECF No. 23. But the next Admin-
istration has made its intent clear to "[g]uarantee the Affordable Care Act's" supposed
"nondiscrimination protections for the LGBTQ+ community" and "reverse" "religious
exemptions" for (*inter alia*) "medical providers." Ex.F-10. Beginning on January 20,
then, Plaintiffs face crippling penalties jeopardizing their ability to continue serving
the needy consistent with their beliefs and (for the State) its sovereign interests.

37

***Success on the Merits.*** As already shown, Plaintiffs succeed on the merits of all their claims. This factor is paramount, *Sharpe Holdings*, 801 F.3d at 937, and in cases like this one, where plaintiffs have established violations of their religious-liberty and constitutional rights, the analysis begins and ends here. *See Telescope Media Grp. v. Lucero*, 936 F.3d 740, 762 (8th Cir. 2019); *see also Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1146 (10th Cir. 2013) ("[O]ur case law analogizes RFRA to a constitutional right."), *aff'd*, 573 U.S. 682; *Archdiocese of St. Louis v. Burwell*, 28 F. Supp. 3d 944, 958 (E.D. Mo. 2014) ("a likely RFRA violation satisfies … irreparable harm.").

***Irreparable Harm.*** Even if Plaintiffs had to make a separate showing of irreparable harm, they have done so here. Absent an injunction, HHS's interpretation of Section 1557 means Plaintiffs must either comply with invalid regulations and violate their faith or violate those regulations and face massive financial penalties. That "loss of" religious freedom "unquestionably constitutes irreparable injury," *Elrod v. Burns*, 427 U.S. 347, 373 (1976), which is why an injunction is the typical relief under RFRA. *E.g.*, *O Centro*, 546 U.S. at 427; *Sharpe Holdings*, 801 F.3d at 945-46.

HHS's interpretation also threatens irreparable harm to North Dakota by upending its laws and policies governing its healthcare facilities and insurance plans. A State suffers irreparable harm when its laws or policies are enjoined. *Maryland v. King*, 567 U.S. 1301 (2012) (Roberts, C.J., in chambers). Here, HHS's interpretation of Section 1557 strips North Dakota of its right to enforce its own laws in its healthcare programs, requires State facilities to offer transition and abortion procedures, and requires the State to train employees about their new obligations. North Dakota did not agree to these requirements when it chose to participate in Medicare and Medicaid decades ago. This is irreparable harm to its sovereign interest. *See Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001).

If HHS contends that Plaintiffs face no risk of enforcement and therefore irreparable harm is unlikely, it is mistaken. *Cf. Winter v. Nat. Res. Def. Council, Inc.*, 555

U.S. 7, 22 (2008). Plaintiffs face ongoing, irreparable harm from HHS's actions and divergent decisions from across the country.

First, while the *Franciscan* court properly vacated the portions of the 2016 Rule that required parties like Plaintiffs to perform and cover transition procedures and abortions, two district courts have now expressly purported to reinstate provisions of the 2016 Rule having just that effect. *Walker*, 2020 WL 4749859, at *10; *Whitman-Walker*, 2020 WL 5232076, at *14, *23. And a third has held that, in light of *Bostock*, the 2020 Rule itself may, "in fact, extend protection against discrimination to LGBTQ individuals via the Rule's incorporation of Title IX by reference." *Washington*, 2020 WL 5095467, at *8.

Moreover, even aside from these decisions, the *Franciscan* court's vacatur wouldn't prohibit HHS from imposing the same requirement by other means, such as by initiating an enforcement action directly under Section 1557 or promulgating a new rule imposing the same burden. *Cf.* 42 U.S.C. § 18116(c) (HHS "*may* promulgate regulations to implement this section." (emphasis added)). And again, the incoming Administration has already signaled its resolve to do just that. *See* Ex.F-10.

Finally, even apart from the specifics of any interpretive rule, some courts have interpreted Section 1557 itself to cover "gender identity" discrimination and therefore require provision or coverage of gender-transition procedures. *See, e.g., Tovar v. Essentia Health*, 342 F. Supp. 3d 947, 952-53 (D. Minn. 2018); *Prescott v. Rady Children's Hosp.-San Diego*, 265 F. Supp. 3d 1090, 1098-1100 (S.D. Cal. 2017). These decisions were "not based on" the 2016 or 2020 Rule but were "grounded in the language of the statute itself." *Prescott*, 265 F. Supp. 3d at 1098. Plaintiffs believe these decisions wrongly interpret the statute, as explained above. But what is clear is that regardless of which specific Section 1557 regulation governs, "irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis omitted).

In short, Plaintiffs face the very real threat of enforcement and liability such that

a permanent injunction is both timely and necessary. *See, e.g.*, *Archdiocese of St. Louis*, 28 F. Supp. 3d at 958 ("[I]n light of the current legal uncertainty regarding the enforceability of the contraceptive mandate as to nonprofit organizations with religious objections, the Court finds it in the public interest to … enjoin enforcement of the mandate[.]" (citations omitted)).

***Balance of Harms.*** "[T]he balance-of-harm and public-interest factors need not be taken into account" here, since "the public interest will perforce be served by enjoining the enforcement of" an invalid law. *Guttau*, 190 F.3d at 847-48. Nonetheless, the balance tips for Plaintiffs. The harms faced by Plaintiffs are severe. *Supra* pp. 16-18, 34-37. And the harms to HHS are minimal. As HHS itself agrees, its interests are served when "providers [are] generally free to use their best medical judgment, consistent with their understanding of medical ethics, in providing healthcare to Americans." 85 Fed. Reg. at 37,187. That's precisely what an injunction would achieve.

***Public Interest.*** "[I]t is always in the public interest to protect constitutional rights," *Carson v. Simon*, 978 F.3d 1051 (8th Cir. 2020) (quotation marks omitted), and "[t]his principle applies equally to" the Spending Clause as to RFRA, since RFRA "enforces the First Amendment," *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 298 (5th Cir. 2012). "The public interest in the vindication of religious freedom" thus "favors the entry of an injunction." *Christian Emps. All.*, 2019 WL 2130142, at *6. Moreover, stripping Plaintiffs of Medicare and Medicaid funding hurts the vulnerable people that depend on Plaintiffs' services—the poor, the elderly, and those in underserved rural areas. The public interest favors an injunction.

## CONCLUSION

The motion should be granted.

Respectfully submitted this the 23rd day of November, 2020.

| /s/ Luke W. Goodrich | /s/ Wayne Stenehjem |
|---|---|
| Luke W. Goodrich<br>Mark L. Rienzi<br>The Becket Fund for Religious Liberty<br>1200 New Hampshire Ave. NW<br>Suite 700<br>Washington, DC 20036<br>Telephone: (202) 349-7216<br>Facsimile: (202) 955-0090<br>lgoodrich@becketlaw.org<br><br><br>*Counsel for Plaintiffs Religious Sisters of Mercy; Sacred Heart Mercy Health Care Center (Alma, MI); SMP Health System, and University of Mary* | Wayne Stenehjem<br>Attorney General of North Dakota<br>600 E. Boulevard Avenue<br>Bismarck, ND  58505-0040<br>Telephone: (701) 328-2210<br>Facsimile: (701) 328-2226<br><br>Douglas A. Bahr<br>Solicitor General<br>N.D. Office of Attorney General<br>500 N. 9th Street<br>Bismarck, ND 58501<br>Telephone: (701) 328-3640<br>Facsimile: (701) 328-4300<br><br><br>*Counsel for Plaintiff North Dakota* |

## CERTIFICATE OF SERVICE

I hereby certify that on November 23, 2020, the foregoing was served on all parties via ECF.

/s/ Luke W. Goodrich
Luke W. Goodrich
