## UNITED STATES DISTRICT COURT
## DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| THE RELIGIOUS SISTERS OF MERCY; SACRED HEART MERCY HEALTH CARE CENTER (Jackson, MN); SACRED HEART MERCY HEALTH CARE CENTER (Alma, MI); SMP HEALTH SYSTEM; UNIVERSITY OF MARY; | ) ) ) ) ) ) | |
| and | ) ) | Case No. 3:16-cv-00386 |
| STATE OF NORTH DAKOTA, | ) | |
| Plaintiffs | ) ) | |
| v. | ) | |
| ALEX M. AZAR II, Secretary of the United States Department of Health and Human Services; and UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, | ) ) ) ) ) | |
| Defendants | ) ) | |
| _____ | ) ) | |
| THE CATHOLIC BENEFITS ASSOCIATION; DIOCESE OF FARGO; CATHOLIC CHARITIES NORTH DAKOTA; and CATHOLIC MEDICAL ASSOCIATION, | ) ) ) ) ) | |
| Plaintiffs | ) ) | Case No. 3:16-cv-432 |
| v. | ) | |
| ALEX M. AZAR II, Secretary of the United States Department of Health and Human Services; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; JANET DHILLON, Chair of the United States Equal Employment Opportunity Commission; and UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) ) ) ) ) ) ) | |
| Defendants | | |

## CBA PLAINTIFFS' VERIFIED SECOND AMENDED COMPLAINT
## FOR INJUNCTIVE AND DECLARATORY RELIEF

1

**Table of Contents**

I.   NATURE OF THE ACTION ................................................................................ 4

II.  JURISDICTION AND VENUE ......................................................................... 6

III.  PARTIES ........................................................................................................... 6

   A.  Plaintiffs ........................................................................................................ 6

     1.  Diocese of Fargo ..................................................................................... 6

     2.  Catholic Charities North Dakota ............................................................ 9

     3.  Catholic Medical Association ................................................................ 10

     4.  The Catholic Benefits Association ........................................................ 12

   B.  Defendants .................................................................................................. 15

IV.  PLAINTIFFS' BELIEFS AND PRACTICES RELATED TO THE MANDATE.............. 16

   A.  Catholic teaching on the duty to treat all persons with dignity.......................... 16

   B.  Catholic teaching on gender identity ................................................................ 17

   C.  Catholic teaching on abortion .......................................................................... 18

   D.  Catholic teaching on scandal ............................................................................ 19

   E.  The Ethical and Religious Directives ................................................................ 19

   F.  The Catholic Benefits Association's Ethics Committee.................................... 20

   G.  The Mandate constitutes bad medicine............................................................ 21

V.  THE MANDATE............................................................................................. 22

   A.  Statutory Overview ....................................................................................... 22

     1.  Section 1557 of the Affordable Care Act and its incorporation of Title IX of the Education Amendments of 1972........................................................ 22

     2.  Title VII of the Civil Rights Act of 1964 ........................................... 24

     3.  Anti-abortion provisions in or applicable to the Affordable Care Act........... 25

   B.  The 2016 Rule ............................................................................................. 26

     1.  Healthcare professionals are required to perform or refer for gender transition procedures. ................................................................................. 28

     2.  Healthcare providers are required to alter their speech and medical advice. ................. 29

     3.  Covered employers and insurance providers are required to offer employee benefits covering gender transition procedures. ............................................... 30

     4.  Sex-specific healthcare facilities or programs, including shower facilities or hospital wards, must be opened to individuals based on gender identity............................ 33

     5.  Other requirements of the 2016 Rule ........................................................... 34

     6.  HHS rejected calls to accommodate religious exercise in the 2016 Rule...................... 35

C.   The EEOC, invoking Title VII, has imposed on non-covered entities the Mandate's requirement of gender-transition coverage. .......................................................... 37

D.   Enforcement Mechanisms ............................................................................. 40

VI.   HHS'S UNSUCCESSFUL EFFORT TO REPEAL THE MANDATE ............................. 42

A.   Litigation against the 2016 Rule ................................................................... 42

B.   The 2020 Rule ................................................................................................ 43

1.   Gender identity ............................................................................... 44

2.   Abortion .......................................................................................... 45

3.   Protections for religious freedom and conscience.......................... 46

4.   Covered entities.............................................................................. 47

5.   Enforcement mechanisms ............................................................... 48

C.   *Bostock v. Clayton County* ........................................................................... 48

D.   Legal challenges to, and preliminary injunctions against, the 2020 Rule ........................ 49

1.   Effect of the preliminary injunctions against the 2020 Rule........... 51

2.   Other pending legal challenges to the 2020 Rule........................... 53

VII.   The Mandate burdens the religious exercise of the CBA and its members. ..................... 54

A.   The Mandate's effects on CBA members that are covered entities – medical services .... 54

B.   The Mandate's effects on CBA members that are covered entities – insurance coverage 56

C.   The Mandate's effects on insured CBA members ........................................... 56

D.   Mandate's effects on self-insured CBA members .......................................... 57

VIII.   NEED FOR RELIEF.................................................................................................. 58

IX.   CAUSES OF ACTION .............................................................................................. 59

X.   PRAYER FOR RELIEF ............................................................................................. 79

Plaintiffs THE CATHOLIC BENEFITS ASSOCIATION, DIOCESE OF FARGO, CATHOLIC CHARITIES NORTH DAKOTA, and CATHOLIC MEDICAL ASSOCIATION, through their attorneys, allege:

## I.   NATURE OF THE ACTION

1.      In May 2016, the U.S. Department of Health and Human Services ("HHS"), in coordination with the Equal Employment Opportunity Commission ("EEOC"), published a final rule interpreting Section 1557 of the Affordable Care Act ("ACA"). Section 1557 prohibits discrimination on the basis of sex in federally funded health programs and activities. *See* 42 U.S.C. § 18116. HHS's rule, the "2016 Rule," radically expands this prohibition into a mandate that coerces Catholic hospitals and other healthcare providers to perform, support, and cover gender-transition and abortion procedures. HHS also said that it would coordinate with the EEOC to enforce a similar coverage requirement against employers and their health plans pursuant to Title VII of the Civil Rights Act of 1964, thus extending the mandate to hundreds of thousands of employers across the country, even those not involved in healthcare.

2.      In 2019, a federal district court found that the 2016 Rule violated the Religious Freedom Restoration Act and the Administrative Procedure Act, vacated portions of the rule, and ordered HHS to reconsider. In June 2020, HHS published a new final rule, the "2020 Rule," that would have repealed much of the 2016 Rule, including its most problematic provisions. But the new rule never became operative. Two district courts enjoined it and ordered that the 2016 Rule remain in effect.

3.      In this Second Amended Complaint, Plaintiffs refer to the requirements imposed by the 2016 Rule collectively as the "Mandate." Plaintiffs will refer separately to the 2016 Rule and the 2020 Rule when context or clarity requires.

4.      The 2016 Rule applies directly to a "covered entity," *i.e.*, an entity that operates a federally funded health program or activity. This encompasses virtually all healthcare providers and health insurers in the United States. And because the rule affects nearly every insurer, it also affects Catholic employers that are not "covered entities." As a result of the rule, some members of Plaintiff The Catholic Benefits Association received notice from their insurers that their health plans had begun covering gender-transition services, including "[m]ale to female surgeries," "female to male surgeries," and "cross-sex hormone therapy."

5.      Catholic employers cannot avoid the Mandate by adopting a self-insured health plan and working with a third party administrator ("TPA") to administer benefits, because the 2016 Rule also subjects TPAs to its requirements. Catholic employers that have excluded gender-transition and abortion services from their self-insured health plans have been required to indemnify their TPAs, or otherwise accept their TPAs' liability, for violating the 2016 Rule.

6.      HHS could have included both a religious exemption and an abortion exemption in its 2016 Rule. There was ample reason to do so. Section 1557 prohibits sex discrimination by incorporating Title IX, and Title IX expressly provides that it "shall not apply" to religious organizations, 20 U.S.C. § 1681(a)(3), and "shall [not] be construed to require . . . any person . . . to provide or pay for any benefit or service . . . related to an abortion," *id.* § 1688. Numerous other federal laws, including the ACA itself, the Religious Freedom Restoration Act, and the First Amendment, likewise protect rights of conscience and religious exercise. But HHS ignored all of this, imposed its Mandate to maximal effect, and forced a needless confrontation with healthcare providers and employers like Plaintiffs and their members, whose religious convictions prohibit them from facilitating gender transitions and abortions.

7.     Failure to comply with the Mandate exposes Catholic entities to severe penalties. Covered entities can be fined, barred from Medicaid and Medicare funding, and subjected to treble damages under the False Claims Act. Responsible persons may face prison time. Because the EEOC similarly interprets Title VII to require employer health plans to cover gender-transition services, employers – even employers that are not covered entities under the 2016 Rule – may face civil lawsuits and agency enforcement actions that expose them to compensatory damages, punitive damages, and attorneys fees.

8.     Plaintiffs seek a declaration that the Mandate cannot lawfully be applied to them or to any of their members, and they seek an injunction barring enforcement of the Mandate against them, their members, and any third parties acting in concert with them for the delivery of health coverage and services, including insurers and TPAs.

## II.     JURISDICTION AND VENUE

9.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1361 because this action arises under the Constitution and laws of the United States. The Court has jurisdiction to render declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, and 42 U.S.C. § 2000bb-1.

10.     Venue lies in this district under 28 U.S.C. § 1391(e)(1). Plaintiffs Diocese of Fargo and Catholic Charities North Dakota reside in this district and this division because their principal places of business are here.

## III.     PARTIES

### A.     Plaintiffs

#### 1.     Diocese of Fargo

11.     The Diocese of Fargo is that "portion of the people of God," located in 30 counties in eastern North Dakota, "which is entrusted to [the Bishop of Fargo] for him to

shepherd" in cooperation with his priests. *See* Code of Canon Law, c. 369 (1983). The Diocese carries out the spiritual, educational, and social service mission of the Catholic Church in eastern North Dakota. Its Bishop is the Most Reverend John Thomas Folda. He exercises pastoral care and canonical support for more than 130 parishes and missions and other Catholic ministries within the Diocese.

12.     The Diocese of Fargo is a member of The Catholic Benefits Association.

13.     The Diocese of Fargo comprises 35,786 square miles and, through its parishes and other Catholic organizations, ministers to more than 71,000 Catholics and thousands of others in eastern North Dakota.

14.     The Diocese of Fargo has 15 or more employees and is an "employer" within the meaning of Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 2000e(b).

15.     The educational mission of the Diocese of Fargo is carried out, in part, through 12 elementary schools, one middle school, and one high school within the Diocese. The five diocesan schools in the Fargo metro area (three elementary schools, the middle school, and the high school) belong to the St. John Paul II Catholic Schools Network.

16.     The charitable mission of the Diocese of Fargo is carried out through local parishes and various ministries founded by or otherwise related to the Diocese, including Catholic Charities North Dakota.

17.     The Diocese of Fargo has a Respect Life Office whose mission is to foster a culture of life and to proclaim and defend the God-given, inviolable dignity of every person. The Respect Life Office runs Project Rachel, a post-abortion ministry that offers hope and healing for those who suffer from the spiritual and emotional pain of abortion and its aftermath.

18.     Another ministry of the Diocese of Fargo is the North Dakota Catholic Conference, which acts on behalf of the Catholic bishops of North Dakota to respond to public policy issues of concern to the Catholic Church and to educate Catholics and the general public about Catholic social doctrine. Inspired by Scripture and Catholic teachings, the Conference works at the appropriate level of government for legislation and regulations that reflect the Gospel message of respect for human life, care for the poor, and promotion of the common good. The Conference advocates across a broad spectrum of issues, including alternatives to abortion, support for children and families, healthcare, religious liberty, economic justice, and care for the environment.

19.     The Diocese of Fargo operates a self-insured health plan. That is, the Diocese does not contract with a separate insurance company for its primary health coverage. Rather, the Diocese itself underwrites the medical costs of plan participants. It rents a provider network and has engaged a TPA to administer its plan, Blue Cross Blue Shield of North Dakota ("BCBSND").

20.     BCBSND is a covered entity under the 2016 Rule.

21.     Consistent with Catholic values and teaching, the Diocese of Fargo's health plan categorically excludes gender transition and abortion procedures.

22.     Because of the 2016 Rule, BCBSND required the Diocese of Fargo to enter into a "PPACA Section 1557 Nondiscrimination Addendum." The Addendum recites that "Section 1557 applies to [BCBSND's] operations as a third-party administrator." Under the Addendum, Diocese of Fargo accepts "any and all liability" for decisions related to plan design, including the exclusion of gender transition and abortion coverage, and absolves BCBSND of any fiduciary

responsibility related to "any plan design or administration that may be determined to violate Section 1557."

23.     Many of the Catholic parishes and affiliated Catholic ministries within Diocese of Fargo participate in the diocesan health plan.

### 2.     Catholic Charities North Dakota

24.     Catholic Charities North Dakota ("Catholic Charities") serves the poor, elderly, and disabled throughout North Dakota through critical social services programs. Its mission is to serve people in need, regardless of religious affiliation, based on the fundamental principles of Catholic Social Teaching. The services of Catholic Charities include disaster relief, individual and family counseling, adoption services, pregnancy counseling, and guardianship services for adults with special needs.

25.     Catholic Charities is a member of The Catholic Benefits Association.

26.     Catholic Charities has 15 or more employees and is an "employer" within the meaning of Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 2000e(b).

27.     Catholic Charities adheres to Catholic teachings, including those regarding sanctity of human life and care for one's neighbors. Catholic Charities operates Adults Adopting Special Kids ("AASK"), which provides adoption services to children in foster care and the families who adopt them. Through its pregnancy and parental counseling program, Catholic Charities counsels mothers and fathers on parenting, adoption, and marriage, and connects them with community resources. In its disaster relief program, Catholic Charities provides emergency relief and recovery services for victims of blizzards, floods, tornadoes, droughts, and wildfires, offering direct financial aid and other assistance. Finally, through its guardianship programs, Catholic Charities offers guardianship services to vulnerable adults and persons with intellectual

disabilities, providing support and direction for individuals who face difficulties in daily living and decisionmaking.

28.     Catholic Charities contracts with a group health insurance company for the benefit of its employees and their families.

29.     Upon information and belief, Catholic Charities' insurer is a covered entity under the 2016 Rule.

### 3.     Catholic Medical Association

30.     The Catholic Medical Association ("CMA") is a national, physician-led community of healthcare professionals. Its mission is to inform, organize, and inspire its members, in steadfast fidelity to the teachings of the Catholic Church, to uphold the principles of the Catholic faith in the science and practice of medicine.

31.     The CMA's mission includes defending its members' right to follow their conscience and Catholic teaching in their professional work. It also serves as a national advocate for the views of Catholic physicians and healthcare professionals.

32.     The CMA is a member of The Catholic Benefits Association.

33.     To be a member of the CMA, a Catholic physician must solemnly promise to:

- Practice Catholic moral principles, in particular those related to bio-medical ethics;
- Be faithful to the teachings of Catholic Church and to form one's professional conscience in accord with them;
- Refuse to become an instrument of violent or oppressive applications of medicine;
- Respect one's patients and treat them without prejudice arising from religion, racial, ethnic, socio-economic or sexual differences; and
- Work with openness toward every person, independently of their religious beliefs.

34.     CMA members include Catholic physicians who practice in a number of medical specialties, including endocrinology, ob-gyn, psychiatry, dermatology, urology, internal

medicine, pediatrics, family practice, and plastic surgery. While CMA members in these specialties do not provide gender transition services, they do provide medical services and perform medical procedures that are performed by other physicians as part of a gender transition.

35.    CMA members include licensed physicians who are covered entities under the 2016 Rule.

36.    These CMA members will be impacted by the Mandate because the Mandate (1) compels them to speak differently to their patients with regard to gender transition procedures, (2) prohibits them from conveying to patients their own medical judgment with regard to gender transition services, and (3) forces them to offer services or facilities in furtherance of gender transitions.

37.    The CMA has members who provide healthcare coverage for employees, coverage that excludes gender transition services and surgeries. Those members will be impacted by the Mandate.

38.    The CMA has members who have treated or currently treat patients with gender dysphoria, and who may be liable for failure to provide or refer their patients for gender transition services or surgeries.

39.    The CMA has standing to represent all of its present and future members.

40.    The Mandate harms the CMA's members.

41.    The CMA seeks to protect its members' ability to practice medicine in accordance with Catholic values and to avoid providing medical services that are contrary to Catholic values.

42.    The CMA can adequately represent its members' interests.

43.    [*Intentionally omitted*].

### 4.     The Catholic Benefits Association

44.     The CBA is a § 501(c)(3) nonprofit corporation and Catholic ministry. Its articles of incorporation state that it is "organized for charitable purposes" that are "consistent with Catholic values, doctrine, and canon law." Specifically, they state that the CBA is organized "[t]o support Catholic employers . . . that, as part of their religious witness and exercise, provide health or other benefits to their respective employees in a manner that is consistent with Catholic values"; "[t]o work and advocate for religious freedom of Catholic and other employers seeking to conduct their ministries and businesses according to their religious values"; "[t]o make charitable donations to Catholic ministries"; and "[t]o incorporate . . . one or more Catholic insurance companies, in furtherance of the Ministry's purposes." *See* Ex. A, Amended and Restated Certificate of Incorporation of the Catholic Benefits Association ("CBA Articles"), art. IV.

45.     The Most Reverend William E. Lori, Archbishop of Baltimore, is chairman of the CBA's board of directors.

46.     Eight of CBA's directors are Catholic bishops.  They are Most Rev. Gregory M. Aymond of New Orleans, Most Rev. Paul S. Coakley of Oklahoma City, Most Rev. Salvatore Cordileone of San Francisco, Most Rev. John T. Folda of Fargo, Most Rev. Bernard A. Hebda of Saint Paul and Minneapolis, Most Rev. William E. Lori of Baltimore, Most Rev. Joseph F. Naumann of Kansas City in Kansas, and Most Rev. Thomas G. Wenski of Miami.  Two of its directors are religious women, Mother Agnes Mary Donovan of Sisters of Life, and Sister Mary Peter Muehlenkamp of the Dominican Sisters of Saint Cecilia.  Five of its directors are Catholic lay persons, including: Helen Alvare, Beth Elfrey, Ed Hanway, Carla Mills, and Doug Wilson.

47.     All of the CBA's officers are Catholic.

48.     The CBA has a standing Ethics Committee, comprised exclusively of the

archbishops on its board. The CBA's bylaws state:

> The Ethics Committee shall have exclusive authority to review all benefits,
> products, and services provided by the Ministry, its affiliates or subsidiaries, or
> their respective contractors to ensure such conform with Catholic values and
> doctrine. If they do not, the committee shall determine the necessary corrections to
> bring such benefits, products, and services into conformity with Catholic values
> and doctrine. The decision of the committee shall be final and binding on the
> Ministry, its board, and its officers . . . .

Ex. B, CBA Bylaws, art. 5.14.2.

49.     To be a member of the CBA, an organization must meet these criteria, among

others: (1) it shall be a Catholic employer, and (2) with regard to the benefits it provides to its

employees, independent contractors, or students, or with regard to the health care services it

provides to its patients, the employer shall, as part of its religious witness and exercise, be

committed to providing no benefits or services inconsistent with Catholic values. Ex. B, CBA

Bylaws art. 3.1.2; *see also* Ex. A, CBA Articles, art. VI, Members; Ex. C, CBA Nonprofit

Employer Application for Membership; Ex. D, CBA For Profit Employer Application for

Membership.

50.     The Bylaws of the CBA provide that an employer "shall satisfy the requirement

of being Catholic if either the employer is listed in the current edition of *The Official Catholic

Directory* or the secretary or his or her designee makes such a determination." Ex. B, CBA

Bylaws, art. § 3.1.1.1.

51.     The Bylaws further provide that a for-profit employer seeking membership in the

CBA "shall be deemed Catholic only if (i) Catholics (or trusts or other entities wholly controlled

by such Catholic individuals) own 51% or more of employer, (ii) 51% or more of the members

of the employer's governing body, if any, is comprised of Catholics, and (iii) either the

employer's owners or governing body has adopted a written policy stating that the employer is

13

committed to providing no benefits to the employer's employees or independent contractors inconsistent with Catholic values." Ex. B, CBA Bylaws, art. § 3.1.1.2.

52.　All members of the CBA meet its criteria for being Catholic.

53.　The CBA presently has over 1,030 employer members plus over 5,100 member Catholic parishes, covering more than 90,000 employees and their families.

54.　CBA members include over 60 Catholic dioceses and archdioceses. CBA members also include hospitals, Catholic Charities, mental health service providers, counseling centers, nursing homes, senior residence facilities, schools, colleges, religious orders, and other Catholic ministries and Catholic-owned businesses.

55.　CBA members include hospitals and other healthcare entities that receive Medicaid and Medicare payments and thus are covered entities under the 2016 Rule.

56.　CBA members include Catholic Charities and other social service organizations that offer counseling and other mental health services, in individual and group settings, that receive Medicaid and Medicare payments and participate in HHS-funded programs and thus are covered entities under the 2016 Rule.

57.　CBA members include employers, including Catholic dioceses and archdioceses, that provide employee health benefits in conjunction with health insurers and TPAs. These insurers and TPAs participate in federally funded marketplaces and thus are covered entities under the 2016 Rule. The 2016 Rule thus constrains CBA members' ability to arrange for and secure health plans that reflect their Catholic values.

58.　CBA members include employers that are covered entities and those that are not covered entities under the 2016 Rule.

59.     CBA members include employers with 15 or more employees who are "employers" within the meaning of Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 2000e(b).

60.     The CBA has standing to represent all of its present and future members.

61.     The Mandate harms the CBA's members.

62.     The CBA seeks to protect its members' ability to operate in accordance with Catholic values and to access morally compliant health coverage for their respective employees or agents. It additionally seeks, for members that are covered entities, protection from being required to provide medical services and to perform surgeries contrary to Catholic values.

63.     The CBA can adequately represent its members' interests. All members are similarly situated in that the Defendants' Mandate coerces CBA members to cover, provide, pay for, or otherwise directly or indirectly facilitate access to gender transition services and abortions for their patients or for their employees in violation of members' sincerely held Catholic beliefs. The Mandate also deprives or will deprive certain CBA members of the option to purchase group insurance without gender transition and abortion coverage.

64.     The CBA brings this action on behalf itself and on behalf of specific members who themselves have suffered and will suffer concrete harm as a result of Defendants' actions.

**B.    Defendants**

65.     Defendants are appointed officials of the federal government and federal government agencies responsible for promulgating, administering, and enforcing the Mandate.

66.     Defendant United States Department of Health and Human Services is an executive agency of the United States government and is responsible for the promulgation, administration, and enforcement of the 2016 Rule.

67.     Defendant Alex M. Azar II is the Secretary of HHS. He is sued only in his official capacity.

68.     Defendant Equal Employment Opportunity Commission is a federal agency that administers, interprets, and enforces certain laws, including Title VII. The EEOC is responsible for, among other things, investigating complaints and bringing enforcement actions against employers for discrimination "because of . . . sex" in violation of Title VII.

69.     Defendant Janet Dhillon is the EEOC Chair. She is, in this capacity, responsible for the administration and implementation of policy within the EEOC, including investigation and enforcement pursuant to Title VII. She is sued only in her official capacity.

## IV.    PLAINTIFFS' BELIEFS AND PRACTICES RELATED TO THE MANDATE

70.     All Plaintiffs and all CBA members are Catholic ministries or Catholic-owned businesses that believe and practice the teachings of the Catholic Church on the nature of the human person, the dignity of humankind, the right to life, the right of conscience and religious freedom, and related ethical issues.

### A.    Catholic teaching on the duty to treat all persons with dignity

71.     The Catholic Church teaches that all people are born in the image and likeness of God and are thus imbued with human dignity. Catechism of the Catholic Church ("CCC") 1701. As such, all persons and are to be loved and respected in their human freedom, CCC 1738, even if they reject the Church's teaching on matters of sexual identity and sexual morality, CCC 2358.

72.     The United States Conference of Catholic Bishops ("USCCB") has applied this teaching to transgender persons and those afflicted with gender dysphoria. In response to the U.S. Department of Education's guidance letter asserting that Title IX bars discrimination based on "gender identity," the USCCB stressed that the Catholic Church "consistently affirms the inherent dignity of each and every human person and advocates for the wellbeing of all people,

16

particularly the most vulnerable." The USCCB statement affirms that people who struggle with their gender identity "deserve compassion, sensitivity, and respect."[1]

73.    The comments the USCCB filed along with other Christian bodies in response to HHS's proposed rule under Section 1557 likewise affirmed that "[e]veryone should have access to health care and health coverage."[2]

74.    HHS has acknowledged that every religious group that submitted comments in response to its propose rule shared similar sentiments. Its 2016 Rule notes, "None of the commenters supporting a religious exemption asserted that there would be a religious basis for generally refusing to treat LGBT individuals for a medical condition." 81 Fed. Reg. 31,376, 31,379 (May 18, 2016).

**B.    Catholic teaching on gender identity**

75.    Catholic teaching on the nature of the human person begins with the Book of Genesis, which teaches that "God created man in his own image . . . male and female he created them." CCC 2331 (quoting Genesis 1:27).

76.    The Catechism further teaches that "[e]veryone, man and woman, should acknowledge and accept his sexual identity." CCC 2333. "By creating the human being man and woman, God gives personal dignity equally to the one and the other. Each of them, man and woman, should acknowledge and accept his sexual identity." CCC 2393.

---

[1] USCCB, *USCCB Chairmen Respond to Administration's New Guidance Letter on Title IX Application*, May 16, 2016, https://www.usccb.org/news/2016/usccb-chairmen-respond-administrations-new-guidance-letter-title-ix-application.

[2] Comments from USCCB et al. to U.S. Dept. of Health and Human Services Re: Nondiscrimination in Health Programs and Activities RIN 0945-AA-2 (Nov. 6, 2015), http://www.usccb.org/about/general-counsel/rulemaking/upload/Comments-Proposal-HHS-Reg-Nondiscrimination-Federally-Funded-Health.pdf.

77.     Pope Francis has reiterated this Catholic teaching in recent years, affirming that "man too has a nature that he must respect and that he cannot manipulate at will. . . . The acceptance of our bodies as God's gift is vital for welcoming and accepting the whole world as a gift from the Father. . . . Learning to accept our body, to care for it and to respect its fullest meaning, is an essential element of any genuine human ecology." *Laudato Si*, No. 155 (2015).

78.     As for youth who are struggling with their gender identity, Pope Francis has taught that "the young need to be helped to accept their own body as it was created." *Amoris Laetitia*, No. 285 (2016).

79.     Sexual reassignment surgery requires the destruction of healthy sexual and reproductive organs.[3]

80.     The Catholic Church teaches that intentionally removing healthy organs that identify as a person as male or female is a type of amputation or mutilation that is intrinsically evil.

81.     Some gender transition surgeries also involve sterilization. The Catholic Church teaches that all forms of sterilization are contrary to the moral law. CCC 2370.

82.      The Catholic Church teaches that "[e]xcept when performed for strictly therapeutic medical reasons, directly intended amputations, mutilations, and sterilizations performed on innocent persons are against the moral law." CCC 2297.

**C.     Catholic teaching on abortion**

83.     The Catechism of the Catholic Church teaches that life begins at conception and that "[h]uman life must be respected and protected absolutely from the moment of conception."

---

[3] Richard P. Fitzgibbons, M.D., et al., *The Psychopathology of "Sex Reassignment" Surgery: Assessing its Medical, Psychological and Ethical Appropriateness*, Nat'l Catholic Bioethics Q. 97, 100 (Spring 2009), https://repository.library.georgetown.edu/handle/10822/1029434.

CCC 2270. Thus, "[d]irect abortion, that is to say, abortion willed either as an end or a means, is gravely contrary to the moral law." CCC 2271.

### D.     Catholic teaching on scandal

84.     Catholic moral theology prohibits acts that may give rise to "scandal." The Catechism defines scandal as "an attitude or behavior which leads another to do evil." CCC 2284. The Catechism teaches that "[a]nyone who uses the power at his disposal in such a way that it leads others to do wrong becomes guilty of scandal and responsible for the evil that he has directly or indirectly encouraged." CCC 2287. Avoiding scandal is particularly important for Catholic entities that seek to inculcate Catholic faith and values.

### E.     The Ethical and Religious Directives

85.     The foregoing teachings are reflected in the Ethical and Religious Directives for Catholic Health Care Services ("Ethical and Religious Directives" or "ERDs"), a document issued by the United States Conference of Catholic Bishops in order "to reaffirm the ethical standards of behavior in health care that flow from the Church's teaching about the dignity of the human person" and "to provide authoritative guidance on certain moral issues that face Catholic health care today." USCCB, *Ethical and Religious Directives for Catholic Health Care Services, Fifth Edition*, ¶ 4, http://www.usccb.org/issues-and-action/human-life-and-dignity/health-care/upload/Ethical-Religious-Directives-Catholic-Health-Care-Services-fifth-edition-2009.pdf .

86.     The ERDs teach that "[d]irect sterilization of either men or women, whether permanent or temporary, is not permitted in a Catholic health care institution. Procedures that induce sterility are permitted when their direct effect is the cure or alleviation of a present and serious pathology and a simpler treatment is not available." *Id*. ¶ 53.

87. The ERDs teach that "Catholic health care organizations are not permitted to engage in immediate material cooperation in actions that are intrinsically immoral, such as abortion, euthanasia, assisted suicide, and direct sterilization." *Id*. ¶ 70.

**F.    The Catholic Benefits Association's Ethics Committee**

88. As noted above, the CBA's Ethics Committee, comprised exclusively of Catholic archbishops, has the duty and responsibility to define Catholic values and doctrine on relevant issues for CBA members.

89. In November 2016, the CBA's Ethics Committee convened to address doctrinal and ethical issues related to the Mandate. After consultation, it unanimously adopted the following resolutions:

> a.   **RESOLVED**: that treatments and services designed to alter a person's biological sex are contrary to Catholic values. A Catholic employer, therefore, cannot, consistent with Catholic values, comply with the government's mandate to include coverage in its employee health plan for treatments services designed to alter a person's biological sex.
>
> b.   **RESOLVED**: that treatments and services designed to alter a person's biological sex are contrary to Catholic values. A Catholic hospital, clinic, physicians practice group, or other medical provider, therefore, cannot, consistent with Catholic values, comply with the government's mandate to provide or deliver treatments or services designed to alter a person's biological sex.
>
> c.   **RESOLVED**: that abortion is contrary to Catholic values. A Catholic employer, therefore, cannot, consistent with Catholic values, comply with any government mandate to include coverage in its employee health plan for abortion.
>
> d.   **RESOLVED**: that abortion is contrary to Catholic values. A Catholic health care insurer or third party administrator, therefore, cannot, consistent with Catholic values, comply with any government abortion mandate by operating or administering a plan that provides coverage for abortion.
>
> e.   **RESOLVED**: that abortion is contrary to Catholic values. A Catholic hospital, clinic, physicians practice group, or other medical provider, therefore, cannot, consistent with Catholic values, comply with any government abortion mandate that requires the provision and delivery of abortion services.

90.     Consistent with the Ethics Committee's guidance, Plaintiffs and all CBA members believe they must adhere to the above teachings as matters of religious faith and doctrine. Consequently, CBA members believe that gender transition procedures, sterilization, and abortion are contrary to the Catholic faith. CBA members further believe, as part of their faith, that they must not provide, pay for, or directly or indirectly facilitate access to such services and, therefore, that they must not perform gender transition services or abortions and must not include coverage for such procedures in their group health plans.

**G.     The Mandate constitutes bad medicine**

91.     In addition to the religious and ethical convictions described above, Plaintiffs and all CBA members also believe that the Mandate constitutes bad medicine.

92.     Because Defendants' Mandate has no age limit, it requires covered entities to provide gender transition services for adolescents diagnosed with gender dysphoria.

93.     Placing adolescents on puberty blockers or cross-sex hormones may cause permanent infertility and increased health risks.

94.     For example, male adolescents on cross-sex hormones are at a higher risk for thrombosis, cardiovascular disease, weight gain, elevated blood pressure, decreased glucose tolerance, gallbladder disease, and breast cancer.

95.     Similarly, female adolescents on cross-sex hormones are at a higher risk for hepatotoxicity, polycythemia, increased risk of sleep apnea, insulin resistance, and unknown effects on breast, endometrial, and ovarian tissues.

96.     These consequences are even more serious given that the overwhelming majority of adolescents who are formally diagnosed with gender dysphoria naturally come to accept their sex and enjoy emotional health by late adolescence.

97.     Even where gender transition surgeries are effective in helping patients' physical bodies match their gender identity, post-surgical individuals have substantially higher rates of overall mortality, death from cardiovascular disease and suicide, suicide attempts, and hospitalizations compared to a healthy control population, especially as the years progress.

98.     Plaintiffs believe that Defendants' Mandate also declares as "medically necessary" a radical course of treatment that the medical profession properly rejects when it comes to other psychological conditions where people experience emotional distress because of a discrepancy between their self-image and the physical reality. According to Defendants' logic, it would be "medically necessary" to perform liposuction on someone with anorexia nervosa (belief that one is obese), cosmetic surgery on someone with body dysmorphic disorder (belief that one is disfigured), or amputations for someone with body integrity identity disorder (belief that one is meant to be disabled).

99.     Plaintiffs also believe that optimal patient care—including patient education, diagnosis, and treatment—requires taking account of the biological differences between men and women. To cite but one example, optimal prevention of and treatment for heart disease in women requires monitoring for different warning signs, accounting for different risk factors, and providing different counseling than it would for men.

100.    For all these reasons, the CBA and its members believe that providing gender transition services is contrary to their religious and professional obligations and constitutes bad medicine.

## V.    THE MANDATE

### A.    Statutory Overview

#### 1.    Section 1557 of the Affordable Care Act and its incorporation of Title IX of the Education Amendments of 1972

22

101.    Together, the Patient Protection and Affordable Care Act, Pub. L. 111-148, 124 Stat. 119 (Mar. 23, 2010), and the Health Care and Education Reconciliation Act of 2010, Pub. L. 111-152, 124 Stat. 1029 (Mar. 30, 2010), make up and are known as the Affordable Care Act.

102.    Section 1557(a) of the ACA prohibits discrimination in federally funded healthcare programs and activities on the basis of (1) race, color, and national origin, (2) sex, (3) age, and (4) disability. *See* 42 U.S.C. § 18116(a). The statute does not do this directly. Instead, it incorporates by reference, and bars discrimination "on the ground prohibited by," four other federal laws: (1) Title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.), (2) Title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.); (3) the Age Discrimination Act of 1975 (42 U.S.C. 6101 et seq.); and (4) section 794 of Title 29 (the Rehabilitation Act).

103.    Section 1557(b) of the ACA provides that nothing in the statute "shall be construed to invalidate or limit the rights, remedies, procedures, or legal standards available to individuals aggrieved under title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.), title VII of the Civil Rights Act of 1964 (42 U.S.C. 2000e et seq.), title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.), section 794 of Title 29, or the Age Discrimination Act of 1975." 42 U.S.C. § 18116(b).

104.    Title IX was enacted in 1972. Public Law No. 92-318, 86 Stat. 235 (June 23, 1972). It states that no person "shall, on the basis of sex, be excluded from participating in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

105.    Title IX's prohibition, however, "shall not apply" to an institution "controlled by a religious organization if the application of this subsection would not be consistent with the religious tenets of such organization." 20 U.S.C. § 1681(a)(3).

106.    Title IX also says that "[n]othing in this chapter shall be construed to require or prohibit any person, or public or private entity, to provide or pay for any benefit or service, including the use of facilities, related to an abortion." 20 U.S.C. § 1688.

107.    The ordinary public meaning of Title IX, and thus Section 1557, is that religious organizations like Plaintiffs are not subject to its requirements, nor can the statute be construed to require Plaintiffs to provide or pay for abortions.

### 2.    Title VII of the Civil Rights Act of 1964

108.    Congress enacted Title VII in 1964. Public Law 88-352, 78 Stat. 241 (July 2, 1964).

109.    Title VII makes it unlawful for an employer to discriminate against an employee or prospective employee "because of such individual's . . . sex." 42 U.S.C. § 2000e-2.

110.    Title VII defines an "employer" subject to its provisions as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year." 42 U.S.C. § 2000e(b).

111.    The U.S. Census Bureau estimates that there are over 875,000 employers in the United States with 15 or more employees.[4]

112.    Title VII contains an exemption for religious employers. It states that Title VII "shall not apply" to a religious organization's "employment of individuals of a particular

---

[4] *See* U.S. Census Bureau, "2017 SUSB Annual Data Tables by Establishment Industry" (Mar. 2020), https://www.census.gov/data/tables/2017/econ/susb/2017-susb-annual.html (select "U.S. and states, NAICS sectors, small employment sizes less than 500" for statistics on firm size measured by number of employees).

religion." *See* 42 U.S.C. § 2000e-1(a). The statute defines "religion" broadly to include "all aspects of religious observance and practice, as well as belief." 42 U.S.C. § 2000e(j).

113.    Congress enacted the Pregnancy Discrimination Act in 1978 to further define what constitutes "sex" discrimination under Title VII. It specified that the terms "because of sex" or "on the basis of sex" include "because of or on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k). At the same time, Congress clarified that Title VII "shall not require an employer to pay for health insurance benefits for abortion." *Id.*

### 3.    Anti-abortion provisions in or applicable to the Affordable Care Act

114.    The text, context, and history of the Affordable Care Act reflect clear congressional intent that no group health plan is or should be required to cover abortion.

115.    The Act provides that "[n]otwithstanding any other provision of this title (or any amendment made by this title) . . . nothing in this title (or any amendment made by this title), shall be construed to require a qualified health plan to provide coverage of [abortion] services . . . as part of its essential health benefits for any plan year." 42 U.S.C. § 18023(b)(1)(A)(i).

116.    The Act provides that "the issuer of a qualified health plan shall determine whether or not the plan provides coverage of [abortion] services . . . as part of such benefits for the plan year." *Id.* § 18023(b)(1)(A)(ii).

117.    The Act provides that "[n]othing in this Act shall be construed to have any effect on Federal laws regarding (i) conscience protection; (ii) willingness or refusal to provide abortion; and (iii) discrimination on the basis of the willingness or refusal to provide, pay for, cover, or refer for abortion or to provide or participate in training to provide abortion." *Id.* § 18023(c)(2).

118.    The Affordable Care Act itself does not contain a restriction on the use of federal funds to pay for abortion services. This omission nearly defeated the Act's passage when a group

of pro-life Democrats in the House of Representatives, led by Rep. Bart Stupak of Michigan, threatened to withhold their votes from the bill. To secure their votes, then-President Obama issued an executive order that prohibited the use of federal funds to pay for "abortion services . . . , consistent with a longstanding Federal statutory restriction that is commonly known as the Hyde Amendment." Exec. Order No. 13,535, Patient Protection and Affordable Care Act's Consistency with Longstanding Restrictions on the Use of Federal Funds for Abortion, 3 C.F.R. 201 (2010).

119.    In addition, the Weldon Amendment—a feature of every appropriations act for HHS since 2005—provides, "None of the funds made available in this Act [making appropriations for the Departments of Labor and HHS] may be made available to a Federal agency or program, or to a State or local government, if such agency, program, or government subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions." Consolidated Appropriations Act of 2012, Pub. L. No. 112-74, div. F, tit. V, § 507(d)(1), 125 Stat. 786, 1111 (2011). The term "health care entity" includes "a health insurance plan." *Id.*

120.    The Affordable Care Act and the Weldon Amendment prohibit the government from coercing the consciences of healthcare providers that respect the sanctity of life. Executive Order 13,535 reflects the federal government's longstanding avoidance of coercing the consciences of taxpayers that oppose abortion and government funding of abortion services.

**B.    The 2016 Rule**

121.    On May 18, 2016, HHS finalized a rule pursuant to Section 1557 stating that impermissible discrimination "on the basis of sex" "includes . . . discrimination on the basis of

26

. . . termination of pregnancy, . . . sex stereotyping, and gender identity." 81 Fed. Reg. 31,376, 31,467 (May 18, 2016). Plaintiffs refer to this as the "2016 Rule."

122.    The 2016 Rule defines "gender identity" to include a person's "internal sense of gender, which may be male, female, neither, or a combination of male and female." *Id.*; *see also id.* at 31,392 (stating that the "gender identity spectrum includes an array of possible gender identities beyond male and female"); *id.* at 31,384 (stating that individuals with "non-binary gender identities are protected under the rule").

123.    The 2016 Rule defines "sex stereotypes" to mean "stereotypical notions of masculinity or femininity, including expectations of how individuals represent or communicate their gender to others, such as behavior, clothing, hairstyles, activities, voice, mannerisms, or body characteristics." *Id.* at 31,468.

124.    The 2016 Rule also defines sex discrimination to encompass discrimination based on "termination of pregnancy" in covered programs. *Id.* at 31,467. HHS expressly declined "to state explicitly" that it would not interpret this phrase as an abortion mandate, as commenters on the proposed rule had urged it to do. Instead, HHS simply noted the existence of conscience protections in federal law and ACA limitations on requiring abortion coverage. *Id.* at 31,388.

125.    The 2016 Rule applies to a  "covered entity," defined to mean "any entity that has a health program or activity, any part of which receives Federal financial assistance from [HHS]." *Id.* at 31,445. HHS estimates that the 2016 Rule covers "almost all licensed physicians because they accept Federal financial assistance," including payments from Medicare and Medicaid. *Id.* Other observers estimate that 2016 Rule applies "to over 133,000 (virtually all) hospitals, nursing homes, home health agencies, and similar provider facilities, about 445,000 clinical laboratories, 1,200 community health centers, 171 health-related schools, state Medicaid

27

and CHIP programs, state public health agencies, federally facilitated and state-based

marketplaces, at least 180 health insurers that market policies through the [federally facilitated

marketplace] and state-based marketplaces, and up to 900,000 physicians." Timothy Jost,

Implementing Health Reform: HHS Proposes Rule Implementing Anti-Discrimination ACA

Provisions (Contraceptive Coverage Litigation Update), *Health Affairs Blog* (Sept. 4, 2015),

http://healthaffairs.org/blog/2015/09/04/implementing-health-reform-hhs-proposes-rule-

implementing-anti-discrimination-aca-provisions/.

126. The 2016 Rule's extension of Section 1557 to "gender identity" and "termination

of pregnancy," coupled with its expansive definition of a "covered entity," means that (1)

healthcare providers are required to perform or refer for gender transition procedures, (2)

healthcare providers are required to alter their speech and medical advice, (3) covered employers

and insurance providers are required to offer employee benefits covering gender transition

procedures, (4) sex-specific healthcare facilities and programs, including shower facilities and

hospital wards, must be opened to individuals based on gender identity, among other

requirements. These are described in more detail below.

      **1.**    **Healthcare professionals are required to perform or refer for gender transition procedures.**

127. The 2016 Rule requires healthcare providers and professionals to perform (or

refer for) gender transition procedures if they offer analogous services in other contexts. For

example, "[a] provider specializing in gynecological services that previously declined to provide

a medically necessary hysterectomy for a transgender man would have to revise its policy to

provide the procedure for transgender individuals in the same manner it provides the procedure

for other individuals." 81 Fed. Reg. at 31,455. HHS explained that a hysterectomy in this gender

transition context would be "medically necessary to treat gender dysphoria," *id*. at 31,429,

thereby defining medical necessity, benefit, and prudence as a matter of federal law, without regard to the opinions, judgment, and conscientious considerations of the many medical professionals who hold views to the contrary.

128.    HHS issued this Mandate despite the widespread, well-documented, ongoing debate about the medical risks and ethics associated with various gender transition procedures, even within the transgender community itself. The 2016 Rule seeks to preempt the serious medical and moral debate about gender transition procedures by concluding in the context of physicians offering "health services" that a "categorization of all transition-related treatment . . . as experimental, is outdated and not based on current standards of care." 81 Fed. Reg. at 31,435; *see also id*. at 31,429.

129.    In creating the Mandate, HHS disregarded the commenters that asked HHS to make clear that health services need only be covered if they are deemed to be "medically necessary" or "medically appropriate" in the professional opinion of those charged with the care of the patient. In response to these comments, HHS stated that under its 2016 Rule, some procedures "related to gender transition" may be required even if they were not "strictly identified as medically necessary or appropriate." *Id*. at 31,435. Thus, under the rule, if a doctor would perform a mastectomy as part of a medically-necessary treatment for breast cancer, it would be illegal for the same doctor to decline to perform a mastectomy for a gender transition, even if the doctor believed that removing healthy breast tissue was contrary to the patient's medical interest.

> ### 2.    Healthcare providers are required to alter their speech and medical advice.

130.    By concluding that it was "outdated and not based on current standards of care" for a healthcare provider to "categoriz[e] all transition-related treatment . . . as experimental," *id*.,

HHS has seriously curbed a Catholic healthcare entity's ability to maintain policies and practices reflecting a contrary view, even if such a view is based on the entity's religious convictions, conscientious beliefs, and medical judgment. The 2016 Rule thus forces Catholic healthcare providers to alter their speech and medical advice.

131.     The 2016 Rule compels the speech of healthcare institutions and professionals in several ways. For example, the rule mandates revisions to healthcare providers' written policies, requiring express affirmations that gender transition-related procedures would be provided, *id*. at 31455, even if such revisions do not reflect the entity's medical judgment, values, or beliefs. It requires physicians to use gender-transition affirming language in all situations regardless of circumstance and mandates, for example, that medical providers use "a transgender individual's preferred name and pronoun," *id*. at 31,406, and not "impose" a "binary view of gender," *id.* at 31,435. Thus, to avoid liability, healthcare providers are compelled to speak by revising their policy to endorse gender transition-related services, to express language that is "affirming" of gender transition, and to express a non-binary view of gender. Further, by treating as discriminatory a medical view of "transition-related treatment . . . as experimental," the rule coerces healthcare providers to speak about these procedures the way the government wants them to, even though they disagree and even though they believe they would disserve patients in so doing.

> **3.    Covered employers and insurance providers are required to offer employee benefits covering gender transition procedures.**

132.     The 2016 Rule prohibits certain employers, health programs, and insurance plans from exercising judgment as to what they cover. HHS stated, "[A]n explicit, categorical (or automatic) exclusion or limitation of coverage for all health services related to gender transition is unlawful on its face." *Id*. at 31,429.

133.    For example, if a doctor concludes that a hysterectomy "is medically necessary to treat gender dysphoria," the patient's employer or insurance plan is required to cover the procedure on the same basis that it would cover it for other conditions (like cancer). *Id*. HHS also stated that the "range of transition-related services, which includes treatment for gender dysphoria, is not limited to surgical treatments and may include, but is not limited to, services such as hormone therapy and psychotherapy, which may occur over the lifetime of the individual." *Id*. at 31,435-36. As such, coverage is required under the 2016 Rule notwithstanding the rights of employers, like Plaintiffs, that offer employee health benefits consistent with the religious beliefs and values of their organizations.

134.    This conflict with religious employers extends beyond treatment related to gender dysphoria because some required procedures (such as elective hysterectomies) result in sterilization, and the 2016 Rule also extends to "termination of pregnancy."

135.    This health benefit requirement of the 2016 Rule applies to any of the following types of employers who receive HHS funding: (1) any entity principally involved in providing or administering health services (including hospitals, nursing homes, counseling centers, physicians' offices, etc.), (2) any type of employer that receives HHS funding for the primary purpose of funding an "employee health benefit program," and (3) any entity such as a university with a health training or research program that receives HHS funding or Federal financial assistance for that "health program or activity." *See id.* at 31,472, 31,437. Thus, any such employers that have always offered employee health benefits that reflect their religious or conscientious beliefs, and that exclude gender transition procedures from employee benefits, are considered discriminatory under the 2016 Rule.

136.    As a result of the 2016 Rule, some CBA members received notices from their insurance companies that their health plans were changing. These changes were not requested by these members. They were imposed involuntarily by the insurers on the ground that the changes were mandated by the 2016 Rule. Exhibits E and F hereto are, respectively, the gender dysphoria policies that United Healthcare and Blue Cross Blue Shield of Kansas City delivered to CBA member dioceses – even those these dioceses are not themselves "covered entities" under the 2016 Rule.

137.    The United Healthcare "Gender Dysphoria Rider" informed the diocese that its plan would now cover "[b]enefits for the treatment of Gender Dysphoria" and that any "exclusion for sex transformation operations and related services . . . is deleted." Ex. E at 1, 3. "Benefits for the treatment of Gender Dysphoria" include psychotherapy, "[c]ross-sex hormone therapy," and "[s]urgery for the treatment of Gender Dysphoria." *Id.* The latter category of surgery includes "Male to female surgeries" such as orchiectomy and penectomy (removal of testicles and penis) and clitoroplasty, labiaplasty, and vaginoplasty (creation of a clitoris, labia, and vagina). It also includes "Female to male surgeries" such as mastectomy, hysterectomy, vulvectomy and vaginectomy (removal of vulva and vagina), and metoidioplasty and phalloplasty (creation of penis).

138.    After receiving notice of the United Healthcare rider in the mail, the CBA member diocese called the insurance company to demand the rider be removed from its plan. The insurer refused, informing the diocese that its plan must include the rider a result of the 2016 Rule.

139.    The Blue Cross Blue Shield of Kansas City "Treatment of Gender Dysphoria" Policy informed the covered diocese that "[i]f coverage for gender reassignment surgery is

available per the member's benefit, Blue Cross and Blue Shield of Kansas City (Blue KC) will provide coverage for treatment of gender dysphoria including gender reassignment surgery when it is determined to be medically necessary." Ex. F at 1. Under the policy, the diocesan plan covers "[p]sychotherapy for gender dysphoria"; "Continuous Hormone Replacement Therapy" with "[h]ormones of the desired gender," and surgeries for a "medically necessary initial gender reassignment," such as those identified above.

140.    After receiving notice of the Blue Cross Blue Shield policy, the CBA member diocese called the insurer and was informed that the policy applied to the diocese's plan as a result of 2016 Rule.

4.    **Sex-specific healthcare facilities or programs, including shower facilities or hospital wards, must be opened to individuals based on gender identity.**

141.    With regard to facilities, the 2016 Rule states that even for sex-specific facilities such as "shower facilities" offered by healthcare providers, individuals cannot be excluded "based on their gender identity." 81 Fed. Reg. at 31,409.

142.    When Title IX—the foundation for the 2016 Rule—was enacted, Congress ensured that it protected and preserved the privacy rights of individuals in intimate areas. *See* 20 U.S.C. § 1686; 117 Cong. Rec. 30407 (1971); 117 Cong. Rec. 39260 (1971); 117 Cong. Rec. 39263 (1971),; 118 Cong. Rec. 5807 (1972). HHS's predecessor, the Department of Health, Education, and Welfare, promulgated regulations guaranteeing the privacy of individuals in intimate areas. *See* 34 C.F.R. § 106.32(b); 34 C.F.R. § 106.33 ("A recipient may provide separate toilet, locker room, and shower facilities on the basis of sex . . . ."). But in the 2016 Rule, HHS wholly disregarded any "legal right to privacy" that could be violated "simply by permitting another person access to a sex-specific program or facility which corresponds to their gender identity." 81 Fed. Reg. at 31,389, 31,409.

143.    With regard to other health programs, HHS stated that sex-specific health programs or activities are permissible only if the covered entity could demonstrate "an exceedingly persuasive justification, that is, that the sex-specific program is substantially related to the achievement of an important health-related or scientific objective." *Id.* at 31,468. HHS stated that it would "expect a covered entity to supply objective evidence, and empirical data if available, to justify the need to restrict participation in the program to only one sex," and in "no case" would HHS "accept a justification that relies on overly broad generalizations about the sexes." *Id*.

### 5.    Other requirements of the 2016 Rule

144.    The 2016 Rule requires that covered entities applying for federal financial assistance affirm up front that they will comply with the rule. *Id.* at 31,468.

145.    The rule also requires covered entities to post notices regarding compliance with the 2016 Rule in conspicuous locations. HHS provided a sample notice in Appendix A to the rule, which stated in relevant part that the covered entity "does not exclude people or treat them differently because of race, color, national origin, age, disability, or sex." *Id.* at 31,472.

146.    Covered entities are required to train employees on the requirements of the 2016 Rule. *See id.* at 31,452, 31,458-59. This training mandate creates ethical challenges, notably a compelled speech problem, for CBA members in the healthcare field. HHS estimated that covered entities would have to spend $371.7 million dollars to train their employees on the requirements of the rule. *Id.* at 31,452.

6.   **HHS rejected calls to accommodate religious exercise in the 2016 Rule.**

147.   HHS was aware that the 2016 Rule would substantially burden the religious exercise of religious hospitals, churches, ministries, and other employers. *See id*. at 31,378.

148.   During the comment period, many religious organizations voiced their alarm at the scope of the earlier proposed rule and explained why it was essential for HHS to include adequate protections for religious employers and healthcare organizations. For example, the United States Conference of Catholic Bishops joined with the National Association of Evangelicals, the Christian Medical Association, the National Catholic Bioethics Center, and other religious organizations to submit comments explaining how HHS's proposed rules would affect religious employers and urging HHS to protect religious exercise. *See* Comments from USCCB et al., *supra*, note 2.

149.   Recall that Section 1557 does not independently prohibit discrimination, but instead references four preexisting laws: Title VI, Title IX, the Age Act, and the Rehabilitation Act (Section 504). HHS faithfully incorporated the exemptions applicable to Title VI, the Age Act, and the Rehabilitation Act into its 2016 Rule:

> The exceptions applicable to Title VI ***apply*** to discrimination on the basis of race, color, or national origin under this part. The exceptions applicable to Section 504 ***apply*** to discrimination on the basis of disability under this part. The exceptions applicable to the Age Act ***apply*** to discrimination on the basis of age under this part.

81 Fed Reg. at 31,470 (emphases added).

150.   But when it came to Title IX, HHS changed course. Unlike its treatment of the other thee statutes cited in Section 1557, HHS refused to incorporated Title IX's religious exemption. 81 Fed. Reg. at 31,380. Instead of incorporating Title IX's religious exemption or otherwise recognizing the burden that its rule would place on religious healthcare providers and other religious employers, HHS merely stated that religious objectors could assert claims under

35

existing statutory protections for religious freedom. *Id*. at 31,376. But HHS also failed to provide

any mechanism by which a religious entity could determine if it was entitled to any existing

religious protections under the law.

151.   The 2016 Rule was, in this regard, even more extreme and unyielding than the

contraceptive/abortifacient mandate that HHS created based on another section of the Affordable

Care Act. *See Sharpe Holdings, Inc. v. U.S. Dep't of Health & Human Servs.*, 801 F.3d 927, 933-

35 (8th Cir. 2015) (describing HHS's contraceptive and abortifacient mandate). While HHS

reluctantly decided to exempt a narrowly defined group of "religious employers" from its

abortifacient and contraception mandate, *id*. at 933, it declined to exempt *any* religious

employers from the 2016 Rule. And while many non-exempt religious employers could avoid the

contraceptive/abortifacient mandate (though at substantial cost) by maintaining a grandfathered

group health plan, there is no grandfather exemption from the requirements of Section 1557 or

the 2016 Rule.

152.   Even while refusing to exempt religious organizations from its Mandate, the

government has exempted its own insurance programs. TRICARE, the military's insurance

program, does not cover "surgery for gender dysphoria." TRICARE, Covered Services, Gender

Dysphoria Services (last updated June 18, 2020).[5] A TRICARE guidance memo states that in the

context of gender dysphoria treatment, "[i]n no circumstance will a provider be required to

deliver care that he or she feels unprepared to provide either by lack of clinical skill or due to

---

[5] Available at https://tricare.mil/CoveredServices/IsItCovered/GenderDysphoriaServices.

ethical, moral, or religious beliefs."[6] Yet no similar protections for providers' medical judgment or religious beliefs are offered under the 2016 Rule.

153.    Further, Medicare and Medicaid do not require coverage for gender reassignment surgery, but allow states and local administrators to make coverage determinations on a case-by-case basis. Ctrs. for Medicare & Medicaid Servs., Decision Memo for Gender Dysphoria and Gender Reassignment Surgery (Aug. 30, 2016).[7] The Centers for Medicare & Medicaid Services, which is part of HHS, concluded that "there is not enough evidence to determine whether gender reassignment surgery improves health outcomes" because while some studies "reported benefits," "others reported harms." Ctrs. for Medicare & Medicaid Servs., Proposed Decision Memo for Gender Dysphoria and Gender Reassignment Surgery (June 2, 2016).[8]

**C.    The EEOC, invoking Title VII, has imposed on non-covered entities the Mandate's requirement of gender-transition coverage.**

154.    Although the 2016 Rule directly applies only to "covered entities," it announces that the EEOC will enforce a similar rule against employers under Title VII. The 2016 Rule declares that where HHS "lacks jurisdiction over an employer," it will "refer or transfer the matter to the EEOC and allow that agency to address the matter." *Id*. at 31,432. When Section 1557 does not apply, claims may be brought against employers under Title VII. *Id*. at 31,404. HHS decided that, for non-healthcare entities, Title VII was better suited to "address claims that

---

[6] Memo. from Karen S. Guice, Acting Assistant Sec'y of Defense to Assistant Sec'y of Army et al., Subject: Guidance for Treatment of Gender Dysphoria for Active and Reserve Component Service Members (July 29, 2016)

[7] Available at https://www.cms.gov/medicare-coverage-database/details/nca-decision-memo.aspx?NCAId=282.

[8] Available at https://www.cms.gov/medicare-coverage-database/de-tails/nca-proposed-decision-memo.aspx?NCAId=282.

an employer has discriminated in the provision of benefits, including health benefits, to its employees." *Id*. at 31,437.

155.    The EEOC confirmed to HHS it would cooperate in such matters, indicating that "the date a complaint was filed with [HHS] will be deemed the date it was filed with the EEOC." *Id*. at 31,432.

156.    In the context of Title VII, the EEOC has adopted similar substantive standards as HHS. When the 2016 Rule was promulgated, the EEOC interpreted Title VII as prohibiting discrimination against employees on the basis of "transgender status." EEOC, What You Should Know About EEOC and the Enforcement Protections for LGBT Workers.[9] The EEOC maintains this interpretation today. *See* EEOC, What You Should Know: The EEOC and Protections for LGBT Workers ("EEOC Statement").[10]

157.    The EEOC has specifically enforced this interpretation by requiring employer health plans to cover "medically necessary care based on transgender status." EEOC, Deluxe Financial to Settle Sex Discrimination Suit on Behalf of Transgender Employee, 2016 WL 246967 (Jan. 21, 2016) (noting that three-year consent decree with employer "provides that, as of January 1, 2016, [employer's] national health benefits plan will not include any partial or categorical exclusion for otherwise medically necessary care based on transgender status").

158.    Dignity Health is one of the largest healthcare systems in the United States, and includes many Catholic hospitals.  In June 2016, Josef Robinson, a transgender male, sued

---

[9] This EEOC Statement was previously available at https://www.eeoc.gov/eeoc/newsroom/wysk/enforcement_protections_lgbt_workers.cfm. The version of this page, as accessed and preserved on December 15, 2016 by the Internet Archive, is attached hereto as Exhibit G. The foregoing URL now redirects to the URL in note 10, *infra*.

[10] Available at https://www.eeoc.gov/laws/guidance/what-you-should-know-eeoc-and-protections-lgbt-workers.

Dignity Health for maintaining an employee health plan that categorically excluded coverage for gender transition services. Robinson's complaint asserted a violation of Title VII, claiming that "[d]iscrimination on the basis of transgender status or gender nonconformity is discrimination on the basis of 'sex' under Title VII," and that the hospital's exclusion of transgender surgery constituted a violation of Section 1557 of the Affordable Care Act. EEOC filed an amicus brief in the case in support of Robinson, arguing that the employer's transgender exclusion violated Title VII by denying Robinson "access to medically necessary treatment for his gender dysphoria, a serious health condition directly related to the fact that he is transgender." Amicus Brief of EEOC in Support of Plaintiff, *Robinson v. Dignity Health*, 16-cv-03035 YGR (N.D. Cal.) (filed Aug. 22, 2016).[11]

159.    The EEOC has taken enforcement action against other employers for the "categorical exclusion" from their health plans of "services related to transgender treatment/sex therapy." Soc'y for Human Res. Mgmt., Wal-Mart Loses Perfect LGBTQ Rating Because of Transgender Harassment, Nov. 30, 2017.[12]

160.    Since promulgating the guidance and taking the positions and enforcement actions described above, the EEOC has never changed its interpretation or application of Title VII.

161.    Accordingly, it is the policy and official position of the EEOC, based on the EEOC Statement and the agency's actual enforcement actions, that exclusion of gender-transition coverage in employer health plans constitutes a violation of Title VII's ban on "sex" discrimination.

---

[11] Available at https://www.eeoc.gov/sites/default/files/migrated_files/eeoc/litigation/briefs/robinson.html.

[12] Available at https://www.shrm.org/resourcesandtools/legal-and-compliance/employment-law/pages/wal-mart-lgbtq-rating.aspx.

### D.    Enforcement Mechanisms

162.    CBA members that do not comply with the Mandate may face enforcement actions initiated by federal agencies or by individuals who allege they have been discriminated against.

163.    The 2016 Rule subjects "covered entities" to enforcement actions brought by HHS's Office of Civil Rights ("OCR"). If the Director of OCR concludes that a covered entity had discriminated on the basis of "gender identity" or "termination of pregnancy," the entity would have to take "remedial action . . . to overcome the effects of the discrimination." 81 Fed. Reg. at 31,468. If it refuses, OCR could initiate an administrative procedure to terminate the entity's HHS funding. *Id*. at 31,472, 31,439.

164.    The 2016 Rule also empowers OCR to compel covered entities to record and submit compliance reports under Section 1557. *Id.* at 31,439, 31,472.

165.    Under the 2016 Rule, where HHS does not have jurisdiction over an alleged discriminatory act, it said it would refer the matter to the EEOC for enforcement under Title VII. Similar to HHS's authority under Section 1557, the EEOC has authority to investigate alleged Title VII violations and will ask violators to voluntarily take corrective action for the discriminatory behavior. 42 U.S.C. § 2000e-5(a).

166.    If HHS or the EEOC are dissatisfied with an entity's corrective remedial actions, the 2016 Rule permits referral of the matter to the Department of Justice to bring a federal lawsuit to enforce federal civil rights laws. *See, e.g*., 81 Fed. Reg. at 31,439, 31,441.

167.    Title VII creates a private right of action. In the 2016 Rule, HHS interpreted Section 1557 as authorizing a private right of action. *See id.* at 31,440. This means that

40

individuals who believe they have been discriminated against on the basis of gender identity may bring their own federal lawsuits. These laws can also be enforced by class action suits.

168.    Sanctions for failing to comply with the 2016 Rule are severe. They include compensatory damages, punitive damages, treble damages, civil penalties, attorney fees, injunctive relief, and even loss of federal funding.

169.    _Loss of federal funding_: Catholic healthcare entities subject to the 2016 Rule risk the denial or discontinuance of federal funding if they do not comply. *Id.* at 31,472. HHS Form 690 makes compliance "a condition of continued receipt of Federal financial assistance" and authorizes the government "to seek judicial enforcement of this assurance."

170.    _Civil and criminal penalties and treble damages_: Covered entities that submit HHS Form 690 but do not comply with the 2016 Rule could be liable under the False Claims Act, which authorizes a civil penalty of up to $11,000 for each false claim, "plus 3 times the amount of damages which the Government sustains because of" the false claim. 31 U.S.C. § 3729(a)(1). False claims related to a health program may also subject responsible persons to fines and up to five years imprisonment under 18 U.S.C. § 1035.

171.    _Compensatory damages_: Catholic employers that violate the 2016 Rule may be subject to compensatory damages under Section 1557 or under Title VII. 81 Fed. Reg. at 31,472 ("The enforcement mechanisms available for and provided under . . . Title IX . . . shall apply for purposes of Section 1557."); *Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 76 (1992) (compensatory damages available under Title IX); 42 U.S.C. § 1981a(b)(3) (compensatory damages available under Title VII). Compensatory damages may include pecuniary losses and even nonpecuniary losses such as "emotional pain" and "mental anguish." 42 U.S.C. § 1981a(b)(3); *Williams v. Pharmacia, Inc.*, 137 F.3d 944, 954 (7th Cir. 1998).

41

172.   *Punitive damages*: Punitive damages are available under Title VII if the employer acted "with malice or with reckless indifference to the federally protected rights" of an employee. 42 U.S.C. § 1981a(b)(1). Punitive damages are subject to the same statutory caps that are imposed for nonpecuniary losses. *See id.* § 1981a(b)(3).

173.   *Injunctive relief*: Courts may order broad forms of injunctive relief under Title VII, *see* 42 U.S.C. §2000e-5(g)(1); *United States v. Criminal Sheriff, Parish of Orleans*, 19 F.3d 238, 239 (5th Cir. 1994), and may even mandate that employers adopt certain policies, *see, e.g.*, *Morris v. Am. Nat'l Can Corp.*, 730 F. Supp. 1489, 1498 (E.D. Mo.1989), *aff'd in part, rev'd in part on other grounds*, 941 F.2d 710 (8th Cir. 1991); *Robinson v. Jacksonville Shipyards, Inc.*, 760 F. Supp. 1486 (M.D. Fla. 1991). Title IX, and hence Section 1557, also permit broad injunctive relief. *See Roberts v. Colo. State Bd. of Agriculture*, 998 F.2d 824, 826 (10th Cir. 1993).

174.   *Attorney's fees*: Under Title VII and Section 1557, a prevailing party is entitled to costs and attorney's fees. *See* 42 U.S.C. § 2000e-5(k); *id.* § 1988(b).

## VI.   HHS'S UNSUCCESSFUL EFFORT TO REPEAL THE MANDATE

### A.   Litigation against the 2016 Rule

175.   On December 31, 2016, the U.S. District Court for the Northern District of Texas issued a nationwide preliminary injunction prohibiting HHS from "enforcing the [2016] Rule's prohibition against discrimination on the basis of gender identity or termination of pregnancy." *Franciscan Alliance, Inc. v. Burwell*, No. 16-cv-108, 227 F. Supp. 3d 660, 696 (N.D. Tex. 2016). The court concluded that the rule's "expanded definition of sex discrimination" exceeded HHS's statutory authority under Section 1557, and that the rule's failure to incorporate the religious and abortion exemptions in Title IX "renders the Rule contrary to law" in violation of the APA. *Id.* at 689, 691. The court also found that that the rule violated RFRA because it placed "substantial

42

pressure on Plaintiffs to perform and cover [gender] transition and abortion procedures" in violation of their religious beliefs, and HHS could not show that the rule satisfied RFRA's requirement of strict scrutiny. *Id.* at 692-93.

176.    On October 15, 2019, as clarified in an order of November 21, 2019, the same court entered summary judgment vacating the 2016 Rule "insofar as the Rule defines 'On the basis of sex' to include gender identity and termination of pregnancy," and remanded to HHS for further consideration. *See Franciscan Alliance, Inc. v. Azar*, No. 16-cv-108-O, ECF Nos. 175, 182 (N.D. Tex.).

177.    On December 30, 2016, the Court in this case issued an order temporarily staying enforcement of the 2016 Rule against Plaintiffs. ECF No. 23. On January 23, 2017, the Court amended its December 30 order "to make clear that it temporarily stays enforcement, as to the named Plaintiffs, of Section 1557's prohibitions against discrimination on the bases of gender identity and termination of pregnancy." ECF No. 36.

## B.    The 2020 Rule

178.    In May 2019, HHS issued a Notice of Proposed Rulemaking, and in June 2019 it published a proposed rule, to amend the 2016 Rule. *See* Nondiscrimination in Health and Health Education Programs or Activities, 84 Fed. Reg. 27,846 (June 14, 2019). Citing the *Franciscan Alliance* court's preliminary-injunction decision, the proposed rule stated that the Rule's definition of "sex" "exceeded [HHS's] authority under Section 1557." *Id.* at 27,849. The proposed rule sought to address this issue by repealing the 2016 Rule's definition of "sex" in its entirety, which, HHS said, would "allow the Federal courts, in particular, the U.S. Supreme Court . . . to resolve any dispute about the proper legal interpretation of" the term "sex" in Section 1557. *Id.* at 27,873. As the proposed rule noted, *see id.* at 27,855, the Supreme Court had

recently granted certiorari to decide whether sex discrimination under Title VII included discrimination on the basis of sexual orientation and gender identity, in three cases that would later be decided together as *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020).

179.   On June 12, 2020, HHS finalized its new rule, the "2020 Rule." *See* Nondiscrimination in Health and Health Education Programs or Activities, 85 Fed. Reg. 37,160 (June 19, 2020).

180.   The 2020 Rule would have taken effect on August 18, 2020. *Id.* at 37,160.

181.   The 2020 Rule seeks to repeal certain portions of the 2016 Rule, and in particular, "omits the vacated language concerning gender identity and termination of pregnancy." *Id.* at 37,162; *see also id.* at 32,236 ("[T]his final rule removes . . . the expansive inclusion of gender identity and sex stereotyping in the definition of sex discrimination."). But HHS declined to replace the 2016 Rule's definition of "sex" with a new definition, reasoning instead that the Supreme Court's then-forthcoming decision in *Bostock* would "likely have ramifications for the definition of 'on the basis of sex' under Title IX." *Id.* at 37,168. Thus, simply repealing the prior definition would permit "application of the [*Bostock*] Court's construction." *Id.*

182.   Responding to the *Franciscan Alliance* court's vacatur order, HHS said that, under the 2020 Rule, it "will interpret Section 1557's prohibition on sex-based discrimination consistent with Title IX and its implementing regulations," *id.* at 37,192, and that it was amending its Title IX regulations "to explicitly incorporate relevant statutory exemptions from Title IX, including abortion neutrality and the religious exemption," *id.* at 37,162.

### 1.   Gender identity

183.   The 2020 Rule seeks to clarify that Section 1557 does not require healthcare professionals to perform gender transition procedures. *Id.* at 37,188. HHS "believes providers should be generally free to use their best medical judgment, consistent with their understanding

of medical ethics, in providing healthcare to Americans." *Id.* at 37,187. "[T]he 2016 Rule inappropriately interfered with the ethical and medical judgment of health professionals." *Id.* The 2020 Rule "does not presume to dictate to medical providers the degree to which sex matters in medical decision making, nor does it impose the 2016 Rule's vague and overbroad mandate that they 'treat individuals consistent with their gender identity.'" *Id.* at 37,188.

184.    The 2020 Rule seeks to "clarif[y] that sex, according to the Title IX's plain meaning, may be taken into account in the provision of healthcare, insurance (including insurance coverage), and health research, as was the practice before the 2016 Rule." *Id.* at 37,189. At the same time, the 2020 Rule does not "prohibi[t] a healthcare provider from offering or performing sex-reassignment treatments and surgeries, or an insurer from covering such treatments and procedures, either as a general matter or on a case-by-case basis." *Id.* at 37,188.

185.    While the 2016 Rule prohibits health insurers from "hav[ing] or implement[ing] a categorical coverage exclusion or limitation for all health services related to gender transition," *id.* at 37,196  (quotation omitted), the 2020 Rule seeks to repeal this prohibition, noting that there is a lack of "medical consensus to support one or another form of treatment for gender dysphoria," *id.* at 37,198. In HHS's view, "the 2016 Rule did not give sufficient evidence to justify, as a matter of policy, its prohibition on blanket exclusions of coverage for sex-reassignment procedures." *Id.* Even if it were appropriate policy to mandate the provision and coverage of gender transition procedures, HHS could not do so "through application of Section 1557 and Title IX" because "[t]here is no statutory authority to require the provision or coverage of such procedures under Title IX protections from discrimination on the basis of sex." *Id.*

### 2.    Abortion

186.    The 2020 Rule seeks to repeal the 2016 Rule's provisions related to "termination of pregnancy." The 2020 Rule prohibits discrimination on "the grounds prohibited under . . .

45

Title IX," and revises HHS's Title IX regulations to explicitly incorporate Title IX's abortion exemption. *Id.* at 37,192-93. HHS did this, it said, "to ensure those [Title IX] regulations are implemented consistent with the statute." *Id.* at 37,192.

187.    The 2020 Rule does not seek to add any separate, abortion-related conscience protection because, in HHS's view, it is unnecessary in light of the Title IX abortion exemption, the explicit incorporation of that exemption into HHS's revised Title IX regulations, and the 2020 Rule's requirement that Section 1557 be construed consistently with Title IX. *See id.* at 37,193.

### 3.    Protections for religious freedom and conscience

188.    The 2020 Rule "does not craft a religious exemption to Section 1557." *Id.* at 37,207. Rather, it "simply states that the Section 1557 regulation will be implemented consistent with" various religious and conscience protections already present in federal law, "including RFRA, healthcare conscience statutes, and the religious organization exception in Title IX." *Id.*

189.    Accordingly, the 2020 Rule states that "[i]nsofar as the application of any requirement under this part would violate, depart from, or contradict definitions, exemptions, affirmative rights, or protections provided by" Title IX, RFRA, and numerous other federal laws protecting conscience, "such application shall not be imposed or required." 45 C.F.R. § 92.6(b).

190.    HHS stated that it "agrees with the court in *Franciscan Alliance* that particular provisions in the 2016 Rule violated RFRA as applied to private plaintiffs." 85 Fed. Reg. at 32,707. Regarding the 2016 Rule's gender identity provisions, HHS conceded that it "sees no compelling interest in forcing the provision, or coverage, of . . . medically controversial [gender transition] services by covered entities, much less in doing so without a statutory basis." *Id.* at 37,188. And regarding the 2016 Rule's "termination of pregnancy" provisions, HHS stated that the *Franciscan Alliance* court "rightly held that [HHS] regulations forbidding discrimination on

the basis of sex must be construed in light of the underlying text of Title IX, including abortion neutrality." *Id.* at 37,218.

### 4.      Covered entities

191.    Like the 2016 Rule, the 2020 Rule seeks to make Section 1557 applicable to "any entity that has a health program or activity, any part of which receives Federal financial assistance from [HHS]." *Id.* at 37,226. If an entity receives HHS funds and is "principally engaged in the business of providing healthcare," then Section 1557 applies to the entity as a whole. *Id.* at 37,244. Otherwise, Section 1557 applies only to the "health program or activity" of the entity that receives HHS funds. *See id.*

192.    The 2020 Rule seeks to narrow the application of Section 1557 to health insurance issuers. While the 2016 Rule declares that health insurance issuers are entities "principally engaged in the business of providing healthcare," the 2020 Rule seeks to repeal this aspect of the 2016 Rule and clarify that the provision of health insurance coverage is not *per se* the provision of "healthcare." Under the new rule, "an entity principally or otherwise engaged in the business of providing health insurance shall not, by virtue of such provision, be considered to be principally engaged in the business of providing healthcare." *Id.* at 37,244-45 (45 C.F.R. § 92.3(c)). Thus, a health insurance issuer not principally engaged in the business of healthcare would be subject to Section 1557 only to the extent of any federally funded health program or activity of the issuer.

193.    The 2020 Rule states that employer-sponsored (i.e., self-insured) health plans are not covered entities "[t]o the extent that [they] do not receive Federal financial assistance and are not principally engaged in the business of providing healthcare." *Id.* at 37,173.

### 5.     Enforcement mechanisms

194.     The 2020 Rule seeks to repeal the "patchwork" of enforcement mechanisms contained in the 2016 Rule, and to adopt the enforcement mechanisms of the four statutes which Section 1557 incorporates along with "their implementing regulations respectively, each for its own statute." *Id.* at 37,202; *see also Doe v. BlueCross BlueShield of Tennessee, Inc.*, 926 F.3d 235, 240 (6th Cir. 2019) (stating that the 2016 Rule's blending of different enforcement mechanisms under Section 1557 "failed to respect" the plain language of Section 1557); *Briscoe v. Health Care Serv. Corp.*, 281 F. Supp. 3d 725, 738 (N.D. Ill. 2017) (language of Section 1557 "unambiguously demonstrate[s] Congress's intent to import the various different standards and burdens of proof into a Section 1557 claim, depending upon the protected class at issue" (quotation omitted)).

195.     Because the incorporated statutes and their implementing regulations contain their own enforcement mechanisms, the enforcement mechanisms described above for the 2016 Rule continue to apply, in substantial part, under the 2020 Rule.

196.     In the 2020 Rule, HHS declined to "to take a position in its regulations on the issue of whether Section 1557 provides a private right of action." *Id.* at 37,203. HHS stated that, "[t]o the extent that Section 1557 permits private rights of action, plaintiffs can assert claims under Section 1557 itself rather than under the Department's Section 1557 regulation." *Id.*

197.     Courts have held that Section 1557 authorizes a private right of action to the extent that the incorporated statutes do. *See Doe*, 926 F.3d at 239; *Briscoe*, 281 F. Supp. 3d at 737.

### C.     *Bostock v. Clayton County*

198.     On June 15, 2020, the Supreme Court decided *Bostock*. The Court held that when "an employer . . . fires someone simply for being homosexual or transgender," the employer has

"discriminated against that individual 'because of such individual's sex'" within the meaning of Title VII. 140 S. Ct. at 1753.

199. *Bostock* did not hold that the term "sex" in Title VII equates to gender identity. Rather, the *Bostock* Court "assum[ed]" that "sex" means biological sex. *Id.* at 1739. But the Court reasoned that if an employer "fires a transgender person who was identified as a male at birth but who now identifies as a female," while "retain[ing] an otherwise identical employee who was identified as female at birth," then "the individual employee's sex plays an unmistakable and impermissible role in the discharge decision." *Id.* at 1741-42.

200. The Court cautioned, however, that its opinion did not "prejudge" the proper interpretation of "other federal . . . laws that prohibit sex discrimination," *id.* at 1753, including Section 1557 and Title IX, *see id.* at 1779-82 & n.57 (Alito, J., dissenting).

201. The Court further said it was "deeply concerned with preserving the promise of the free exercise of religion," and emphasized that the First Amendment and RFRA, among other laws, protect religious employers against being forced to "violate their religious convictions." *Id.* at 1754. Religious liberty protections, the Court explained, may "supersede Title VII's commands in appropriate cases." *Id.*

202. *Bostock* also instructs court to read statutes "in accord with the[ir] ordinary public meaning." *Id.* at 1738.

**D.     Legal challenges to, and preliminary injunctions against, the 2020 Rule**

203. Before the 2020 Rule could take effect, on August 17, 2020, the U.S. District Court for the Eastern District of New York entered "a stay and preliminary injunction to preclude the [2020 Rule] from becoming operative." *Walker v. Azar*, 2020 WL 4749859, at *1 (E.D.N.Y. 2020). The court concluded that the 2020 Rule is "contrary to *Bostock*," that HHS's

attempt to repeal the 2016 Rule was "contrary to law," and that the plaintiffs were likely to succeed on the merits of their APA claim. *Id.* at *1, *9. The court acknowledged that the *Franciscan Alliance* court had vacated the 2016 Rule in part and "agree[d] that it has no power to revive a rule vacated by another district court." *Id.* at *7. The court nonetheless thought that "*Franciscan Alliance* did not address the concept of 'sex stereotyping' embodied in the 2016 Rule." *Id.* The court entered the following order:

> [T]he Court stays the repeal of the 2016 definition of discrimination on the basis of sex. As a result, the definitions of "on the basis of sex," "gender identity," and "sex stereotyping" currently set forth in 45 C.F.R. § 92.4 [sic] will remain in effect. In addition, the Court preliminarily enjoins the defendants from enforcing the repeal.

204.    The *Walker* court's preliminary injunction reinstates the 2016 Rule and the Mandate.

205.    On September 2, 2020, the U.S. District Court for the District of Columbia entered a nationwide preliminary injunction against aspects of the 2020 Rule. *See Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Human Servs.*, 2020 WL 5232076, at *45 (D.D.C. 2020).

206.    Citing the *Franciscan Alliance* vacatur, the court acknowledged that it had "no authority . . . to disregard the final order of a district court vacating part of a regulation." *Id.* at *13. But the court distinguished between what it called the "'gender identity' portion" of the 2016 Rule and that rule's "prohibition on discrimination based on sex stereotyping." *Id.* at *14. Believing that *Franciscan Alliance* vacated only the former "portion," the court enjoined the 2020 Rule to the extent that it "eliminated 'sex stereotyping' from the [2016] Rule's definition of 'discrimination on the basis of sex." *Id.* at *1, *45.

207.    The court also held that HHS erroneously incorporated Title IX's religious exemption into its new rule without considering "the potential negative consequences that

50

importing a blanket religious exemption into Section 1557 might have for access to health care."
*Id.* at *28. The court stated, however, that "nothing in this decision renders religiously affiliated
providers devoid of protection" and identified two "statutory safeguards": the ACA's explicit
conscience and abortion protections, 42 U.S.C. § 18023(c)(2), and RFRA. *Id.* at *29.

208.    The court refused to invalidate the provision of the 2020 Rule that repealed the
2016 Rule's prohibition on categorical coverage exclusions for gender-transition services. The
court was satisfied that HHS had "thoroughly considered the evidence" on this issue and that it
was "not this Court's place to resolve this scientific debate." *Id.* at *31.

209.    The court concluded that HHS is "preliminarily enjoined from enforcing the
repeal of the 2016 Rule's definition of discrimination '[o]n the basis of sex' insofar as it includes
'discrimination on the basis of . . . sex stereotyping'" and "from enforcing its incorporation of
the religious exemption contained in Title IX." *Id.* at *45.

### 1.    Effect of the preliminary injunctions against the 2020 Rule

210.    The two preliminary injunctions against the 2020 Rule "overla[p]" with one
another. *Id.* at *41.

211.    The court's order in *Walker* noted that the 2016 Rule's definition of
discrimination "on the basis of sex" includes discrimination based on "gender identity," "sex
stereotyping," and "termination of pregnancy." 2020 WL 4749859 at *1. The court's order "stays
the repeal of the 2016 definition of discrimination on the basis of sex"; states that this definition,
along with the 2016 definitions of "gender identity" and "sex stereotyping" "will remain in
effect"; and enjoins HHS "from enforcing the repeal." *Id.* at *10.

212.    The *Whitman-Walker Clinic* court purported to distinguish between a "gender
identity" portion and a "sex stereotyping" portion of the 2016 Rule, and then "enjoined . . . the
repeal" of the "sex stereotyping" portion. But even that court acknowledged that these two

"portions" of the 2016 Rule could not be "meaningfully separated" because "the belief that an individual should identify with only their birth-assigned sex *is* such a sex-based stereotype." 2020 WL 5232076, *23 (emphasis added). Both are "[d]iscrimination based on transgender status—*i.e.*, gender identity." *Id.*

213.    HHS is of the view that there is no meaningful distinction between the "gender identity" provision and the "sex stereotyping" provision of the 2016 Rule, and that the *Franciscan Alliance* vacatur applied to both. *See* 85 Fed. Reg. at 37,236 ("[T]he sex stereotyping provision [of the 2016 Rule] had no real-world effect after the [*Franciscan Alliance*] decision.").

214.    The EEOC is of the view that there is no meaningful distinction between discrimination based on "gender identity" and discrimination based on "sex stereotyping." *See* Amicus Brief of EEOC in Support of Plaintiff, at 4, *Robinson v. Dignity Health*, 16-cv-03035 YGR (N.D. Cal.) (filed Aug. 22, 2016) ("[T]here is an inherent link between gender identity and gender-nonconformity. . . . A person is defined as transgender precisely because of the perception that his or her behavior transgresses gender stereotypes." (quotations and citation omitted));[13] Reply of EEOC to Def.'s Resp. to EEOC's Amicus Brief, *Robinson v. Dignity Health*, 16-cv-03035 YGR (N.D. Cal.) (filed Sep. 8, 2016) (stating that "discrimination against transgender individuals is inherently a form of sex stereotyping").[14]

215.    The *Whitman-Walker Clinic* injunction, which has nationwide scope, also prohibits "incorporation" into the 2020 Rule "of the religious exemption contained in Title IX." *Id.* at *45. The court suggested that "a blanket religious exemption" might "allow for

---

[13] Available at https://www.eeoc.gov/sites/default/files/migrated_files/eeoc/litigation/briefs/robinson.html.

[14] Available at https://www.eeoc.gov/sites/default/files/migrated_files/eeoc/litigation/briefs/robinson2.html.

discrimination on the bases prohibited by Section 1557 or for the denial of health services to women." *Id.* at *28 (quoting 81 Fed. Reg. at 31,379) (internal quotation marks omitted).

216.     The Mandate imposed by the 2016 Rule is anchored in its definition of discrimination "on the basis of sex." Under the injunctions issues in *Walker* and *Whitman-Walker Clinic*, that definition remains fully in effect and, accordingly, the Mandate remains fully in effect. Thus, Section 1557, as interpreted by HHS, continues to mandate that covered entities, including religious organizations, perform and cover gender-transition and abortion services.

217.     Neither injunction affects the EEOC's interpretation of Title VII, and the EEOC has never backed off its interpretation that employers – even employers that are not covered entities under HHS's rules – must cover gender-transition services in their health plans.

218.     Accordingly, each and every one of this Second Amended Complaint's allegations regarding the 2016 Rule and its effects on CBA and CMA members continue to apply, notwithstanding HHS's attempted repeal in the 2020 Rule. Even if the *Walker* and *Whitman-Walker Clinic* preliminary injunctions are without legal basis, as indeed they are, they create a legal state of affairs, or at least a state of significant legal uncertainty, that makes Plaintiffs' need for declaratory and injunctive relief both critical and imminent.

### 2.     Other pending legal challenges to the 2020 Rule

219.     Other legal challenges to the 2020 Rule are pending. Plaintiffs in these cases are likewise seeking to invalidate the 2020 Rule and its repeal of the "gender identity" and "termination of pregnancy" provisions of the 2016 Rule. These plaintiffs also seek to invalidate HHS's effort to incorporate religious and abortion exemptions into the 2020 Rule. *See BAGLY v. U.S. Dep't of Health & Human Servs.*, No. 20-cv-11297, Compl., ECF No. 1, ¶¶ 231-32 (D. Mass. July 9, 2020) (seeking to invalidate the 2020 Rule's elimination of "gender identity" and "termination of pregnancy" from definition of sex discrimination, saying it will "embolden

discrimination . . . on the basis of gender identity" and "embolden refusals of reproductive healthcare."); *New York v. U.S. Dep't of Health & Human Servs.*, No. 20-cv-05583, Compl., ECF No. 1, ¶¶ 96, 234 (S.D.N.Y. July 20, 2020) (challenging "[t]he 2020 Rule's removal of the mandate that covered entities treat transgender people consistent with their gender identity" and removal of the abortion mandate because it will "further stigmatize abortion" and "embolden providers to deny abortion care"); *Washington v. U.S. Dep't of Health & Human Servs.*, Compl., No. 20-cv-01105, Compl., ECF No. 1, ¶ 1(W.D. Wash. July 16, 2020) (challenging the 2020 Rule's elimination of "sex stereotyping and gender identity from the definition of prohibited 'sex' discrimination").

**VII.    The Mandate burdens the religious exercise of the CBA and its members.**

220.    Although the Mandate applies directly only to "covered entities," it impacts all Catholic employers.

221.    The decisions of CBA members to refuse to cooperate in their patients', employees', or plan beneficiaries' efforts to undergo gender transition procedures qualify as the exercise of religion.

222.    The decisions of CBA members to refuse, for religious reasons, to cooperate in their patients', employees', or plan beneficiaries' efforts to obtain an abortion qualify as the exercise of religion.

**A.    The Mandate's effects on CBA members that are covered entities – medical services**

223.    The Mandate's regulatory scheme makes it virtually impossible for CBA members that qualify as a "covered entity" to continue their healthcare ministries. Their options are: (1) provide gender transition services, (2) cease providing any services that HHS may correlate with gender transition, (3) continue to meet patients' needs but refuse to provide gender

54

transition services, (4) stop participating in all HHS-related programs, including Medicaid and

Medicare; and (5) cease providing health services and activities.

224.    Option 1, directly providing gender transition and abortion services, is contrary to

Catholic values and would give rise to scandal. Directly providing gender transition services is

contrary to Catholic values. This situation gives rise to scandal and the loss of members'

reputation because patients, employees, and the larger community would perceive that CBA-

member healthcare providers profess one thing but do another. Such scandal devastates ministry.

225.    Option 2, ceasing providing any services that HHS may correlate with gender

transition and abortion, would be ruinous for covered entity CBA members and their patients. In

order to avoid the Mandate, CBA members could refuse to perform any procedure that might be

used as part of a gender transition, such as hysterectomies, mastectomies, hormone treatments,

and plastic surgery. Doing so would prevent these CBA members from being able to use such

procedures to address medical illnesses or conditions—such as uterine cancer, breast cancer,

menopause, and miscarriage—thus injuring their healing ministries. Artificially restricting their

medical services in this manner would cause these CBA members to incur financial losses, lose

valuable employees, and suffer other injuries.

226.    Absent injunctive relief from this Court, option 3 is ruinous because it would

expose covered entity CBA members to HHS and EEOC enforcement actions and other penalties

as described above.

227.    Option 4, stopping participation in HHS-related programs, including Medicaid

and Medicare, would severely penalize CBA members for maintaining their religious

convictions. This would also require them to severely curtail their services to the poor, disabled,

and the elderly, thus injuring their healing ministries.

228.    Option 5, ceasing their health services and activities, would burden CBA members' religious exercise.

**B.    The Mandate's effects on CBA members that are covered entities – insurance coverage**

229.    The Mandate also affects covered entities' ability to offer their employees health benefits that reflect their Catholic values. Their options are: (1) provide a group health plan that includes coverage for gender transition and abortion services, (2) provide a group health plan that excludes coverage for gender transition and abortion services, or (3) cease providing health coverage.

230.    Option 1, providing a group health plan that covers gender transition and abortion services, is contrary to Catholic values and would give rise to scandal.

231.    Absent injunctive relief from this Court, option 2 is ruinous because it would expose covered entity CBA members to HHS and EEOC enforcement actions and other penalties as described above.

232.    Option 3, dropping health benefits, would burden CBA members' exercise of religion because: (a) Catholic values commend providing just compensation and benefits supportive of family values, including, whenever possible, health care; (b) eliminating health insurance for employees subjects CBA members to annual excise taxes of $2,000 per employee after the first 30 employees, 26 U.S.C. § 4980H(a), (c)(1); and (c) eliminating health insurance would put CBA members at a significant disadvantage in the market for recruiting the best workers and thereby harm the operation of their ministries.

**C.    The Mandate's effects on insured CBA members**

233.    The Mandate also injures CBA members who are not covered entities, and are thus not directly regulated by the 2016 Rule. Regardless of whether a CBA member is a covered

entity, the Mandate restricts its ability to acquire a group health plan that reflects Catholic values. This is because group insurers are covered entities that are required, under the 2016 Rule, to cover both transgender services and abortion.

234.    For CBA members that sponsor an insured group plan, their options are: (1) provide a group health plan that includes coverage for gender transition and abortion services, (2) provide a group health plan that excludes coverage for gender transition and abortion services, or (3) cease providing health coverage.

235.    Option 1, providing a group health plan that covers gender transition and abortion services is contrary to Catholic values and would give rise to scandal.

236.    The Mandate has made option 2, providing a group health plan that excludes gender transition and abortion services, either impossible or unduly burdensome. Insured CBA members have been told by their insurers that, as a direct result of the 2016 Rule, their plans must include gender-transition coverage. Insurers may also conclude that the 2016 Rule requires plans to include abortion coverage. Absent injunctive relief from this Court, even if a non-covered entity CBA member were able to secure a morally compliant insured plan, option 2 is ruinous because it would expose CBA members to EEOC enforcement actions and other penalties as described above.

237.    Option 3, dropping health benefits, would burden CBA members' exercise of religion as described above.

### D.    Mandate's effects on self-insured CBA members

238.    The Mandate also injures CBA members who have a self-insured group health plan. For CBA members that sponsor a self-insured group health plan, their options are: (1) provide a group health plan that includes coverage for gender transition services, (2) provide a

group health plan that excludes coverage for gender transition services, or (3) cease providing health coverage.

239.    Option 1, providing a group health plan that covers gender transition services, is contrary to Catholic values and would give rise to scandal.

240.    The Mandate has made option 2, providing a group health plan that excludes gender transition and abortion coverage, either impossible or unduly burdensome. Self-insured CBA members have been told by their TPAs that they will not administer a plan that categorically excludes all gender transition coverage unless the CBA member agrees to indemnify the TPA or accept the TPA's liability. TPAs may also find that the 2016 Rule compels them to seek an indemnification agreement before excluding abortion coverage. Absent injunctive relief from this Court, even if a non-covered entity CBA member were able to secure a morally compliant self-insured plan, option 2 is ruinous because it would expose members to EEOC enforcement actions and other penalties as described above.

241.    Option 3, dropping healthcare benefits, would burden CBA members' exercise of religion as described above.

## VIII.   NEED FOR RELIEF

242.    The *Walker* and *Whitman-Walker Clinic* injunctions prevent the 2020 Rule from becoming operative and order that the 2016 Rule remains in effect. As a result, absent relief from this Court, CBA members are presently subject to the Mandate and are required to perform, or include in their health plans, gender-transition and abortion services or else risk enforcement actions, civil lawsuits, and other penalties.

243.    Some insured CBA members have already been forced to cover transgender-related health services as a direct result of the Mandate, in contravention of their religious beliefs. *See* Exs. E and F.

58

244.     As a direct result of the Mandate, self-insured CBA members have been notified by their TPAs that they must indemnify their TPA or accept their TPA's liability in order to maintain their exclusion of all gender transition coverage.

245.     Absent relief from this Court, CBA members that are covered entities are currently threatened by the Mandate with administrative investigations, civil lawsuits, and various penalties if they continue to offer health services in a manner that reflect their Catholic convictions.

246.     Absent relief from this Court, all CBA members are currently threatened by the Mandate with administrative investigations, civil lawsuits, and various penalties if they continue to offer employee health benefits in a manner that reflects their Catholic convictions.

## IX.     CAUSES OF ACTION

### COUNT I

#### Violation of the Administrative Procedure Act
#### Agency Action Not in Accordance with Law

247.     Plaintiffs incorporate by reference all preceding paragraphs.

248.     Defendants are "agencies" under the APA, 5 U.S.C. § 551(1), and the 2016 Rule, along with the EEOC Statement complained of herein, constitute "rules" under the APA, *id.* § 551(4), and constitute "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court," *id.* § 704.

249.     The APA prohibits agency actions that are "not in accordance with law." *Id.* § 706(2)(A). The 2016 Rule and the EEOC Statement are not in accordance with law for a number of independent reasons.

250.     The 2016 Rule will require physicians to perform gender transition procedures regardless of whether those procedures are "medically necessary" or "medically appropriate." It

59

is not in accordance with law for HHS to require medical professionals to perform procedures that may not be necessary or appropriate, and may in fact be harmful to the patients.

251.    The 2016 Rule also states that a physician's view of gender transition procedures as "experimental" is "outdated and not based on current standards of care." 81 Fed. Reg. at 31,435; *see also id.* at 31,429. It is not in accordance with law for HHS to dictate appropriate medical views on the necessity and experimental nature of gender transition procedures, and to dictate what constitutes best standards of care in an area of science and medicine that is being hotly debated in the medical community.

252.    The 2016 Rule is not in accordance with Section 1557 of the Affordable Care Act (42 U.S.C. § 18116) or Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq. Neither Section 1557 nor Title IX prohibits consideration of the real biological differences between the sexes in the context of healthcare and health coverage. HHS's attempt to expand the definition is not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A).

253.    The EEOC Statement is not in accordance with Title VII. Title VII does not prohibit consideration of the real biological differences between the sexes in the context of healthcare and health coverage. EEOC's attempt to expand the definition is not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A).

254.    HHS's failure to include in the 2016 Rule a religious exemption that parallels the religious exemption in Title IX is also not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A).

255.    HHS's failure to include an exclusion for sterilization and sterilization-related services is not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A) because it is inconsistent with the Church Amendments, 42 U.S.C. § 300a-7(b), which protect the right of

healthcare entities who receive federal funding to refuse to participate in or assist with sterilizations.

256.    HHS's failure to include an exclusion for abortion and abortion-related services is not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A) because it is inconsistent with: (a) the plain language of Title IX, which prohibits requiring coverage, payment, or the use of facilities for abortion; (b) the Church Amendments, 42 U.S.C. §300a-7(b), which protect the right of healthcare entities who receive federal funding to refuse to participate in or assist with abortions; (c) Section 245 of the Public Health Service Act, 42 U.S.C. § 238(n), which prohibits the federal government from discriminating against any healthcare entity on the basis that the entity refuses to perform abortions, provide referrals for abortions, or to make arrangements for such abortions; (d) the Weldon Amendment, which has been readopted or incorporated by reference in every HHS appropriations act since 2005, and provides that no funds may be made available under HHS appropriations act to a government entity that discriminates against an institution or individual physician or healthcare professional on the basis that the entity or individual "does not provide, pay for, provide coverage of, or refer for abortions"; and (e) Section 1303(b)(4) of the ACA, 42 U.S.C. § 18023(b)(4), which states that "[n]o qualified health plan offered through an Exchange may discriminate against any individual healthcare provider or healthcare facility because of its unwillingness to provide, pay for, provide coverage of, or refer for abortions."

257.    The 2016 Rule is not in accordance with Title VII, which requires CBA members to reasonably accommodate their employees' religious practices, because the 2016 Rule will make it illegal for CBA members who receive HHS funds to accommodate their employees' religious objections to providing gender transition procedures.

258.     The 2016 Rule also forces physicians to provide medical services related to gender transition. This is not in accordance with substantive due process rights protecting a medical professional's right to not perform a procedure he or she believes to be experimental, ethically questionable, and potentially harmful.

259.     The 2016 Rule is not in accordance with law because it violates the First Amendment, Fifth Amendment, and the Religious Freedom Restoration Act, as hereafter described.

260.     Plaintiffs have no adequate or available administrative remedy, or, in the alternative, any effort to obtain an administrative remedy would be futile.

261.     Plaintiffs have no adequate remedy at law.

262.     Absent injunctive and declaratory relief against the Mandate, Plaintiffs have been and will continue to be harmed.

## COUNT II

**Violation of the Administrative Procedure Act**
**Agency Action In Excess of Statutory Authority and Limitations**

263.     Plaintiffs incorporate by reference all preceding paragraphs.

264.     The APA prohibits agency actions that are "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C). The 2016 Rule and the EEOC Statement are in excess of statutory jurisdiction, authority, and limitations for a number of reasons.

265.     For the reasons described above, there is no statutory authority or jurisdiction for HHS to require medical professionals and facilities to perform procedures (or refer for the same) that may not be necessary or appropriate, and may in fact be harmful to the patients.

266.     For the reasons described above, there is no statutory authority or jurisdiction for HHS to dictate appropriate medical views on the necessity and experimental nature of gender

transition procedures, or to dictate what constitutes best standards of care in an area of science and medicine that is being hotly debated in the medical community.

267.    For the reasons described above, HHS's decision to interpret Section 1557 to ban "gender identity" discrimination in the context of healthcare and health coverage is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C).

268.    For the reasons described above, EEOC's decision to interpret Title VII to ban "gender identity" discrimination in the context of healthcare and health coverage is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C).

269.    For the reasons described above, HHS's failure to include a religious exemption in the 2016 Rule that parallels the religious exemption in Title IX is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C).

270.    For the reasons discussed above, HHS's failure to include an exclusion for sterilization and sterilization-related services is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C) because it is inconsistent with the Church Amendments, 42 U.S.C. § 300a-7(b).

271.    For the reasons discussed above, HHS's failure to include an exclusion for abortion and abortion-related services is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C) because it is inconsistent with: (a) the plain language of Title IX, which prohibits requiring coverage, payment, or the use of facilities for abortion; (b) the Church Amendments, 42 U.S.C. § 300a-7(b); (c) Section 245 of the Public Health Service Act, 42 U.S.C. § 238(n); (d) the Weldon Amendment, which has been readopted or incorporated by reference in every HHS appropriations act since 2005; and (e) Section 1303(b)(4) of the ACA, 42 U.S.C. § 18023.

272.    For the reasons described above, HHS's decision to require CBA members to act in violation of Title VII by not accommodating their employees' religious and conscientious objections to participating in (or referring for) gender transition treatment or procedures is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C).

273.    For the reasons discussed above, the 2016 Rule is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C) as it violates the First Amendment, Fifth Amendment, and the Religious Freedom Restoration Act, as hereafter described.

274.    Plaintiffs have no adequate or available administrative remedy, or, in the alternative, any effort to obtain an administrative remedy would be futile.

275.    Plaintiffs have no adequate remedy at law.

276.    Absent injunctive and declaratory relief against the Mandate, Plaintiffs have been and will continue to be harmed.

## COUNT III

**Violation of the Administrative Procedure Act**
**Agency Action that is Arbitrary, Capricious and an Abuse of Discretion**

277.    Plaintiffs incorporate by reference all preceding paragraphs.

278.    The APA prohibits agency actions that are "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A). The 2016 Rule is arbitrary and capricious agency action for a number of reasons.

279.    For the reasons described above, it is arbitrary and capricious for HHS to require medical professionals to perform (or refer for) procedures that the physician believes may not be necessary or appropriate, and that may even be harmful to the patient.

280. For the reasons discussed above, it is arbitrary and capricious for HHS to dictate appropriate medical views on the necessity and experimental nature of gender transition procedures, and to dictate what constitutes best standards of care.

281. For the reasons discussed above, HHS's prohibition on "gender identity" discrimination in the context of healthcare and health coverage is an arbitrary and capricious interpretation of Section 1557 of the Affordable Care Act (42 U.S.C. § 18116) and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*

282. For the reasons discussed above, EEOC's prohibition on "gender identity" discrimination in the context of healthcare and health coverage is an arbitrary and capricious interpretation of Title VII.

283. For the reasons discussed above, HHS's failure to include a religious exemption in the 2016 Rule that parallels the religious exemption in Title IX is arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A).

284. For the reasons discussed above, HHS's failure to include an exclusion for sterilization and sterilization-related services is arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A) because it is inconsistent with the Church Amendments, 42 U.S.C. § 300a-7(b).

285. For the reasons discussed above, HHS's failure to include an exclusion for abortion and abortion-related services is arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A).

286. For the reasons described above, HHS's decision to require Plaintiffs to act in violation of Title VII by not accommodating their employees' religious objections to

participating in gender transition procedures is arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A).

287.    For the reasons discussed above, the 2016 Rule is arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A) as it violates the First Amendment, Fifth Amendment, and Religious Freedom Restoration Act as hereafter described.

288.    Plaintiffs have no adequate or available administrative remedy, or, in the alternative, any effort to obtain an administrative remedy would be futile.

289.    Plaintiffs have no adequate remedy at law.

290.    Absent injunctive and declaratory relief against the 2016 Rule, Plaintiffs have been and will continue to be harmed.

## COUNT IV

### Violation of the First Amendment of the United States Constitution
### Freedom of Speech
### Compelled Speech and Compelled Silence

291.    Plaintiffs incorporate by reference all preceding paragraphs.

292.    CBA members plan to continue using their best medical and ethical judgment in treating and advising patients. Performing (or referring for) gender transition procedures is contrary to their best medical and/or ethical judgment.

293.    The 2016 Rule states, in the context of physicians offering "health services" that a "categorization of all transition-related treatment . . . as experimental, is outdated and not based on current standards of care." 81 Fed. Reg. at 31,435; *see also id.* at 31,429.

294.    The 2016 Rule prohibits CBA members from expressing their professional opinions that gender transition procedures are not the best standard of care or are experimental.

295.    The 2016 Rule also requires CBA members to amend their written policies to expressly endorse gender transition procedures, even if such revisions do not reflect the medical

judgment, values, or beliefs of CBA members. *Id.* at 31455. The 2016 Rule also requires CBA

members to use gender-transition affirming language in all situations, regardless of

circumstance. *Id.* at 31406.

296.   Performing (or referring for) gender transition procedures is also contrary to the

religious and conscientious beliefs of CBA members, and their beliefs prohibit them from

conducting, participating in, or referring for such procedures.

297.   The 2016 Rule compels CBA members to conduct, participate in, refer for, or

otherwise facilitate gender transition procedures.

298.   The 2016 Rule prohibits CBA members from expressing their religious views that

gender transition procedures are not the best standard of care or are experimental.

299.   The 2016 Rule compels CBA members to speak in ways that they would not

otherwise speak.

300.   The 2016 Rule thus violates CBA members' right to be free from compelled

speech as secured to them by the First Amendment of the United States Constitution.

301.   The 2016 Rule's compelled speech requirement is not justified by a compelling

governmental interest.

302.   Even if HHS has a compelling government interest, the 2016 Rule is not narrowly

tailored to achieve that interest.

303.   Absent injunctive and declaratory relief against the 2016 Rule, the CBA and its

members have been and will continue to be harmed.

## COUNT V

**Violation of the First Amendment of the United States Constitution**
**Freedom of Speech and Free Exercise Clause**
**Viewpoint Discrimination**

304.   Plaintiffs incorporate by reference all preceding paragraphs.

305.   CBA members' sincere religious and conscientious beliefs prohibit them from facilitating or participating in gender transition procedures.

306.   CBA members' medical judgment is that it is harmful and unethical to encourage a patient to undergo gender transition procedures.

307.   The 2016 Rule states, in the context of physicians offering "health services" that a "categorization of all transition-related treatment, for example as experimental, is outdated and not based on current standards of care." 81 Fed. Reg. at 31,435; *see also id.* at 31,429.

308.   The 2016 Rule would prohibit CBA members from expressing their religious or conscientious viewpoint that gender transition procedures are not the best standard of care.

309.   The 2016 Rule withholds funding based on an intent to restrict CBA members' speech.

310.   The 2016 Rule's viewpoint discrimination is not justified by a compelling governmental interest.

311.   Even if HHS has a compelling government interest, the 2016 Rule is not narrowly tailored to achieve that interest.

312.   Defendants' actions thus violate CBA members' rights as secured to them by the First Amendment of the United States Constitution.

313.   Absent injunctive and declaratory relief against the 2016 Rule, the CBA and its members have been and will continue to be harmed.

## COUNT VI

**Violation of the First and Fifth Amendments of the United States
Constitution
Freedom of Speech and Due Process
Overbreadth**

314.   Plaintiffs incorporate by reference all preceding paragraphs.

68

315.    The 2016 Rule regulates protected speech. The 2016 Rule states, in the context of physicians offering "health services" that a "categorization of all transition-related treatment . . . as experimental, is outdated and not based on current standards of care." 81 Fed. Reg. at 31,435; *see also id.* at 31,429.

316.    This exposes CBA members to penalties for expressing their medical and moral views of gender transition procedures. It also prohibits CBA members from using their medical judgment to determine the appropriate standard of care for interactions with their patients.

317.    CBA members believe that the 2016 Rule restricts their speech regarding the best standard of care for patients.

318.    The 2016 Rule states: "The determination of whether a certain practice is discriminatory typically requires a nuanced analysis that is fact-dependent." *Id*. at 31,377.

319.    The 2016 Rule chills CBA members' speech.

320.    The 2016 Rule's overbreadth is not justified by a compelling governmental interest.

321.    Even if HHS has a compelling government interest, the 2016 Rule is not narrowly tailored to achieve that interest.

322.    Defendants have therefore violated CBA members' rights secured to them by the Free Speech Clause of the First Amendment and the Due Process Clause of the Fifth Amendment by prohibiting speech that would otherwise be protected.

323.    Absent injunctive and declaratory relief against the 2016 Rule, the CBA and its members have been and will continue to be harmed.

## COUNT VII

**Violation of the First and Fifth Amendments of the United States
Constitution
Freedom of Speech and Due Process
Void for Vagueness**

324.    Plaintiffs incorporate by reference all preceding paragraphs.

325.    The 2016 Rule requires that a covered entity apply "neutral, nondiscriminatory criteria that it uses for other conditions when the coverage determination is related to gender transition" and "decline[s] to limit application of the rule by specifying that coverage for the health services addressed in § 92.207(b)(3)-(5) must be provided only when the services are medically necessary or medically appropriate." 81 Fed. Reg. at 31,435.

326.    Without allowing CBA members to use their judgment about what is medically necessary or appropriate, the 2016 Rule is ambiguous in the types of services CBA members are required to provide and perform.

327.    Requiring a CBA member to apply "neutral, nondiscriminatory criteria that it uses for other conditions" is a subjective standard without a limiting construction. *Id.*

328.    The 2016 Rule states, in the context of physicians offering "health services" that a "categorization of all transition-related treatment, for example as experimental, is outdated and not based on current standards of care." *Id.*; *see also id.* at 31,429.

329.    The 2016 Rule does not provide a limiting construction for what the current standard of care is, nor does it provide guidance as to how physicians can rely on their best medical judgment when it conflicts with the 2016 Rule.

330.    The 2016 Rule is not justified by a compelling governmental interest.

331.    Even if HHS has a compelling government interest, the 2016 Rule is not narrowly tailored to achieve that interest.

70

332.     Because CBA members are unable to determine what kind of procedures and services they will be required to provide and perform, Defendants have violated CBA members' rights secured to them by the Free Speech Clause of the First Amendment and the Due Process Clause of the Fifth Amendment.

333.     Absent injunctive and declaratory relief against the 2016 Rule, the CBA and its members have been and will continue to be harmed.

## COUNT VIII

**Violation of the First Amendment of the United States Constitution
Free Exercise Clause and Freedom of Speech
Unbridled Discretion**

334.     Plaintiffs incorporate by reference all preceding paragraphs.

335.     The 2016 Rule "applies to every health program or activity, any part of which receives Federal financial assistance provided or made available by the Department; every health program or activity administered by the Department; and every health program or activity administered by a Title I entity." 45 C.F.R. 92.2(a).

336.     The 2016 Rule also states: "The determination of whether a certain practice is discriminatory typically requires a nuanced analysis that is fact-dependent." 81 Fed. Reg. at 31,377.

337.     The 2016 Rule also says: "Insofar as the application of any requirement under this part would violate applicable Federal statutory protections for religious freedom and conscience, such application shall not be required." 45 C.F.R. 92.2(b)(2).

338.     Because the Defendants have sole discretion over financial assistance provided or made available, and because Defendants have sole discretion over the application of the 2016 Rule and any religious freedom protection that applies, the 2016 Rule vests unbridled discretion over which organizations will have their First Amendment interests accommodated.

71

339.    In Title IX of the Education Amendments of 1972, Congress precluded discrimination on the basis of "sex" in federally funded education programs, "except that . . . this section shall not apply to an educational institution which is controlled by a religious organization if the application of this subsection would not be consistent with the religious tenets of such organization." 20 U.S.C. § 1681(a)-(a)(3). Defendants have exercised unbridled discretion by declining to apply the clear religious freedom protections of Title IX.

340.    In Title IX of the Education Amendments of 1972, Congress banned sex discrimination in federally funded education programs, except that it made clear that "[n]othing in this chapter shall be construed to require or prohibit any person, or public or private entity, to provide or pay for any benefit or service, including the use of facilities, related to an abortion. Nothing in this section shall be construed to permit a penalty to be imposed on any person or individual because such person or individual is seeking or has received any benefit or service related to a legal abortion." 20 U.S.C. § 1688. Defendants have exercised unbridled discretion by declining to apply the clear abortion protections of Title IX.

341.    Defendants' actions therefore violate CBA members' rights not to be subjected to a system of unbridled discretion when engaging in speech or when engaging in religious exercise, as secured to them by the First Amendment of the United States Constitution.

342.    Absent injunctive and declaratory relief against the 2016 Rule, the CBA and its members have been and will continue to be harmed.

## COUNT IX

**Violation of the First Amendment to the United States Constitution**
**Free Speech Clause**
**Unconstitutional Conditions**

343.    Plaintiffs incorporate by reference all preceding paragraphs.

344.    The 2016 Rule imposes an unconstitutional condition on Plaintiffs' receipt of federal funding.

345.    The 2016 Rule applies to any healthcare provider who accepts federal funding from any source for any program.

346.    The 2016 Rule requires CBA members to adopt policies regarding standards of care for patients that violate Plaintiffs' religious and conscientious beliefs, as well as their medical judgment, and also interfere with CBA members' practice of medicine.

347.    Defendants' actions therefore impose an unconstitutional condition on CBA members' receipt of federal funding and violate Plaintiffs' rights as secured to them by the First and Fourteenth Amendments of the United States Constitution.

348.    Absent injunctive and declaratory relief against the 2016 Rule, the CBA and its members have been and will continue to be harmed.

## COUNT X

**Violation of the First Amendment**
**Freedom of Speech**
**Expressive Association**

349.    Plaintiffs incorporate by reference all preceding paragraphs.

350.    CBA members believe and teach that participating in actions, procedures, and services with the goal of transitioning from one sex to another violate their religious beliefs.

351.    CBA members believe and teach that participating in actions, procedures, and services that result in elective sterilizations violate their religious beliefs.

352.    CBA members believe and teach that participating in actions, procedures, and services related to abortion violate their religious beliefs.

353.    The Mandate compels CBA members to participate in procedures, services, and activities that contradict their religious beliefs and message.

73

354.    The Mandate compels CBA members to offer health coverage for procedures, services, and activities that violate their religious beliefs and message.

355.    Defendants' actions thus violate CBA members' rights of expressive association as secured to them by the First Amendment of the United States Constitution.

356.    Absent injunctive and declaratory relief against the Mandate, the CBA and its members have been and will continue to be harmed.

357.    The Mandate exposes CBA members to civil suits that would hold them liable for practicing and expressing their sincerely held religious beliefs.

358.    The Mandate furthers no compelling governmental interest.

359.    The Mandate is not the least restrictive means of furthering Defendants' stated interests.

## COUNT XI

### Violation of the Religious Freedom Restoration Act
### Compelled Medical Services

360.    Plaintiffs incorporate by reference all preceding paragraphs.

361.    CBA members' sincerely held religious beliefs prohibit them from deliberately offering services and performing (or referring for) operations or other procedures required by the 2016 Rule. CBA members' compliance with these beliefs is a religious exercise.

362.    CBA members sincerely held religious beliefs prohibit them facilitating gender transition procedures. CBA members' compliance with these beliefs is a religious exercise.

363.    CBA members' sincerely held religious beliefs prohibit them facilitating sterilization procedures. CBA members' compliance with these beliefs is a religious exercise.

364.    CBA members' sincerely held religious beliefs prohibit them facilitating abortion-related services. CBA members' compliance with these beliefs is a religious exercise.

365.     The Mandate creates government-imposed coercive pressure on CBA members to change or violate their religious beliefs.

366.     The Mandate chills CBA members' religious exercise.

367.     The Mandate exposes CBA members to the loss of substantial government funding as a result of their religious exercise.

368.     The Mandate exposes CBA members to substantial penalties under the False Claims Act, 31 U.S.C. § 3729 et seq.

369.     The Mandate exposes CBA members to criminal penalties under 18 U.S.C. § 1035.

370.     The Mandate exposes CBA members to civil suits that would hold them liable for practicing their sincerely held religious beliefs.

371.     The Mandate thus imposes a substantial burden on the CBA's and its members' religious exercise.

372.     The Mandate furthers no compelling governmental interest.

373.     The Mandate is not the least restrictive means of furthering Defendants' stated interests.

374.     The Mandate violates the CBA's and its members' rights secured to them by the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb et seq.

## COUNT XII

### Violation of the Religious Freedom Restoration Act
### Compelled Insurance Coverage

375.     Plaintiffs incorporate by reference all preceding paragraphs.

376.    For the same reasons discussed above, CBA members' sincerely held religious beliefs prohibit them from deliberately offering health insurance that would cover services related to gender transition, sterilization, and abortion.

377.    CBA members specifically exclude coverage of any services related to gender transition and abortion in their group health plans.

378.    CBA members' compliance with these beliefs by maintaining these exclusions is a religious exercise.

379.    Under the Mandate, insurance exclusions related to gender transition, sterilization, and abortion services, are facially invalid.

380.    The Mandate exposes CBA members to the loss of substantial government funding as a result of their religious exercise.

381.    The Mandate also makes it more expensive for CBA members to do business with a third party administrator for a health benefits plan. The Mandate subjects third party administrators to potential liability for administering plans that reflect Catholic teachings by categorically excluding gender transition and abortion services, and thus CBA members will be forced to indemnify, or accept liability for, any TPA. This constitutes an additional substantial burden on the CBA's and its members' religious exercise.

382.    The Mandate exposes CBA members to substantial penalties under the False Claims Act, 31 U.S.C. § 3729 et seq.

383.    The Mandate exposes CBA members to criminal penalties under 18 U.S.C. § 1035.

384.    The Mandate exposes CBA members to civil suits that would hold them liable for practicing their sincerely held religious beliefs.

385.    The Mandate thus imposes a substantial burden on the CBA's and its members' religious exercise.

386.    The Mandate furthers no compelling governmental interest.

387.    The Mandate is not the least restrictive means of furthering Defendants' stated interests.

388.    The Mandate violates the CBA's and its members' rights secured to them by the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb et seq.

## COUNT XIII

### Violation of the First Amendment to the United States Constitution
### Free Exercise Clause

389.    Plaintiffs incorporate by reference all preceding paragraphs.

390.    CBA members object to providing, facilitating, covering, or otherwise participating in gender transition procedures.

391.    The Mandate imposes substantial burdens on CBA members by forcing them to choose between their exercise of religion and the avoidance of fines, penalties, liability, and other adverse consequences.

392.    The Mandate seeks to suppress the religious practice of individuals and organizations such as CBA members, while allowing exemptions for similar conduct based on secular and non-religious reasons. Thus, the Mandate is neither neutral nor generally applicable.

393.    None of the statutes pursuant to which the Mandate is promulgated is generally applicable. Section 1557, Title IX, and Title VII are not generally applicable. For example, Title VII is not generally applicable because it exempts or does not cover employers that employ fewer than 15 employees and, as a result, does not apply to millions of employers that together employ hundreds of millions of people.

394.    The Mandate is not justified by a compelling governmental interest.

395.    Even if the Mandate is justified by a compelling government interest, it is not the least restrictive means of achieving that interest.

396.    Defendants' actions thus violate the CBA's and its members' rights secured to them by the Free Exercise Clause of the First Amendment of the United States Constitution.

397.    Absent injunctive and declaratory relief against the Mandate, the CBA and its members have been and will continue to be harmed.

### COUNT XIV

**Violation of the Fifth Amendment to the United States Constitution**
**Due Process Clause**
**Substantive Due Process**

398.    Plaintiffs incorporate by reference all preceding paragraphs.

399.    The United States has a deeply rooted tradition of honoring physicians' and healthcare institutions' rights to provide medical treatment in accordance with their moral and religious beliefs.

400.    CBA members possess a fundamental right of liberty of conscience.

401.    CBA members possess a fundamental right not to be coerced to provide medical procedures and services in violation of their conscience.

402.    The Mandate coerces CBA members to provide medical services and coverage in violation of their conscience.

403.    Defendants' conduct cannot be justified by a compelling governmental interest.

404.    The Mandate is not justified by a compelling governmental interest.

405.    Even if Defendants have a compelling government interest, the Mandate is not narrowly tailored to achieve that interest.

406.    Defendants' actions therefore violate CBA members' rights to substantive due process.

407.    Absent injunctive and declaratory relief against the Mandate, the CBA and its members have been and will continue to be harmed.

### COUNT XV

**Violation of the Fifth Amendment to the United States Constitution
Due Process and Equal Protection**

408.    Plaintiffs incorporate by reference all preceding paragraphs.

409.    The Due Process Clause of the Fifth Amendment mandates the equal treatment of all religious faiths and institutions without discrimination or preference.

410.    The Mandate discriminates on the basis of religious views or religious status by refusing to recognize religious exemptions that exist in the law.

411.    The Mandate discriminates on the basis of religious views or religious status by refusing to recognize valid medical views of religious healthcare professionals on gender transition procedures.

412.    The Defendants' actions thus violate Plaintiffs' rights secured to them by the Fifth Amendment of the United States Constitution.

413.    Absent injunctive and declaratory relief against the Mandate, the CBA and the CMA and their respective members have been and will continue to be harmed.

## X.    PRAYER FOR RELIEF

Wherefore Plaintiffs request that the Court:

A.  Declare that neither the Affordable Care Act, Title IX, nor Title VII, nor any regulations or other executive actions promulgated thereunder, shall infringe on the CBA's and its members' right and power to request, design, contract for, adopt, and implement health

plans and insurance policies that exclude coverage of health services for gender transition and abortion consistent with their medical judgment and sincerely held religious beliefs.

B.  Declare that the Mandate and Defendants' enforcement of the Mandate against the CBA and its members violate the Administrative Procedure Act, and that no taxes, penalties, or other burdens can be charged or assessed against these members for failure to pay for, provide, or directly or indirectly facilitate access to abortion or gender transition services.

C.  Declare that the Mandate and Defendants' enforcement of the Mandate against the CBA and its members violate the Religious Freedom Restoration Act, and that no taxes, penalties, or other burdens can be charged or assessed against the CBA and its members for failure to pay for, provide, or directly or indirectly facilitate access to abortion or gender transition services.

D.  Declare that the Mandate and Defendants' enforcement of the Mandate against the CBA and its members violate the laws and constitutional provisions described in their causes of action and that no taxes, penalties, or other burdens can be charged or assessed against the CBA and its members for failure to pay for, provide, or directly or indirectly facilitate access to abortion or gender transition services.

E.  Declare that Defendants may not apply or enforce the Mandate against the insurers and TPAs of the CBA and its members; may not interfere with members' attempts to arrange or contract for morally compliant health coverage or related services for their employees; and that no taxes, penalties, or other burdens can be charged or assessed against such insurers or TPAs in relation to their work for the CBA and its members;

F.  Declare that CBA members have the right to contract with service providers, including insurers and third party administrators, to secure morally compliant health plans.

80

G. Issue a temporary restraining order, preliminary injunction, and permanent injunction prohibiting Defendants from:

 a. Enforcing the Mandate against the CBA and its present and future members;

 b. Charging or assessing fines, taxes, penalties, or other burdens against the CBA and its present and future members for failure to provide, perform, pay for, cover, or facilitate access to health services for gender transition and abortion;

 c. Removing or threatening to remove federal funding, reimbursements, payments, or benefits of any kind from the CBA's present and future members for failure to provide, perform, pay for, cover, or facilitate access to health services for gender transition and abortion;

 d. Removing or threatening to remove access to federal contracts, grants, and programs from the CBA's present and future members for failure to provide, perform, pay for, cover, or facilitate access to health services for gender transition and abortion;

 e. Applying or enforcing the Mandate against the insurers and TPAs of the CBA's present and future members; and

 f. Interfering with the CBA's present and future members' relationships with their insurers or TPAs and with those members' attempts to contract for morally compliant health coverage for their employees.

H. Award Plaintiffs the costs of this action and reasonable attorney's fees as provided by law, including 28 U.S.C. § 2412(d) and 42 U.S.C. § 1988(b); and

I. Award such other and further relief as the Court deems equitable and just.

DATED: November 23, 2020.

81

Respectfully submitted,

*/s/ L. Martin Nussbaum*          
L. Martin Nussbaum
Ian Speir
Nussbaum Speir Gleason PLLC
2 N. Cascade Ave., Suite 1430
Colorado Springs, CO 80903
(719) 428-4937
martin@nussbaumspeir.com
ian@nussbaumspeir.com

*Attorneys for Plaintiffs*

*sdg*

## <u>VERIFICATION PURSUANT TO 28 U.S.C. § 1746</u>

I declare under penalty of perjury that the foregoing allegations pertaining to the teachings of the Catholic Church and the beliefs and values of The Catholic Benefits Association are true and correct to the best of my knowledge.


Executed on November 18, 2020.


/s/ *Most Rev. William E. Lori*
Most Rev. William E. Lori
Archbishop of Baltimore
Chairman of the Board, The Catholic Benefits
Association

## <u>VERIFICATION PURSUANT TO 28 U.S.C. § 1746</u>

I declare under penalty of perjury that the foregoing allegations pertaining to The Catholic Benefits Association and its members are true and correct to the best of my knowledge.

I further declare under penalty of perjury that Exhibit A attached hereto is a true and accurate copy of the Amended and Restated Certificate of Incorporation of The Catholic Benefits Association, that Exhibit B is a true and accurate copy of the Third Amended and Restated Bylaws of The Catholic Benefits Association, that Exhibit C is a true and accurate copy of the CBA Nonprofit Employer Application for Membership, and that Exhibit D is a true and accurate copy of the CBA For Profit Employer Application for Membership.

Executed on November 19, 2020.

/s/ *Doug Wilson*
Doug Wilson
Executive Director, The Catholic Benefits
Association

## <u>VERIFICATION PURSUANT TO 28 U.S.C. § 1746</u>

I declare under penalty of perjury that the foregoing allegations pertaining to the Diocese of Fargo are true and correct to the best of my knowledge.

Executed on November 18, 2020.

/s/ *Scott Hoselton*
Scott Hoselton, CPA, CDFM, CGMA
Chief Financial Officer, Diocese of Fargo

<u>**VERIFICATION PURSUANT TO 28 U.S.C. § 1746**</u>

I declare under penalty of perjury that the foregoing allegations pertaining to Catholic Charities North Dakota are true and correct to the best of my knowledge.

Executed on November 18, 2020.

/s/ *Dianne Nechiporenko*
Dianne Nechiporenko
Executive Director, Catholic Charities North Dakota

86