**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
EASTERN DIVISION**

| | | |
|---|---|---|
| The Religious Sisters of Mercy, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | **MEMORANDUM AND ORDER** |
| | ) | |
| Alex M. Azar II, Secretary of the United | ) | Case No. 3:16-cv-00386 |
| States Department of Health and Human | ) | |
| Services, et al., | ) | |
| | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| Catholic Benefits Association, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| Alex M. Azar II, Secretary of the United | ) | Case No. 3:16-cv-00432 |
| States Department of Health and Human | ) | |
| Services, et al., | ) | |
| | ) | |
| Defendants. | ) | |

In these consolidated cases, a coalition of entities affiliated with the Catholic Church and the State of North Dakota challenge the implementation of Section 1557 of the Patient Protection and Affordable Care Act ("ACA"), a statute that prohibits certain forms of discrimination in healthcare. The Plaintiffs contend that the Department of Health and Human Services ("HHS") and, derivatively, the Equal Employment Opportunity Commission ("EEOC") interpret Section 1557 and related antidiscrimination laws in a way that compels them to perform and provide insurance coverage for gender transitions and abortions.

The Catholic Plaintiffs move for summary judgment and injunctive relief under the Religious Freedom Restoration Act of 1993 ("RFRA"). North Dakota joins some of them in an

Administrative Procedure Act ("APA") challenge and separately seeks reprieve under the Spending Clause of the Constitution.  For the reasons below, the Court concludes that the RFRA entitles the Catholic Plaintiffs to permanent injunctive relief from the provision or coverage of gender-transition procedures.  The other claims either run afoul of jurisdictional limitations or do not warrant summary judgment.

## I.    BACKGROUND

The Court begins with the statutory framework of Section 1557.  Next is an overview of the implementing regulations and resulting litigation.  An introduction of the parties follows.  Last is a summary of these cases' recent procedural developments.

### A.    Statutory Framework

Enacted in March 2010, the ACA is "a comprehensive national plan to provide universal health insurance coverage."  Nat'l Fed'n of Indep. Bus. v. Sebelius, 567 U.S. 519, 583 (2012).  Fundamentally, the ACA is designed to broaden access to healthcare and insurance coverage.  King v. Burwell, 576 U.S. 473, 478-79 (2015).  Part and parcel with that objective is the ACA's ban on discrimination in healthcare.

Codified at 42 U.S.C. § 18116, Section 1557 of the ACA prohibits any federally funded or administered health program or activity from engaging in discrimination.  Rather than specifically listing the prohibited grounds for discrimination, Section 1557 coopts four preexisting civil rights statutes: (1) Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq.) (race, color, or national origin); (2) Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681 et seq.) (sex); (3) the Age Discrimination Act of 1975 (42 U.S.C. § 6101 et seq.) (age); and (4) the Rehabilitation Act of 1973 (29 U.S.C. § 794) (disability).  In kind, Section 1557 adopts the enforcement mechanisms available under each incorporated statute.  42 U.S.C. § 18116(a).  The

Secretary of HHS holds discretionary authority to promulgate implementing regulations.  Id. § 18116(c).

The lone prohibited ground relevant for these cases stems from Title IX, which forbids discrimination "on the basis of sex."  20 U.S.C. § 1681(a).  Two exceptions merit mention up front.  First, Title IX is inapplicable "to an educational institution which is controlled by a religious organization" if application "would not be consistent with the religious tenets of such organization."  Id. § 1681(a)(3); see also 20 U.S.C. § 1687.  Second, Title IX cannot "require or prohibit any person, or public or private entity, to provide or pay for any benefit or service, including the use of facilities, related to an abortion."  20 U.S.C. § 1688.

For enforcement, Section 1557 (by way of Title IX) greenlights administrative agencies to revoke federal funding for an offending health program or activity.  20 U.S.C. § 1682.  Agencies may also pursue "any other means authorized by law," including civil enforcement proceedings, debarment from doing business with the federal government, lawsuits under the False Claims Act, and even criminal penalties.[1]  See id.  In addition, Section 1557 supports a private right of action for damages and attorney's fees.  See Rumble v. Fairview Health Servs., No. 14-cv-2037 (SRN/FLN), 2015 WL 1197415, at *7 n.3 (D. Minn. Mar. 16, 2015) (concluding that Section 1557 provides a private right of action because each incorporated statute does so).

---

[1] Applicants for federal financial assistance from HHS must complete Form 690, which certifies that the applicant will comply with antidiscrimination laws like Section 1557 and Title IX.  See 45 C.F.R. §§ 86.4, 92.4.  Subsequent failure to comply with those laws may trigger the False Claims Act, exposing an offender to civil penalties of up to $11,000 per false claim "plus 3 times the amount of damages which the Government sustains because of" any false claim.  31 U.S.C. § 3729(a)(1).  Further, an individual who makes a materially false statement in connection with the delivery of or payment for healthcare benefits or services is subject to criminal monetary penalties, up to five years' imprisonment, or both.  18 U.S.C. § 1035.

### B.      Regulations and Litigation

1.      <u>The 2016 Rule</u>

More than six years after the ACA became law, HHS promulgated a rule interpreting Section 1557.  <u>See</u> Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31,376 (May 18, 2016) ("2016 Rule").  The 2016 Rule applied broadly.  HHS defined "covered entity" to encompass any "entity that operates a health program or activity, any part of which receives Federal financial assistance." <u>Id.</u> at 31,466 (formerly codified at 45 C.F.R. § 92.4).  And a "health program or activity" meant "the provision of health-related services, health-related insurance coverage, or other health-related coverage." <u>Id.</u> at 31,467.  For entities "principally engaged" in those endeavors, the regulation extended to "all of [their] operations." <u>Id.</u>  Due to near-ubiquitous participation in Medicaid and Medicare, HHS estimated that the 2016 Rule would apply to "almost all practicing physicians in the United States" and to over 133,000 hospitals, clinics, and other healthcare facilities. <u>Id.</u> at 31,445-46.  The agency also predicted that the regulation would apply to the approximately 180 insurers that offered health plans through ACA or state-based marketplaces. <u>Id.</u> at 31,445.

Making the incorporation of Title IX plain, the 2016 Rule prohibited discrimination "on the basis of . . . sex." <u>Id.</u> at 31,469 (formerly codified at 45 C.F.R. § 92.101(a)).  HHS then defined that phrase to include "discrimination on the basis of . . . termination of pregnancy, . . . sex stereotyping, and gender identity." <u>Id.</u> at 31,467 (formerly codified at 45 C.F.R. § 92.4).  Drilling down further, the 2016 Rule defined "gender identity" as "an individual's internal sense of gender, which may be male, female, neither, or a combination of male and female, and which may be different from an individual's sex assigned at birth." <u>Id.</u>  And "sex stereotypes" in part meant "the expectation that individuals will consistently identify with only one gender and that they will act

4

in conformity with the gender-related expressions stereotypically associated with that gender." Id. at 31,468.  The regulation left "termination of pregnancy" undefined.

HHS contextualized those definitions with specific examples of discriminatory conduct. To start, the 2016 Rule prohibited a covered healthcare provider from refusing to offer medical services for gender transitions[2] if that provider offered comparable services to others. Id. at 31,471 (formerly codified at 45 C.F.R. § 92.206).  HHS used this example: "A provider specializing in gynecological services that previously declined to provide a medically necessary hysterectomy for a transgender man would have to revise its policy to provide the procedure for transgender individuals in the same manner it provides the procedure for other individuals." Id. at 31,455.  The same concept theoretically applied for abortions.  So if an obstetrician performed dilation and curettage procedures for miscarriages, then the 2016 Rule barred a later refusal to perform those procedures for abortions.  See Doc. No. 95, ¶ 134.  As for covered entities' health plans, HHS declared that any "categorical . . . exclusion or limitation on coverage for all health services related to gender transition is unlawful on its face."  81 Fed. Reg. at 31,429; see also id. at 31,471-72 (formerly codified at 45 C.F.R. § 92.207(b)(4)-(5)).  Put differently, the 2016 Rule prohibited covered insurers and third-party administrators[3] ("TPAs") from offering or administering health plans with gender-transition exclusions.  Doc. No. 97, ¶ 133.  The regulation likewise banned healthcare providers from issuing such exclusions in their employee health plans. Id. ¶ 135.

---

[2] HHS noted that "[t]he range of transition-related services, which includes treatment for gender dysphoria, is not limited to surgical treatments and may include . . . hormone therapy and psychotherapy, which may occur over the lifetime of the individual."  81 Fed. Reg. at 31,435-36.
[3] Self-insured entities often contract with TPAs to administer their group health plans.  TPAs "are generally not responsible for the benefit design of the self-insured plans they administer."  81 Fed. Reg. at 31,432.

Meanwhile, the 2016 Rule imported applicable statutory exceptions for discrimination based on race, color, national origin, age, and disability. 81 Fed. Reg. at 31,470 (formerly codified at 45 C.F.R. § 92.101(c)). For sex discrimination, though, HHS conspicuously omitted Title IX's religious and abortion-neutrality exemptions. See id. The agency deflected comments calling for the religious carve-out's inclusion by positing that "Section 1557 contains no religious exemption" and that "a blanket religious exemption could result in a denial or delay in the provision of health care and in discouraging individuals from seeking necessary care." Id. at 31,380.

HHS rejected the abortion-neutrality exemption too, explaining that separate ACA provisions could shield objecting providers and insurers. Id. In particular, HHS cited to Section 1303 of the ACA. That statute provides that a qualified health plan is not required to include abortion coverage as an essential health benefit. 42 U.S.C. § 18023(b)(1)(A)(i). Section 1303 additionally bars qualified health plans offered through an ACA exchange from discriminating against an individual healthcare facility or provider because of an unwillingness to provide, pay for, provide coverage of, or refer for abortions. Id. § 18023(b)(4). Myriad other federal laws offer similar protection. The Weldon Amendment, which consistently appears in HHS appropriations legislation, prevents federal agencies from discriminating against healthcare entities based on (identical to Section 1303) refusal to provide, pay for, provide coverage of, or refer for abortions. See Consolidated Appropriations Act of 2019, Pub. L. No. 115-245, Div. B, § 507(d)(1), 132 Stat. 2981, 3118 (2018). The Coats-Snowe Amendment prohibits the federal government from discriminating against healthcare entities that decline to perform, refer for, or undergo training for abortions. 42 U.S.C. § 238n(a)(1). And the Church Amendments guarantee that a recipient of certain sources of federal funds cannot be compelled to perform or assist in sterilization procedures

or abortions if "contrary to [the recipient's] religious beliefs or moral objections."  42 U.S.C. § 300a-7(b)(1).

Having jettisoned the Title IX exemptions, HHS settled on a narrower exclusion.  The 2016 Rule excepted applications that "would violate applicable Federal statutory protections for religious freedom and conscience."  81 Fed. Reg. at 31,466 (formerly codified at 45 C.F.R. § 92.2(c)).  More specifically, HHS explained that the RFRA "is the proper means to evaluate any religious concerns about the application of Section 1557 requirements."  Id. at 31,380.  HHS went on to note that it would evaluate "individualized and fact specific" RFRA claims "on a case-by-case basis."  Id.  To obtain an exception, in other words, a provider objecting on religious grounds needed to convince HHS that the regulation circumstantially violated the RFRA.  Doc. No. 95, ¶ 51.  Otherwise, an objecting provider's last resort rested in federal court.  Id.

The 2016 Rule had implications for employers outside the healthcare context as well.  Title VII of the Civil Rights Act of 1964 bans all employers with 15 or more employees—whether receiving federal funding or not—from engaging in sex discrimination.[4]  42 U.S.C. §§ 2000e-2(a), 2000e(b).  The EEOC holds primary responsibility for interpreting and enforcing Title VII.  See Griggs v. Duke Power Co., 401 U.S. 424, 433-34 (1971).  HHS coordinated with the EEOC to expand the 2016 Rule's reach to otherwise noncovered entities through Title VII's analogous ban on sex discrimination.  See 81 Fed. Reg. at 31,432.

Understanding that relationship demands more explanation.  Recall that HHS designated health plans with categorical exclusions for gender-transition services as facially discriminatory. Id. at 31,429.  That meant health insurers and TPAs receiving federal financial assistance could

---

[4] Title VII similarly mandates an employer to reasonably accommodate employees' religious beliefs unless doing so results in undue hardship on the employer's business.  See 42 U.S.C. § 2000e(j); 29 C.F.R. § 1605.2(c).

not issue or administer such exclusions without potential exposure to Section 1557 liability—even if the entities they contracted with fell entirely outside the regulation's scope.  Id. at 31,432.  As a corollary, employers that wished to exclude coverage for gender-transition services in their group health plans faced a disincentive to do so if contracting with a covered entity.  Id.

The situation became especially precarious for TPAs.  The Employee Retirement Income Security Act of 1974 ("ERISA") compels TPAs to administer health plans as written.  29 U.S.C. § 1104(a)(1)(D).  So if a self-insured employer designed a health plan on its own with a categorical gender-transition exclusion, ERISA would require that employer's TPA to administer the plan by its terms.  81 Fed. Reg. at 31,432.  But the 2016 Rule would have simultaneously found the TPA's administration of the same plan unlawfully discriminatory.  Id. at 31,429.  Recognizing that dichotomy, HHS committed to "adjusting" enforcement by initially determining "whether responsibility for the decision or other action alleged to be discriminatory rests with the employer or with the [TPA]."  Id. at 31,432.  If the latter, HHS would commence enforcement proceedings as usual.  Id.  If the former, however, jurisdictional limitations prevented the agency from pursuing enforcement unless the employer already qualified as a covered health program or activity.  Id.

That jurisdictional gap is where the EEOC entered the picture.  HHS explained the coordinated response this way:

> Where, for example, [HHS] lacks jurisdiction over an employer responsible for benefit design, [HHS] typically will refer or transfer the matter to the EEOC and allow that agency to address the matter.  The EEOC has informed [HHS] that, provided the filing meets the requirements for an EEOC charge, the date a complaint was filed with [HHS] will be deemed the date it was filed with the EEOC.

Id.  By the time HHS promulgated the 2016 Rule, the EEOC had already interpreted Title VII to protect against gender-identity discrimination as an inherent form of sex discrimination.  See Macy v. Holder, EEOC Appeal No. 0120120821, 2012 WL 1435995, at *7 (Apr. 20, 2012).  In plain

terms, then, HHS indicated that the EEOC would pursue Title VII enforcement actions against nonhealthcare employers with gender-transition exclusions in their group health plans.  See Doc. No. 97, ¶ 165.

2.     Litigation Challenging the 2016 Rule

The 2016 Rule quickly drew legal challenges.  One month after the regulation took partial effect, a group of states and religious healthcare providers brought suit in the Northern District of Texas.  Franciscan All., Inc. v. Burwell, Case No. 7:16-cv-00108, Doc. No. 1 (N.D. Tex. Aug. 23, 2016).  Similar coalitions sued in this district not long after.  Religious Sisters of Mercy v. Burwell, Case No. 3:16-cv-00386, Doc. No. 1 (D.N.D. Nov. 7, 2016); Cath. Benefits Assoc. v. Burwell, Case No. 3:16-cr-00432, Doc. No. 1 (D.N.D. Dec. 28, 2016).  This Court eventually consolidated the Religious Sisters of Mercy and Catholic Benefits Association cases.  Doc. No. 37.

On December 31, 2016, the Franciscan Alliance court entered a nationwide preliminary injunction.  227 F. Supp. 3d 660, 695 (N.D. Tex. 2016).  The court's order barred enforcement of the 2016 Rule insofar as it prohibited discrimination based on "gender identity" and "termination of pregnancy."  Id.  The court first concluded that the regulation violated the APA by impermissibly expanding the scope of sex discrimination under Title IX to encompass gender identity.  Id. at 689.  Next, the court faulted HHS's decision to omit Title IX's religious and abortion-neutrality exemptions.  Id. at 691.  The court then determined that the regulation's mandate for healthcare entities to perform and insure gender-transition and abortion procedures imposed a substantial burden on the private plaintiffs' exercise of religion.  Id. at 692.  Finally, the court found that HHS failed to show that the 2016 Rule satisfied strict scrutiny under the RFRA.  Id. at 693.

In the meantime, this Court stayed enforcement of the 2016 Rule against the named Plaintiffs.  Doc. No. 23.  The Court later clarified that the stay only prevented enforcement of the regulation's "prohibitions against discrimination on the bases of gender identity and termination of pregnancy."  Doc. No. 36.  Further, the Court acknowledged the extant nationwide preliminary injunction in <u>Franciscan Alliance</u>.  <u>Id.</u>

With key aspects of the 2016 Rule on hold and the onset of a new presidential administration, HHS resolved to return to the drawing board.  In late May 2017, the Defendants requested a voluntary remand and stay in these cases to permit the agency "to assess the reasonableness, necessity, and efficacy" of the challenged regulation.  Doc. No. 45.  HHS also expressed a desire "to address certain issues identified by" the <u>Franciscan Alliance</u> court in its preliminary injunction decision.  <u>Id.</u>  The Court granted the Defendants' motion and imposed a stay on August 24, 2017.  Doc. No. 56.  The <u>Franciscan Alliance</u> court ordered a similar stay.  Civil Action No. 7:16-cv-00108-O, 2017 WL 3616652, at *5 (N.D. Tex. July 10, 2017).

Over a year passed while a draft of a new proposed rule circulated through the federal bureaucracy.  <u>See</u> Doc. Nos. 57, 58, 59, 61, 62, 64.  Then in December 2018, the <u>Franciscan Alliance</u> litigation restarted.  Case No. 7:16-cv-00108, Doc. No. 126 (N.D. Tex. Dec. 17, 2018).  The plaintiffs in that case promptly moved for summary judgment and permanent injunctive relief.  <u>See, e.g.</u>, <u>id.</u>, Doc. No. 136 (N.D. Tex. Feb. 4, 2019).

In June 2019, while those motions remained pending, HHS issued a Notice of Proposed Rulemaking that sought to revise the 2016 Rule.  <u>See</u> Nondiscrimination in Health and Heath Education Programs or Activities, 84 Fed. Reg. 27,846 (proposed June 14, 2019) ("NPRM").  Among other things, the NPRM proposed to repeal the 2016 Rule's definition of "on the basis of sex" in its entirety.  <u>Id.</u> at 27,857.  But HHS then pointed out that the United States Supreme Court

had recently granted three petitions for writs of certiorari—consolidated and later decided as Bostock v. Clayton County, 590 U.S. ___, 140 S. Ct. 1731 (2020)—in part to determine whether Title VII's proscription of sex discrimination equated to a bar on gender-identity discrimination. 84 Fed. Reg. at 27,855; see also 139 S. Ct. 1599 (2019) (mem.) (granting certiorari and consolidating cases).  The NPRM acknowledged that "[b]ecause Title IX adopts the substantive and legal standards of Title VII, a holding by the U.S. Supreme Court on the definition of 'sex' under Title VII will likely have ramifications for the definition of 'sex' under Title IX." 84 Fed. Reg. at 27,855 (footnote omitted).  With Bostock looming, HHS declined to propose a new definition of "sex" in the NPRM. Id. at 27,857.  The agency instead demurred to "allow the Federal courts, in particular, the U.S. Supreme Court, to resolve any dispute about" that term's "proper legal interpretation." Id. at 27,873.

Four months after HHS rolled out the NPRM, the Franciscan Alliance court granted summary judgment for the plaintiffs. 414 F. Supp. 3d 928 (N.D. Tex. 2019).  The court adhered to the reasoning in its preliminary injunction decision and concluded that the 2016 Rule violated both the RFRA and the APA. Id. at 942-43.  Yet the court stopped short of entering a nationwide permanent injunction against enforcement of the 2016 Rule's prohibitions on discrimination based on gender identity and termination of pregnancy. Id. at 946.  Instead, the court elected to vacate those portions of the regulation and remand to HHS for further consideration. Id.  Neither party appealed on the merits.  But the plaintiffs appealed the denial of injunctive relief to the Fifth Circuit Court of Appeals, where briefing wrapped up in early December. See Franciscan All., Inc. v. Azar, USCA No. 20-10093 (5th Cir. Jan. 24, 2020).

3.     The 2020 Rule

HHS finalized a new rule interpreting Section 1557 on June 12, 2020.  See Section 1557 of the Patient Protection and Affordable Care Act, U.S. Dep't of Health & Human Servs., https:// www.hhs.gov/civil-rights/for-individuals/section-1557/index.html  (last visited Jan. 19, 2021). Publication in the Federal Register occurred one week later.  Nondiscrimination in Health and Health Education Programs or Activities, 85 Fed. Reg. 37,160 (June 19, 2020) ("2020 Rule").  The 2020 Rule marks a significant shift from HHS's original Section 1557 interpretation.

In scope, the 2020 Rule applies more narrowly than its predecessor in two respects.  First, HHS redefined "health program or activity" to eliminate blanket regulatory application to entities "principally or otherwise engaged in the business of providing health insurance."  45 C.F.R. § 92.3(c).  Health insurers remain subject to Section 1557 for the specific parts of their operations that receive federal financial assistance.  See id. § 92.3(b) ("For any entity not principally engaged in the business of providing healthcare, the requirements applicable to a 'health program or activity' under this part shall apply to such entity's operations only to the extent any such operation receives Federal financial assistance.").  The revision indicates only that the entirety of federally funded insurers' operations no longer automatically qualifies for regulation merely by virtue of selling or administering health insurance plans.  See 85 Fed. Reg. at 37,172.  And second, whereas the 2016 Rule extended to all HHS-administered programs, the 2020 Rule applies exclusively to the agency's programs administered under Title I of the ACA.  45 C.F.R. § 92.3(a).  That means some programs administered by, for example, the Centers for Medicare and Medicaid Services and the Centers for Disease Control and Prevention likely now fall outside Section 1557's reach. See 85 Fed. Reg. at 37,170-71.

True to the NPRM, the 2020 Rule repealed the definition of "on the basis of sex" in full. Id. at 37,167.  HHS reverted to stating that discrimination is barred on the ground prohibited by Title IX without supplemental definition.  See 45 C.F.R. § 92.2(b)(2).  Still, HHS took the position that the "extension of sex-discrimination protections to encompass gender identity was contrary to the text of Title IX."  85 Fed. Reg. at 37,168.  The agency repeatedly leaned on the Solicitor General's amicus curiae brief in Bostock to support that stance.  See id. at 37,178, 37,194, 37,195. That notwithstanding, HHS reaffirmed its expectation that Bostock—however decided—would impact the meaning of "on the basis of sex" under Title IX.  Id. at 37,168.  HHS suggested that the repeal "would not preclude application of the [Bostock] Court's construction" of the phrase.  Id.

In a similar vein, HHS dispensed with the 2016 Rule's prohibition on categorical gender-transition exclusions in covered entities' health plans.  Id. at 37,201.  The agency asserted a lack of "statutory authority to require the provision or coverage of such procedures under Title IX protections from discrimination on the basis of sex."  Id. at 37,198.  HHS further concluded that the coverage mandate had improperly preempted legitimate medical debate, explaining that "the medical community is divided on many issues related to gender identity, including the value of various 'gender-affirming' treatments for gender dysphoria."  Id. at 37,187.

The 2020 Rule also expanded and clarified available exceptions to Section 1557.  Id. at 37,204.  Namely, HHS incorporated the Title IX religious and abortion-neutrality exemptions.  See 45 C.F.R. § 92.6(b) (stating that any application that would contradict exemptions provided by Section 1557's four incorporated civil rights statutes, including Title IX, "shall not be imposed or required").  The 2020 Rule additionally set out an explicit, though not exhaustive, list of federal religious freedom and conscience provisions that would override application of Section 1557 in

some circumstances.  Id.  That list included the RFRA, Section 1303 of the ACA, the Weldon Amendment, the Coats-Snow Amendment, and the Church Amendments.  Id.

       4.       <u>Bostock and Litigation Challenging the 2020 Rule</u>

On June 15, 2020, the Supreme Court decided <u>Bostock</u>—just three days after HHS finalized the 2020 Rule.[5]  The Court held that firing an employee for being homosexual or transgender constitutes sex discrimination under Title VII because such a decision "necessarily and intentionally discriminates against that individual in part because of sex."  <u>Bostock</u>, 140 S. Ct. at 1744.  In so holding, the Court assumed that "sex" referred "only to biological distinctions between male and female."  <u>Id.</u> at 1739.  Even with that assumption, the Court deemed it "impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex."  <u>Id.</u> at 1741.

<u>Bostock</u> arrived with caveats, however.  The Court warned that its decision did not "prejudge" any "other federal or state laws that prohibit sex discrimination."  <u>Id.</u> at 1753.  Indeed, a dissent from Justice Alito went so far as to identify Section 1557 as having the potential to "emerge as an intense battleground under the Court's holding."  <u>Id.</u> at 1781 (Alito, J., dissenting). And the Court separately expressed continued commitment to safeguarding employers' religious convictions.  <u>Id.</u> at 1753-54 (majority opinion).  Referencing the RFRA by name, the Court categorized it as "a kind of super statute" that "might supersede Title VII's commands in appropriate cases."  <u>Id.</u> at 1754.

A flurry of litigation commenced in the wake of <u>Bostock</u>.  Almost immediately, five cases sprung up seeking to prevent enforcement of the 2020 Rule and to revive various aspects of the 2016 Rule.  See <u>Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Human Servs.</u>, Case No.

---

[5] <u>Bostock</u> preceded the 2020 Rule's publication in the Federal Register by four days.

1:20-cv-01630 (D.D.C. June 22, 2020); <u>Walker v. Azar</u>, Case No. 1:20-cv-02834 (E.D.N.Y. June 26, 2020); <u>Boston All. of Gay, Lesbian, Bisexual & Transgender Youth v. U.S. Dep't of Health & Human Servs.</u>, Case No. 1:20-cv-11297 (D. Mass. July 9, 2020); <u>Washington v. U.S. Dep't of Health & Human Servs</u>, Case No. 2:20-cv-01105 (W.D. Wash. July 16, 2020); <u>New York v. U.S. Dep't of Health & Human Servs.</u>, Case No. 1:20-cv-05583 (S.D.N.Y. July 20, 2020).  Briefing on dispositive motions is ongoing in two of those cases, while district courts have decided preliminary injunction motions in the other three.

In <u>Boston Alliance</u> and <u>New York</u>, where dispositive motions remain pending, the plaintiffs challenge the 2020 Rule's repeal of specific protections against discrimination based on gender identity and termination of pregnancy, as well as its incorporation of Title IX's religious and abortion-neutrality exemptions.  <u>See</u> Case No. 1:20-cv-11297, Doc. No. 1, ¶¶ 166-80 (D. Mass. July 9, 2020); Case No. 1:20-cv-05583, Doc. No. 1, ¶ 86 (S.D.N.Y. July 20, 2020).  As for <u>Washington</u>, the court denied a preliminary injunction motion and dismissed that case for lack of standing.  CASE NO. C20-1105JLR, --- F. Supp. 3d ----, 2020 WL 5095467 (W.D. Wash. Aug. 28, 2020).  The court centrally reasoned that, after <u>Bostock</u>, the plaintiffs failed to show an imminent risk of injury because the 2020 Rule possibly protected against gender-identity discrimination under a straightforward reading of Title IX's "on the basis of sex" language—even without the 2016 Rule's definitional provision.  <u>Id.</u> at *7.

In the two remaining cases, the district courts entered partially overlapping preliminary injunctions.  <u>Walker v. Azar</u>, Case No. 20-CV-2834 (FB) (SMG), --- F. Supp. 3d ----, 2020 WL 4749859, at *10 (E.D.N.Y. Aug. 17, 2020); <u>Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Human Servs.</u>, Civil Action No. 20-1630 (JEB), --- F. Supp. 3d ----, 2020 WL 5232076, at *45 (D.D.C. Sept. 2, 2020).  Both courts determined that the 2020 Rule violated the APA by failing to

consider <u>Bostock</u> prior to publication.  See <u>Walker</u>, 2020 WL 4749859, at *9; <u>Whitman-Walker</u>, 2020 WL 5232076, at *26.  Yet the chosen remedies differed slightly.

The <u>Walker</u> court's order reinstates the 2016 Rule's definition of "on the basis of sex" to encompass "gender identity" and "sex stereotyping."  2020 WL 4749859, at *10.  The court also later enjoined the repeal of the former 45 C.F.R. § 92.206, which essentially repeats the prohibition against discrimination based on gender identity in the provision of health services.  <u>Walker v. Azar</u>, Case No. 20-CV-2834 (FB) (SMG), 2020 WL 6363970, at *4 (E.D.N.Y. Oct. 29, 2020).

By contrast, the preliminary injunction entered by the <u>Whitman-Walker</u> court revives only the 2016 Rule's "sex stereotyping" definition.  2020 WL 5232076, at *26.  Even so, the court found that definition broad enough to protect against discrimination based on gender identity too.  <u>Id.</u> at *23.  Lastly, the court blocked the 2020 Rule's incorporation of the Title IX religious exemption.  <u>Id.</u> at *29.  Although declining to deem incorporation of the religious exemption substantively invalid, the court nevertheless concluded that HHS had failed to adequately weigh the impact it might have on access to healthcare.  <u>Id.</u>

All other aspects of the 2020 Rule remain in effect today.  The two courts that granted preliminary injunction motions passed up invitations to enjoin the regulation in total.  <u>Walker</u>, 2020 WL 6363970, at *1; <u>Whitman-Walker</u>, 2020 WL 5232076, at *45.  So incorporation of the Title IX abortion-neutrality exemption is still effective, as are the repeal of "termination of pregnancy" from the definition of sex discrimination, the repeal of the insurance coverage mandate for gender-transition services, the inclusion of specific overriding religious freedom and conscience protections, and the narrower scope of application to health insurers.  See <u>Walker</u>, 2020 WL 6363970, at *2-3 (enumerating provisions in 2020 Rule not subject to injunctions).  Also worth noting, HHS recently appealed both adverse preliminary injunction decisions.  See <u>Walker</u>

v. Azar, USCA No. 20-3827 (D.C. Cir. Nov. 10, 2020); Whitman-Walker Clinic, Inc. v. U.S. Dep't

of Health & Human Servs., USCA No. 20-5331 (2d Cir. Nov. 9, 2020).

Throughout the last four and a half years of fluid regulatory interpretations and litigation

surrounding Section 1557, the EEOC's interpretation of Title VII as applied to employers' group

health plans has stayed static.  Doc. No. 97, ¶ 160.  The EEOC—before and after Bostock—has

taken the consistent position that Title VII protects against discrimination based on gender identity.

Compare Doc. No. 97-7 (EEOC guidance document on protections for LGBT workers from

December 2016), with What You Should Know: The EEOC and Protections for LGBT Workers,

U.S. Equal Emp't Opportunity Comm'n, https://www.eeoc.gov/laws/guidance/what-you-should-

know-eeoc-and-protections-lgbt-workers (last visited Jan. 19, 2021) (contemporary EEOC

guidance document on protections for LGBT workers).  In line with that stance, the EEOC has

pursued enforcement actions against nonhealthcare employers that categorically exclude coverage

for gender transitions from their health plans.  See Doc. No. 97, ¶¶ 156-59.

### C.   Introduction of Parties

Four Catholic organizations and the State of North Dakota comprise the Plaintiffs in

Religious Sisters of Mercy.  In Catholic Benefits Association, the Plaintiffs consist of the

namesake organization and three of its members, all affiliated with the Catholic Church.  The

Defendants are agencies and appointed officials of the United States government responsible for

promulgating and enforcing the challenged interpretations of federal law.

### 1.   Religious Sisters of Mercy Plaintiffs

Plaintiff Religious Sisters of Mercy is a Catholic order of religious sisters devoted to works

of mercy, including offering healthcare to the underserved.  Doc. No. 96-2, ¶ 2.  Located in Alma,

Michigan, the Religious Sisters of Mercy is a nonprofit corporation officially approved by the

Vatican.  Id. ¶ 3.  The sisters choose to follow their faith by offering care to those suffering from physical, psychological, intellectual, and spiritual ailments.  Id. ¶ 4.  As part of that mission, some sisters serve as licensed healthcare professionals.  Id. ¶ 5; see also Doc. No. 96-5, ¶ 2.

The Religious Sisters of Mercy own and operate Plaintiff Sacred Heart Mercy Health Care Center ("Sacred Heart"), a nonprofit clinic located in Alma, Michigan.  Doc. No. 96-2, ¶ 6.  Several of the sisters work at Sacred Heart as doctors, nurses, or other healthcare professionals.  Id.  The clinic serves poor, disabled, and elderly Medicare and Medicaid patients and provides low-cost or free care to uninsured individuals.  Id. ¶ 8.  The Religious Sisters of Mercy operate Sacred Heart in accordance with the Ethical and Religious Directives for Catholic Healthcare Services issued by the United States Conference of Catholic Bishops.  Id. ¶ 6.

Plaintiff SMP Health System is a nonprofit health system sponsored by another Catholic religious order, the Sisters of Mary of the Presentation.  Doc. No. 96-3, ¶ 4.  Headquartered in Valley City, North Dakota, SMP Health System operates healthcare facilities in North Dakota and Illinois.  Id. ¶ 3.  It places special emphasis on providing services to the poor and elderly, including Medicare and Medicaid patients.  Id. ¶ 4.  The Sisters of Mary of the Presentation operate SMP Health System in a manner that abides by the Ethical and Religious Directives for Catholic Healthcare Services issued by the United States Conference of Catholic Bishops.  Id. ¶ 5.

Plaintiff University of Mary ("University") is a Roman Catholic, Benedictine higher education institution with its main campus in Bismarck, North Dakota.  Doc. No. 96-4, ¶¶ 5-6.  While welcoming students of all faiths and backgrounds, the University upholds Catholic teaching in its programs and services.  Id. ¶ 6.  The University offers a nursing program and operates a student health clinic that each receive funding from HHS.  Id. ¶¶ 8, 10.

Consistent with their Catholic faith, each of these Plaintiffs believes "that every man and woman is created in the image and likeness of God, and that they reflect God's image in unique—and uniquely dignified—ways." Doc. Nos. 96-2, ¶ 9; 96-3, ¶ 6; 96-4, ¶ 9.  When providing medical services, these Plaintiffs serve every person who needs and qualifies for care, including transgender individuals.  Doc. Nos. 96-2, ¶ 7; 96-3, ¶ 7; 96-6, ¶ 4.  Nonetheless, they believe that performing gender-transition procedures would violate their medical judgment by potentially causing harm to patients.  Doc. Nos. 96-2, ¶ 11; 96-5, ¶ 9.  They also believe that performing gender-transition, abortion, and sterilization services would violate their religious beliefs regarding human sexuality and procreation.  Doc. Nos. 96-2, ¶ 12; 96-3, ¶¶ 8-10; 96-4, ¶ 10.  Finally, these Plaintiffs offer health benefits to their eligible employees, and they object for religious reasons to providing insurance coverage for abortions, sterilizations, and gender transitions.  Doc. Nos. 96-2, ¶ 15; 96-3, ¶ 11; 96-4, ¶ 13.

Plaintiff North Dakota oversees and controls several state agencies that receive financial assistance from HHS.  Doc. No. 95, ¶ 12.  For example, the North Dakota Department of Human Services received nearly $900 million in Medicaid funding in the most recent fiscal year.  Doc. No. 96-8, ¶ 4.  Additionally, North Dakota operates a State Hospital in Jamestown that provides psychiatric and chemical dependency treatment in part through HHS-administered funds.  Doc. No. 95, ¶ 12.  The state's Medicaid program excludes coverage for abortions (with exceptions for rape, incest, or to save the life of the mother) and gender reassignment surgeries.  Medical Servs. Div., N.D. Dep't of Human Servs., General Information for Providers: North Dakota Medicaid and Other Medical Assistance Programs 85 (2021).  North Dakota's employee health plan excludes coverage for similar services.  Doc. No. 95, ¶ 165.  The state also employs licensed healthcare professionals and offers health benefits to those employees and their families.  Id. ¶ 12.

2.      <u>Catholic Benefits Association Plaintiffs</u>

Plaintiff Catholic Benefits Association ("CBA") is a nonprofit corporation and Catholic ministry.  Doc. No. 97-1, p. 1.  Among other purposes, the CBA is organized "[t]o support Catholic employers . . . that, as part of their religious witness and exercise, provide health or other benefits to their respective employees in a manner that is consistent with Catholic values."  <u>Id.</u> at 2.  The CBA's membership includes over 1,030 employers and 5,100 Catholic parishes within more than 60 dioceses and archdioceses, collectively covering more than 90,000 employees and their families.  Doc. No. 97, ¶¶ 53-54.  Membership in the CBA is limited to Catholic employers that commit to providing benefits or services consistent with Catholic values.  Doc. No. 97-2, p. 4.  Many CBA members offer healthcare or health-related services that receive funding from Medicare, Medicaid, or other HHS-administered programs.  Doc. No. 97, ¶¶ 54-56.  And some employer members, including Catholic dioceses and archdioceses, offer employee health benefits in conjunction with health insurers and TPAs that receive federal financial assistance.  <u>Id.</u> ¶ 57.

The three remaining Plaintiffs are CBA members.  Plaintiff Diocese of Fargo ("Diocese") carries out the spiritual, educational, and social service mission of the Catholic Church in eastern North Dakota.  <u>Id.</u> ¶ 11.  The Diocese employs more than 15 individuals and operates a self-insured health plan for its employees.  <u>Id.</u> ¶¶ 14, 19.  Many Catholic parishes and affiliated ministries within the Diocese participate in that plan as well.  <u>Id.</u> ¶ 23.  The Diocese has engaged Blue Cross Blue Shield of North Dakota ("BCBSND")—an entity that receives federal financial assistance through an ACA exchange—as a TPA to administer its health plan.  <u>Id.</u> ¶¶ 19-20.  BCBSND has required the Diocese to enter into an indemnification agreement for decisions related to health plan design, such as the exclusion of gender-transition and abortion coverage.  <u>Id.</u> ¶ 22.

20

Plaintiff Catholic Charities North Dakota ("Catholic Charities") serves the poor, elderly, and disabled through critical social service programs. Id. ¶ 24. Its programs include disaster relief, individual and family counseling, adoption services, pregnancy counseling, and guardianship services for adults with special needs. Id. Catholic Charities employs more than 15 individuals. Id. ¶ 26. To provide benefits to its employees, Catholic Charities contracts with an insurer that receives federal financial assistance from HHS. Id. ¶¶ 28-29.

Plaintiff Catholic Medical Association ("CMA") is a national, physician-led community of healthcare professionals that strives to uphold the principles of the Catholic faith in the science and practice of medicine. Id. ¶ 30. Member physicians must promise to adhere to Catholic moral principles, particularly those related to bio-medical ethics. Id. ¶ 32. Consistent with their faith, CMA members do not provide gender-transition services, but some do perform procedures like hysterectomies and mastectomies that other physicians perform as part of gender transitions. Id. ¶ 34. Some CMA members also offer health benefits for employees that exclude coverage for gender transitions and abortion. Id. ¶ 37.

3.      Defendants

Defendant United States Department of Health and Human Services is the federal agency tasked with implementing and enforcing Section 1557. Doc. No. 95, ¶ 66. Sued in his official capacity, Defendant Alex M. Azar II is the Secretary of HHS. Id. ¶ 67. HHS and Secretary Azar are Defendants in both consolidated cases. Defendant Equal Employment Opportunity Commission is the federal agency charged with implementing and enforcing Title VII. Id. ¶ 68. Sued in her official capacity, Defendant Janet Dhillon is the Chair of the EEOC. Id. ¶ 69. The EEOC and Chair Dhillon are Defendants solely in Catholic Benefits Association.

### D.      Recent Procedural Developments

On November 6, 2020, the Plaintiffs moved to lift the stay.  Doc. No. 92.  The Court granted the motion and set deadlines for amended complaints and responses.  Doc. No. 93.  On November 23, 2020, the Plaintiffs timely filed amended complaints and contemporaneously moved for partial summary judgment and permanent injunctive relief.  Doc. Nos. 95-98.

Invoking the RFRA, the APA, and the Spending Clause of the Constitution, the <u>Religious Sisters of Mercy</u> Plaintiffs seek relief from HHS's current interpretation of Section 1557.  Doc. No. 96.  The <u>Catholic Benefits Association</u> Plaintiffs, relying exclusively on the RFRA, request relief from the same interpretation of Section 1557, as well from parallel interpretations of Title VII, Title IX, or any other federal laws.  Doc. No. 98.  In the alternative, all the Plaintiffs move for a preliminary injunction.  Doc. No. 96-1, p. 2; Doc. No. 104, p. 29.

The Defendants responded in opposition to the motions on December 23, 2020.  Doc. No. 111.  Accompanying the response, the Defendants moved to dismiss both cases in their entirety for lack of jurisdiction.  Doc. No. 112.  The Plaintiffs submitted final briefing on January 6, 2021.  Doc. Nos. 116-119.  The Court held a hearing on the motions on January 14, 2021.  Doc. No. 123.

## II.      <u>JURISDICTION</u>

Federal courts must possess jurisdiction before reaching the merits of a case.  <u>Va. House of Delegates v. Bethune-Hill</u>, 587 U.S. ___, 139 S. Ct. 1945, 1950 (2019).  Article III of the Constitution limits federal judicial power to the resolution of "Cases" and "Controversies."  <u>Hein v. Freedom from Religion Found., Inc.</u>, 551 U.S. 587, 597 (2007).  Spawning from that limitation, the frequently intertwined doctrines of standing, ripeness, and mootness all probe whether a subsisting controversy warrants judicial intervention.  <u>Warth v. Seldin</u>, 422 U.S. 490, 499 n.10 (1975).  Because the case or controversy requirement rests on separation-of-powers principles, the

inquiry becomes "especially rigorous" where the judiciary is called upon to review the validity of actions taken by the political branches of government.  Clapper v. Amnesty Int'l USA, 568 U.S. 398, 408-09 (2013) (citations omitted).

### A.    Standing

Standing requires (1) an injury in fact, (2) causation, and (3) redressability.  Hughes v. City of Cedar Rapids, 840 F.3d 987, 992 (8th Cir. 2016).  An injury in fact is "the actual or imminent invasion of a concrete and particularized legal interest." Kuehl v. Sellner, 887 F.3d 845, 850 (8th Cir. 2018) (citations omitted).  Plaintiffs seeking declaratory and injunctive relief "must show they are experiencing an ongoing injury or an immediate threat of injury."  Webb ex rel. K.S. v. Smith, 936 F.3d 808, 815 (8th Cir. 2019) (citation omitted).  Causation is satisfied when the injury is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." Balogh v. Lombardi, 816 F.3d 536, 543 (8th Cir. 2016) (cleaned up).  Redressability is "a likelihood that the injury will be redressed by a favorable decision." Kuehl, 887 F.3d at 850 (citations omitted).

The party invoking federal jurisdiction bears the burden to establish standing.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992).  Courts "assume that on the merits the plaintiffs would be successful in their claims" when analyzing standing.  Am. Farm Bureau Fed'n v. EPA, 836 F.3d 963, 968 (8th Cir. 2016) (citation omitted).  Plaintiffs "must demonstrate standing separately for each form of relief sought."  Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 185 (2000) (citations omitted).

The Plaintiffs contend that HHS's current interpretation of Section 1557 will cause imminent injury by forcing them to choose between performing and providing insurance coverage for gender transitions and abortions or risking the loss of federal funding and other penalties.  The

<u>Catholic Benefits Association</u> Plaintiffs also raise the prospect of injury from interpretations of Title VII, Title IX, and other federal laws that might compel the same actions.  The Defendants counter that the judicial vacatur and later administrative repeal of the 2016 Rule abate any risk of injury from Section 1557.  They further respond that the lack of imminent EEOC enforcement dooms the Title VII claims.

  1. <u>Section 1557</u>

  Some claims against HHS's interpretation of Section 1557 appear to center on the notion that recent court decisions have fully reinstated the 2016 Rule.  Not so.  Much of the 2020 Rule remains operative, including provisions that obviate several asserted harms.  Insofar as the 2020 Rule alleviated their injuries prior to submission of the most recent amended complaints, the Plaintiffs lack standing.  With that said, HHS's interpretation of Section 1557—as influenced by <u>Bostock</u> and the two nationwide preliminary injunctions against the 2020 Rule—provokes a credible threat of enforcement for refusal to provide or insure gender-transition procedures.

  At the outset, though, any claims regarding forced abortion services and insurance coverage falter.[6]  The 2020 Rule repealed "termination of pregnancy" from the regulatory definition of sex discrimination.  <u>See</u> 45 C.F.R. § 92.2(b)(2).  Added to that, HHS incorporated the Title IX abortion-neutrality exemption and identified overriding religious freedom and conscience laws that protect against the compulsory provision of abortions.  <u>See</u> 45 C.F.R. § 92.6(b).  No court has enjoined those amendments to date, and nothing indicates that HHS imminently intends to reverse course and again remove them.  So the Plaintiffs cannot show existing injury because HHS's interpretation of Section 1557 affords the exact protection they seek.

---

[6] The parties have often treated the abortion-related claims as an afterthought since this litigation gained its second wind.  Excising these claims on the front end will streamline resolution of the remaining jurisdictional issues.

Trying to sidestep that reality, the Plaintiffs hint at the specter of future injury, highlighting the pending <u>Boston Alliance</u> and <u>New York</u> cases that look to eliminate incorporation of the abortion-neutrality exemption.  But HHS opposes those lawsuits, and how other district courts may resolve them is plainly inappropriate for this Court to guess.  The Plaintiffs cannot use this litigation to obtain preemptive judicial affirmation of an exception that HHS already recognizes. <u>See</u> <u>KCCP Trust v. City of North Kansas City</u>, 432 F.3d 897, 899 (8th Cir. 2005) (explaining that Article III prohibits federal courts from issuing advisory opinions).  As interpreted today, Section 1557 does not proscribe refusal to perform or insure abortions, leaving the Plaintiffs tilting at windmills.  Lack of standing defeats the abortion-related claims.

Turning to the claims regarding compelled gender-transition procedures and insurance coverage, the initial task is to separate the wheat from the chaff.  Despite consolidation, cases joined together under Rule 42(a) of the Federal Rules of Civil Procedure retain their "independent character."  <u>Hall v. Hall</u>, 584 U.S. ___, 138 S. Ct. 1118, 1125 (2018).  Each consolidated case "must be considered separately to determine whether or not this Court has jurisdiction to consider its merits." <u>Butler v. Dexter</u>, 425 U.S. 262, 267 n.12 (1976) (per curiam); <u>see also</u> <u>Rich v. Lambert</u>, 53 U.S. 347, 352-53 (1851) (dismissing three of five consolidated cases for lack of jurisdiction).

A closer look at the two cases here reveals a preliminary difference for standing purposes. "When a statute is challenged by a party who is a target or object of the statute's prohibitions, 'there is ordinarily little question that the [statute] has caused him injury.'" <u>St. Paul Area Chamber of Com. v. Gaertner</u>, 439 F.3d 481, 485 (8th Cir. 2006) (alteration in original) (quoting <u>Minn. Citizens Concerned for Life v. FEC</u>, 113 F.3d 129, 131 (8th Cir. 1997)).  The <u>Religious Sisters of Mercy</u> Plaintiffs, as entities that operate health programs receiving federal financial assistance from HHS, qualify as objects of Section 1557 and its implementing regulations.  Conversely,

"when the plaintiff is not himself the object of the government action . . . he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." Summers v. Earth Island Inst., 555 U.S. 488, 493 (2009) (quoting Lujan, 504 U.S. at 562).  Section 1557 does not apply directly to the named Catholic Benefits Association Plaintiffs.  They assert instead that the statute causes them secondhand injury by mandating their insurers and TPAs to offer and administer health plans that cover gender-transition procedures.

But HHS's interpretation of Section 1557 no longer does that.  The 2016 Rule applied to all operations of an entity principally engaged in the provision of health insurance.  81 Fed. Reg. at 31,467 (formerly codified at 45 C.F.R. § 92.4).  That interpretation indirectly impacted entities like the Diocese and Catholic Charities.  While their own health insurance plans did not receive federal financial assistance, other plans that their insurers and TPAs offered did, thereby triggering the regulation.  With the 2020 Rule's arrival, however, health insurers now remain subject to Section 1557 only for the parts of their operations that receive federal funding.  See 45 C.F.R. § 92.3(b)-(c).  In explaining the revision's primary import, HHS stated: "To the extent that employer-sponsored group health plans do not receive Federal financial assistance . . ., they would not be covered entities."  85 Fed. Reg. at 37,173; see also Doc. No. 97, ¶¶ 192-93 (summarizing the 2020 Rule's narrower application to health insurers).

Precisely so here.  None of the Catholic Benefits Association Plaintiffs aver that their own health plans receive federal funding.  For those health plans, then, the prevailing interpretation of Section 1557 does not require insurers or TPAs to cover gender-transition procedures.  Ongoing or future risk of injury is absent as a result.

Attempting to show otherwise, the CBA points out that "[a]s a result of the 2016 Rule, two CBA members already have been required to cover gender-transition services for their

employees." Doc. No. 119, p. 2.  And the Diocese "has been forced to indemnify its TPA against liability for exclusion of . . . gender-transition services from its health plan." Id. at 3.  Yet those harms emanate from since-repealed regulations, not existing HHS policy.  Past injuries alone cannot confer standing to pursue declaratory and injunctive relief.  Frost v. Sioux City, 920 F.3d 1158, 1162 (8th Cir. 2019).  Without controlling regulations, if insurers and TPAs continue to pressure the Catholic Benefits Association Plaintiffs to cover gender-transition procedures or enter into indemnification agreements, such actions are not attributable to HHS.  See Balogh, 816 F.3d at 543.  Those Plaintiffs thus lack standing to challenge Section 1557 in their own capacities.

Still, the CBA alternatively asserts the ability to sue on behalf of its members. Associational standing inheres when "(1) the individual members would have standing to sue in their own right; (2) the organization's purpose relates to the interests being vindicated; and (3) the claims asserted do not require the participation of individual members." Sierra Club v. U.S. Army Corps of Eng'rs, 645 F.3d 978, 986 (8th Cir. 2011) (citations omitted).  An organizational plaintiff "need not establish that all of its members would have standing to sue individually so long as it can show that 'any one of them' would have standing." Iowa League of Cities v. EPA, 711 F.3d 844, 869 (8th Cir. 2013) (quoting Warth, 422 U.S. at 511).  Members on whose behalf suit is brought may remain unnamed.  Disability Rights Wis., Inc. v. Walworth Cnty. Bd. of Supervisors, 522 F.3d 796, 802 (7th Cir. 2008); Doe v. Stincer, 175 F.3d 879, 882 (11th Cir. 1999).

The CBA easily satisfies the second and third requirements for associational standing.  The CBA's purpose of supporting Catholic employers that wish to provide employee benefits consistent with their religious beliefs is certainly germane to a lawsuit that challenges regulations affecting members' health plans.  See Doc. No. 97-1, p. 2.  And where an organizational plaintiff

"seeks only declaratory and prospective injunctive relief, the participation of individual [members] . . . is not required." Heartland Acad. Cmty. Church v. Waddle, 427 F.3d 525, 533 (8th Cir. 2005).

As for the ability of individual members to sue, the CBA's verified second amended complaint confirms that its membership includes Catholic hospitals and other healthcare entities "that receive Medicaid and Medicare payments and participate in HHS-funded programs." Doc. No. 97, ¶¶ 55-56. That places at least some CBA members on equal footing with the Religious Sisters of Mercy Plaintiffs. The unified question then becomes whether those Plaintiffs—and, by implication, the similarly situated CBA members—possess standing.

When challenging threatened government action, plaintiffs need not wait for actual enforcement to satisfy the injury-in-fact requirement. Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158 (2014). Instead, they must demonstrate only "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979). Here, that standard is met.

First, the Plaintiffs' conduct implicates constitutional interests. The Catholic healthcare entities' refusal to perform or cover gender-transition procedures is predicated on an exercise of their religious beliefs protected by the First Amendment. See United States v. Ali, 682 F.3d 705, 709 (8th Cir. 2012) (explaining that the RFRA safeguards First Amendment free-exercise rights). Similarly, North Dakota's abstention from providing or insuring such procedures originates from state sovereignty interests embedded in the Spending Clause. See Nat'l Fed'n of Indep. Bus., 567 U.S. at 577 (expressing concern with "ensuring that Spending Clause legislation does not undermine the status of the States as independent sovereigns in our federal system"). Because the Plaintiffs' intend to engage in protected conduct, "their other claims are affected with a

constitutional interest too, regardless of the precise legal theory." <u>Telescope Media Grp. v. Lucero</u>, 936 F.3d 740, 750 (8th Cir. 2019).

Second, Section 1557 "arguably proscribe[s]" the Plaintiffs' refusal to perform or cover gender-transition procedures. <u>Driehaus</u>, 573 U.S. at 162. True enough, HHS tried to repeal the 2016 Rule's explicit prohibition on gender-identity discrimination, firmly stating that "extension of sex-discrimination protections to encompass gender identity was contrary to the text of Title IX." 85 Fed. Reg. at 37,168. But that repeal never took effect. Rather, two district courts entered partially overlapping preliminary injunctions that collectively reinstate the prior definition of "on the basis of sex" to include "gender identity" and "sex stereotyping." <u>Walker</u>, 2020 WL 4749859, at *10; <u>Whitman-Walker</u>, 2020 WL 5232076, at *45. The <u>Whitman-Walker</u> court further enjoined incorporation of the Title IX religious exemption. <u>Id.</u> As the Defendants readily acknowledge, "persons subject to an injunctive order issued by a court with jurisdiction are expected to obey that decree until it is modified or reversed." <u>GTE Sylvania, Inc. v. Consumers Union of U.S., Inc.</u>, 445 U.S. 375, 386 (1980). Construing the same definitions that now control once again, HHS previously classified the categorical refusal to perform or cover gender-transition procedures as unlawfully discriminatory. 81 Fed. Reg. at 31,471-72 (formerly codified at 45 C.F.R. §§ 92.206, 92.207(b)(4)-(5)). With the religious exemption enjoined too, a clear path for the Plaintiffs to incur liability under Section 1557 emerges.

What is more, the Plaintiffs face potential consequences from the 2020 Rule even without the injunctions. That is so because HHS declined to promulgate a new regulatory definition for "sex," instead leaving the door open to "application of the [<u>Bostock</u>] Court's construction." 85 Fed. Reg. at 37,168. The Supreme Court later held that Title VII proscribes discrimination based on transgender status under a plain reading of the statute's prohibition on sex discrimination.

Bostock, 140 S. Ct. at 1744.  HHS admitted that such a holding would "likely have ramifications for the definition of 'on the basis of sex' under Title IX" and, in turn, Section 1557.  85 Fed. Reg. at 37,168.  Case law vindicates that prediction.  Relying on Bostock, the Fourth and Eleventh Circuits recently held that Title IX protects against discrimination based on gender identity. Grimm v. Gloucester Cnty. Sch. Bd., 972 F.3d 586, 616 (4th Cir. 2020); Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty., 968 F.3d 1286, 1305 (11th Cir. 2020).  The Washington court, when reviewing a challenge to the 2020 Rule, further noted that the plaintiffs there "may be correct" that "Section 1557 and Title IX must now be interpreted to include concepts like gender identity" in light of Bostock.  2020 WL 5095467, at *8.  Like those courts, the Eighth Circuit has long recognized that "the Supreme Court's interpretation of Title VII properly informs [the] examination of Title IX." Wolfe v. Fayetteville, Ark. Sch. Dist., 648 F.3d 860, 866 (8th Cir. 2011). Considering these decisions and HHS's own statements, the Plaintiffs' refusal to perform or cover gender-transition procedures arguably falls within the ambit of Section 1557.[7]

Third, a credible threat of enforcement endures.  Such a threat arises "when a course of action is within the plain text of a statute." Alexis Bailly Vineyard, Inc. v. Harrington, 931 F.3d 774, 778 (8th Cir. 2019) (citing North Dakota v. Heydinger, 825 F.3d 912, 917 (8th Cir. 2016)). As just explained, Section 1557 is amenable to an interpretation that would expose the Plaintiffs to liability for declining to provide or insure gender-transition services.  And here "there is no 'evidence—via official policy or a long history of disuse—that authorities' have 'actually' refused to enforce" the statute. Jones v. Jegley, 947 F.3d 1100, 1104 (8th Cir. 2020) (quoting 281 Care Comm. v. Arneson, 638 F.3d 621, 628 (8th Cir. 2011)).  To the contrary, HHS has undertaken two

_____

[7] The Court ultimately does not decide whether Section 1557 protects against discrimination based on gender identity.

rulemakings to refine enforcement parameters in the ten years following Section 1557's enactment. Most recently, HHS vowed in the 2020 Rule's preamble to "vigorously enforce the prohibitions on discrimination based on . . . sex." 85 Fed. Reg. at 37,175. That is more than sufficient to establish a credible threat of enforcement. The Plaintiffs satisfy the injury-in-fact requirement.

Finally, HHS's responsibility to enforce Section 1557 supplies a sufficient causal relationship to the asserted injuries, which declaratory and injunctive relief will likely redress. For a pre-enforcement constitutional challenge to a statute, "the causation element of standing requires the named defendants to possess authority to enforce the complained-of provision." Calzone v. Hawley, 866 F.3d 866, 869 (8th Cir. 2017) (quoting Dig. Recognition Network v. Hutchinson, 803 F.3d 952, 957-58 (8th Cir. 2015)). HHS and Secretary Azar fit that bill for Section 1557. Redressability is likewise plain because a favorable decision "will relieve a discrete injury" of threatened enforcement. Massachusetts v. EPA, 549 U.S. 497, 525 (2007) (citation omitted).

The Defendants attempt to attack standing from several angles, but to no avail. They first contend that the Franciscan Alliance court's vacatur of the 2016 Rule and the ensuing promulgation of the 2020 Rule cured the Plaintiffs' injuries altogether. But since the Supreme Court decided Bostock and two district courts followed with preliminary injunctions against parts of the 2020 Rule, Section 1557 presents the Plaintiffs with a renewed threat of financial sanctions, civil enforcement proceedings, and even criminal penalties.

Next, the Defendants underscore that HHS has appealed the adverse preliminary injunction decisions, apparently suggesting that the outcome of those proceedings could avert the need for this litigation. Yet a standing inquiry focuses exclusively on the facts that existed at the time of the operative complaint. Conners v. Gusano's Chicago Style Pizzeria, 779 F.3d 835, 840 (8th Cir.

31

2015).  How HHS's appeals might turn out in the future is irrelevant to whether the Plaintiffs faced an injury in fact when they submitted their amended complaints.

This line of argument calls to mind the long-running litigation contesting the ACA's contraceptive mandate.  There, religious organizations challenged HHS regulations that required employers to cover certain forms of contraceptives in their health plans.  See Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania, 591 U.S. ___, 140 S. Ct. 2367, 2376 (2020) (collecting cases).  The Eighth Circuit determined that the mandate violated the RFRA and affirmed injunctive relief.  Sharpe Holdings, Inc. v. U.S. Dep't of Health & Human Servs., 801 F.3d 927, 945-46 (8th Cir. 2015), vacated on other grounds sub nom. U.S. Dep't of Health & Human Servs. v. CNS Int'l Ministries, No. 15-775, 2016 WL 2842448 (U.S. May 16, 2016).  HHS later issued new regulations in an effort to repeal the mandate.  See Little Sisters of the Poor, 140 S. Ct. at 2377-78.  Two district courts then preliminarily enjoined the repeal rules under the APA.  California v. U.S. Dep't of Health & Human Servs., 281 F. Supp. 3d 806, 832 (N.D. Cal. 2017); Pennsylvania v. Trump, 281 F. Supp. 3d 553, 585 (E.D. Pa. 2017).

In reaction, religious organizations renewed their RFRA claims against the restored mandate.  District courts across the country—this one among them—exercised jurisdiction and granted injunctive relief.  See Christian Emps. All. v. Azar, Case No. 3:16-cv-309, 2019 WL 2130142, at *5-6 (D.N.D. May 15, 2019); see also DeOtte v. Azar, 393 F. Supp. 3d 490, 514-15 (N.D. Tex. 2019); Sharpe Holdings, Inc. v. U.S. Dep't of Health & Human Servs., No. 2:12 CV 92 DDN, 2018 WL 1520031, at *4 (E.D. Mo. Mar. 28, 2018); Reaching Souls Int'l v. Azar, Case No. CIV-13-1092-D, 2018 WL 1352186, at *2 (W.D. Okla. Mar. 15, 2018).  Each court acted while the two preliminary injunctions against the repeal rules went up and down the appellate ladder.  See, e.g., Pennsylvania v. President United States, 930 F.3d 543 (3d Cir. 2019); California

v. U.S. Dep't of Health & Human Servs., 941 F.3d 410 (9th Cir. 2019); California v. Azar, 911 F.3d 558 (9th Cir. 2018).  Indeed, the Supreme Court had the last word: The repeal rules did not violate the APA.  Little Sisters of the Poor, 140 S. Ct. at 2386.  Despite the possibility of an appellate court reaching that conclusion all along, not one of the district courts that issued RFRA injunctions against the judicially restored contraceptive mandate discovered a lack of jurisdiction. The similar posture in those cases reinforces the conclusion that standing is present here.

As a last effort, the Defendants contend that HHS has evinced an intent to refrain from enforcing the challenged interpretation of Section 1557 against the Plaintiffs.  They point specifically to the 2020 Rule's express incorporation of the Title IX religious exemption, the RFRA, and other federal conscience laws.  See 45 C.F.R. § 92.6(b).  To reiterate, though, the Whitman-Walker court blocked incorporation of the religious exemption nationwide.  2020 WL 5232076, at *45.  So HHS cannot defeat standing with a wink and a nod to a regulatory interpretation that another court has enjoined.  Nor does a general commitment to follow preexisting religious freedom and conscience protections thwart standing.  HHS is always bound to implement federal law consistent with the RFRA.  See 42 U.S.C. § 2000bb-3(a) (providing that the RFRA applies to "implementation" of "all Federal law"); Little Sisters of the Poor, 140 S. Ct. at 2389 (Alito, J., concurring) (noting that HHS is "obligated to" implement federal law "in a manner that complies with RFRA").  Simply repeating what the statute already commands does not diminish the possibility that HHS will review the Catholic Plaintiffs' "individualized and fact specific" RFRA concerns and then decide to pursue enforcement anyway.  81 Fed. Reg. at 31,380. The other conscience protections enmeshed in the 2020 Rule apply primarily to abortions, offering

little to no protection from the compulsory provision or coverage of gender-transition procedures.[8]
See Franciscan All., 227 F. Supp. 3d at 683 (concluding that identical conscience laws "do not reach religious objections to providing or covering transition-related procedures"). All told, the Defendants' arguments in opposition to standing fail.

The Religious Sisters of Mercy Plaintiffs have standing to challenge HHS's interpretation of Section 1557 that requires them to perform and provide insurance coverage for gender-transition procedures. So too would the Catholic hospitals and other healthcare entities that count themselves as CBA members. The CBA therefore possesses associational standing to sue on behalf of its members, including the Diocese, Catholic Charities, and the CMA.

2.      Title VII

By the same token, the CBA has associational standing to pursue RFRA claims against the EEOC's interpretation of Title VII.[9] Again, the CBA's organizational purpose is relevant to religious freedom claims pertaining to members' health plans. The participation of individual members remains unnecessary to obtain declaratory and injunctive relief. Heartland Acad. Cmty. Church, 427 F.3d at 533. Moreover, individual CBA members like the Diocese and Catholic Charities have standing to sue in their own right.

Akin to the Section 1557 claims, the three-part injury-in-fact standard articulated in Babbitt continues to control. Applying that standard, the Catholic Benefits Association Plaintiffs' refusal

---

[8] The Church Amendments allow recipients of certain sources of federal funds to abstain from performing sterilization procedures on religious or moral grounds. 42 U.S.C. § 300a-7. That exemption could conceivably apply to some surgeries for gender transitions. Even so, not all gender-transition surgeries result in sterilization, and the Plaintiffs also object to nonsurgical services like counseling and pharmaceutical treatments. See Doc. Nos. 95, ¶ 35; 97, ¶ 133.

[9] Title VII exempts employers from paying for health insurance benefits for abortion. 42 U.S.C. § 2000e(k). The Catholic Benefits Association Plaintiffs do not appear to assert any abortion-related claims against the EEOC's interpretation of Title VII. To the extent they do, such claims would succumb to the same standing problems that defeat the Section 1557 abortion claims.

to cover gender-transition procedures in their health plans stems from a First Amendment exercise of their religious beliefs.  See Ali, 682 F.3d at 709.  And their conduct is not just arguably, but quite clearly, proscribed by Title VII.  The EEOC first interpreted Title VII to protect against gender-identity discrimination nearly a decade ago.  See Macy, 2012 WL 1435995, at *7.  Then in Bostock, the Supreme Court held that the statute must be interpreted that way.  140 S. Ct. at 1744.  In the 2016 Rule, HHS confirmed that the EEOC would pursue enforcement actions against nonhealthcare employers with gender-transition exclusions in their health plans.  81 Fed. Reg. at 31,432.  CBA members offer health plans with such exclusions and have more than 15 employees, bringing them squarely within Title VII's reach.[10]  Doc. No. 97, ¶¶ 14, 21, 26.

The Defendants primarily dispute standing by asserting a lack of threatened enforcement. They emphasize that the CBA, despite representing more than a thousand employers over the four-year course of this litigation, has not shown any members subject to past or imminent EEOC enforcement action.  But while "enforcement history is relevant . . ., it is not determinative." Alexis Bailly Vineyard, 931 F.3d at 778.  For example, the Eighth Circuit found that a coalition of labor unions had standing to challenge two picketing statutes even though the defendant officials submitted sworn affidavits expressing "no present plan to enforce" them.  United Food & Com. Workers Int'l Union v. IBP, Inc., 857 F.2d 422, 429 (8th Cir. 1988) (internal quotation marks omitted).  The court reasoned that "present intentions may not be carried out, and it is not certain that changes in leadership or philosophy might not result in reinstitution of the challenged policy."

---

[10] Title VII exempts a religious entity "with respect to the employment of individuals of a particular religion to perform work connected with the carrying on . . . of its activities." 42 U.S.C. § 2000e-1(a).  Most courts deem that exception inapplicable "to a religious organization charged with discrimination on the basis of sex."  Starkey v. Roman Catholic Archdiocese of Indianapolis, Inc., --- F. Supp. 3d ----, No. 1:19-cv-03153-RLY-TAB, 2020 WL 6434979, at *4 (S.D. Ind. Oct. 21, 2020) (collecting cases); accord Herx v. Diocese of Ft. Wayne-South Bend Inc., 48 F. Supp. 3d 1168, 1175-76 (N.D. Ind. 2014) (collecting cases).

Id. at 430 (cleaned up).  Of more recent vintage, the court determined that two beggars had standing to challenge an anti-loitering law where the defendant state swore off enforcing the statute against them in open court.  Rodgers v. Bryant, 942 F.3d 451, 455 (8th Cir. 2019).  Citing United Food, the court explained that "in-court assurances do not rule out the possibility that [the state] will change its mind and enforce the law more aggressively in the future."  Id.

This case is stronger than both United Food and Bryant.  The EEOC has never disavowed an intent to enforce Title VII's prohibition on gender-transition exclusions in health plans against the CBA or its members.  At the same time, the EEOC has enforced that very interpretation against other employers.  See Doc. No. 97, ¶¶ 157-59.  Because the CBA members' "course of action is within the plain text" of Title VII, a credible threat of enforcement persists.  Alexis Bailly Vineyard, 931 F.3d at 778 (citing Heydinger, 825 F.3d at 917).

The CBA members satisfy the causation and redressability elements as well.  The EEOC shoulders enforcement responsibility for Title VII, and declaratory and injunctive relief will likely redress the threat of enforcement.  See Massachusetts, 549 U.S. at 525.  Accordingly, the CBA possesses associational standing for the claims against the EEOC's interpretation of Title VII.

3.     Title IX and Other Federal Laws

Beyond challenges to Section 1557 and Title VII, the Catholic Benefits Association Plaintiffs seek to prospectively bar interpretations of Title IX or any other federal laws that may compel them to perform or cover gender transitions and abortions.  But that is a bridge too far.

To the extent Title IX even applies to those Plaintiffs, the statutory scheme explicitly exempts religious organizations.  20 U.S.C. § 1681(a)(3); see also 20 U.S.C. § 1687.  Nor can the statute mandate an entity "to provide or pay for any benefit or service, including the use of facilities, related to an abortion."  20 U.S.C. § 1688.  So Title IX necessarily cannot prohibit

36

religious entities from refusing to perform or insure gender transitions or abortions. While the Court acknowledges that Section 1557 incorporates Title IX's ban on sex discrimination, relief from Title IX itself is incongruous.

Almost needless to say, the CBA and its members cannot pursue religious freedom claims against as yet unimagined interpretations of federal laws they do not even identity. If that were possible, anyone could stroll in with a list of religious beliefs and enjoin the government from ever adopting laws that might violate them. Federal courts lack such sweeping authority. Flast v. Cohen, 392 U.S. 83, 96 (1968) (citation omitted) ("[T]he oldest and most consistent thread in the federal law of justiciability is that the federal courts will not give advisory opinions.").

The Catholic Benefits Association Plaintiffs have not shown a credible threat of enforcement for conduct arguably proscribed by Title IX or other unnamed federal laws. They therefore lack an injury in fact necessary to support standing. Only their RFRA claims challenging the interpretations of Section 1557 and Title VII may proceed.

### B.      Judicial Comity

Shifting from standing, the Defendants separately contend that considerations of judicial comity prevent the exercise of jurisdiction. They specifically assert that injunctive relief in these cases would directly conflict with the preliminary injunctions entered in Walker and Whitman-Walker. In part, the Court agrees.

A district court may "in its discretion dismiss a declaratory or injunctive suit if the same issue is pending in litigation elsewhere." Abbott Lab'ys v. Gardner, 387 U.S. 136, 155 (1967) (citations omitted). "Generally, principles of comity and judicial economy make courts reluctant to exercise jurisdiction over claims involving the orders of coordinate courts." Zambrana v. Califano, 651 F.2d 842, 844 (2d Cir. 1981) (citations omitted); see also West Gulf Mar. Ass'n v.

ILA Deep Sea Local 24, 751 F.2d 721, 728 (5th Cir. 1985).  "Prudence requires that whenever possible, coordinate courts should avoid issuing conflicting orders."  Feller v. Brock, 802 F.2d 722, 728 (4th Cir. 1986) (citations omitted).  "When an injunction sought in one federal proceeding would interfere with another federal proceeding, considerations of comity require more than the usual measure of restraint, and such injunctions should be granted only in the most unusual cases."  Bergh v. Washington, 535 F.2d 505, 507 (9th Cir. 1976) (citation omitted).

The APA claims run headlong into this barrier.  The Religious Sisters of Mercy Plaintiffs move for injunctive relief because, in their view, HHS violated the APA "by misinterpreting Section 1557" to prohibit gender-identity discrimination and by "failing to incorporate a statutorily mandated religious exemption from Title IX."  Doc. No. 96, p. 2.  The Walker and Whitman-Walker decisions stand in diametric opposition.  In Walker, the court determined that HHS's interpretation of Section 1557 violated the APA because the 2020 Rule contravened Bostock by taking the position that the statute did not protect against discrimination based on gender identity. 2020 WL 4749859, at *9.  The court then partially enjoined repeal of the 2016 Rule and reinstated the definition of "on the basis of sex" to encompass "gender identity" and "sex stereotyping."  Id. at *10.  Two weeks later, the Whitman-Walker court found similar APA violations and halted repeal of the "sex stereotyping" definition and incorporation of the Title IX religious exemption. 2020 WL 6363970, at *45.  Both orders apply nationwide.  See id. at *6, *44.

Imagine now if this Court were to sign off on the injunctive relief proposed here.  Where the Walker and Whitman-Walker courts ordered that HHS must interpret Section 1557 to protect against discrimination based on gender identity, this Court would order that HHS cannot do so. And where the Whitman-Walker court ordered that HHS cannot implement the Title IX religious exemption, this Court would order that HHS must do so.  Irreconcilable becomes the only

appropriate word.  Solidifying that notion, "[w]here different outcomes would place the defendant under inconsistent legal duties, the case for the second court's not going into conflict with the first is particularly strong."  Colby v. J.C. Penney Co., Inc., 811 F.2d 1119, 1124 (7th Cir. 1987).  If imposed, the Plaintiffs' requested injunctive relief would force HHS to choose between disparate orders from "courts of coordinate jurisdiction and equal rank."  West Gulf Mar. Ass'n, 751 F.2d at 728.  That outcome is untenable.

In defense, the Plaintiffs try to paint comity among federal district courts as a doctrine narrowly applicable to overlapping suits presenting identical issues between the same parties.  See Missouri ex rel. Nixon v. Prudential Health Care Plan, Inc., 259 F.3d 949, 954 (8th Cir. 2001) ("Plaintiffs may not pursue multiple federal suits against the same party involving the same controversy at the same time.").  But the principle extends more broadly.  See Hartford Fire Ins. Co. v. California, 509 U.S. 764, 817 (1993) (Scalia, J., dissenting) (discussing "the comity of courts, whereby judges decline to exercise jurisdiction over matters more appropriately adjudged elsewhere"); Feller, 802 F.2d at 728 (declaring "comity" a misnomer in a similar context, but explaining that "whatever its label, there is an underlying policy of judicial administration which counsels against the creation of conflicts such as the one at bar"); Spencer E. Amdur & David Hausman, Nationwide Injunctions and Nationwide Harm, 131 Harv. L. Rev. 49, 52 n.22 (2017) (noting that "the principle of comity . . . normally counsels against issuing a conflicting injunction").  Invoking judicial comity, several district courts have either vacated or abstained from issuing injunctions that posed conflicts with orders of coordinate courts.  See California ex rel. Lockyer v. U.S. Dep't of Agric., 710 F. Supp. 2d 916, 921-23 (N.D. Cal. 2008); Fund for Animals v. Norton, 323 F. Supp. 2d 7, 10-11 (D.D.C. 2004); Exxon Corp. v. U.S. Dep't of Energy,

594 F. Supp. 84, 89-90 (D. Del. 1984); <u>Common Cause v. Jud. Ethics Comm.</u>, 473 F. Supp. 1251, 1253-54 (D.D.C. 1979).

Endorsing the <u>Religious Sisters of Mercy</u> Plaintiffs' proposed APA relief would inevitably conflict with decisions of other district courts and simultaneously subject HHS to inconsistent legal obligations.  The Court believes that route is improper and unwise.  In the exercise of its discretion, the Court declines to adjudicate the APA claims.

Nevertheless, the RFRA and Spending Clause claims do not evoke the same concerns.  The <u>Walker</u> and <u>Whitman-Walker</u> preliminary injunction orders dealt solely with APA challenges to HHS's interpretation of Section 1557.  What the Plaintiffs ask for now are essentially exceptions to the agency's interpretation in the aftermath of those decisions.  The Catholic Plaintiffs insist that HHS's prevailing interpretation should not apply to them for religious freedom reasons.  North Dakota professes entitlement to an exemption on state sovereignty grounds.  Ordering relief under either theory would run parallel, rather than perpendicular, to the other district court decisions. <u>See</u> <u>Whitman-Walker</u>, 2020 WL 5232076, at *42 (explaining that "nothing in this Court's Order affects the application of RFRA"); <u>see also</u> <u>Christian Emps. All.</u>, 2019 WL 2130142, at *5-6 (entering RFRA injunction against contraceptive mandate following APA injunctions blocking repeal rules).  Nor would HHS end up saddled with incompatible orders from coordinate courts. The agency would remain subject to the <u>Walker</u> and <u>Whitman-Walker</u> courts' directives regarding the interpretation of Section 1557, while incurring distinct obligations to avoid applying that interpretation to the Plaintiffs due to countermanding constitutional and statutory authority.  Thus, judicial comity is no bar to the RFRA and Spending Clause claims.

C.        **Ripeness and Mootness**

In a final attempt to defeat jurisdiction, the Defendants raise ripeness and mootness hurdles. Ripeness tests "the fitness of the issues for judicial resolution" and "the hardship to the parties of withholding court consideration." Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n, 461 U.S. 190, 201 (1983) (citation omitted).  The party seeking judicial review "must necessarily satisfy both prongs to at least a minimal degree."  Neb. Pub. Power Dist. v. MidAmerican Energy Co., 234 F.3d 1032, 1039 (8th Cir. 2000).  "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." Texas v. United States, 523 U.S. 296, 300 (1998) (citations and internal quotation marks omitted).

The Plaintiffs' surviving claims against the interpretations of Section 1557 and Title VII satisfy both ripeness prongs.  "Fitness rests primarily on whether a case would benefit from further factual development."  City of Kennett v. EPA, 887 F.3d 424, 433 (8th Cir. 2018) (citation omitted).  These cases present "purely legal questions"—whether the challenged interpretations of federal law violate the RFRA and the Spending Clause—and need no additional factual development.  Iowa League of Cities, 711 F.3d at 867.  Although HHS has appealed the preliminary injunctions against the 2020 Rule, the "chance of a change" is not enough to render claims based on current law unfit for review.  City of Kennett, 887 F.3d at 434.  Meanwhile, "[t]he hardship prong asks whether delayed review 'inflicts significant practical harm' on the plaintiffs." Parrish v. Dayton, 761 F.3d 873, 875 (8th Cir. 2014) (quoting Ohio Forestry Ass'n, Inc. v. Sierra Club, 523 U.S. 726, 733 (1998)).  Practical harm is manifest here because the Plaintiffs must either alter their policies for providing and covering gender-transition procedures (which the Catholic Plaintiffs assert will violate their religious beliefs and North Dakota its sovereign interests) or risk

the loss of critical federal healthcare funding along with potential civil and criminal penalties. Therefore, these cases are sufficiently ripe for review.

Resisting ripeness for the Title VII claims in particular, the Defendants cite to Standing Rock Housing Authority v. EEOC, 585 F. Supp. 2d 1112 (D.N.D. 2008).  There, another court in this district dismissed as unripe a declaratory judgment suit that sought to nullify an EEOC administrative subpoena regarding sexual harassment allegations.  585 F. Supp. 2d at 1121.  The court found a lack of final agency action[11] because "mere issuance of an administrative subpoena fixes no obligations nor imposes any legal liability."  Id. at 1120.  This case is different.  Through the 2016 Rule, the EEOC staked out the position that Title VII forbids employers to categorically exclude gender-transition procedures from their health plans.  81 Fed. Reg. at 31,432.  Its stance has not wavered, as evidenced by multiple enforcement actions brought against employers since then.  See Doc. No. 97, ¶¶ 157-59.  The EEOC's position thus represents "the consummation of the agency's decisionmaking process" and determines "rights or obligations" of the CBA and its members as covered employers.  U.S. Army Corps of Eng'rs v. Hawkes Co., Inc., 587 U.S. ___, 136 S. Ct. 1807, 1813 (2016) (quoting Bennett v. Spear, 520 U.S. 154, 177-78 (1997)).  Standing Rock does not dictate dismissal of the Title VII claims as unripe.

Mootness occurs when "changed circumstances already provide the requested relief and eliminate the need for court action."  McCarthy v. Ozark Sch. Dist., 359 F.3d 1029, 1035 (8th Cir. 2004).  Courts recurrently describe mootness as "the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must

---

[11] The APA circumscribes judicial review in part to "final agency action for which there is no other adequate remedy in a court."  5 U.S.C. § 704.  That requirement informs the ripeness inquiry for challenges to decisions of administrative agencies.  See Lane v. U.S. Dep't of Agric., 187 F.3d 793, 795 (8th Cir. 1999).

continue throughout its existence (mootness)." Arizonans for Official English v. Arizona, 520 U.S. 43, 68 n.22 (1997) (citation omitted).

Simply put, neither case is moot because nothing has changed since the Plaintiffs submitted their amended complaints. They remain subject to the interpretations of Section 1557 and Title VII that spurred them to move for relief. The Plaintiffs possess standing to pursue some of their claims, and the challenged legal regime has stayed constant since this litigation recommenced. These cases are not moot as a result.

In sum, the Court will exercise jurisdiction over the Plaintiffs' RFRA and Spending Clause claims challenging the interpretations of Section 1557 and Title VII that compel them to perform and provide insurance coverage for gender transitions. The abortion-related claims, the APA claims, and the claims challenging Title IX and other unidentified federal laws call for dismissal.

## III.   SUMMARY JUDGMENT

With jurisdiction resolved, the Court addresses the merits. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "An issue is 'genuine' if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party." Schilf v. Eli Lilly & Co., 687 F.3d 947, 948 (8th Cir. 2012) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "A fact is material if it 'might affect the outcome of the suit.'" Dick v. Dickinson State Univ., 826 F.3d 1054, 1061 (8th Cir. 2016) (quoting Anderson, 477 U.S. at 248). Courts view the facts and draw all reasonable inferences most favorably to the nonmoving party. TCF Nat'l Bank v. Mkt. Intel., Inc., 812 F.3d 701, 707 (8th Cir. 2016).

A.      **Religious Freedom Restoration Act**

Congress enacted the RFRA "to provide very broad protection for religious liberty." Burwell v. Hobby Lobby Stores, Inc., 573 U.S. 682, 693 (2014). The RFRA forbids government to "substantially burden a person's exercise of religion" unless the burden (1) "is in furtherance of a compelling governmental interest" and (2) "is the least restrictive means of furthering that compelling interest." 42 U.S.C. § 2000bb-1(b). "A person whose religious practices are burdened in violation of RFRA 'may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief.'" Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418, 424 (2006) (quoting 42 U.S.C. § 2000bb-1(c)). If a substantial burden exists, then the government assumes the obligation to meet the "exceptionally demanding" strict scrutiny standard. Hobby Lobby, 573 U.S. at 728.

1.      Substantial Burden

The RFRA initially queries whether the challenged implementations of Section 1557 and Title VII impose a substantial burden on the Catholic Plaintiffs' exercise of religion. The analysis poses two different questions. "First, would non-compliance have substantial adverse practical consequences?" Little Sisters of the Poor, 140 S. Ct. at 2389 (Alito, J., concurring) (citing Hobby Lobby, 573 U.S. at 720-23). "Second, would compliance cause the objecting party to violate its religious beliefs, as it sincerely understands them?" Id. (emphasis omitted) (citing Hobby Lobby, 573 U.S. at 723-26).

In this instance, adverse practical consequences abound. Under the prevailing interpretations of Section 1557 and Title VII, refusal to perform or cover gender-transition procedures would result in the Catholic Plaintiffs losing millions of dollars in federal healthcare funding and incurring civil and criminal liability. An "imposition of significant monetary

penalties" indisputably qualifies as a substantial burden.  Sharpe Holdings, 801 F.3d at 937; see also Priests for Life v. U.S. Dep't of Health & Human Servs., 808 F.3d 1, 16 n.3 (D.C. Cir. 2015) (Kavanaugh, J., dissenting from denial of reh'g en banc) ("There has never been a question that such a direct penalty imposes a substantial burden on the exercise of religion").

Just as clearly, compliance with the challenged laws would violate the Catholic Plaintiffs' religious beliefs as they sincerely understand them.  The RFRA broadly defines "exercise of religion" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief."  42 U.S.C. §§ 2000bb-2, 2000cc-5(7)(A).  "[T]he 'exercise of religion' involves 'not only belief and profession but the performance of (or abstention from) physical acts.'"  Hobby Lobby, 573 U.S. at 710 (quoting Emp. Div., Dep't of Human Res. of Or. v. Smith, 494 U.S. 872, 877 (1990)).  In meticulous detail, the Catholic Plaintiffs have explained that their religious beliefs regarding human sexuality and procreation prevent them from facilitating gender transitions through either medical services or insurance coverage.  See Doc. Nos. 95, ¶¶ 98-152; 98, ¶¶ 70-100, 220-241.  The Defendants in no way dispute the sincerity of those beliefs.  Doc. No. 113, p. 2.  Nor is it this Court's domain to question them.  Hernandez v. Comm'r, 490 U.S. 680, 699 (1989) ("It is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds.").  Because the interpretations of Section 1557 and Title VII threaten to penalize the Catholic Plaintiffs for adhering to their beliefs, a substantial burden weighs on the exercise of religion.

> 2.    Compelling Interest

With a substantial burden present, the government must demonstrate that the challenged implementations of federal law advance "interests of the highest order."  Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 546 (1993) (citations and internal quotation

marks omitted).  The Defendants never attempt to make that showing here.  In the 2020 Rule, HHS conceded to lacking a "compelling interest in forcing the provision, or coverage, of these medically controversial [gender-transition] services by covered entities."  85 Fed. Reg. at 37,188.

That aside, even the interests advanced prior to the 2020 Rule likely fall short.  The 2016 Rule, for example, proffered a compelling interest in ensuring nondiscriminatory access to healthcare.  81 Fed. Reg. at 31,380.  Similarly, the EEOC has previously asserted that Title VII furthers a "compelling interest in combating discrimination in the workforce."  EEOC v. R.G. & G.R. Harris Funeral Homes, Inc., 884 F.3d 560, 591 (6th Cir. 2018), aff'd, 140 S. Ct. 1731 (2020). But the Supreme Court has instructed to look "beyond broadly formulated interests."  O Centro, 546 U.S. at 431.  Rather, courts must "scrutinize the asserted harm of granting specific exemptions to particular religious claimants and to look to the marginal interest in enforcing the challenged government action in that particular context."  Holt v. Hobbs, 574 U.S. 352, 363 (2015) (cleaned up).  Neither HHS nor the EEOC has articulated how granting specific exemptions for the Catholic Plaintiffs will harm the asserted interests in preventing discrimination.

Also cutting against the Defendants, "a law cannot be regarded as protecting an interest of the highest order . . . when it leaves appreciable damage to that supposedly vital interest unprohibited."  281 Care Comm. v. Arneson, 766 F.3d 774, 787 (8th Cir. 2014) (cleaned up).  A mandate for entities subject to Section 1557 and Title VII to perform and cover gender-transition procedures still leaves gaps, including in the government's own healthcare programs.  See Franciscan All., 227 F. Supp. 3d at 692-93.  In short, the Court harbors serious doubts that a compelling interest exists.  This issue need not be resolved, however, because the Defendants fail to meet the rigors of the least-restrictive-means test.  See Hobby Lobby, 573 U.S. at 728.

3.      Least Restrictive Means

To satisfy the least-restrictive-means test, the government must "come forward with evidence" to show that its policies "are the only feasible means . . . to achieve its compelling interest." Sharpe Holdings, 801 F.3d at 943. "If a less restrictive means is available for the Government to achieve its goals, the Government must use it." Holt, 574 U.S. at 365 (cleaned up). In the RFRA context, "a regulation may constitute the least restrictive means of furthering the government's compelling interests if 'no alternative forms of regulation' would accomplish those interests without infringing on a claimant's religious-exercise rights. Sharpe Holdings, 801 F.3d at 943 (quoting Sherbert v. Verner, 374 U.S. 398, 407 (1963)).

Here, the Defendants possess many less restrictive alternatives beyond forcing the Catholic Plaintiffs to perform and cover gender-transition procedures in violation of their religious beliefs. If the aim is to expand financial support, then "[t]he most straightforward way of doing this would be for the Government to assume the cost of providing" gender-transition procedures for those "unable to obtain them under their health-insurance policies due to their employers' religious objections." Hobby Lobby, 573 U.S. at 728. Other options include providing "subsidies, reimbursements, tax credits, or tax deductions to employees" or paying for services "at community health centers, public clinics, and hospitals with income-based support." Sharpe Holdings, 801 F.3d at 945. ACA exchanges offer yet another viable alternative, whereby "the government could treat employees whose employers do not provide complete coverage for religious reasons the same as it does employees whose employers provide no coverage at all." Id. (citations and internal quotations marks omitted); see also 81 Fed. Reg. at 31,428 (noting that nondiscrimination requirements apply to plans offered through ACA exchanges). And if broadening access to gender-transition procedures themselves is the goal, then "[t]he government could . . . assist

transgender individuals in finding and paying for transition procedures available from the growing number of healthcare providers who offer and specialize in those services." Franciscan All., 227 F. Supp. 3d at 693; see also Doc. No. 120-3 (listing clinics that specialize in healthcare for transgender individuals).

In response, the Defendants have "not shown that these alternatives are infeasible." Sharpe Holdings, 801 F.3d at 945. They therefore fail to demonstrate that their policies use the least restrictive means to burden the Catholic Plaintiffs' exercise of religion. As applied, the challenged interpretations of Section 1557 and Title VII violate the RFRA. Summary judgment is appropriate as a consequence.

### B.    Spending Clause

The Spending Clause empowers Congress "to pay the Debts and provide for the . . . general Welfare of the United States." U.S. Const. Art. I, § 8, cl. 1. Inherent in the spending power is "the authority to impose limits on the use of such funds to ensure they are used in the manner Congress intends." Agency for Int'l Dev. v. All. for Open Soc'y Int'l, 570 U.S. 205, 213 (2013) (citing Rust v. Sullivan, 500 U.S. 173, 195 n.4 (1991)). Though broad, that authority comes with five restraints when conditioning a state's receipt of federal funds:

> (1) the legislation must be in pursuit of the general welfare, (2) conditions on the state's receipt of federal funds must be set out unambiguously so that the state's participation is the result of a knowing and informed choice, (3) conditions on federal funds must be related to the federal interest in particular national projects or programs, (4) conditions must not be prohibited by other constitutional provisions, and finally, (5) the circumstances must not be so coercive that "pressure turns into compulsion."

Van Whye v. Reisch, 581 F.3d 639, 649-50 (8th Cir. 2009) (citing South Dakota v. Dole, 483 U.S. 203, 207-11 (1987)).

From North Dakota's perspective, Section 1557 transgresses two of those boundaries. First, North Dakota contends that Congress failed to unambiguously inform the states that they must perform and provide insurance coverage for gender-transition procedures as a condition of continued federal healthcare funding. Second, the state assails that condition as unconstitutionally coercive. Neither theory is persuasive.

1.      Unambiguous Notice

The Supreme Court often characterizes Spending Clause legislation as "much in the nature of a contract." Pennhurst State Sch. & Hosp. v. Halderman, 451 U.S. 1, 17 (1981). Legitimate exercise of the spending power "thus rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'" Id. "Unlike normal contractual undertakings, federal grant programs originate in and remain governed by statutory provisions expressing the judgment of Congress concerning desirable public policy." Bennett v. Ky. Dep't of Educ., 470 U.S. 656, 669 (1985).

North Dakota asserts that performing and covering gender transitions was not part of the deal when first accepting Medicaid funding in 1965. But the inquiry properly focuses on when the objectionable condition took effect, not when Congress originally enacted the spending program.[12]   See South Dakota v. Dole, 483 U.S. 203, 208 (1987) (finding unambiguous notice satisfied based on 1984 amendments to Federal Aid Highway Act rather than original statute); Bennett, 470 U.S. at 670 (noting that "the legal requirements in place when the grants were made" under 1970 amendments to Title I of the Elementary and Secondary Education Act controlled Spending Clause analysis). The correct question is accordingly whether Section 1557, as enacted in 2010, "furnishes clear notice regarding the liability at issue." Osseo Area Schs., Indep. Sch.

---

[12] In any event, North Dakota voluntarily joined the ACA's Medicaid expansion. See Medicaid Expansion, N.D. Dep't of Human Servs., http://www.nd.gov/dhs/medicaidexpansion/ (last visited Jan. 19, 2021). The state no doubt acquiesced to new funding conditions when doing so.

Dist. No. 279 v. M.N.B. ex rel. J.B., 970 F.3d 917, 922 (8th Cir. 2020) (quoting Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy, 548 U.S. 291, 296 (2006)).

The answer is yes. Section 1557 unambiguously informed North Dakota that liability could attach from engaging in sex discrimination when using federal healthcare funds. See 42 U.S.C. § 18116(a); 20 U.S.C. § 1681(a). By March 2010, a host of federal courts had determined that laws banning sex discrimination equally barred discrimination based on gender identity. See Glenn v. Brumby, 663 F.3d 1312, 1317-18 (11th Cir. 2011) (collecting cases, all of which predate the ACA); see also Tovar v. Essentia Health, 342 F. Supp. 3d 947, 953 (D. Minn. 2018) (rejecting Spending Clause claim because pre-ACA decisions put defendants "on notice that Section 1557's nondiscrimination requirements encompassed gender-identity discrimination"); Flack v. Wis. Dep't of Health Servs., 328 F. Supp. 3d 931, 950 (W.D. Wisc. 2018) (rejecting Spending Clause claim against Section 1557 because when "the Affordable Care Act was enacted, federal courts had already interpreted prohibitions on sex discrimination to cover adverse treatment of transgender people"). Harkening back to the contract analogy, dissension about the meaning of a term does not render an agreement ambiguous. Chavis Van & Storage of Myrtle Beach, Inc. v. United Van Lines, LLC, 784 F.3d 1183, 1188 (8th Cir. 2015). North Dakota possessed sufficient notice that Section 1557 could prohibit discrimination based on gender identity, thereby affording an adequate opportunity to decide whether to continue accepting federal healthcare dollars.

Furthermore, even if 1965 were the right starting point, Congress expressly reserved "[t]he right to alter, amend or repeal any provision" of the Medicaid program from day one. 42 U.S.C. § 1304. The states have also consented—for more than 30 years—to amend their Medicaid plans "whenever necessary to reflect . . . [c]hanges in Federal law, regulations, policy interpretations, or court decisions." 42 C.F.R. § 430.12(c)(1)(i); Medicaid Program; State Plans and Grants to States,

53 Fed. Reg. 36,569, 36,572 (Sept. 21, 1988).  Mindful of those provisions, the Supreme Court commented that the states "might reasonably assume that Congress was entitled to make adjustments to the Medicaid program as it developed."  Nat'l Fed'n of Indep. Bus., 567 U.S. at 583.  Congress has done so numerous times since Medicaid's genesis, repeatedly conditioning the receipt of funds on compliance with new amendments.  See id.  Lack of notice to the states proved insurmountable in a single instance.  That happened when Congress attempted "a shift in kind, not merely degree" by conditioning all existing Medicaid funding on the states adopting what amounted to "an element of a comprehensive national plan to provide universal health insurance coverage."  Id.  Surely, then, prohibiting the states from engaging in sex discrimination when administering Medicaid is a shift in degree, not in kind.

Lastly, North Dakota's reliance on Smith v. Rasmussen, 249 F.3d 755 (8th Cir. 2001), is misplaced.  In that case, the Eighth Circuit held that a state's "prohibition on funding of sex reassignment surgery is both reasonable and consistent with the Medicaid Act."  249 F.3d at 761. Smith is wholly silent, however, on the federal government's ability to enact new laws and regulations requiring states to cover gender-transition procedures.  North Dakota is left exposed to that outcome because "participating States are to comply with requirements imposed by the [Medicaid] Act and by the Secretary of Health and Human Services."  Atkins v. Rivera, 477 U.S. 154, 157 (1986) (citations omitted).  Perceived lack of unambiguous notice does not entitle North Dakota to summary judgment.

    2.    Coercion

The Spending Clause's coercion backstop is closely linked to the Tenth Amendment concept that the federal government may not commandeer the states "to enact or administer a federal regulatory program."  New York v. United States, 505 U.S. 144, 188 (1992); see also Nat'l

Fed'n of Indep. Bus., 567 U.S. at 577-78 (discussing Tenth Amendment limitations on the spending power).  To that end, conditions on federal funds cannot "be so coercive as to pass the point at which 'pressure turns into compulsion.'"  Dole, 483 U.S. at 211 (quoting Steward Machine Co. v. Davis, 301 U.S. 548, 590 (1937)).

North Dakota contends that Section 1557 improperly compels the provision and coverage of gender-transition procedures by threatening to withhold all federal healthcare funding.  The state accepts HHS funds for two distinct purposes: to provide healthcare services and to administer a Medicaid program.  Doc. Nos. 95, ¶ 12; 96-8, ¶ 4.  In these circumstances, conditions on funds for either purpose do not implicate the coercion doctrine.

Insofar as North Dakota provides federally funded healthcare services, Spending Clause protection is precluded because HHS regulates private entities in an identical manner.  "The anticommandeering doctrine does not apply when Congress evenhandedly regulates an activity in which both States and private actors engage."  Murphy v. Nat'l Collegiate Athletic Ass'n, 584 U.S. ___, 138 S. Ct. 1461, 1478 (2018); see also Reno v. Condon, 528 U.S. 141, 150-51 (2000); South Carolina v. Baker, 485 U.S. 505, 514-15 (1988); Garcia v. San Antonio Metro. Transit Auth., 469 U.S. 528, 554-56 (1985).  North Dakota offers healthcare services alongside private entities, meaning the state must accept the universally applicable regulations that follow.

Administering a Medicaid program, on the other hand, is unique to the states.  To be sure, constitutionally impermissible coercion may occur when "conditions take the form of threats to terminate other significant independent grants . . . as a means of pressuring the States to accept policy changes."  Nat'l Fed'n of Indep. Bus., 567 U.S. at 580 (emphasis added).  But the coercion doctrine is inapposite where Congress "condition[s] the receipt of funds on the States' complying with restrictions on the use of those funds, because that is the means by which Congress ensures

that the funds are spent according to its view of the 'general Welfare.'" <u>Id.</u> (emphasis added); <u>see also</u> Dole, 483 U.S. at 210 ("We have also held that a perceived Tenth Amendment limitation on congressional regulation of state affairs did not concomitantly limit the range of conditions legitimately placed on federal grants."); <u>Oklahoma v. U.S. Civ. Serv. Comm'n</u>, 330 U.S. 127, 143 (1947) (explaining that the federal government "does have the power to fix the terms upon which its money allotments to states shall be disbursed"). Section 1557 is a direct restriction on how North Dakota may utilize federal healthcare funding, not an indirect inducement to enact new policies at congressional behest. Because Congress retains the prerogative to impose conditions on the use of federal funds, North Dakota's coercion argument falls flat. Summary judgment on the Spending Clause claims is therefore unwarranted.[13]

## IV.   <u>INJUNCTIVE RELIEF</u>

Rule 65 of the Federal Rules of Civil Procedure authorizes district courts to grant injunctive relief. When considering a motion for permanent injunction, four factors control: "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties; (3) whether the movant proves actual success on the merits; and (4) the public interest." <u>Forest Park II v. Hadley</u>, 336 F.3d 724, 731 (8th Cir. 2003) (citing <u>Bank One, Utah v. Guttau</u>, 190 F.3d 844, 847 (8th Cir. 1999)). While no one factor is dispositive, success on the merits is most important. <u>Brady v. Nat'l Football League</u>, 640 F.3d 785, 789 (8th Cir. 2011). The balance of harms and public interest factors merge when the government is the opposing party. <u>Nken v. Holder</u>, 556 U.S. 418, 435 (2009). The burden to

---

[13] For the same reasons, North Dakota is unlikely to succeed on the merits of its Spending Clause claims. A preliminary injunction is unavailable as a result. <u>See</u> <u>Planned Parenthood Minn., N.D., S.D. v. Rounds</u>, 530 F.3d 724, 732-33 (8th Cir. 2008) (en banc) (holding that a plaintiff challenging government policy must make "a threshold showing that it is likely to prevail on the merits" to secure a preliminary injunction).

demonstrate the necessity of injunctive relief rests with the movant.  General Motors Corp. v. Harry Brown's, LLC, 563 F.3d 312, 316 (8th Cir. 2009).

The Catholic Plaintiffs have demonstrated an entitlement to permanent injunctive relief. An RFRA violation is comparable to the deprivation of a First Amendment right.  See Hobby Lobby Stores, Inc. v. Sebelius, 723 F.3d 1114, 1146 (10th Cir. 2013), aff'd, 573 U.S. 682 (2015); cf. Opulent Life Church v. City of Holly Springs, 697 F.3d 279, 298 (5th Cir. 2012).  So with actual success on the RFRA claims established, "the other requirements for obtaining a[n] . . . injunction are generally deemed to have been satisfied."  Minn. Citizens Concerned for Life, Inc. v. Swanson, 692 F.3d 864, 870 (8th Cir. 2012) (en banc) (citation omitted).

Touching briefly on the remaining factors, intrusion upon the Catholic Plaintiffs' exercise of religion is sufficient to show irreparable harm.  See Child Evangelism Fellowship of Minn. v. Minneapolis Special Sch. Dist. No. 1., 690 F.3d 996, 1000 (8th Cir. 2012) (deeming meritorious First Amendment claim "likely enough, standing alone, to establish irreparable harm").  The balance of harms tilts decisively in their favor too.  Absent an injunction, they will either be "forced to violate their sincerely held religious beliefs" by performing and covering gender-transition procedures "or to incur severe monetary penalties for refusing to comply."  Sharpe Holdings, 801 F.3d at 945.  An injunction will also advance the public interest because the protection of constitutional rights is "always in the public interest."  Carson v. Simon, 978 F.3d 1051, 1061 (8th Cir. 2020) (citation omitted).  Finally, injunctive relief should extend to the Catholic Plaintiffs' present and future members to avoid "continuous litigation and . . . a waste of judicial resources." Christian Emps. All., 2019 WL 2130142, at *5.  Having weighed the pertinent factors, the Court will permanently enjoin the Defendants from enforcing the successfully challenged interpretations of federal law against the Catholic Plaintiffs.

## V.        <u>CONCLUSION</u>

The Court has reviewed the record, the parties' filings, and the relevant legal authority. For the reasons above, the Defendants' motion to dismiss for lack of jurisdiction (Doc. No. 112) is **GRANTED IN PART** and **DENIED IN PART**.  The abortion-related claims, the APA claims, and the claims challenging Title IX and other unidentified federal laws are hereby **DISMISSED WITHOUT PREJUDICE**.  The Plaintiffs' motions for partial summary judgment and injunctive relief (Doc. Nos. 96, 98) are **GRANTED** as to the RFRA claims challenging the interpretations of Section 1557 and Title VII that require the Catholic Plaintiffs to perform and provide insurance coverage for gender-transition procedures and **DENIED** in all other respects.

The Court **DECLARES** that HHS's interpretation of Section 1557 that requires the Catholic Plaintiffs to perform and provide insurance coverage for gender-transition procedures[14] violates their sincerely held religious beliefs without satisfying strict scrutiny under the RFRA. Accordingly, the Court **PERMANENTLY ENJOINS AND RESTRAINS** HHS, Secretary Azar, their divisions, bureaus, agents, officers, commissioners, employees, and anyone acting in concert or participation with them, including their successors in office, from interpreting or enforcing Section 1557 of the ACA, 42 U.S.C. § 18116(a), or any implementing regulations thereto against the Catholic Plaintiffs in a manner that would require them to perform or provide insurance coverage for gender-transition procedures, including by denying federal financial assistance because of their failure to perform or provide insurance coverage for such procedures or by otherwise pursuing, charging, or assessing any penalties, fines, assessments, investigations, or other enforcement actions.

---

[14] As used in this order, the term "gender-transition procedures" includes surgery, counseling, provision of pharmaceuticals, or other treatments sought in furtherance of a gender transition.

The Court further **DECLARES** that the EEOC's interpretation of Title VII that requires the CBA and its members to provide insurance coverage for gender-transition procedures violates their sincerely held religious beliefs without satisfying strict scrutiny under the RFRA. Accordingly, the Court **PERMANENTLY ENJOINS AND RESTRAINS** the EEOC, Chair Dhillon, their divisions, bureaus, agents, officers, commissioners, employees, and anyone acting in concert or participation with them, including their successors in office, from interpreting or enforcing Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., or any implementing regulations thereto against the CBA and its members in a manner that would require them to provide insurance coverage for gender-transition procedures, including by denying federal financial assistance because of their failure to provide insurance coverage for such procedures or by otherwise pursuing, charging, or assessing any penalties, fines, assessments, investigations, or other enforcement actions.

The relief provided in this order shall be restricted to the Catholic Plaintiffs, their present and future members, anyone acting in concert or participation with them, and their respective health plans and any insurers or TPAs in connection with such health plans.  To come within the scope of this order, a CBA member must meet the following criteria:

(a) The employer is not yet protected from interpretations of Section 1557 and Title VII that require the provision or coverage of gender transitions by any other judicial order;

(b) The CBA has determined that the employer meets the CBA's strict membership criteria;

(c) The CBA's membership criteria have not changed since the CBA filed its initial complaint on December 28, 2016; and

(d) The employer is not subject to an adverse ruling on the merits in another case involving

interpretations of Section 1557 and Title VII that require the provision or coverage of

gender transitions.

The Court will set a status conference with the parties in the coming days to discuss resolution of

the remaining claims.

**IT IS SO ORDERED**.

Dated this 19th day of January, 2021.

_/s/ Peter D. Welte_____
Peter D. Welte, Chief Judge
United States District Court