IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| THE RELIGIOUS SISTERS OF MERCY, *et al.*, <br><br> *Plaintiffs,* <br> v. <br><br> XAVIER BECERRA, *et al.,* <br><br> *Defendants.* | No. 3:16-cv-386 |
| THE CATHOLIC BENEFITS ASSOCIATION; DIOCESE OF FARGO; CATHOLIC CHARITIES NORTH DAKOTA; and CATHOLIC MEDICAL ASSOCIATION, <br><br> *Plaintiffs,* <br> v. <br><br> XAVIER BECERRA, *et al.,* <br><br> *Defendants.* | No. 3:16-cv-432 |

**CATHOLIC BENEFITS ASSOCIATION'S SUPPLEMENTAL ARGUMENT REGARDING THE COURT'S AUTHORITY TO RECEIVE EVIDENCE OF CBA'S ASSOCIATIONAL STANDING ON REMAND**

The Catholic Benefits Association, one of the plaintiffs in Case No. 16-cv-432, and pursuant to the Court's July 17 minute entry (Doc. 150), respectfully submits this supplemental response to the Court's question at the July 17 status conference about the Court's authority on remand to receive evidence of the CBA's associational standing. The Court questioned whether it may receive declarations of CBA members who were not among the CBA members named as plaintiffs in this case to assess whether the CBA has associational standing under the rule announced by Eighth

1

Circuit on appeal. The Court may—and should—do so for three independent reasons, any one of which is sufficient authority for the procedure proposed by the CBA. <u>First</u>, the Eighth Circuit did not vacate this Court's injunction protecting the CBA's members based on associational standing. Rather, it entered a general remand, which empowers the Court to reopen the record as to the CBA's associational standing. <u>Second</u>, under the holding of *Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 271 (2015), which concerned a similarly postured question, "elementary principles of procedural fairness" require the Court to give an organizational plaintiff like the CBA an opportunity to provide evidence that satisfies the criterion for associational standing announced by the Eighth Circuit. That evidence, incorporated herein by reference, is discussed below and attached to the CBA's motion to seal filed simultaneously herewith. <u>Third</u>, if the Court dismisses the request for relief based upon associational standing, such dismissal will necessarily be without prejudice. To protect its almost 1,400 members, the CBA would then have to file a new lawsuit, asserting the very evidence of associational standing it is presenting now, resulting in massive judicial inefficiency and prejudice to the CBA and its members, who have been litigating this case for nearly seven years. And indeed, the Government Defendants do not oppose the CBA's proposed procedure for reopening the record, which for the reasons stated below, the CBA respectfully submits is the best way to resolve this protracted litigation.

## BACKGROUND

This case, which passed the six-and-a-half-year mark on June 28, concerns the Catholic Benefits Association Plaintiffs' long-fought effort to enjoin the Department of Health and Human Services and the EEOC from interpreting Section 1557 of the Affordable Care Act and Title VII of the Civil Rights Act to require CBA members to cover and provide "gender-transition services" in

violation of their religious beliefs. The Government Defendants have never contested the merits of these claims. They instead have focused on whether CBA members face a credible threat of enforcement and thus have standing to sue. This Court concluded the CBA has standing to sue based on the undisputed sworn evidence in the CBA's verified complaint that its "members include hospitals and other healthcare entities that receive Medicaid and Medicare payments and thus are covered entities under the 2016 Rule." (Doc. 98 at ¶ 55; *see also* Doc. 124 at 28 (relying on Doc. 98 at ¶¶ 54-55).). The verifications of the complaint were made not only by the CBA's Chairman of the Board and its Executive Director, but also two of its members who were also named plaintiffs, the Diocese of Fargo and Catholic Charities North Dakota. This Court then entered a permanent injunction protecting the CBA's present and future members. (Doc. 133). That injunction remains in place. The CBA now desires to supplement its verified complaint with declarations of several previously unnamed members "that receive Medicaid and Medicare payments and thus are covered entities under the 2016 Rule," plus one of the originally named plaintiffs.

1. **The Eighth Circuit's ruling and general remand**

The Eighth Circuit affirmed this Court nearly in full, with the narrow exception that its decisions requires the CBA to submit additional evidence regarding associational standing. Three aspects of the Eighth Circuit's opinion are relevant to the question raised by the Court at the July 17 status conference.

*First*, the bulk of the Eighth Circuit's decision concerned its affirmance of this Court's order granting summary judgment in favor of the CBA's named-plaintiff members, the Diocese of Fargo, Catholic Charities of North Dakota, and Catholic Medical and Dental Association; as well the Religious Sisters of Mercy Plaintiffs (Plaintiffs in Case No. 16-cv-386). The Eighth Circuit held that

the individual CBA members face a credible threat of enforcement of the Government's interpretation of Section 1557 and Title VII, quoting heavily from this Court's order. *See Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 606-08 (8th Cir. 2022). For the individual CBA member-Plaintiffs there is thus nothing left to decide other than the appropriate fee award under 42 U.S.C. § 1988.

*Second*, as to the CBA's invocation of associational standing, the Eighth Circuit ruled that, to have associational standing, an organizational plaintiff must identify at least one member not named as a plaintiff who would have standing to sue in its own right: "Other than the three named plaintiffs who are CBA members—the Diocese, Catholic Charities, and CMA—the CBA has otherwise failed to identify members who have suffered the requisite harm. Accordingly, we hold that the CBA lacks associational standing to sue on behalf of unnamed members." *Religious Sisters of Mercy*, 55 F.4th at 602; *see also id.* at 601-02 ("[P]laintiff-organizations [must] make specific allegations establishing that **at least one** identified member had suffered or would suffer harm." (Emphasis added)). To the CBA's knowledge, this is a novel ruling.

Notably, the Eighth Circuit derived its novel conclusion in its discussion rejecting a "statistical probability" theory never relied upon by the CBA or by this Court in its order granting summary judgment. The Eighth Circuit described that theory as "whether, accepting the organization's self-description of the activities of its members, there is a statistical probability that some of those members are threatened with concrete injury." *Religious Sisters of Mercy*, 55 F.4th at 601 (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 498–99 (2009)). The CBA has never asserted it has associational standing based on the "statistical probability" theory rejected by *Summers*. The CBA instead argued to this Court and the Eighth Circuit that its named-plaintiff members and its other members described in the CBA's verified complaint have standing to challenge the Government's

4

interpretation of Section 1557 and Title VII.[1] The Eighth Circuit agreed that the CBA's plaintiff-members have standing but ruled for the first time that an association must identify an *additional* member not named as a plaintiff to have associational standing. *Id.* at 602. The Government did not argue before this Court that sworn evidence from the CBA's Chairman, Executive Director, and its member Catholic Charities of North Dakota was inadequate to confer associational standing. Rather, it argued that that evidence was insufficient because the CBA and its members did not face a credible threat of enforcement. (Doc. 111 at 16-17 (arguing that the sworn evidence presented by the CBA was insufficient because it failed to demonstrate a concrete injury).) The CBA thus never had the opportunity to present individual affidavits of a member or members not named as plaintiffs sufficient to satisfy the Eighth Circuit's new criterion for associational standing.

*Third*, the Eighth Circuit's opinion concluded with a general remand: "Accordingly, we affirm the district court's grant of permanent injunctive relief to the plaintiffs except to the extent it recognizes the associational standing of the CBA. We remand for further proceedings consistent with this opinion." *Religious Sisters of Mercy*, 55 F.4th at 609. Significantly, the Eighth Circuit did not vacate this Court's injunction or dismiss the CBA from the case thus signaling that this Court should receive and evaluate the CBA's additional evidence regarding associational standing in light of the Eighth Circuit's opinion.

---

[1] Indeed, longtime federal practice requires less than this. Associational standing has been found, for example, by the association identifying anonymous "Jane Doe" members of the association who have standing. *E.g.*, *National Treasury Employees Union v. U.S. Department of Treasury*, 25 F.3d 237, 242 (5th Cir. 1994) (permitting an organizational plaintiff whose members fear identifying themselves to the government to demonstrate standing by submitting a "Jane Doe" affidavit from a member explaining how it would be injured by the government action at issue.").

### 2. The CBA's Declarations of Members That Were Not Named as Plaintiffs Establish Standing

To comply with the Eighth Circuit's rule that an association must identify a member not named as a plaintiff, the CBA is now providing the declarations of three of its members who have standing in their own right to challenge the Government's interpretation of Section 1557 and Title VII.[2] These non-named-plaintiff members include:

(1) a group of Catholic health clinics that receive Medicare and Medicaid funding (federal financial assistance requisite to trigger Section 1557) and employ nineteen individuals (greater than Title VII's fifteen-employee threshold);

(2) a Catholic-owned pediatric clinic that employs eighteen individuals (Title VII standing) and receives Medicaid funding (Section 1557 standing); and

(3) a Catholic Ministry that provides care for senior services, employs 382 individuals (Title VII standing) and receives Medicare and Medicaid funding (Section 1557 standing).

The CBA is also providing a declaration from a member that is a named plaintiff: Catholic Charities of North Dakota, which employs 82 individuals (Title VII standing) and receives Medicare and Medicaid funding (Section 1557 standing).[3]

These members object to providing and/or covering gender-transition services on religious grounds. In the words of one of the declarations:

> Catholic teaching opposes transgender medicine because it contradicts God's creative sovereignty and confounds human beings' understanding of their own dignity

---

[2] The CBA has filed redacted versions of the first three declarations along with its simultaneously filed motion to seal. The CBA will un-redact the identity of these members if the Court grants the motion to seal. These declarations are **Exhibits 1-3** to the motion to seal.

[3] Given that Catholic Charities of North Dakota verified the CBA's second amended complaint, it is not at all clear why the Eighth Circuit appears to want it to also provide a declaration. Its declaration is attached to the CBA's motion to seal as **Exhibit 4**.

as well as their development as body-soul unities. Catholics believe that as Creator, God does not place any human being in the "wrong body." They also believe that God makes every human being; we do not make ourselves. Catholicism further teaches that God creates every human being as an inseparable unity of body and soul. Consequently, a human being's failure to accept his or her bodily sex would impede self-understanding and development at the biological, physiological, emotional, mental and spiritual levels, all of which are interrelated.

**Exhibit 2** to Motion to Seal at ¶ 10. These CBA members would have standing to sue in their own right to challenge the Government's interpretations of Section 1557 and Title VII under the Eighth Circuit's opinion. The sworn testimony of the CBA's Board Chairman as well as of its Executive Director that the CBA has individual members who were "on equal footing with the Religious Sisters of Mercy Plaintiffs" was thus always accurate. (Doc. 124 at 28 (citing Doc. 97 at ¶¶ 55-56); *see also* Doc. 97 at 82-83 (verification pages of second amended complaint)).

## DISCUSSION

Under the Eighth Circuit's general remand, the Court is permitted to reopen the record and evaluate the CBA's declarations as to associational standing as to the rule announced in the Eighth Circuit's decision. The Court should do so to avoid the massive inefficiency and prejudice that would result by dismissal with leave to refile of the CBA's claims.

1. **The Eighth Circuit's general remand permits the Court to reopen the record and consider the CBA's member declarations.**

The phrase at the conclusion of the Eighth Circuit's opinion in this case—a "remand for further proceedings consistent with this opinion," 55 F.4th at 609—is known as a "general remand." "[U]pon a reversal and remand for further consistent proceedings, the case goes back to the trial court for a new determination of the issues presented as though they had not been determined before, pursuant to the legal principles enunciated in the appellate court's opinion, which must be taken as the law of the case." *Poletti v. Comm'r*, 351 F.2d 345, 347 (8th Cir. 1965); *Republican Party*

*of Minnesota v. White*, 416 F.3d 738, 745 (8th Cir. 2005) (same). This language—"remand for further proceedings consistent with this opinion"—also "operates to make that opinion a part of the mandate." *Bailey v. Henslee*, 309 F.2d 840, 843–44 (8th Cir. 1962).

Where, as here, the circuit court's remand is general and does not specify what "further proceedings" a lower court must entertain on remand, the lower court is free to re-open the record and decide "any issue not foreclosed by the mandate issued by the higher court." *Crum v. Colvin*, No. C14-4055-MWB, 2015 WL 5084325, at *5 (N.D. Iowa Aug. 27, 2015) (quoting *Guidry v. Sheet Metal Workers Int'l Ass'n*, 10 F.3d 700, 706 (10th Cir. 1993)). In other words, under a general remand, a district court is free to consider the issues below *de novo* subject to the legal principles announced in the circuit court's opinion. This principle is most developed in the context of criminal sentencings reversed by a higher court. *E.g.*, *United States v. McFalls*, 675 F.3d 599, 604–06 (6th Cir. 2012)("A general remand permits the district court to re-do the entire sentencing process, including considering new evidence and issues." (collecting cases)). But it also applies in the same procedural posture as the CBA's case: partial reversal of a district's order granting a motion for summary judgment based on a new legal rule announced in the circuit court's opinion.

*Jackson v. State of Alabama State Tenure Comm'n*, 405 F.3d 1276 (11th Cir. 2005) provides a helpful example. *Jackson* made it to the Eleventh Circuit twice. First, the Eleventh Circuit reversed a district court's order granting summary judgment in favor of the defendant-appellee. *Id.* at 1280. On remand, the district court re-opened the record, and entered judgment as a matter of law in favor of the defendant a second time on the same issues. *Id.* On its second time to the Eleventh Circuit, the plaintiff-appellant argued that the Eleventh Circuit's first opinion reversing entry of summary judgment was the law of the case and thus could not be reconsidered by the district court

8

on remand. *Id.* at 1282. The Eleventh Circuit explained that "[u]nder the law of the case doctrine, both the district court and the appellate court are generally bound by a prior appellate decision of the same case." *Id.* at 1283. However, "[e]xceptions to this doctrine apply when substantially different evidence is produced, when there has been a change in controlling authority, or when the prior decision was clearly erroneous and would result in manifest injustice." *Id.* The Eleventh Circuit explained that its earlier decision was not law of the case because, on remand, the district court re-opened the record and allowed new evidence, which fundamentally changed the nature of the case: "Even if we necessarily decided that question in [appellant's] favor during the earlier appeal, we did so only as to the Pickering balance issue framed by the facts (drawn from the evidence viewed in the light most favorable to [appellant]) in that record." *Id.* The court continued, "[w]hen the record changes, which is to say when the evidence and the inferences that may be drawn from it change, the issue presented changes as well." *Id.* Most significantly, the Eleventh Circuit ruled that its general remand for further proceedings consistent with its opinion contemplated that the district court would re-open the record: "our mandate to the district court contained no limitation on the evidence that could be considered on this issue on remand. To the contrary, because we reversed the grant of summary judgment, we anticipated that more evidence would be developed as the case progressed." *Id.* at 1284n.1; *see also Mortimer v. Baca*, 594 F.3d 714, 720–721 (9th Cir. 2010) (holding that the Ninth Circuit's earlier decision on appeal was not the law of the case because "[t]here was considerably more and different evidence before the district court [on remand] in 2007, when it granted the [second] motion for summary judgment.").

So too here. The Eighth Circuit's remand is general, not specific, only partially reversing the Court's grant of summary judgment. Under cases like *Jackson* and *Mortimer*, this Court is not

limited to the record presented to it on summary judgment before appeal. If anything, receiving additional evidence is more warranted in this case in light of the fact that the Eighth Circuit announced a new criterion of associational standing, and that, unlike *Jackson*, the Government Defendants do not oppose reopening the record in this manner.

### 2. The Eighth Circuit's general remand stands in contrast to a circuit court's dismissal or vacatur.

To further illuminate this point, it is helpful to contrast the Eighth Circuit's general remand with remands requiring specific action from a lower court. In short, when a circuit court wants a district court to dismiss a party or vacate an injunction it says so in its remand language. Consider the following examples, many more of which exist:

- In *Ouachita Watch League v. United States Forest Serv.*, 858 F.3d 539, 544 (8th Cir. 2017), the Eighth Circuit concluded that an organization lacked associational standing. Rather than enter a general remand as it did here, however, the court "dismiss[ed] the appeal for lack of jurisdiction."

- In *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 936 (11th Cir. 2020), the Eleventh Circuit concluded that the plaintiff lacked Article III standing. But rather than enter a general remand, the court "vacate[d] the order of the district court and remand[ed] with instructions to dismiss without prejudice."

- And in *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 354 (2006), a case in which the Supreme Court concluded the plaintiff lacked Article III standing, the Court did not enter a general remand, but rather vacated the lower court's judgment and ordered dismissal: "The judgment of the Sixth Circuit is therefore vacated in part, and the cases are remanded for dismissal of plaintiffs' challenge to the franchise tax credit."

Had the Eighth Circuit desired to direct dismissal of the CBA for lack of standing, it would have stated that in its remand language. It instead entered a general remand, which as explained, "permits the district court to re-do" the summary judgment process and/or trial, "including considering new evidence and issues." *McFalls*, 675 F.3d at 604–06. This makes sense in light of the novelty of the Eighth Circuit's conclusion regarding associational standing and concerns of "procedural fairness" discussed below.

3. **"Basic procedural fairness" dictates that CBA be allowed to address the Eighth Circuit's new legal rule.**

The Eighth Circuit's general remand is a sufficient independent basis to reopen the record and receive the CBA's declarations. But even if the Circuit's remand were not enough on its own to authorize the CBA's <u>unopposed</u> request, the fact that "a federal court always has jurisdiction to determine its own jurisdiction" is additional basis to do so. *United States v. Ruiz*, 536 U.S. 622, 628 (2002). This long-established rule has always included the power to take in evidence of standing appropriate to the stage of the proceeding, both before and after trial. *See Rivera-Flores v. P.R. Tel. Co.*, 64 F.3d 742, 748 (1st Cir. 1995) ("[E]ven where the claim is set for jury trial, the court has great latitude to direct limited discovery and to make such factual findings as are necessary to determine its subject matter jurisdiction."); *see also Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 718 (2007) (relying, in part, on facts asserted in new affidavit submitted to the Supreme Court to assure itself of jurisdiction after new circumstances resulted in jurisdiction being questioned); *Warth v. Seldin*, 422 U.S. 490, 501 (1975) (noting that, at the motion-to-dismiss stage, "it is within the trial court's power to allow or to require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing").

That a federal court is always empowered to consider evidence of its jurisdiction is all the more true in a case like this where the CBA has never had the opportunity to submit evidence that would satisfy the Eighth Circuit's criterion for associational standing announced in this case. Take, for example, the Supreme Court's holding as to standing in *Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 268-70 (2015). That case concerned a claim of racial gerrymandering. To support its associational standing, the plaintiff-organization submitted a sworn statement of its representative that it "has members in almost every county in Alabama." *Id.* at 269. Notwithstanding this evidence, the district court dismissed the plaintiff's claim for lack of standing. *Id.* The Supreme Court reversed, explaining that "it seems highly likely that a 'statewide' organization with members in 'almost every county,' the purpose of which is to help 'blacks and other minorities and poor people,' will have members in each majority-minority district." *Id.* at 270. And given the fact that the plaintiff had not been given the opportunity to produce individual affidavits of member residence, the Court ruled that "elementary principles of procedural fairness required" the court below to "give the [plaintiff organization] an opportunity to provide evidence of member residence." *Id.* at 271. The Court explained "we have no reason to believe that the Conference would have been unable to provide a list of members, at least with respect to the majority-minority districts, had it been asked. It has filed just such a list in this Court." *Id.* "Thus, the District Court on remand should reconsider the [plaintiff organization]'s standing by permitting the [plaintiff organization] to file" evidence of its associational standing "and permitting the State to respond." *Id.*

Similar conclusions were reached in *Gill v. Whitford*, 138 S. Ct. 1916, 1933–34 (2018) and *National Council of La Raza v. Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015). In *Gill*, the Court explained that when a case concerns "an unsettled kind of claim," the "justiciability of which [is]

12

unresolved," the proper procedure is to "remand the case to the District Court so that the plaintiffs may have an opportunity to prove" standing under the legal principles announced by the appellate court. 138 S. Ct. at 1934. And in *La Raza*, the Ninth Circuit held that a membership organization must be permitted the opportunity to identify a member who has standing before dismissing the organization for lack of associational standing. 800 F.3d at 1042. In *La Raza*, like this case, "[t]he State agree[d] that leave to amend should be granted" to provide evidence of associational standing. *Id.* at 1041. This was especially the case, the Ninth Circuit explained, given the lack of clarity regarding the requirements of *Summers v. Earth Island Institute,* 555 U.S. 488, (2009)—specifically whether it requires an plaintiff-organization to identify a member who has suffered the requisite harm. *La Raza*, 800 F.3d at 1041.

Here, like *Alabama Legislative Black Caucus*, *Gill*, and *La Raza*, the Eighth Circuit in this case announced a new interpretation of the Supreme Court's associational-standing doctrine (namely *Summers*) that, even if an plaintiff-organization's co-plaintiff members have standing to sue in their own right (as the Eighth Circuit ruled as to the CBA's named-member Plaintiffs), the plaintiff-organization must *also* identify an additional member with standing. Like the plaintiff-organizations in *Alabama Legislative Black Caucus* and *La Raza*, the CBA has never had the opportunity to present evidence of its non-named-plaintiff-member's standing. Thus "elementary principles of procedural fairness" require that it have the opportunity to do so here.

4. **Dismissal of the CBA will be massively inefficient and prejudicial—especially given that the Government Defendants <u>do not oppose</u> the CBA's request.**

To the extent the Court reads the Eighth Circuit's opinion as requiring dismissal of the CBA for lack of associational standing, any such dismissal would be without prejudice. *Cnty. of Mille Lacs v. Benjamin*, 361 F.3d 460, 464 (8th Cir. 2004) ("A district court is generally barred from dismissing

13

a case with prejudice if it concludes subject matter jurisdiction is absent."). In practice, this means that the CBA could re-file the *identical suit* in the District of North Dakota or another district in which venue lies, again identifying the members described above with relevant declarations. If re-filed in this Court, moreover, the CBA would likely move to consolidate its new case with this one. It would make little practical sense to force the CBA to do so. The CBA has been litigating this case for more than six-and-a-half years. The Eighth Circuit affirmed this Court's order that the Government's threatened interpretations of Section 1557 and Title VII violate the Catholic beliefs of the named-CBA-member Plaintiffs. It would work manifest injustice to the CBA as an association advocating for its over 1,300 members to start over to comply with the Eighth Circuit's newly announced rule as to standing.

## CONCLUSION

For these reasons, the Court should set a deadline for the CBA to file a renewed motion for summary judgment to address the new rule of associational standing announced by the Eighth Circuit in this case. The Court should also stay the CBA's and its individual-member-co-Plaintiffs' deadline to seek attorneys' fees and costs until 60 days after entry of judgment in this case.

Respectfully submitted July 21, 2023,

/s/ *Andrew Nussbaum*
L. Martin Nussbaum
Andrew Nussbaum
Nussbaum | Gleason PLLC
2 N. Cascade Ave., Suite 1430
Colorado Springs, CO 80903
(719) 428-4937
martin@nussbaumgleason.com
andrew@nussbaumgleason.com
Attorneys for Plaintiffs The Catholic Benefits Association, *et al.*