THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
EASTERN DIVISION

| | |
|---|---|
| THE RELIGIOUS SISTERS OF MERCY, *et al.*,<br><br>*Plaintiffs,*<br><br>v.<br><br>XAVIER BECERRA, Secretary of the United States Department of Health and Human Service, *et al.*,<br><br><br>*Defendants.* | No. 3:16-cv-386<br><br>**EXHIBIT 1 - DECLARATION OF L. MARTIN NUSSBAUM** |
| CATHOLIC BENEFITS ASSOCIATION; DIOCESE OF FARGO; CATHOLIC CHARITIES NORTH DAKOTA; and CATHOLIC MEDICAL ASSOCIATION,<br><br>*Plaintiffs,*<br><br>v.<br><br>XAVIER BECERRA, Secretary of the United States Department of Health and Human Service, *et al.*,<br><br><br>*Defendants.* | No. 3:16-cv-432 |

1.      My name is L. Martin Nussbaum.  I am over eighteen and have personal knowledge

of the contents of this declaration.

2.      I have served as General Counsel for the Catholic Benefits Association ("CBA")

since its incorporation in 2013.  I have served as lead litigation counsel for the CBA in this action

1

from September 8, 2015 when HHS issued its notice of proposed rulemaking, "Nondiscrimination in Health Programs & Activities,"80 Fed. Reg. 54,172 (Sept. 8, 2015) ("NPRM"). This NPRM was the prequel to HHS's final rule "Nondiscrimination in Health Programs & Activities," 81 Fed. Reg. 31376 (November 7, 2016) ("2016 HHS Rule") that, along with the United States Equal Employment Opportunity Commission's similar actions and pronouncements provided the subject matter for this lawsuit ("EEOC Mandate"). I served as lead counsel for CBA, Diocese of Fargo, Catholic Charities North Dakota. and Catholic Medical Association throughout this lawsuit.

3.      My then-law firm, Lewis Roca Rothgerber Christie LLP, with its largest offices based in Denver, filed suit for the named plaintiffs on December 28, 2016. At that time, my team and I were in the Colorado Springs office. After my partner, Ian Speir, and I started a boutique firm in Colorado Springs serving religious institutions nationwide, in November 2018, we continued to serve as lead litigation counsel. Our firm, called Nussbaum Speir PLLC subsequently became Nussbaum Speir Gleason PLLC and, thereafter, Nussbaum Gleason PLLC. Throughout these changes, I served as lead litigation counsel in this case. The litigation of this case continued through eight calendar years until this Court entered its Amended Final Judgment on October 11, 2023.

4.      CBA Plaintiffs seek payment from Government Defendants of $1,022,378 for time-adjusted fees for 2,100.75 hours of work reasonably expended by our attorneys and paralegals as set forth in Exhibit 1-H, the Lodestar Calculation Based on Time-Valued Hourly Rates Time Net Hours Billed. In addition, they seek payment from the government for $4,340.80 in costs and $37,693.50 for expert witness fees for the three experts who provided declarations in support of this fee petition. These sums total $1,064,412.30.

5.      The attached exhibits in support of this declaration are:

Ex. 1  Declaration of L. Martin Nussbaum
      Ex. 1-A  Costs
      Ex. 1-B  Detailed Billings Reflecting Adjustments
      Ex. 1-C  Total Hours Billed (by attorney and year)
      Ex. 1-D  Net Hours Billed After Billing Judgment Deletions (by attorney and year)
      Ex. 1-E  Primary Timekeepers Actual Hourly Rate by Year
      Ex. 1-F  Lodestar Calculation based on Actual Hourly Rates Time Net Hours Billed
      Ex. 1-G  Inflation Rated Based on Consumer Price Index (2017 through October 2023)
      Ex. 1-H  Lodestar Calculation Based on Time-Valued Hourly Rate Times Net Hours Billed
      Ex. 1-I  Resume of L. Martin Nussbaum
      Ex. 1-J  Resume of Ian Speir
      Ex. 1-K  Resume of Andrew M. Nussbaum
      Ex. 1-L  Resume of Eric N. Kniffin
      Ex. 1-M  Resume of Matthew Mellema
      Ex. 1-N  Williams and Connolly (Kevin Baine) billing statement
      Ex. 1-O  Greenburg Traurig (Troy Eid) billing statement
      Ex. 1-P  Fees Related to Fee Petition
      Ex. 1-Q  Resume of Alec Afarian

In addition, the fee petition includes these additional exhibits from experts.

Ex. 2  Declaration of Thomas B. Bair, esq.
Ex. 3  Declaration of Kevin T. Baine, esq.
Ex. 4  Declaration of Troy A. Eid, esq.

6.      Exhibits 1-I, 1-J, 1-K, 1-L, 1-M, and 1-P are, respectively, the resumes of the primary

attorney timekeepers Eric Kniffin, Matthew Mellema, Andrew Nussbaum, myself, and Ian Speir.

## Qualifications and Expertise

7.      I served as a partner and as chair of the Religious Institutions practice group at

Lewis Roca Rothgerber Christie for twenty years. Ian Speir and I are the founding partners of Nuss-

baum Gleason PLLC. My practice has focused exclusively on advising and advocating for religious

institutions and religious liberty for decades.  I have detailed my body of professional work over the

past thirty-eight years in my resume attached as Exhibit 1-I, including admissions in seven courts including the United States Supreme Court; *pro hac vice* admissions in nineteen courts; twenty published opinions along with other notable cases; sixty-one published articles; and scores of presentations on legal issues mostly related to the First Amendment and the law affecting religious institutions. Exhibit 1-I also references a number of honors I have received including graduating with a baccalaureate degree from the University of Notre Dame *summa cum laude*, Phi Beta Kappa, and as the winner of the Cavanaugh Award for the top theology student; graduating with a juris doctor degree from the University of Texas School of Law as Weaver Fellow and as the top second year law student; twice being named as the top non-profit institution lawyer in Colorado, and as being listed as a Chambers recognized lawyer in First Amendment Litigation nationwide.

8.      I have served as a consultant to the United States Conference of Bishops Religious Liberty Committee from its inception in 2011 and on the Executive Committee of the National Diocesan Attorneys Association since 2016. I also served on the Christian Legal Society's Case Selection Committee from 1999 to 2011.

9.      I have advocated or argued or submitted briefs in courts at all levels—from county courts to the United States Supreme Courts, *see* Ex. 1-I at 3-8, and I have been on the winning side in well over 90% of my cases, including an Episcopal Church secessionist congregation dispute that lasted three-and-one-half weeks and thereby became the longest church trial in Colorado history.

10.      I have been frequently asked to provide comment on religious liberty issues and have been quoted in Christian Post, Christianity Today, Crux, Denver Post, Deseret News, Intermountain Jewish News, Los Angeles Times, Milwaukee Sentinel, National Catholic Register, National Public Radio, New York Times, The Pillar, Wall Street Journal, Washington Examiner, and

Washington Post. The Washington Times has described Mr. Speir's and my advocacy as "bril-

liant." *See* Rebecca Hagelin, "Apathy, ignorance for First Amendment attack our freedoms,"

Washington Times (December 16, 2018) (https://www.ijn.com/first-nussbaum-fights-freedom-

worship/).

11.     Ian Speir provided outstanding analysis, research, and briefing on this case from its

inception, and he argued it at the United States Court of Appeals for the Eighth Circuit. Ian was

the co-founder and original Managing Partner of our firm. He was Order of the Coif at the

Georgetown University Law Center. Ian graduated *summa cum laude, cum laude, magna cum laude,*

respectively, in bachelor's, master's, and juris doctor degree programs at Oral Roberts University,

University of Texas A&M, and Georgetown Law Center. He clerked for Judge Jerome Homes on

the Tenth Circuit, and he has been involved in numerous instances of successful amicus advocacy

at the United States Supreme Court and as lead counsel before U.S. Courts of Appeal, the Colorado

Supreme and Appellate Courts, and various trial courts. Ian is a lecturer in constitutional law at the

University of Colorado at Colorado Springs. He has published articles on religious freedom, federal

court procedure, and other topics in Providence, Public Discourse, the Journal of Appellate Prac-

tice, and other publications. Ian also was the principal writer of a brief and dossier that persuaded

United States Secretary of State John Kerry to make the country's second declaration of genocide

related to the treatment of Christians by Iraq, Syria and Libya (available at

https://www.kofc.org/un/en/resources/communications/genocide-report.pdf ).  For more detail,

*see* Exhibit 1-J.

12.     Andrew Nussbaum graduated first in his class at the Tulane Law School. He won

numerous other awards from that institution for outstanding legal scholarship. He thereafter served

as law clerk for William J. Pryor Jr., the Chief Judge for the United States Court of Appeals for the Eleventh Circuit. Andrew served as litigation associate counsel at Hogan Lovells, an international firm with 2,500 lawyers. He then served as the first clerk for newly-appointed United States District Court Judge for the District of Colorado, Daniel Domenico. Andrew is the Managing Partner at Nussbaum Gleason PLLC. His practice includes both religious liberty advocacy for Evangelical, Catholic, and Jewish organizations and commercial litigation. He has prevailed in every religious liberty case he has undertaken. Andrew's amicus advocacy to the United States Supreme Court has included representing the premier First Amendment scholar in the nation, Professor Michael McConnell. For more detail, *see* Exhibit 1-K.

13.     Eric Kniffin, a partner, was quite active on this case during 2016 and 2017. Eric, a former United States District Court clerk and *cum laude* graduate of the Notre Dame Law School, was already a seasoned religious liberty advocate after years of work at the Becket Fund for Religious Liberty where he helped draft the merits briefs on two landmark United States Supreme Court cases: *Hosanna-Tabor v. E.E.O.C.*, 565 U.S. 171 (2012) and *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014). Eric has served as an expert commentator for many publications including Wall Street Journal, National Review, Huffington Post, National Catholic Register, Inside Higher Ed, and Washington Times. Eric is now a fellow at the Ethics and Public Policy Institute where he is counsel in its HHS Accountability Project. Additional information regarding Eric's extensive religious liberty advocacy is detailed in Ex. 1-L and in his EPPC professional biography at https://eppc.org/author/eric_kniffin/.

14.     Matthew Mellema, an associate, worked on this case during 2016, two years after he had graduated from Yale Law School where he was an editor on two journals, and one year after

he completed his clerkship for Colorado Supreme Court Justice Allison Eid. Matt primarily assisted with legal research. Matt was an active member of the firm's Religious Institutions Group at that time. For more detail, *see* Exhibit 1-M.

15.     Alec Afarian, an associate, worked on this case during 2023, shortly after he graduated from Notre Dame Law School where was a dual degree recipient in law and technology. Alec primarily assisted with legal research. For more detail, *see* Exhibit 1-Q

### Calculation of Lodestar Amounts

16.     The CBA Plaintiffs engaged my firm, first at Lewis Roca and then at Nussbaum Gleason, for the purpose of protecting them from HHS's application of Section 1557 of the Affordable Care Act to require them to cover and, if competent, to perform gender transition services and abortion services and for the purpose of protecting those same institutions from the EEOC's interpretation of Title VII to impose a similar coverage mandate. Collectively, I refer to HHS's and EEOC's respective interpretations of Section 1557 and Title VII as the "Mandate."

17.     Exhibit 1-A "Costs" details the expenses that plaintiffs seek totaling $4,340.80. The costs listed on Exhibit 1-A are a true and accurate reflection of the out-of-pocket expenses incident to this litigation that were incurred by our firm and our former firm and were reimbursed by the CBA.  They include, among others, expenses for reasonable travel, lodging, and meals for Ian Speir and me associated with our travel from Colorado Springs to St. Paul, Minnesota for December 15, 2021 oral argument before the Eighth Circuit. The research costs were incurred in relation to the briefing and analysis before this Court and the Eighth Circuit.

18.     Exhibit 1-B "Detailed Billings Reflecting Adjustments" includes contemporaneous time records accurately detailing the tasks and amount of time our personnel spent representing

the plaintiffs in litigating this case. We billed for all this time in the "Hours" column based on our regular billing rates. The hours billed in the "Net Hours" column is the balance left after four types of reduction. First, HHS's NPRM, discussed in paragraph two of the declaration, was published on September 8, 2015. After that issued, we had substantial discussion among our team and with our client along with analysis to begin to assess whether the CBA Plaintiffs would need to file suit. By May 13, 2016, the CBA had determined that a lawsuit was necessary and we opened a litigation file within our firm. Thus, the first reduction is that the "Hours" column does not include any of the hours billed for the legal work performed from September 8, 2015 through May 12, 2016. Second, as the billing attorney, I reviewed each monthly bill before we sent it to the client. When doing that, I routinely deleted or reduced specific entries if I felt the work was inefficient or unproductive. Thus, the column entitled "Hours" reflects the net hours actually billed to the client after my monthly edits during the regular billing cycle. Third, this exhibit reflects a number of redactions or adjustments that I made as part of this fee application process to eliminate duplicative or nonproductive time or time not directly related to advancing the goals of the lawsuit. Fourth, I also eliminated all the hours for those timekeepers who billed few hours on this case and did not significantly advance the litigation. They are Professor Helen Alvaré, Deion Kathawa, and Ed Gleason. I refer to the remaining timekeepers (Ian Speir, Andrew Nussbaum, Eric Kniffin, Matthew Mellema, and myself) along with our paralegals as the "primary timekeepers." The third and fourth types of reductions are reflected in the column entitled "Adjustments." There are also a few additional redactions of the text with regard to names and identifying information within Exhibit 1-B to protect the anonymity of CBA members other than the named plaintiffs. Finally, there are a few redactions providing detail related to strategy considerations not previously disclosed to the government.

There is no reduction in hours billed with regard to either of the latter two types of redaction. Finally, this exhibit includes a column entitled "Net Hours." It represents the difference between the "Hours" column and the "Adjustments" column. All of the Lodestar calculations below are based on the Net Hours Column for the primary timekeepers.

19.     Exhibit 1-C "Total Hours Billed (by attorney and year)" reports the total number of hours billed by all attorneys along with the total number of hours billed by paralegals for each year after the first and second adjustments described in paragraph seventeen.  After multiplying the net hours worked for each timekeeper by the applicable rates, the CBA paid those fees.

20.     Exhibit 1-D "Net Hours Billed After Billing Judgment Deletions (by primary time-keeper and year)" reports the net number of hours billed, after all adjustments, by primary time-keeper or paralegal for each year.

21.     Exhibits 1-C and 1-D also indicate the bar date for the lawyer timekeepers.

22.     Exhibit 1-E  lists "Primary Timekeepers Actual Hourly Rate by Year".  These rates are our regular billing rates for each primary timekeeper by year.  The are:

| Timekeeper | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|---|---|
| Eric Kniffin (2003) | $355 | $370 | $395 | n/a | n/a | n/a | n/a | n/a |
| Matthew Mellema (2013) | $260 | $260 | n/a | n/a | n/a | n/a | n/a | n/a |
| Andrew Nussbaum (2016) | n/a | n/a | n/a | n/a | n/a | $400 | $410 | $425 |
| Martin Nussbaum (1985) | $510 | $510 | $550 | $560 | $575 | $585 | $595 | $595 |

| Ian Speir (2011) | $310 | $350 | $380 | $395 | $425 | $450 | $475 | $475 |
|---|---|---|---|---|---|---|---|---|
| Paralegals | $210 | $215 | n/a | $250 | $125 | $125 | $150 | $150 |

23.      Exhibit 1-F is the "Lodestar Calculation Based on Actual Hourly Rates Times Net Hours Billed." This chart multiplies the net hours worked for each of the primary timekeepers by that timekeeper's rate for the year when the hours were worked. It is important to note that this chart does not take the time-value of money into account and, therefore, an award based on this number would not make the CBA whole. The total fees calculated through this chart's methodology is $880,917.

24.      The sum in the previous paragraph includes fees billed in October, November, and December 1 through December 7, 2023. Much of the billings for those months—but not all—were incurred for legal work preparing this fee petition.  Because the amount of "fees on fees" was not known at the time the experts prepared their declarations, they did not opine on the reasonableness of the "fees on fees."  The total hours and fees for preparing this fee petition are listed in Exhibit 1-P entitled "Fees Related to Fee Petition."

25.      The law related to attorney fees applications recognizes that, for lawsuits litigated over several years, the use of actual billing rates, year by year, does not make the prevailing party whole because of the time value of money.  To address this inequity, the law commends (1) multiplying each attorney's rate for the final year of the litigation times his or her net hours billed; or (2) adjusting an attorney's past rate for inflation. *Missouri v. Jenkins*, 491 U.S. 274, 283-84 (1989). The former approach acceptably addresses the time value of fees billed by Martin Nussbaum, Ian Speir, Andrew Nussbaum, and the paralegals who worked on the case during 2023. It does adequately address the time value of money for fees billed by Eric Kinffin whose last work on this case was in

2018 or for Matthew Mellema whose last work in this case was in 2017. In our fee petition, we recommend that the court approve a just rate for those two timekeepers calculated by inflating their respective final year rates by the increases in the consumer price index for each year after the attorney ended his work on this case. Exhibit 1-G is the "Inflation Rate Based on Consumer Price Index (2017 through October 2023). *See* https://inflationdata.com/Inflation/Inflation_Rate/HistoricalInflation.aspx.

| Year | Inflation Rate |
|---|---|
| 2017 | 2.13% |
| 2018 | 2.44% |
| 2019 | 1.81% |
| 2020 | 1.24% |
| 2021 | 4.7% |
| 2022 | 8.01% |
| 2023* | 4.22% |

26.     Exhibit1-H is the "Lodestar Calculation Based on Time-Valued Hourly Rate Times Net Hours Billed." The time-valued rate is the 2023 rate for those timekeepers active in 2023. Because there is no 2023 rate for Messrs. Kniffin and Mellema, the time-valued rate is his most recent annual billing rate adjusted by the inflation rate based on the consumer price index. Thus, the time-valued rate for Eric Kniffin is his 2018 rate times the inflation rate for each year from 2019 through 2023 or $395 x (1.0181)(1.0124)(1.047)(1.0801)(1.0422) = $395 x 1.215 = $480. For Matthew Mellema, his time-valued rate is his 2017 rate times the inflation rate for each year from 2017 through 2023 or $260 times (1.0244)(1.0181)(1.0124)(1.047)(1.0801)(1.0422) = $260 x 1.244 = $323. The total calculated through this chart's methodology is $1,022,378.

**Fees of Expert Witnesses in Support of Fee Application**

27.     Because proof of the reasonableness of fees requires "affidavits of comparable at-torneys" testifying to the same, *see Baker v. John Morrell & Co.*, 263 F.Supp.2d 1161, 1192 (N.D. Iowa 2003), *aff'd*, 382 F.3d 816 (8th Cir. 2004), it was critical to engage experts to provide testi-mony regarding the results and the reasonableness of our rates and hours. Accordingly, we acquired the services of Thomas Bair, a deeply experienced North Dakota lawyer with experience represent-ing religious institutions. Mr. Bair's resume is attached to our fee petition as Exhibit 2.  Mr. Bair waived fees for his services.

28.     We also acquired the expert witness services of Kevin Baine, Senior Counsel at Wil-liams and Connolly LLP in Washington, D.C. Mr. Baine has deep experience advocating for reli-gious institutions. His regular hourly rate is $1,550 per hour. Mr. Baine often discounts that rate to $1,000 per hour for religious institution clients. Mr. Baine's declaration is attached to our fee peti-tion as Exhibit 3. His billing statement is in the amount of $ 17,500 for his expert services in support of this fee petition. It is attached as Ex. 1-N.  This sum is the net amount after an additional courtesy discount of $4,200.

29.     Finally, we retained Troy Eid, a partner at Greenburg Traurig's Denver office, as an expert witness. Mr. Eid has deep experience, regionally and nationally, in complex and constitu-tional litigation. His regular hourly rate is $935 per hour. In January, it will increase to $1,015. As a courtesy, Mr. Eid discounted that rate for his services here to $841.50 per hour. Mr. Eid's resume is attached to our fee petition as Exhibit 3. His billing statement in the amount of $20,193.30 for his expert services in support of this fee petition is attached as Ex. 1-O. This sum is the net amount after an additional courtesy discount of $2,243.70.

30.     The sum of Mr. Baine's expert witness fee and Mr. Eid's expert witness fee in support of this fee application is $37,693.50.

### Results Achieved

31.     The CBA Plaintiffs have received final, permanent ,and excellent results in this litigation and thus merit attorney's fees.

32.     Through this litigation, we successfully invoked the Religious Freedom Restoration Act to acquire declaratory and permanent injunctive relief against HHS from its Mandate interpreting Section 1557 of the Affordable Care Act ("ACA").  The Mandate requires employers, insurers, and third-party administrators to cover in their health plans gender transition services and medical providers to perform such services.  "Gender transition services" includes puberty blockers, cross-sex hormones, all forms of gender transition surgeries and related counseling.  Including such services in their health plans would violate the values of the Catholic employers we represented in this litigation.  Those protected through the relief we acquired included the named plaintiffs in 16cv-432: the Catholic Benefits Association, the Diocese of Fargo, Catholic Charities North Dakota, and the Catholic Medical Association. CBA Plaintiffs' suit was one of only three lawsuits in the country to achieve this result.

33.     CBA Plaintiffs also acquired the same relief against the EEOC from its interpretation of Title VII to require employers (with fifteen or more employees) to cover gender transition services ("GTS") in their health plans. CBA Plaintiffs was the first and only lawsuit in the country to acquire such relief against the EEOC.

34.     CBA Plaintiffs filed this lawsuit on December 18, 2016 through my law firm at that time, Lewis Roca Rothgerber Christie LLP with principal offices in Denver and Phoenix. Our

attorneys worked out of Colorado Springs offices. In November 2018, my colleague, Ian Speir, and I left the Lewis Roca firm and founded a new boutique firm, Nussbaum Speir PLLC, that focused on serving religious institutions. We continued to represent the CBA plaintiffs from our new firm without further involvement from the Lewis Roca firm.

35.    A second group of plaintiffs-State of North Dakota, The Religious Sisters of Mercy; Sacred Heart Mercy Health Care Center (Jackson, MN); Sacred Heart Mercy Health Care Center (Alma, MI); SMP Health System; and the University of Mary—represented by Becket Law—had previously filed a similar lawsuit in the same division (collectively, the "RSM Plaintiffs"). The RSM Plaintiffs sought similar relief against HHS as did the CBA Plaintiffs with regard to HHS. The RSM Plaintiffs did not sue the EEOC. The Court consolidated the two cases. As a result, substantial strategizing and coordination between the CBA and RSM legal teams was thereafter necessary.

36.    Given the significance of the case, the American Civil Liberties Union filed amicus briefs to oppose the plaintiffs' arguments.

37.    One of the unusual aspects of this lawsuit is that it was conducted against the back-drop of a constantly developing legal terrain including the decisions in the related case, *Franciscan Alliance v. Becerra*, No. 7:16-cv-0010, the HHS's promulgation of a complicated new regulation during Trump administration ("the 2020 Rule") that initially ameliorated some of the issues of concerns of the CBA Plaintiffs, the Supreme Court's *Bostock* decision that made the 2020 Rule less helpful; and the five lawsuits challenging the 2020 Rule. These closely related developments re-quired significant legal resources to monitor and analyze them because they had substantial bearing on the CBA lawsuit.

38.     CBA Plaintiffs initially feared that the 2016 HHS mandate also required health plan coverage of abortion services. The Court ruled that HHS's mandate did not require coverage of abortion services.

39.     The District Court issued an opinion in favor of our plaintiffs. *See Religious Sisters of Mercy v. Azar*, 513 F.Supp.3d 1113 (D. N.D. 2021).

40.     The Eighth Circuit did likewise. *See Religious Sisters of Mercy v. Becerrra*, 55 F.4th 583 (8th Cir. 2022).

41.     These opinions protected not only our plaintiffs but their respective insurers and third-party administrators who were themselves subject to the 2016 coverage mandates even though they were not parties to the lawsuit.

42.     On August 4, 2022, HHS published a notice of proposed rulemaking that proposed to substantially expand its implementation of ACA § 1557.  See Nondiscrimination in Health Programs and Activities, Fed. Reg. 47,824.  We anticipate that this proposed rule will be made final in the winter of 2024.  The proposed rule will substantially expand HHS's 2016 gender transition services coverage mandate to include not only "gender transition services" but "gender-affirming care."  The latter will include additional mandates related to social affirmation, gender-affirming cosmetic surgery and, likely, surgical and chemical abortion.  It appears that the wording of the injunction we acquired for our named plaintiffs is broad enough to protect them from the forthcoming gender-affirming care mandate.

43.     While we were unsuccessful in acquiring injunctive relief for the unnamed members of the CBA, that portion of our lawsuit was dismissed without prejudice.  We did acquire protection for them over the eight calendar years that this lawsuit was active. Importantly, the precedents we

won for our named plaintiffs at the Eighth Circuit on the substantive issues will inure to the benefit of the CBA's unnamed members in a new lawsuit we filed for their benefit on October 13, 2023. *See Catholic Benefits Ass'n v. Becerra,* No. 3:23-cv-00203-PDW-ARS (D. N.D.).

44.      This litigation was undertaken by the plaintiffs and the CBA's members at considerable risks to them, and the greatest of this risk was that of giving moral scandal.  s Catholic institutions, they preach respect for life and the ordering of all humankind as men and women, boys and girls. Paying for or performing medical services seeking to reverse this order would give rise to scandal. Scandal, especially for religious institutions, undercut every other aspect of their missions.

45.      In addition to the risk of scandal, CBA Plaintiffs faced significant legal risk, including ruinous fines, criminal sanctions, civil-enforcement actions, lose of federal financial assistance. These penalties were existential for CBA Plaintiffs.

46.      This was hard fought litigation conducted over three administrations during eight calendar years.  It included an appeal to the United States Court of Appeals for the Eighth Circuit and further litigation upon remand.

## Rates

47.      It is my opinion and that of the Catholic Benefits Association and the rates and hours billed for this litigation were reasonable. Indeed, as explained in the declarations of Kevin Baine and Troy Eid, the rates are well below market for litigation requiring the particular expertise necessary in this case.

48.      While I will not repeat the analysis of Messrs. Eid and Baine, I will comment on the fees received by the Becket Fund in two related lawsuits, *Franciscan Alliance, Inv. v. Becerra.* ___ F.4th ___, 2022 WL 2700044 (5th Cir. 2022), and this consolidated case, *Religious Sisters of Mercy*

*v. Becerra.* In both, the Becket Fund's clients sought relief from the HHS-portion of the Mandate but not from the EEOC portion. Thus, the EEOC was not a defendant in the Becket cases. While the Fifth Circuit case made several trips to the Fifth Circuit, the issues related to the HHS 2016 Rule were the same.

49.      In the Fifth Circuit case, the Court, after discounting fees 5% because of block billing, approved $2,203,053.23 in attorney's fees plus $4,209.28 in costs. What is most relevant is the hourly rates approved by the Court in that case for successful advocacy on issues of the same complexity of that addressed by CBA's counsel. The court approved the following hourly rates for Becket work in 2022:

| Daniel Chen (2016) | $700 |
|---|---|
| Joseph Davis (2014) | $790 |
| Luke Goodrich (2004) | $1,000 |
| Mark Rienzi (2000)[1] | $1,250 |
| Paralegals | $210 |

*See Franciscan Alliance v. Becerra,* No. 7:16-cv-001087-O,  ECF 224, Plaintiff's Memorandum in Support of Their Motion for Award of Attorneys Fees and Expenses, 14 (N.D. Tex., Wichita Falls Div. dec. 23, 2022).

50.      The government and Becket settled Becket's request for attorneys fees in the *Religious Sisters of Mercy* companion case for $950,000.  That case, while quite similar to ours with regard to the 2016 HHS Mandate, was less complicated than the CBA case because Becket did not sue the EEOC with regard to its interpretation of Title VII imposing a similar coverage mandate, and it did not seek to establish associational standing.  Thus, Becket attorneys did no briefing or argument related to Title VII, the EEOC's interpretation of the same, or associational standing.

---

[1] Prof. Rienzi's rate is for 2021.

I declare under penalty of perjury under the laws of the United States and of this Court that the foregoing is true and correct.

Date:  December 11, 2023

_____
L. Martin Nussbaum