IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| THE RELIGIOUS SISTERS OF MERCY, *et al.*,<br><br>*Plaintiffs,*<br><br>v.<br><br>XAVIER BECERRA, Secretary of the United States Department of Health and Human Service, *et al.*,<br><br>*Defendants.* | No. 3:16-cv-386 |
| CATHOLIC BENEFITS ASSOCIATION, *et al.*<br><br>*Plaintiffs,*<br><br>v.<br><br>XAVIER BECERRA, Secretary of the United States Department of Health and Human Service, *et al.*,<br><br>*Defendants.* | No. 3:16-cv-432 |

**DECLARATION OF TROY A. EID IN SUPPORT OF PLAINTIFFS' MOTION FOR ATTORNEY FEES**

Troy A. Eid, being of full age, certifies as follows:

1.       I am a Shareholder with the law firm of Greenberg Traurig LLC ("GT Law"), an international law firm which has more than 2,650 attorneys in 47 locations in the United States, Europe, the Middle East, Latin America and Asia. I have twice been a Shareholder at GT Law: From 2003 to 2006, and again from 2009 to the present. During the interim, I served with the United States Department of Justice as explained below.

1

2. I am located in GT Law's office in Denver, CO and have both a local Colorado practice and a national practice. As such, I am familiar with local, regional and national law firm hourly rates, and with the rates charged by attorneys located in Colorado who offer specialized services on a regional and nationwide basis.

3. Since January 2009, I have co-chaired GT Law's American Indian Law Practice Group, an intra-firm network of more than two dozen attorneys from GT offices across the United States. I also maintain a significant national practice dealing with internal corporate and institutional investigations, often triggered when our clients receive federal grand jury subpoenas probing possible criminal activity.

4. In addition to representing GT clients, I have increasingly been appointed by federal courts around the United States, especially during the past decade, to mediate complex disputes between Indian tribes and multi-national energy companies, and between tribes and state governments. By way of illustration, I recently spent three years mediating a pipeline dispute between one of the world's largest crude-oil pipeline companies and a federally recognized Native American tribe in the Upper Midwest that involved more than 20 different attorneys and 35 experts specializing in various aspects of water quality, environmental protection and remediation, emergency response, and pipeline systems integrity.

5. From 2006 to 2009, I served as Colorado's 40th United States Attorney, appointed by President George W. Bush. During the Obama Administration, I was appointed by the United States Senate to chair the Indian Law and Order Commission, the national advisory board to the President and Congress for strengthening public safety and criminal justice for all 574 federally recognized Native American and Alaska Native tribes in the United States.

6. Before first joining GT in October 2003, I served on the cabinet of former Colorado Governor Bill Owens as Chief Legal Counsel to the Governor and later as the Executive Director of the Colorado Department of Personnel & Administration, where I directed Colorado's 72,000-member civil service system and supervised the cabinet department that provided business, financial, technology, procurement, real estate, administrative adjudication, and operational services to the state's $8 billion government.

7. As part of my practice at GT Law, for a combined total of more than 17 years as a shareholder in the firm's Denver office, I have worked extensively as co-counsel with other many other law firms and attorneys based in the Colorado Front Range, as well as with lawyers practicing in various jurisdictions outside of Colorado and the Rocky Mountain West and Midwest, under circumstances in which I have been required to review and approve other lawyers' hourly billing rates. Based on the above, I am familiar with the range of attorney hourly rates routinely charged for handling complex constitution and administrative litigation in Colorado; the Rocky Mountain West and Midwest; and in many of the major metropolitan centers on the East and West Coasts.

8. I have broad experience with the legal market both in the Colorado Front Range and nationwide. GT's American Indian law practice, roughly half of which involves energy development, also frequently brings me to the Western Plains states, particularly North Dakota. Consequently, I am familiar with the reasons why counsel located in Colorado are selected for matters in those jurisdictions and the customary rates for those services.

9. The Denver-Colorado Springs legal market is the regional center for the Rocky Mountain West and extends to the Western Plains states. It is common for clients across that entire region to retain Colorado attorneys when they have complex matters or complicated disputes that would benefit from specialized legal services, but do not wish to retain an attorney from one of the even larger legal markets on the East and West Coasts and pay coastal rates.

10. I am also familiar with the billing rates charged by expert attorneys who practice constitutional law at the trial and appellate levels. As part of our American Indian Law Practice Group at GT Law, for instance, I have co-authored dozens of *amicus curiae* briefs for the United States Supreme Court and various federal courts of appeals. We often coordinate in these representations (on behalf of one or more Indian tribes) with many other regional and national law firms specializing in federal litigation that has national legal and public policy implications.

11. When this case was filed on December 18, 2016, Plaintiffs were represented by L. Martin Nussbaum and Ian Speir of Lewis Roca Rothgerber Christie LLP ("Lewis Roca"), with assistance from more junior attorneys. Mr. Nussbaum and Mr. Speir subsequently left Lewis Roca and created Nussbaum Gleason, a boutique law firm that specializes in representing religious institutions and other non-profit organizations in constitutional matters, commercial litigation, and issues related to real estate, entity structure and governance, employment, and intellectual property. This matter accompanied Nussbaum and Speir to their new firm.

12. I am familiar with Nussbaum Gleason, and with the practice group at Lewis Roca that preceded it. It has extensive experience and expertise relevant to this litigation and is a reasonable choice to handle this matter. Many if not most attorneys of comparable experience and reputation in this field are located in Washington, DC and charge rates higher than those charged by Nussbaum Gleason. The matter is of sufficient complexity and importance that it required the services of a substantial firm. Furthermore, the subject matter is highly controversial, and in my experience most major national and international firms tend to be increasingly reluctant to undertake the matter and prosecute it with the necessary vigor.

13. Although the firm is headquartered in Colorado Springs, Colorado, it is a sophisticated firm with a nationwide practice and is best understood as part of the greater Colorado Front Range legal market, not as a local Colorado Springs firm.

14. The stakes of the litigation were very high for the members of the Catholic Benefits Association, who were facing the prospect of choosing between their ability to participate in federal programs that were, in many cases, their primary source of revenue and performing medical

procedures that their religion teaches are gravely immoral. *See* Nondiscrimination in Health Programs and Activities, Fed. Reg. 47,824. This was quite literally "bet the hospital" litigation in my estimation.

15. Although they did not ultimately prevail on every point, Nussbaum Gleason achieved an excellent outcome for its clients. First, they successfully established standing in the District of North Dakota, which had favorable precedent from earlier case that raised similar issues, and obtained an emergency stay of the regulation. Both the District Court and the United States Court of Appeals for the Eighth Circuit ruled in their favor, *Religious Sisters of Mercy v. Azar*, 513 F.Supp.3d 1113 (D. N.D. 2021) and *Religious Sisters of Mercy v. Becerrra*, 55 F.4th 583 (8th Cir. 2022).

16. The litigation was complex. The original complaint was 73 pages, 391 averments, 6 exhibits, and 15 separate causes of action. (Case no. 3:16-cv-00432).

17. It was also greatly complicated by the evolving regulatory environment. On June 6, 2019, the U.S. Department of Health and Human Services issued a notice of proposed rulemaking that promised to correct many of the issues with the previous rule, and which became final on June 19, 2020. Nondiscrimination in Health and Health Education Programs or Activities, Delegation of Authority, 85 Fed. Reg. 37,160. This rule became the target of a new wave of litigation, which had to be closely monitored for its potential to influence the above-captioned case. This rule was then subsequently rescinded and replaced by the Biden Administration.

18. In my experience, regulatory developments and related litigation require significant resources to monitor and can greatly complicate and delay the progress of litigation.

19. Ultimately, the case was a complete victory for all the named Plaintiffs. *Religious Sisters of Mercy v. Becerrra*, 55 F.4th 583 (8th Cir. 2022).

20. The only issue where Plaintiffs did not prevail was organizational standing, a jurisdictional defect that will likely prove curable. The dismissal of those particular plaintiffs was without prejudice.

21. This was an excellent result for Nussbaum Gleason's clients. Even the unnamed members of the Catholic Benefits Association that did not ultimately establish standing obtained a five-year reprieve from a rule that could have substantially burdened their ability to operate. They also obtained a favorable and likely controlling precedent on the merits that should inure to their benefit in a subsequent lawsuit recently filed on their behalf.

22. I have reviewed the billing records that have been prepared by Nussbaum Gleason and Lewis Roca and find them to be very reasonable. They are appropriate to the complexity of the litigation and its importance.

23. I have also reviewed the rates and find them reasonable for the Front Range legal market, for matters of this nature and scope.

24. In considering the reasonableness of these rates I looked to my own experience in private and public law practice, along with decisions from the District of Colorado regarding reasonable attorney rates and the rates commonly charged by our firm.

25. Courts seeking to establish reasonable rates in the Front Range market have historically relied on a survey that was conducted by the National Law Journal in 2010, at which time Denver law firms were billing between $285-$810/hr. for partners and between $170-$540/hr. for associates. *See Miller v. Bahakel Commc'ns*, Civil Action 20-cv-0791-WJM-KMT, at *4 (D. Colo. May 9, 2022); *Biax v. Nvidia*, 2013 WL 4051908 (D. Colo. 2013). Rates have risen considerably in the decade since that survey was conducted.

26. In support of the rates in *Miller v. Bahakel*, a partner at the Denver law firm Wheeler Trigg O'Donnell, which maintains a high-profile regional and national law practice in addition to practicing in Colorado, submitted an expert report stating that in 2020, his firm charged standard hourly rates ranging from $455 to $850 /hr for partners, rising to $475 and $885 in 2021. Declaration of Edward Stewart in Support of Bahakel's Motion for Sanctions, *Miller v. Bahakel Commc'ns*, Civil Action 20-cv-0791-WJM-KMT, Dkt. 42-1 at ¶ 7, attached to this Declaration as an Exhibit. He also attested that they charged between $415 to $430 for associates with approximately five years of experience. *Id*. at ¶ 8. "The Court agrees with Mr. Stewart's analysis." *Miller*, supra, at *4.

27. As a longtime GT Law Shareholder, I am familiar with the process by which our law firm sets rates. It does so in part by using survey data from PricewaterhouseCoopers, broken down by market and practice group, when available, and then adjusted based on our own market experience. Shareholders at GT Law are responsible for setting their own rates within these market parameters. In 2023, for example, my standard hourly rate is $935 per hour, set to rise to $1,015/hour this January 1st. My practice with new clients is to discount these rates by 10 percent.

28. While GT Law's rates for all our attorneys are not public information, I can say that my own hourly rate is consistent with that of most other shareholders of my years of practice experience in our Denver office, who charge between $800 and $1,600 per hour depending on their particular area of specialized law practice. Senior associates in our firm's office in Denver typically charge between $550 and $850 per hour.

29. In conclusion, based on my knowledge and experience litigating cases in Colorado and nationwide, my familiarity with the hourly rates charged by firms in these legal markets, the qualifications of the Nussbaum Gleasom attorneys involved in this litigation, the nature and complexity of this litigation, and the success obtained for the client, it is my opinion that the Nussbaum Gleason's requested rates are reasonable.

     I declare under penalty of perjury under the laws of the United States of America and of this Court that the foregoing is true and correct.

Dated: November 28, 2023   _/s/ Tom A. Eid_____